# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION (AERA), 1430 K Street NW, Suite 1200, Washington, DC 20005, <br><br> and <br><br> SOCIETY FOR RESEARCH ON EDUCATIONAL EFFECTIVENESS (SREE), 6003 Executive Blvd. Rockville, MD 20852, <br><br>      *Plaintiffs*, <br><br>      v <br><br> U.S. DEPARTMENT OF EDUCATION, 400 Maryland Ave SW Washington, D.C. 20202, <br><br> INSTITUTE OF EDUCATION SCIENCES,   400 Maryland Ave SW Washington, D.C. 20202, <br><br> LINDA MCMAHON, Secretary of Education,   in her official capacity, 400 Maryland Ave SW Washington, D.C. 20202, <br><br> and <br><br> MATTHEW SOLDNER, Acting Director of   Institute of Education Sciences, in his   official capacity, 400 Maryland Ave SW Washington, D.C. 20202 <br><br>      *Defendants*. | Case No. 25-cv-1230 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*"Learning is not attained by chance, it must be sought for with
ardor and diligence." – Abigail Adams*

Plaintiffs American Educational Research Association and Society for Research on Educational Effectiveness allege as follows:

1.      Since its founding, the United States has steadily worked to expand educational opportunities to all. Leaders of our country have understood that our success is dependent on an educated society—one that can solve difficult problems, rise to the challenges that present themselves, and serve as an engine to drive innovation and our collective prosperity.

2.      Critical to those efforts are the teachers, professors, and schools that educate our students. But behind them stands another group equally committed to ensuring that students in our country are able to learn, grow, and ultimately thrive as members of a democratic society. These are the researchers who provide rigorous, scientific findings to support schools and educators, leaders, and policymakers in their efforts to determine *what* and *how* to teach effectively.

3.      Education researchers dedicate their careers to determining what works—what serves students, teachers, and faculty, and what does not. Their work ensures that it is not the independent task of each teacher, professor, school, or college to find the evidence needed to determine the most effective way to track student growth, or to present information in an age-appropriate way. Instead, their work serves as a data-anchored foundation, upon which our nation's educational endeavors at every level rely, to ensure our country's students have available to them the most effective and evidence-based educational tools in the world.

4.      Our country has recognized that such efforts are critical. Much like the creation of the National Institutes of Health for medical research, or the Defense Advanced Research Projects Agency ("DARPA") at the Department of Defense, Congress recognized that the federal

government needed research to determine how to achieve better educational outcomes to ensure U.S. competitiveness over time and to support the educational responsibilities of states.

5.    Comprehensive research and data collection concerning the progress of education in our country, and effective strategies to address existing challenges, is a vital public good that cannot be effectively or affordably provided by schools, and higher education institutions, or even states in a scattered manner. A comprehensive national effort is required, with a broad range of inputs, for such an important and complex challenge.

6.    Our elected leaders have recognized the importance of this public good for decades. In the 1970s, Congress created the National Institute of Education. It later evolved into the Office of Educational Research and Improvement, and finally it transformed into the Institute of Education Sciences ("IES" or the "Institute") after Congress passed the Education Sciences Reform Act.

7.    For more than a half-century, Congress has instructed the Department of Education, and its predecessors before that, to invest in research and to collect, analyze, and disseminate data to ensure that children, youth, and students pursuing higher education are getting the quality instruction and support they need, and our country is getting the returns it needs on its educational investments.

8.    Congress has made clear that it did not authorize this investment in the collection and analysis of data simply for the sake of the Department of Education. Congress included in IES's statutory functions that it should "widely disseminate the findings and results of scientifically valid research in education" and "promote the use, development, and application of knowledge gained from scientifically valid research activities." 20 U.S.C. § 9512.

9.    Congress has not changed its course. It has consistently and continuously

3

appropriated funds for such efforts.

10.     Indeed, since the pandemic's disruptions, our education system has faced unprecedented challenges, including the erosion of the progress made in raising student achievement over the last two decades. We only know the extent of these challenges because of IES's data and research, and the additional research and analysis it has enabled.

11.     That dissemination is key to understanding the purpose and strength of IES. IES's statutory mission requires the dissemination of "scientifically valid" data and research to researchers and policymakers, among others. *Id*. Multiple provisions within IES's authorizing statute require dissemination of data and research to researchers. *See, e.g.*, *id.* §§ 9512, 9533, 9543, 9564. The statutory definition of dissemination itself specifically includes researchers. *Id.* § 9501(10).

12.     Plaintiffs represent those researchers. Plaintiffs' members have relied on IES data, research, and other products since its creation, using it to further advance knowledge about education and solve pressing challenges in education.

13.     But in the last two months, Defendants have taken dramatic, unreasoned, and unlawful actions to make it impossible for IES to carry out the vital functions assigned to it by Congress: to collect and analyze high quality data about our students' progress, to conduct rigorous education research to identify challenges and find solutions, and to disseminate this information to the researchers, educators, policymakers, and the public that depend on it.

14.     Without IES, Plaintiffs and their members stand to lose the ability to meaningfully carry out their public service mission of serving our nation's students by conducting impartial, high-quality data analysis, research, and evaluations to overcome challenges within our education

system. And our nation will be unable to assess or understand whether our next generation is succeeding or what educational approaches will afford them a brighter future.

15.     Defendants have eviscerated this crucial agency through, *first*, a thoughtless and sweeping cancellation of contracts carrying out intensive studies and supporting data collection and dissemination (collective, the "Research Termination Action"), and *second*, a mass termination of nearly 90 percent of IES staff (the "IES Staff Termination Action").

16.     On February 10, 2025, a Department of Government Efficiency ("DOGE") staffer delivered a list of 89 IES contracts to be cancelled, worth nearly $900 million, to the Department of Education (the "Department"), where IES is housed. IES followed suit and cancelled all those contracts the same day. Days later, on February 13, 2025, the Department abruptly cancelled the contracts for all 10 IES Regional Educational Laboratories ("RELs")—critical components of IES's research and dissemination functions required by statute—without offering any meaningful reasoning.

17.     The impact on the education research community was immediate and devastating.

18.     The researchers who rely on IES data and studies were left in the lurch, not knowing how they could continue their critical work without the data and studies on which their science has relied for years. Researchers who rely on high-quality IES data and studies to form the foundation of their own research designs quickly learned their planned research would be impossible. Evaluators and professors who rely on the IES research and dissemination resources knew that their work would be harmed with no plausible substitute. And researchers and graduate students learned that IES would not be able to effectively operate its system for granting and approving access to vital "restricted" data, harming or destroying their ability to complete research they had already begun and making impossible untold research in the future.

19.     Studies that had been ongoing for years—including several that were parts of decades-long longitudinal studies—were immediately stopped. Some of these research inquiries were nearly complete after the expenditure of tens of millions of dollars in federal funds. After years of investment, all that remained was final data analysis and publication. Yet the abrupt termination means such results will never be shared with the public that paid for that work.

20.     No reasons were given for this mass cancellation of contracts—which are the primary mechanism through which IES, and its renowned federal statistical agency, the National Center for Education Statistics ("NCES"), carry out their congressionally-mandated functions.

21.     IES and its components, including NCES, are funded by Congress to have a small staff of federal employees and to carry out their education research mandates through contractors.

22.     A large share of IES contracts have now been cancelled, and IES and its components have been rendered incapable of carrying out their required duties: to collect and analyze data, conduct rigorous research, and disseminate findings and research-based practice strategies concerning various facets of the condition and progress of education in the United States.

23.     DOGE has made clear that these mass cancellations are *not* mere management of which entities will use appropriated funds to conduct required research. Instead, DOGE characterizes these cancellations as having generated "savings," making clear that Defendants do not intend to use the funds to conduct required research activities with other contractors or entities.[1]

24.     This snap decision to terminate the ability of IES to do the work necessary to carry out its required duties, was patently unreasoned, arbitrary and capricious, and contrary to the laws Congress has enacted.

---

[1] Dep't of Gov. Efficiency, *Savings*, https://www.doge.gov/savings [https://perma.cc/K9GZ-8BUR].

25.     Although a Department spokesperson initially vaguely represented that some of the cancelled contracts might be rebid, the Department has not taken meaningful action to rebid or reinstate the contracts necessary to carry out IES's statutorily required and Congressionally-funded functions.[2] The Department could have also chosen to bring some of that work in-house. It took no steps to do so.

26.     Instead, on March 11, 2025, Defendants announced a mass reduction in force ("RIF"), erasing any doubt about their intentions not to reinstate or rebid the cancelled contracts or to take any other actions to ensure IES and components carry out their statutorily required functions. No office or program of the Department was gutted more fully than IES and its subcomponents. Roughly *90 percent* of IES's already slim staff was placed on leave and is due for final termination.[3] Only about 20 staff remain at IES and its 4 major component agencies, and, on information and belief, only 3 staff remain at NCES, one of the nation's oldest statistical agencies.[4]

27.     Defendants offered no reasoned basis for this decision. Nor could they. Instead, Defendants' action to deprive IES of the staff necessary to function flowed from a clear intention to eviscerate IES's operations. Defendant McMahon admitted that the Department's RIFs were intended to be a first step toward a "final mission" to shut down the Department.[5]

28.     Days later, on March 14, 2025, Congress passed a continuing resolution that continued to fund IES's activities and staff at the full level received the previous fiscal year—

---

[2] Laura Meckler and Hannah Natanson, *DOGE rips through Education Department, cutting contracts, staff and grants,* Wash. Post (Feb. 14, 2025), https://www.washingtonpost.com/education/2025/02/13/doge-education-department-cuts/ [https://perma.cc/4KDD-2PA3]. As acknowledged below, Defendants appear to have engaged in a handful of limited reinstatements, but the vast majority of contracts remain cancelled.
[3] Jill Barshay, *Chaos and confusion as the statistics arm of the Education Department is reduced to a skeletal staff of 3*, Hechinger Rep. (Mar. 14, 2025), https://hechingerreport.org/proof-points-chaos-confusion-statistics-education/ [https://perma.cc/5RLR-5TZ4].
[4] *Id.*
[5] Dep't of Educ., *Secretary McMahon: Our Department's Final Mission* (Mar. 3, 2025), https://www.ed.gov/about/news/speech/secretary-mcmahon-our-departments-final-mission [https://perma.cc/F7BT-MQ3D].

nearly $800 million. But Defendants did not take action to restore IES's capacity to carry out its required functions. The vast majority of contract cancellations and termination decisions remained in place.

29.    Even after Congress's clear direction to continue IES's functions just days earlier, on March 20, 2025, President Trump confirmed that Defendants intended to keep IES from functioning as he issued an Executive Order seeking "closure" of the entirety of the Department and making clear that Defendants' actions were in service not of efficiency, but of evisceration.[6]

30.    Ironically, in the very order that confirmed the Department's intent to permanently destroy IES, the President cited *IES data* at length to justify the closure of the Department.

31.    In citing National Assessment of Educational Progress ("NAEP") test scores to argue that the Department's approach has not been sufficiently successful, the President missed the point that IES not only identified the rollback in progress, but also highlighted the complex issues contributing to it and is crucial to reversing the trend.

32.    Congress directed IES to "strengthen the national capacity to conduct, develop, and widely disseminate scientifically valid research in education." 20 U.S.C. § 9512. The steps taken by the Defendants to decimate the Institute, through the mass cancellation of contracts and termination of staff, do anything but.

33.    Defendants have determined in an arbitrary, capricious, and unlawful manner to simply not carry out IES's required functions, depriving Plaintiffs—and the nation—of the core research, statistics, and other data used to assess our students' progress and identify policies and practices that can lead to improvements and a better future.

---

[6] *Improving Education Outcomes by Empowering Parents, States, and Communities,* Exec. Order No. 14242 (Mar. 20, 2025), 90 Fed. Reg. 13679 (Mar. 25, 2025), *available at* https://www.whitehouse.gov/presidential-actions/2025/03/improving-education-outcomes-by-empowering-parents-states-and-communities/ [https://perma.cc/T8KY-BU96].

## PARTIES

34.    Plaintiff American Educational Research Association ("AERA"), is a leading national research society, founded in 1916, concerned with improving the educational process by encouraging scholarly inquiry related to education and evaluation and by promoting the dissemination and practical application of research results. AERA has approximately 25,000 members, including professional researchers, graduate students, and postdoctoral fellows working in higher education, research organizations, schools and educational agencies, other educational institutions or settings, foundations, nonprofit organizations, and companies in just about every state and district in the United States. Also, AERA includes institutional memberships under the designation the Consortium of University and Research Institutions, represented by deans of schools of education and leaders of other education research organizations. AERA publishes seven leading peer reviewed journals and holds an Annual scientific conference of well over 14,000 participants that drive future research in the field and inform policy and practice. AERA is headquartered and incorporated in Washington, DC.

35.    Plaintiff Society for Research on Educational Effectiveness ("SREE"), is an interdisciplinary professional association dedicated to advancing the generation and use of effectiveness research to solve pressing challenges in education. SREE has approximately 925 individual, student, and institutional members who are researchers, practitioners, policymakers, and students with an interest in advancing education research to address challenges in education. SREE advocates for the development and use of rigorous research methods, convenes educators, researchers, and policymakers to share solutions, and supports its members in their efforts through meetings, workshops, professional development, and publications. SREE is headquartered in Rockville, Maryland, and incorporated in Illinois.

9

36.     Defendant U.S. Department of Education is a federal department that serves the federal agency responsible, by law, for increasing accountability of federal education programs, and for promoting improvements in the quality of education through federally supported research, evaluation, and sharing of information. 20 U.S.C. § 3402.

37.     Defendant IES is a federal agency, and component of the Department, established to provide national leadership in expanding fundamental knowledge and understanding of education by providing information about the condition and progress of education in the United States and the effectiveness of education programs. 20 U.S.C. § 9511.

38.     Defendant Linda McMahon is the Secretary of Education. She is sued in her official capacity.

39.     Defendant Matthew Soldner is the Acting Director of IES. He is sued in his official capacity.

## JURISDICTION AND VENUE

40.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 *et. seq.*, and the Administrative Procedure Act, 5. U.S.C. § 701, *et seq*.

41.     Venue is proper in the District of Maryland pursuant to both 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiff SREE is a resident of this district.

## LEGAL FRAMEWORK

### *The Administrative Procedure Act*

42.     Under the Administrative Procedure Act (APA), a court shall "hold unlawful and set aside agency action … found to be arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law." 5 U.S.C. § 706(2)(A). The APA likewise requires a court to hold unlawful agency actions that are "in excess of statutory jurisdiction, authority, or limitations." *Id.* § 706(2)(B).

### *The Education Sciences Reform Act*

43.    The Education Science Reform Act ("ESRA") of 2002 created the Institute for Education Sciences ("IES"), to coordinate existing and new component centers for education data and research, including:

    a.   The National Center for Education Statistics ("NCES"), a federal statistical agency that is more than 150 years-old, thus predating IES, and is charged with numerous statistical and other data collection and analysis functions,

    b.   The National Center for Education Research ("NCER") and the National Center for Special Education Research ("NCSER"), components that fund and manage rigorous education research projects, and

    c.   The National Center for Education Evaluation and Regional Assistance ("NCEE"), a component that funds and operates critical dissemination functions for education research findings, including the What Works Clearinghouse, Regional Education Laboratories, and the Education Resource Information Center.

44.    Under ESRA, IES exists to conduct education research, disseminate findings, and promote the use and application of research findings in the classroom, which may be carried out through grants, contracts, or cooperative agreements. 20 U.S.C. § 9512.

45.    ESRA requires the Director of IES to enter contracts to establish Regional Education Laboratories ("RELs") to serve the needs of each of the 10 geographic regions of the United States established by the Educational Research, Development, Dissemination, and

Improvement Act of 1994. ESRA specifies activities to be carried out through those contracts to support education research and the practical implementation of knowledge gained through such research through dissemination and the provision of technical assistance. *Id*. § 9564.

46.    ESRA directs IES to submit an annual report "on the condition and progress of education in the United States" to the President and appropriate congressional committees no later than June 1 of each calendar year. 20 U.S.C. § 9545(b).

47.    ESRA requires that NCES, an IES component, "shall collect, report, analyze, and disseminate statistical data related to education." *Id.* § 9543(a).

48.    ESRA enumerates numerous specific topical areas and activities included in this requirement for NCES' collection, analysis, and dissemination of education data, including:

a.    "full and complete statistics" on the "condition and progress of education" at each level from preschool through adult education. *Id.* § 9543(a)(1).

b.    "data on educational activities and student achievement . . . in the United States compared with foreign nations." *Id*. § 9543(a)(6).

c.    "longitudinal and special data collections necessary to report on the condition and progress of education." *Id.* § 9543(a)(7).

d.    "data on financial aid to postsecondary students." *Id.* § 9543(a)(1)(E).

e.    "the incidence, frequency, seriousness, and nature of violence affecting students" and related individuals "as well as other indices of school safety" enumerated by the statute. *Id.* § 9543(a)(1)(H).

49.    ESRA established the NCER and requires it to carry out research on successful education reform strategies and to "synthesize and disseminate" the finds of its research. *Id.* §§ 9351, 9353.

50.     ESRA authorizes IES, through the NCEE, to conduct evaluations of Title I and other federally supported education programs. *Id*. § 9563.

51.     ESRA's authorization of appropriations has been consistently extended through appropriations Acts, including, just weeks ago, the Congressional continuing resolution that continued the provisions of the Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 693 (Mar. 23, 2024), and the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, 139 Stat. 9 (Mar. 15, 2025).

### The National Assessment of Educational Progress Authorization Act

52.     The National Assessment of Educational Progress Authorization Act ("NAEPA") requires IES, through NCES, to ensure that National Assessment of Educational Progress ("NAEP") data concerning student achievement are "made available on a timely basis following official reporting, in a manner that facilitates further analysis." 20 U.S.C. § 9622(b)(2)(H).

### The Higher Education Opportunity Act of 2008

53.     The Higher Education Opportunity Act ("HEOA") of 2008 requires NCES to collect and analyze data about higher education spending and costs, as well as financial aid and student debt. *Id*. §§ 1015, 1015a.

### The Individuals with Disabilities Education Act, as Amended

54.     The Individuals with Disabilities Education Act, as amended in 2004, assigns to IES a broad range of research, evaluation, assessment, and dissemination responsibilities regarding students with disabilities. *Id*. § 1464. The Act requires that the Secretary delegate these research and data functions to IES and provides that IES carry out "objective studies, evaluations, and assessments" regarding numerous aspects of education for students with disabilities, including educational and transitional services. *Id*.

13

*Appropriations*

55.     Congress enacted the Further Consolidated Appropriations Act, 2024, providing

$793.1 million in funds for "necessary expense for the Institute of Education Sciences" to

"remain available through September 30, 2025." Pub. L. 118-47, 138 Stat. 693 (Mar. 23, 2024).

The congressional explanatory statement accompanying the Act directed IES through its

component NCES to not only continue, but to intensify, data collection for the National

Postsecondary Student Aid Study ("NPSAS"). The statement also provided that $121.5 million

of the IES appropriation was provided for "Statistics," $53.733 million was provided for

"Regional Education Laboratories," $64.255 million was provided for research in "Special

Education," $13.318 million was provided for "Special Education Studies and Evaluations," and

$245 million for "Research, Development and Dissemination."[7] This appropriation was extended

by continuing resolution on March 15, 2025. Full-Year Continuing Appropriations and

Extensions Act, 2025, Pub. L. 119-4, 139 Stat. 9 (Mar. 15, 2025).

## ALLEGATIONS

### *IES Structure and Work*

56.     The Education Sciences Reform Act of 2002 mandated the establishment of the IES

within the Department of Education.

57.     IES is a nonpartisan science agency that publishes reports and studies that, by law,

"undergo rigorous, independent peer review."[8]

---

[7] Joint Explanatory Statement for the Labor, Health and Human Services, Education, and Related Agencies Appropriations Act, 2024, https://docs.house.gov/billsthisweek/20240318/Division%20D%20LHHS.pdf [https://perma.cc/J929-JJKW] ("LHHS Joint Explanatory Statement, 2024").

[8] Grover J. (Russ) Whitehurst, *The Institute of Education Sciences: A Model for Federal Research Offices*, 678 Annals of the Am. Acad. of Pol. and Soc. Sci. 124 (July 2018), https://www.jstor.org/stable/26582345 [https://perma.cc/9XAC-M7CQ].

58.     IES serves to "help people and lawmakers create informed education practices and policies by providing access to high-quality research, data, statistics, and evaluations."[9] In addition to collecting and analyzing data from existing education programs, IES also funds the provision of education services through research programs that are designed to produce scientifically rigorous results relevant to inform effective education practice.[10]

59.     IES has historically employed relatively few full-time employees. Many of IES's vital functions are thus carried out through contracted services.[11] IES depends on contractors not only for research program design and execution, but also for data collection, analysis, and dissemination.

60.     These contracted projects are overseen by IES employees, who also enable coordination of many of the contracts that, working together, carry out the Institute's statutory mission to "provide national leadership in expanding fundamental knowledge and understanding of education." 20 U.S.C. § 9511.

61.     Before recent efforts to dismantle the Institute, IES consisted of four centers: NCES, NCER, NCEE, and NCSER.[12] Each was statutorily created.

62.     The most prominent is NCES, which was established in its first form in 1867.[13] NCES is one of the federal government's 13 principal statistical agencies that produce official

---

[9] IES, *Fund Education Sciences*, https://ies.ed.gov/what-we-do/ed-sciences [https://perma.cc/XZF6-LKJH].
[10] *Id.*
[11] Stuart Buck, *Inexplicable Cuts at the Dept. of Education*, The Good Science Project (Feb. 13, 2025), https://goodscience.substack.com/p/inexplicable-cuts-at-the-dept-of?r=4lx6g&triedRedirect=true [https://perma.cc/4FJZ-FCB6]; Meckler and Natanson, *DOGE rips through Education Department* [https://perma.cc/4KDD-2PA3]; Education Sciences Reform Act of 2002, Pub. L. 107–279, § 112, 116 Stat. 1941, 1945 (2002), https://ies.ed.gov/ies/2025/01/education-sciences-reform-act-2002-0 [https://perma.cc/B9HQ-5RGA]; Cong. Rsch. Serv., R47481, The Education Sciences Reform Act (ESRA): A Primer (Mar. 20, 2023), https://www.congress.gov/crs_external_products/R/PDF/R47481/R47481.2.pdf [https://perma.cc/HMT3-ZCZ8].
[12] IES, *Institute of Education Sciences (IES) Organizational Chart*, https://ies.ed.gov/ies/2025/01/org-chart-pdf [https://perma.cc/7Q9B-N8LC].
[13] IES, https://ies.ed.gov/# [https://perma.cc/26PZ-G6EV].

statistics and statistical work that is foundational to the other IES Centers' work.[14] NCES, along with its related statistical agencies, plays a vital role in providing "relevant, timely, accurate, and trustworthy government statistics," to inform the public, policymakers, and researchers.[15]

63. NCES is responsible for surveying and producing data on the "condition of education" and how it changes over time. NCES and its predecessor organizations have carried out such evidence and data collection and analysis roles for more than 150 years.[16] Without NCES's key surveys, compilations, and analyses, it will be impossible to track progress, assess learning, identify gaps affecting students, and set priorities for attention over time and across the country. These include:

a. The compilation, analysis, and dissemination of Common Core of Data ("CCD") and NAEP results, which are the most widely used indicators for educational progress and attainment in American education.

b. The "High School & Beyond Longitudinal Studies," an ongoing, nationally representative longitudinal study commenced in 1980 studying the long-term educational and career outcomes of students in the American educational system.[17]

c. The "Early Childhood Longitudinal Studies (ECLS) Program," which has tracked educational experiences of cohorts of young children for more than 20 years.[18]

---

[14] Obama White House Archives, *Principal Statistical Agencies and Recognized Units*, https://obamawhitehouse.archives.gov/omb/inforeg_statpolicy/bb-principal-statistical-agencies-recognized-units [https://perma.cc/RGE3-KSCV].
[15] Nat'l Acads. of Scis., Eng'g, & Med., *8th Edition of Principles and Practices for a Federal Statistical Agency*, https://www.nationalacademies.org/our-work/8th-edition-of-principles-and-practices-for-a-federal-statistical-agency [https://perma.cc/R9PY-V8BX].
[16] Bureau of Educ., *Report of the Comm'r of Educ., Made to the Sec'y of the Interior* (Oct. 27, 1870), *available at* https://archive.org/details/reportofcommissi00unit_6/page/n5/mode/2up [https://perma.cc/68BY-UB4M].
[17] NCES, *High School & Beyond: Longitudinal Studies*, https://nces.ed.gov/surveys/hsb/ [https://perma.cc/8MSJ-8TZD].
[18] NCES, *Early Childhood Longitudinal Studies (ECLS) Program*, https://nces.ed.gov/ecls/ [https://perma.cc/9PGW-366G].

    d.   The "Trends in International Mathematics and Science Study (TIMSS)" which is an international comparative study conducted every 4 years for the last 30 years to compare U.S. students to those around the world.[19]

    e.   The "School Survey on Safety and Crime," which is the primary source of school-level data on crime and safety for the Department and surveys 4,800 U.S. public schools.[20]

64.    The information collected in these (and other) NCES surveys is critical to understanding our nation's educational performance, evolving trends and needs over time. It tells us what allows students to succeed *after* education, and what accounts for variations across districts and states. It measures our comparative performance with other nations to ensure the competitiveness of our students and country in the global economy. These surveys and studies inform researchers, educational leaders, and policymakers over and over again.

65.    Moreover, NCES data provides the foundation of the education research conducted with IES funding *and* more broadly serves as a backbone resource for scholarly research, public understanding, and commercial purposes.

66.    IES's other components also provide critical research resources and functions for disseminating IES research findings. For example, NCEE provides:

    a.   The What Works Clearinghouse, which is a critical set of resources that offer researchers and educators data and evidence on education programs, practices, and policies to determine what approaches may be most effective and most critical to

---

[19] NCES, *Trends in International Mathematics and Science Study (TIMSS)*,
https://nces.ed.gov/timss/results23/index.asp#/math/intlcompare, [https://perma.cc/74HJ-MLE2].
[20] NCES, *School Survey on Crime and Safety (SSOCS)*, https://nces.ed.gov/surveys/ssocs/ [https://perma.cc/3PNW-SYHC].

elevate and continue, and, conversely, what approaches are not effective. It would not be possible to develop many of these resources absent NCES data.

    b.   The Regional Educational Laboratories, which are ten labs across the country that put research into practice, and that are "required by law to address the evidence-related needs identified by state and local partners."[21] RELs provide free services and resources to states, localities, and school districts, like research, training, coaching, and technical support to ensure they "get more bang for [their] buck."[22]

67.    NCEE also conducts evaluations that determine the efficacy of education programs supported by federal funding. Among those that were cancelled, without notice or explanation, were a study evaluating violence reduction strategies in schools;[23] a study evaluating ways to address the shortage of skilled workers in critical industries like health care;[24] a study to evaluate the most effective "catch-up strategies" for students struggling in math;[25] and a study to evaluate how financial aid requirements impact a student's ability to succeed.[26]

68.    Beyond the individual Center-specific studies that IES conducts through contracts, there are many contracts that span across IES and support the other critical work. For example,

---

[22] AASA, The Sch. Superintendents Ass'n, *GUEST BLOG: USED's Regional Educational Lab Program: Using Evidence to Maximize your Investments* (Feb. 11, 2025), https://www.aasa.org/resources/blog/guest-blog-used-s-regional-educational-lab-program-using-evidence-to-maximize-your-investments [https://perma.cc/B8LD-AV5V]; IES, *The Regional Educational Laboratory (REL) Program*, https://ies.ed.gov/use-work/regional-educational-laboratories-rel [https://perma.cc/K9U5-PSDQ].

[23] IES, Evaluations, *Evaluation of Grant Programs to Increase School-Based Mental Health Services*, https://ies.ed.gov/use-work/evaluations/evaluation-grant-programs-increase-school-based-mental-health-services [https://perma.cc/5G4N-D5P3].

[24] IES, Evaluations, *Study of Perkins V Accountability Changes: Defining Career and Technical Education (CTE) Concentrators*, https://ies.ed.gov/use-work/evaluations/study-perkins-v-accountability-changes-defining-career-and-technical-education-cte-concentrators [https://perma.cc/E3YW-3YWL].

[25] IES, Evaluations, *Study of Strategies to Address Unfinished Learning in Math*, https://ies.ed.gov/use-work/evaluations/study-strategies-address-unfinished-learning-math [https://perma.cc/7ERE-QVFN].

[26] IES, Evaluations, *Understanding How Colleges Implement Satisfactory Academic Progress Requirements and Their Implications for Federal Financial Aid*, https://ies.ed.gov/use-work/evaluations/understanding-how-colleges-implement-satisfactory-academic-progress-requirements-and-their [https://perma.cc/4F53-7PJK].

there are contracts that support data sharing[27] and dissemination,[28] technical assistance and administrative support,[29] and communications and modernization.[30] In other words, many of the contracts make required research and evaluation possible.

69.     Another critical aspect of IES's work is providing access to important data it has collected to researchers and other experts who can use it in their research, including federally funded research, to further understanding of our education system. This function is operationalized through restricted-data licenses issued to researchers. By law, IES is required to make broad swaths of its data and research publicly available. 20 U.S.C. § 9574. But some of the most scientifically valuable IES data contains individually identifiable information, which can only be made accessible by license to qualified organizations, such as universities and research institutions

---

[27] USASpending.Gov, IES to Quality Info. Partners (991990024F0387),
https://www.usaspending.gov/award/CONT_AWD_91990024F0387_9100_91990023D0041_9100
[https://perma.cc/K7MG-QFS5?type=image].
[28] USASpending.Gov, Dep't of Educ. to Manhattan Strategy Grp. (91990024F0373),
https://www.usaspending.gov/award/CONT_AWD_91990024F0373_9100_91990023D0029_9100
[https://perma.cc/UKC8-5GH5], USASpending.Gov, Dep't to Educ. to Manhattan Strategy Grp. (91990024F0345),
https://www.usaspending.gov/award/CONT_AWD_91990024F0345_9100_91990023D0029_9100
[https://perma.cc/QP6V-TYAF]; USASpending.Gov, IES to Mathematica (91990024F0316),
https://www.usaspending.gov/award/CONT_AWD_91990024F0316_9100_91990023A0001_9100
[https://perma.cc/24CR-V8EU?type=image], USASpending.Gov, IES to Rsch. Tri. Inst. (91990024F0347),
https://www.usaspending.gov/award/CONT_AWD_91990024F0347_9100_91990023D0042_9100
[https://perma.cc/78UF-RECY?type=image].
[29] USASpending.Gov, IES to Am. Inst. for Rsch. in Behavioral Scis. (91990018C0046),
https://www.usaspending.gov/award/CONT_AWD_91990022F0350_9100_91990020A0014_9100
[https://perma.cc/RSS9-HCF8?type=image]; USASpending.Gov, IES to Activate Rsch. (91990022F0006),
https://www.usaspending.gov/award/CONT_AWD_91990022F0006_9100_GS00F428GA_4732
[https://perma.cc/8S23-HTA2?type=image], USASpending.Gov, Dep't to Educ. to Am. Inst. for Rsch. in Behavioral
Scis. (91990024F0301),
https://www.usaspending.gov/award/CONT_AWD_91990024F0301_9100_91990023D0006_9100
[https://perma.cc/77WN-9JK9?type=image]; USASpending.Gov, IES to Synergy Enters. (91990020F0309),
https://www.usaspending.gov/award/CONT_AWD_91990020F0309_9100_EDESE15A0015_9100
[https://perma.cc/VN7D-3GZU?type=image]. Note that the contract for mailing services was publicized by DOGE.
This critical service supports the ability of IES to mail hundreds of thousands of pieces of mail on an annual basis to
and from survey respondents, schools, districts, and families.
[30] USASpending.Gov, IES to Accenture Fed. Servs. (91990024F0376),
https://www.usaspending.gov/award/CONT_AWD_91990024F0376_9100_91990023D0003_9100
[https://perma.cc/FS52-UMEG?type=image], USASpending.Gov, IES to Grant Thornton LLP (91990025F0013),
https://www.usaspending.gov/award/CONT_AWD_91990025F0013_9100_91990020A0002_9100
[https://perma.cc/2WNF-Q88H?type=image].

because IES is required to protect such information even as it carries out its obligation to make data available. 20 U.S.C. § 9573.

70.    These licenses make the scientific work of researchers and graduate students possible. These licenses are an important ingredient in making sure that our country gets the most out of its investment in education research to monitor developmental change, the impact of interventions, or make causal connections. Where the data collected and analyzed is available to others via restricted license agreements, their ensuing work, based on those data, furthers IES's mission to provide scientific evidence on which to ground education practice and policy. Key contracts that supported IES's ability to administer restricted-data licenses were terminated without notice or explanation, and IES's skeletal remaining staff cannot plausibly operate the system to issue new licenses or undertake disclosure review before results can be released and shared, certainly not without significant contract support. *See* Contracts GS-35F-0329Y/91990022F0007; GS-00F-428 GA/91990022F0006.[31]

### *The Vital Impact of IES on the Nation's Education System*

71.    The research and data conducted, collected, analyzed, and disseminated by IES has had a transformative impact on the nation's education system. IES data has informed policymakers and the public about the status of our students' progress and critical gaps that must be addressed with rigorous standards to ensure accuracy and effectiveness. And IES research has continually identified strategies and policies for educators and policymakers that are fundamental to addressing challenges and affording our children, college students, adult learners—and our

---

[31] USASpending.Gov, Dep't of Educ. to Sanametrix, Inc. (GS-35F-0329Y/91990022F0007), https://www.usaspending.gov/award/CONT_AWD_91990022F0007_9100_GS35F0329Y_4732 [https://perma.cc/TG5J-WEUN?type=image]; USASpending.Gov, IES to Activate Rsch. (91990022F0006), https://www.usaspending.gov/award/CONT_AWD_91990022F0006_9100_GS00F428GA_4732 [https://perma.cc/8S23-HTA2?type=image].

nation—a brighter future.

72.    For example, the dramatic improvement in literacy education in Mississippi between 2013 and 2022 (from 49th in the country for fourth-grade reading to 21st) provides just one example of the critical impact of IES's mission.[32] This sweeping change—dubbed the "Mississippi Miracle"—was thanks, in large part, to the work of programs funded by IES.[33] In particular, the REL Southeast worked with the state to gather data, implement teacher training, and demonstrate effectiveness for the state's lawmakers.[34] When asked for comment about IES's dismantling in February 2025, the former state Superintendent, Carey Wright, stated, "I can't say enough about how important they were."[35]

73.    In another recent example, the California Department of Education ("CDE") also recently recruited the REL West to assist with the analysis of data from the state's Alternate English Language Proficiency Assessments for California.[36] The results from REL West's work with the CDE were used to improve English Language learner education,[37] and make important recommendations that were adopted by policymakers.[38]

74.    Another example of IES's important work is its funding for evaluations of the City University of New York ("CUNY") Accelerated Study in Associate Programs ("ASAP"), a nationally lauded program that supports low-income CUNY students in overcoming obstacles to

---

[32] *Kids' reading scores have soared in Mississippi 'miracle,'* PBS (May 17, 2023), https://www.pbs.org/newshour/education/kids-reading-scores-have-soared-in-mississippi-miracle [https://perma.cc/SP35-9RHL].
[33] *See* Greg Toppo, *Trump Cuts Research Lab That Helped Nurture 'Mississippi Miracle,'* The74 (Feb. 20, 2025), https://www.the74million.org/article/trump-cuts-research-lab-that-helped-nurture-mississippi-miracle/ [https://perma.cc/Y8G9-E22G].
[34] *Id.*
[35] *Id.*
[36] Molly Faulkner-Bond, *Supporting California's English Learner Students Who Have the Most Significant Cognitive Disabilities*, IES (Sept. 11, 2023), https://ies.ed.gov/learn/blog/supporting-californias-english-learner-students-who-have-most-significant-cognitive-disabilities [https://perma.cc/2NU4-5KJN].
[37] *Id.*
[38] *Id.*

obtaining their associate's degrees in three years or less,[39] and in fostering replication this approach through programs around the country.[40]

75.     More broadly, IES data informs the general public and critical industries about the condition and status of education in our country, in states, and in particular areas.

76.     All of this and other important work to support our nation's students is in jeopardy following Defendants' actions.

### *At DOGE's Direction, IES Cancelled Contracts Required to Carry Out Statutorily-Required Data Collections, Research, and Dissemination*

77.     On the morning of February 10, 2025, a representative of DOGE (part of the "U.S. DOGE Service" organized as a component of the Executive Office of the President and led by Elon Musk), arrived at the Department.[41]

78.     The DOGE representative delivered a list of IES contracts that IES leadership was directed to cancel immediately.[42] The DOGE representative did not provide any substantial reasons for the direction to cancel the contracts on the list.[43]

79.     That same day, February 10, 2025, IES canceled 89 contracts for numerous education research and statistics projects following the direction from DOGE.[44]

---

[39] *See, e.g.*, IES, *Ten-Year Follow-up of Two RCTs of CUNY's ASAP Model – Educational and Labor Market Outcomes*, https://ies.ed.gov/use-work/awards/ten-year-follow-two-rcts-cunys-asap-model-educational-and-labor-market-outcomes [https://perma.cc/F7PJ-DMSH]; IES, *Assessing the Long-Term Efficacy and Costs of the City University of New York's (CUNY'S) Accelerated Study in Associate Programs (ASAP)*, https://ies.ed.gov/use-work/awards/assessing-long-term-efficacy-and-costs-city-university-new-yorks-cunys-accelerated-study-associate [https://perma.cc/MP84-TEJX].
[40] *See, e.g.*, Cynthia Miller & Michael J. Weiss, *Increasing Community College Graduation Rates: A Synthesis of Findings on the ASAP Model From Six Colleges Across Two States*, 44 Educational Evaluation and Policy Analysis 210 (June 2022), https://files.eric.ed.gov/fulltext/EJ1339008.pdf [https://perma.cc/LN2K-M4YD].
[41] Meckler and Natanson, *DOGE rips through Education Department* [https://perma.cc/4KDD-2PA3].
[42] *Id.*
[43] *Id.*
[44] Matt Berg (@mattberg33), X/Twitter (Feb. 11, 2025, 4:03 PM ET), https://x.com/mattberg33/status/1889419969990893686 [https://perma.cc/NF29-XPCQ].

80.     That evening, DOGE claimed credit on X, stating "[a]lso today, the Department of Education terminated 89 contracts worth $881mm." The sole justification offered in DOGE's statement was a one sentence critique of an aspect of work one contractor was paid $1.5 million to carry out.[45] DOGE provided not even a single sentence of reasoning for the cancellation of the other 88 contracts constituting $879.5 million of the $881 million purportedly at issue. On information and belief, IES cancelled all of these contracts "for convenience," without citing a cause or performance problem.

81.     This post by DOGE is one of many in which the entity has asserted that its cancellations of contracts and grants are saving federal funds and reducing federal expenditures.[46]

82.     Days later, on February 13, Defendants announced that they had cancelled *all* the contracts needed to operate the RELs, with a total value of more than $330 million.

83.     As a result of this Research Termination Action, DOGE currently lists the Department as second on its list of "Total Contract Savings," following only the much larger Department of Health and Human Services ("HHS").[47]

84.     DOGE's repeated categorization of these contract cancellations as "total . . . savings"[48] makes clear that Defendants have no plan to rebid the contracts so that other companies carry out the activities that have been halted as a result of Defendants' rash action.

85.     Defendant McMahon's statements endorsing the President's desire and order to shutdown Department of Education in its entirety further demonstrate that Defendants do not intend to rebid these contracts to meaningfully carry out IES's functions through other means.

---

[45] Department of Government Efficiency (@DOGE), X/Twitter (Feb. 10, 2025, 7:43 PM ET), https://x.com/DOGE/status/1889113011282907434 [https://perma.cc/N9UU-QFHH].
[46] Glenn Kessler, *Trump says DOGE found 'tens of billions' in savings. Not even close*, Wash. Post (Feb. 12, 2025), https://www.washingtonpost.com/politics/2025/02/12/doge-savings-trump-musk/ [https://perma.cc/E3L3-5JPL].
[47] Dep't of Gov. Efficiency, *Savings* [https://perma.cc/K9GZ-8BUR].
[48] *Id.*

*The Cancelled Contracts Gut IES and NCES's Ability to Function and Carry Out Congressionally Required Research Functions*

86.     The Research Termination Action—involving contracts that IES and the Department cancelled at DOGE's behest—guts IES's core, legally-required functions.

*Undermining the Common Core of Data and NAEP*

87.     The most prominent sources of data concerning educational progress in the United States are NAEP scores and the Common Core of Data ("CCD"), on which NAEP relies on for accuracy and reliability.   NAEP—often referred to as "the Nation's Report Card"—involves testing a sample of students each year to assess the nation's academic progress. NAEP uses the comprehensive CCD to ensure that its sample is representative of the nation's students, and, thus, accurate and reliable. CCD is also a "trusted data source used by [Department of Education] stakeholders, researchers and the public…[and] is critical not only to these stakeholders but also to [the Department's] commitment to provide high-quality data products."[49] CCD consists of public data files on public elementary and secondary school districts schools and students, including demographic economic and staffing data. It is used for many purposes, including for designing high-quality research that is replicable and generalizable.

88.     CCD and NAEP are two of the vehicles NCES uses to carry out its statutory mandate to compile and disseminate "full and complete statistics" on the "condition and progress of education." 20 U.S.C. § 9543(a)(1).

89.     The February Research Termination Action ended vital work necessary to maintain the CCD and to carry out effective NAEP testing.

90.     In particular, the abrupt cancellation of the $22.8 million contract--

---

[49] IES Staff, *Common Core of Data (CCD) Nonfiscal Data Releases - How the National Center for Education Statistics Improved Timeliness* (Nov. 4, 2024), IES, https://nces.ed.gov/learn/blog/common-core-data-ccd-nonfiscal-data-releases-how-national-center-education-statistics-improved [https://perma.cc/VMP3-FYGP].

91990023D0008/91990024F0331[50]—to provide "data and dissemination" services for EDFacts initiative will cripple the CCD, as the collection of data from school districts, centralization of data from state education agencies, and management, analysis, and provision of this data will cease.[51] Defendants also cancelled an important contract for supporting EDFacts and the CCD "to ensure data quality, improve statistical methodology, and increase production efficiency of data files and reports." *See* 91990020A0014/91990022F0350.[52]   This work is necessary to the CCD's core function of providing an *accurate* base of data to use for NAEP sampling and for other research.

91.    Neither school districts nor states could replicate or replace these efforts. The datasets span the country and ensure that researchers and school districts have an accurate picture of education in the U.S., in order to fully understand their own districts, as well as national perspectives. The IES website itself states that the "benefits from this investment however reach beyond data products resulting in significant burden reductions both for states and for [the Department] program offices that use the data."[53]

92.    On information and belief, Defendants partially reinstated this contract but then essentially undermined that action by terminating crucial staff who supervise its performance. Defendants also simultaneously cancelled the work of an expert panel that works to ensure the

[50] USASpending.Gov, Dep't of Educ. To Applied Enter. Mgmt. Corp. (91990024F0331), https://www.usaspending.gov/award/CONT_AWD_91990024F0331_9100_91990023D0008_9100 [https://perma.cc/C5JW-8H7G?type=image]; USASpending.Gov, IES to Applied Enter. Mgmt. Corp. (91990024F0367), https://www.usaspending.gov/award/CONT_AWD_91990024F0367_9100_91990023D0008_9100 [https://perma.cc/LM4E-ME8P?type=image].
[51] Dep't of Educ., *The EDFacts Initiative*, https://www.ed.gov/data/edfacts-initiative [https://perma.cc/LCD4-YPUC].
[52] USASpending.Gov, IES to Am. Inst. for Rsch. in Behavioral Scis. (91990018C0046), https://www.usaspending.gov/award/CONT_AWD_91990022F0350_9100_91990020A0014_9100 [https://perma.cc/RSS9-HCF8?type=image].
[53] IES Staff, *How the National Center for Education Statistics Improved Timeliness* [https://perma.cc/VMP3-FYGP].

validity of NAEP scores and began cancelling the administration of some NAEP assessments.[54]

93.    Researchers and evaluators also regularly use the CCD to ensure the representativeness and generalizability of their studies, research, and randomized trials in a manner that will not be possible without an up-to-date and accurate CCD. Simply put, the CCD is valuable in its own terms and provides an essential backbone for other quality data collections.

*Cutting Short Critical Longitudinal Studies*

94.    ESRA requires NCES to conduct "longitudinal and special data collections necessary to report on the condition and progress of education" 20 U.S.C. § 9543(a)(7).

95.    NCES has fulfilled this statutory requirement by funding, over a long period of time, several longitudinal studies with funds appropriated by Congress.[55] Some of these studies have been active for more than 40 years.

96.    The Research Termination Action cut off work on a large share of NCES's ongoing longitudinal studies so essential to tracking and monitoring changes over time and identifying the factors that can explain difference, for example, in learning trajectories. Most of these studies had collected years of data, and millions or tens of millions of dollars of taxpayer dollars had already been spent. But now researchers and the public will never have the benefit of learning what the studies were poised to discover about our education system.

97.    One such study was the Early Childhood Longitudinal Study, Kindergarten ("ECLS-K"). The ECLS-K commenced with a cohort of the kindergarten class of 1998-99, and has followed that and subsequent cohorts of kindergarten classes through the 8th grade. The most recent cohort in the ECLS is the kindergarten class of 2023-24. The study collects a broad array

---

[54] Jill Barshay, *NAEP, the Nation's Report Card, Was Supposed to be Safe. It's Not*, KQED (Apr. 7, 2025), https://www.kqed.org/mindshift/65386/naep-the-nations-report-card-was-supposed-to-be-safe-its-not [https://perma.cc/TQT2-2ZUC].
[55] NCES, *Longitudinal Studies Branch (LSB)*, https://nces.ed.gov/surveys/lsb/ [https://perma.cc/SYF2-5B6R].

of data on student performance in school, early school experiences, and child development.

98.    The ECLS-K has been a consistent source of national data for policymakers on issues like transitions to kindergarten and beyond, child development, school progress, and effective early childhood education.[56] The Research Termination Action ended the ECLS-K, through the cancellation of contract 91990019C0002.[57]

99.    A second ongoing NCES longitudinal study was the High School and Beyond study ("HS&B"). The HS&B conducts surveys over time of high school students, and their teachers and parents, and uses high school and postsecondary transcript data to determine students' trajectories after leaving high school, including postsecondary attainment, workforce progress, and career outcomes.[58] The HS&B commenced in 1980 with a nationally representative sample of 10th and 12th graders, and most recently added a cohort of 9th graders from 2022.[59]

100.    HS&B data has been widely relied up for many dozens, if not hundreds, of studies in education research as well as studies concerning labor markets, social capital, alcohol use, and teen pregnancy. Policymakers have relied on HS&B data in designing national education policy.

101.    The ongoing HS&B study was abruptly halted on February 10, through the

---

[56] Beth Meloy, Madelyn Gardner, and Linda Darling-Hammond, *Untangling the Evidence on Preschool Effectiveness Insights for Policymakers*, Learning Pol'y Inst. (Jan. 2019), https://learningpolicyinstitute.org/sites/default/files/product-files/Untangling_Evidence_Preschool_Effectiveness_REPORT.pdf [https://perma.cc/9NU4-YSJM]; Tamara G. Halle, et al., ASPE Report, *In the Running for Successful Outcomes: Exploring the evidence for Thresholds of School Readiness Technical Report*, Off. of Ass't Sec'y for Plan. & Eval. (Nov. 30, 2012), https://aspe.hhs.gov/reports/running-successful-outcomes-exploring-evidence-thresholds-school-readiness-technical-report-0 [https://perma.cc/S28H-6RZU]; Tamara G. Halle, et al., ASPE Report, *In the Running for Successful Outcomes: Examining the Predictive Power of Children's School Readiness Skills*, Off. of Ass't Sec'y for Plan. (Nov. 30, 2012), https://aspe.hhs.gov/reports/running-successful-outcomes-examining-predictive-power-childrens-school-readiness-skills-0 [https://perma.cc/M5NU-DL5F]; Lawrence J. Schweinhart, *Use of early childhood longitudinal studies by policy makers*, 10 Int'l J. of Child Care and Educ. Pol'y, no. 6, Oct. 2016, *available at* https://ijccep.springeropen.com/articles/10.1186/s40723-016-0023-5 [https://perma.cc/QDE8-4YJP].
[57] HigherGov, *The Design and Conduct of the Early Childhood Longitudinal Study, Kindergarten Class of 2022 through 2023*, https://www.highergov.com/contract/91990019C0002/ [https://perma.cc/9NN4-T6F9].
[58] NCES, *High School & Beyond: Longitudinal Studies* [https://perma.cc/8MSJ-8TZD].
[59] *Id.*

cancellation of contract GS00Q140ADU217/91990018F0018, after nearly half of its $98 million in potential funds had been obligated over nearly seven years.[60]

102.    A third ongoing longitudinal study was the NPSAS, which, since 1987, has examined students in postsecondary education with a particular focus on how they finance educational attainment, using student surveys, institution records, and administrative data sources.[61]

103.    NPSAS is relied upon by researchers and policymakers in the higher education field because it is the only comprehensive longitudinal study that evaluates key student-level characteristics that are not collected or published elsewhere. For example, it is the only source of information on how students choose to pay for college and the extent to which different types of students are unable to afford tuition. Without these data, there would be little understanding of what percentage of students take out loans, how those numbers are changing over time, or what portion of students' aid is used on tuition vs. nontuition expenses. And without NPSAS, it would difficult, if not impossible, to determine whether any connection exists between students' unmet financial need and their outcomes post-graduation.

104.    Policymakers have relied on this study, such that Congress recently reiterated its expectation that NCES continue to conduct the study at regular intervals.[62]

105.    The ongoing NPSAS study was abruptly halted on February 10, through the cancellation of contracts 91990022C0017 and 91990018C0039. The first contract was 3 years into

---

[60] USASpending.Gov, IES to Rsch. Tri. Inst. (91990018F0018),
https://www.usaspending.gov/award/CONT_AWD_91990018F0018_9100_GS00Q14OADU217_4732
[https://perma.cc/W2UY-6ESU?type=image].
[61] IES, *National Postsecondary Student Aid Study (NPSAS)*, https://nces.ed.gov/surveys/npsas/
[https://perma.cc/5B5V-E52P].
[62] LHHS Joint Explanatory Statement, 2024 [https://perma.cc/J929-JJKW].

performance, and $20 million of its potential $75 million value had already been obligated.[63] The second contract was more than 6 years into performance with $48.5 million of a potential $76 million value already obligated.[64]

106.    Further demonstrating that the Research Termination Action intended to end NCES's conduct of its statutory mandate to conduct longitudinal studies, the action also stopped work being provided through smaller contracts to support NCES longitudinal study work and dissemination of findings, with cancellation of contracts 91990023D0006/91990023F0034[65] and 91990023D0005/91990024F0330[66] for technical support and publication supporting the longitudinal surveys branch.

*Ceasing Financial Aid Data Collection*

107.    NCES is required by ESRA to collect, analyze and disseminate "data on financial aid to postsecondary students." 20 U.S.C. § 9543(a)(1)(E).

108.    As noted above, the Research Termination Action halted the long-running longitudinal study, NPSAS, into postsecondary education with a focus on financial aid, through the cancellation of contracts 91990022C0017 and 91990018C0039.

109.    The Research Termination Action also halted research concerning the impacts of the Department's "satisfactory academic progress" ("SAP") policy for determining continued

---

[63] USASpending.Gov, IES to Rsch. Tri. Inst. (91990018F0018),
https://www.usaspending.gov/award/CONT_AWD_91990022C0017_9100_-NONE-_-NONE-
[https://perma.cc/C2HC-S9QP?type=image].

[64] USASpending.Gov, IES to Rsch. Tri. Inst. (91990018C0039),
https://www.usaspending.gov/award/CONT_AWD_91990018C0039_9100_-NONE-_-NONE-
[https://perma.cc/ZLL3-U8UL?type=image].

[65] USASpending.Gov, IES to Am. Inst. for Rsch. in Behavioral Scis. (91990023F0034),
https://www.usaspending.gov/award/CONT_AWD_91990023F0034_9100_91990023D0006_9100
[https://perma.cc/QZU2-KFYN?type=image].

[66] USASpending.Gov, IES to Activate Rsch. Inc. (91990024F0330),
https://www.usaspending.gov/award/CONT_AWD_91990024F0330_9100_91990023D0005_9100
[https://perma.cc/XB54-8YWX?type=image].

eligibility for financial aid through the cancellation of contract 91990022A0017/91990024F0369.[67] The Research Termination Action also halted work on a small contract for evaluations of financial aid information and delivery strategies through the cancellation of contract 91990019D0003/91990020F0369.[68]

110.    NCES is thus no longer conducting a meaningful effort to collect or analyze data related to financial aid to postsecondary students. Without such data, federal and state policymakers will be left in the dark about whether, for example, changes in financial aid policy are having adverse impacts on student outcomes.

*Ceasing NCES's Required Studies of International Comparisons and of Adult Education*

111.    NCES is required by ESRA to collect and analyze data regarding "educational activities and student achievement . . . in the United States compared with foreign nations," and to provide "complete statistics" on the condition of education at the "adult level[]" and regarding "adult literacy and reading skills." 20 U.S.C. §§ 9543(1)(D), 9543(6).

112.    The February Research Termination Action has halted NCES's work to carry out its required study of international comparisons and of adult education and literacy.

113.    The February Research Termination Action has halted work on the consolidated contract to conduct the Program for International Student Assessment ("PISA"), the Progress in International Reading Study (PIRLS), and the Program for the International Assessment of Adult Competencies (PIAAC), through cancellation of contract GS00Q14OADU223-91990019F0025.[69]

---

[67] USASpending.Gov, Dep't of Educ. to Mathematica, Inc. (91990024F0369),
https://www.usaspending.gov/award/CONT_AWD_91990024F0369_9100_91990022A0017_9100
[https://perma.cc/PT5S-ME7D?type=image].
[68] USASpending.Gov, Dep't of Educ. to ABT Global LLC (91990020F0369),
https://www.usaspending.gov/award/CONT_AWD_91990020F0369_9100_91990019D0003_9100
[https://perma.cc/M4UN-WF57?type=image].
[69] It appears that this contract may have been reinstated in very small part, just days before the IES Staff Termination was announced. USASpending.Gov, Dep't of Educ. to WeStat, Inc. (91990019F0025),

114.    NCES used this contract to conduct significant comparative assessments of both high school age students and of adults to fulfill its statutory responsibility to assess both. This contract was nearly five years into performance and nearly $42 million of a potential award of $67.6 million had already been obligated.[70]

115.    On information and belief, Defendants may have partially reinstated this contract, but this half-measure will be insufficient to allow IES to actually carry out its PISA-related functions. This is particularly true because the staff that oversaw, directed, and were responsible for PISA functions were terminated in the mass RIF.

116.    The Research Termination Action also terminated NCES's contract for an assessment of the effectiveness of adult education, cancelling contract 91990018C0057. This study was nearly seven years into performance with $7.2 million of a potential $16.5 million already outlayed.[71]

*Abrupt Cessation of Special Education Research Programs Providing Services*

117.    The Individuals with Disabilities Education Act ("IDEA") provides that the Department, through IES, "shall, directly or through grants, contracts, or cooperative agreements . . . assess the progress" of efforts to provide a "free appropriate public education to children with disabilities." 20 U.S.C. § 1464(a)(2).

118.    IES, through the NCSER, was carrying out this responsibility, in no small part, through a significant study of special education students' transition out of high school and into colleges and careers. This study was carried out by funding the provision of services in the

---

https://www.usaspending.gov/award/CONT_AWD_91990019F0025_9100_GS00Q14OADU223_4732 [https://perma.cc/WB8T-LMN3?type=image].
[70] *Id.*
[71] USASpending.Gov, Dep't of Educ. to Mathematica, Inc. (91990018C0057), https://www.usaspending.gov/award/CONT_AWD_91990018C0057_9100_-NONE-_-NONE- [https://perma.cc/VQM5-38R9].

"Charting My Path" program for students with disabilities in school districts across the country in order to study the effectiveness of those services. These services were abruptly cancelled, leaving students with disabilities who needed support with transitions in the lurch, with no time or help to even transition out of the Charting My Path program. *See* Contract 91990019C0078.[72]

*Critical Support Services Contracts Necessary to IES's Operations Were Cut Off*

119.    In addition to large, specific studies, IES's Research Termination Action also cut off numerous streams of work necessary to the agency's operations. The Research Termination Action also abruptly shut down critical support services that were essential to IES carrying out its functions globally. IES was already thinly staffed for its mission and relied heavily on contractors. IES staff is now scarcely even a skeleton crew, and core functions cannot be completed as a result of these support contract cancellations.

120.    For example, IES's contracts for support for the "projects of the Statistical Standards and Data Confidentiality staff ('SSDCS') related to statistical standards, confidentiality, and data security," was terminated. This project supported IES's work granting access to restricted data (data that could be used to identify particular school districts or individuals), granting and amending restricted data licenses, and conducting disclosure reviews of researchers' work based on restricted data before they are able to publish. Without this support, researchers will not be able to access even existing data, and some researchers who have already used existing restricted data for their research will not be able to publish their findings. Graduate students face significant harms: if they timely can't get access to data or obtain permission to publish, their degree completion, career timetable, publication opportunities, and employment trajectories are at risk.

---

[72] USASpending.Gov, Dep't of Educ. to Am. Inst. for Rsch. in Behavioral Scis. (91990019C0078), https://www.usaspending.gov/award/CONT_AWD_91990019C0078_9100_-NONE-_-NONE- [https://perma.cc/8GSA-FXP8?type=image].

IES's terms require disclosure review to ensure that restricted data is not revealed in researchers' work. *See* Contracts GS-35F-0329Y/91990022F0007; GS-00F-428 GA/91990022F0006.[73]

121.    Dozens of other contracts for supporting other studies and evaluations, dissemination functions, data analysis and review, digital modernization, library services, technical assistance and more were also cancelled, leaving IES unable to carry out its research, data, and dissemination functions in myriad ways—an inability made all the more plain following the mass termination of IES staff.

### IES Cancels Contracts to Operate Congressionally Required Regional Educational Laboratories

122.    On February 13, 2025, days after its unreasoned cancellation of 89 contracts to carry out vital research activities, IES cancelled all of the contracts used to operate the nation's 10 RELs, totaling $336 million.

123.    ESRA requires IES to "enter into contracts with entities to establish a networked system of 10 regional educational laboratories [RELs] that serve the needs of each region of the United States." 20 U.S.C. § 9564. ESRA further details the extensive activities that RELs must carry out to conduct research and provide support to states, public schools, and educators.

124.    In 2024, President Trump's nominee to serve as Deputy Secretary of Education implored states and school districts to take full advantage of the resource RELs in order to better use education research to improve outcomes for students.[74]

125.    In cancelling all 10 of the contracts used to operate the statutorily required RELs,

---

[73] USASpending.Gov, Dep't of Educ. to Sanametrix, Inc. (GS-35F-0329Y/91990022F0007), https://www.usaspending.gov/award/CONT_AWD_91990022F0007_9100_GS35F0329Y_4732 [https://perma.cc/TG5J-WEUN?type=image]; USASpending.Gov, IES to Activate Rsch. (91990022F0006), https://www.usaspending.gov/award/CONT_AWD_91990022F0006_9100_GS00F428GA_4732 [https://perma.cc/8S23-HTA2?type=image].
[74] Penny Schwinn and Carey Wright, *From COVID Learning Loss to Artificial Intelligence, Education R&D Can't Wait*, The74 (July 29, 2024), https://www.the74million.org/article/from-covid-learning-loss-to-artificial-intelligence-education-rd-cant-wait/ [https://perma.cc/YXV7-TY8A].

the Department provided just two sentences of explanation containing one example specific to one REL, and the reasoning was cursory and unsupported by evidence:

> The Department terminated 10 contracts totaling $336 million with the Regional Educational Laboratories, the purpose of which is supposed to support applied research, development, and technical assistance activities; however, review of the contracts uncovered wasteful and ideologically driven spending not in the interest of students and taxpayers. For example, the Regional Educational Laboratory Midwest has been advising schools in Ohio to undertake "equity audits" and equity conversations.[75]

126.    DOGE tweeted a statement that appeared to take credit for this cancellation of RELs contracts, in combination with the cancellation of training grants related to equity, though it did not mention the RELs or provide any justification for the cancellation.[76]

### Defendants Indiscriminately Fire 90 Percent of IES's Staff, Making Agency Function Impossible

127.    Less than one month after Defendants' Research Termination Action that halted a substantial share of IES's required data collection and analysis, research, and dissemination functions, Defendants announced a mass RIF terminating nearly all IES staff, the IES Staff Termination Action.

128.    Defendants' decision to fire approximately 90 percent of IES staff brings the agency and its four components—including NCES, NCER, NCSER, and NCEE—down to a staff of only about 20. NCES, which is charged with administering NAEP and scores of studies and data collections and analyses—is left with a staff of only three.[77]

---

[75] Dep't of Educ., Press Release, *U.S. Department of Education Cancels Additional $350 Million in Woke Spending* (Feb. 13, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-cancels-additional-350-million-woke-spending [https://perma.cc/WR8N-VTHV].

[76] Department of Government Efficiency (@DOGE), X/Twitter (Feb. 14, 2025, 8:52 PM ET), https://x.com/DOGE/status/1890579786629574809 [https://perma.cc/G8R2-8EN2].

[77] This is almost certainly the smallest staff NCES has ever had. Indeed, in 1870 in the agency's very infancy—with far fewer statutory responsibilities—it had a staff of five, as well as additional funds for support in "compiling statistics and preparing reports." *See* Bureau of Educ., *Report of the Comm'r of Educ.* [https://perma.cc/68BY-UB4M].

129.    This IES Staff Termination Action resulted in the overwhelming share of IES's staff ceasing to work to carry IES functions after March 21, 2025, with their final separation scheduled for June 9, 2025.[78]

130.    The IES Staff Termination Action demonstrated that Defendants had no intention to merely re-bid the mass cancelled contracts in order to have the agency's responsibilities fulfilled by more efficient contractors. Instead, they intend for the agency *not* to carry out its required functions.

131.    It is implausible that the skeletal staff remaining at IES could even meaningfully rebid a fraction of the contracts through which IES has carried out its functions in recent decades.

132.    It is further not possible for such a small staff to effectively and lawfully administer the contracts and coordinate interrelated research among them, as necessary for IES to carry out its functions. Agency contracting officers cannot merely sign a contract and fully delegate an agency's functions to a private entity. The agency must supervise and oversee the conduct of the contractors' work, and draw connections across the work, to ensure contractors carry out the work in an effective manner that achieves the agency's goals and fulfills its duties with internal controls to prevent overpayments.

133.    It is further impossible, for the skeletal remaining IES staff to continue setting an effective strategic course for the research conducted and data collected, for ensuring effective research design, for carrying out basic reporting requirements, and for making the work of IES meaningful through engagement with the public, educators, researchers, and policymakers.

134.    Indeed, NCES has, on information and belief, only a single contracting officer

---

[78] Dep't of Educ., Press Release, *U.S. Department of Education Initiates Reduction in Force* (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force [https://perma.cc/WF8P-AAQD].

remaining to oversee what would—if the agency were carrying out its required functions—be hundreds of millions of dollars in contracts to administer NAEP, conduct the many longitudinal studies required by the law, and disseminate the agency's data.

135.    Further NCES, with this scintilla of continuing staff, has no way of conducting the type and quality of data collection and analysis that it is required to as a federal statistical agency to "produce and disseminate relevant and timely statistical information" and to use "best practices" to conduct "credible and accurate statistical activities." 44 U.S.C. § 3563; 5 C.F.R. § 1321.

136.    NCEE, with a handful of remaining staff, could not even administer the laborious full re-bidding of ten statutorily required contracts for the RELs, much less fully carry out the responsibilities to disseminate research and data, including through the What Works Clearinghouse ("WWC") and ERIC.

137.    Defendants' Staff Termination Action, in combination with their earlier Research Termination Action, have eviscerated IES's very ability to function. Once viewed as our the nation's leading source for rigorous, independent education research, evaluation, and statistics, IES, including NCES, has been kneecapped, and will be unable to perform its statutory duties, let alone serve as a model for statistical data collection and analysis in the field of education research.

138.    IES's tiny remaining staff—which was already slim—cannot possibly *directly* carry out the robust research, data collection, data analysis, and dissemination responsibilities the agency is tasked with.

139.    Defendants' IES Staff Termination Action has made the functioning of IES effectively impossible. A staff of 20 or so cannot effectively manage an $800 million annual budget of complex scientific contracts and also carry out meaningful statistical analysis and research work.

140.    Defendants' attempt to leave a skeletal remaining staff, and a husk of existing contracts, should not obscure the intent and effect of their actions: the unreasoned and unlawful halting of IES's work.

## HARM TO PLAINTIFFS

141.    The Research Termination Action and IES Staff Termination Action are already harming Plaintiffs AERA and SREE and their members, and these Actions stand to cause devastating harm that cannot be remedied if not quickly rectified.

142.    Both AERA and SREE have themselves been harmed by the evisceration of IES's functions, and they stand to suffer irreparable harm to their missions if these actions are not reversed.

143.    AERA is a national research society that strives to advance knowledge about education, to encourage scholarly inquiry related to education, and to promote the use of research to improve education and serve the public good.

144.    SREE is an organization dedicated to addressing pressing educational challenges by generating, synthesizing, and applying reliable evidence of program and policy effectiveness. SREE's members seek to create and apply effectiveness research to achieve better, more equitable educational outcomes.

145.    The effective demolition of IES will cause a dramatic decline in the amount of quality education research that will be conducted in this country, destroying the entirety of the system of education data and research on which Plaintiffs' missions depend. The remnants of education research work that can be conducted with foundation and university support will be significantly lower in reliability, validity, generalizable application, and other forms of quality without the strong data foundations and research standards provided by IES and its components.

For example, AERA's programs to support advanced statistical analysis by graduate students and early career scholars and to create a hub for education data resources will be badly harmed by IES's evisceration. AERA and SREE cannot carry out their missions and related programs for their members' and education fields if Defendants' actions are not addressed and substantially reversed to require IES to continue to function.

146.    AERA and SREE are large membership organizations composed of education researchers, evaluators, data scientists, educational statisticians, professors, educators, policymakers, education school deans, and school district staff—as well as graduate students studying to enter these professions. And Plaintiffs' members have been badly harmed in their abilities to do their work.

147.    Plaintiffs' members work in their public interest professions in education research, evaluation, data analysis, practice, and policy will quickly become impossible or overwhelmingly more difficult if IES ceases to carry out its functions, if Defendants' contract cancellations and mass staff terminations remain in place.

148.    Plaintiffs' members have lost, or will imminently lose, access to vital data and research resources that they need to carry out their work in their chosen careers. In some instances, via the evisceration of the process for granting, amending, and administering restricted data licenses and conducting disclosure reviews, Plaintiffs' members will not be able to use research already conducted. For graduate student members, this will prevent them from timely completion of their degree programs, which can impact their ability to complete their degree at all and can impose significant hardship and additional costs.

149.    As another example, many of Plaintiffs' members regularly rely on the NCEE WWC to gain access to credible, vetted research, standards for conducting rigorous research and

program evaluation, and for practice and implementation guides that consolidate rigorous research findings into usable form for practitioners. SREE members in school districts use these resources to directly inform their work improving education for students. AERA and SREE researchers and data scientists use these resources for meta-analysis research, as a critical source of peer-reviewed research and standards for study designs, and as a critical source of reliable data. Defendants' actions have cancelled a half dozen contracts that were directly used to operate the WWC, and much of the research and data that formed the basis of the WWC. The contract cancellations for the WWC and other crucial research, and the mass staff terminations at IES, threaten to ensure—at minimum—that the WWC's research and data fails to be updated, valid, and reliable. The cancellation of contracts directly supporting the WWC may stop it from operating at all.

150.    Similarly, without the Education Resource Information Center ("ERIC")— which compiles all education research—Plaintiffs' members will be denied access to a crucial resource that has been used for decades. Meta-analysis will become infinitely more difficult, and ensuring access to the wide universe of available education research will be nearly impossible. Plaintiffs have already received information indicating that ERIC's functioning is being dramatically curtailed, with scientific journals being notified that their work will no longer be added to the Center. Indeed, it will not be possible for Defendants to meaningfully operate ERIC without the support contracts on which they have relied and without sufficient staff as a result of terminations. Further, without IES carrying out the numerous significant studies it has cancelled or effectively administering new studies, research, and data collection, the resources available on any stump version of ERIC that could remain will be significantly less useful, reliable, or up to date as the system of education research withers.

151.    The cancellation of the RELs contracts, which support education research and

evaluation and the translation and application of rigorous research for and by practitioners, will also lead to harm to SREE's members. SREE's members, particularly those who work in school districts, utilize the RELs regularly to gain access to resources that facilitate the application of rigorous, up-to-date research in their work advising on curricular and instructional changes and interventions. Without the availability of the RELs, these practitioners will be deprived of a key resource that they use to fulfill their roles within school districts. No school district of any size could replicate these resources with local funds or projects. The lack of access to RELs will seriously degrade these SREE members' abilities to effectively work in their professions.

152.    Plaintiffs' members will also be directly harmed by the failure to complete specific studies that were abruptly ended through Defendants' mass contract cancellations. This includes, for example, Defendants' cancellation of:

   a.  The Multi-Tiered Systems of Support for Reading ("MTSS") study, which was focused on preventing and addressing students' literacy issues. The MTSS was abruptly cancelled on February 10, 2025. The government has invested approximately $39 million dollars of taxpayer funds in this study, which has examined teachers and thousands of elementary students across the country to determine successful approaches to literacy support. Cancellation of this study deprives Plaintiffs' members who conduct meta-analysis and literacy research from using a rigorous assessment of interventions to improve students' reading abilities that was years in the making and on which they relied on in their planning for integration into future research. Without reinstating and salvaging this study before the years of data are potentially destroyed, this harm will be irreparable and cannot be remedied by isolated, small-scale private attempts to substitute for this work.

b. The ECLS-K, which was a longitudinal study following students, and gathering information from their teachers and parents, starting in Kindergarten. Enormous resources were already invested in this study before its cancellation, with a sample of 15,000 Kindergarteners already selected and followed for several years, along with information gathering from many more thousands of teachers and parents. Plaintiffs' members have relied on earlier versions of this study and were planning to use the critical findings of this study to further future research, but that will not be possible as even the data already collected will not be used and published with this contract's cancellation.

c. The cancellation of the ED Facts and dissemination support services contract—along with the mass terminations of IES employees—will make it impossible for IES to continue to update the CCD. Plaintiffs' members rely on this data for myriad purposes as it is foundational for the field of rigorous education research and data analysis. Plaintiffs' members use ED Facts and the CCD to ensure that research designs will result in reliable and generalizable findings and as a key source of data analysis. Further, CCD is essential to the accurate sampling needed to administer the NAEP in a manner that ensures its results are valid through the use of a representative sample. Without an updated and accurate CCD, Plaintiffs' members will promptly be harmed in their ability to carry out research work and to continue in their chosen careers.

d. The NPSAS, which studies and disseminates information concerning higher education, particularly regarding how students finance their pursuit of higher education. Plaintiffs' members will be harmed by the lack of availability of the

results of this study, as they have used previous iterations of the study intensively for important research projects—including projects that have influenced policy—and planned to use upcoming findings to further their research.

153.    Plaintiffs' members are also harmed by Defendants' actions as they make it impossible to conduct research with important data that contains potentially identifying information for individuals and school districts. Some of Plaintiffs' members will not be able to publish research they have already conducted with this restricted use data. Defendants' cancellation of the technical assistance contract for confidentiality and data security, Contract number 91990023 D0046/91990024F0327,[79] along with Defendants' mass layoffs, will make it impossible to continue to grant and amend licenses to access restricted use data, to send restricted use data in a secure manner, and to approve research employing restricted data in pre-publication review. Plaintiffs' members have already received indications that IES will soon not be able to carry out these functions, and some members have already lost access to restricted data. Plaintiffs' members will be harmed irreparably by the failure to perform these functions, particularly if they can never publish work based on data they have already received and invested resources in.

154.    Further, NAEP is a vital source of data for Plaintiffs' members and is regularly relied on in their research work and in application by those members who work in school districts. Without IES staff sufficient to carry out NAEP, and without an accurate and updated Common Core of Data reflecting changes in populations and school openings and closings, NAEP will cease the be the powerfully important resource that it has been for decades. Plaintiffs' members work will be deeply harmed by this loss of an incomparable resource reflecting comparative

---

[79] USASpending.Gov, Dep't of Educ. to Sanametrix, Inc. (91990024F0327), https://www.usaspending.gov/award/CONT_AWD_91990024F0327_9100_91990023D0046_9100 [https://perma.cc/9WDV-4T4Q?type=image].

achievement across the nation.

155.    All of these harms are compounded and particularly devastating for Plaintiffs'
members who are current graduate students seeking degrees in education research and statistics
fields. After dedicating years of time and many resources to their studies, many of these members
need access to IES data and research—including restricted data—and prepublication review to
finish the theses necessary to earn their degrees and begin their careers. Without this data and
research being available promptly, they stand to suffer harm that cannot be remedied years down
the road, as they will be unable to complete the programs in which they are currently enrolled.

156.    The harm to Plaintiffs and their members will be particularly hard to remedy
following the final June 9, 2025, separation of the mass of IES staff from their positions. It will be
very challenging to rehire in any remotely timely fashion sufficiently expert staff to carry out IES
functions. Years of accumulated data and expertise would be lost forever, and Plaintiffs' members
would not be able to continue in their careers in education research, losing decades of investment
in those public service pursuits.

## CLAIMS FOR RELIEF

### Count One
### Administrative Procedure Act – 5 U.S.C. § 706(2)

157.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as
if fully set forth herein.

158.    Plaintiffs state this cause of action against all Defendants.

159.    The Research Termination Action and the IES Staff Termination actions are both
final agency actions subject to judicial review. 5 U.S.C. § 706.

160.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found
to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law";

"contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory … authority …"; or done "without observance of procedure required by law." 5 U.S.C. § 706(2).

161.    The actions taken by Defendants are arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A) because:

    a.    Defendants arbitrarily and capriciously issued a mass cancellation of education research contracts that prevent IES and NCES from carrying out their core functions, disregarding ongoing work and reliance interests.

    b.    Defendants arbitrarily and capriciously reduced the IES staff to a level that will make impossible IES's conduct of its functions and greatly harm the effectiveness of any fraction of remaining work the agency is able to conduct.

162.    Defendants' actions are not in accordance with several laws in violation of 5 U.S.C. § 706(2)(A), including ESRA, NAEPA, IDEA, HEOA, Further Consolidated Appropriations Act, 2024, and Full-Year Continuing Appropriations and Extensions Act, 2025, because:

    a.    Defendants' mass cancellation of contracts has prevented IES and its components from carrying out statutorily mandated functions and from expending the funds Congress has appropriated for the purpose of carrying out those functions, including under the ESRA, NAEPA, IDEA, HEOA, Further Consolidated Appropriations Act, 2024, and Full-Year Continuing Appropriations and Extensions Act, 2025.

    b.    Defendants' mass RIF terminations of nearly 90 percent of IES staff is contrary to law as it prevents IES and NCES from carrying out statutorily-mandated functions and from expending the funds Congress has appropriated for the purpose of carrying out those functions, including under the ESRA, NAEPA, IDEA, HEOA,

Further Consolidated Appropriations Act, 2024, and Full-Year Continuing Appropriations and Extensions Act, 2025.

163.    Defendants' actions are contrary to the legislative and executive separation of powers under the Constitution in violation of 5 U.S.C. § 706(2)(B).

164.    Defendants' actions are in excess of the agency's statutory authority in violation of 5 U.S.C. § 706(2)(C), because they contravene the laws they purport to implement, including ESRA, NAEPA, IDEA, HEOA, Further Consolidated Appropriations Act, 2024, and Full-Year Continuing Appropriations and Extensions Act, 2025, and because these actions are not authorized under those or other statutes.

165.    Defendants' actions are without observance of procedure required by law in violation of 5 U.S.C. § 706(2)(D) because these rash and sweeping actions to eviscerate IES's functions changed the agency's position without required procedure and disclosure.

**Count Two**
**Ultra Vires**
**Violation of the Separation of Powers**

166.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

167.    Plaintiffs state this cause of action against all Defendants.

168.    Plaintiffs have a non-statutory right of action to declare unlawful official action that is ultra vires.

169.    The Executive Branch and its officers and agencies may not take any action that exceeds the scope of their constitutional and/or statutory authority.

170.    Congress has enacted laws that charge IES with mandatory functions through ESRA, NAEPA, Appropriations Acts, and other statutes.

171.    Congress has directed Defendants to spend a specific amount of money to carry out those functions.

172.    Defendants lack the constitutional or statutory authority to determine not to carry out those functions by refusing to spend the appropriated funds on staff and contracts that carry out IES's data, research, and dissemination functions.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court:

A.  Declare that the February Research Termination Action (and related actions) cancelling education research contracts *en masse*, is arbitrary, capricious, and not in accordance with law in violation of the Administrative Procedure Act, and violates statutory and constitutional requirements;

B.  Declare that the IES Staff Termination Action announced on March 11, 2025, and subsequent notices of termination of nearly 90 percent of IES staff (and related actions), is arbitrary, capricious, and not in accordance with law in violation of the Administrative Procedure Act, and violate statutory and constitutional requirements;

C.  Order Defendants to take expeditious steps, not longer than 30 days following the Court's order, to reinstate the cancelled contracts or, where another contractor could provide equivalent services, to promptly re-bid the contracts, soliciting new contracts to carry out the research and data activities covered by the cancelled contracts.

D.  Order Defendants to take immediate action to prevent the destruction of data in possession of contractors whose contracts were cancelled in the IES Research Termination Action where the data could be subject to deletion requirements or otherwise is at risk of deletion;

E.  Vacate the IES Staff Termination Action announced on March 11, 2025;

F.  Order Defendants to place individuals designated for termination through the IES Staff

Termination action back in their roles necessary to carry out IES functions;

G.  Award Plaintiffs their costs, attorneys' fees, and other disbursements for this action; and

H.  Grant any other relief this Court deems appropriate.


Dated: April 14, 2025                    Respectfully submitted,

                                         */s/ Daniel A. McGrath*

                                         Daniel A. McGrath (Bar No. 31501)
                                         Madeline H. Gitomer (Bar No. 31518)
                                         Emma R. Leibowitz*
                                         Victoria S. Nugent (Bar No. 15039)
                                         Democracy Forward Foundation
                                         P.O. Box 34553
                                         Washington, DC 20043
                                         (202) 448-9090
                                         dmcgrath@democracyforward.org
                                         mgitomer@democracyforward.org
                                         eleibowitz@democracyforward.org
                                         vnugent@democracyforward.org

                                         *Counsel for Plaintiffs*

                                         **pro hac vice* forthcoming