## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, *et al.*, | |
| *Plaintiffs*, | |
| *vs.* | |
| U.S. DEPARTMENT OF EDUCATION, *et al.*, | Civil Action No. 8:25-cv-01230 |
| *Defendants*. | |

## **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................. 3

    I.    Congress Established IES, Assigned the Agency Critical Functions, and Continues to Fund Its Operation. ............................................................................................ 3

    II.    In February, IES's Research Studies and Functions Were Terminated En Masse in the Research Termination Action. .......................................................................... 6

    III.    In March, Defendants Terminated Nearly 90 Percent of IES's Remaining Staff. .. 9

ARGUMENT ................................................................................................................... 11

    I.    Plaintiffs Have Standing. ...................................................................................... 12

    II.    Plaintiffs Are Likely to Succeed on the Merits. .................................................... 16

        A.    The Termination Actions are final agency actions for which there is no adequate remedy without the APA. ........................................................... 17

        B.    The Termination Actions were arbitrary and capricious, with a stunning lack of reasoning or consideration of their impacts. ................................ 19

            i.    Defendants offered hardly any explanation for the Termination Actions. ...................................................................................... 20

            ii.    What little reasoning Defendants have offered for the Termination Actions has no rational connection to the evidence before them.. 21

            iii.    The Termination Actions are also unexplained, impermissible changes in fundamental agency positions that do not consider Plaintiffs' reliance interests at all. ................................................. 23

            iv.    Defendants failed to consider important aspects of the Termination Actions, and did not rely on the factors Congress directed them to consider. ..................................................................................... 26

            v.    Defendants' unreasoned and unexplained cancellation of research contracts mid-performance is illustrative of the profound arbitrariness of the Termination Actions. ...................................... 28

        C.    The Termination Actions are contrary to law and in excess of Defendants' statutory authority. ................................................................................. 28

        D.    Defendants' Termination Actions violate the constitutional separation of powers by eviscerating a Congressionally-created agency and refusing to spend appropriated funds. ........................................................................ 33

    III.    Plaintiffs Are Suffering Immediate, Irreparable Harm. ....................................... 35

        A.    The imminent final separation of IES's expert staff in June threatens irreparable harm because it will destroy IES's ability to disseminate quality research and data to Plaintiffs' members for years to come. ........ 36

B.    Without prompt relief, the data and findings of the cancelled research contracts will be lost permanently, depriving Plaintiffs' members of irreplaceable information. .......................................................... 38

C.    Plaintiffs' members will suffer irreparable harm to their ability to access and use restricted data. ................................................................. 41

IV.    The Balance of Equities and Public Interest Both Favor an Injunction. ............... 43

CONCLUSION .................................................................................................................. 44

## TABLE OF AUTHORITIES

**Cases**

*Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985) .................................................. 18

*Alston v. Balt. Gas & Elec. Co.*, No. 22-CV-1061, 2023 WL 1472020 (D. Md. Feb. 1, 2023).... 18

*Am. Fed'n of Tchrs. v. Dep't of Educ.*, No. 25-CV-628, 2025 WL 1191844 (D. Md. Apr. 24, 2025) ................................................................................................................ 12

*Bennett v. Spear*, 520 U.S. 154 (1997) ........................................................................ 17

*Burlington Truck Lines v. United States*, 371 U.S. 156 (1962) .................................... 23

*CACI, Inc. v. U.S. Navy*, 674 F. Supp. 3d 257 (E.D. Va. 2023) .................................. 18

*Casa de Maryland v. DHS*, 924 F.3d 684 (4th Cir. 2019) ..................................... 23, 24

*Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928 (D. Md. 2020) .......................... 12

*Citizens for Resp. & Ethics in Washington v. U.S. DOGE Serv.*, No. 25-CV-511, 2025 WL 752367 (D.D.C. Mar. 10, 2025) ................................................................... 40

*City of New York v. DOD*, 913 F.3d 423 (4th Cir. 2019) .............................................. 36

*Clinton v. City of New York*, 524 U.S. 417 (1998) ....................................................... 33

*Does 1-26 v. Musk*, No. 25- CV-0462, 2025 WL 840574 (D. Md. Mar. 18, 2025)....................... 34

*Drs. for Am. v. OPM*, No. 25- CV-322, 2025 WL 452707 (D.D.C. Feb. 11, 2025)..................... 40

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ........................................... 23

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ......................................................... 19

*Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581 (4th Cir. 2012) ..................... 26

*HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669 (D. Md. 2020) ........................................... 43

*hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022) ................................ 40

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411 (4th Cir. 1999) .............. 43

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) .............................. 12

*Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613 (4th Cir. 2018) ................. 13, 15

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013)......................................................... 34

*In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517 (4th Cir. 2003) ............................................ 12

*Jimenez–Cedillo v. Sessions*, 885 F.3d 292 (4th Cir. 2018) ........................................................ 23

*Lance v. Coffman*, 549 U.S. 437 (2007) ................................................................................... 13

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330 (4th Cir. 2021) ..................... 43

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ............................. 15

*Loc. 2677, Am. Fed'n of Gov't Emps. v. Phillips*, 358 F. Supp. 60 (D.D.C. 1973) ..................... 34

*Mayor & City Council of Baltimore v. Azar*, 439 F. Supp. 3d 591 (D. Md. 2020) ................. 21

*Mayor of Baltimore v. Azar*, 973 F.3d 258 (4th Cir. 2020) ........................................................ 21

*Maryland v. USDA*, 25-CV-0748, 2025 WL 800216 (D. Md. Mar. 13, 2025) ........... 16, 18, 19, 43

*Medellin v. Texas*, 552 U.S. 491 (2008) .................................................................................. 33

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ............... *passim*

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197 (4th Cir. 2019) ................. 35

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546 (4th Cir. 1994) ............................................................................................................................ 36

*Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109 (2022) ....................................................... 29

*Nat'l Treasury Emps. Union v. Vought*, No. 25-CV-0381, 2025 WL 942772 (D.D.C. Mar. 28, 2025) ........................................................................................................................... 29, 34, 37

*New England Anti-Vivisection Soc'y v. Goldentyer*, No. 20-CV-02004, 2023 WL 2610867 (D. Md. Mar. 23, 2023) ....................................................................................................... 28

*Nken v. Holder*, 556 U.S. 418 (2009) ...................................................................................... 43

*NLRB v. Noel Canning,* 573 U.S. 513 (2014) ........................................................................... 35

*POET Biorefining, LLC v. EPA*, 970 F.3d 392 (D.C. Cir. 2020) ................................................. 17

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) ............................................................. 43

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) .............................................................. 43

*Tepeyac v. Montgomery Cnty.*, 722 F.3d 184 (4th Cir. 2013) ................................................... 43

*United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013) ................................................ 12

*West Virginia v. Thompson*, 475 F.3d 204 (4th Cir. 2007) ....................................................... 20, 23

*Widakuswara v. Lake*, No. 25-CV-2390, 2025 WL 945869 (S.D.N.Y. Mar. 28, 2025) ...................
.................................................................................................................................. 29, 34, 37

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008)................................................................... 12

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ............................................ 33, 34

**Statutes**

2 U.S.C. § 683 ............................................................................................................................. 34

20 U.S.C. § 9501 ...................................................................................................................... 4, 15

20 U.S.C. § 9511 ................................................................................................................. *passim*

20 U.S.C. § 9512 ................................................................................................................ 26, 30, 33

20 U.S.C. § 9531 .......................................................................................................................... 4

20 U.S.C. § 9533 ................................................................................................................ 29, 30, 33

20 U.S.C. § 9534 ........................................................................................................................ 30, 33

20 U.S.C. § 9541 ...................................................................................................................... 4, 30

20 U.S.C. § 9543 ........................................................................................................... 29, 32, 33, 39

20 U.S.C. § 9545 ........................................................................................................................ 33

20 U.S.C. § 9546 ........................................................................................................................ 33

20 U.S.C. § 9561 .......................................................................................................................... 4

20 U.S.C. § 9562 ........................................................................................................................ 30, 33

20 U.S.C. § 9563 ........................................................................................................................ 30

20 U.S.C. § 9564 ................................................................................................................ 30, 32, 33

20 U.S.C. § 9567 .......................................................................................................................... 4

20 U.S.C. § 9567b ............................................................................................................ 29, 30, 33

20 U.S.C. § 9622 ........................................................................................................................ 29, 32

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, 139 Stat. 9 (Mar. 15, 2025) .............................................................................................. 5, 11, 27, 33

Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 693 (Mar. 23, 2024) ...................................................................................................... 27

**Other Authorities**

Advancing Artificial Intelligence Education for American Youth, Exec. Order No. 14277 (Apr. 23, 2025), to be published as 90 Fed. Reg. 17519 (Apr. 28, 2025), *available at* https://www.whitehouse.gov/presidential-actions/2025/04/advancing-artificial-intelligence-education-for-american-youth/ [https://perma.cc/AY7E-WGMA].............. 40

Alex MacGillis, *Trump's War on Measurement Means Losing Data on Drug Use, Maternal Mortality, Climate Change and More*, ProPublica (Apr. 18, 2025), https://www.propublica.org/article/trump-doge-data-collection-hhs-epa-cdc-maternal-mortality [https://perma.cc/LZ8D-TW9X] ...................................................................... 8

Arthur Jones II, *'Your position is being abolished': Education Department staff get official reduction-in-force notices*, ABC News (Apr. 10, 2025), https://abcnews.go.com/US/position-abolished-department-education-employees-official-reduction-force/story?id=120699980 [https://perma.cc/9UPM-BCYN] ......................... 18

Bureau of Educ., *Report of the Comm'r of Educ., Made to the Sec'y of the Interior* (Oct. 27, 1870), *available at* https://archive.org/details/reportofcommissi00unit_6/page/n5/mode/2up [https://perma.cc/68BY-UB4M]........................................................................... 10

Cory Turner, *DOGE abruptly cut a program for teens with disabilities. This student is 'devastated'*, NPR (Apr. 14, 2025), https://www.npr.org/2025/04/14/nx-s1-5345870/trump-doge-students-disabilities [https://perma.cc/7K42-2E5M].................... 26

Cynthia Miller and Michael J. Weiss, *Increasing Community College Graduation Rates: A Synthesis of Findings on the ASAP Model From Six Colleges Across Two States*, 44 Educational Evaluation and Policy Analysis 210 (June 2022), https://files.eric.ed.gov/fulltext/EJ1339008.pdf [https://perma.cc/LN2K-M4YD] ............ 5

David Chard, *POV: Cuts to Department of Education's Institute of Education Sciences Equals High Risk and Low Reward*, Bos. Univ. Today (Feb. 27, 2025), https://www.bu.edu/articles/2025/department-of-education-cuts-high-risk-low-reward/ [https://perma.cc/A2SG-P6GF] ........................................................................... 4

Dep't of Educ., Fiscal Year 2025 Budget Summary, *available at* https://www.ed.gov/sites/ed/files/about/overview/budget/budget25/summary/25summary.pdf [https://perma.cc/N4NA-JDRJ] ................................................................... 5

Greg Toppo, *Trump Cuts Research Lab That Helped Nurture 'Mississippi Miracle,'* The74 (Feb. 20, 2025), https://www.the74million.org/article/trump-cuts-research-lab-that-helped-nurture-mississippi-miracle/ [https://perma.cc/Y8G9-E22G]............................................. 5

Improving Education Outcomes by Empowering Parents, States, and Communities, Exec. Order No. 14242 (Mar. 20, 2025), 90 Fed. Reg. 13679 (Mar. 25, 2025), *available at*

https://www.whitehouse.gov/presidential-actions/2025/03/improving-education-outcomes-by-empowering-parents-states-and-communities/ [https://perma.cc/T8KY-BU96]................................................................................................................. 11, 22

Jeffrey Mervis, *Layoffs gut research agency that helped monitor U.S. education*, Science (Mar. 13, 2025), https://www.science.org/content/article/layoffs-gut-research-agency-helped-monitor-u-s-education [https://perma.cc/T7LE-AXF]......................................... 11, 21, 27

Jill Barshay, *Chaos and confusion as the statistics arm of the Education Department is reduced to a skeletal staff of 3*, Hechinger Rep. (Mar. 14, 2025), https://hechingerreport.org/proof-points-chaos-confusion-statistics-education/ [https://perma.cc/5RLR-5TZ4]................. 10

Jill Barshay, *NAEP, the Nation's Report Card, Was Supposed to be Safe. It's Not*, KQED (Apr. 7, 2025), https://www.kqed.org/mindshift/65386/naep-the-nations-report-card-was-supposed-to-be-safe-its-not [https://perma.cc/TQT2-2ZUC] ...................................... 8, 32

*Kids' reading scores have soared in Mississippi 'miracle,'* PBS (May 17, 2023), https://www.pbs.org/newshour/education/kids-reading-scores-have-soared-in-mississippi-miracle [https://perma.cc/SP35-9RHL] ............................................................................ 5

Laura Meckler and Hannah Natanson, *DOGE rips through Education Department, cutting contracts, staff and grants*, Wash. Post (Feb. 14, 2025), https://www.washingtonpost.com/education/2025/02/13/doge-education-department-cuts/ [https://perma.cc/4KDD-2PA3] ............................................................................ *passim*

Molly Faulkner-Bond, *Supporting California's English Learner Students Who Have the Most Significant Cognitive Disabilities*, IES (Sept. 11, 2023), https://ies.ed.gov/learn/blog/supporting-californias-english-learner-students-who-have-most-significant-cognitive-disabilities [https://perma.cc/2NU4-5KJN]............................ 5

USAFacts Team, *What is IES and what does it do?*, USAFacts (Feb. 20, 2025), https://usafacts.org/articles/what-is-ies-and-what-does-it-do/ [https://perma.cc/W8ZK-T6FS] ................................................................................................................................... 5

## INTRODUCTION

In a handful of sweeping, arbitrary actions, Defendants have eviscerated the nation's education research agency—the Institute of Education Sciences ("IES"). Congress established IES and its four component centers to provide high-quality, timely education data and research that would serve the needs of educators, schools, and students. To achieve that aim, Congress explicitly required that IES disseminate its data and research to education researchers so that they can further our knowledge of the education system and practices that can improve it. Congress gave IES numerous mandatory duties to ensure its mission was achieved and has consistently appropriated funding to carry out those functions. For decades, IES has served as the foundation for education researchers' work to assess the state of our education system, understand the challenges faced by our students, and discover practices to address those challenges.

But in a couple of ill-considered swings of the hatchet, Defendants have made it impossible for IES to carry out its statutorily-required functions. *First*, in February, Defendants abruptly terminated contracts carrying out vital research studies mid-stream—even where tens of millions of dollars had already been expended and years of work had been invested. In the same blow, they slashed contracts that underpinned the leanly-staffed agency's ability to function. This dramatic termination of research contracts was both unexplained and unconsidered. Expert IES staff were neither consulted beforehand nor given a rationale afterward. *Second*, in March, Defendants announced the termination of nearly 90 percent of IES's staff, a move that would obliterate the agency. This termination is set to take final effect in June. Two of IES's centers—each charged by Congress with a long list of statutory research and dissemination duties—will be left with a *single* employee.

These actions are contrary to Congress's instructions and appropriations. Even after Defendants announced these cuts, Congress appropriated funding for the agency at the same level as last year. Congress's direction is clear: IES must continue to carry out the numerous data, research, and dissemination functions that Congress has assigned to it for more than two decades.

Defendants' actions make that impossible. Defendants have cut off the vast majority of IES's functions by terminating research and support contracts *en masse* and leaving the agency with a skeleton staff that has no plausible way to carry out the agency's duties.

This is of great consequence to Plaintiffs and their members. Plaintiffs' members are education researchers, as well as instructors and policymakers—including higher education faculty, school district leaders, data scientists, statisticians, and graduate students preparing for these roles—working to improve educational outcomes for children, adolescents, college students, and adult learners. They rely on the quality, timely education data and research that Congress requires IES to disseminate for use in their own research.

The abrupt termination of IES's data and research functions, without notice, has sent shockwaves through the education research community. Plaintiffs' members have already lost access to data and research that IES was previously disseminating. This loss has harmed Plaintiffs' members by limiting their abilities to do their jobs and to contribute to our country's understanding of the state of our education system. The harms Plaintiffs' members suffer are substantial, and, without preliminary relief, Defendants' actions will have dire long-lasting effects that cannot be remedied: IES will be effectively dismantled and its work discontinued; the data of years-long studies (including critical post-pandemic assessments) will be lost; and core data sets will not be updated. All of this means that Plaintiffs' members will not be able to do the work that Congress has directed IES to encourage and support.

Defendants' actions are arbitrary and capricious and violate Congress's clear directions in IES's organic statute and appropriations laws, as well as constitutional separation-of-powers principles. Plaintiffs ask that this Court order preliminary relief to prevent further irreparable harm to Plaintiffs' members and to the public.

## FACTUAL BACKGROUND

In two rash acts, Defendants eviscerated IES, a congressionally-established and -funded agency that provides the infrastructure for rigorous, high-quality education data collection and research in the United States. First, through an unconsidered and abrupt mass contract cancellation (the "Research Termination Action"), and then through a reduction in force ("RIF") designating nearly 90 percent of IES's staff for termination (the "IES Staff Termination Action" and, together, the "Termination Actions"), Defendants have acted to stop IES from carrying out its vital functions. But Congress has not removed or reduced a single function required of IES during this period. Instead, immediately following the Termination Actions, Congress indicated that IES should continue those functions by funding IES at the same level it had the year prior. If these actions are permitted to stand, education researchers across the country—including Plaintiffs' members—will be deprived of the statutorily-required resources that IES must publicly disseminate so that those researchers and other members of the education community, including parents and educators, can assess how our nation's students are performing, what interventions and strategies will help them improve, and how to put those ideas into practice.

I.     **Congress Established IES, Assigned the Agency Critical Functions, and Continues to Fund Its Operation.**

Congress created IES in 2002 to "provide national leadership in expanding fundamental knowledge and understanding of education . . . in order to provide parents, educators, students, researchers, policymakers, and the general public with reliable information about" the condition

and progress of education in our country, practices that will improve achievement and opportunity, and the effectiveness of federal programs. 20 U.S.C. § 9511. To achieve this mission, Congress instructed IES to "compile statistics, develop products, and conduct research, evaluations, and *wide dissemination activities* . . . supported by Federal funds appropriated to the Institute." *Id* (emphasis added).[1] IES was established within the Department of Education ("the Department") with four significant centers. First, Congress incorporated the National Center for Education Statistics ("NCES"), a principal federal statistical agency that has collected and analyzed education data for more than 150 years, into IES. 20 U.S.C. § 9541. Second and third, Congress created the National Center for Education Research ("NCER") and the National Center for Special Education Research ("NCSER") within IES to carry out high-quality scientific research on education to improve the nation's education system. 20 U.S.C. §§ 9531, 9567. Fourth, Congress created the National Center for Education Evaluation and Regional Assistance ("NCEE") to provide technical assistance, disseminate research and evaluation results, and conduct education evaluations. 20 U.S.C. § 9561.

Since its establishment, IES has played a critical role in supporting and fostering a robust system of rigorous education data collection and analysis, research regarding education practices, and dissemination of critical findings to researchers, educators, and policymakers. IES's work has fueled a revolution in education data and research that has facilitated evidence-based policymaking and practice to improve our nation's education system.[2] The research IES has funded and

---

[1] The Education Sciences Reform Act of 2002 so focuses on "dissemination" that it defines the term: "The term 'dissemination' means the *communication and transfer of the results of scientifically valid research, statistics, and evaluations, in forms that are understandable, easily accessible, and usable, or adaptable for use in, the improvement of educational practice* by teachers, administrators, librarians, other practitioners, *researchers*, parents, *policymakers, and the public*, through technical assistance, publications, electronic transfer, and other means." 20 U.S.C. § 9501(10) (emphasis added).

[2] David Chard, *POV: Cuts to Department of Education's Institute of Education Sciences Equals High Risk and Low Reward*, Bos. Univ. Today (Feb. 27, 2025) [https://perma.cc/A2SG-P6GF], McGrath Decl. Ex. 1 (AERA-0153–56).

disseminated, and the field of rigorous education research that it has fostered, have aided policymakers and educators in improving outcomes for students across the country. From the "Mississippi Miracle" that vastly improved literacy in one of the nation's poorest states to the transformation of English language learning in California, to approaches for increasing community college graduation rates in New York, IES's data, research, and dissemination plays a crucial role in fostering opportunity for our nation's students. Compl. ¶¶ 72–74.[3]

Congress has continued to fund IES to carry out these critical functions, with annual funding this and last fiscal year of $807.6 million.[4] With this level of funding, IES has typically been leanly staffed with agency experts, and has carried out much of its critical data, research, and dissemination work through contracts intensively overseen by that expert staff Ex. A, Whitehurst Declaration ("Decl.") ¶¶ 5–9 (AERA-0003–05). [5] Although IES's functions are critical, its budget has generally constituted less than 0.3% of the Department's budget.[6]

---

[3] *Kids' reading scores have soared in Mississippi 'miracle*,*'* PBS (May 17, 2023) [https://perma.cc/SP35-9RHL], McGrath Decl. Ex. 2 (AERA-0158–59); Greg Toppo, *Trump Cuts Research Lab That Helped Nurture 'Mississippi Miracle*,*'* The74 (Feb. 20, 2025) [https://perma.cc/Y8G9-E22G], McGrath Decl. Ex. 3 (AERA-0161–0169); Molly Faulkner-Bond, *Supporting California's English Learner Students Who Have the Most Significant Cognitive Disabilities*, IES (Sept. 11, 2023) [https://perma.cc/2NU4-5KJN], McGrath Decl. Ex. 4 (AERA-0171–73); IES, *Ten-Year Follow-up of Two RCTs of CUNY's ASAP Model – Educational and Labor Market Outcomes* [https://perma.cc/F7PJ-DMSH], McGrath Decl. Ex. 5 (AERA-0175–79); IES, *Assessing the Long-Term Efficacy and Costs of the City University of New York's (CUNY'S) Accelerated Study in Associate Programs (ASAP)* [https://perma.cc/MP84-TEJX], McGrath Decl. Ex. 6 (AERA-0181–84); Cynthia Miller and Michael J. Weiss, *Increasing Community College Graduation Rates: A Synthesis of Findings on the ASAP Model From Six Colleges Across Two States*, 44 Educational Evaluation and Policy Analysis 210 (June 2022) [https://perma.cc/LN2K-M4YD], McGrath Decl. Ex. 7 (AERA-0187–0209).
[4] Dep't of Educ., Fiscal Year 2025 Budget Summary at 1–6, 63–65, and 71–85 [*available at* https://perma.cc/N4NA-JDRJ], McGrath Decl. Ex. 8 (AERA-0211–35); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, 139 Stat. 9 (Mar. 15, 2025) ("Cont. Res. Mar. 2025").
[5] Laura Meckler and Hannah Natanson, *DOGE rips through Education Department, cutting contracts, staff and grants,* Wash. Post (Feb. 14, 2025) [https://perma.cc/4KDD-2PA3], McGrath Decl. Ex. 9 (AERA-0237–40).
[6] USAFacts Team, *What is IES and what does it do?*, USAFacts (Feb. 20, 2025) [https://perma.cc/W8ZK-T6FS], McGrath Decl. Ex. 10 (AERA-0242–45).

## II.    In February, IES's Research Studies and Functions Were Terminated *En Masse* in the Research Termination Action.

On February 10, 2025, a staffer affiliated with the Department of Government Efficiency ("DOGE") arrived at the Department with a list of 89 IES contracts worth nearly $900 million and a mission to terminate the contracts—and they were cancelled within 24 hours.[7] No meaningful reasoning was provided—publicly or even to IES expert staff responsible for the contracts—to justify the mass cancellation of the contracts through which IES carried out its critical work.[8] *See* Ex. D, Pollard Young Decl. ¶¶ 8–10 (AERA-0026–27). As one long-time IES research analyst explains in her declaration, IES subject matter experts and their superiors had no involvement in the rapid process of deciding to conduct this mass cancellation:

> On February 10, 2025, my colleagues and I were called into a division-wide meeting by our supervisors. Our supervisors said that they had been called into an emergency meeting with IES's Acting Director, and were told that the Department of Government Efficiency ("DOGE") had decided to terminate the majority of IES's contracts…I only found out that the two contracts I oversaw for the WWC were canceled when I received emails from contractors…No DOGE or ED employee discussed the consequences of canceling the contracts I oversaw with me prior to this meeting. None of my IES colleagues talked with DOGE either. The first day that DOGE arrived at IES was February 10, and I understand that they had already marked the contracts for cancellation. As a subject matter expert and employee responsible for some of these contracts, I neither participated in any deliberations before their cancellation, nor am I aware of any reasoning being provided for the cancellations. Neither my supervisor nor his supervisor was involved in the decision or aware of the cancellations in advance.

*Id*. at ¶¶ 8–11 (AERA-0026–27).

Days later, on February 13, 2025, Defendants cancelled all 10 IES contracts to operate Regional Education Laboratories ("RELs") that serve states and districts by conducting evaluations of education practices, undertaking tailored research, and disseminating findings.[9]

---

[7] Meckler and Natanson, *DOGE rips through Education Department* [https://perma.cc/4KDD-2PA3], McGrath Decl. Ex. 9 (AERA-0238).

[8] *Id.* (AERA-0238)

[9] Dep't of Educ., Press Release, *U.S. Department of Education Cancels Additional $350 Million in Woke Spending* (Feb. 13, 2025) [https://perma.cc/WR8N-VTHV], McGrath Decl. Ex. 11 (AERA-0247).

DOGE quickly claimed credit for these cancellations and characterized them as "savings" of federal funds.[10] A post-hoc X message from the Department vaguely suggested that IES had not succeeded by citing, ironically, *IES data* showing a post-pandemic decline in mathematics scores.[11] This unconsidered blanket termination of critical contracts ("the Research Termination Action") had immediate, detrimental impacts.

The Research Termination Action abruptly halted key IES research, data, and dissemination functions, including large studies that the government had already invested tens of millions of dollars in over extended periods of time. For example, many of IES's longitudinal studies were abruptly cancelled, including the Early Child Longitudinal Study, Kindergarten ("ECLS-K") of a cohort of 15,000 Kindergarteners and the High School and Beyond Study ("HS&B") of recent cohorts of high school students. Compl. ¶¶ 97–101.[12] Past iterations of these studies have greatly contributed to our understanding of student development and success, and significant resources have already been invested in studying the current cohorts. In the case of HS&B, nearly $50 million had already been obligated over the last seven years before its cancellation.[13] Now, no research or data stand to be published from those years of intensive study.

Other large research endeavors, like the Multi-Tiered Systems of Support ("MTSS") assessments of critical reading intervention strategies and the National Postsecondary Student Aid Study ("NPSAS") of how students progress in higher education and how they pay for it were also abruptly cutoff. The government had already invested more than $68 million in the NPSAS study

---

[10] Dep't of Gov. Efficiency, *Savings* [https://perma.cc/K9GZ-8BUR], McGrath Decl. Ex. 12 (AERA-0250).
[11] U.S. Department of Education (@usedgov), X/Twitter (Feb. 12, 2025, 5:16 PM ET) [https://perma.cc/FBR3-VSUN], McGrath Decl. Ex. 13 (AERA-0253).
[12] HigherGov, *The Design and Conduct of the Early Childhood Longitudinal Study, Kindergarten Class of 2022 through 2023* [https://perma.cc/9NN4-T6F9], McGrath Decl. Ex. 14 (AERA-0255, AERA-0258); USASpending.Gov, *IES to Rsch. Tri. Inst. (91990018F0018)* [https://perma.cc/W2UY-6ESU?type=image], McGrath Decl. Ex. 15 (AERA-0262–63).
[13] *IES to Rsch. Tri. Inst. (91990018F0018)* [https://perma.cc/W2UY-6ESU?type=image], McGrath Decl. Ex. 15 (AERA-0262).

through two contracts that were three and six years into performance, respectively. Compl. ¶ 105.[14]

All of that research into how students are able to succeed, or not, in higher education and how they

pay for that education will be lost due to this abrupt cancellation. Compl. ¶¶ 102–103.

The Research Termination Action also stopped IES's critical functions in myriad other

ways. At least two of the cancelled contracts were necessary for the operation, maintenance, and

accuracy of the Common Core of Data ("CCD"). Compl. ¶¶ 89–90.[15] The CCD is a central

collection of data about the characteristics of the nation's education system, and its accuracy is

critical to ensuring that other research and data in the education research field is reliable and

generalizable. Perhaps most importantly, the accuracy of the CCD is vital to the accuracy of the

National Assessment of Educational Progress ("NAEP")—often referred to as "The Nation's

Report Card"—because it enables a valid sample for NAEP testing. Compl. ¶ 87. The CCD must

be continuously updated as populations change, people move, and schools open and close.

Particularly in the post-pandemic period, these changes have been rapid, and consistent updating

is required to ensure CCD fulfills its vital function. Ex. J, Tipton Decl. ¶¶ 16–18 (AERA-0081).[16]

The Research Termination Action also ceased work on dozens of other contracts that

provided crucial support services and conducted other evaluations and studies. For example,

Defendants cancelled two support contracts necessary for IES to provide adequate access to

---

[14] USASpending.Gov, *Dep't of Educ. to Mathematica, Inc. (91990024F0369)* [https://perma.cc/PT5S-ME7D?type=image], McGrath Decl. Ex. 16 (AERA-0267); USASpending.Gov, *IES to Rsch. Tri. Inst. (91990018C0039)* [https://perma.cc/ZLL3-U8UL?type=image], McGrath Decl. Ex. 17 (AERA-0272).

[15] USASpending.Gov, *Dep't of Educ. To Applied Enter. Mgmt. Corp. (91990024F0331)* [https://perma.cc/C5JW-8H7G?type=image], McGrath Decl. Ex. 18 (AERA-0279–80); USASpending.Gov, *Dep't of Educ. to Am. Inst. for Rsch. in Behavioral Scis. (91990018C0046)* [https://perma.cc/J22W-4849], McGrath Decl. Ex. 19 (AERA-0285).

[16] Defendants have reportedly engaged in a partial reinstatement of this vital contract but then terminated the IES staff with the capacity and expertise required to ensure its effective execution. The CCD and NAEP remained in serious jeopardy. *See* Jill Barshay, *NAEP, the Nation's Report Card, Was Supposed to be Safe. It's Not*, KQED (Apr. 7, 2025) [https://perma.cc/TQT2-2ZUC], McGrath Decl. Ex. 20 (AERA-0288–96); Alex MacGillis, *Trump's War on Measurement Means Losing Data on Drug Use, Maternal Mortality, Climate Change and More*, ProPublica (Apr. 18, 2025) [https://perma.cc/LZ8D-TW9X], McGrath Decl. Ex. 21 (AERA-0297–300).

restricted data—data that contains information through which specific schools or individuals could be identified—to researchers by providing licenses, amended licenses, and secure procedures for sending restricted data, and facilitating a disclosure review process before research based on such data can be published. Compl. ¶ 120.[17] Numerous other support contracts essential for IES's functions—from dissemination, to technological and administrative support, to data analysis—were also cancelled. Compl. ¶¶ 121, 127, 138.[18]

### III.    In March, Defendants Terminated Nearly 90 Percent of IES's Remaining Staff.

IES has long been leanly staffed, with approximately 200 staff in its central offices and four centers to carry out a wide array of data collection and analysis, research, and dissemination activities across the country. *See* Whitehurst Decl. ¶¶ 5–10 (AERA-0003–06); Compl. ¶¶ 21, 26.[19] As a result, the agency has relied heavily on contractors and grantees to aid in carrying out its core functions. Ex. E, Chard Decl. ¶ 17 (AERA-0045). As the founding director of IES, Russ Whitehurst, explains, IES was created with staffing efficiency as a priority, and has maintained approximately its original level of staffing even as its budget and responsibilities have grown. Whitehurst Decl. ¶ 5 (AERA-0003). Given this lean model, IES's already small expert staff is

---

[17] USASpending.Gov, *Dep't of Educ. to Sanametrix, Inc. (91990022F0007)* [https://perma.cc/TG5J-WEUN?type=image], McGrath Decl. Ex. 22 (AERA-0301–06); *USASpending.Gov, Dep't of Educ. to Sanametrix, Inc. (91990024F0327)* [https://perma.cc/9WDV-4T4Q?type=image], McGrath Decl. Ex. 23 (AERA-0307–11).

[18] USASpending.Gov, *Dep't of Educ. to Manhattan Strategy Grp. (91990024F0373)* [https://perma.cc/UKC8-5GH5], McGrath Decl. Ex. 24 (AERA-0312–16); USASpending.Gov, *IES to Mathematica (91990024F0316)* [https://perma.cc/24CR-V8EU?type=image], McGrath Decl. Ex. 25 (AERA-0317–21); USASpending.Gov, *IES to Rsch. Tri. Inst. (91990024F0347)* [https://perma.cc/78UF-RECY?type=image], McGrath Decl. Ex. 26 (AERA-0322–26); *Dep't of Educ. to Am. Inst. for Rsch. in Behavioral Scis. (91990018C0046)*, [https://perma.cc/J22W-4849], McGrath Decl. Ex. 19 (AERA-0282–87); USASpending.Gov, *IES to Activate Rsch. (91990022F0006)* [https://perma.cc/8S23-HTA2?type=image], McGrath Decl. Ex. 27 (AERA-0327–31); USASpending.Gov, *Dep't to Educ. to Am. Inst. for Rsch. in Behavioral Scis. (91990024F0301)* [https://perma.cc/77WN-9JK9?type=image], McGrath Decl. Ex. 28 (AERA-0332–36); USASpending.Gov, *IES to Synergy Enters. (91990020F0309)* [https://perma.cc/VN7D-3GZU?type=image], McGrath Decl. Ex. 29 (AERA-0337–42).

[19] OPM, *FedScope* (select "Quarter Months" Data Cube under "Status Data," then select "September 2024," then on the top dropdown menu, select "Agency - All," "Cabinet Level Agencies," "ED-Department of Education," and "EDER-Institute of Education Sciences") [https://perma.cc/A9C8-HVWS], McGrath Decl. Ex. 30 (AERA-0343–44); *see also* Whitehurst Decl. ¶ 5 (AERA-0003).

critical to the functioning of the agency. All components need expert staff to develop the agency's strategic approaches, direct research and evaluation projects, oversee the work of contractors, and carry out the many tasks required to comply with federal contracting requirements and ensure effective performance. NCES, for example, needs experts who can oversee data collections and perform analysis. Chard Decl. ¶ 9 (AERA-0043); Whitehurst Decl. ¶ 11 (AERA-0006). NCER and NCSER need expert staff to chart the strategic course for high-quality research, engage with research applicants, and oversee the performance of grantees and contractors. Ex. B, Okagaki Decl. ¶ 10 (AERA-0013).

On March 11, 2025, Defendants made carrying out these functions impossible. As a part of the Department's announcement of a mass RIF, the Department designated nearly 90 percent of IES's staff for termination, leaving only about 20 employees across IES's main office and its four components. Pollard Young Decl. ¶ 16 (AERA-0029).[20] NCES was left with three staff—fewer than it had in 1870, shortly after it was established. Compl. ¶ 128[21]; Pollard Young Decl. ¶ 16(a) (AERA-0029). NCER and NCEE were each left with only a single remaining employee. Pollard Young Decl. ¶¶ 16(b), 16(d) (AERA-0029). Defendants released barely any information about these terminations and offered no explanation of how IES would (or could) continue to serve its functions following the RIF. Compl. ¶ 130. The IES Staff Termination Action left a short period of time before staff were placed on administrative leave on March 21, 2025, at which point IES's capacity was dramatically truncated.[22] Pollard Young Decl. ¶ 15 (AERA-0028–29). Staff received formal RIF termination notices on or around April 10, 2025, and they are due to be finally separated

---

[20] Jill Barshay, *Chaos and confusion as the statistics arm of the Education Department is reduced to a skeletal staff of 3*, Hechinger Rep. (Mar. 14, 2025) [https://perma.cc/5RLR-5TZ4], McGrath Decl. Ex. 31 (AERA-0345–51).

[21] Bureau of Educ., *Report of the Comm'r of Educ., Made to the Sec'y of the Interior,* at 5 (Oct. 27, 1870) [https://perma.cc/68BY-UB4M], McGrath Decl. Ex. 32 (AERA-0352–54).

[22] Dep't of Educ., Press Release, *U.S. Department of Education Initiates Reduction in Force* (Mar. 11, 2025) [https://perma.cc/WF8P-AAQD], McGrath Decl. Ex. 33 (AERA-0355–56).

from the agency on or around June 10, 2025. Pollard Young Decl. Ex. 2 (AERA-0037–40); Compl. ¶ 129.[23]

The IES Staff Termination Action was part of Defendants'—and the Trump Administration's—broad effort to close the Department of Education. In announcing the RIF that terminated the vast majority of IES staff, Defendant Education Secretary Linda McMahon said it was a part of the Department's "final mission."[24] The next week, the President issued an executive order directing the closure of the Department, which essentially memorialized the Termination Actions as the Administration's policy and which justified the actions to end the Department and IES, ironically, by citing *IES data* showing educational challenges in wake of the pandemic.[25] While Defendant McMahon stated that the mass RIF, and thus the IES Staff Termination Action, would not stop the Department from carrying out "all statutory programs," Defendant Acting IES Director Matthew Soldner wrote the next day that the termination of the "vast majority of IES staff" was to "transition our core work to others."[26] But the Department has not identified these "others." Congress has not altered any of IES's statutory responsibilities, and days after the IES Staff Termination Action, it appropriated funding for IES (not some unidentified "others") at the same level as the previous year.[27]

## ARGUMENT

A preliminary injunction "prevent[s] irreparable harm during the pendency of a lawsuit," giving the Court time to "render a meaningful judgment on the merits." *United States v. South*

---

[23] *Id.*

[24] Dep't of Educ., *Secretary McMahon: Our Department's Final Mission* (Mar. 3, 2025) [https://perma.cc/F7BT-MQ3D], McGrath Decl. Ex. 34 (AERA-0357–60).

[25] Improving Education Outcomes by Empowering Parents, States, and Communities, Exec. Order No. 14242 (Mar. 20, 2025), 90 Fed. Reg. 13679 (Mar. 25, 2025) [*available at* https://perma.cc/T8KY-BU96], McGrath Decl. Ex. 35 (AERA-0361–63) ("IES Funding EO").

[26] Jeffrey Mervis, *Layoffs gut research agency that helped monitor U.S. education*, Science (Mar. 13, 2025) [https://perma.cc/T7LE-AXF], McGrath Decl. Ex. 36 (AERA-0364–66).

[27] Cont. Res. Mar. 2025.

*Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003)). Preliminary relief is appropriate when plaintiffs show that: "(1) there is a likelihood of success on the merits; (2) there is a likelihood the movant will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in movant's favor; and (4) the injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). All factors weigh in Plaintiffs' favor here.[28]

### I.     <u>Plaintiffs Have Standing.</u>

Plaintiffs are membership associations of education researchers. These researchers face, and are already experiencing, innumerable harms as a result of IES's destruction through the Research Termination Action and the IES Staff Termination Action. *See generally, e.g.*, Ex. L, Garvey Decl.; Ex. N, Alex Doe Decl.; Ex. O, Wong Decl.; Ex. I, Reardon Decl.; Ex. F, Gersten Decl.; Ex. K, Talbott Decl.; Pigott Decl.; Ex. R, Watkins Decl.; Ex. P., Hedges Decl.; Tipton Decl. The law creating IES specifically obligates the agency both to create and disseminate its timely and relevant research and data to education researchers. Defendants' Termination Actions caused Plaintiffs' harms here, and the relief sought would redress those harms.

An association may assert standing as the representative of its members where (1) "its members would have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). This is just such a case. Taking the second two prongs first, the continued operation of the nation's education research agency is unquestionably germane to

---

[28] In the alternative, Plaintiffs are entitled to relief "to preserve status or rights" pending resolution of the case under 5 U.S.C. § 705, which is governed by the same factors. *Am. Fed'n of Tchrs. v. Dep't of Educ.*, No. 25-CV-628, 2025 WL 1191844, at *7 (D. Md. Apr. 24, 2025) (citing *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020)).

Plaintiffs' missions as associations of education researchers. Compl. ¶¶ 141–156; Ex. H, Levine (AERA) Decl. ¶¶ 4–9 (AERA-0064–66); Ex. G, Weiss (SREE) Decl. ¶ 6 (AERA-0055). And the injunctive relief sought here—seeking declaratory and injunctive relief to require IES to continue to carry out its required functions—does not require the individual participation of Plaintiffs' members.

The first prong is also satisfied because Plaintiffs' members would have standing to sue in their own right. To have standing, a plaintiff must "demonstrate the now-familiar elements of injury in fact, causation, and redressability." *Lance v. Coffman*, 549 U.S. 437, 439 (2007). Plaintiffs' members easily satisfy that three-part test. Plaintiffs' members have suffered and will imminently suffer further "concrete and particularized" and "actual or imminent" injuries as a result of Defendants' actions. *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 621 (4th Cir. 2018) (cleaned up). The shutting down of virtual, remote access to certain data has already caused Plaintiffs' members to lose access to IES data that is subject to restrictions that protect identifying information ("restricted-use data")—data critical to their education research—and Defendants' mass-cancellation of contracts and mass-termination of staff imminently threatens Plaintiffs' members access to and use of that and other critical data through other means. Garvey Decl. ¶¶ 22–25 (AERA-0095–96); Reardon Decl. ¶¶ 14–15 (AERA-0074); Alex Doe Decl. ¶¶ 8, 11 (AERA-0106); Wong Decl. ¶¶ 10–18 (AERA-0111–12). The Research Termination Action and IES Staff Termination Action further directly threaten the continued operation of the What Works Clearinghouse ("WWC"),[29] and will deprive both the Education Research Information Center ("ERIC") and WWC of updated research studies and data that Plaintiffs' members need to address new challenges and to foster further effective research and practice. Tipton Decl. ¶¶ 21–24 (AERA-

---

[29] *See* USASpending.Gov, *Dep't of Educ. to ABT Global LLC (91990025F0014)* [https://perma.cc/UQ44-J3KS], McGrath Decl. Ex. 37 (AERA-0367–71).

0082–83); Talbott Decl. ¶¶ 11–12 (AERA-0089); Watkins ¶¶ 7–10 (AERA-0132). The dissemination of education research and data through the WWC and ERIC is critical to the work of Plaintiffs' members in conducting meta-analysis, in designing research projects and evaluations, and in putting research-based education interventions into practice. *See, e.g.*, Boulay Decl. ¶¶ 5–7 (AERA-0124–25), 10–12; Pigott Decl. ¶¶ 8–13 (AERA-0136–37); Watkins Decl. ¶¶ 7–10 (AERA-0132).

Defendants' cancellation of myriad significant studies in the Research Termination Action, moreover, like the ECLS-K studies and the MTSS approach to reading study, will directly prevent Plaintiffs' members from gaining access to vital, long-running research products that they had been planning to incorporate into their work. Reardon Decl. ¶¶ 18–19 (AERA-0075); Gersten Decl. ¶¶ 9–15 (AERA-0050–52).[30] Plaintiffs' members have also already lost access to the updated data, research, and services provided by the RELs: With the RELs contracts cancelled, they are no longer conducting research, disseminating research and data resources, or providing the technical assistance relied on by Plaintiffs' members. *See, e.g.*, Talbott Decl. ¶ 13 (AERA-0089–90); Weiss (SREE) Decl. ¶ 9 (AERA-0056–57). Another contract cancellation cut off the needed technical assistance that had been provided to Plaintiffs' members. Weiss (SREE) Decl. ¶ 10 (AERA-0057).[31] And since the IES Staff Termination Action, new research grants are not being approved, harming Plaintiffs' members ability to access timely research on relevant topics conducted by others. *See, e.g.*, Talbott Decl. ¶ 7–13 (AERA-0087–90); Reardon Decl. ¶ 20 (AERA-0076). The harms to Plaintiffs' members are many, ongoing, and growing. Ultimately, if Defendants'

---

[30] *See also* IES, *Impact Evaluation of Training in Multi-Tiered Systems of Support for Reading in Early Elementary School* [https://perma.cc/8MNG-QZPA], McGrath Decl. Ex. 38 (AERA-0372–75); Jill McCarroll, *Happy New Year from the ECLS-K: 2024!*, NCES (Jan. 7, 2025) [https://perma.cc/TW43-ZV24], McGrath Decl. Ex. 39 (AERA-0376–79).

[31] USASpending.Gov, *Dep't of Educ. to ABT Global LLC (91990020F0305)* [https://perma.cc/FZ3Q-QZMK], McGrath Decl. Ex. 40 (AERA-0380–84).

evisceration of IES is allowed to stand, with only a tiny stump of staff left and a mass of contracts cancelled, irreplaceable timely, quality education research, data, and related resources will not be disseminated or available to Plaintiffs' education researcher, policymaker, and practitioner members.

These harms were unquestionably caused by Defendants' Termination Actions. No Congressional prompting or change in law caused Plaintiffs' members to lose access to the critical data and research they need to conduct their research and further our understanding of the education system; Defendants' actions did. And that harm is redressable by a favorable decision here: Plaintiffs seek relief, including the reinstatement of IES staff to perform IES functions and the reinstatement of cancelled contracts, that would require IES's continued operation and the fulfillment of its functions on which Plaintiffs' members rely. *See Hutton*, 892 F.3d at 619 (reciting causation and redressability elements of standing). Plaintiffs' members would therefore have Article III standing to sue in their own right.

Plaintiffs' members also would have prudential standing because they fall within the zone of interest of the statutes they seek to enforce. "[I]n the in the APA context," the zone-of-interests test for standing "is not especially demanding," requiring only that a plaintiff's interests are "arguably" within the zone of the relevant statute under a "lenient" analysis. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014). The interests of Plaintiffs' members—as education researchers—are unambiguously within the zone that Congress sought to protect in enacting the Education Sciences Reform Act ("ESRA"). ESRA specifically identifies serving the interests of, and disseminating quality data and research to, "researchers" as an explicit purpose underlying IES's establishment. 20 U.S.C. §§ 9501(10), 9511(b)(1). Plaintiffs have been injured

by Defendants' actions to eviscerate IES's functions, and they have standing to challenge those actions.[32]

## II.    **Plaintiffs Are Likely to Succeed on the Merits.**

Plaintiffs are likely to prevail in showing that Defendants' Termination Actions—cutting off vital research and support contracts and terminating the vast majority of IES staff—must be set aside under the Administrative Procedure Act (APA). The APA permits judicial review of "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and provides that a court "shall" "hold unlawful and set aside agency action" that is, among other things, "arbitrary [and] capricious," "not in accordance with law," "in excess of statutory … authority," or "contrary to constitutional [] power." 5 U.S.C. § 706(2)(A)–(C). Defendants' Termination Actions are reviewable final agency actions that must be set aside for multiple independent reasons. *First*, these actions are arbitrary, with almost no reasoning provided for their dramatic destruction, no consideration of reliance interests or expert input, and irrational consequences that throw away hundreds of millions of dollars already invested in ongoing studies. *Second*, the Termination Actions are contrary to law and exceed Defendants' statutory authority as they make it impossible for IES to carry out the many duties assigned to the agency by Congress. *Third*, the disregard of Congress's direction to carry out IES's functions and to spend appropriated funds on those functions violates Congress's constitutional power and separation-of-powers principles.

---

[32] Some preliminary relief ordering reinstatement of employees has been stayed by the Supreme Court and the Fourth Circuit with brief reasoning and reference to standing. *OPM v. Am. Fed'n of Gov't Emps.*, No. 24A904, 2025 WL 1035208, at *1 (U.S. Apr. 8, 2025); *Maryland v. USDA*, No. 25-1248, 2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025) (citing *OPM*). But both *Maryland* and *OPM* concerned challenges to the firing of small percentages of affected agencies' employees who were in probationary status, and plaintiffs in those cases did not challenge wholesale agency destruction. Further, in *Maryland*, the lower court found the challenging states' standing was based specifically on the purported failure to comply with relevant RIF regulations (and concomitant requirements that states be provided requisite notice. *Maryland v. USDA*, No. 25-CV-0748, 2025 WL 973159, at *5 (D. Md. Apr. 1, 2025). In *OPM*, the Supreme Court based its brief stay on the inadequacy of organizational standing articulated by non-profits as a result of the loss of probationary employees, but here Plaintiffs have shown concrete harms to their members flowing from the termination of nearly *all* IES employees.

### A. The Termination Actions are final agency actions for which there is no adequate remedy.

As an initial matter, the Research Termination Action and IES Staff Termination Action are subject to judicial review because they are final agency actions for which there is no other adequate remedy in court. 5 U.S.C. § 706.

An agency's action is final when it (1) represents "the consummation of the agency's decisionmaking process," and (2) either determines legal "rights or obligations" or is an action "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotations omitted). Defendants' statements, and those of the Administration, have made clear that the Termination Actions are intended as a permanent act to gain "savings" by ceasing to carry out functions that Congress assigned to IES.[33] Defendant Secretary McMahon's statements about the "final" mission of dismantling the entirety of the Department of Education further demonstrate that the evisceration of IES through the Termination Actions is the consummation of Defendants' decision-making.[34] *See POET Biorefining, LLC v. EPA*, 970 F.3d 392, 404 (D.C. Cir. 2020) (finding that approval by agency official who was "no mere subordinate" was evidence of finality). Defendants' IES Staff Termination Action itself confirmed the finality of the Research Termination Action, as there are no longer sufficient staff to adequately administer research and data contracts. *See, e.g.*, Whitehurst Decl. ¶¶ 7–11 (AERA-0004–06); Pollard Young Decl. ¶¶ 18–20 (AERA-0030–31); Chard Decl. ¶¶ 15–21 (AERA-0044–45); Okagaki Decl. ¶¶ 9–11 (AERA-0013). Defendants further confirmed the finality of the IES Staff Termination Action by placing the designated employees on administrative leave, cutting off their access to government

---

[33] Dep't of Gov. Efficiency, *Savings* [https://perma.cc/K9GZ-8BUR], McGrath Decl. Ex. 12 (AERA-0248–51).

[34] *McMahon: Our Department's Final Mission* [https://perma.cc/F7BT-MQ3D], McGrath Decl. Ex. 34 (AERA-0357–60).

communication systems, and by sending final, formal RIF notices on or around April 10, 2025.[35] Pollard Young Decl. Ex. 2 (AERA-0037–40); *see CACI, Inc. v. U.S. Navy*, 674 F. Supp. 3d 257, 272 (E.D. Va. 2023) (finding even the agency's failure to act without any formal decision-making process was "final agency action" given the context, including the agency's "last communication" to a relevant party).

Defendants' statements and actions also demonstrate that the Termination Actions determine "rights and obligations" of other parties and produce "legal consequences." The Research Termination Action involved abrupt cancellations of contracts, altering Defendants' legal obligations to other parties.[36] *See Alston v. Balt. Gas & Elec. Co.*, No. 22-CV-1061, 2023 WL 1472020, at *10 (D. Md. Feb. 1, 2023) (noting that contracts involve "legal consequences" (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985))). The IES Staff Termination Action, similarly, determines rights and obligations and has "self-evident legal consequences." See *Maryland v. USDA*, 25-CV-0748, 2025 WL 800216, at *11 (D. Md. Mar. 13, 2025) ("[A]ny agency's decision to dismiss an employee effects self-evident legal consequences for both parties and plainly marks the end of the agency's decisionmaking with respect to the employee involved."), *appeal docketed*, No. 25-1248 (4th Cir. Mar. 17, 2025) (stayed on other grounds in a case directly challenging layoffs as a result of lack of notice and layoffs' impact on state unemployment systems). And the harms to Plaintiffs' members clearly illustrate that the Termination Actions "will directly affect the parties" here, and, indeed, that they already

---

[35] Arthur Jones II, *'Your position is being abolished': Education Department staff get official reduction-in-force notices*, ABC News (Apr. 10, 2025) [https://perma.cc/9UPM-BCYN], McGrath Decl. Ex. 41 (AERA-0385–89).

[36] *See, e.g.,* USASpending.Gov, *IES to Applied Enter. Mgmt. Corp. (91990024F0367)* [https://perma.cc/LM4E-ME8P?type=image], McGrath Decl. Ex. 42 (AERA-0390–94); USASpending.Gov, *IES to WeStat, Inc. (91990019C0002)* [https://perma.cc/9XBU-EWJ6], McGrath Decl. Ex. 43 (AERA-0395–400); *Dep't of Educ. to Am. Inst. for Rsch. in Behavioral Scis. (91990018C0046)* [https://perma.cc/J22W-4849], McGrath Decl. Ex. 19 (AERA-0282–87) (showing contracts were "terminated for convenience").

are. *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).

Further, Plaintiffs have "no other adequate remedy in a court," 5 U.S.C. § 704, for challenging Defendants' Termination Actions. Although the Termination Actions involve cancellation of contracts, no contract claim would provide Plaintiffs with an adequate remedy. Plaintiffs cannot bring any contract claims because they are not parties to the cancelled contracts. And, in any event, the typical remedy for such a contract claim—money damages—would not provide Plaintiffs an adequate remedy because it would not result in the resumption of IES's statutorily-required research and dissemination functions. *See Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988). Likewise, although the Termination Actions involve firing of personnel, Plaintiffs could not bring any employment claims because they are not themselves the impacted employees. And Plaintiffs' complaint is not, in any case, akin to an employment action because Plaintiffs seek to ensure the functioning of the agency on which they rely not the particulars of an employment relationship. *See Maryland v. USDA*, 2025 WL 800216, at *14 n.5. The Termination Actions are subject to review under the APA.

### B.  The Termination Actions are arbitrary and capricious, with a stunning lack of reasoning or consideration of their impacts.

Plaintiffs are likely to prevail on their claim that Defendants' Termination Actions must be set aside because they are arbitrary and capricious. The APA "requires agencies to examine relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted). An "agency action that is arbitrary and capricious shall be set aside as unlawful." 5 U.S.C. § 706(2)(A). An agency's decision is arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of the

> problem, offered an explanation for its decision that runs counter to
> the evidence before the agency, or is so implausible that it could not
> be ascribed to a difference in view or the product of agency expertise.

*West Virginia v. Thompson*, 475 F.3d 204, 212 (4th Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n,*

463 U.S. at 43). Defendants' mass contract cancellation and termination of the vast majority of

IES staff was abrupt and unreasoned.

### i. Defendants offered hardly any explanation for the Termination Actions.

Defendants have offered barely a scintilla of explanation for their dramatic Termination

Actions, which stand to destroy IES and, through it, the system of quality education research

developed in the United States over decades. To effectuate the Research Termination Action, a

representative from DOGE arrived at the Department and directed a mass contract cancellation

with no reasoning provided even to the staff responsible for the contracts, and the cancellations

were completed within a day. Pollard Young Decl. ¶¶ 8–11 (AERA-0026–27); Compl. ¶¶ 77–79.[37]

There was no consultation with expert staff or deliberative process before this rash mass

cancellation was undertaken. Pollard Young Decl. ¶¶ 8–11 (AERA-0026–27). DOGE made brief

reference—in an X message—to one aspect of a single, small contract to justify the "savings" it

claimed flowed from Defendants' mass contract cancellations. Compl. ¶ 80.[38] Defendants

terminated all these contracts "for convenience"—with no reason given—and a Department

spokesperson could not offer an explanation as to how DOGE reached the conclusion that the

---

[37] Meckler and Natanson, *DOGE rips through Education Department* [https://perma.cc/4KDD-2PA3], McGrath Decl. Ex. 9 (AERA-0236–240).

[38] This reference to the contract paying for observation of mail operations may have concerned the performance of quality control for the sending of surveys to ensure resulting data was reliable, but given the paucity of information provided by Defendants about their actions, it remains a mystery to what DOGE was referring in the handful of words it offered to justify the abrupt cancellation of $881 million of research and data contracts. Department of Government Efficiency (@DOGE), X/Twitter (Feb. 10, 2025, 7:43 PM ET) [https://perma.cc/N9UU-QFHH], McGrath Decl. Ex. 44 (AERA-0401–02).

contracts should be cancelled.[39] Defendants offered just one more shred of justification about one of the 10 cancelled REL contracts, that a single REL had advised schools in a single state to take actions related to "equity."[40] Defendants and the Administration offered no justification for the cancellation of the 97 other contracts cancelled abruptly.

Defendants offer even less explanation for the IES Staff Termination Action. In a preview of the President's Executive Order directing the Department to close entirely, Defendant McMahon stated that the Department-wide RIF that cut nearly 90 percent of IES staff was part of the Department's "final mission," but offered no explanation of why IES's research functions were to be terminated.[41] Defendant Soldner, in stating that the "vast majority of IES has been subject to a department-wide Reduction in Force (RIF)," explained only that IES's focus would now be "preparing for a transition of our core work to others."[42] But those "others" have not been identified. These conclusory assertions are not "explanations," and they do not "square with what is required" under the APA. *Mayor & City Council of Baltimore v. Azar*, 439 F. Supp. 3d 591, 606 (D. Md. 2020), *aff'd sub nom. Mayor of Baltimore v. Azar*, 973 F.3d 258 (4th Cir. 2020).

### ii. What little reasoning Defendants have offered for the Termination Actions has no rational connection to the evidence before them.

Indeed, to the extent Defendants' bare explanations rely on anything at all, it may be the President's desire to close the Department. But that justification also fails because it offers no "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. The President's March 20, 2025, Executive Order seemed to offer some purported

---

[39] Meckler and Natanson, *DOGE rips through Education Department* [https://perma.cc/4KDD-2PA3], McGrath Decl. Ex. 9 (AERA-0236–40).
[40] *U.S. Department of Education Cancels Additional $350 Million in Woke Spending* [https://perma.cc/WR8N-VTHV], McGrath Decl. Ex. 11 (AERA-0246–47).
[41] *U.S. Department of Education Initiates Reduction in Force* [https://perma.cc/WF8P-AAQD], McGrath Decl. Ex. 33 (AERA-0355–56).
[42] Mervis, *Layoffs gut research agency that helped monitor U.S. education* [https://perma.cc/T7LE-AXF], McGrath Decl. Ex. 36 (AERA-0364–66).

"purpose and policy" for the mass RIF that predated it by directing Secretary McMahon to close the Department and "return authority" to the "States and local communities."[43] Defendant McMahon's earlier reference to the Termination Action being part of the Department's "final mission" echoes this policy aim of returning authority to the states.[44] But the President and the White House cite IES data at length to justify the policy aim of closing the Department, demonstrating that Defendants *themselves* continue to rely on the validity and importance of IES's work even as they seek to destroy it.[45] Defendant McMahon and the President's stated desire to return authority "back to the states" provides no justification for eviscerating an education research and data agency that does not exercise any control over state and local education.[46] Experts in the field, moreover, believe that states and localities cannot substitute for the national leadership role played by IES in the field of education research. *See* Whitehurst Decl. ¶¶ 12–14 (AERA-0007–08) (explaining the lack of existing state structures, funding, and expert staff at the state level); Hedges

---

[43] IES Funding EO [https://perma.cc/T8KY-BU96], McGrath Decl. Ex. 35 (AERA-0361–63).

[44] *U.S. Department of Education Initiates Reduction in Force* [https://perma.cc/WF8P-AAQD], McGrath Decl. Ex. 33 (AERA-0355–56).

[45] IES Funding EO § 1 [https://perma.cc/T8KY-BU96], McGrath Decl. Ex. 35 (AERA-0361–63) ("Today, American reading and math scores are near historical lows. This year's National Assessment of Educational Progress showed that 70 percent of 8th graders were below proficient in reading, and 72 percent were below proficient in math."); *Fact Sheet: President Donald J. Trump Empowers Parents, States, and Communities to Improve Education Outcomes*, The White House (Mar. 20, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-empowers-parents-states-and-communities-to-improve-education-outcomes/ [https://perma.cc/7LNG-Q967] ("Since its relatively recent inception in 1979, the Department of Education, which does not directly educate students, has spent over $3 trillion without improving student achievement as measured by standardized National Assessment of Educational Progress (NAEP) scores. Federal taxpayers spent around $200 billion in additional education funding during COVID-19, which, given the substantial learning loss that resulted, typifies the ineffectiveness of the current federally driven model. Mathematics and reading scores are down in public schools, despite per-pupil spending having increased by more than 245% since the 1970s, indicating that more spending does not mean better education. 13-year-olds' mathematics scores are the lowest they have been in decades. 13-year-olds' reading scores are the lowest since testing began over 30 years ago. Low-performing students are falling further behind. In 2023, 13 Baltimore, Maryland, high schools had zero students who tested proficient in mathematics."), McGrath Decl. Ex. 45 (AERA-0403–05).

[46] Dep't of Educ., Press Release, *Statement on President Trump's Executive Order to Return Power Over Education to States and Local Communities* (Mar. 20, 2025) [https://perma.cc/N4AC-MF55], McGrath Decl. Ex. 46 (AERA-0406–07) ("We are sending education back to the states where it so rightly belongs. . . . we will empower states to take charge and advocate for and implement what is best for students, families, and educators in their communities.")

Decl. ¶¶ 23–24 (AERA-0120–21). These facts show the stark lack of a "rational connection" between the "relevant data" available to Defendants and their Termination Actions obliterating IES's functioning. *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Moreover, the destruction of IES certainly cannot be considered a rational "product of agency expertise," *West Virginia*, 475 F.3d at 212, where, as here, the record shows little to no engagement with agency experts before undertaking the Termination Actions, Pollard Young Decl. ¶¶ 8–11 (AERA-0026–27).[47]

### iii. The Termination Actions are also unexplained, impermissible changes in fundamental agency positions that do not consider Plaintiffs' members' reliance interests at all.

The Termination Actions are arbitrary and capricious for the additional reason that Defendants failed to address the change in course or consider the reliance interests their actions affect. The Fourth Circuit has held that "in changing policies, agencies 'must provide a reasoned explanation for the change.'" *Casa de Maryland v. DHS*, 924 F.3d 684, 703 (4th Cir. 2019) (finding a letter justifying the recission of DACA to be insufficient and arbitrary(quoting *Jimenez–Cedillo v. Sessions*, 885 F.3d 292, 298 (4th Cir. 2018))). The explanation must address the 'facts and circumstances that underlay or were engendered by the prior policy,' including any 'serious reliance interests." *Id.* at 704 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)). Any "'unexplained inconsistency' in agency policy indicates that the agency's action is arbitrary and capricious, and therefore unlawful." *Jimenez–Cedillo*, 885 F.3d at 298 (finding change in interpretation of crimes of moral turpitude was arbitrary and capricious).

Defendants utterly failed to explain their change in policy. The abrupt and unreasoned decisions that neither 90 percent of IES staff nor more than $1.2 billion in data, research, and

---

[47] Meckler and Natanson, *DOGE rips through Education Department* [https://perma.cc/4KDD-2PA3], McGrath Decl. Ex. 9 (AERA-0236–40).

dissemination contracts were required any longer show a fundamental change in agency position: the view of whether the agency should carry out its core functions at all. Defendants have offered almost no explanation for that change, leading to the type of "unexplained inconsistency" that renders the Termination Actions arbitrary and unlawful. *Id*. at 298. Even considering the shreds of reasoning they have offered, or which can be inferred from the President's order, White House documents, and Defendant McMahon's statements—relying on the validity of IES data to shutter IES and citing states' need for authority as a basis for shuttering an agency without authority over states—Defendants have failed to articulate a "rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

These cursory explanations, moreover, do not account in any way for Plaintiffs' members' serious reliance interests. *Casa de Maryland*, 924 F.3d at 703. Plaintiffs' members fundamentally rely on IES carrying out its mission: to facilitate an ecosystem of high-quality education data and research, and to disseminate that data and research to researchers like Plaintiffs' members. Hedges Decl. ¶ 23 (AERA-0120). Plaintiffs' members have dedicated decades and enormous resources into careers in education research that rely on IES functioning as Congress has directed. And Plaintiffs' members—including students who have enrolled in degree programs—rely on this quality data and research for their own research designs, meta-analysis, dissertations, and application in education settings to address educational challenges. Below are a selection of examples of the ways in which IES ceasing to carry out its functions harms Plaintiffs' members' reasonable reliance interests:

- "My team and my students have been planning research using ECLS-K data. I previously published several high-profile research papers using earlier ECLS-K studies from 1998 and 2010 and planned to add to that research using the new ECLS-K study data. The inability to use this rich and important data source will diminish our ability to conduct effective research and data analysis on trends and patterns in kindergarten readiness and strategies for improving early childhood education." Reardon Decl. ¶ 18 (AERA-0075).

- "My work outside IES-funded projects is still very reliant on the research, data, and analysis made possible by IES's resources . . . The abrupt February 10, 2025, cancellation of the [MTSS] study will prevent me, but also other researchers in the fields of special education and reading, from gaining access to invaluable research and data . . .  My work will be significantly compromised . . . The mass cancellation of IES contracts, and the subsequent mass layoffs of IES staff, makes the career in which I have invested decades untenable . . ." Gersten Decl. ¶¶ 7, 10, 15–16 (AERA-0049–52).

- "I have created and maintained, with the assistance of others, 'The Generalizer,' which is an online resource that I provide to researchers to aid in ensuring their findings are representative and generalizable across school types and populations. . . . I generally support it with my own time and work with a low cost developer to provide free access to education researchers. This work would be impossible without IES data. . . . This tool relies upon updated data funded through canceled IES contracts . . . . Contracts supporting these data sources were abruptly cancelled in February. Without these and other sources of data, the Generalizer tool will quickly become out-of-date and unreliable." Tipton Decl. ¶¶ 8, 10, 14–15 (AERA-0079, AERA-0081).

- "For all of this work, it is critical that we used the HSLS09 restricted-use data set. . . . The loss of the virtual cold room means we cannot use restricted-use HSLS09 data for our work.. . . further, the staff at NCES that I have worked with are gone. The people who could have possibly helped me are no longer there. Therefore, we cannot use HSLS09 data." Garvey ¶¶ 19, 26–27 (AERA-0095–96).

- "The [What Works Clearinghouse] provides extensively vetted education research studies as well as practice guides created using these studies to make them useful for practical application. This is an invaluable resource for my teaching and for my students' use in application as it provides evidence-based approaches and interventions for education practice. The lack of availability or degraded capacity of the WWC would be personally devastating because as an academic and practitioner it is essential to my work and career." Pigott Decl. ¶¶ 9, 10 (AERA-0136).

- "I have worked in school districts for decades, including as a director of research, evaluation and assessment. . . . In my work, it is vital to rely on IES-supported high-quality research. Without this high-quality research I would more often be forced to rely on information that is not valid or reliable, and would more often be forced to make decisions that impact the students I seek to serve with worse quality data that may not be representative." Watkins Decl. ¶¶ 3, 10 (AREA-0131–32).

*See also* Boulay Decl. ¶¶ 7, 12–13 (AERA-0125–28); Reardon Decl. ¶¶ 8, 20 (AERA-0073, AERA-0076); Talbott Decl. ¶¶ 3–4 (AERA-0085–86).

The system of quality education research created by IES's establishment is critical to education, and IES's functions cannot be replicated by the scattered and disparate efforts of states and private actors. Whitehurst Decl. ¶¶ 12–13 (AERA-0007). Plaintiffs' members' reliance on IES

is justified: Congress created IES to serve this role, requires IES to carry out these functions, has funded the agency every year since 2002, and specifically directed it to account for and disseminate data and research to education researchers. 20 U.S.C. § 9511; *id.* § 9512 ("Functions").

Defendants have not offered a single word to justify their disregard of these reliance interests, nor even an indication that they are aware that the reliance interests of researchers exist.[48] Defendants' ignorance of existing conditions and interests is no defense; rather, it is instead an independent reason to find that the Termination Actions were arbitrary and capricious. *See Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012) ("A material misapprehension of the baseline conditions existing in advance of an agency action can lay the groundwork for an arbitrary and capricious decision.").

### iv. Defendants failed to consider important aspects of the Termination Actions, and did not rely on the factors Congress directed them to consider.

Defendants' Termination Actions are also arbitrary and capricious both because Defendants "relied on factors which Congress has not intended [the agency] to consider" and "entirely failed to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Defendants' unreasoned mass contract cancellations and mass staff termination fully disregard Congress's direction to operate IES in a manner that carries out its statutorily-required functions to foster effective education research in the United States. Defendants' apparent attempt

---

[48] Further illustrating this disregard for reliance interests in Defendants' Termination Actions, they also abruptly cancelled a contract carrying out a study of special education transition supports by funding services for students in districts around the country. These students' services were abruptly terminated on a day's notice. Cory Turner, *DOGE abruptly cut a program for teens with disabilities. This student is 'devastated'*, NPR (Apr. 14, 2025) [https://perma.cc/7K42-2E5M], McGrath Decl. Ex. 47 (AERA-0408–418); USASpending.Gov, *Dep't of Educ. to Am. Inst. for Rsch. in Behavioral Scis. (91990019C0078)* [https://perma.cc/8GSA-FXP8?type=image], McGrath Decl. Ex. 48 (AERA-0419–23).

to achieve "savings"[49] through these actions fully ignores that, even after the Termination Actions, Congress appropriated the same level of funding for IES as it had for the previous year and a half.[50]

Further, Defendants' own statements surrounding the IES Staff Termination Action are, at a minimum, contradictory and clearly do not rely on Congress's directions in ESRA or its recent appropriations. Notwithstanding Secretary McMahon's assurance that the Department would "continue to deliver on all statutory programs," Defendants have not explained how they would do so, and instead suggested unspecified "others" would carry out IES's functions.[51]

And Defendants have clearly not considered the ramifications of their Termination Actions on our nation's ability to understand the "status and progress" of our education system or to conduct research with "high standards of quality, integrity, and accuracy." 20 U.S.C. § 9511. Defendants' Termination Actions stand to destroy the field of high-quality education research that has been built for decades with the "national leadership," support, research and data dissemination, and resources provided by IES. 20 U.S.C. § 9511; Okagaki Decl. ¶¶ 15–18 (AERA-0014–15); Whitehurst Decl. ¶¶ 12–14 (AERA-0007–08); Chard Decl. ¶¶ 13–14 (AERA-0044); Hedges Decl. ¶¶ 22–24 (AERA-0120–21). Nor is there any evidence they have considered the necessity of IES for tracking the status of our nation's progress on its educational challenges—which are acute following the pandemic, as the President and the Department have acknowledged using IES data— or the vital role of IES's rigorous research to identify evidence-based methods of addressing those challenges. Courts in this District have found far more rational decision-making than Defendants' Termination Actions to be arbitrary and capricious. *See, e.g.*, *New England Anti-Vivisection Soc'y*

---

[49] Dep't of Gov. Efficiency, *Savings* [https://perma.cc/K9GZ-8BUR], McGrath Decl. Ex. 12 (AERA-0248– 51).

[50] Cont. Res. Mar. 2025 (referring to Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 693 (Mar. 23, 2024)).

[51] Mervis, *Layoffs gut research agency that helped monitor U.S. education* [https://perma.cc/T7LE-AXF], McGrath Decl. Ex. 36 (AERA-0364–66).

*v. Goldentyer*, No. 20-CV-02004, 2023 WL 2610867, at *11 (D. Md. Mar. 23, 2023) (finding that the Department of Agriculture's use of "focused inspections" to address the valid "practical consideration of inspector workload" considered a factor—workload—that Congress did not intend").

    **v.    Defendants' unreasoned and unexplained cancellation of research contracts mid-performance is illustrative of the profound arbitrariness of the Termination Actions.**

    Finally, Defendants' decision—without explanation—to cancel numerous large contracts mid-performance after millions or tens of millions of dollars had already been spent to conduct extensive data collection and research stands out for its lack of reasoning. These cancellations, if allowed to stand, achieve minimal savings and will waste hundreds of millions of taxpayer dollars by preventing the completion and dissemination of critical research that was already well underway. The HS&B study was cancelled after more than $44 million dollars were spent on conducting it over almost seven years.[52] The ECLS-K Study was cancelled after $57 million were spent to conduct it over 5 years, and thousands of children and their parents and educators were studied.[53] *See* Reardon Decl. ¶¶ 18–19 (AERA-0075–76). The contracts to carry out the National Postsecondary Aid Study were cancelled abruptly after more than 6 years of work and $68 million in taxpayer funds were expended.[54]

    **C.    The Termination Actions are contrary to law and in excess of Defendants' statutory authority.**

    Plaintiffs are also likely to prevail on their claim that the Termination Actions are "not in accordance with law" and "in excess of statutory . . . authority," 5 U.S.C. § 706(2); s*ee Nat'l Fed'n*

---

[52] *IES to Rsch. Tri. Inst. (91990018F0018)* [https://perma.cc/W2UY-6ESU?type=image], McGrath Decl. Ex. 15 (AERA-0261–65).
[53] *IES to WeStat, Inc. (91990019C0002)* [https://perma.cc/9XBU-EWJ6], McGrath Decl. Ex. 43 (AERA-0395–400).
[54] *IES to Rsch. Tri. Inst. (91990018F0018)* [https://perma.cc/W2UY-6ESU?type=image], McGrath Decl. Ex. 15 Ex. 15 (AERA-0261–65); *IES to Rsch. Tri. Inst. (91990018C0039)* [https://perma.cc/ZLL3-U8UL?type=image], McGrath Decl. Ex. 17 (AERA-0271–76).

*of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided."). Through the Termination Actions, Defendants have acted to stop carrying out IES's required functions, as the agency has terminated the staff needed to carry out those functions and a large share of the contracts through which it previously met its statutory obligations. And halting the performance of statutorily-required functions violates the APA. *See Widakuswara v. Lake*, No. 25-CV-2390, 2025 WL 945869, at *5 (S.D.N.Y. Mar. 28, 2025); *Nat'l Treasury Emps. Union v. Vought*, No. 25-CV-0381, 2025 WL 942772, at *40–41 (D.D.C. Mar. 28, 2025); Prelim. Inj. Op. at 25–28, *Widakuswara v. Lake*, No. 25-cv-1015 (D.D.C. Apr. 22, 2025), ECF No. 98.

The mandatory functions Congress has required IES to undertake are numerous and complex. ESRA requires that IES's NCES "*shall* collect, report, analyze, and disseminate statistical data related to education." 20 U.S.C. § 9543(a). ESRA lists numerous specific areas and ways in which NCES must carry out this requirement, including through longitudinal studies, data on financial aid, comparisons with foreign nations, and much more. *Id*. NCES must also carry out National Assessment of Educational Progress ("NAEP") using high-quality methods and disseminate the results. *See id.* § 9622 (using "shall" nine times to specify NCES Commissioner's mandatory responsibilities regarding NAEP). Congress has similarly assigned numerous mandatory duties to NCER and NCSER. The law requires that the research centers "shall" propose research plans to the IES Directors, carry out those research plans, conduct "long-term research activities," "promote the use of scientifically valid research," "synthesize and disseminate findings" in conjunction with NCEE, and carry out numerous other research activities detailed by the statute. *Id.* §§ 9533, 9567b. ESRA also requires that IES, through NCEE, "*shall* enter into contracts with entities to establish a networked system of 10 regional educational laboratories." *Id.*

§ 9564. The law also requires that NCEE "shall" "conduct evaluations"; "widely disseminate information on scientifically valid research, statistics, and evaluation," particularly to states and school districts; manage the National Library of Education; and make research and statistics "accessible in a user-friendly, timely, and efficient manner," including through a "searchable Internet-based online database." *Id.* § 9562.

IES's obligations are not only numerous, but Congress has repeatedly made clear that IES's functions must be carried out with a *high standard of quality* to ensure accurate and valid research and data, and that this research must be conducted and disseminated in an up-to-date, timely, and relevant manner.[55] The requirement for IES's data and research to be of high quality and timely is not incidental—these requirements go to the core purpose of creating IES as an institution to promote rigorous, valid research that can be used to effectively address education challenges.

The Termination Actions have made it impossible for IES to carry out its legally-required functions. With a staff of only 20, and a large share of its existing contracts for data collection, longitudinal studies, research studies, dissemination and support cancelled, IES simply will not be able to fulfill its many statutory requirements to conduct high-quality research, collect and analyze valid data, and to disseminate that research and data. Chard Decl. ¶¶ 16–24 (AERA-0045–46); Whitehurst Decl. ¶¶ 7–11 (AERA-0004–06); Pollard Young Decl. ¶¶ 18–19 (AERA-0030–31). Any argument that IES's remaining skeleton staff could carry out these functions, or that the husk of remaining contracts fulfills these requirements, ignores the many statutory requirements that

---

[55] *See, e.g.*, *id.* § 9512 (enumerating five times that IES functions involve "scientifically valid" research and data); *id.* § 9541(b)(1) (NCES must employ "the highest methodological standards"); *id.* §§ 9533, 9534 (NCER "shall maintain published peer-review standards" and conduct "research that is rigorous" and "meet the highest standards of professional excellence"); *id.* § 9567b(b)(1) (NCSER activities "shall . . . conform to high standards of quality, integrity, accuracy, validity, and reliability"); *id.* §§ 9562(a)(2), 9563 (NCEE "shall" disseminate "scientifically valid research, statistics, and evaluation" and evaluations conducted with "highest possible standards of quality"); *id.* § 9541(b) (NCES "shall" collect, analyze, and report data that is "timely" and "relevant and useful"); *id.* § 9533 (NCER "shall . . .ensure that research is relevant to education practice"); *id.* § 9562 (NCEE "shall" disseminate information in "timely" manner including "most current research").

IES's data and research must be of high quality and be updated and timely. *See supra* n.55. It is not plausible for a tiny remaining IES staff to even administer the contracts and grants necessary to carry out the agency's functions, much less to strategically plan and effectively oversee the performance of data, research, and dissemination contracts in a manner that ensures high-quality, scientifically valid education data and research. *See* Chard Decl. ¶¶ 16–24 (AERA-0045–46); Ex. C, McLaughlin Decl. ¶¶ 20–24 (AERA-0021–22); Whitehurst Decl. ¶¶ 7–11 (AERA-0004–06). And that quality is integral to Congress's directions. A slapdash operation with a skeleton crew violates the law.

This matter is not one on which reasonable people can disagree. Defendants' staff terminations are so extreme that an examination at any level of detail shows IES's continued operation is not possible if they remain in place. NCER has *one* remaining employee. Pollard Young Decl. ¶ 16 (AERA-0029). NCER has historically—in keeping with the statutory requirements placed on the Center—administered hundreds of research grants, developed training programs for researchers, disseminated information and findings, engaged stakeholders, and charted a strategic direction with a staff of approximately 15 mostly expert staff carrying a heavy workload. Whitehurst Decl. ¶ 8–10 (AERA-0004–06). NCER's work will grind to a halt without adequate staffing, and the Center will necessarily disregard the duties Congress has charged it with. NCEE also has *one* remaining employee, who is *also* the Acting Director of IES, Defendant Soldner. Pollard Young Decl. ¶ 16 (AERA-0029). But simply operating the RELs—just one slice of NCEE's mandatory duties—is an intensive undertaking. Twenty staff have typically been involved in operating the RELs, with 5 staffers dedicated to managing the 10 RELs on a full-time basis. *Id.* ¶ 19. And NCEE has numerous other research, evaluation, and dissemination

responsibilities. It will simply be impossible for NCEE to carry out its mandatory duties in statute following the IES Staff Termination Action.

But Defendants are not even *trying* to meet the absolute minimum of their statutory obligations. The Research Termination Action abruptly shut down the mechanisms through which IES carried out required functions. For example, ESRA unambiguously requires Defendants to operate 10 RELs through contracts. 20 U.S.C. § 9564. Defendants are now operating none.[56] The law requires Defendants to conduct longitudinal studies and studies of financial aid, and to provide complete statistics regarding adult education and international comparisons, but they have cancelled the contracts that were fulfilling these responsibilities. *Id.* §§ 9543(a)(7), 9543(a)(1)(E), 9543(a)(1)(D), 9543(a)(6).[57] Defendants' cancellation of numerous longitudinal studies and of contracts supporting the Common Core of Data ("CCD") and mass layoffs at NCES—leaving only three staff down from at least 85[58]—jeopardize IES's ability even to carry out NAEP, Chard Decl. ¶ 22 (AERA-0045), and certainly threaten that it will not be carried out adequately, *see* 20 U.S.C. § 9622.[59] Nowhere do the statutes creating and mandating IES functions empower Defendants to disregard the agencies' required functions based on their own discretion.

---

[56] U.S. Department of Education Cancels Additional $350 Million in Woke Spending [https://perma.cc/WR8N-VTHV], McGrath Decl. Ex. 11 (AERA-0246–47).

[57] *See, e.g.*, USASpending.Gov, *IES to Rsch. Tri. Inst. (91990022C0017)* [https://perma.cc/C2HC-S9QP?type=image], McGrath Decl. Ex. 49 (AERA-425-428) (NPSAS); *IES to Rsch. Tri. Inst. (91990018C0039)* [https://perma.cc/ZLL3-U8UL?type=image], McGrath Decl. Ex. 17 (AERA-0271–76) (NPSAS); USASpending.Gov, *Dep't of Educ. to Westat, Inc. (91990019F0025)* [https://perma.cc/WB8T-LMN3?type=image], McGrath Decl. Ex. 50 (AERA-0430–33) (Program for International Student Assessment, or "PISA"); *IES to Rsch. Tri. Inst. (91990018F0018)* [https://perma.cc/W2UY-6ESU?type=image], McGrath Decl. Ex. 15 (AERA-0261–265) (HS&B); *IES to WeStat, Inc. (91990019C0002)* [https://perma.cc/9XBU-EWJ6], McGrath Decl. Ex. 43 (AERA-0395–400) (ECLS-K).

[58] Inst. of Educ. Scis., *IES Staff* (select "NCES" under "Filter by Office") (archived Apr. 28, 2025) [https://perma.cc/997C-7D67], McGrath Decl. Ex. 52 (AERA-0441–42).

[59] Barshay, *NAEP, the Nation's Report Card, Was Supposed to be Safe. It's Not* [https://perma.cc/TQT2-2ZUC], McGrath Decl. Ex. 20 (AERA-0288–96).

### D. Defendants' Termination Actions violate the constitutional separation of powers by eviscerating a congressionally-created agency and refusing to spend appropriated funds.

Finally, Plaintiffs are likely to prevail on their claim that Defendants' Termination Actions must be set aside because they violate the Constitution. 5 U.S.C. § 706(2)(B). At core, those Actions flout Congress's clear establishment of IES, assignment of myriad mandatory duties to the agency, and appropriation of funds to carry out those duties. Disregarding Congress's commands in those ways violates the separation of powers enshrined in the U.S. Constitution.

"[T]he Executive Branch must act based on authority that 'stem[s] either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Executive Branch's power "is at its lowest ebb" when it "takes measures incompatible with the express or implied will of Congress." *Id.* at 637 (Jackson, J. concurring); *Medellin v. Texas*, 552 U.S. 491, 524 (2008) (adopting Justice Jackson's separation-of-powers framework). The power to enact laws lies with Congress, and the executive branch may not "repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

Here, Congress has spoken clearly and unequivocally, establishing IES as an agency directed to carry out numerous functions related to education data, research, and dissemination in a scientifically rigorous and timely manner. *See* 20 U.S.C. §§ 9511, 9512, 9533, 9534, 9543, 9545, 9546, 9562, 9564, 9567b. Congress has appropriated $800 million for the agency to carry out those functions. Cont. Res. Mar. 2025. But Defendants' Termination Actions have, nonetheless, gutted the agency's staff, abruptly cut off many of its data, research, and dissemination functions, and made it impossible as a practical matter to continue those functions and certainly to carry them out with the high standards of quality required by Congress.

Defendants' Termination Actions—cutting IES's contracts to the bone and staff to a stump—also violate the separation of powers by refusing to spend funds Congress has appropriated

and directed Defendants to spend. The dramatic reduction in staff and cancellation of contracts with a total value exceeding $1.2 billion, which the Administration categorized as "savings," makes clear that Defendants are refusing to spend appropriated funds on IES functions as Congress directed. In addition to Congress's specific appropriation of funds for IES, Congress has also enacted a statutory scheme in the Impoundment Control Act ("ICA") that strictly restrains the Executive Branch's ability "to spend less than the full amount appropriated by Congress for a particular project or program." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.); *see* 2 U.S.C. § 683. While Defendants have clearly taken action to spend far less—through staff and contracts—than Congress appropriated, they have not taken the required steps for recission under the ICA. Through ESRA, its appropriations acts, and the ICA, Congress has made clear its "will" that IES should be fully functional. *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). Defendants' Termination Actions are plainly "incompatible" with that will, and, as such, their power is at its "lowest ebb." *Id.*

This form of mass contract cancellation and termination of employees—seeking to fully eviscerate an agency created through statute and funded through appropriations—is precisely what courts in and outside of this district have held to be a violation of the separation of powers. *See Does 1-26 v. Musk*, No. 25-CV-0462, 2025 WL 840574, at *25 (D. Md. Mar. 18, 2025) (stayed on appeal on grounds that named defendants were incorrect as they were without formal authority over dismantled agency); *Loc. 2677, Am. Fed'n of Gov't Emps. v. Phillips*, 358 F. Supp. 60, 72 (D.D.C. 1973); *Widakuswara v. Lake*, No. 25-CV-2390, 2025 WL 945869, at *7 (S.D.N.Y. Mar. 28, 2025); *Nat'l Treasury Emps. Union v. Vought*, No. 25-CV-0381, 2025 WL 942772, at *21 (D.D.C. Mar. 28, 2025); Prelim. Inj. Op. at 29–31, *Widakuswara v. Lake*, No. 25-cv-1015 (D.D.C.

Apr. 22, 2025), ECF No. 98. The Termination Actions violate the separation of powers and thus the APA.

In the alternative, if the Court finds that the APA is unavailable, Defendants' termination actions would be *ultra vires* as the violate the separation of powers for the same reasons explained above. As the Supreme Court has long recognized, separation-of-powers claims can be brought under the Constitution. *See NLRB v. Noel Canning,* 573 U.S. 513, 525 (2014).

### III.    Plaintiffs Are Suffering Immediate, Irreparable Harm.

Plaintiffs also are suffering irreparable harm that warrants a preliminary injunction. To show irreparable harm, a party must clearly show that it will suffer actual, imminent harm that "cannot be fully rectified" by a final judgment after trial. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (internal quotation marks and citations omitted). Plaintiffs more than meet this standard.

*First*, the imminent final separation of nearly 90 percent of IES staff—particularly staff with specific expertise in IES projects and operations—will irreparably harm Plaintiffs and their members by destroying, for years to come, the agency's ability to disseminate the relevant, timely, quality research and data that Plaintiffs' members rely on. *Second*, data and research that Plaintiffs' members planned to use, which was collected over years of time, will never be released and used if the significant studies cancelled in the Research Termination Action are not reinstated promptly before data are destroyed and connections with researchers and subjects are lost. *Third*, the imminent loss, which has already begun, of access to valuable restricted data, and subsequent permission to publish work based on that data, is already causing irreparable harm to Plaintiffs' members. The loss of this access also threatens to gravely harm the Plaintiffs' student members' ability to complete their degree programs.

This failure to disseminate timely, relevant research and data to Plaintiffs' members will

prevent them from doing their work within the interconnected system of education research created by Congress. None of these harms to Plaintiffs' researcher members can be remedied by damages at the time of judgment, as money damages are unavailable under the APA, *see City of New York v. DOD*, 913 F.3d 423, 430 (4th Cir. 2019), and such damages, even if available, would be "difficult to ascertain" and award, *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (internal quotation marks omitted).

### A. The imminent final separation of IES's expert staff in June threatens irreparable harm because it will destroy IES's ability to disseminate quality research and data to Plaintiffs' members for years to come.

Plaintiffs and their members have already begun suffering grave harms as IES's functions have been eviscerated and the interrelated system of quality, timely education data and research supported by IES is grinding to a halt. If the IES employees currently on administrative leave are finally separated from the Department of Education on or around June 10, 2025—as Defendants' statements and RIF notices indicate, *see* Pollard Young Decl. Ex. 2 (AERA-0037–40)[60]—expert program officers, research scientists, statisticians, and contracting officers will move on to other employment opportunities, breaking the agency with permanence that cannot be remedied for years to come. Whitehurst Decl. ¶ 11 (AERA-0006); Pollard Young Decl. ¶ 20 (AERA-0031). As these expert staff, with decades of institutional knowledge about education data and research expertise, find other positions and potentially leave the field of education research, the ecosystem of education research that IES is crucial to will crater. Whitehurst Decl. ¶¶ 11–14 (AERA-0006–08); Chard Decl. ¶ 24 (AERA-0046) ("Many of the leaders, experts, and statisticians who will be lost, and presumably pursue other endeavors, have accumulated decades of expertise in carrying out IES's highly technical data and research functions.").

---

[60] *U.S. Department of Education Initiates Reduction in Force* [https://perma.cc/WF8P-AAQD], McGrath Decl. Ex. 33 (AERA-0355–56).

Defendants' IES Staff Termination Action is akin to the planned destruction of the other agencies where courts have found preliminary relief was necessary to prevent the irreparable harm of a *fait accompli* agency destruction because, "[o]nce the agency is gone, there will be no opportunity to afford relief at a later point in the litigation." *Nat'l Treasury Emps. Union*, 2025 WL 942772, at *41. Here, this mass loss of expert staff will not only "halt agency action in the short term," but will "threaten the efficacy of the agency in the long-term" if relief is not obtained until final judgment. *Widakuswara*, 2025 WL 945869, at *9.

Decimating the agency in this manner will ensure Plaintiffs' members are deprived of access to the high-quality, timely data and research that IES is required to disseminate for an indefinite, extended period. *See supra* n. 54. There will be no updated, high-quality national education data and research to use in meta-analyses or for research design. Tipton Decl. ¶¶ 8–15 (AERA-0079–81); Pigott Decl. ¶¶ 10–12 (AERA-0136). Longitudinal and broad research studies—such as the HS&B, the High School Longitudinal Study, the MTSS on reading, the NPSAS on student financial aid, and the ECLS-K—will simply not be conducted, or at best, will be conducted through contracts with no substantive oversight by the remaining skeleton staff. Chard Decl. ¶¶ 16–22 (AERA-0045–46) ("Managing such contracts requires intensive, near-daily monitoring by expert staff to ensure that contractors are effectively carrying out the work needed by IES"); Okagaki Decl. ¶¶ 9–11 (AERA-0013); McLaughlin Decl. ¶¶ 20–23 (AERA-0021–22). Without the continued use of peer review to approve quality research grant applications, Plaintiffs' members will be deprived of the high-quality research they have relied on to inform their work and the opportunity to carry out more of that research, including non-federally-funded research, themselves. Talbott Decl. ¶¶ 8–13 (AERA-0088–90); Reardon Decl. ¶¶ 16–20 (AERA-0075–76); Gersten Decl. ¶¶ 9–16 (AERA-0050–52). Plaintiffs' members will be deprived of the ability to

37

use these rich resources for years, even if Plaintiffs prevail at final judgment here. *See, e.g.*, *id.*; Garvey Decl. ¶¶ 9–13 (AERA-0093–94). The research and dissemination carried out by the RELs will be made impossible, Weiss (SREE) Decl. ¶ 9 (AERA-0056–57); Talbott Decl. ¶ 13 (AERA-0089–90), as NCEE will not have sufficient staff to rebid or reinstate and manage the contracts to operate them even if a court ordered that remedy in the future. Pollard Young Decl. ¶ 19 (AERA-0030–31). And Plaintiffs' members will not be able to rely on the practical resources provided by them or through the WWC and ERIC, as NCEE could not possibly administer them effectively without significant, skilled staff. *See, e.g.*, Pigott Decl. ¶¶ 8–13 (AERA-0136–37); Talbott Decl. ¶¶ 11–12 (AERA-0089); Tipton Decl. ¶¶ 21–24 (AERA-0082–83); Watkins Decl. ¶¶ 7–9 (AERA-0132).

If the IES Mass Staff Termination is left in place and the vast majority of IES staff are finally terminated, Plaintiffs' many education researcher members will lose irreplaceable access to the data, research, and dissemination resources IES is required to provide for years to come. This would destroy the very field of education research in a manner that cannot be remedied at final judgment after long-lasting damage has been done to IES's ability to function as Congress intended. *See* Chard Decl. ¶ 24 (AERA-0046); Whitehurst Decl. ¶ 11 (AERA-0006) ("If almost all IES staff are terminated … it will take years to restore the agency's functions. IES's professional staff was acquired over a long period of time and required a heavy investment in recruiting and retention. The current staff has developed significant expertise… .").

**B. Without prompt relief, the data and findings of the cancelled research contracts will be lost permanently, depriving Plaintiffs' members of irreplaceable information.**

Enormous resources were poured into conducting research and collecting data from large cohorts of students, parents, and educators in many of the significant research studies halted by Defendants' February Research Termination Action. This includes early childhood education

research in the ECLS-K, studies of high school impacts on future success in the HSB, studies of the impact of financial resources on student progress in the NPSAS, the effectiveness of reading interventions in the MTSS, and other significant studies that took years and were tens of millions of dollars into performance.[61] These studies were occurring at a pivotal period in American education, during and in the fallout from the pandemic. Essential to longitudinal studies is the ability—recognized by Congress in requiring such studies, 20 U.S.C. § 9543(7)—to track the same students over time. Without prompt relief, Plaintiffs' members will never be able to regain access to the vital research and data based on this work in order to continue their own research. *See, e.g.*, Gersten Decl. ¶ 9 (AERA-0050) ("My work and research at IRG on reading instruction and meta-analysis has relied heavily on studies like the Multi-Tiered Systems of Support for Behavior . . . . [and] my work will be significantly compromised by the cancellation of this study."); Reardon Decl. ¶ 18 (AERA-0075) ("I previously published several high-profile research papers using earlier ECLS-K studies from 1998 and 2010 and planned to add to that research using the new ECLS-K study data. The inability to use this rich and important data source will diminish our ability to conduct effective research and data analysis on trends and patterns in kindergarten readiness and strategies for improving early childhood education."); Ex. T, Radwin Decl. ¶ 11 (AERA-0141) ("I had planned to use the 2024 NPSAS study to examine changes over time … My work analyzing the needs and experiences of student parents will be directly harmed by the cancellation of IES contracts that made data concerning those students available.").

The loss of data and research being collected or conducted over the last several years and

---

[61] *IES to Rsch. Tri. Inst. (91990018F0018)* [https://perma.cc/W2UY-6ESU?type=image], McGrath Decl. Ex. 15 (AERA-0261–65) (HS&B); *Dep't of Educ. to Am. Inst. for Rsch. in Behavioral Scis. (91990018C0046)* [https://perma.cc/J22W-4849], McGrath Decl. Ex. 19 (AERA-0282–87) (MTSS); *IES to Rsch. Tri. Inst. (91990022C0017)* [https://perma.cc/C2HC-S9QP?type=image], McGrath Decl. Ex. 49 (AERA-0425–28) (NPSAS); *IES to Rsch. Tri. Inst. (91990018C0039)* [https://perma.cc/ZLL3-U8UL?type=image], McGrath Decl. Ex. 17 (AERA-0271–76) (NPSAS); *IES to WeStat, Inc. (91990019C0002)* [https://perma.cc/9XBU-EWJ6], McGrath Decl. Ex. 43 (AERA-0395–400) (ECLS-K).

ongoing until the February cancellations is particularly damaging. Our education system has experienced significant challenges as a result of the pandemic and data from the post-pandemic era is particularly important, Tipton Decl. ¶¶ 16, 18 (AERA-0081); Okagaki Decl. ¶ 12 (AERA-0013–14), as Defendants have tacitly acknowledged with its citation of pandemic era student achievement declines.[62] Further, we are also now on the cusp of significant changes and challenges in education due to technological advancements with artificial intelligence ("AI"). Tipton Decl. ¶ 18 (AERA-0081). This Administration has itself recognized the critical nature of this moment in education research with last week's Executive Order directing Defendant McMahon to "utilize existing research programs . . . to use AI for improved student achievement" because AI "is rapidly transforming the modern world" and teachers must be equipped "to utilize AI in their classrooms to improve educational outcomes."[63]

Courts have—fortunately—not had the occasion to consider whether the obliteration of a federal research agency creates irreparable harm for researchers due to the lack of access to timely data and research, but courts *have* found that cutting off access to data or even *delaying* access to information, can cause irreparable harm in other contexts. *See e.g.*, *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1189 (9th Cir. 2022) (upholding irreparable harm finding concerning company's inability to access LinkedIn profile data); *Citizens for Resp. & Ethics in Washington v. U.S. DOGE Serv.*, No. 25-CV-511, 2025 WL 752367, at *7 (D.D.C. Mar. 10, 2025) ("indefinite delay in the release of the requested USDS records would cause CREW and the public irreparable harm."); *Drs. for Am. v. OPM*, No. 25-CV-322, 2025 WL 452707, at *8 (D.D.C. Feb. 11, 2025)

---

[62] U.S. Department of Education (@usedgov), X/Twitter (Feb. 12, 2025, 5:16 PM ET) [https://perma.cc/FBR3-VSUN], McGrath Decl. Ex. 13 (AERA-0252–53).

[63] Advancing Artificial Intelligence Education for American Youth, Exec. Order No. 14277 (Apr. 23, 2025), to be published as 90 Fed. Reg. 17519 (Apr. 28, 2025) [*available at* https://perma.cc/AY7E-WGMA], McGrath Decl. Ex. 51 (AERA-0434–39).

(finding irreparable harm would result from "removal of the webpages and datasets.").

### C. Plaintiffs' members will suffer irreparable harm to their ability to access and use restricted data.

Plaintiffs' members also face an irreparable injury in the loss of their ability to use restricted-use data, which is essential to their work and cannot be remedied years later. As discussed above, Plaintiffs' members rely on restricted-use data, which, because of the sensitive information it contains, has strict requirements for use. This harm is acute for education researchers and particularly acute for graduate students whose need for timely access to data is essential for completing their graduate programs.

IES has cancelled its remote restricted-use data program (which permitted such data to be accessed outside of the traditional "cold room environment," the traditional means of accessing restricted-use data), which will make it significantly more difficult for many of Plaintiffs' members to access restricted-use data (by requiring them to go to a "cold room" at an already licensed institution). The agency's indication that it will not accept new user applications or requests for new data stands to make much of Plaintiffs' members' work impossible, as the information they seek in restricted-use data sets is unavailable elsewhere. *See* Ex. M, Brady Doe Decl. ¶ 13 (AERA-0100) ("The second part [of my dissertation] examines information about students that is not publicly available . . . . All of these variables are only accessible through the restricted license."); Alex Doe Decl. ¶¶ 7–8 (AERA-0105–06) (noting that their research relies on information available only in the restricted-use dataset); Garvey Decl. ¶ 19 (AERA-0095) (describing how information integral to his research collective's work is "available only" in the restricted-use dataset).

These changes will impact Plaintiffs' professional and student members. Many members may not be able to continue their work. Jason Garvey, for example, will not be able to run his organization's "Emerging Scholars" program, which relied on being able to teach in the "virtual"

cold rooms. *See* Garvey Decl. ¶ 25 (AERA-0096). Nor will he be able to access comparable data, as his organization cannot afford "institutional datasets or privately-held research datasets" that might replace some IES data. *See id.* ¶ 28 (AERA-0096).

For Plaintiffs' student members, the limits on restricted-use data have serious consequences. As one member put it, in light of this loss of data, they will need to "completely reconceptualize" their dissertation. *See* Brady Doe Decl. ¶¶ 17–18 (AERA-0101). Some of Plaintiffs' members may also be significantly delayed in—or, effectively prohibited from— publishing their dissertations, as the publication of research utilizing restricted-use data requires NCES review and approval. IES has indicated that there will be "delays in response to both new and existing" disclosure review requests. *See* Wong Decl. Ex. 1 (AERA-0115). Members have stated that they will have to delay their graduations in order to rethink their dissertations or determine how to share their dissertations with the doctoral committees who vote to confer PhDs. *See* Brady Doe Decl. ¶¶ 17–18 (AERA-0101); Wong Decl. ¶¶ 18–19 (AERA-0112–13) ("Because the NCES disclosure review may be delayed, and because I have no idea for how long, I have spent significant time trying to figure out how I will be able to graduate . . . .[T]his will affect my graduation . . . . I am likely to push graduation until December to have more time to figure this out."). Student members will also be prohibited from publishing their dissertations, which may lead to professional consequences. *See, e.g.*, Alex Doe Decl. ¶ 14 (AERA-0106) ("I do not know if I will actually be able to publish my dissertation"), ¶ 23 ("[T]he work I have done for several years will never be seen by my peers, future colleagues, or those in my profession."); Wong Decl. ¶ 14 (AERA-0112) ("I had planned to defend my dissertation in August 2025, and I am very worried that I will not be able to get my dissertation through the disclosure review process before then.").

## IV.    **The Balance of Equities and Public Interest Both Favor an Injunction.**

The final two factors, which address whether the balance of equities tips in a movant's favor and whether the injunction is in the public interest, "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, both favor Plaintiffs.

Plaintiffs seek relief to require Defendants to carry out legally-required functions that are critical to understanding the status and progress of education in our country, to obtaining high-quality research on practices that can address educational challenges, and to disseminating that information to better serve our nation's students.

To start, the government cannot suffer harm from an injunction that merely ends an unlawful action because "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional" or which "merely ends an unlawful practice." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (internal quotation marks and citations omitted); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws." *HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669, 686 (D. Md. 2020) (internal quotation marks and citations omitted). "If anything, the system is improved by such an injunction." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013) (internal quotation marks and citations omitted).[64]

---

[64] To the extent that Defendants request a bond upon entry of a preliminary injunction, a bond of $0 or another nominal amount is appropriate here. As the Fourth Circuit has held, "[w]here the district court determines that the risk of harm is remote, or that the circumstances otherwise warrant it, the court may fix the amount of the bond accordingly. In some circumstances, a nominal bond may suffice." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999). This is the type of public-interest litigation where just such nominal security is usually all that courts require. *See Maryland v. USDA*, 2025 WL 800216, at *26 (collecting cases).

Further, the public interest favors the maintenance of an agency that serves the interests of tens of millions of students, their educators, policymakers, researchers, and society more broadly by allowing us to understand the challenges within our schools and to learn more effective ways to address them, the work of which cannot be replicated by other means. *See* Whitehurst Decl. ¶¶ 10, 12, 14 (AERA-0006–08); Okagaki Decl. ¶¶ 7–10, 12 (AERA-0012–14); Chard Decl. ¶¶ 14, 24 (AERA-0044, AERA-0046); Reardon Decl. ¶ 18 (AERA-0075). The "terrible long-term effects for our nation's students" that may stem from IES's decimation, Okagaki Decl. ¶ 15 (AERA-0014), and the "immense" harm to our country's education system favor Plaintiffs here.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion for a preliminary injunction to prevent the obliteration of an irreplaceable federal agency. Plaintiffs pray that the Court enters an injunction restoring the status quo and requiring Defendants to take all action necessary to reverse the effects of their unlawful activity, as specified in their motion.

Dated: April 29, 2025

Respectfully submitted,

*/s/ Daniel A. McGrath*
Daniel A. McGrath (Bar No. 31501)
Madeline H. Gitomer (Bar No. 31518)
Emma R. Leibowitz (Bar No. 31568)
Victoria S. Nugent (Bar No. 15039)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
dmcgrath@democracyforward.org
mgitomer@democracyforward.org
eleibowitz@democracyforward.org
vnugent@democracyforward.org
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Daniel A. McGrath, certify that I filed the foregoing with the Clerk of Court for the

United States District Court for the District of Maryland by using the CM/ECF system, which

sent a notice of such filing to all registered CM/ECF users who have appeared in this case. I also

emailed a copy of the motion and its attachments to counsel at the Department of Justice.

/s/ Daniel A. McGrath
*Counsel for Plaintiffs*