## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

AMERICAN EDUCATIONAL RESEARCH
ASSOCIATION, *et al.*,

          *Plaintiffs,*

          *vs.*

U.S. DEPARTMENT OF EDUCATION,
*et al.*,

          *Defendants.*

Civil Action No. 8:25-cv-01230

### INDEX OF EXHIBITS IN SUPPORT OF
### PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

| Exhibit | Exhibit Name | Bates Numbers |
|---------|--------------|---------------|
| A | Declaration of Grover J. "Russ" Whitehurst | AERA-0001–AERA-0009 |
| B | Declaration of Lynn Okagaki | AERA-0010–AERA-0015 |
| C | Declaration of Joan McLaughlin | AERA-0016–AERA-0022 |
| D | Declaration of Erin Pollard Young | AERA-0023–AERA-0040 |
| E | Declaration of David Chard | AERA-0041–AERA-0046 |
| F | Declaration of Russell Gersten | AERA-0047–AERA-0052 |
| G | Declaration of Ellen Weiss (SREE) | AERA-0053–AERA-0061 |
| H | Declaration of Felice Levine (AERA) | AERA-0062–AERA-0070 |
| I | Declaration of Sean Reardon | AERA-0071–AERA-0076 |
| J | Declaration of L. Elizabeth Tipton | AERA-0077–AERA-0083 |
| K | Declaration of Elizabeth Talbott | AERA-0084–AERA-0090 |
| L | Declaration of Jason Garvey | AERA-0091–AERA-0097 |
| M | Declaration of Brady Doe | AERA-0098–AERA-0103 |
| N | Declaration of Alex Doe | AERA-0104–AERA-0108 |
| O | Declaration of Nancy Wong | AERA-0109–AERA-0115 |
| P | Declaration of Larry Hedges | AERA-0116–AERA-0121 |
| Q | Declaration of Beth Boulay | AERA-0122–AERA-0129 |

| Exhibit | Exhibit Name | Bates Numbers |
|---|---|---|
| R | Declaration of Thomas Watkins | AERA-0130–AERA-0133 |
| S | Declaration of Therese Pigott | AERA-0134–AERA-0137 |
| T | Declaration of David Radwin | AERA-0138–AERA-0142 |
| U | Declaration of Daniel A. McGrath (Attorney) | AERA-0143–AERA-0151 |
| 1 | David Chard, POV: Cuts to Department of Education's Institute of Education Sciences Equals High Risk and Low Reward, Bos. Univ. Today (Feb. 27, 2025) | AERA-0152–AERA-0156 |
| 2 | Kids' reading scores have soared in Mississippi 'miracle,' PBS (May 17, 2023) | AERA-0157–AERA-0159 |
| 3 | Greg Toppo, Trump Cuts Research Lab That Helped Nurture 'Mississippi Miracle,' The74 (Feb. 20, 2025) | AERA-0160–AERA-0169 |
| 4 | Molly Faulkner-Bond, Supporting California's English Learner Students Who Have the Most Significant Cognitive Disabilities, IES (Sept. 11, 2023) | AERA-0170–AERA-0173 |
| 5 | IES, Ten-Year Follow-up of Two RCTs of CUNY's ASAP Model – Educational and Labor Market Outcomes | AERA-0174–AERA-0179 |
| 6 | IES, Assessing the Long-Term Efficacy and Costs of the City University of New York's (CUNY'S) Accelerated Study in Associate Programs (ASAP) | AERA-0180–AERA-0184 |
| 7 | Cynthia Miller & Michael J. Weiss, Increasing Community College Graduation Rates: A Synthesis of Findings on the ASAP Model From Six Colleges Across Two States, 44 Educ. Evaluation and Pol'y Analysis 210 (June 2022) | AERA-0185–AERA-0209 |
| 8 | Dep't of Educ., Fiscal Year 2025 Budget Summary Excerpt | AERA-0210–AERA-0235 |
| 9 | Laura Meckler and Hannah Natanson, DOGE rips through Education Department, cutting contracts, staff and grants, Wash. Post (Feb. 14, 2025) | AERA-0236–AERA-0240 |
| 10 | USAFacts Team, What is IES and what does it do?, USAFacts (Feb. 20, 2025) | AERA-0241–AERA-0245 |
| 11 | Dep't of Educ., Press Release, U.S. Department of Education Cancels Additional $350 Million in Woke Spending (Feb. 13, 2025) | AERA-0246–AERA-0247 |
| 12 | Dep't of Gov. Efficiency, Savings | AERA-0248–AERA-0251 |
| 13 | U.S. Department of Education (@usedgov), X/Twitter (Feb. 12, 2025, 5:16 PM ET) | AERA-0252–AERA-0253 |

| Exhibit | Exhibit Name | Bates Numbers |
|---|---|---|
| 14 | HigherGov, The Design and Conduct of the Early Childhood Longitudinal Study, Kindergarten Class of 2022 through 2023 | AERA-0254–AERA-0260 |
| 15 | USASpending.Gov, IES to Rsch. Tri. Inst. (91990018F0018) | AERA-0261–AERA-0265 |
| 16 | USASpending.Gov, Dep't of Educ. to Mathematica, Inc. (91990024F0369) | AERA-0266–AERA-0270 |
| 17 | USASpending.Gov, IES to Rsch. Tri. Inst. (91990018C0039) | AERA-0271–AERA-0276 |
| 18 | USASpending.Gov, Dep't of Educ. To Applied Enter. Mgmt. Corp. (91990024F0331) | AERA-0277–AERA-0281 |
| 19 | USASpending.Gov, Dep't of Educ. to Am. Inst. for Rsch. in Behavioral Scis. (91990018C0046) | AERA-0282–AERA-0287 |
| 20 | Jill Barshay, NAEP, the Nation's Report Card, Was Supposed to be Safe. It's Not, KQED (Apr. 7, 2025) | AERA-0288–AERA-0296 |
| 21 | Alex MacGillis, Trump's War on Measurement Means Losing Data on Drug Use, Maternal Mortality, Climate Change and More, ProPublica (Apr. 18, 2025) | AERA-0297–AERA-0300 |
| 22 | USASpending.Gov, Dep't of Educ. to Sanametrix, Inc. (91990022F0007) | AERA-0301–AERA-0306 |
| 23 | USASpending.Gov, Dep't of Educ. to Sanametrix, Inc. (91990024F0327) | AERA-0307–AERA-0311 |
| 24 | USASpending.Gov, Dep't of Educ. to Manhattan Strategy Grp. (91990024F0373) | AERA-0312–AERA-0316 |
| 25 | USASpending.Gov, IES to Mathematica (91990024F0316) | AERA-0317–AERA-0321 |
| 26 | USASpending.Gov, IES to Rsch. Tri. Inst. (91990024F0347) | AERA-0322–AERA-0326 |
| 27 | USASpending.Gov, IES to Activate Rsch. (91990022F0006) | AERA-0327–AERA-0331 |
| 28 | USASpending.Gov, Dep't to Educ. to Am. Inst. for Rsch. in Behavioral Scis. (91990024F0301) | AERA-0332–AERA-0336 |
| 29 | USASpending.Gov, IES to Synergy Enters. (91990020F0309) | AERA-0337–AERA-0342 |
| 30 | OPM, FedScope | AERA-0343–AERA-0344 |
| 31 | Jill Barshay, Chaos and confusion as the statistics arm of the Education Department is reduced to a skeletal staff of 3, Hechinger Rep. (Mar. 14, 2025) | AERA-0345–AERA-0351 |
| 32 | Bureau of Educ., Report of the Comm'r of Educ., Made to the Sec'y of the Interior (Oct. 27, 1870) | AERA-0352–AERA-0354 |

| Exhibit | Exhibit Name | Bates Numbers |
|---|---|---|
| 33 | Dep't of Educ., Press Release, U.S. Department of Education Initiates Reduction in Force (Mar. 11, 2025) | AERA-0355–AERA-0356 |
| 34 | Dep't of Educ., Secretary McMahon: Our Department's Final Mission (Mar. 3, 2025) | AERA-0357–AERA-0360 |
| 35 | Improving Education Outcomes by Empowering Parents, States, and Communities, Exec. Order No. 14242 (Mar. 20, 2025), 90 Fed. Reg. 13679 (Mar. 25, 2025) | AERA-0361–AERA-0363 |
| 36 | Jeffrey Mervis, Layoffs gut research agency that helped monitor U.S. education, Science (Mar. 13, 2025) | AERA-0364–AERA-0366 |
| 37 | USASpending.Gov, Dep't of Educ. to ABT Global LLC (91990025F0014) | AERA-0367–AERA-0371 |
| 38 | IES, Impact Evaluation of Training in Multi-Tiered Systems of Support for Reading in Early Elementary School | AERA-0372–AERA-0375 |
| 39 | Jill McCarroll, *Happy New Year from the ECLS-K: 2024!*, NCES (Jan. 7, 2025) | AERA-0376–AERA-0379 |
| 40 | USASpending.Gov, Dep't of Educ. to ABT Global LLC (91990020F0305) | AERA-0380–AERA-0384 |
| 41 | Arthur Jones II, 'Your position is being abolished': Education Department staff get official reduction-in-force notices, ABC News (Apr. 10, 2025) | AERA-0385–AERA-0389 |
| 42 | USASpending.Gov, IES to Applied Enter. Mgmt. Corp. (91990024F0367) | AERA-0390–AERA-0394 |
| 43 | USASpending.Gov, IES to WeStat, Inc. (91990019C0002) | AERA-0395–AERA-0400 |
| 44 | Department of Government Efficiency (@DOGE), X/Twitter (Feb. 10, 2025, 7:43 PM ET) | AERA-0401–AERA-0402 |
| 45 | Fact Sheet: President Donald J. Trump Empowers Parents, States, and Communities to Improve Education Outcomes, The White House (Mar. 20, 2025) | AERA-0403–AERA-0405 |
| 46 | Dep't of Educ., Press Release, Statement on President Trump's Executive Order to Return Power Over Education to States and Local Communities (Mar. 20, 2025) | AERA-0406–AERA-0407 |
| 47 | Cory Turner, DOGE abruptly cut a program for teens with disabilities. This student is 'devastated', NPR (Apr. 14, 2025) | AERA-0408–AERA-0418 |
| 48 | USASpending.Gov, Dep't of Educ. to Am. Inst. for Rsch. in Behavioral Scis. (91990019C0078) | AERA-0419–AERA-0423 |

| Exhibit | Exhibit Name | Bates Numbers |
|---|---|---|
| 49 | USASpending.Gov, IES to Rsch. Tri. Inst. (91990022C0017) | AERA-0424–AERA-0428 |
| 50 | USASpending.Gov, Dep't of Educ. to WeStat, Inc. (91990019F0025) | AERA-0429–AERA-0433 |
| 51 | Advancing Artificial Intelligence Education for American Youth, Exec. Order No. 14277 (Apr. 23, 2025) | AERA-0434–AERA-0439 |
| 52 | Inst. of Educ. Scis., *IES Staff* (select "NCES" under "Filter by Office") (archived Apr. 28, 2025) | AERA-0440–AERA-0442 |

# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, *et al.*, | |
| *Plaintiffs*, | |
| vs. | Civil Action No. 8:25-cv-01230 |
| U.S. DEPARTMENT OF EDUCATION, *et al.*, | |
| *Defendants*. | |

## DECLARATION OF GROVER J. "RUSS" WHITEHURST

I, Grover J. "Russ" Whitehurst, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am over eighteen years old, of sound mind, and fully competent to make this declaration.

2. I served a full six-year term from 2002 to 2008 as the founding Director of the Institute of Education Sciences ("IES") within the U.S. Department of Education ("ED"). Just prior to that, in 2001-2002, I was the Senate-confirmed Assistant Secretary of Education in charge of the Office of Educational Research and Improvement ("OERI") within ED. In that role I worked with Congress to write the Education Sciences Reform Act ("ESRA"), which is the legislation that created IES.

3. After my eight years of federal service, I became the Herman and George R. Brown Chair, Director of the Brown Center on Education Policy, and Senior Fellow in Economic Studies, all at the Brookings Institution in Washington, DC. Just prior to my federal service, I was Chair of the Department of Psychology at Stony Brook University, where I am currently Professor Emeritus. I have also served as the Vice-President for Academic Affairs at the Merrill-Palmer Institute in Detroit. I earned a Ph.D. in experimental child psychology from the University of Illinois at Urbana-Champaign. My research career has focused on developing and evaluating programs intended to accelerate the development and progress through school of children with language and reading problems. I have over 100 peer-reviewed publications.

4. I am consequently knowledgeable about IES's functions, requirements, and purpose, as well as education research and policy more broadly.

5. IES was organized after its legislative founding in 2002 with efficiency and coherence as touchstones. I worked diligently, with the support of the Secretary of Education, to ensure that IES was staffed in a manner that was as efficient as possible. Indeed, it had fewer staff for its responsibilities than comparable components of other departments. The goal in this staffing model  was to have an office with highly qualified and busy staff operating with clear responsibilities. Staffing at IES has remained at about the same lean level of around 205 in the 23 years since the initial organization plan was implemented. This has been despite substantial increases in budget and scope of work at IES during the intervening years.

6. Evidence that staffing at IES is spare comes from several sources, including formal recommendations from external advisory groups.  For instance, a 2022 report on the future of IES from the prestigious National Academies of Science concluded that "Given the breadth of what IES is expected to accomplish … staffing has historically been limited in comparison to other federal science, research, and statistical agencies with similar objectives."[1]  Hard data corroborate this conclusion: For instance, the American Statistical Association reports that the National Center for Education Statistics ("NCES"), the largest division of IES, has, by far, the smallest number of FTE staff per budget dollar of any of the 13 principal federal statistical agencies.  In fact, if NCES were staffed based on its budget at the median level of the other major statistical agencies it would be seven times larger in terms of number of employees.[2]

7. Further to the previous point, IES has been exceptionally efficient and productive in carrying out its duties at its historically low levels of staffing.  It led all other federal agencies that do similar work in that regard. In that context, it is either irrational or deceptive to propose that the agency can carry out its required functions with a staff nearly 90 percent smaller.

8. Consider what might be required in terms of staff to carry out just a portion of the required functions of just one of the four centers within IES, the National Center for Education Research ("NCER").  I will limit this consideration to doctoral level staff who serve as program officers for particular topics of research funded by NCER.  Per ESRA,

---

[1] National Academies of Sciences, Engineering, and Medicine. 2022. The Future of Education Research at IES: Advancing an Equity-Oriented Science. Washington, DC: The National Academies Press. https://doi.org/10.17226/26428 [page 54]

[2] National Academies of Sciences, Engineering, and Medicine. (2022). A Vision and Roadmap for Education Statistics. Washington, DC: The National Academies Press. https://doi.org/10.17226/26392. National Academies of Sciences, Engineering, and Medicine. 2022.

"The Research Commissioner shall support" at least 8 research and development centers with each center's focus chosen from a list of 11 topics provided in legislation: 1) Adult literacy, 2) Assessment, standards, and accountability, 3) Early childhood development and education, 4) English language learners, 5) Improving low achieving schools, 6) Innovation in education reform, 7) State and local policy, 8) Postsecondary education and training, 9) Rural education, 10) Teacher quality, and 11) Reading and literacy.  In addition, per ESRA, "the Research Center shall carry out research initiatives" on 12) Closing the achievement gap, 13) Impact of technology, and 14) Cognition and learning. In addition to these 14 topics there are a number of research foci that have been added to the NCER portfolio since the legislative list was created.

9. For each of these 14+ topics, NCER would need one staff member to serve as program officer for that research initiative. A program officer in NCER has many responsibilities. For instance, they read draft grant applications and provide feedback to the researcher who is planning to apply for funding.  They manage funded research projects, monitoring progress and providing guidance.  They provide technical advice on research design and methodology.  They connect researchers with relevant experts. Outside of their activities in overseeing particular grants, they help develop and implement programs that train researchers to conduct high-quality education research, contribute to efforts to disseminate the findings of education research to educators, policymakers, and the public, engage with stakeholders in the areas of research in which they are expert, and contribute to the evolving research priorities within IES.

10. NCER presently has 468 open research grants.[3]  Historically NCER staffing has ranged from 13 to 17 full-time employees.[4]  Taking the median number of 15 staff as the pool of program officers prior to the recent mass staff reduction, each program officer would have been overseeing over 30 individual funded grants, while carrying an additional workload associated with grants in the application stage.  That would have been a heavy workload for the office as a whole and for each program officer.  With only a handful of program officers, it would be an impossible workload.  If the staff reductions from the mass reduction in force stand, it will be impossible for NCER and the National Center for Special Education Research ("NCSER"), the other grant-making division of IES, to fulfill its legislative requirements in awarding and managing grants.  The research grant component of IES will grind to a halt for existing grants.  No new research grants will be made even though Congress has appropriated the funds for that purpose.

11. If almost all IES staff are terminated and either retire or move to new jobs before a court or new leadership decides to adequately staff the agency, it will take years to restore the agency's functions.  IES's professional staff was acquired over a long period of time and required a heavy investment in recruiting and retention.  The current staff has developed significant expertise in education research, education statistics, and different forms of government administration including grant and contract awards and oversight. If the vast majority of existing staff are finally separated from the agency, later efforts to rebuild IES will be troubled.

---

[3] IES website as referenced on 4/18/2025:
https://ies.ed.gov/funding/research/education-research-grants?&mcontenttype=Grant&lawardstatus=Open&morg=NCER
[4] National Academies of Sciences, Engineering, and Medicine. 2022. The Future of Education Research at IES: Advancing an Equity-Oriented Science. Washington, DC: The National Academies Press. https://doi.org/10.17226/26428.

12. If IES collapses, its functions cannot effectively be replaced by state and local research efforts. No state in the nation currently has anything like a mini-IES within its state department of education, for good reasons.  One reason is lack of funding at the state level.  Another is lack of legislation at the state level to support the political independence such an office would need to carry out its work.  Yet another would be almost insurmountable challenges in attracting qualified staff – the pool of technically qualified researchers, evaluators, and statisticians is too small to support 50 state level IES-type offices, and only a minority of qualified individuals would be interested in service in a state department of education.  Finally, there is the problem of level of inquiry.  The IES-type office in Mississippi will be focused on questions and data that are of primary interest in Mississippi.  The same would be true for the other states.  Without IES, who will address the research, evaluation, and assessment questions of relevance to all jurisdictions?  Without IES who will provide the comparative data that will allow Mississippi to know whether the Mississippi education system is performing better than Alabama's?  Without IES, who will answer "what works?" questions about the many federal education policies, such as student loans? The answer to all these questions is that no state entity will do this work. It has to be done at a national level.

13. In that context and mindful that the Trump administration has defended its efforts to close ED through mass reductions in force as "returning control of education to the states" I note that a) the scientific functions of IES cannot be "returned" to the states because they never existed at the state level; and b) Article I, Section 8, Clause 8 of the Constitution grants Congress the power to "promote the Progress of Science and useful Arts."  That is

precisely the intent and consequence of the Education Sciences Reform Act, to promote the progress of an applied science of education.

14. IES has been a remarkable bi-partisan government success story. ESRA, which established IES, was passed in 2002 by unanimous consent in both the House and Senate. Since that time IES has received continued bipartisan support in Congress. Within the executive branch, until presently, it has been in favor in both Republican and Democrat administrations. Its success has been signaled in many ways, most importantly by the increasing useful knowledge it has generated of the condition of education and of what works and doesn't in education policy and practice. Among its notable external evaluations, the Office and Management and Budget ("OMB") gave IES its highest score for program effectiveness, concluding that "IES has transformed the quality and rigor of education research within the Department of Education and increased the demand for scientifically based evidence of effectiveness in the education field as a whole."[5] It would be a serious loss to the nation if IES were swept away. It would be doubly tragic if IES, created by a unanimous act of Congress, were shut down without legislative warrant.

April 19, 2025
Fort Myers, FL

  __/s/ Gover J. "Russ" Whitehurst*____
Grover J. "Russ" Whitehurst

*A copy of the signature page bearing an original signature is attached hereto.

-------

[5]
https://obamawhitehouse.archives.gov/sites/default/files/omb/assets/omb/expectmore/summary/10009008.2007.html

precisely the intent and consequence of the Education Sciences Reform Act, to promote the progress of an applied science of education.

14. IES has been a remarkable bi-partisan government success story. ESRA, which established IES, was passed in 2002 by unanimous consent in both the House and Senate. Since that time IES has received continued bipartisan support in Congress. Within the executive branch, until presently, it has been in favor in both Republican and Democrat administrations. Its success has been signaled in many ways, most importantly by the increasing useful knowledge it has generated of the condition of education and of what works and doesn't in education policy and practice. Among its notable external evaluations, the Office and Management and Budget ("OMB") gave IES its highest score for program effectiveness, concluding that "IES has transformed the quality and rigor of education research within the Department of Education and increased the demand for scientifically based evidence of effectiveness in the education field as a whole."[5] It would be a serious loss to the nation if IES were swept away. It would be doubly tragic if IES, created by a unanimous act of Congress, were shut down without legislative warrant.

April 19, 2025
Fort Myers, FL

_____

Grover J. "Russ" Whitehurst

---

[5]

https://obamawhitehouse.archives.gov/sites/default/files/omb/assets/omb/expectmore/summary/10009008.2007.html

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AMERICAN EDUCATIONAL RESEARCH
ASSOCIATION, *et al.*,

*Plaintiffs*,

vs.

U.S. DEPARTMENT OF EDUCATION,
 *et al.*,

*Defendants*.

Civil Action No. 8:25-cv-01230

## DECLARATION OF LYNN OKAGAKI

I, Lynn Okagaki, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1.  I am over eighteen years old, of sound mind, and fully competent to make this declaration.

2.  I served in several senior roles within the Institute of Education Sciences ("IES") and its components for nearly a decade. First, I served as Commissioner for Education Research from 2005 to 2011 leading the National Center on Education Research ("NCER"), from 2007 to 2011 I also served as Acting Commissioner for Special Education Research leading the National Center for Special Education Research ("NCSER"), and, earlier, from 2002 to 2005 I served in senior roles within the IES Office of Science.

3. I previously served as a professor of human development and family science, and served at Purdue University for approximately 10 years.

4. After leaving IES, I became the dean of the College of Education and Human Development at the University of Delaware and later served as the deputy provost for academic affairs at that University until my retirement.

5. IES and its components fund research throughout the country to address education challenges. This work is to find solutions for the education problems that teachers, principals, education administrators, and policymakers face, such as improving instruction in reading, math, science, and other vital academic subjects.

6. IES was created to conduct rigorous, scientific research in education to provide the public with reliable, valid research findings. This was a sea change that transformed education research for the better. Earlier forms of education research lacked the rigor to provide the nation with valid, reliable findings that could be used to address the practical education challenges faced by teachers, education administrators, and policy makers. Conducting and facilitating high-quality research is a core and irreplaceable mission of IES.

7. Since IES's creation more than two decades ago, the civil servants at NCER and NCSER have helped to create and foster the scientific community necessary to conduct this high-quality research. The federal employees of these IES components work with researchers who are developing research proposals to ensure quality design, and then oversee grantees and contractors carrying out research to ensure it is high-quality.

8. IES's structure provides checks and accountability to ensure that the research it funds and conducts is high in quality and will generate reliable and valid findings that will support the improvement of our nation's education system. One such check is IES's Office of

Science, which is responsible for conducting a separate process of scientific peer-review of applications for research grants, as well as the scientific peer-review of reports from IES research and evaluation contracts to further ensure rigor and high-quality in IES research. The Office of Science's work requires significant expertise and is a vital component of IES and illustrative of IES's critical role in promoting rigorous education research that is useful to our nation's educators and students.

9. I am aware of IES's recent large-scale terminations of most of its staff, and that at present only about 20 or so staff likely remain. It is not possible for IES and its four components to conduct the peer review, quality control, and implementation oversight that is critical to ensuring that IES-funded and facilitated research is high quality and serves its intended purpose. Without high quality research, IES cannot serve the transformative function assigned to it by Congress.

10. Indeed, without expert staff engaged in strategic planning, rigorous assessment of research proposals, oversight of grantee and contractor performance, and many other important functions, any research IES funds in a haphazard manner could do more harm than good by producing inaccurate results and findings that are later relied on by educators and policymakers.

11. Further, there are staff within IES who are critical to the administrative functions necessary simply to make grants and contracts to researchers. It would be extremely difficult, if not impossible, for even these basic administrative functions to be adequately handled with IES retaining only a very small staff across all of its components.

12. Our country's education system is currently in a critical situation. In the fallout from the pandemic, we have seen National Assessment of Educational Progress ("NAEP") scores

decline significantly in both mathematics and reading after decades of improvement. Indeed, we only understand this rollback because of IES's National Center for Education Statistics ("NCES") administration of high-quality, rigorous assessment and data analysis. Continuation of IES's work is critical to three related efforts: developing instructional methods that will overcome pandemic-related learning loss; ensuring that the causes of these pandemic-related losses are understood and can be avoided in the future; and understanding whether any of the learning losses following the pandemic years should be attributed to conditions unrelated to the pandemic.

13. If IES only carries out a small fraction of what Congress has directed the agency to do, they will not be able to fund the research needed to improve education for our students.

14. Further, dramatically cutting back on the number of contracts and grants awarded will decimate the system of education research in our nation as professionals with expertise in the field will be forced to leave it, researchers will not have data and resources available that are necessary to doing critical further research, and talented people will not continue to enter the field of education research.

15. This could have terrible long-term effects for our nation's students. The national environment of quality education research that IES has built and fostered over decades cannot be reconstituted in a year or two if it is destroyed now through mass contract cancellations and agency staffing terminations.

16. Other invaluable IES resources will also be lost if IES's recent mass contract cancellations and staff terminations remain in place. For example, the practice guides created by IES based on rigorous research and subject to their own rigorous peer review are important practical resources for our nation's educators.  This work will cease.

17. Further, at NCES, many of the recently cancelled contracts carry out research and data collection and analysis that are integral to a larger ecosystem of education research. Researchers who were not directly working on cancelled IES studies but used the comprehensive data provided by NCES will not be able to continue the critical research they conducted without access to the reliable data NCES had previously provided. NCES's data are also relied on by education policymakers across the country. Many of the cancelled studies and data collection projects concern the type of data that has been an invaluable resource for improving our nation's education system.

18. IES's functions cannot plausibly be replaced by state and local research efforts. IES, with a budget that is generally a very small fraction of the Department of Education's overall budget, has created and fostered a national system of high-quality education research. That role is irreplaceable, and it cannot be fulfilled with a small fraction of IES's previous staff and research contracts.

April 24, 2025
Newark, Delaware

Lynn Okagaki

# Exhibit C

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

AMERICAN EDUCATIONAL RESEARCH
ASSOCIATION, *et al.*,

*Plaintiffs,*

vs.

U.S. DEPARTMENT OF EDUCATION,
 *et al.*,

*Defendants.*

Civil Action No. 8:25-cv-01230

---

## DECLARATION OF JOAN MCLAUGHLIN

I, Joan McLaughlin, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am over eighteen years old, of sound mind, and fully competent to make this declaration.

2. I am a former Commissioner of the National Center for Special Education Research ("NCSER") in the Institute of Education Sciences ("IES") and spent my career evaluating government programs and overseeing education research, with an emphasis on early childhood intervention and special education.

3. I have a Ph.D. in developmental psychology from Cornell University.

4. I spent the first eight years of my career in the federal government at the U.S. General Accounting Office and then the U.S. Department of Agriculture studying and evaluating government programs. I then worked 16 years for a private consulting firm conducting

studies and evaluations of programs under contract for a number of federal agencies, including the Department of Health and Human Services' early childhood education programs.

5. My efforts at the consulting firm included work as a project director on an evaluation of a literacy program being conducted by a Regional Education Laboratory through IES.

6. In 2009, I began serving as the Deputy Commissioner of NCSER. In this role, I also served as a Program Officer, overseeing NCSER's grants related to early intervention and early learning in special education. In 2013, I was appointed to serve as Commissioner of NCSER, and I served in that position until my retirement in 2022.

7. As a result of my career in research and evaluation, and my service at NCSER, I have both substantial content knowledge in early childhood, early intervention, and special education. I also have developed expertise in conducting research, including designing and implementing research using scientifically rigorous methods and analyses.

8. I also have significant experience and understanding of the functioning of NCSER, IES, and federal agencies more broadly.

9. NCSER conducts much of its critical research in special education programs and interventions through carefully designed grant programs. The purpose of NCSER, and IES more broadly, is not merely to promote education research, but to support and foster high-quality education research with valid and reliable results, and to then disseminate research findings to educators, policymakers, and the public so that education in our country can be improved and challenges addressed.

10. To achieve its mission, NCSER engages in a strategic planning process using the expertise of its staff. Program officers are generally required to regularly—on at least an annual

basis–use their expertise to identify areas of research that are important and in need of development. This requires a review of available research, input from IES stakeholders, deliberations with NCSER and other IES staff, and intensive strategic planning.

11. Given the historically limited resources NCSER has faced, this also requires significant prioritization of areas of need following the initial strategic planning efforts.

12. Following this strategic planning process, NCSER drafts and then revises the Request for Applications ("RFAs") for research grants based on feedback from the IES Director and Deputy Director for Science. The RFAs seek to solicit projects that meet the strategic needs identified with appropriate parameters and requirements to ensure that the resulting research is of high quality.

13. After RFAs have been revised and then approved by the IES Director, they are published to solicit applications proposing research projects. Grant applications go through an initial screening led by the Office of Science to ensure that they meet the requirements of the RFA (for example, they must include a research plan and staffing plan). The Office of Science then sets up peer review panels of experts to review the grant proposals. These reviews are accomplished using contracts and are an important tool to ensure the quality of the applications received. The peer reviewers discuss and independently rate the applications. A slate of the applications and their ratings is prepared for each RFA following the panel reviews. Awards are made in rank order, starting with the highest-rated applications, depending on the availability of funding.

14. After an application has been selected to receive funding, NCSER staff continue to have significant responsibilities to ensure that the research conducted is of high-quality. NCSER program officers meet with the awardees to discuss the research to be conducted,

key milestones of the project, and grant award requirements. Program officers continue to monitor the progress of these grants through regular meetings with the grantees and annual reports. If a grantee encounters difficulties in conducting the planned research or administering the grant, the program officers increase their grant monitoring activities.

15. NCSER cannot carry out its mission to increase the knowledge and understanding of children and youth with disabilities alone. In addition to relying on peer review that is led by the Office of Science, NCSER relies on other IES Centers as well.

16. For example, NCSER has limited resources for disseminating the results of its research. NCSER relies heavily on the National Center for Education Evaluation and Regional Assistance ("NCEE") for dissemination through its well-established mechanisms, including the What Works Clearinghouse ("WWC"), and the Education Resource Information Center ("ERIC"). The Practice Guides developed through the WWC are important ways to synthesize research findings for educators. These mechanisms were developed and overseen by NCEE but run by experienced contractors.  NCEE also crucially conducts, through its own staff and hired contractors, dissemination work through professional and practitioner meetings and conferences to ensure that IES research, including NCSER research, has a meaningful impact.

17. NCSER also has relied on the National Center for Education Statistics ("NCES") to collect data on students with disabilities, including through the National Assessment of Education Progress ("NAEP") and through some NCES longitudinal studies. These data are an important research resource for NCSER and the research carried out through its grantees.

18. NCSER has also carried out critical functions through contracts, as well as grants, because its small staff needed additional support. For example, the Education Sciences Reform Act ("ESRA") requires stakeholder and expert input for various NCSER programs. NCSER would generally hold technical working group meetings to gain important information required by the statute from experts and stakeholders on particular topics, such as the transition of students with disabilities from high school. Contractors were necessary to carry out this important work.

19. NCSER also has used contracts to help disseminate its work and findings to critical special education stakeholders. For example, a contractor developed a number of short video segments on interventions for students with disabilities for local news stations across the country.

20. Staff overseeing contract work are required to be contracting officer representatives (CORs). To become a COR, staff must go through intensive training to ensure they have the skills to oversee the multiple components of government contracts. Once staff are certified, continuing education is required to keep their certification. Given the limited number of staff that remain in IES, there are likely very few CORs and given their other responsibilities, such as managing the grant process and overseeing grants, these staff cannot plausibly manage and oversee all of the important, large contracts that IES relies on to carry out the agency's other mandated functions.

21. IES cannot plausibly function and fulfill its mission outlined in the Education Sciences Reform Act (ESRA) with a tiny staff significantly smaller than the nearly 200 staff working there when I retired from the agency in 2022.

22. The role of the many expert staff at IES is to ensure that the statistical data, research, and evaluations conducted by IES are scientifically rigorous and accurately inform policymakers and educators about what works to ensure our nation's children receive the highest quality education.  Since it was founded, IES has significantly improved the information that is available to address educational challenges and disseminated this work widely.

23. The strategic planning, vetting, quality control, expert analysis, and oversight of grantees and contractors that is required for IES and its components to function effectively is simply not possible with only around 20 staff spread across IES's four centers and its centralized functions.

24. In my time at NCSER, we prioritized being good stewards of taxpayer dollars and ensuring a high-quality product for the public. It is not possible for the very small staff that remains to meet all of the legislative mandates outlined in ESRA and to do so with the same high standards that have come to be the hallmark of IES.

April 25, 2025

Arlington, VA

*Joan E. McLaughlin*

Joan McLaughlin

# Exhibit D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, *et al.*, <br><br> *Plaintiffs*, <br><br> vs. <br><br> U.S. DEPARTMENT OF EDUCATION, *et al.*, <br><br> *Defendants*. | Civil Action No. 8:25-cv-01230 |

---

**DECLARATION OF ERIN POLLARD YOUNG**

I, Erin Pollard Young, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1.     I am over eighteen years old, of sound mind, and fully competent to make this declaration. This declaration is based on my personal knowledge and information that has been shared with me through conversations with my colleagues.

2.     I am an Education Research Analyst in the National Center for Education Evaluation and Regional Assistance ("NCEE"), a part of the Institute of Education Sciences (IES), which is itself a semi-independent division of the Department of Education ("ED"). I have worked at NCEE for 14 years. As an Education Research Analyst, I have knowledge about the responsibilities of IES in general and NCEE specifically.

1

3.    NCEE is divided into two divisions: Evaluation and Knowledge Use. I work in the Knowledge Use division. The Knowledge Use Division has two branches: the Regional Educational Laboratory Branch and the Knowledge Synthesis Branch. I work in the Knowledge Synthesis Branch.

4.    The Knowledge Synthesis Branch is responsible for three programs:

a. Education Resources Information Center (ERIC). ERIC is a large-scale database of education research that is 60 years old. It is the second most visited website of the Department. It is the only major database of grey literature, which means literature not published in a journal, but from schools, districts, or policy centers across the country. It also includes literature from both mainstay and obscure journals. It catalogs the metadata and makes it available in a free database and data feeds. It has over 14 million users a year.

b. What Works Clearinghouse (the Clearinghouse). The Clearinghouse reviews relevant research, identifies well-designed and well-implemented impact studies, summarizes the findings from those studies, and disseminates them to the public. It reviews studies against the Departments' evidence standards to determine whether a study' research methods support its causal claims. It is a trusted source of scientific evidence for what works in education.

c. The National Library of Education. The National Library of Education is a legislatively mandated program and one of five national libraries designated by Congress. The library serves the public by providing access to rare and historic education materials, as well as serving as an agency library that supports the Department's offices.

2

5.    All of the Knowledge Use division's programs carry out statutory requirements. The REL program was established by the Education Sciences Reform Act, 20 U.S.C. § 9564. ERIC predated ESRA, but was explicitly continued by that statute. *See* 20 U.S.C. § 9562(a). While not authorized by name, the Clearinghouse's function is mandated by ESRA, 20 U.S.C. § 9562(a)(3) and (b), and the Every Student Succeeds Act, 20 U.S.C. § 5545—and is further referenced by name at 20 U.S.C. § 7013. The Clearinghouse standards and procedures have been incorporated by reference into regulations. 34 C.F.R. § 77.2.. The National Library of Education was established by ESRA. *See* 20 U.S.C. § 9562(d).

6.    Until February 2025, I served as the Contracting Officer's Representative (or "COR") for three contracts across two programs. I managed the contract for ERIC, which is a highly visible project. I have managed ERIC for 12 years. I also managed two contracts involving the Clearinghouse. I managed an infrastructure project that included overseeing the development of methodological standards, training on those standards, developing a workflow management system to review research against those standards, peer review of all findings, and maintaining the website.

7.    I also oversaw the development of a Practice Guide on reading interventions for students K-3 struggling in reading. The practice guide was being written by a panel of experts to address the concern, often raised by the President and the Secretary of Education, that American children are falling behind in reading. The practice guide was going to provide a free resource full of recommended activities, scripts, and lessons to improve reading.

8.    On February 10, 2025, my colleagues and I were called into a division-wide meeting by our supervisors. Our supervisors said that they had been called into an emergency meeting with IES's Acting Director, and were told that the Department of Government

AERA-0026

Efficiency ("DOGE") had decided to terminate the majority of IES's contracts, including all contracts relating to the Knowledge Use division except those for the RELs. We were not given any lists of which contracts were terminated, and were told not to communicate with contractors. I only found out that the two contracts I oversaw for the WWC were canceled when I received emails from contractors. I was only copied on some of the termination notices. I found out after the termination notices were sent out that ERIC was not included on the list.

9.       No DOGE or ED employee discussed the consequences of canceling the contracts I oversaw with me prior to this meeting. None of my IES colleagues talked with DOGE either. The first day that DOGE arrived at IES was February 10, and I understand that they had already marked the contracts for cancellation.

10.      As a subject matter expert and employee responsible for some of these contracts, I neither participated in any deliberations before their cancellation, nor am I aware of any reasoning being provided for the cancellations. Neither my supervisor nor his supervisor was involved in the decision or aware of the cancellations in advance.

11.      Based on my 14 years at IES, and training as a COR, the way these contracts were terminated was extremely unusual. The COR is the person at an agency who has the most direct knowledge of a contract, and the contractor's performance of that contract. These contracts had no concerns over performance and met a bona fide need of the Department.

12.      The cancellation of the WWC support contracts means that the Department cannot review new studies and publish reviews to its website. Educators and teachers will no longer have access to a credible, trusted, free review of educational programs before they spend a lot of money purchasing them. Instead, they may purchase programs based on sales pitches and waste money on programs that are not proven to be effective. Additionally, the Clearinghouse

AERA-0027

reviews the Department's grant applications to determine whether methodologies in proposed grants are supported by evidence as defined by 20 U.S.C.§ 7801(21). Without that work, the Department may fund programs that have no evidence of effectiveness.

13.     My third contract, the contract for ERIC, was not canceled. But that contract will expire on its own if an option to extend is not exercised by April 23, 2025. I was informed by IES leadership that DOGE was only approving contract actions that had a reduction of funding of at least 50%. To reduce the contract by 50% would mean ERIC would have to drop 45% of its source publications, and cease providing customer support, creating communications materials, and approving new sources to be indexed.

14.     If the ERIC contract does not continue, then the website will not be updated with new education research, and there is a risk that valuable research will be lost. Commercial search engines and scholarly databases rely on ERIC to gather and catalog education research and non-journal literature will become much harder to discover without ERIC. Even at a fifty percent reduction, it will become a far-less useful and effective tool—particularly without the customer support that helps fulfill NCEE's obligations under 20 U.S.C. § 9562(b)(4).  It will be harder for teachers and students to have a free way to gather research and resources and learn from less known sources. Instead, they may turn to free, easily accessible sources like blogs, TikTok, or Pinterest. Peer-reviewed educational research will no longer be available to everyone, but instead it will only be available to the elite who can pay to access it. It is also possible that the website could be dismantled entirely, which would have a huge impact on educators and researchers.

***Reduction in Force***

15.     On March 11, 2025, I received an internal email advising me to telework the

AERA-0028

following day because there was a security threat for all three Department of Education buildings. Around 6 p.m. that evening, my laptop restarted, and I was no longer able to send external emails. Around 7:22 p.m., I received an email stating that "your organizational unit is being abolished along with all positions within the unit—including yours." The email further informed me that I would be placed on administrative leave beginning March 21, 2025. Attached as Exhibit 1 to this Declaration is a true and correct copy of that email. As has been publicly reported, the next day I received an email from Acting IES Director Soldner stating that the vast majority of IES staff had been subject to termination and our work was being transitioned from IES. I do not have access to that email. On April 10, 2025, I received a "Notice of Separation Due to Reduction in Force" that indicated my position, as well as the entire Knowledge Synthesis Branch was being abolished. A true and correct copy of that email is attached as Exhibit 2 to this Declaration.

16.    My understanding is that IES was significantly impacted by this Reduction in Force (RIF). The following employees remain:

   a.  NCES: Has three remaining employees.

   b.  NCER: Only the Commissioner

   c.  NCSER: not subject to the RIF, but has fewer than 10 total employees

   d.  NCEE: Only the Commissioner, who is also the Acting Director of IES

   e.  Additional IES staff who were not part of one of these four centers were also impacted. The director of IT and the Information Security Specialist, who  run the server and keep it secure and ensure that personally identifiable information remains confidential were subject to the RIF. Staff who handle congressional inquiries and FOIA requests were also subject to the RIF.

6

17.     When a federal contract is terminated for convenience, the COR is responsible for overseeing the closeout of that contract—including by ensuring the return of any work-product, including any data that might be in the contractor's possession.  I was not able to complete the closeouts of my contracts before being placed on administrative leave.  That work, like ERIC, was transitioned to another project officer who is taking over all of the contracts at NCEE—including the canceled ones-- in addition to her current responsibilities. She will not have the capacity to create agreements with publishers, review all of the deliverables, be the help desk for the website, and work to solve problems as they arise—while also closing out contracts and ensuring the preservation of data on top of her normal responsibilities. I do not believe that the project officer will have the capacity needed to effectively manage ERIC, much less any of the other NCEE programs that have been assigned to her, on top of her existing workload.

18.     Based on my knowledge and experience, I do not believe that the Department can meet its many statutory obligations under ESRA following the RIF with the very small remaining staff. There are three Contracting Officer's Representatives left at IES. They are not going to be able to run the statutorily required programs themselves. There are no staff remaining to manage the contracts and or the budget, put money on the contracts, help write the solicitation packages—much less comply with FOIA, manage the servers, preserve confidential data,  and ensure the timely dissemination of research and data. There are not enough people at IES left to ensure that IES is fulfilling its statutory responsibilities.

19.     For example, ESRA explicitly requires IES, through NCEE, to enter into contracts to operate 10 Regional Education Laboratories ("RELs"). The statute is very prescriptive in the requirements that IES must meet in entering these contracts, and the depth of oversight IES must perform in overseeing their execution. In past years, I was responsible for developing the

7

procurement package for the REL program, and it took months of intensive effort. *See* 20 U.S.C. § 9564. Re-bidding and overseeing the performance of all 10 RELs contracts will be an extraordinarily intensive undertaking that typically takes at least 20 individuals to review proposals and at least 5 full time staff to manage the contracts. But NCEE now has only a single employee–the Commissioner–who would, if IES actually sought to carry out its required functions–be fully responsible for the RELs, as well as all of NCEE's other functions.

20.    The implementation of this RIF gives me and my colleagues significant doubts about the viability of continuing in the education research and data field. Due to the cancellation of contracts and grants and the RIF, the majority of my colleagues and I will be unable to transition to other education research positions. To my knowledge, terminated IES staff have already begun exploring other forms of employment outside of education. Further, due to the RIFs and hiring freezes at other agencies, terminated staff are unlikely to find positions within the government. This will result in their certifications lapsing.  As a result, the final termination of so many staff is likely to lead to the loss of institutional knowledge that will not be easily replaced.

April 24, 2025

Arlington, VA                              ___/s/ Erin Pollard Young*___
                                          Erin Pollard Young

*A copy of the signature page bearing an original signature is attached hereto due to low scan quality

8

procurement package for the REL program, and it took months of intensive effort. *See* 20 U.S.C. § 9564. Re-bidding and overseeing the performance of all 10 RELs contracts will be an extraordinarily intensive undertaking that typically takes at least 20 individuals to review proposals and at least 5 full time staff to manage the contracts. But NCEE now has only a single employee–the Commissioner–who would, if IES actually sought to carry out its required functions–be fully responsible for the RELs, as well as all of NCEE's other functions.

20.    The implementation of this RIF gives me and my colleagues significant doubts about the viability of continuing in the education research and data field. Due to the cancellation of contracts and grants and the RIF, the majority of my colleagues and I will be unable to transition to other education research positions. To my knowledge, terminated IES staff have already begun exploring other forms of employment outside of education. Further, due to the RIFs and hiring freezes at other agencies, terminated staff are unlikely to find positions within the government. This will result in their certifications lapsing. As a result, the final termination of so many staff is likely to lead to the loss of institutional knowledge that will not be easily replaced.

April 24, 2025

Arlington, VA

Erin Pollard Young

8

Exhibit 1

**Pollard, Erin**

| | |
|---|---|
| **From:** | Clay, Jacqueline |
| **Sent:** | Tuesday, March 11, 2025 7:38 PM |
| **To:** | CHCO |
| **Subject:** | CHCO - Notice to Employees Impacted by Reduction in Force (RIF) |
| **Attachments:** | Instructions for ED Employees Impacted by RIF, 3-11-25.docx; ED RIF Information and Resources, 3-11-25.docx; Office Hours – Retirement Paperwork and Process  |  Questions and Answers |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Dear Colleagues,

I am writing to share some difficult news.  This email serves as notice that your organizational unit is being abolished along with all positions within the unit – including yours.  Please note, if you elected to separate under another program e.g., Deferred Resignation Program, Voluntary Early Retirement Authority (Early-Out), or Voluntary Separation Incentive Payment (Buy-Out), you are NOT impacted by the Reduction in Force (RIF).

To provide you with the maximum opportunity to focus on your transition, you will be placed on paid administrative leave starting **Friday, March 21, 2025**.

> ➢ ***Please take immediate action to review and comply with the Instructions for Employees Impacted by the RIF (attached).  This document contains important information regarding access to ED facilities, transitioning your work, and preparing for administrative leave.***

> ➢ ***Ensure* your Principal Operating Component (POC) has your current mailing address, and a good personal phone number and email address to contact you.**

> ➢ During the transition period, you will retain limited equipment and systems access to enable official communications regarding your RIF standing.  Please note:
>   - ○  You are only authorized to back-up your data to a network device or approved backup device.
>   - ○ You are prohibited from storing sensitive or mission-critical data on your systems' hard drive or handheld device.
>   - ○ All Department of Education system resources, including hardware, software programs, files, paper reports, and data are the sole property of the Department of Education, and there should be no expectation of privacy.
>   - ○ You are prohibited from transmitting electronic copies of Department of Education materials to your home or other personal accounts.
>   - ○ Personnel using remote access shall not download or store Government information on private equipment, optical or digital media.

AERA-0034

o Unauthorized or improper use of this system may result in disciplinary action, as well as civil and criminal penalties.

➢ No earlier than 30 days from the date of this email you will receive your official RIF notice, which will begin an additional 60 days of paid administrative leave prior to your separation from the agency.

➢ This will give you a total of 90 days on paid leave to help facilitate your transition.

➢ Your official RIF notice will provide more detailed information on your specific benefits and standing and be delivered to your mailing address on file.

➢ You will only retain your Ed.gov email to facilitate communications with the agency through March 21, 2025.

ED has made the determination to initiate RIF procedures as part of the agency's restructuring process. These actions support Executive Order (EO) 14158, Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative, dated February 11, 2025 and Office of Personnel Management Guidance on Agency RIF and Reorganization Plans, dated February 26, 2025. This decision is in no way a reflection of your performance or contributions, which we deeply appreciate.

I recognize that this is a challenging moment, and my team is committed to supporting you through this transition.

➢ For additional information about Reductions in Force, visit the Office of Personnel Management RIF site.

➢ For general questions regarding next steps, please email workforcereshaping@ed.gov.

➢ For specific retirement or benefits questions, please contact benefits@ed.gov.

➢ Use the Employee Assistance Program, if needed. The Employee Assisstance Program (EAP) and WorkLife4You Program, provided by Federal Occupational Health (FOH), are available 24 hours a day, 7 days a week at 1-800-222-0364 (TTY: 1-888-262-7848) or at www.FOH4you.com or www.worklife4you.com.

➢ Should you lose access or need IT support, please contact the Help Desk at ocioenterprisehelpdesk@ed.gov; or call 202-708-HELP (202-708-4357) and select Option 2.

With regard,

Jacqueline Clay
Chief Human Capital Officer

Attachments:
Instructions for ED Employees Impacted by RIF
ED RIF Information and Resources
Benefits and Work/Life Email: Office Hours – Retirement Paperwork and Process

AERA-0035

3

Exhibit 2

AERA-0037



UNITED STATES DEPARTMENT OF EDUCATION

April 10, 2025

**MEMORANDUM**

TO:        Young, Erin Pollard
           EDUCATION RESEARCH ANALYST, GS-1730-14
           IES, KNOWLEDGE SYNTHESIS

FROM:      Jacqueline Clay
           Deputy Assistant Secretary
           Chief Human Capital Officer
           Office of Human Resources
           Office of Finance and Operations

SUBJECT:   Notice of Separation Due to Reduction in Force

In accordance with the Executive Order titled *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative*, dated February 11, 2025, it is with great regret that I must inform you that your position of EDUCATION RESEARCH ANALYST, GS-1730-14 is being abolished and you have been reached for reduction in force (RIF) action. This memorandum constitutes a specific RIF notice.

Effective June 10, 2025, ED will conduct a RIF within your competitive area. This action is a result of the abolishment of your position in IES, KNOWLEDGE SYNTHESIS.

This RIF is in accordance with current law and regulations, which include Chapter 35 of Title 5, United States Code, 5 Code of Federal Regulations, Part 351, internal U.S. Department of Education (ED) policy, and where applicable, the governing collective bargaining agreement between AFGE and ED. In accordance with these provisions, ED will release you from your competitive level, and you do not have an assignment right to another position in your competitive area. As a result, your separation from the Federal service by RIF on June 10, 2025.

To conduct the RIF, the Office of Human Resources (OHR) prepared retention registers which listed employees in retention standing order based on civil service tenure, veterans' preference, length of Federal service and performance ratings. We used the following information to determine your retention standing as of the RIF effective date:

**Competitive Area:** ERTK
**Service Type:** Competitive
**Position Title, Pay Plan, Series and Grade:** EDUCATION RESEARCH ANALYST, GS-1730-14
**Competitive Level:** R1S

**Tenure Group:** 1, CAREER APPT OR EXC (NOT ON TRIAL PD & W/O TIME LIMIT)
**Retention Tenure/ Subgroup:** 1B
**Service Computation Date (SCD):** March 14, 2011
**Latest Three Performance Evaluations:**
Rating Performance and Pattern FY24: 5
Rating Performance and Pattern FY23: 5
Rating Performance and Pattern FY22: 5
**SCD adjusted by latest three performance ratings:** March 14, 1991

Attached to this letter is an Employee Guide to RIF Benefits which contains information regarding leave and other benefits available to employees separated by RIF, as well as information on the ED Career Transition Assistance Plan. In addition, you may authorize OHR to release your qualification information to Federal, state, and private sector agencies and organizations by completing the attached release authorization.  Information regarding benefits available under the Workforce Investment Act of 1998 Program, including unemployment insurance is located at
http://www.doleta.gov/usworkforce/WIA/planstatus.cfm.

You may be eligible to receive severance pay. If you are eligible for severance, we will process payment upon separation.   If you think you may be eligible for discontinued service or regular retirement, please see the Employee Guide to RIF Benefits for more information or contact benefits@ed.gov.  **Note:**  You are not eligible for severance pay if you are eligible for an immediate annuity under Minimum Retirement Age (MRA) +10, optional or discontinued service retirement.

If you resign on or before the RIF effective date of June 10, 2025, ED will still consider your separation involuntary.  Please be advised that you may affect your appeal rights if you resign.  You are strongly encouraged to contact OHR for information if you are considering resigning during this specific notice period.

OHR staff are available to assist you by explaining this proposed action and will provide you with copies of pertinent regulations, benefits information, or other material related to this action that you may wish to review. Title 5 of the Code of Federal Regulations Part 351 contain the RIF regulations. OHR will provide a copy to you upon request. You may also inspect the appropriate retention register through the OHR. You may obtain any information in writing by sending your request to the ED RIF Team, email: WorkforceReshaping@ed.gov.

You may have the right to appeal this action to the Merit Systems Protection Board (MSPB).  Should you elect to appeal to the MSPB, your appeal must be in writing and submitted no later than 30 calendar days after the effective date of the reduction in force action.  For more information, please visit www.mspb.gov or contact your local MSPB regional or field office (see attached). However, if you are a bargaining unit employee, you must use the negotiated grievance procedures and may not appeal to the MSPB unless you allege that the RIF action was based upon discrimination.

Alternatively, you may file an electronic appeal at https://e-appeal.mspb.gov/. See *How to File an Appeal* at http://www.mspb.gov/appeals/appeals.htm.  If you file an appeal the MSPB must serve an acknowledgement order to the following address:

Office of the General Counsel,
U.S. Department of Education
400 Maryland Ave, SW
Washington, DC  20202

If you believe this action is because of a prohibited personnel practice other than discrimination based on your race, color, religion, sex, national origin, age, disability, marital status, or political affiliation, you may seek corrective action with the Office of the Special Counsel (OSC). Your decision to file an MSPB appeal or to seek corrective action from the OSC is exclusive and irrevocable.  See Prohibited Personnel Practices Overview for more information about seeking corrective action.

If you believe this action is because of race, color, religion, sex (including pregnancy), national origin, physical disability, genetic information, or age, you may file a complaint with Office of Equal Employment Opportunity Services by email at ODS_OEEOS@ed.gov. To initiate a complaint, you must contact an ED Equal Employment Opportunity Counselor within 45 days of the effective date of this action.

This RIF action is not a reflection upon your performance or conduct. It is solely due to the reduction in the number of positions as described earlier in this letter. ED appreciates the service you have rendered. We deeply regret that this decision affects you, and we recognize the difficulty of the moment.

**Attachments:**
RIF Information Sheet
Employee Guide to RIF Benefits
ED Placement Programs
Reemployment Priority List Registration Form
Authorization to Release Qualifications Information
Severance Pay Information
MSPB Appeal Offices Locations

Sent by email to: erin.pollard@gmail.com

No hard copy to follow

AERA-0040

# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AMERICAN EDUCATIONAL RESEARCH
ASSOCIATION, *et al.*,

   *Plaintiffs*,

vs.

U.S. DEPARTMENT OF EDUCATION,
 *et al.*,

   *Defendants*.

Civil Action No. 8:25-cv-01230

---

### DECLARATION OF DAVID CHARD

I, David Chard, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am over eighteen years old, of sound mind, and fully competent to make this declaration.

2. I served on the National Board of Education Sciences for six years and, I have worked in education for four decades.

3. I have served in higher education in various roles. I have worked in education research, including as a principal investigator on large studies, and I have supervised expert faculty conducting education research.

4. The National Board of Education Sciences serves as an advisor to the Director of the Institute of Education Sciences ("IES").

5. In my service on the board, and my long career in the education research field, I have learned about the functioning and role of IES in great detail.

6. IES was created to ensure that the education research field conducted rigorous research with high standards, so that the resulting research was reliable and valid. This goal was to inform policymakers, educators and the public about strong evidence of what works in our education system and under what circumstances.

7. IES is charged with numerous critical functions to achieve this goal, including overseeing annual progress of our nation's schools in educating our children, maintaining critical databases on our educational progress, creating a system to design, develop, and test innovations using rigorous research methodologies, building a shared and trusted knowledge base for educators about what works, and using processes for generating the best ideas modeled after other very successful research agencies.

8. The National Center for Education Statistics ("NCES") is a venerable component of IES that long predates the agency's establishment, and NCES has been the center of the data collection, longitudinal surveys, national and international surveys, and testing that fundamentally inform our policymakers, educators, and public about the status of education in our country and our comparative performance internationally.

9. To do this work, NCES requires many expert statisticians and analysts to assess our national educational performance and our comparative performance. Past presidents, governors, and state governments have been very interested in this critical information to inform education policy and understand our nation and states' comparative educational performance.

10. IES contains three other Centers that perform important functions. The National Center for Education Evaluation and Regional Assistance ("NCEE") plays a critical role in disseminating information and technical assistance to regions of the country about education practices supported by quality evidence to address educational challenges.

11. For example, the What Works Clearinghouse and the Regional Education Laboratories ("RELs") have provided the best resources for evidenced based practices that the United States has ever had.

12. The National Center for Education Research ("NCER") and the National Center for Special Education Research ("NCSER") were created to foster rigorous education research in a streamlined manner, with a particular focus on underserved communities and students with disabilities.

13. With these resources, and through its research functions, IES sets a standard for the best way to address educational challenges rather than relying solely on self-interested commercial providers of curricula.

14. Before IES's creation, States had not historically taken responsibility for this form of rigorous research, data collection, and dissemination. IES has invested in and created a system of national education research that cannot be replicated by diverse private and local government actors.

15. I understand that IES's total staff, including across its four components and central offices, has been reduced to around 20 people following mass terminations. It is my understanding, for example, that NCES has been reduced to only three staff and that IES's Office of Science has no remaining employees.

16. It is simply infeasible for IES to carry out its critical functions with this extraordinarily low level of staffing following mass terminations.

17. Before these mass terminations, IES was already thinly-staffed and relied on contractors to carry out many important studies, data collections, and other functions.

18. Managing such contracts often requires intensive, near-daily monitoring by expert staff to ensure that contractors are effectively carrying out the work needed by IES, with appropriate controls for activities conducted and federal dollars spent.

19. The quality of IES's functioning is contingent on having sufficient resources to monitor contractor performance, evaluating the work being completed by contractors, and sufficient expertise in education research and statistics.

20. This is to say nothing of carrying out all of IES's other functions, including charting its strategic direction, proposing new areas of study, and drafting reports to disseminate the findings from studies carried out by contractors.

21. It will simply not be possible to carry out these functions with the tiny staff that remains at IES following the mass terminations.

22. For example, at NCES, even without conducting required longitudinal studies, it would be nearly impossible to administer the National Association for Education Progress ("NAEP"), much less ensure the reliability of the methods employed or to fulfill the reporting requirements following collection and analysis of NAEP results.

23. In another example, the elimination of all the staff of the Office of Science within IES removes the experts that played the key role of ensuring all the agency's Centers upheld a high standard of rigor.  This is core to IES's mission of creating and disseminating valid, high-quality data and research so that policymakers and educators are accurately

informed about the status of education in our country and the approaches that could effectively address challenges in the education system.

24. The mass termination and contract cancellations to date stand to erase infrastructure and historically accumulated knowledge and expertise within IES and the education research community that will be extraordinarily difficult, and likely impossible, to reconstitute. Many of the leaders, experts, and statisticians who will be lost, and presumably pursue other endeavors, have accumulated decades of expertise in carrying out IES's highly technical data and research functions. Many of the contracts that were cancelled include data and high-quality research that will now never be published. The harm to our education system of these actions will be immense. We will be unaware of the status of education in this country, and of what approaches will work to address existing challenges.

April 24, 2025

Provincetown, MA

David Chard

# Exhibit F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, *et al.*, | |
| *Plaintiffs*, | |
| vs. | Civil Action No. 8:25-cv-01230 |
| U.S. DEPARTMENT OF EDUCATION, *et al.*, | |
| *Defendants*. | |

## DECLARATION OF RUSSELL GERSTEN

I, Russell Gersten, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am over eighteen years old, of sound mind, and fully competent to make this declaration.

2. I am an education researcher and member of the Society for Research on Educational Effectiveness ("SREE") and of the American Association on Educational Effectiveness ("AERA"), of which I have been a member for more than 40 years.

3. I have been working in the field of education research since 1977 with a focus on students with disabilities.

4. In my work, I have focused on research design and implementation, special education, reading and math instruction, and translating research into practice. I have worked and

co-written 8 widely used practice guides for practitioners on best ways to teach mathematics and reading to students with learning problems and disabilities. I have also authored more than 150 publications. I have extensive experience directing applied research grants (totaling more than $38 million) both from the federal government and state education agencies.

5. I currently serve as the Executive Director of the Instructional Research Group ("IRG"), which is an educational research institute that I helped found. I have also served as the Principal Investigator for Institute of Education Studies ("IES") projects involving rigorous randomized controlled trials, serving as the Director of the Math Strand for the Center on Instruction, the Director of Research for the Regional Educational Laboratory – Southwest, and the Principal Investigator for several What Works Clearinghouse ("WWC") Projects, including a series of 8 practice guides.

6. In these roles, I have seen firsthand how effective IES-operated projects are. For example, the WWC practice guides are considered the most frequently downloaded and most widely used product that the Department has ever developed—helping practitioners find feasible ways to implement teaching practices that are supported by rigorous evidence.

7. My work outside of IES-funded projects is still very reliant on the research, data, and analysis made possible by IES's resources on advances in research design and analysis as well as its support for a comprehensive environment supporting rigorous education research.

8. At IRG our work is currently focused on three areas of education research:

a.  First, we are studying reading instruction and progress in special education, including evaluating teacher training and looking at areas of study that have been neglected, such as language and vocabulary development.

b.  Second, we are developing and evaluating methods for teaching complex mathematics concepts and content in algebra, statistics and rational numbers, particularly for students with disabilities.

c.  Third, we are conducting meta-analyses and research syntheses using the body of available education research and data and then translating the findings into the widely used practice guides that provide examples of how to implement research findings.

9.  My work and research at IRG on reading instruction and meta-analysis has relied heavily on studies like the Multi-Tiered Systems of Support for Behavior ("MTSS"), which is focused on preventing reading failure in the early grades. The MTSS evaluation study was abruptly cancelled on February 10, 2025. The government has invested approximately $39 million dollars of taxpayer funds in this study, which has examined teachers and thousands of elementary students across the country to determine whether this approach to beginning reading instruction, mandated by all 50 states, does in fact lead to better outcomes for young children.

10. The abrupt, February 10, 2025, cancellation of the study, which is very near completion, will prevent me, but also other researchers in the fields of special education and reading, from gaining access to invaluable research and data concerning students' reading ability and instructional approaches' impacts on those abilities.

11. In support of the MTSS study, IES contractors provided specialized support in reading instruction to students who had been screened and were determined as requiring additional small group intervention lessons, trained classroom teachers on these interventions and evidence-based practices in classroom reading instruction, and closely monitored the progress of students requiring such interventions. Those operating the MTSS study also surveyed teachers and observed classrooms to collect additional data on the actual impact of the training on how teachers taught reading and whether students significantly improved in their reading performance.

12. After years of investment in training, monitoring, and data collection, those operating the MTSS study had begun to comb through the data, studying the effectiveness of potential interventions to aid young students.

13. But the cancellation of this study— funded through IES contracts—stopped this work in its tracks and will prevent the study's findings from being published and disseminated.

14. This will impede my ability to effectively communicate the critical findings of the study to schools as they struggle to implement MTSS, to conduct further research into students' reading abilities, and to synthesize valid reliable up-to-date education research as required for my work at IRG. There are no private sources of funding that could conduct a study of this scope, involving over 6,000 students in 8 states to gauge how effective this policy is across the country. Instead, districts will need to rely on their intuitions and prior beliefs, rather than on scientific evidence.

15. My work will be significantly compromised by the     end of the MTSS study.  The nation's educators and students—and the public interest to which I have dedicated my career—will also be significantly harmed.      Schools will be deprived of information

about how to approach reading interventions and the types of teacher training that is most effective. They cannot make decisions without hard evidence. The abrupt cessation of this study will prevent our society and education system from understanding the effectiveness of tested approaches to addressing critical literacy gaps that can greatly impact students' futures in our society.

16. The mass cancellation of IES contracts, and the subsequent mass layoffs of IES staff, makes the career in which I have invested decades untenable—and will prevent me from accessing the data I need to do my work at IRG, as the vast resources IES provides to education researchers are no longer available.

17. This harm is imminent and irreparable. If IES does not continue to conduct this critical research in the coming months, the environment that supports our work and my profession will not survive. I do not believe it will be tenable for me to continue in this career in which I have invested so much, nor for the 10 doctoral level researchers with expertise in research design, reading and mathematics curriculum, and teacher training to use their skills in the public interest.

April 23, 2025
[Long Beach, California]

_____

Russell Gersten

# Exhibit G

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, *et al.*, | |
| *Plaintiffs,* | |
| vs. | Civil Action No. 8:25-cv-01230 |
| U.S. DEPARTMENT OF EDUCATION, *et al.*, | |
| *Defendants*. | |

**DECLARATION OF ELLEN WEISS**

I, Ellen Weiss, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am over eighteen years old, of sound mind, and fully competent to make this declaration.

2. I submit this declaration on behalf of the Society for Research on Educational Effectiveness ("SREE"), where I have served as Executive Director for nearly seven years.

3. I hold a Masters in Public Policy from Duke University and have previously served in roles impacting policy, including as a legislative assistant in Congress and as an analyst at the Department of Education.

4. SREE is an interdisciplinary professional membership association dedicated to advancing the generation and use of educational effectiveness research to solve pressing challenges

in education, from early childhood to post-secondary education. Effectiveness research includes large-scale evaluations – randomized trials and quasi-experiments – to understand if programs meant to improve student outcomes work as intended – that is, if they cause student outcomes to improve. SREE is dedicated to advancing research that is relevant to education practice in order to implement better strategies for serving students. SREE is headquartered in Rockville, Maryland, and incorporated in Illinois.

5.  In the last membership year, SREE had a total membership of 925.  Membership enrollment for the current membership year is now open, and SREE is continuing to enroll additional members. SREE's members include researchers, practitioners, policymakers, and students with an interest in advancing education research to address challenges in education.

6.  SREE advocates for the development and use of rigorous research methods to evaluate educational programs. Like the Institute for Education Sciences ("IES"), its members focus their research on answering questions regarding "What Works, for Whom, and Under What Conditions." To that end, SREE convenes educators, researchers, and policymakers to share solutions, and supports its members in their efforts through meetings, workshops, professional development, and publications. SREE also holds conferences, offers professional development, disseminates research design resources, and employs other strategies to bring diverse professionals in the education research field together to share knowledge and practices in service of improving the effectiveness of education strategies and policies.

7.  SREE administers and, in collaboration with Taylor and Francis, publishes a journal of educational effectiveness – The Journal of Research on Educational Effectiveness

("JREE") – that serves as a forum for rigorous vetting and dissemination of education research. The journal publishes articles that includes studies of the effectiveness of specific education interventions and programs, as well as meta-analyses of other research, and methodological work focused on improving applied research to advance research design and data analysis.  The Journal has published numerous articles on the effectiveness of specific literacy interventions, strategies to counter absenteeism, curricula, and broader education reform impacts.

8.  SREE and its membership rely heavily on the connected environment of education research data and resources operated and created by IES.  Many of SREE's members were recruited into the field of education and trained in education research as part of IES funded pre- and post-doctoral training programs. Many members of SREE lead or collaborate on IES-funded research evaluating the impacts of educational interventions, and many other members of SREE contribute to the development and use of rigorous methods for testing these interventions. More succinctly, SREE's members cannot adequately carry on with their careers in education research if IES stops funding the collection of high-quality education data and research.

9.  SREE also has members who are policymakers and staff in school districts across the country. These members rely both on IES continuing to provide timely and relevant high quality education research and data and in IES carrying out its dissemination roles by sharing resources like Practice Guides through the What Works Clearinghouse ("WWC") and the dissemination, evaluations and technical assistance functions of the Regional Education Laboratories ("RELs").  The recent contract cancellations will mean that these Practice Guides are not updated making the research in them less relevant over time. And

RELs are not providing technical assistance or conducting new research or evaluations. This is particularly important now, as the education system is experiencing significant challenges following the pandemics and is seeing accelerated changes that must be accurately measured in a timely manner to provide researchers, and the students and public they work to serve, with relevant information.

10. SREE members also contribute to the broader education research enterprise, through technical assistance and through training researchers to support the use of rigorous research methods in evaluations. For example, one contract cancelled on February 10 provided technical assistance oversight to the Education Innovation and Research (EIR) program within the Department of Education. This technical assistance was meant to ensure that EIR studies included strong research designs that would allow for unequivocal conclusions regarding if the new programs improved student outcomes. Other SREE members lead IES-funded statistical and methodological research institutes which train hundreds of education researchers (many members of SREE) in the use of rigorous, cutting-edge research for better understanding if programs work, and if they do, where and for whom they work best. These IES funded workshops are attended by researchers across the field of education and provide resources that are not available anywhere else.

11. IES (and its predecessor components) has for decades served as a crucial resource for promoting high quality education research and data.  In the last two decades, IES's efforts to build a world class education research system have created a community of researchers with the training to carry out high quality education research.  That system and

community–which includes SREE and its members–is in grave jeopardy if IES ceases to function.

12. SREE members rely upon the use of ERIC for conducting reviews of, disseminating, and synthesizing research findings.  As a result of the RIF's to IES staff and the contract cancellations, ERIC is slated to reduce the included journals by nearly 50%. This means both that the existing literature will not be available to SREE members – which will make thorough systematic reviews and meta-analyses impossible – and that SREE members – who have completed research with IES grants – may not be able to provide the findings of their studies to school districts and decision-makers without journal subscriptions.

13. As part of the February 10 contract cancellations, a contract for the organization overseeing the scientific review panels for August 2024 IES grant proposals (NCER and NCSER) was cancelled. No decisions have to date been made on the funding of any of these proposals. Additional IES grant proposals were submitted for a March 2025 deadline; because of the RIF's to IES staff, there is currently no staff (or contracts) to review these grant proposals. SREE members submitted proposals to both competitions, including proposals for evaluating new and existing programs, and the development of new measures and methods for rigorous research. SREE includes both regular members and student members (primarily graduate students in schools of education, but also in the fields of statistics, psychology, computer science, and economics). Most SREE members who are not students are employed at universities, as consultants, and at contract research firms. The employment of these members – and thus their membership in the SREE organization – is in jeopardy, since this ecosystem depends upon federal contracts and grants for employment. Since February 10, contract research firms have begun a process

of continued layoffs. In the absence of funding from grants, universities are not hiring post-docs, research associates, research assistants, or new faculty. Without new positions, these researchers will need to leave the field of education research. Reductions to the membership of the organization are a threat to its livelihood and mission. Terminating nearly all of IES's staff and cancelling contracts supporting vital research, dissemination resources, and other important functions threatens SREE's ability to continue to effectively achieve its purpose.

14. Effectiveness research – the focus of SREE's mission – is an ecosystem of research that focuses on understanding "what works, for whom, and under what conditions". The ecosystem is centered around the rigorous research designs and methods to determine if there is strong evidence that a program works – if it improves student learning. Determining if a program works is based upon use of a strong causal design. Randomized trials provide an important means for testing if an intervention works by randomizing students, teachers, or schools; often this includes at least 40 schools for findings to be unambiguous. Studies of this scope require large teams of researchers and multiple years of funding. IES is the primary funder of these studies, both through contracts and grants. There is no other government agency that funds studies of this size and scope in education. In the absence of this funding – via both contracts and grants – the ability to carry out the mission of SREE is in jeopardy.

15. I understand from public statements from the Department of Education that IES staff are set to be finally terminated in June. If IES definitively separates its expert staff, it is likely it will take years to rebuild the agency.  SREE and its members stand to lose an

irreplaceable resource without IES, which will make it infeasible for many members to continue to do their vital, public-interested work.

April 28, 2025
Rickville, Maryland                                    /s/ Ellen Weiss*_____
                                                       Ellen Weiss

*Signature page attached hereto.

irreplaceable resource without IES, which will make it infeasible for many members to continue to do their vital, public-interested work.

April 28, 2025
Rockville, Maryland

*Ellen R. Weiss*

Ellen Weiss

# Exhibit H

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, *et al.*, | |
| *Plaintiffs*, | |
| vs. | Civil Action No. 8:25-cv-01230 |
| U.S. DEPARTMENT OF EDUCATION, *et al.*, | |
| *Defendants*. | |

**DECLARATION OF FELICE LEVINE**

I, Felice J. Levine, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following

is true and correct:

1.      I am over eighteen years old, of sound mind, and fully competent to make this

declaration.

2.      I submit this declaration on behalf of the American Educational Research Association

("AERA"), where I serve as Executive Director.

3.      I hold A.B., A.M., and Ph.D. degrees in sociology and psychology from the University of

Chicago. Prior to my service at AERA, I served as Executive Officer of the American

Sociological Association, Director of the Law and Social Science Program at the

National Science Foundation, and a Senior Research Social Scientist at the American Bar

Foundation. I have conducted research in the social, behavioral, and education sciences

throughout my career. I have published or led important studies focusing on topics ranging from children and youth, to open science, to higher education, and I have worked to use and promote quality data, indicators, and statistics in the social sciences in numerous capacities. For well over three decades, I have developed expertise on issues of confidentiality, research integrity, and ethical conduct in research, as well as other issues related to research and science policy.

4.    AERA is a national research society, founded in 1916, that strives to advance knowledge about education, encourage scholarly inquiry related to education, and promote the use of research to improve education and serve the public good. AERA also works to foster the dissemination and practical application of research results. In short, AERA exists to advance the field of education research so that education can serve our students, families, educators, school leaders, and society more broadly.

5.    AERA is a membership organization with approximately 25,000 members, most of whom are education researchers (defined at the highest level of generality). This membership includes university faculty, researchers, statisticians, data scientists, graduate students preparing for such careers, and other professionals with expertise in education research. AERA also has institutional members, through our Consortium of University and Research Institutions, represented by deans of schools of education and leaders of other education research organizations. AERA is headquartered and incorporated in Washington, DC.

6.    As a scientific society, AERA has its own research program directed to advancing the field, promoting cutting-edge lines of inquiry, and undertaking projects and initiatives that foster the highest quality research and standards in education research. In carrying out these efforts, AERA undertakes a range of projects and initiatives. For example, for well over a decade, AERA has

awarded grants for research conferences intended to stimulate new lines of study on education issues. Dating back to 1966, AERA has worked in concert with the American Psychological Association and the National Council on Measurement in Education to publish the *Standards for Educational and Psychological Testing* that represents the gold standard in guidance on testing in the United States and worldwide. In more recent years, in collaboration with the Inter-university Consortium for Political and Social Research, AERA operates the Partnership for Expanding Education Research in STEM ("PEERS") Data Hub to make data that exist in public-use form accessible to a wide and diverse range of scholars. These are all methods through which AERA works to elevate and advance the field of education research through data, statistics, and studies. Most recently and rapidly after the eruption of the COVID pandemic, AERA undertook a study that focused on the impact of COVID on graduate students and early career scholarly on their research, their lives, career options, and potential harms. As part of our commitment to serve the public good, as lead author, I presented the results of this work to the U.S. House of Representatives Committee on Science, Space, and Technology at a hearing titled "Building Back the U.S. Research Enterprise: COVID Impacts and Recovery" in February 2021.

7.    AERA is engaged in the advancement, sharing, and dissemination of scientific knowledge at early stages of knowledge production through publication. The AERA Annual Meeting, the AERA Online Papers Repository, and the AERA i-Presentation Gallery are all dedicated functions of AERA to iteratively share results, have opportunities for scholarly interaction and discussion, and enhance transparency in reporting that make for rigorous research. AERA publishes seven peer-reviewed journals in the field of education research, statistics, and evaluation all of which undertake high quality peer review where authors and reviewers are deidentified to reduce inadvertent bias. AERA's members all receive access to AERA journals without cost.

8.  AERA offers and provides for professional development and training in research and research-related activities, including training programs, workshops (including for high school and undergraduate students), course offerings at the Annual Meeting, and a Virtual Learning Series—all of which build capacity, competencies, understandings, and an environment of support that fosters a culture of research rigor and excellence. Without Institute of Education Sciences ("IES") resources, data, and access to IES-funded research, this AERA mission and purpose will be far less viable and effective.

9.  AERA, further, provides professional development for users of data and research so that policymakers, practitioners, relevant professionals, and others in the education ecosystem understand the role of education research in improving education practice, and better engage in evidence-based work. The AERA Annual Meeting serves as a forum for professionals in the education research field to connect and collaborate.

10. The continued operation of IES and its centers, including the National Center for Education Statistics ("NCES"), is critical to AERA and its members.

11. Since its establishment by Congress in 2002, IES has promoted, funded, and created high-quality education data and research. IES has integrated peer-review standards and quality assessment into its research and data collection, and analysis functions in a manner that ensures education researchers have access to high-quality data and research.

12. This effort cannot be reasonably replaced or replicated by any effort of the private sector, states, districts, or higher education institutions. For example, state agencies cannot possibly provide the complete and accurate data on the status and progress of our entire nation's education system that is currently provided by NCES.

13. IES, and particularly its storied component NCES, play a vital role in creating the environment and requiring standards in which rigorous education research and data

analysis are even possible.  NCES has existed for more than 150 years and plays a critical role as a high-quality federal statistical agency that provides objective, timely data about our educational system. NCES's data, from longitudinal and other studies to the National Assessment of Educational Progress ("NAEP"), are critical resources for AERA and its members.

14.    Without NCES's generation and dissemination of high-quality data—and the ability for AERA's members to access and use that data, even when it is restricted—AERA will have much less research to publish in its many publications, as AERA members and other education researchers will have lost the core, quality data sources that underpin much of the field of education research. By stifling the creation of valuable new research, the inability of IES and NCES to provide high quality data hampers AERA's ability to fulfill its mission, to both serve the field of education research and the public.

15.    In fact, AERA and its members have already begun to experience these harms. At our recent Annual Meeting this past week, our members were unable to share and present new information as they would have before because they did not have access to data and resources from IES.  At the conference, AERA members—graduate student members and members at all career stages—reported that they are not able to receive access to restricted-use data or receive disclosure review of data, which is needed for their important work. Moreover, those involved in editing AERA journals also reported that authors were hampered in responding to peer review that frequently requires additional data analysis due to the protracted timetable for IES disclosure review. This has had the consequence of delaying publication and the dissemination of useful findings. This problem is particularly acute for graduate student members, as their degree programs

have specific timelines, and the work they must undertake to meet those timelines relies on IES data or approval of data use. IES's stated disclosure review policy has been that it will complete review within 5 to 10 business days.  Based on these reports, IES does not appear to be complying (or able to comply) with its own standard. Moreover, not only is disclosure review now delayed so significantly that it might be described as denied, but also IES has no bandwidth to review new applications for restricted-use data, which I learned from IES leadership is currently on hold.

16.    The ability of our education researcher members to do their vital work and to continue their careers effectively is dependent on IES continuing to provide the backbone of high-quality data collections, data analysis, research, resources, and dissemination that no other entity could reasonably provide. The unavailability of the crucial data collected and analyzed by NCES, for example, will critically undermine AERA's programs.

17.    AERA's members will be enormously frustrated in their abilities to carry on with their careers at universities and research institutions (and other entities) if they no longer have the research infrastructure of data and high-quality resources that form the foundation for education researchers' work.

18.    For example, AERA has had, for more than 30 years, a dedicated program to support doctoral students and early career scholars in the advanced statistical analysis of federal data resources, most particularly the data (and especially the restricted data) provided by NCES. This program has prepared leading education researchers and education statisticians and will be badly harmed by the IES and, within it, NCES evisceration. If NCES ceases to function as the federal statistical agency for education, and does not have the resources to collect and provide vital, trustworthy, high quality data, this treasured

AERA program will be harmed, past and present awardees harmed, and the public and policy makers informed by this work harmed. Even in just the short period of time since IES's contracts and staff were terminated en masse, these harms are already becoming far too apparent.

19.     If IES ceases to function and continues to fail to review and approve grant applications— as our members have already experienced—our members will lose the opportunities to conduct research using the rich, high-quality research funded and directed by IES.

20.     I understand from public statements from the Department of Education that IES staff are set to be finally terminated in June. As explained, our members have experienced significant harms from the reduction in staff and contract terminations. If the agency finally separates the vast majority of its expert staff, the years that could be necessary to rebuild IES would cause enormous harm to the field of education research and to AERA's members. Resources and data will be hopelessly absent, out-of-date, or deeply flawed for an extended period of time, making it increasingly difficult for AERA's members to conduct any new research or analysis directed at solving educational challenges that our nation currently faces. IES and its components' work is invaluable and irreplaceable.

21.     Because IES' critical data functions are not (and cannot) be performed by states, school districts, schools, institutions of higher education, or other existing federal agencies (as none has the expertise, staffing or contractor support that IES had in place and expertly operated for decades), IES's permanent destruction would drive education researchers and education statisticians with great expertise out of the field entirely. They would not be able to continue with their work.  And the absence of these data would dissuade

graduate students from entering the field in the first place, harming the field for decades

to come. The country stands to lose the ability to accurately assess the state of our

educational system and to understand policies that could improve it if IES is dismantled.

April 29, 2025
Reston, VA

Felice J. Levine

# Exhibit I

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, *et al.*, | |
| *Plaintiffs*, | |
| vs. | Civil Action No. 8:25-cv-01230 |
| U.S. DEPARTMENT OF EDUCATION, *et al.*, | |
| *Defendants*. | |

**DECLARATION OF SEAN REARDON**

I, Sean Reardon, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am over eighteen years old, of sound mind, and fully competent to make this declaration.

2. I am a member of the American Educational Research Association and the Society for Research on Educational Effectiveness. Broadly speaking, I study educational opportunity in the U.S. and how the public education system creates opportunities for children.

3. My research investigates the causes, patterns, trends, and consequences of social and educational inequality. In particular, I study issues of residential and school segregation and of racial and ethnic and socioeconomic disparities in academic achievement and educational success. In addition, my work develops methods of measuring social and

educational inequality (including the measurement of segregation and achievement gaps) and methods of causal inference in educational and social science research.

4. I have invested more than three decades of time and resources in the profession of studying education, education outcomes, and the impact of education out of a commitment to the public interest. I see my work as part of an effort to understand educational challenges and inequities, and educational successes, to better inform our society, policymakers, and educators about how our nation's education system can be improved.

5. I have used National Center for Education Statistics ("NCES") data regularly as an integral part of my work since 1993. I and my team use both publicly available NCES data, as well as restricted-use data NCES data.

6. Accessing and using restricted data from IES–data that has potentially identifying information within it–is vital to the research that I and my team conduct. If, as a result of the cancellation of support contracts and termination of staff, IES can no longer effectively administer the system for sending restricted data and conducting pre-disclosure review of research products based on those data, my ability to carry out important research will be harmed.

7. After conducting analysis and research using restricted data, I and my team regularly create research products, such as papers and public-use databases, for dissemination to the broader research community and the general public.

8. We regularly invest hundreds or thousands of hours into research and analysis conducted with this restricted data, and the subsequent creation of research products for publication.

9. Before those products created with inputs from restricted data can be published, they must go through pre-disclosure review at IES. My understanding is that this review is conducted by a combination of contractors and IES employees.

10. Without receiving pre-disclosure review, research that has consumed significant time and resources cannot be published. There is significant uncertainty about whether and for how long IES can continue to provide access to, and approve publications relying on, restricted data with the currently available resources.

11. Much of my research relies in particular on EDFacts data that has historically been collected by the Department under Title I regulations. For the last 15 years, my research has relied primarily on restricted-use EDFacts data provided by NCES. These data are the only source for comprehensive data on academic performance patterns in each public school in the U.S.

12. At present, I and my team are working on research designed to measure school improvement patterns in each public school and district in the U.S. over the last 15 years.

13. Without the availability of pre-publication review, we will not be able to publish our findings that we have worked so hard to create.

14. The mass cancellation of IES support contracts, in combination with the loss of approximately 90 percent of IES's staff, creates an imminent risk that this prepublication review will no longer be available to even allow use of restricted data we have already received.

15. Additionally, without the availability of any meaningful resources–through either support contracts or staff–it is doubtful that I and my team will be able to continue to successfully request existing restricted data.

16. Moreover, the actual data and research that NCES other IES components create will be tremendously diminished by the mass contract cancellations and lay offs of almost all staff, which will prevent me from using up-to-date, high quality data in my research and will prevent our nation from understanding the status of our education system.

17. It will also be harmful if contractors who have collected and/or analyze data for NCES or other parts of IES are not allowed to share or are required to destroy such data and analyses when their contracts are terminated. The destruction of important data that has already been collected would further harm our ability to do our work going forward.

18. For example, my understanding is that the contract for the Early Childhood Longitudinal Study, Kindergarten Cohort ("ECLS-K") study has been canceled. My team and my students have been planning research using ECLS-K data. I previously published several high-profile research papers using earlier ECLS-K studies from 1998 and 2010 and planned to add to that research using the new ECLS-K study data. The inability to use this rich and important data source will diminish our ability to conduct effective research and data analysis on trends and patterns in kindergarten readiness and strategies for improving early childhood education.

19. Moreover, this cancellation is a senseless waste of valuable resources that have already been expended. The ECLS-K study included detailed information on 15,000 kindergarteners in 800+ public and private schools across the U.S. IES invested enormous resources to collect these data through teacher, parent, and principal surveys and multiple one-on-one assessments of all 15,000 students by trained assessors. The first three waves of the ECLS-K data have already been collected, and NCES had scheduled the early waves of data to be released in early 2026, with subsequent waves collected and

released over the next few years. If the data collected in the ECLS-K study is not made

available, that investment will be wasted.

20. The dramatic cutbacks at IES have had other direct harms.  For example, no new research

proposals are being reviewed by IES, as they cancelled the expert review panels—expert

panels that evaluate research proposals received by IES—that had been scheduled for

February and March 2025. In addition to the harm caused by the failure to continue to

conduct important research, I am also harmed directly by the agency's failure to continue

functioning. I submitted two proposals to IES in September 2024, which would have

been reviewed in February/March of 2025. Given that the review panels have been

cancelled, these proposals cannot be reviewed or funded. In addition, I and my colleagues

at Stanford submitted a grant proposal, in response to a Request for Proposals from IES,

to training Ph.D students in cutting-edge education research methods. The lack of staff at

the National Center for Education Research ("NCER") will make it almost impossible for

this or other proposals to be reviewed or funded.  I and my team expended hundreds of

hours and resources into these proposals that won't be considered because the agency's

resources are not being dedicated to its historical and congressionally-funded functions. I

also will not have the benefit of the continuing up-to-date research that would have been

created by other recipients of these grants.

April 28, 2025
[Stanford, CA]

_____

Sean Reardon