UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION., et al.,<br><br>   Plaintiffs,<br><br>  v.<br><br>U.S. DEPARTMENT OF EDUCATION, et al.,<br><br>   Defendants. | Civil Action No. 8:25-cv-01230 (SAG) |

**MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Table of Contents .................................................................................................. i

Background ......................................................................................................... 1

I.    Statutory Background ...................................................................................... 1

II.   Factual Background ......................................................................................... 3

III.  Procedural Background .................................................................................... 5

Legal Standards .................................................................................................. 6

Argument ........................................................................................................... 7

I.    Plaintiffs Are Not Likely to Prevail on the Merits of their Claims .................... 7

     A.    The Court Lacks Jurisdiction Over Plaintiff's Claims. ............................ 7

         1.    Plaintiffs Lack Article III Standing. ............................................ 7

         2.    The Court Lacks Jurisdiction Over Plaintiff's Challenge
to the Cancellation of the Institute's Contracts. ......................... 10

         3.    Congress Has Channeled Subject-Matter
Jurisdiction Over Plaintiffs' Claims Arising
from Federal Employment into a Distinct System,
Not Review in This Court in the First Instance. ......................... 12

     B.    Plaintiff's APA Claim Fails. ................................................................. 16

         1.    Plaintiffs Do Not Seek Judicial Review of
a Discrete Agency Action ........................................................ 16

         2.    Plaintiffs Do Not Identify any Agency Action That is Final. ...... 18

         3.    There Are Adequate Alternative Remedies Available. ................ 19

         4.    Plaintiffs are Unlikely to Succeed on their
Arbitrary and Capricious Claims. ............................................. 19

5.      Plaintiffs are Unlikely to Succeed on their
Claim that the Termination Actions are Contrary
to law and in Excess of Defendants' Statutory Authority......................... 22

6.      Plaintiffs are Unlikely to Prevail on Their Constitutional Claim. ............ 22

II.    Plaintiffs Have Not Shown that They Will Face Irreparable Harm Absent a Preliminary
Injunction. ...................................................................................................................... 25

III.   The Equities and Public Interest Weigh Against Relief. .................................................. 25

IV.    Any Preliminary Injunction Should Be Limited. ............................................................. 26

V.     Any Preliminary Injunction Should Be Accompanied by Security and Be Stayed. ......... 27

Conclusion ...................................................................................................................................... 27

President Trump campaigned on reducing government waste and improving government efficiency. To fulfill his campaign promises, he tasked Secretary of Education Linda McMahon with reducing bureaucratic bloat within the Department of Education. Under her leadership, the Department is in the process of streamlining operations and delivering services at a lower administrative cost to the taxpayer.

Plaintiffs, two membership associations of education researchers, seek a preliminary injunction that would have this Court micromanage the Department's Institute of Education Sciences ("IES" or "Institute"). Specifically, Plaintiffs seek to have this Court preliminarily enjoin staffing and contracting decisions that the Department recently made, under the guise that those decisions may impact the data and information that Plaintiffs' members rely upon. Such micromanagement would be judicial overreach—there is no legal basis justifying the extent and breadth of the requested preliminary injunction. If granted, that injunction would eliminate the discretion entrusted to the Secretary to run the Department's day-to-day operations as they relate to IES. Instead of the Executive Branch faithfully executing the laws of Congress, substantial aspects of a cabinet-level agency's operations would instead be put under the control of this Court.

This Court should deny relief. As a threshold matter, Plaintiffs lack Article III standing, and Plaintiffs' contract and employment claims cannot be brought in this Court. While the Department is required by Congress to perform research and disseminate the findings of that research, the statutes are silent as to any particular study or research plan that has to be performed. These choices, and others made by the Department, are therefore within the discretion of the Executive. Nor can Plaintiffs show irreparable harm. Finally, the balance of the equities and public interest tip in Defendants' favor.

**BACKGROUND**

## I.   <u>Statutory Background</u>

The Department of Education was established as part of the Department of Education Organization Act. Pub. L. No. 96-88, 93 Stat. 668 (1979). The purpose of the Department is

principally

> (1) to strengthen the Federal commitment to ensuring access to equal educational opportunity for every individual; (2) to supplement and complement the efforts of States, the local school systems and other instrumentalities of the States, the private sector, public and private educational institutions, public and private nonprofit educational research institutions, community-based organizations, parents, and students to improve the quality of education; (3) to encourage the increased involvement of the public, parents, and students in Federal education programs; (4) to promote improvements in the quality and usefulness of education through federally supported research, evaluation, and sharing of information; (5) to improve the coordination of Federal education programs; (6) to improve the management and efficiency of Federal education activities, especially with respect to the process, procedures, and administrative structures for the dispersal of Federal funds, as well as the reduction of unnecessary and duplicative burdens and constraints, including unnecessary paperwork, on the recipients of Federal funds; and (7) to increase the accountability of Federal education programs to the President, the Congress, and the public.

20 U.S.C. § 3402.

Under the Education Sciences Reform Act, Pub. L. 107–279, tit. I, 116 Stat 1940 (codified at 20 U.S.C. §§ 9501-9584) (the "Act"), Congress established IES within the Department to:

> compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need (including in technology areas) that are supported by Federal funds appropriated to the Institute and ensure that such activities-- (A) conform to high standards of quality, integrity, and accuracy; and (B) are objective, secular, neutral, and nonideological and are free of partisan political influence and racial, cultural, gender, or regional bias.

20 U.S.C. § 9511(b)(2). The Act also established within the Institute four centers: the National Center for Education Research, the National Center for Education Statistics, the National Center for Education Evaluation and Regional Assistance, and the National Center for Special Education Research and delineated the duties for each center. *Id.* §§ 9511-9567.

Additionally, the Act states that the Institute shall "[d]isseminat[e] information in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public" and **"**[u]tiliz[e] the most modern technology and other methods available, including arrangements to use data collected electronically by States and local educational

agencies, to ensure the efficient collection and timely distribution of information, including data and reports," and "[m]ak[e] information available to the public in an expeditious fashion." *Id.* § 9575(2), (3), (6). Additionally, "data collected by the Institute, including any office, board, committee, or center of the Institute, in carrying out the priorities and mission of the Institute, shall be made available to the public, including through use of the Internet." *Id.* § 9574.

## II.    <u>Factual Background</u>

On February 26, 2025, the President signed the "Implementing the Presidents 'Department of Government Efficiency' Cost Efficiency Initiative" Executive Order. Exec. Order No. 14,222, 90 Fed. Reg. 11,095 (Feb. 26, 2025) (the "Contract Executive Order"). The purpose of this order was to "commence[ ] a transformation in Federal spending on contracts, grants, and loans to ensure Government spending is transparent and Government employees are accountable to the American public." *Id.* § 1. Accordingly, this Executive Order instructed "[e]ach Agency Head, in consultation with the agency's DOGE Team Lead, [to] review all existing covered contracts and grants and, where appropriate and consistent with applicable law," "terminate or modify (including through renegotiation) such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of [the President's] Administration." *Id.* § 3(b). Covered contracts are defined as, among other things, "discretionary spending through Federal contracts," but excludes "direct assistance to individuals; expenditures related to immigration enforcement, law enforcement, the military, public safety, and the intelligence community; and other critical, acute, or emergency spending, as determined by the relevant Agency Head." *Id.* § 2(d). The Executive Order instructed the process to "commence immediately" and to "prioritize the review of funds disbursed under covered contracts and grants to educational institutions . . . for waste, fraud, and abuse." *Id.*

On March 20, 2025, President Trump signed the "Improving Education Outcomes by Empowering Parents, States, and Communities" Executive Order. Exec. Order No. 14,242, 90 Fed. Reg. 13,679 (Mar. 20, 2025) (the "Department Executive Order"). The Department Executive

Order found that the "Department of Education has entrenched the education bureaucracy" that "is not working." *Id.* § 1. For example, the Order identified the Department of Education's "public relations office that includes over 80 staffers at a cost of more than $10 million per year." *Id.* Ultimately, the Order contemplates that the "[c]losure of the Department of Education would drastically improve program implementation in higher education" and "would provide children and their families the opportunity to escape a system that is failing them." *Id.*

Under the Department Executive Order, the Secretary of Education was directed "to the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education." *Id.* § 2(a). The "Secretary of Education shall ensure that the allocation of any Federal Department of Education funds is subject to rigorous compliance with Federal law." *Id.* § 2(b). And the Department Executive Order states that it should "be implemented consistent with applicable law and subject to the availability of appropriations." *Id.* § 3(b).

The Secretary has described her role pursuant to the Department Executive Order as "an overhaul" of the Department of Education. U.S. Dep't of Educ., *Secretary McMahon: Our Department's Final Mission* (Mar. 3, 2025), https://www.ed.gov/about/news/speech/secretary-mcmahon-our-departments-final-mission. As part of the overhaul, the Department is implementing a reduction in force, which impacts "[a]ll divisions within the Department," and some divisions will require "significant reorganization to better serve students, parents, educators, and taxpayers." U.S. Dep't of Educ., *U.S. Department of Education Initiates Reduction in Force* (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force ("RIF Press Release"). The purpose of the reduction in force is "efficiency, accountability, and ensuring that resources are directed where they matter most: to students, parents, and teachers." *Id.* It is "the first step of eliminating . . . bureaucratic bloat," Filip Timotija, *Education secretary: Mass layoffs first step toward total shutdown*, The Hill (Mar. 12, 2025), https://thehill.com/homenews/education/5190161-linda-mcmahon-education-department-mass-layoffs/ ("Hill Article"). The Department intends to "ke[ep] all of the right people and the good people to make sure that the outward-facing programs . . . the grants, the appropriations that come

- 4 -

from Congress, all of that are being met, and none of that's going to fall through the cracks." *Id.* As part of the reduction in force, any staff that may be separated will first be put on administrative leave. RIF Press Release.

After the overhaul, the Department has stated that it "will continue to deliver on all statutory programs that fall under the agency's purview." *Id.* The Secretary stated that she planned to keep fifty percent of the Department "related to expenditures and key programs" for which Congress has appropriated money. Ingraham Angle, *Education secretary says department took first steps to eliminate 'bureaucratic bloat'*, Fox News (Mar. 11, 2025), https://www.foxnews.com/video/6369901522112.

Longer term, Secretary McMahon recognizes that shutting down the Department will require "work with Congress." Hill Article. The Secretary plans to partner with Congress and other federal agencies to determine the best path forward to fulfill the expectations of the President and the American people. Lexi Lonas Cochran, *Linda McMahon gives Education staffers their 'final mission'*, The Hill (Mar. 4, 2025), https://thehill.com/homenews/education/5175086-linda-mcmahon-education-department-trump-musk/.

### III.    **Procedural Background**

Plaintiffs, the American Educational Research Association and Society for Research on Educational Effectiveness, filed their Complaint on April 14, 2025. Plaintiffs allege that the Department has cancelled contracts necessary for IES to carry out its functions (which Plaintiffs refer to as the "Research Termination Action") and have, through a reduction in force ("RIF"), terminated nearly 90 percent of IES staff (which Plaintiffs refer to as the "IES Staff Termination Action"). Plaintiffs' Complaint contains two substantive counts. Count One alleges that the Department's actions violate the APA, whereas Count II alleges that the Department's actions are ultra vires. *See* Compl. ¶¶ 157-172.

Plaintiffs filed a motion for preliminary injunction on April 29, 2025. Pls.' Consent Mot. for Leave to Exceed Page Lim., ECF No. 11; Pls.' Mot. for Prelim. Inj., ECF No. 12. Plaintiffs

seek an order requiring the Department of Education to 1) reverse the Department's termination of IES employees pursuant to the "IES Staff Termination Action" by revoking RIF notices sent to IES employees and by removing them from administrative leave and placing them back into their roles to carry out IES functions; 2) reinstate all contracts that were terminated by IES as part of the "Research Termination Action"; and 3) take prompt action to preserve data collected in research conducted by contractors with contracts cancelled in the "Research Termination Action." Proposed Order, ECF No. 12-2.

## LEGAL STANDARDS

A preliminary injunction is an "extraordinary and drastic remedy" that should "never [be] awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). Whether to grant interim injunctive relief is within the Court's "sound discretion." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994). "Federal decisions have uniformly characterized the grant of interim relief as an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in [the] limited circumstances which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1992) (cleaned up); *accord Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (quoting *Winter v. Nat. Res Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008)); *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001).

"A party seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (cleaned up). "[A]ll four requirements must be satisfied." *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009), *judgment vacated on other grounds*, 559 U.S. 1089 (2010). The third and fourth factors of

the analysis—harm to others and the public interest— "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The movant's burden is "exceedingly high." *Mahmoud v. McKnight*, 102 F.4th 191, 203 (4th Cir. 2024), *cert. granted sub. nom Mahmoud v. Taylor*, 145 S. Ct. 1123 (2025) (Mem.).

## ARGUMENT

I. <u>**Plaintiffs Are Not Likely to Prevail on the Merits of their Claims**</u>

A. **The Court Lacks Jurisdiction Over Plaintiff's Claims.**

1. <u>Plaintiffs Lack Article III Standing</u>

Plaintiffs lack Article III standing, which is a "bedrock constitutional requirement." *United States v. Texas*, 599 U.S. 670, 675 (2023). It requires that a plaintiff "possess a personal stake" in the outcome, which "helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024). Standing doctrine thus "serves to protect the 'autonomy' of those who are most directly affected so that they can decide whether and how to challenge the defendant's action." *Id.* at 379–80.

Under any theory of standing, "the irreducible constitutional minimum" requires that, (1) the plaintiff have suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) there must exist "a causal connection between the injury and the conduct complained of"; and (3) it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Membership-based associations like Plaintiffs can establish standing "either in [their] own right or as a representative of [their] members." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013). Plaintiffs do not assert that they, as membership-based associations, have organizational standing in their own right, but instead rely

upon the theory that they have standing as representatives of their members. *See* PI Br. at 12-16.[1]
They do not.

An organization establishes "representational standing" by demonstrating that: "(1) its own
members would have standing to sue in their own right; (2) the interests the organization seeks to
protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought
requires the participation of individual members in the lawsuit." *S. Walk at Broadlands*, 713 F.3d
at 184  (quoting *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1251 (4th Cir.
1991)). To satisfy the first prong, organizational plaintiffs must offer specific facts "establishing
that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island
Inst.*, 555 U.S. 488, 498 (2009) (emphasis added); *Lujan*, 504 U.S. at 563. As with any injury, it
must be "actual or imminent, not speculative" harm, "meaning that the injury must have already
occurred or be likely to occur soon." *All. for Hippocratic Med.*, 602 U.S. at 381. If the injury has
not come to pass, it must be "certainly impending"; "allegations of possible future injury are not
sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). And it must be "concrete—
that is, real, and not abstract." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021).

The nature of Plaintiffs' alleged injuries also matters. Plaintiffs here claim that their
members suffer informational injuries—in other words, the cancellation of contracts and
termination of employees will deprive Plaintiffs' members of information. Informational standing
has its own set of requirements Plaintiffs must satisfy: 1) "that a person lack access to information
to which he is legally entitled," and 2) "that the denial of that information creates a 'real' harm
with an adverse effect."  *Dreher v. Experian Info Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017).

As a threshold matter, Plaintiffs cannot make a showing of informational injury. Many of

---

[1] Under the organizational standing theory, "[a]n organization may suffer an injury in fact when a
defendant's actions impede its efforts to carry out its mission." *Lane v. Holder*, 703 F.3d 668, 674
(4th Cir. 2012); *see Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). Because Plaintiffs
make no effort to demonstrate that they have organizational standing, including failing to show an
injury to the plaintiff organizations' core activities or the diversion of resources that is a hallmark
of *Havens* standing, Defendants do not address that theory of standing here.

Plaintiffs' members have failed to demonstrate that they lack access to the data or information that they seek from the Institute. *See* Ex. I, Reardon Decl., ECF No. 12-3(merely claiming that future research will be hampered, not present access harmed); Ex. J, Tipton Decl., ECF No. 12-4, (claiming only harm to future research plans if IES does not continue same research efforts). For example:

- Russell Gersten states that he relies on studies "like" the MTSS study, one of the cancelled study contracts. Ex. F ¶ 9, ECF No. 12-3.

- Ellen Weiss states that SREE members are harmed IES may put out less studies in the future (¶ 9), that future studies by IES may have less rigorous designs (¶ 10, because their grants may not be reviewed (¶ 13, and that ERIC will maintain only half of education related journals (¶ 12). Ex. G, ECF No. 12-3.

- Felice Levine states that AERA members are harmed because there will be less data in the future (¶ 14), that IES will no longer provide statistical assistance (¶ 18), and that future grants will not be approved (¶ 19). Ex. H, ECF No. 12-3.

These members have yet to suffer a real harm with an adverse effect. For these members, a favorable decision would not remedy their "informational injury."  In this regard, Plaintiffs' claims are speculative—although they may fear what may happen in the future, this amounts to nothing more than conjecture about future events that may or may not occur. In other words, Plaintiffs' theory of standing amounts to a causal chain of reductions-in-force and contract cancellations that plaintiffs allege will impair the Department from providing the information Plaintiffs' members seek. That is insufficient to confer standing. *See South Carolina v. United States*, 912 F.3d 720, 728–29 (4th Cir. 2019) (describing "chain of possibilities" as "too speculative to give rise to a sufficiently concrete injury-in-fact").

But even if Plaintiffs' members could show a non-speculative informational injury—only one part of the chain they must show for standing—they cannot connect it to a statutory violation rather than an exercise of proper discretion. "The decision to undertake a reorganization necessitating a [reduction in force] is within the discretion of the agency," *McKenna v. Dep't of*

*Interior*, 996 F.2d 1235 (Fed. Cir. 1993). And any other programmatic decisions regarding the Institute's handling of its statutorily required duties or responsibilities are likewise committed to agency discretion. *Lujan*, 497 U.S. at 891; *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). For example, Jason Garvey states that he is no longer able to access the current virtual platform for restricted use data. Ex. L ¶ 25, ECF No. 12-14. But as he concedes, he may still have access to the data via a physical cold room and the Department states it is moving the remote access program to a new platform. *Id.* at ¶¶ 22-23. Plaintiffs cannot show that this is an unreasonable exercise of discretion in providing information to the public.

Yet Plaintiffs ask this Court to insert itself into IES's reorganization and shift in policy priorities and, in the name of equity, issue a programmatic injunction freezing in place the Department's programmatic structure, personnel, and organization. And Plaintiffs ask this Court to do so notwithstanding the Secretary's differing judgment about how the Institute should operate. Having crossed—in Plaintiffs' mind—some threshold for organization and programmatic change that is as unarticulated as it is inarticulable, Plaintiffs ask this Court to step in and manage the Department's day-to-day operations.

2.    The Court Lacks Jurisdiction Over Plaintiff's Challenge to the Cancellation of the Institute's Contracts.

Any challenges to the cancellation of the Institute's contracts are not subject to this Court's jurisdiction. Under the Tucker Act, any claim based on "an express or implied contract with the United States" must be brought in the Court of Federal Claims. 28 U.S.C. § 1491(a)(1). To determine whether an action is "at its essence a contract action," this Court "make[s] rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds." *United States v. J & E Salvage Co.*, 55 F.3d 985, 988 (4th Cir. 1995) (citing *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 969-70 (D.C. Cir. 1982)). In this case, rational distinctions make clear that this Court lacks jurisdiction over any claims challenging the cancellation of the Institute's contracts.

Plaintiffs point to the Education Sciences Reform Act and the APA as sources of the rights to the reinstatement of the contracts cancelled by the Institute. *See* Mem. of L. & Supp. of Pls.' Mot. for a Prelim. Inj. at 16, ECF No. 12-1 ("Pls. Br."). That Act permits the Institute to perform its delineated functions "directly *or* through grants, contracts, or cooperative agreements." 20 U.S.C. § 9512 (emphasis added). While the Act allows the Institute's centers to enter contracts to perform their duties, Plaintiffs do not suggest that the Act required the centers to maintain the particular contracts being challenged. Given that Plaintiffs seek the reinstatement of specific contracts that had been cancelled, *see* Proposed Order, the source of Plaintiffs' challenge then lies within those specific contracts themselves. Moreover, Plaintiffs' citation to the APA is misplaced, as the APA itself does not grant jurisdiction where another statutory scheme (here, the Tucker Act) applies. *See Albrecht v. Comm. on Emp. Benefits of Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) ("the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court" under the APA (cleaned up)).

The Supreme Court recently reaffirmed the impropriety of relying on the APA to challenge contractual matters in *Department of Education v. California*. There, a group of states challenged grant terminations by the Department of Education under the APA—a gambit that the Supreme Court rejected:

> The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Nor does the waiver apply to claims seeking "money damages." *Ibid*. True, a district court's jurisdiction is "not barred by the possibility" that an order setting aside an agency's action may result in the disbursement of funds. *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988). But, as we have recognized, the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered here. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002). Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

*Dep't of Ed. v. California*, 145 S. Ct. 966, 968 (2025). Since the Supreme Court issued its decision in *California*, courts have responded by withholding or staying orders that would have required

the types of remedies Plaintiffs seek here. *See, e.g.*, *Am. Ass'n of Colleges for Teacher Ed., et al. v. McMahon*, No. 25-1281, 2025 WL 1232337 (4th Cir. Apr. 10, 2025) (granting the Government's motion to stay a preliminary injunction regarding termination of grants, citing *California*); *Mass. Fair Housing Cent. et al v. HUD*, Civ. A. No. 25-30041 (D. Mass Apr. 14, 2025) (dissolving temporary restraining order considering the Supreme Court's decision in *California*).

Simply put, the nature of the relief Plaintiffs seek sounds in contract. Plaintiffs ask the Court to order Defendants to reinstate all contracts that were terminated for convenience in the "February 2025 Research Termination Action." Proposed Order,  ECF No. 12-2,. In that regard, Plaintiffs seek the classic contractual remedy of specific performance. But this Court cannot order the Government to continue to perform under a contract; that type of specific performance claim can only be resolved by the Court of Federal Claims. *California*, 145 S. Ct. at 968 (the "Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA," and "as we have recognized, the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money[.]'" (cleaned up)). Thus, this Court lacks jurisdiction over the claims challenging the Departments' cancellation of contracts.

      3.    <u>Congress Has Channeled Subject-Matter Jurisdiction Over Plaintiffs' Claims Arising from Federal Employment into a Distinct System, Not Review in This Court in the First Instance.</u>

Even if Plaintiffs have Article III standing, this Court lacks jurisdiction to adjudicate plaintiffs' challenges to the employment decisions of federal agencies. Although district courts have jurisdiction over civil actions arising under federal law, *see* 28 U.S.C. § 1331, "Congress may preclude district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump ("AFGE")*, 929 F.3d 748, 754 (D.C. Cir. 2019). As detailed below, Congress has precluded jurisdiction for the

claims brought by Plaintiffs challenging the Department's reductions in force.

The Civil Service Reform Act ("CSRA") and the Federal Service Labor-Management Relations Statute ("FSL-MRS"), which is set forth in the CSRA, together provide a comprehensive "scheme of administrative and judicial review" for resolving both disputes between employees and their federal employers and disputes brought by unions representing those employees. *Id.* at 752 (regarding FSL-MRS); *see Graham v.* Ashcroft, 358 F.3d 931, 933 (D.C. Cir. 2004) (regarding CSRA more broadly). In passing the CSRA, Congress made the Merit Systems Protection Board[2] and Federal Labor Relations Authority ("FLRA")[3] the exclusive means for federal employees, labor unions, and other interested parties to raise challenges to final, non-discrimination-related, adverse employment actions. *See United States v. Fausto*, 484 U.S. 439, 455 (1988). CSRA channeling is required even when such disputes involve constitutional claims. *See Elgin v. Dep't of the Treasury*, 567 U.S. 1, 10–15 (2012) (citation omitted); *see also AFGE*, 929 F.3d at 752; *Nat'l Ass'n of Agric. Emps. v. Trump,* 462 F. Supp. 3d 572, 586 (D. Md. 2020) (adopting the reasoning of *AFGE*).

CSRA's channeling provisions preclude this Court's review of Plaintiffs' reduction in force claims. Everything about those claims, and the remedies Plaintiffs seek, derives from the relationship between the federal government and its employees, to which Plaintiffs and their members are strangers. Plaintiffs cannot step into the shoes of those employees and assert claims against the Department that the employees cannot themselves assert in federal district court, but

---

[2] Congress established the MSPB to, among other things, hear employee appeals of final adverse actions as set out in 5 U.S.C. § 7512. *See* 5 U.S.C. § 1204(a)(1). The MSPB may order relief to prevailing employees, including reinstatement, backpay, and attorney's fees. *Id.* §§ 1204(a)(2), 7701(g). Employees may appeal adverse MSPB decisions to the Federal Circuit. *See id.* § 7703(b)(1)(A); *see also* 28 U.S.C. § 1295(a)(9).

[3] The FLRA was established by Congress as part of the FSM-LRS to conduct hearings and resolve complaints of unfair labor practices, *see* 5 U.S.C. § 7105(a)(2)(G). Direct review of the FLRA's decisions on unfair labor practice and negotiability issues is available in the courts of appeals. *See id.* § 7123(a). FLRA regulations are set out at 5 C.F.R. pt. 2420. Among other things, the regulations allow persons or organizations who show that the outcome of the proceeding is likely to directly affect their rights or duties to intervene. *See* 5 C.F.R. § 2423.22.

instead must pursue before the FLRA or the MSPB.

In *AFGE*, the D.C. Circuit applied the "two-step framework set forth in" *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), to conclude that the union plaintiffs in that case could not challenge in district court three executive orders related to federal employment. *AFGE*, 929 F.3d at 754. Under that framework, district courts lack jurisdiction over suits like this one when the intent for exclusive review in the court of appeals is "(i) fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure." *See id.* at 755 (citations omitted).

The Supreme Court repeatedly has held that the CSRA provides the exclusive means of redressing employment disputes involving federal employees. *See Elgin*, 567 U.S. at 10-15; *Fausto*, 484 U.S. at 455. In other words, Congress intended to make the FSL-MRS and CSRA the exclusive scheme, and they satisfy the first step of the two-step *Thunder Basin* framework. As to covered actions, beyond restricting judicial review of covered constitutional claims, the CSRA prevents district courts from deciding the merits of APA claims challenging an agency's "'systemwide' . . . policy interpreting a statute," its "implementation of such a policy in a particular case," *Nyunt v. Chairman, Broad Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009) (quoting *Fornaro*, 416 F.3d at 67-69), or its decision to engage in "'a *type* of personnel action' the [CSRA] does not cover," *Mahoney v. Donovan*, 721 F.3d 633, 635-36 (D.C. Cir. 2013) (emphasis in original); *but see Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023).

That Plaintiffs have framed their alleged injury in constitutional terms does not allow the them to sidestep CSRA's mandatory channeling regime. *See* PI Br.at 33-35. *Cf. State of Maryland et al. v. U.S. Dept. of Ag.*, No. 25-1248 (4th Cir.) (April 9, 2025) ECF No. 42  ("The Government is likely to succeed in showing the district court lacked jurisdiction over Plaintiffs' claims, and the Government is unlikely to recover the funds disbursed to reinstated probationary employees"). Were Plaintiffs' theory correct, downstream users of government services could always go directly to court to raise challenges to agency reductions in force notwithstanding Congress's determination that the employees must themselves first pursue relief administratively. Courts have repeatedly

rejected these sorts of end runs. In *Elgin*, the Supreme Court held that even if a federal employee was raising constitutional claims, the CSRA imposes an "implied preclusion of district court jurisdiction[.]" 567 U.S. at 12. Similarly, in *AFGE*, numerous federal unions asserted broad constitutional and statutory challenges to a set of three Executive Orders. *See* 929 F.3d at 752. The D.C. Circuit held that the FLRA provided the exclusive avenue through which unions could bring their claims. *See id*. at 754–61 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–16 (1994)); *Nat'l Ass'n of Agric. Emps.*, 462 F. Supp. 3d at 586 (adopting the reasoning of *AFGE v Trump*); *Am. Fed'n of Gov't Emps. v. Sec'y of the Air Force*, 716 F.3d 633, 636–39 (D.C. Cir. 2013); *Nat'l Treasury Emps. Union v. Trump*, --- F. Supp. 3d ----, 2025 WL 561080, at *7 (D.D.C. Feb. 20, 2025) (upholding channeling requirement and denying request for emergency relief).

Indeed, it would be odd if a stranger to the federal-employment relationship—such as Plaintiffs here—could raise claims in this Court that the affected federal employees cannot themselves raise. In fact, it would upend the entire reticulated process Congress set out in the exclusive statutory schemes of the CSRA and other employment statutes. The "exclusion" of Plaintiffs "from the provisions establishing administrative and judicial review for personnel action" of the type challenged here "prevents [Plaintiffs] from seeking review" under other provisions. *Fausto*, 484 U.S. at 455. When a comprehensive scheme of the sort at issue here permits review at the behest of some types of plaintiffs but not others, it implicitly precludes review by plaintiffs who are not authorized to bring claims.

For example, *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347 (1984), considered a statute that permitted dairy handlers to obtain review of certain "market orders" after exhausting administrative remedies, but did not authorize review by anyone else. *See id.* at 346 (citing 7 U.S.C. § 608c). When a group of dairy consumers sought review of a marketing order, the Supreme Court explained that the statute omits a "provision for participation by consumers in any proceeding," and that "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* at 347. Hence, the "structure of this Act indicates that Congress intended only producers and

handlers, and not consumers, to ensure that the statutory objectives would be realized." *Id.* And the "restriction of the administrative remedy to handlers strongly suggests that Congress intended a similar restriction of judicial review of market orders." *Id.* Any other holding would facilitate circumvention of the comprehensive statutory scheme. *See id.* at 348.

The principles described in *Block* fully apply to the CSRA and other employment statutory schemes. *See Fausto*, 484 U.S. at 448 (applying *Block* to conclude that certain employees who lack CSRA appeal rights "should not be able to demand juridical review for the type of personnel action covered by that chapter"). Because Congress intentionally foreclosed judicial review by parties other than those to whom it specifically authorized to seek relief, Plaintiffs, who are not employees of the Department, certainly cannot challenge the Department's employment actions here.

"Although the [Plaintiffs] Complaint avoids invoking the term 'unfair labor practice,' this is precisely what it attempts to allege." *Rogers v. Kelley*, No. 8:22-CV-02924-PX, 2024 WL 1856305, at *3 (D. Md. Apr. 29, 2024). "[N]o private cause of action exists to litigate unfair labor practice claims in federal court" *Id.* Here, the conduct being regulated is plainly the employment at the Department of Education. Because "district courts do not have concurrent jurisdiction over matters within the exclusive purview of the FLRA," this Court should reject Plaintiffs' effort to disrupt Congress's review scheme and to seek premature, improper review before this Court. *Am. Fed'n of Gov't Emps., AFL-CIO v. Loy*, 367 F.3d 932, 935 (D.C. Cir. 2004) (citing *Karahalios v. Nat'l Fed'n of Fed. Employees, 489 U.S. 527, 533 (1989)*).

### B.    Plaintiff's APA Claim Fails.

Plaintiffs are unlikely to succeed on the merits of their APA claim.

#### 1.    Plaintiffs Do Not Seek Judicial Review of a Discrete Agency Action

As a threshold matter, Plaintiffs do not identify an agency action that the Department has taken that could specifically be redressed by a federal court. Plaintiffs must plead "an identifiable action or event" and "direct [their] attack against some particular 'agency action' that causes [them]

harm." *Lujan*, 497 U.S. at 891; *Norton*, 542 U.S. at 62 (APA limits judicial review to "circumscribed, discrete agency actions"). These final agency actions must be "circumscribed [and] discrete." *Norton*, 542 U.S. at 62. The APA does not provide for "general judicial review of [an agency's] day-to-day operations," *Lujan*, 497 U.S. at 899, like "constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). The APA thus contains "a prohibition on programmatic challenges," meaning "challenges that seek 'wholesale improvement' of an agency's programs by court decree." *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (cleaned up). "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted). The avoidance of such review reflects separation of powers concerns and seeks to prevent the "broad programmatic attacks" disfavored in agency review. *Norton*, 542 U.S. at 64; *see also New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (internal quotations and citations omitted) ("When challenging agency action . . . the plaintiff must . . . identify specific and discrete governmental conduct, rather than launch a broad programmatic attack on the government's operations.").

Plaintiffs' claims and requested injunction present exactly the type of wholesale challenge that the APA forbids. Plaintiffs' allegations reveal that they do not seek judicial review of a discrete agency action. Rather, they seek wholesale judicial review of the Department's management of the Institute. Instead of presenting the court with a "narrow question to resolve," *Cobell*, 455 F.3d at 307, Plaintiffs challenge the Department's day to day operations regarding IES's staffing levels and contracts. Addressing this type of claim would require the Court to supervise IES's activities and determine how it would accomplish each statutorily-mandated function—an even more extreme kind of supervisory claim than was at issue and rejected in *Lujan*. *See* 497 U.S. at 892-93. Such a claim would completely circumvent the purpose of the APA's discrete agency action requirement, which is to "protect agencies from undue judicial interference with their lawful

- 17 -

discretion and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton*, 542 U.S. at 66-67.

2.     Plaintiffs Do Not Identify any Agency Action That is Final.

Even assuming Plaintiffs have identified discrete agency actions, they have not shown that these programmatic actions are final. "Final agency action" has two components. First, the action must "mark the 'consummation' of the agency's decisionmaking process[.]" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted). It may not be a "preliminary, procedural, or intermediate agency action[.]" 5 U.S.C. § 704. Second, the action must "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178 (citation omitted).

Plaintiffs assert that the Research Termination Action and IES Staff Termination Action are both final agency actions. *See* Pls. Br. at 17-19. To that end, Plaintiffs cite various steps taken by Defendants—statements made by the Secretary, the reduction in force, and the like—to argue that the final agency action requirement is satisfied. *See id.* at 17. It is telling, however, that Plaintiffs are unable to identify any concrete, final decision by the Department of Education to actually shut down the Institute. To the extent that Plaintiffs are relying on any of the individual actions taken with respect to the Institute as the final agency action (even if those actions are part of a Department-wide effort), Secretary McMahon in her public statements has indicated those programmatic decisions mark the initiation, not the consummation, of the agency's decision-making process regarding the reorganization of the Department.

The actions taken so far reflect a decision by Department leadership that agency functions need to be streamlined and reorganized. Those decisions are thus "preliminary" in nature and "not directly reviewable." *See* 5 U.S.C. § 704. "It may be a step, which if erroneous will mature into a prejudicial result[.]" *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948). But that does not make the individual programmatic actions themselves the "consummation of the administrative process" reevaluating the agency's priorities to reorganize the Department. *Id.* at

- 18 -

113.

      3.     <u>There Are Adequate Alternative Remedies Available.</u>

Review under the APA is available only where "there is no other adequate remedy in a court." 5 U.S.C. § 704. The requirement that a plaintiff have "no other adequate remedy in court," *id*., reflects that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action," *Bowen*, 487 U.S. at 903. As already described above, this is, in essence, an employment action, and there are CSRA and FSL-MRS remedies. To the extent this case rests on contract claims, then the Court of Federal Claims provides an adequate alternative under the Tucker Act.

      4.     <u>Plaintiffs are Unlikely to Succeed on their Arbitrary and Capricious Claims.</u>

Plaintiffs present various arguments for why they believe they are likely to succeed on their APA arbitrary and capricious claims. *See* Pls. Br. at 19-28. Specifically, Plaintiffs assert that the Defendants' failed to offer an adequate explanation for their actions, *see id.* at 20-21, that the reasoning Defendants have offered has no rational connection to the evidence before them, *see id.* at 21-23, that the Defendants' actions fail to consider Plaintiffs' reliance interests, *see id.* at 23-26, that Defendants failed to consider important aspects of the problem, *see id.* at 26-28, and that Defendants' cancellation of contracts reflects the arbitrary nature of Defendants decision, *see id.* at 28. These are, in essence, five different ways of alleging the same thing: Plaintiffs claim that Defendants' actions are arbitrary and capricious because they failed to adequately explain why they conducted a reduction in force or terminated contracts.

"Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Rather, the Court must ensure "that the agency has acted within a zone of reasonableness[.]" *Id*. "[T]he standard of review is highly deferential" in determining whether an action is arbitrary and capricious, *Littlefield v. Dep't of the Interior*, 85 F.4th 635, 643

(1st Cir. 2023), *cert. denied*, 144 S. Ct. 1117 (2024), and agency action regarding reallocation of resources, if reviewable at all, must be afforded highly deferential rational basis review, *cf. Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (noting that, absent a statutory directive to the contrary, an agency has unreviewable "capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way.").

As described above, President Trump and Secretary McMahon have repeatedly articulated the presence of inefficiency and waste at the Department. As noted, the Secretary has reorganized the Department of Education as part of an effort to right-size and streamline the Department's operations. Plaintiffs may disagree with that decision, but that does not give them the right to substitute their judgment for that of the Secretary's about how best to conduct civil rights enforcement.

Plaintiffs acknowledge as much when they assert that, "to the extent Defendants' bare explanations rely on anything at all, it may be the President's desire to close the Department." PI Br.. at 21. Plaintiffs then claim that the "justification also fails because it offers no 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). Plaintiffs' assertions, however, reflect a fundamental "lack of understanding" of "the nature" of the Department's actions, *see Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978). As a threshold matter, while the Department Executive Order directs the Secretary to "take all necessary steps to facilitate the closure of the Department of Education," she may only do so "to the maximum extent appropriate and permitted by law." Exec. Order No. 14,242 § 2(b), 90 Fed. Reg. at 13,679. And while Plaintiffs assert that the Administration's stated goals do not justify "eviscerating an education research and data agency," Pls. Br. at 22; *see also id.* at 23-24 (similar assertion regarding lack of explanation of change in policy and alleged reliance interests), the Department's actions are part of a longer-term plan to streamline its operations to the minimum required by statute. And ultimately, Courts lack the power to "dictat[e] to the agency the methods[] [and] procedures" it uses to complete its statutory obligations. *See Vt. Yankee*, 435 U.S. at 545 (quoting *Fed. Power Comm'n v. Transcon.*

*Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976)). To override these principles and enjoin agency leadership from exercising control over their own staffing and contracting issues would be an extraordinary violation of the separation of powers.

To that end, the reduction in force and contract terminations incorporate the type of actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Markland v. OPM*, 140 F.3d 1031, 1033 (Fed. Cir. 1998) ("We accord an agency wide discretion in conducting a reduction-in-force; absent a clear abuse of that discretion, a substantial departure from applicable procedures, a misconstruction of governing statutes, or the like, we do not upset a final agency decision.") (cleaned up). First, staffing decisions fit neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln*, 508 U.S. at 191-92 (citation omitted). After all, the point of the Department's actions is to improve efficiency, which allows the Department to "meet its statutory responsibilities in what [the new administration] sees as the most effective or desirable way." *Id.* at 192. The reduction in force and other decisions on program implementation reflects the Administration's effort to realign the Department to provide better service to the American people. "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985).

Second, Plaintiffs cannot point to a particular statute limiting the agency's inherent discretion to reduce headcount. Again, agencies generally have broad discretion to determine how to implement a statute. *See Vt. Yankee*, 435 U.S. at 543.

But even if this Court were to conclude that the Department's explanation for the reductions in force or termination of contracts is insufficient for judicial review, that would in no way justify a preliminary injunction. Rather, "the proper course" would be "to remand to the [Department] for additional . . . explanation," not any type of injunction. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

5.      Plaintiffs are Unlikely to Succeed on their Claim that the Termination
        Actions are Contrary to law and in Excess of Defendants' Statutory
        Authority.

Plaintiffs are unlikely to prevail on their claim that the Termination Actions are "not in accordance with law" and "in excess of statutory . . . authority." 5 U.S.C. § 706(2).

Insofar as Plaintiffs are challenging the President's executive orders, the claims fail because they rely on characterizations of those orders that are inconsistent with its terms. The DOGE Contract Executive Order instructs for the termination of contracts "where appropriate and consistent with applicable law." Exec. Order. No. 14,222 § 3(b), 90 Fed. Reg. at 11,096. Moreover, the Department Executive Order does not require the immediate shutdown of the Department. To the contrary, the Department Executive Order requires the Secretary of Education only to discontinue activities "to the maximum extent appropriate and permitted by law." Exec. Order No. 14,242 § 2(a), 90 Fed. Reg. at 13,679. Definitionally, directing the Secretary to end contracts or functions unless required by law cannot be interpreted to violate the law. It is plainly lawful for the President to direct the Secretary to act within the agency's discretion to implement the Act and related statutes consistent with the law.

Plaintiffs argue that "Defendants have acted to stop carrying out IES's functions and a large share of the contracts through which it previously met its statutory obligations." Pls. Br. at 29. According to Plaintiffs, the staffing cuts are too significant to allow IES to continue to function. *See id.* at 30-31. That is a judgment call for the Department, and not Plaintiffs or this Court, to make. *See Vt. Yankee*, 435 U.S. at 545.

6.      Plaintiffs are Unlikely to Prevail on Their Constitutional Claim.

Plaintiffs claim that the Defendants' Termination Actions must be set aside because they violate the Constitution or are ultra vires to the extent they violate separation-of-powers principles. *See* Pls. Br. at 33-35. According to Plaintiffs, Defendants' actions violate mandatory duties and disregard the appropriation of funds to carry out those duties.

Any challenge to funding decisions by the Department are committed to the agency's

discretion by law. *See* 5 U.S.C. § 701(a)(2). In appropriating funds for the Institute, Congress gave the agency broad discretion to decide when and how to spend funds consistent with the various purposes specified in the appropriations laws. Here, in 2024, Congress appropriated funds "[f]or necessary expenses for the Institute of Education Sciences." Further Consolidated Appropriations Act, 2024, Pub. Law 118-47, 138 Stat. 690 (Mar. 23, 2024); S. Rept. 118-84 at 247 (incorporated into statute by Pub. Law 118-47 § 4 and Explanatory Statement, 170 Cong. Rec. H1501, 1886 (Mar. 22, 2024). Congress continued funding at this level for 2025. Sec. 1101(a)(8), Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. Law 119-4 (Mar. 15, 2025)

Those appropriations provide no standards "against which to judge the agency's exercise of discretion" in making the many choices the agency must make concerning how to spend those funds. *See Heckler*, 470 U.S. at 830. The agency has unreviewable discretion to make choices on how the appropriations are spent. *Lincoln*, 508 U.S. at 192 ("the allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion."). The Department's decisions about how best to spend appropriated funds "requires 'a complicated balancing of a number of factors which are peculiarly within its expertise,'" and the "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 193 (quoting *Heckler*, 470 U.S. at 831–32).

Here, Congress merely appropriated funds for broad purposes, including for the expenses of Institute operations, and the further delineation of broad purposes does not require that the Government provide specific amount funds to particular contracts or employee salaries. *See* Further Consolidated Appropriations Act, 2024, Pub. Law 118-47, 138 Stat. 690 (Mar. 23, 2024) (appropriating funds "[f]or necessary expenses for the Institute of Education Sciences"); S. Rept. 118-84 at 247 (incorporated into statute by Pub. L. 118-47, § 4 and Explanatory Statement, 170 Cong. Rec. H1501, 1886 (Mar. 22, 2024); Sec. 1101(a)(8), Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4 (Mar. 15, 2025). How those funds "could best be distributed" is not a judicially reviewable question, but instead is left to agency discretion.

Nor do Plaintiffs make any progress by repackaging their APA claims as ultra vires claims.

"[S]uits for specific relief against officers of the sovereign" allegedly acting "beyond statutory authority or unconstitutionally" are not barred by sovereign immunity. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689, 693 (1949). The exception to sovereign immunity is based on the principle that such *ultra vires* action by a federal officer "is beyond the officer's powers and is, therefore, not the conduct of the sovereign." *Id.* at 690. Here, Plaintiffs set forth no *ultra vires* claim that is distinct from their APA claims—as reflected by the fact that they devote one paragraph to that claim as an alternative means to pursue their APA claim. *See* PI Br. at 35. Indeed, Plaintiffs' *ultra vires* claim in Count II alleges that "Defendants lack the constitutional or statutory authority to determine not to carry out those functions by refusing to spend the appropriated funds on staff and contracts that carry out IES's data, research, and dissemination functions." Compl. ¶¶ 166-172. Aside from the allegations regarding appropriations, this count is merely duplicative of the APA claim in Count I, which alleges violations of statutory requirements. Thus, Plaintiffs' *ultra vires* claim fails for the same reasons as does the APA claims.

Moreover, Plaintiffs' separation of powers *ultra vires* claim is barred at the outset because it is purely statutory. The Supreme Court has made clear that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review[.]" *Dalton v. Specter*, 511 U.S. 462, 473-74 (1994). This keeps with the long tradition of "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id*. at 472. The Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or if the executive officers rely on an unconstitutional statute. *Id.* at 473 n.5. Neither of those situations applies here.

Contending that the challenged actions violate the separation of powers, Plaintiffs are advancing the similar arguments the Supreme Court rejected in *Dalton*. Plaintiffs' alleged separation-of-powers claims hinge entirely on, respectively, whether Defendants acted in accordance with statutory obligations and appropriations law. Pls. Br. at 33-35. The outcome of the issues Plaintiffs raises depends on resolution of statutory claims rather than any unique separation-of-powers principles. If Plaintiffs' argument were accepted, then every garden-variety

action by a federal agency alleged to be in violation of a statutory provision could also for the same reason be alleged to violate the constitutional separation of powers. Thus, Plaintiffs' are unlikely to succeed on their *ultra vires* claim.

## II.   Plaintiffs Have Not Shown that They Will Face Irreparable Harm Absent a Preliminary Injunction.

To show irreparable injury, a plaintiff must make a "clear showing" that it will suffer harm that is "neither remote nor speculative, but actual and imminent." *Direx Israel,* 952 F.2d at 812 (citation omitted). In addition, harm is irreparable only when it "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (citation omitted). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction] are not enough." *Roe*, 947 F.3d at 228 (citation omitted). As described above, *supra* Section I.A.1, Plaintiffs' harms are too speculative to establish standing, let alone for making a "credible showing of a likelihood of irreparable harm." *Pub. Citizen Health Rsch. Grp. v. Acosta*, 363 F. Supp. 3d 1, 23 (D.D.C. 2018).

The irreparable harm from lack of data is diminished here by the length of time since Plaintiffs and its members learned of the contract cancellations or other issues with retrieving Institute data. Plaintiffs claim that the many of the Institute's contracts were terminated as early as February 10, 2025. *See* Pls. Br. at 6-9. The fact that Plaintiffs then have waited more than two months to seek injunctive relief calls into doubt their claims that they and their members are suffering irreparable harm from the Institute's status.

## III.   The Equities and Public Interest Weigh Against Relief.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. These factors tilt decisively against granting a preliminary injunction here. Granting a preliminary injunction would disrupt the

Department's efforts to comply with the DOGE Contract Executive Order to "terminate . . . such covered contracts . . . to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of [the] Administration," Exec. Order. No. 14,222 § 3(b), 90 Fed. Reg. at 11,095-96, as well as the Department Executive Order's directive to "the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education and return authority over education to the States and local communities while ensuring the effective and uninterrupted delivery of services, programs, and benefits on which Americans rely," Exec. Order No. 14,242 § 2(a), 90 Fed. Reg. at 13,679.

The public has an interest in permitting the President to take decisive action when it comes to setting his policy priorities for the Institute. Entering any sort of preliminary relief would displace and frustrate the President's decision about how to best address those issues. *Heckler*, 470 U.S. at 831–32. As discussed above, Plaintiffs will not suffer any irreparable harm from the denial of their request for preliminary relief, because Plaintiffs have not shown that their harm could not otherwise be mediated later, or they have asserted harms on behalf of parties not before this Court.

## IV.    Any Preliminary Injunction Should Be Limited.

For the reasons explained above, Plaintiffs are not entitled to a preliminary injunction. But if the Court concludes otherwise, the relief granted "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). The expansive relief that Plaintiffs seek flouts these well-established principles and should be significantly narrowed, if awarded at all.

As such, any preliminary injunction should do no more than necessary to alleviate the irreparable harm to any specific Plaintiff that the Court finds to have established such harm. Extending relief that is either broader in substance or scope (i.e., wholesale reinstatement of staffing at or any contracts for programs that Plaintiffs do not even utilize) would violate the foundational Article III principle that judicial remedies "must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). A federal court may entertain a suit

only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." *Id.* at 66 (citation omitted). Principles of equity reinforce those limitations, and "[u]niversal injunctions have little basis in traditional equitable practice." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring).

## V.    Any Preliminary Injunction Should Be Accompanied by Security and Be Stayed.

Any preliminary injunction should also require Plaintiffs to post a security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues an injunction here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction. Particularly given that the relief requested by Plaintiffs could hinder Defendants' ability to conduct the reorganization of the Department in a manner consistent with the President's policies, the Court should consider the implications of any order prohibiting the President from implementing his policy objectives.

Finally, to the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending any appeal that is authorized by the Solicitor General, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction should be denied.

DATED: May 12, 2025                    Respectfully submitted,

                                       YAAKOV M. ROTH
                                       Acting Assistant Attorney General

                                       BRAD P. ROSENBERG
                                       Special Counsel

                                       */s/ Michael Bruns*____
                                       Michael Bruns
                                       Trial Attorney
                                       United States Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L Street, N.W.
                                       Washington, DC 20005
                                       michael.bruns@usdoj.gov
                                       (202) 514-4011

                                       KELLY O. HAYES
                                       United States Attorney
                                       Charles R. Gayle (Bar No. 14706)
                                       Assistant United States Attorney
                                       U.S. Attorney's Office for the District of Maryland
                                       36 South Charles St.,
                                       Baltimore, MD 21201

                                       *Counsel for Defendants*