# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

AMERICAN EDUCATIONAL
RESEARCH ASSOCIATION, *et al.*,

      *Plaintiffs*,

      *vs.*

U.S. DEPARTMENT OF EDUCATION,
*et al.*,

      *Defendants*.

Civil Action No. 8:25-cv-01230 (SAG)

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Page

INTRODUCTION ...............................................................................................................1

ARGUMENT ..................................................................................................................... 2

    I.    **This Court has jurisdiction to hear education researchers' claims. ................. 2**

        A.    Plaintiff education research associations have standing to challenge actions that halted the required functions of the nation's education research agency. ................................................................................................................. 2

        B.    The Tucker Act does not prevent this Court from exercising jurisdiction over Plaintiffs' claims. ................................................................................ 5

            i.    The source of law here is statutory, not contractual. ........................... 6

            ii.    Plaintiffs seek equitable relief, not money damages. .......................... 9

        C.    Federal employment laws do not prevent this Court from exercising jurisdiction over Plaintiff organizations' claims that IES must carry out its functions................................................................................................... 10

    II.    **Plaintiffs Are Likely to Succeed on the Merits. ................................... 14**

        A.    Plaintiffs challenge discrete agency actions—a reduction in force and mass contract cancellation—subject to APA review. ......................................... 14

        B.    The contract cancellations and staff terminations are "final" agency actions. ............................................................................................................... 16

        C.    There are no other adequate remedies available. ...................................... 17

        D.    Defendants' mass terminations of staff and contracts were arbitrary and capricious. ............................................................................................... 18

        E.    Defendants' extreme actions are contrary to law. ..................................... 20

        F.    Defendants' Termination Actions violate the separation of powers.......... 21

    III.    **Plaintiffs Are Suffering Immediate, Irreparable Harm and the Equities and Public Interest Weigh Strongly In Favor of Relief.......................................... 22**

    IV.    **The Relief Plaintiffs Seek—Whether in the Form of a Preliminary Injunction or Section 705 Stay—Is Appropriate Here. ..................................................... 23**

    V.    **Any relief this Court orders does not require security and should not be stayed. ............................................................................................................... 24**

i

**CONCLUSION** ................................................................................................................... **24**

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abbott Lab'ys v. Gardner*, 387 U.S. 136 (1967) ............................................................18

*Advocates for Hwy. & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136 (D.C. Cir. 2005) .................................................................................................20

*AIDS Vaccine Advoc. Coal. v. Dep't of State*, No. 1:25-cv-00400, 2025 WL 1380421 (D.D.C. May 13, 2025) ..............................................................................................10

*AIDS Vaccine Advoc. Coal. v. Dep't of State*, No. 1:25-cv-00400, 2025 WL 752378 (D.D.C. Mar. 10, 2025) ...............................................................................................9

*Allina Health Servs. v. Sebelius*, 746 F.3d 1102 (D.C. Cir. 2014) ..................................20

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 1:25-cv-00702, 2025 WL 833917 (D. Md. Mar. , 2025) .....................................................................................7

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 25-1281, 2025 WL 1232337 (4th Cir. Apr. 10, 2025) ...............................................................................................7

*Am. Bar Ass'n v. DOJ.*, No. 1:25-cv-01263, 2025 WL 1388891 (D.D.C. May 14, 2025) ............................................................................................................................8

*Am. Fed'n of Gov't Emps v. Trump*, No. 3:25-cv-03698, 2025 WL 1358477 (N.D. Cal. May 9, 2025) ......................................................................................................12

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748 (D.C. Cir. 2019) ............13

*Am. Fed'n of Tchrs. v. Dep't of Educ.*, No. 1:25-cv-00628, 2025 WL 1191844 (D. Md. Apr. 24, 2025) .........................................................................................23, 24

*Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023) ...............................................12, 13, 17

*Bennett v. Spear*, 520 U.S. 154 (1997) ............................................................................16

*Bowen v. Massachusetts*, 487 U.S. 879 (1988)........................................................5, 7, 9, 17

*California v. Dep't of Educ.*, No. 1:25-cv-10548 (D. Mass. Mar. 6, 2025)......................8

*Dalton v. Specter*, 511 U.S. 462 (1994)..........................................................................21

*Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) .....................................................7, 8

*Dep't of State v. AIDS Vaccine Advoc. Coal.*, 145 S. Ct. 753 (2025)..........................10

*Doe v. Va. Dep't of State Police*, 713 F.3d 745 (4th Cir. 2013) .....................................3

*Does 1-26 v. Musk*, No. 1:25-cv-00462, 2025 WL 840574 (D. Md. Mar. 18, 2025) ...................21

*Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337 (4th Cir. 2017) ...........................................4

*Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360 (D.D.C. 2017) ....................................22

*Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012) .................................................................13

*Gasner v. Bd. of Supervisors*, 103 F.3d 351 (4th Cir. 1996) ..............................................3

*Gomez v. Trump*, 485 F. Supp. 3d 145 (D.D.C. 2020) ....................................................24

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002).........................................10

*Guardsman Elevator Co. v. United States*, 50 Fed. Cl. 577 (Fed Cl. 2001)...................................6

*Heckler v. Chaney*, 470 U.S. 821 (1985) .........................................................................19

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411 (4th Cir. 1999)..............................24

*Holbrook v. Tenn. Valley Auth.*, 48 F.4th 282 (4th Cir. 2022) ....................................................18

*Int'l Org. of Masters, Mates & Pilots, ILA, AFL-CIO v. Nat'l Lab. Rels. Bd.*, 61 F.4th 169 (D.C. Cir. 2023) ...........................................................................................17

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .....................23

*Lincoln v. Vigil*, 508 U.S. 182 (1993) .............................................................................19

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ..............................................................20

*Lujan* v. *Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990)...........................................................15

*Maryland v. USDA,* No. 1:25-cv-00748, 2025 WL 800216 (D. Md. Mar. 13, 2025) ..............4, 24

*Maryland v. USDA*, No. 1:25-cv-00748, 2025 WL 973159 (D. Md. Apr. 1, 2025)......................14

*Maryland v. USDA*, No. 25-1248, 2025 WL 1073657 (4th Cir. Apr. 9, 2025) .............................13

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ..................................................5, 6, 7, 10

*Mt. Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197 (4th Cir. 2019) ...........................22

*Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-00239, 2025 WL 597959 (D.D.C. Feb. 25, 2025) ...........................................................................................................24

*Nat'l Env't Dev. Assn.'s Clean Air Project v. EPA.*, 752 F.3d 999 (D.C. Cir. 2014)...................17

*Nat'l Treasury Emps. Union v. Vought*, No. 1:25-cv-00381, 2025 WL 942772
(D.D.C. Mar. 28. 2025)..............................................................................................16, 21

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ................................................15

*Ohio River Valley Env't Coal., Inc. v. Kempthorne*, 473 F.3d 94 (4th Cir. 2006)..........................7

*Sustainability Inst. v. Trump*, No. 2:25-cv-02152 (D.S.C. Apr. 29, 2025)..........................8, 9, 19

*Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947 (4th Cir. 2025) ......................19

Prelim. Inj., *Rhode Island v. Trump,* No. 1:25-cv-00128 (D.R.I. May 13, 2025...........................8

*Rhode Island v. Trump*, No. 1:25-cv-00128, 2025 WL 1303868 (D.R.I. May 6, 2025)
................................................................................................8, 9, 12, 13, 15

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020) ..................................................23

*South Carolina v. United States*, 912 F.3d 720 (4th Cir. 2019)..................................2, 3

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)..........................................11, 12

*United States v. Fausto*, 484 U.S. 439 (1988) ....................................................13

*United States v. J & E Salvage Co.*, 55 F.3d 985 (4th Cir. 1995)..................................7

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519 (1978) .........18, 19

## STATUTES

20 U.S.C. § 9501..................................................................................3, 4

20 U.S.C. § 9511..................................................................................3, 4

20 U.S.C. § 9512..................................................................................3, 4

20 U.S.C. § 9533..................................................................................3, 6

20 U.S.C. § 9541..................................................................................3

20 U.S.C. § 9543..................................................................................3, 6

20 U.S.C. § 9562..................................................................................6

20 U.S.C. § 9563..................................................................................3

20 U.S.C. § 9564..................................................................................3, 6

20 U.S.C. § 9567b.................................................................................3

5 U.S.C. § 704 ....................................................................................................17

5 U.S.C. § 705 ....................................................................................................23

5 U.S.C. § 706 ....................................................................................................17

5 U.S.C. § 7103 .............................................................................................11, 13

5 U.S.C. § 7701 .............................................................................................11, 13

## OTHER AUTHORITIES

*Halting Administrative Action in the Supreme Court*, 137 Harv. L. Rev. 2016 (2024) ................24

USASpending.Gov, *Dep't of Educ. to Gen. Dynamics Info. Tech., Inc.
      (91990022C0066)*, https://perma.cc/2RKH-TPBB?type=image .........................................3

## INTRODUCTION

Defendants offer no substantive defense of their actions to eviscerate the Institute of Education Sciences ("IES"), the education research agency created and funded by Congress. Nor could they. In one unconsidered act—the Research Termination Action—Defendants slashed almost 100 contracts supporting vital research at a critical point in our nation's education system. A month later, Defendants designated nearly 90 percent of IES staff for termination and put them on leave. As a result, the agency is now not carrying out the duties Congress assigned it—to collect, conduct and disseminate data and research to education researchers and the public.

Defendants don't deny what they've done. They dispute the Court's authority to act. *First*, Defendants pluck a handful of isolated lines from Plaintiffs' declarations to argue that the harms alleged and demonstrated with evidence are speculative. Defendants ignore the concrete harms Plaintiffs have experienced. *Second*, Defendants argue that the existence of other adjudicatory schemes for federal contractors and employees bar Plaintiffs' claims here. But Plaintiffs are neither federal contractors nor federal employees. *Third*, in various ways, Defendants assert that their actions to cut off IES's ability to function by slashing its staff and contracts to the bone are just garden-variety agency management within Defendants' unreviewable discretion. But Defendants never seriously respond to Plaintiffs' evidence showing that they are not carrying out IES's statutory functions and not using funds appropriated to IES to do so.

This case does not present a close call. Plaintiffs are being harmed, Defendants' actions to gut a congressionally created agency are arbitrary and unlawful, and this court's jurisdiction is not barred by schemes intended to address claims fundamentally different from those levied by Plaintiffs.

## ARGUMENT

### I.    This Court has jurisdiction to hear education researchers' claims.

#### A. Plaintiff education research associations have standing to challenge actions that halted the required functions of the nation's education research agency.

With a handful of citations to cherry-picked lines of Plaintiffs' declarations, Defendants liken the harms Plaintiffs face to the "chain of possibilities" found to be speculative in cases like *South Carolina v. United States*, 912 F.3d 720, 728 (4th Cir. 2019). But Defendants are wrong on the facts here and the applicability of the case law they cite.

Defendants ignore numerous concrete harms that Plaintiffs have recounted as flowing from Defendants' actions. *See, e.g.*, Pls.' Mem. ISO Prelim. Inj. (hereinafter "Pls. Br.") at 4–8, 17, 27–33; PI Ex. I, Reardon Declaration ("Decl.") ¶¶ 18–19 (AERA-0075–76); PI Ex. T, Radwin Decl. ¶¶ 10, 12 (AERA-0140, 0041); PI Ex. L, Garvey Decl. ¶ 26 (AERA-0096). And even in the course of cherry-picking from Plaintiffs' declarations to argue that their harms are speculative, Defendants mischaracterize the content of those declarations. For example, Defendants assert Russell Gersten merely "relies on studies 'like' the [cancelled] MTSS," Defs.' Resp. in Opp'n (hereinafter "Opp'n") at 9. But Mr. Gersten declared unequivocally that his "work will be significantly compromised by the end of the MTSS study" and its cancellation "will prevent me …from gaining access to invaluable research and data concerning students' reading ability. . . ." PI Ex. F, Gersten Decl. ¶¶ 10, 15 (AERA-0050, 0051). Defendants similarly call a statement in one of Plaintiffs' declarations that "future grants will not be approved" speculative, Opp'n at 9, but wholly ignore the declarations of Plaintiffs' members that state grant reviews and approvals for new research have, in fact, already stopped. PI Ex. K, Talbott Decl. ¶ 6 (AERA-0087); Reardon Decl. ¶ 20

(AERA-0076).[1]

Defendants' argument that these injuries are connected to "an exercise of proper discretion" rather than a statutory violation fare no better. Opp'n at 9. Plaintiffs' injuries are *directly* tied to obligations imposed on IES by Congress, including that the agency shall "conduct and support scientifically valid research activities," and also "widely disseminate the findings and results" to "researchers." 20 U.S.C. §§ 9501(10); 9511; 9512; *see also* 20 U.S.C. §§ 9533, 9541, 9543, 9563, 9564, 9567b. As one Plaintiff member explained, "it is vitally important to my work, and to the public interests I seek to serve, that IES continue to fund and carry out its work in collecting and disseminating" education data. PI Ex. J, Tipton Decl. ¶ 17 (AERA-0081); *see* PI Ex. Q, Boulay Decl. ¶ 14 (AERA-0128); PI Ex. H, Levine Decl. ¶¶ 16–17 (AERA-0068).

Defendants' citation to *South Carolina* is similarly brief and generalized, omitting the facts that distinguish that case from Plaintiffs' claims. In that case, the court found the state's injury— becoming the "permanent" repository of nuclear material—was too speculative because the complained of injuries were "*decades in the future*" and required the failure of a clearly articulated Department of Energy plan to remove the material. *South Carolina*, 912 F.3d at 729 (emphasis in original). The state did not complain of *any* current or imminent injury. *Id*. In this case, precisely because Defendants have already taken the Termination Actions, the "future impact" of those actions does *not* "remain[] wholly speculative." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) (quoting *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 361 (4th Cir. 1996)). Here, the actions are complete, there are injuries now, and there are also clear anticipated injuries. *See*, *e.g*., Garvey Decl. ¶¶ 19, 26–27 (AERA-0095–96) ("[W]e cannot use restricted-use HSLS09 data

---

[1] Further buttressing the declarations of Plaintiffs' members, Defendants terminated the "scientific peer review" contract that supported review of research grant proposals necessary to vet and issue grants to conduct new, scientifically valid education research. USASpending.Gov, *Dep't of Educ. to Gen. Dynamics Info. Tech., Inc. (91990022C0066)*, https://perma.cc/2RKH-TPBB?type=image.

. . . . the staff at NCES that I have worked with are gone").

Finally, Defendants argue that Plaintiffs fail to satisfy the test for informational standing. While Plaintiffs' injuries are not limited to loss of information, they clearly satisfy both prongs of the Fourth Circuit test.[2] Numerous Plaintiff members now "lack access to information to which [they are] legally entitled." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017); *see, e.g.*, Gersten Decl. ¶¶ 10, 13–14 (AERA-0050–51); Reardon Decl. ¶ 6 (AERA-0073); Tipton Decl. ¶¶ 14–15, 21–22 (AERA-0081–82) ("This took relies upon updated data funded through canceled IES contracts."); Talbott Decl. ¶¶ 6–8 (AERA-0087–88); Garvey Decl. ¶¶ 19, 25, 28 (AERA-0095–96); PI Ex. M, Brady Doe Decl. ¶¶ 14, 19–20 (AERA-0100–01); Boulay Decl. ¶ 12 (AERA-0127); PI Ex. S, Pigott Decl. ¶¶ 10–13 (AERA-0136-–37); Radwin Decl. ¶¶ 11–13 (AERA-0141).[3] And "the denial of that information creates a 'real' harm with an adverse effect." *Dreher*, 856 F.3d at 345 (citation omitted); *see also Maryland v. USDA,* No. 1:25-cv-00748, 2025 WL 800216, at *8 (D. Md. Mar. 13, 2025) (finding that "real, downstream harm is a critical component of an informational injury" (cleaned up)). Quite simply, IES has stopped conducting much of its statutorily-required data collection, research, and other activities. IES obviously cannot disseminate data and research that it has not conducted. Plaintiffs' members rely on the quality education research and data disseminated by IES, and their work and careers will be badly harmed by Defendants' actions to eviscerate the agency's functioning. *See, e.g.*, Gersten Decl. ¶¶ 15–16 (AERA-0051–52) ("The mass cancellation of IES contracts, and the subsequent mass layoffs of IES staff, makes the career in which I have invested decades untenable"); Pigott Decl. ¶¶ 9, 10 (AERA-0136) ("The lack of availability or degraded capacity of the WWC would be personally

---

[2] Plaintiffs are not only arguing they are injured because IES is failing to release the information (i.e. survey and study data), but also that IES is failing to conduct the surveys, studies, and other statutorily-required activities altogether. *See* Compl. ¶ 13.
[3] 20 U.S.C. §§ 9501(1), 9511(b)(1), 9512.

devastating because as an academic and practitioner it is essential to my work and career."); Brady Doe Decl. ¶¶ 18, 22–23 (AERA-0101–102) ("Now that virtual access to this dataset is unavailable, my graduation timeline has changed."); PI Ex. O, Wong Decl. ¶ 19 (AERA-0113) ("I have spent significant time trying to figure out how I will be able to graduate."); Reardon Decl. ¶ 10, 13 (AERA-0074) ("Without the availability of pre-publication review, we will not be able to publish our findings that we have worked so hard to create.").

### B.  The Tucker Act does not prevent this Court from exercising jurisdiction over Plaintiffs' claims.

Defendants argue that the Tucker Act divests this Court of jurisdiction over Plaintiffs' Research Termination Action challenge because it is "at its essence a contract action." Opp'n at 10. But this action is founded in IES's statutory requirements and appropriations—not in contracts. Plaintiffs are not contractors and do not rely on a single contract provision to make their claims. And Plaintiffs here seek equitable relief to require performance of IES functions mandated by Congress, not specific performance of contract terms or monetary damages awarded to contractors under the Tucker Act.

The authority Defendants themselves rely on compels the conclusion that this Court has jurisdiction. Under *Megapulse, Inc. v. Lewis*, whether an action is "at its essence a contract action," and thus district court jurisdiction is precluded by the Tucker Act, "depends both on [1] the source of the rights upon which the plaintiff bases its claims, and [2] upon the type of relief sought (or appropriate)." 672 F.2d 959, 968 (D.C. Cir. 1982) (internal quotations omitted). Plaintiffs' claims are statutory, not contractual, in nature, and Plaintiffs do not and cannot seek the monetary relief provided under the Tucker Act. *See Bowen v. Massachusetts*, 487 U.S. 879, 904 (1988) (holding Tucker Act did not preclude claims seeking declaratory and equitable relief). This Court has jurisdiction to hear the claims Plaintiffs raise.

i.  **The source of law here is statutory, not contractual.**

Defendants' argument that Plaintiffs' claims are contractual, not statutory, fails for several reasons, but most fundamentally, Plaintiffs are not parties to the contracts relevant to this case and are not able to bring contractual claims in the Court of Federal Claims. *See Guardsman Elevator Co. v. United States*, 50 Fed. Cl. 577, 580 (Fed Cl. 2001) ("Tucker Act jurisdiction thus extends only to plaintiffs in privity of contract with the Government."). This fact distinguishes this case from many of the others where courts have considered the closer calls involved, where parties have had their own agreements with the government terminated. (And even in *those* cases, district courts have often found they have jurisdiction to hear such claims when they seek more than damages.).

Plaintiffs here assert claims rooted in the laws that assigned duties to IES and funding to carry them out. Pls. Br. at 20–22.[4] The terms and conditions of the cancelled contracts are not at issue. Plaintiffs do not cite even a single contract provision. No contractual analysis is required.

Defendants argue that no matter Plaintiffs' actual claims, they are still simply "contract actions." Opp'n at 11. But, in *Megapulse*, the D.C. Circuit *disagreed* with the position that any case referencing or incorporating "a contract is necessarily on the contract and therefore directly within the Tucker Act." 672 F.2d at 968. This case presents an easier question than in *Megapulse*. There the court found that even though the plaintiff contractor's relationship with the agency was rooted in contract, the source of its claim was a statutory data right under the Trade Secrets Act, so

---

[4] *See* 20 U.S.C. § 9543 (NCES "shall collect, report, analyze, and disseminate statistical data related to education . . . including . . . disseminating full and complete statistics . . . on the condition and progress of education at the preschool, elementary, secondary, postsecondary, and adult levels . . . including . . . early childhood . . . data on financial aid to postsecondary students [and more]"; *id.* § 9533 (NCER "shall . . . maintain published peer-review standards . . .carry out specific, long-term research activities . . . implement the [statutorily-required] plan . . .to carry out scientifically valid research . . . synthesize and disseminate . . . the findings and results . . . shall support the following topics of research [listing 11 topics]"); *id.* § 9562 (NCEE "shall . . . conduct evaluations . . . widely disseminate information on scientifically valid research . . . make such information accessible in a user-friendly, timely, and efficient manner); *id.* § 9564(a) (NCEE "shall enter into contracts with entities to establish a networked system of 10 regional educational laboratories".)

the court had jurisdiction. *Id*. Plaintiffs here are not in contract with Defendants at all.

Defendants do not seriously engage with these issues and instead make the circular assertion that, because Plaintiffs' challenge concerns "specific contracts that had been cancelled," this is a contract action. Opp'n at 11.[5] Defendants' citation to *J & E Salvage Co.* is inapposite. There the Fourth Circuit cited approvingly of *Megapulse*,[6] but easily found the Contract Disputes Act applied to disputes over a contractor's purchase of containers from the government because the plaintiff "unquestionably" relied on contract doctrine and "the question presented [was] one of contract interpretation," making it "impossible to ignore the terms of the contract documents." *United States v. J & E Salvage Co.*, 55 F.3d 985, 988 (4th Cir. 1995).

Defendants' attempts to compare this case to the emergency-docket stay in *Department of Education v. California*, 145 S. Ct. 966 (2025), and *American Association of Colleges for Teacher Education. v. McMahon*, fare no better. Those cases involved circumstances in which the plaintiff "organizations ha[d] stopped receiving their Grant Award funds" and sought the resumption of those payments. No. 1:25-cv-00702, 2025 WL 833917, at *6 (D. Md. Mar. 17, 2025), *stayed*, *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 25-1281, 2025 WL 1232337, at *1 (4th Cir. Apr. 10, 2025). The plaintiffs in those cases were grant recipients themselves, and the allegations

---

[5] Defendants do briefly point to the fact that IES may, under statute, perform many of its functions "directly *or* through grants, contracts, or cooperative agreements" to argue this case is a garden-variety contract action barred by the Tucker Act. Opp'n at 11 (emphasis in original). But, of course, Plaintiffs are not parties to any contract and Defendants are *not* carrying out IES's required functions in any of these ways. The IES Staff Termination Action—gutting 90 percent of the positions of an already leanly-staffed agency—makes it impossible to perform these required functions inside the Department. And in the months since taking these actions, IES has not assumed responsibility for the data being collected or research being conducted in the HS&B, the MTSS, the NPSAS, and the other study contracts it cancelled. It simply isn't doing or disseminating that research at all—and therein lies Plaintiffs' challenge. Pls. Br. at 39.

[6] And elsewhere, the Fourth Circuit has recognized that the Supreme Court in *Bowen* "rejected the argument that … the Tucker Act barred APA review" even where Plaintiffs could "seek monetary relief in the Court of Federal Claims." *Ohio River Valley Env't Coal., Inc. v. Kempthorne*, 473 F.3d 94, 100 n.5 (4th Cir. 2006) (citing *Bowen*, 487 U.S. at 904).

focused on the specific terms of their grant agreements.[7]

Moreover, in its brief order in *California*, the Supreme Court recognized that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." 145 S. Ct. at 968. The tide of district court rulings informed by this Supreme Court order explore exactly when and why the Tucker Act does not divest federal district courts of jurisdiction to hear constitutional or statutory challenges to agency actions—even those that involve grants or contracts *more* directly than this case. For example, in *Sustainability Institute v. Trump*, a court in this Circuit applied *Megapulse*'s framework and found that even where plaintiffs had grant agreements with the government and ultimately sought the flow of funds under those agreements, the statutory basis of the plaintiff's claims precluded application of the Tucker Act to divest the district court of jurisdiction. Order, No. 2:25-cv-02152 (D.S.C. Apr. 29, 2025), ECF No. 146. And in *Rhode Island v. Trump*, a district court enjoined the government from implementing an executive order that had resulted in terminations of grant agreements at three small federal agencies. Prelim. Inj., No. 1:25-cv-00128 (D.R.I. May 13, 2025), ECF No. 60. The court found that because plaintiffs brought claims under the APA and Constitution, the suit challenged the agencies' actions to "reduce the performance of their statutory function," so the Tucker Act did not divest the court of jurisdiction. *Rhode Island*, No. 1:25-cv-00128, 2025 WL 1303868, at *6 (D.R.I. May 6, 2025). The same is true here. Although some of Plaintiffs' harms stem from contract cancellations that does not "transform this action into one sounding in contract." *Id.*; *see also Am. Bar Ass'n v. DOJ.*, No. 1:25-cv-01263, 2025 WL 1388891, at *5 (D.D.C. May 14, 2025) (since "source of the right" was constitutional "regardless of the

---

[7] *See, e.g.*, Compl. ¶¶ 165–66, 180–84, *California v. Dep't of Educ.*, No. 1:25-cv-10548 (D. Mass. Mar. 6, 2025), ECF No. 1 (alleging that the terminations were not made pursuant to the terms and conditions of the grant agreements).

agreements' terms," Tucker Act did not apply); *AIDS Vaccine Advoc. Coal. v. Dep't of State*, No. 1:25-cv-00400, 2025 WL 752378, at *9 (D.D.C. Mar. 10, 2025) ("*AIDS Vaccine I*") ("[I]t would be quite extraordinary to consider Plaintiffs' claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached.").

**ii. Plaintiffs seek equitable relief, not money damages.**

Plaintiffs here seek equitable relief to halt the Research Termination Action so that IES can provide the vital, quality data and research that is required by law, not money damages available to contractors in the Court of Federal Claims under the Tucker Act. Claims seeking such equitable relief are not barred by the Tucker Act even if they also require money to be paid. *See AIDS Vaccine I*, 2025 WL 752378, at *8 ("Plaintiffs seek only invalidation of the policy, including the withholding of payment that flowed from it."); *Rhode Island,* 2025 WL 1303868, at *6–7 (While "the relief the [plaintiffs] seek implicates enjoining the unlawful terminations" of agreements, and might require the "payment of money by the federal government," relief was still "equitable" and Tucker Act did not preclude court's jurisdiction).

In *Bowen*, the Court explained that money damages "provide relief that substitutes for that which ought to have been done." 487 U.S. at 910. By contrast, equitable relief, like Plaintiffs seek here, is not a "substitute remed[y] at all, but attempt[s] to give the plaintiff the very thing to which he was entitled." *Rhode Island,* 2025 WL 1303868 at *6 (citing *Bowen*, 487 U.S. at 895). A claim for relief "that requires the federal government to pay money to plaintiffs does not automatically transform the action into one for money damages." Order at 3, *Sustainability Inst. v. Trump*, No. 2:25-cv-02152 (D.S.C. Apr. 29, 2025), ECF No. 146 (citing *Bowen*, 487 U.S. at 893)*.* Indeed, the Supreme Court, in *California*, "explicitly distinguished between cases where 'an order setting aside an agency's action may result in the disbursement of funds,'" like Plaintiffs' action here, and cases like *California*, "in which the plaintiffs seek to 'enforce a contractual obligation to pay

money.'" *AIDS Vaccine Advoc. Coal. v. Dep't of State*, No. 1:25-cv-00400, 2025 WL 1380421, at *3 (D.D.C. May 13, 2025) ("*AIDS Vaccine II*") (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). And as the district court in *AIDS Vaccine II* noted, "just one month before [*California*], Defendants made the same jurisdictional arguments to the Supreme Court in this [USAID] case, and the Supreme Court declined to adopt them." *Id.* (citing *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 145 S. Ct. 753 (2025)).

Defendants' characterization of the equitable relief Plaintiffs seek as contractual specific performance also fails. In requesting *preliminary* relief, Plaintiffs seek reinstatement of the cancelled contracts or a stay of the contract terminations, because that is the only way for IES to fulfill its functions in a manner that prevents irreparable harm in the near future for two reasons. First, contractors for many of the significant contracts have already collected years of data and conducted analysis that Plaintiffs' members had been counting on for their own work. Pls' Br. at 39. Second, prompt rebidding of other contracts *en masse* is likely impossible, particularly given IES's current skeletal staff and the intensive nature of contract bidding. *See* PI Ex. D, Pollard Young Decl. ¶ 19 (AERA-0030–31). But, as Defendants acknowledge, *see* ECF No. 24, this action ultimately seeks only reinstatement *or rebidding* of contracts because it seeks to require IES to carry out its functions, not the enforcement of contract terms in particular contracts. The relief ultimately sought here is "at its essence," *Megapulse*, 672 F.2d at 968, the performance of statutorily-required data, research, and dissemination functions, not damages or contractual specific performance. *Id.*

### C. Federal employment laws do not prevent this Court from exercising jurisdiction over Plaintiff organizations' claims that IES must carry out its functions.

Defendants argue that Plaintiffs' request to reinstate personnel is foreclosed because federal employees have administrative means of adjudicating employment disputes. The Supreme Court's

*Thunder Basin* standard makes clear that this Court has jurisdiction to consider Plaintiffs' claims related to the IES Staff Termination Action. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 213–15 (1994).

Defendants assert that laws governing employment disputes between federal employees and their agencies preclude this action, where non-employee Plaintiffs complain that Defendants' elimination of 90 percent of an agency's staff positions stop the agency from carrying out its legally required functions. But Plaintiffs are neither employees nor employee representatives, and this is not an employment dispute. The Civil Service Reform Act ("CSRA") and Federal Service Labor-Management Relations Statute ("FSL-MRS") provide administrative procedures that *federal employees* and *federal employee unions*, respectively, may employ in employment and labor disputes. See 5 U.S.C. § 7701(a) (permitting CSRA appeals from only "an employee, or applicant for employment"); *id.* § 7103(a)(4) (defining "labor organization" subject to FSL-MRS administrative review as an organization dealing with an agency on behalf of federal employees). Under the CSRA and the FSL-MRS, employees' and unions' claims are respectively first adjudicated by agencies expert in employment and labor laws, the Merit Systems Protection Board ("MSPB") and the Federal Labor Relations Authority ("FLRA"), before a subsequent ability to seek judicial review. These laws offer no mechanism for parties injured by the mass staff termination at a federal agency that cuts off that agency's statutorily required functioning.

Plaintiffs, who are not federal employees, cannot obtain review *at all* under these administrative schemes. And their claim that Defendants' IES Staff Termination Action stops IES from carrying out its legally required functions is of a fundamentally different kind than the employment dispute governed by the CSRA and FSL-MRS and regularly adjudicated by the MSPB

and FLRA. Under the Supreme Court's holding in *Thunder Basin*, recently reaffirmed in *Axon*, this Court has jurisdiction to hear Plaintiffs' claims under all relevant factors.

In determining whether an administrative review scheme precludes judicial review of a particular type of action, the Supreme Court has held that three factors control. *First*, "could precluding district court jurisdiction 'foreclose all meaningful judicial review'?" *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023) (quoting *Thunder Basin Coal Co.*, 510 U.S. at 212). *Second*, "is the claim 'wholly collateral to [the] statute's review provisions?'" *Id*. *Third*, and last, "is the claim 'outside the agency's expertise'?" *Id*. When "the answer to all three questions is "yes," there is a presumption that Congress did not limit jurisdiction, and even if the "factors point in different directions," jurisdiction may still not be limited because "Congress rarely allows claims about agency action to escape effective judicial review." *Id*.

In this case all the *Thunder Basin* factors weigh in favor of finding that the Court has jurisdiction to hear Plaintiffs' claims that the IES Staff Termination Action will prevent the agency from carrying out its vital and required functions. *First*, Plaintiffs are neither employees nor unions, and have no way to obtain "meaningful judicial review"—or *any* review at all—under the CSRA or FSL-MRS. *Axon,* 598 U.S. at 186. As the *Rhode Island* court recently observed in enjoining mass staff terminations at other agencies, the CSRA "at most, contemplates the availability of judicial review of *federal employees'* disputes over employment decisions." 2025 WL 1303868, at *7 (emphasis in original); *see also Am. Fed'n of Gov't Emps v. Trump*, No. 3:25-cv-03698, 2025 WL 1358477, at *15 (N.D. Cal. May 9, 2025) (finding *Thunder Basin* factors weighed "strongly" against finding CSRA or FSL-MRS preclusion of jurisdiction over non-profit claims related to reductions in force). Indeed, Defendants' argument is essentially that if the government fires every person at an agency on which a party relies, there is *no* mechanism for

judicial review even if the agency is statutorily required to serve the party's interests. Opp'n at 15.

*Second*, Plaintiffs' claims that Defendants are failing to carry out statutorily-required and congressionally-funded actions in violation of the law and the separation of powers are "wholly collateral" to the employment dispute review provisions of the CSRA and FSL-MRS. These claims have nothing to do with alleged personnel practices, employment grievances, or labor disputes covered by those laws. *Axon*, 598 U.S. at 186; 5 U.S.C. §§ 7701, 7103; *Rhode Island*, 2025 WL 1303868, at *7–8 (finding claims concerning "agencies' actions to curtail their respective statutory and discretionary functions" were "wholly collateral" to CSRA scheme). Plaintiffs seek relief to ensure IES has the expert staff needed to carry out the quality, timely research Congress has assigned to it. *Third*, and relatedly, the MSPB and FLRA have no expertise related to the work of IES or in the statutes that assigned numerous duties to the agency. *Axon*, 598 U.S. at 186; *Rhode Island*, 2025 WL 1303868, at *7.

Defendants avoid this substantive inquiry and instead rely on conclusions—not facts and reasoning—in the cases they cite. But to the extent that courts have referred to the administrative remedies available under the FSL-MRS and CSRA as "exclusive," they have done so in the context of challenges brought by federal employees or their unions. The authorities Defendants themselves point to make this clear. Opp'n at 12–14.[8] The only instance in which a court may have found the administrative schemes to be exclusive of non-employees is found in the stay this Circuit issued through an interlocutory summary order in *Maryland v. USDA*, No. 25-1248, 2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025) (staying *Maryland v. USDA*, No. 1:25-cv-00748, 2025 WL 973159, at

---

[8] Citing *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019) (FSL-MRS "provides the exclusive procedures *by which federal employees and their bargaining representatives* may assert federal labor-management relations claims" and relying on fact that FSL-MRS still allowed unions to obtain "meaningful judicial review.") (emphasis added); *Elgin v. Dep't of Treasury*, 567 U.S. 1, 11 (2012) (CSRA framework "indicates that extrastatutory review is not available *to those employees* to whom the CSRA *grants* administrative and judicial review") (first emphasis added); *United States v. Fausto*, 484 U.S. 439, 445 (1988) (CSRA "scheme of administrative and judicial review" was enacted to accommodate interests "of federal employees").

*5 (D. Md. Apr. 1, 2025)). But Defendants ignore that this Circuit was considering a case brought on the basis of *personnel regulations*, and which did not involve the wholesale destruction of an agency's functioning through mass termination but instead the short-term impacts on state unemployment systems from the failure to receive statutory layoff notice required by federal personnel rules (in laying off the relatively small share of employees in probationary status). *Id.*

## II.    Plaintiffs Are Likely to Succeed on the Merits.

Notably, Defendants do not substantively defend the Termination Actions. Instead, they argue, variously, that the Court cannot assess whether they are rational and lawful because the identified acts are somehow not discrete and identifiable, that they are not "final," that adequate alternate remedies are available, and, most of all, that Defendants' acts to refuse to carry out congressionally-required activities are committed to their unreviewable discretion. These arguments all fail to engage the actual facts of this case, where Defendants' readily-identifiable termination actions eviscerated IES's capacity to carry out its required functions in disregard of the law, reliance interests of education researchers, and basic reason.

### A.    Plaintiffs challenge discrete agency actions—a reduction in force and mass contract cancellation—subject to APA review.

Defendants assert that Plaintiffs' claims do not seek review of discrete agency actions and instead seek "wholesale judicial review of the Department's management of the Institute." Opp'n at 17. That's just not the case. Plaintiffs seek relief related to two discrete agency actions. Although Defendants' actions have had the broad *effect* of eviscerating IES's functions, the actions Plaintiffs challenge remain discrete: the mass cancellation of IES contracts in February 2025—the Research Termination Action—and the designation of 90 percent of IES staff for termination in March 2025—the IES Staff Termination Action. Pls. Br. at 6–11; *see also Lujan* v. *Nat'l Wildlife Fed'n*,

14

497 U.S. 871, 891 (1990) (Under "the APA, respondent must" identify "some particular 'agency action' that causes it harm.")

In the Research Termination Action, Defendants cancelled 89 contracts all at once with little to no process or deliberation on February 10, with 10 more contracts for all Regional Education Laboratories ("RELs") cancelled a few days later on February 13. Pls. Br. at 6–9. In the IES Staff Termination Action, Defendants designated almost all of IES's staff for termination in one fell swoop on March 11, and IES's Acting Director explained that decision as a single action to terminate "the vast majority" of IES staff the next day. Pls. Br. at 9–11.[9]

These actions are entirely different from the facts of the cases Defendants' rely on to assert that this is an impermissible challenge to "abstract policy disagreements." Opp'n at 18 (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004)). *Norton*, for example, involved a challenge to agency *inaction* in failing to broadly regulate federal lands, and the Court found that the plaintiffs could not identify a discrete action the agency was required to take. *Id.* at 64. Similarly, in *Lujan*, the Court found the plaintiffs were similarly challenging a host of agency failures to act on land use regulation and not "a completed universe of particular [agency] orders and regulations." 497 U.S. at 890. Here, there are clear, discrete agency actions at issue—cancelled contracts and staff terminated—not "generalized complaints" or a "wholesale" challenge to agency management as Defendants charge without support. Opp'n at 17. Defendants cannot transform this suit into a "programmatic" challenge by simply alleging that Plaintiffs' claims are "broad programmatic attacks" or "seek wholesale improvement" of IES. *Id*. *See also Rhode Island*, 2025 WL 1303868, at *8 (challenge of policy "eliminating all functions and components not mandated by statute" not a barred "programmatic challenge"); *Nat'l Treasury Emps. Union v. Vought*, No.

---

[9] Jeffrey Mervis, *Layoffs gut research agency that helped monitor U.S.* education, Science (Mar. 13, 2025) [https://perma.cc/T7LE-AXF], PI Ex. U, McGrath Decl. Ex. 36 (AERA-0364–66).

1:25-cv-00381, 2025 WL 942772, at *9 (D.D.C. Mar. 28, 2025) (holding that "Defendants'
repeated incantation of the words 'programmatic' and 'abstract' cannot change the character of
what is actually going on," and finding stop-work order to be a "discrete order" that is "ripe for
review"), *stayed in part on other grounds pending appeal*, No. 25-5091 (D.C. Cir. Apr. 11, 2025).

Defendants warn that in order to provide meaningful relief here, the Court would need to
"supervise IES's activities and determine how it would accomplish each statutorily mandated
function," which it states would result in "undue judicial interference." Opp'n at 17 (citations
omitted). Plaintiffs request no such relief, instead appropriately tailoring their request to restore
and maintain the status quo prior to the Termination Actions taken by Defendants.

### B.  The contract cancellations and staff terminations are "final" agency actions.

Defendants have not merely announced that they *may* cancel contracts carrying out vital
education research *en masse*, nor have they just declared that they *plan* to terminate 90 percent of
IES's staff. They have made the decision to carry out these actions, and they have acted on them
concretely. Defendants terminated 99 contracts, ending the work being carried out under those
contracts. Pls. Br. at 6–9. Defendants announced their mass reduction in force, placed the vast
majority of IES staff on administrative leave, and sent them legally required 60-day termination
notices. *See* Pollard Young Decl. Ex. 2 (AERA-0037–40). These actions are not tentative, and they
are not "preliminary." Opp'n at 18. They are the "consummation of a decision-making process,"
and they affect "rights [and] obligations" and have "legal consequences." *Bennett v. Spear*, 520
U.S. 154, 178 (1997) (internal quotation marks and citation omitted); Pls. Br. at 17–19.

Defendants' characterization of the Termination Actions as being part of an ongoing
purported "reorganization" of the Department, Opp'n at 18, does not alter the finality of the
discrete actions Plaintiffs' challenge here as an "agency action may be final even if the agency's
position is 'subject to change' in the future." *Nat'l Env't Dev. Assn.'s Clean Air Project v. EPA*,

752 F.3d 999, 1006 (D.C. Cir. 2014). And, of course, Defendants are not even claiming that they are reconsidering their mass contract cancellations and staff terminations—so it's unclear how the challenged actions lack finality even in Defendants' own telling.

Defendants argue that because there has not been a singular announcement to "actually shut down the Institute," the actions taken are simply that agency functions "need to be streamlined and reorganized." Opp'n at 18. Plaintiffs' claims that Defendants are violating multiple laws do not hinge on IES being completely "shut down." They hinge on their actions to abandon statutory directives. These are specific legal claims relating to two actions that are unlawful under the APA in myriad ways. *See Axon*, 598 U.S. at 186 ("Congress rarely allows claims about agency action to escape effective judicial review.")

### C.  There are no other adequate remedies available.

In a few sheepish sentences, Defendants argue that Plaintiffs' claims under the APA are unavailable because there are alternative "adequate remed[ies]" available, foreclosing APA review under 5 U.S.C. § 704. Opp'n at 19. To support this assertion, Defendants cite only (1) *Bowen* and (2) the availability of administrative remedies *to federal employees and contractors*. But in *Bowen*, the Court held that even a party to a federal agreement could still seek APA review under the circumstances as it sought equitable relief. 487 U.S. at 910. And Plaintiffs here, education researchers entitled by IES's statutes to receive quality data and research from the agency, have no ability to bring the claims available to employees and contractors under the CSRA, FSL-MRS, or the Tucker Act. *Supra* Secs. I.A & I.B. There are no alternative adequate remedies that can address the harms that flow from Defendants' acts to eviscerate IES's functional capacity. To remediate an agency's arbitrary and capricious conduct, courts are to "set [it] aside." 5 U.S.C. § 706(2)(A); *see also Int'l Org. of Masters, Mates & Pilots, ILA, AFL-CIO v. Nat'l Lab. Rels. Bd.*, 61 F.4th 169, 180 (D.C. Cir. 2023) (when faced with unreasoned agency action that fails to account for reliance

interests, court is "left with no choice but to vacate"). Returning employees and contractors to their status before the agency executed its arbitrary and capricious action does exactly that.

### D. Defendants' mass terminations of staff and contracts were arbitrary and capricious.

Defendants offer scarcely any substantive justification to argue that the Research Termination Action or the IES Staff Termination Action were the products of reasoned agency decision-making. All Defendants point to is Secretary McMahon's desire "to right-size and streamline the Department's operations" and to reduce "inefficiency and waste." Opp'n at 20. Nowhere do Defendants offer a basis for how cancelling numerous significant data and research contracts years into performance with tens of millions of taxpayer dollars expended before results were released achieved these broad aims. Compare *id*. with Pls. Br. at 28. Nowhere do Defendants explain how a tiny remaining staff, without the benefit of dozens of support contracts, can produce and disseminate the quality data and research required of the agency. And certainly, nowhere do Defendants provide any reasoning that runs counter to the assessments of former IES leaders and staff that this 90 percent reduction in staff—from an already leanly-staff agency—will not allow the agency to carry out its functions. *See, e.g.*, PI Ex. A, Whitehurst Decl. ¶¶ 7–11 (AERA-0004–06).

Defendants assert that these actions are committed to Defendants' discretion and thus unreviewable. But the authorities Defendants cite for this cannot bear the weight they place on them to overcome the "'basic presumption of judicial review' of agency action." *Holbrook v. Tenn. Valley Auth.*, 48 F.4th 282, 287 (4th Cir. 2022) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967)). Defendants rely heavily on *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519 (1978). Opp'n at 20–21. In a far cry from the facts of agency evisceration present here, in *Vermont Yankee*, the Court merely held that it would not

dictate the detailed procedures of agency rulemaking beyond the minimum required by APA. *Id.* at 543–547. Defendants' reliance on *Heckler v. Chaney*, where the Court found a presumption of unreviewable agency discretion in decisions about whether to initiate enforcement actions, is similarly inapt. 470 U.S. 821, 831–32 (1985); Opp'n at 21. The Court in *Heckler* explicitly distinguished its finding of enforcement discretion from cases involving "an affirmative act." *Id.*

And in citing *Lincoln v. Vigil*, Defendants ignore that the Court there found an agency funding allocation to be committed to the agency's discretion only "as long as the agency allocates funds from a lump-sum appropriation *to meet permissible statutory objectives*." 508 U.S. 182, 193 (1993) (emphasis added). Here, Defendants' actions seek to create "savings" [10] by *not* allocating funds appropriated to IES to carry out its statutorily required functions. *See* Pls. Br. at 35–36. Defendants do not point to any other IES functions that the "savings" generated by their mass staff and contract terminations will be dedicated to. Instead, Defendant Soldner explained these actions as IES transferring its functions to unidentified "others."[11] And the Court has "law to apply" here, Order, *Sustainability Institute*, No. 2:25-cv-2152 (D.S.C. Apr. 29, 2025), ECF No. 146 (quoting *Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947, 964 (4th Cir. 2025)), as Congress specifically appropriated funds to carry out IES functions and charged it with numerous mandatory responsibilities. Pls. Br. at 28–32. Defendants have no discretion to not carry out IES's required functions and to refuse to spend the funds Congress appropriated to the agency. [12]

---

[10] Dep't of Gov. Efficiency, *Savings* [https://perma.cc/K9GZ-8BUR], McGrath Decl. Ex. 12 (AERA-0250).

[11] Mervis, *Layoffs gut research agency that helped monitor U.S. education* [https://perma.cc/T7LE-AXF], McGrath Decl. Ex. 36 (AERA-0364–66).

[12] Defendants also argue that remand, rather than vacatur, would be the appropriate remedy here for the agency to merely provide additional explanation. Opp'n at 21. But Defendants' argument goes to the question of ultimate remedy, most appropriate for this Court to address later on. At this preliminary stage, a stay, or similar relief, is appropriate to prevent harm while this Court adjudicates the merits. Even when this case reaches the stage at which consideration of ultimate remedy is appropriate, Defendants are unlikely to be successful, given that "vacatur is the normal remedy," in APA cases and that courts' occasional resort to remand depends on the "'seriousness of the order's deficiencies' and the likely 'disruptive consequences' of vacatur." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102,

### E.  Defendants' extreme actions are contrary to law.

Defendants' arguments that these actions are not contrary to law are unavailing. First, Defendants point to boilerplate language requiring compliance with the law in executive orders regarding contracts and the closure of the Department of Education that were, respectively, issued *after* Defendants' contract cancellations and staff termination actions. Opp'n at 22. But Plaintiffs specifically argue that Defendants' actual actions are not in accordance with law. The mere fact that later-issued executive orders purported to require legal compliance is hardly evidence that Defendants *actually* complied with statutory obligations.

Second, Defendants briefly assert—again relying on *Vermont Yankee*—that their 90 percent "staffing cuts" are "a judgment call for the Department," and that the Court has no role in determining whether these actions affect Defendants' ability to comply with its statutory obligations. Opp'n at 22. This is wrong; courts play precisely this role. See *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024) ("Under the APA, it thus remains the responsibility of the court to decide whether the law means what the agency says.") (cleaned up). And the determination here is straightforward. The Termination Actions taken by Defendants have resulted in failure to comply with statute. Defendants have no response, for example, to Plaintiffs' argument the National Center for Education Evaluation and Regional Assistance ("NCEE") is not carrying out its numerous statutory responsibilities with a single employee, who is also Acting IES Director, with all RELs contracts cancelled, and with the contracts supporting the WWC cancelled. Pls. Br. at 29–30. Nor do Defendants make any argument that other similarly eviscerated IES components are carrying out their statutory functions following Defendants' actions. *See id.* at 28–32 (detailing specific ways in which Defendants' actions are contrary to that statutes that govern IES functions).

---

1110 (D.C. Cir. 2014) (citations omitted); see also *Advocates for Hwy. & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005) ("[U]nsupported agency action normally warrants vacatur … .").

**F. Defendants' Termination Actions violate the separation of powers.**

In refuting Plaintiffs' claims that Defendants' Termination Actions violate the separation of powers—by refusing to carry out IES's statutorily-required functions and to spend funds appropriated by Congress for those functions, Pls. Br. at 33–35—Defendants again seek harbor in their purportedly unfettered discretion. Opp'n at 22–23. But the numerous mandates Congress has enacted for IES to create and disseminate high quality data and research,[13] and Congress's appropriation of funds for the operation of IES, do not grant Defendants discretion to cease to carry out the agency's functions and to refuse to spend those funds altogether.

As Defendants acknowledge, Congress appropriated approximately $800 million for the "expenses for the Institute of Education Sciences," Opp'n at 23. Defendants have cancelled $1.2 billion in IES's contracts, designated 90 percent of its staff for termination, and stated that its functions are being transferred to "others."[14] They have characterized the Research Termination Action as generating "savings," but they have not submitted a recission package to Congress to re-appropriate these IES funds under the Impoundment Control Act. Pls. Br. at 34. Plaintiffs are not challenging mere agency decisions about "how best to spend appropriated funds," Opp'n at 23, they are challenging the *refusal* to spend the funds to carry out functions assigned to IES by Congress.[15]

---

[13] *See supra* notes 3 & 4.

[14] Jeffrey Mervis, *Layoffs gut research agency that helped monitor U.S. education*, Science (Mar. 13, 2025) [https://perma.cc/T7LE-AXF], McGrath Decl. Ex. 36 (AERA-0364–66).

[15] Defendants overread *Dalton v. Specter*, 511 U.S. 462 (1994), in arguing that Plaintiffs cannot bring an ultra vires claim. *See* Opp'n at 24–25. In that case—regarding base closure under a process in the Defense Base Closure and Realignment Act, *see id.* at 466—the question "boiled down to . . . whether the President exceeded his authority under the Act," *Nat'l Treasury Emps. Union*, 2025 WL 942772, at *8 (citations omitted). Here, Plaintiffs ultra vires claim looks quite different: Plaintiffs allege not only that the relevant statutes provide Defendants with no right to stop IES functions, but also that the challenged actions exceed the Executive's Article II authority and encroach on the power entrusted to Congress. *See* Compl. ¶ 169. As such, "*Dalton* does not apply, and the Court has jurisdiction to perform its traditional duty and consider both the statutory and constitutional claims." *Nat'l Treasury Emps. Union*, 2025 WL 942772, at *9; *see Does 1-26 v. Musk*, No. 1:25-cv-00462, 2025 WL 840574, at *25 (D. Md. Mar. 18, 2025) (stayed on appeal on other grounds).

**III.**     **Plaintiffs Are Suffering Immediate, Irreparable Harm and the Equities and Public Interest Weigh Strongly In Favor of Relief.**

Defendants do not seriously respond to the irreparable harms that Plaintiffs' members are experiencing and will imminently face in the absence of preliminary relief. Plaintiffs' members—including graduate students in degree programs on specific timelines—have already lost access to restricted-use data and had to alter their plans and work programs. Pls. Br. at 41–42. And without preliminary relief, significant years-long research studies and data collections covering a pivotal period in American education will be lost as data are deleted, updated data collections are not made, student research participants progress to higher grades, and connections to those participants wither. Pls. Br. at 38–40. Finally, after 90 percent of IES's expert staff are separated from the agency around June 10, IES's ability to resume its functions will be hampered for an extended period, and Plaintiffs' members will be unable to obtain the quality data and research IES is required to provide for years—making their work nearly impossible. Pls. Br. at 36–38. None of these harms can be "fully rectified by the final judgment after trial." *Mt. Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (citation omitted).

The only tailored argument Defendants offer to suggest Plaintiffs will not experience irreparable harm is Plaintiffs' delay in filing a motion for preliminary relief. But Defendants ignore "the context of the delay." *Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360, 388 n.15 (D.D.C. 2017). Although the Research Termination Action occurred in mid-February, the IES Staff Termination Action came only in mid-March. Defendants themselves make the connection between these two acts clear as they argue Plaintiffs cannot complain of the contract cancellations in the Research Termination Action because Defendants could carry out IES functions through staff—a course made impossible by the IES Staff Termination Action. Opp'n at 11.

Defendants also argue that the equities weigh in their favor because relief would "disrupt

the Department's efforts to comply with" two Executive Orders. Opp'n at 25–26. Yet those Executive Orders only apply "to the extent permitted by law." *Id.* Here, Defendants' actions violate the law, and there "is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citations omitted); *see also Roe v. Dep't of Def.*, 947 F.3d 207, 230–31 (4th Cir. 2020). Any harm Defendants will face is outweighed by the significant harm Plaintiffs have shown they are suffering and will suffer. That the equities weigh in favor of granting relief is only emphasized by the significant harm to the public interest resulting from the decimation of research aimed at improving the nation's education systems. *See, e.g.*, Whitehurst Decl. ¶¶ 12-14 (AERA-0007).

### IV.    The Relief Plaintiffs Seek—Whether in the Form of a Preliminary Injunction or Section 705 Stay—Is Appropriate Here.

Plaintiffs have tens of thousands of education researcher members around the country who have experienced and will imminently experience numerous harms from Defendants' dramatic actions to eviscerate the functioning of IES. *See* Pls. Br. at 35–42. Many of Defendants' actions here—including the mass reduction in staff through the IES Staff Termination Action and the cancellation of numerous support contracts through the Research Termination Action—result in broad and interlocking harms that prevent IES from disseminating quality data and research to Plaintiffs' members. *Id.* A preliminary injunction that returns IES to the status quo before these actions would remedy these harms, as would a Section 705 stay of the Termination Actions.

Section 705 of the APA permits courts to not only postpone effective dates but to "issue all necessary and appropriate process to . . . preserve status or rights pending conclusion of the review proceedings" where "required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705; *Am. Fed'n of Tchrs. v. Dep't of Educ.*, No. 1:25-cv-00628, 2025 WL 1191844, at *7 (D. Md. Apr. 24, 2025). And "this power can be exercised to *command*, as well as to *prohibit*." *Halting*

*Administrative Action in the Supreme Court*, 137 Harv. L. Rev. 2016, 2019 (2024) (emphasis added) (quotations omitted). Where an agency action is unlawful, as the Termination Actions are, a 705 stay is appropriate as interim relief, as vacatur of the actions would likely be an appropriate remedy at final judgment. S*ee Gomez v. Trump*, 485 F. Supp. 3d 145, 202–03 (D.D.C. 2020).[16]

## V.    Any Relief this Court Orders Does Not Require Security and Should Not Be Stayed.

Should this Court enter preliminary relief pursuant to its equitable authority, any bond required should be nominal, as the financial harm suffered by Defendants—if any—from the injunction would be covered by money already appropriated for IES functions. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999) (where the risk of harm to enjoined party is "remote," a "nominal bond may suffice"). A nominal bond is also appropriate in public interest cases. *See Maryland v. USDA*, 2025 WL 800216, at *26 (collecting cases). Should this Court order relief under Section 705, no bond is required. *See Am. Fed'n of Tchrs.*, 2025 WL 1191844, at *23 n.14. Nor should this Court enter a stay of its own preliminary relief. If Defendants "believe that stay pending appeal is warranted" after reviewing this Court's order, they should "make a request consistent with Federal Rule of Appellate Procedure 8." *Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-00239, 2025 WL 597959, at *19 n.14 (D.D.C. Feb. 25, 2025).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion for preliminary relief to prevent the obliteration of an irreplaceable federal agency. Plaintiffs pray that the Court enters an order restoring the status quo and requiring Defendants to take all action necessary to reverse the effects of their unlawful activity.

---

[16] Plaintiffs attach to this Reply an alternative Proposed Order that includes relief pursuant to Section 705, rather than this Court's inherent equitable authority.

Dated: May 19, 2025

Respectfully submitted,

*/s/ Daniel A. McGrath*
Daniel A. McGrath (Bar No. 31501)
Madeline H. Gitomer (Bar No. 31518)
Emma R. Leibowitz (Bar No. 31568)
Victoria S. Nugent (Bar No. 15039)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
dmcgrath@democracyforward.org
mgitomer@democracyforward.org
eleibowitz@democracyforward.org
vnugent@democracyforward.org
*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Daniel A. McGrath, certify that I filed the foregoing with the Clerk of Court for the

United States District Court for the District of Maryland by using the CM/ECF system, which sent

a notice of such filing to all registered CM/ECF users who have appeared in this case.

/s/ Daniel A. McGrath
*Counsel for Plaintiffs*
