# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, *et al.*, | |
| *Plaintiffs*, | |
| *vs.* | Civil Action No. 8:25-cv-01230 (SAG) |
| U.S. DEPARTMENT OF EDUCATION, *et al.*, | |
| *Defendants*. | |

## SUPPLEMENTAL SUBMISSION IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Page

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES .............................................................................. iv

INTRODUCTION ............................................................................................... 1

SUPPLEMENTAL INFORMATION ................................................................. 2

I.     Plaintiffs' members have standing to challenge the Research Termination Action and IES Staff Termination Action. ........................................................ 3

   A.   Plaintiffs' members' injuries are significantly broader than informational injuries.. 3

   B.   Plaintiffs have also suffered informational injuries, as they are education researchers with an explicit statutory entitlement to IES's data and research. ............................. 7

      1.   The statutes governing IES explicitly require the agency to disseminate data and research to researchers. ....................................................................... 7

      2.   Plaintiffs have standing to challenge the Termination Actions as a result of their informational injuries. .................................................................. 8

II.    NCES is statutorily required to collect, compile, and disseminate significant amounts of specific data and to do so in a "timely" and "relevant" manner. 10

   A.   NCES is required to collect, compile, and disseminate early childhood education data. 20 U.S.C. §§ 9543 (a)(1)(B), (L). .............................................................. 11

   B.   NCES is required to collect, compile, and disseminate data on "access to, and opportunity for, postsecondary education, including data on financial aid." 20 U.S.C. § 9543 (a)(1)(E); 20 U.S.C. § 1015a(k). ............................................................... 13

   C.   NCES is required to collect, compile, and disseminate data "on the condition and progress of education" at the "postsecondary" and "adult levels," including "secondary school completions, dropout, and adult literacy and reading skills." 20 U.S.C. § 9543(a)(1)(D). ...................................................................... 15

   D.   NCES is required to collect, compile, and disseminate data on "teaching" and "the conditions of the education workplace, and the supply of, and demand for, teachers." 20 U.S.C. §§ 9543 (a)(1)(F), (G). ........................................................ 17

   E.   NCES is required to collect, compile, and disseminate data on "the incidence, frequency, seriousness, and nature of violence affecting students, school personnel, and other individuals participating in school activities, as well as other indices of school safety." 20 U.S.C. § 9543(a)(1)(H). ............................................. 19

F.    NCES is required to collect, compile, and disseminate data, including "assisting public and private educational agencies, organizations, and institutions in improving and automating statistical and data collection activities" and "determining voluntary standards and guidelines to assist State educational agencies in developing statewide longitudinal data systems that link individual student data" consistent with other statutory requirements. 20 U.S.C. §§ 9543(a)(4), (5). ............................................... 21

G.    NCES is required to collect, compile, and disseminate data on "on educational activities and student achievement . . . in the United States compared with foreign nations." 20 U.S.C. § 9543 (a)(6). ........................................................................ 23

H.    NCES is required to collect, compile, and disseminate data, including "conducting longitudinal and special data collections necessary to report on the condition and progress of education." 20 U.S.C. § 9543 (a)(7). ..................................................... 27

I.    NCES data must "meet[] the highest methodological standards" and "report education information and statistics in a timely manner" in a way that is "relevant and useful" to "researchers." 20 U.S.C. § 9541. ...................................................... 30

III.    **NCEE is required to conduct evaluations and carry out critical dissemination functions. ........................................................................................................... 34**

A.    NCEE is required under ESRA to "conduct evaluations" of federal education programs. 20 U.S.C. §§ 9561; 9562(a)(2). ............................................................. 35

B.    NCEE is required to conduct evaluations by ESSA. 20 U.S.C. §§ 6645; 6491(j); 6633(c)(2). ...................................................................................................... 41

C.    NCEE is required to conduct evaluations of special education by the IDEA. 20 U.S.C. § 1464................................................................................................................ 43

D.    NCEE is required to conduct a career and technical education evaluation under the Perkins Act. 20 U.S.C. §§ 2324(a)(1); (d)(1)(A). ..................................................... 45

E.    NCEE adult education evaluation required by WIOA. 29 U.S.C. § 3332. .............. 47

F.    NCEE must "widely disseminate information on scientifically valid research, statistics, and evaluation" in an "accessible . . . user-friendly, timely and efficient manner" including through a "searchable online database" to "researchers." 20 U.S.C. §§ 9562(a)(2), (3). ...................................................................................... 48

G.    NCEE is required by ESSA to provide technical assistance to "rigorously evaluate" Education Innovation and Research projects. 20 U.S.C. § 7261. ............................ 52

H.    NCEE must operate Regional Education Laboratories. 20 U.S.C. § 9564(a). ........ 55

IV.    **Subject to privacy protections "data collected by the Institute . . . shall be made available to the public, including through use of the Internet," 20 U.S.C. §**

**9574, and the IES "Director shall ensure" the "[d]isseminating [of] information in a timely fashion . . . usable by researchers." 20 U.S.C. § 9575. ................................................................................................................ 58**

**V.       NCER must carry out a research plan for "scientifically valid research" that "meets the procedures for peer review." 20 U.S.C. § 9533(a).......................... 60**

**VI.      Numerous support contracts are necessary to ensure the require dissemination of "timely," "relevant" data and research to "researchers." .......................... 62**

**VII.     Additional Contracts ......................................................................... 64**

**CONCLUSION ................................................................................................ 66**

# TABLE OF AUTHORITIES

## CASES

*Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931 (D.C. Cir. 1986)......... 6

*Akins v. FEC*, 524 U.S. 11 (1998)................................................................ 9

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, No. 25-CV-03698, 2025 WL 1482511 (N.D. Cal. May 22, 2025)................................................................ 3, 6

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 25-1411, 2025 WL 1249608 (4th Cir. Apr. 30, 2025) ........................................... 3

*Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337 (4th Cir. 2017) ............................... 8

*Nat'l Treasury Emps. Union v. Vought*, No. 25-CV-0381, 2025 WL 942772 (D.D.C. Mar. 28, 2025) ................................................................ 3, 6

*New York v. McMahon*, No. 25-10601, 2025 WL 1463009 (D. Mass. May 22, 2025)............. 3, 6

## STATUTES

20 U.S.C. § 1015................................................................ 13, 14

20 U.S.C. § 1221................................................................ 24

20 U.S.C. § 1464................................................................ 43

20 U.S.C. § 2324................................................................ 45

20 U.S.C. § 3543................................................................ 63

20 U.S.C. § 6491................................................................ 42

20 U.S.C. § 6633................................................................ 41, 42

20 U.S.C. § 6645................................................................ 41, 42

20 U.S.C. § 7261................................................................ 52, 53

20 U.S.C. § 9501................................................................ *passim*

20 U.S.C. § 9511................................................................ *passim*

20 U.S.C. § 9533 ................................................................................. 8, 59, 60, 61

20 U.S.C. § 9534 ............................................................................................... 60

20 U.S.C. § 9541 ......................................................................................... *passim*

20 U.S.C. § 9544 ......................................................................................... 62, 63

20 U.S.C. § 9561 ......................................................................................... *passim*

20 U.S.C. § 9562 ......................................................................................... *passim*

20 U.S.C. § 9564 ................................................................................. 35, 55, 57

20 U.S.C. § 9573 ......................................................................................... 58, 59

20 U.S.C. § 9574 ......................................................................................... *passim*

20 U.S.C. § 9575 ......................................................................................... *passim*

20 U.S.C. § 9622 ................................................................................................. 2

20 U.S.C. 1221e-1 ............................................................................................. 24

20 U.S.C. 7801 ....................................................................................... 48, 49, 50

20 U.S.C. § 6491 ............................................................................................... 41

20 U.S.C. § 6633 ............................................................................................... 41

29 U.S.C. § 3332 ............................................................................................... 47

Pub. L. No. 107-279, 116 Stat. 1940 (2002) .............................................. *passim*

Pub. L. No. 108-446, 118 Stat. 2647 (2004) ........................................................ 44

Pub. L. No. 114-95, 129 Stat. 1802 (2015) ............................................ 36, 48, 49, 50

## OTHER AUTHORITIES

Education Demographic and Geographic Estimates (EDGE): About, NCES, https://perma.cc/97VG-SCT9 (last visited May 31, 2025) ...................................... 31

Education Innovation and Research Grant: Home, OESE, Dep't of Educ. (Apr. 22, 2025), https://perma.cc/9MVG-GJXZ ................................................................. 52

Evaluation of Grant Programs to Increase School-Based Mental Health Services, IES, https://perma.cc/7HCG-6UG4 (last visited June 2, 2025) ........................................................ 38

Evaluation of Teacher Residency Programs, IES, https://perma.cc/S587-YWEY (last visited May 31, 2025) ........................................................................................................................... 37

Evaluation of the Regional Educational Laboratories, IES, https://perma.cc/L6RB-X6NM (last visited June 2, 2025) ........................................................................................................... 56

Evaluation of Title I State Assessment Pilots That Provide Flexibility Under the Every Student Succeeds Act, IES, https://perma.cc/4X56-48U8 (last visited May 31, 2025) ........................ 42

Evaluation of Transition Supports for Youth with Disabilities, IES, https://perma.cc/HJ5A-2LRG (last visited May 31, 2025) ........................................................................................ 44

Evaluations of Federal Financial Aid Information and Delivery Strategies: An Experiment Requiring Additional Loan Counseling for Student Borrowers, IES, https://perma.cc/7HCG-6UG4 (last visited June 2, 2025) ............................................................................................. 38

High School & Beyond Longitudinal Studies, NCES, https://perma.cc/B4YX-BH8W (last visited June 2, 2025) ......................................................................................................................... 16

High School and Beyond Longitudinal Study of 2022, NCES, https://perma.cc/U8JL-CJXB (last visited May 31, 2025) .................................................................................................... 28

High School Longitudinal Study of 2009 (HSLS:09), NCES, https://perma.cc/5Y6G-6VJA (last visited June 2, 2025) ................................................................................................................ 16

Impact Evaluation of Training in Multi-Tiered Systems of Support for Reading in Early Elementary School, IES, https://perma.cc/PX9X-SM4D (last visited May 31, 2025) ............. 44

Implementation of Title I/II-A Program Initiatives, IES, https://perma.cc/ZW73-FFE6 (last visited May 31, 2025) ................................................................................................................ 38

Introduction to the Annual Reports and Information Staff, NCES, https://nces.ed.gov/training/datauser/AR_01.html (last visited May 31, 2025) [https://perma.cc/8EH7-Q28R]. ............................................................................. 32

National Evaluation of the Comprehensive Literacy State Development (CLSD) and Striving Readers Comprehensive Literacy (SRCL) Programs, IES, https://perma.cc/7SFS-TBAS (last visited May 31, 2025) ............................................................................. 42

National Household Education Surveys Program (NHES), NCES, https://perma.cc/K7BW-DDP2 (last visited May 31, 2025) ............................................................................. 12

National Implementation Study of Student Support and Academic Enrichment Grants (Title IV, Part A), IES, https://perma.cc/JX7Q-MKQZ (last visited May 31, 2025) .............................. 37

National Longitudinal Transition Study 2012 (NLTS 2012), IES, https://perma.cc/ZHN9-XRJU (last visited May 31, 2025) ............................................................................. 44

National Study of the Implementation of Adult Education Under the Workforce Innovation and Opportunity Act, IES, https://perma.cc/B7U7-4K7X (last visited May 31, 2025).................. 47

National Teacher and Principal Survey, NCES, https://perma.cc/FE2X-UULL (last visited May 31, 2025) ............................................................................. 18

NCES, Administrative Data Collections at NCES, https://perma.cc/NG99-BYD4 (last visited June 2, 2025) ............................................................................. 33

NCES, Program for the International Assessment of Adult Competencies (PIAAC), https://perma.cc/L4BW-F5DC (last visited June 2, 2025)....................................................... 16

Program for International Student Assessment (PISA), NCES, https://perma.cc/T2F2-YCF4 (last visited May 31, 2025) ............................................................................. 25

Progress in International Reading Literacy Study (PIRLS), NCES, https://perma.cc/SV5B-QJJD (last visited May 31, 2025) ........................................................................................................ 25

School Crime Supplement (SCS) to the National Crime Victimization Survey (NCVS), NCES, https://perma.cc/4VY7-QAKM (last visited May 31, 2025) .................................................... 20

School Survey on Crime and Safety (SSOCS), NCES, https://perma.cc/D7NE-3W4F (last visited May 31, 2025) ............................................................................................................................ 20

Study of the Impact of English Learner Classification and Reclassification Policies, IES, https://perma.cc/S645-M4NK (last visited May 31, 2025) ........................................................ 37

Teaching and Learning International Survey (TALIS), NCES, https://perma.cc/Q3KZ-U6HH (last visited May 31, 2025) ........................................................................................................ 25

The EDFacts Initiative, U.S. Dep't of Educ. (Oct. 31, 2024), https://perma.cc/QNZ6-SL8X ..... 31

Trends in International Mathematics and Science Study (TIMSS), NCES, https://perma.cc/X6Q6-K5NA (last visited May 31, 2025) ........................................................................................... 25

USASpending.Gov, Dep't of Educ. to ABT Global LLC (91990022A0016) [https://perma.cc/HF8B-CVTP] ................................................................................................ 39

USASpending.Gov, Dep't of Educ. to Mathematica, Inc. (91990024F0369) [https://perma.cc/PT5S-ME7D?type=image] ........................................................................... 38

USASpending.Gov, Dep't of Educ. to Mathematica, Inc. (EDIES17C0066) [https://perma.cc/8MUV-GUP5?type=image] (last visited May 31, 2025) ............................ 37

USASpending.Gov, IES to Am. Inst. for Rsch. in Behavioral Scis. (91990022F0350) [https://perma.cc/RSS9-HCF8?type=image] ............................................................................ 33

USASpending.Gov, IES to General Dynamics Information Technology, Inc. (91990022C0066) [https://perma.cc/ZH4Q-DBZ2?type=image] ........................................................................... 60

WWC Content Teams, IES, https://perma.cc/4ZRL-ZWAP (last visited May 31, 2025) 48, 50, 51

## INTRODUCTION

Plaintiffs file this memorandum and accompanying evidence following this Court's instruction that the parties confer and that Plaintiffs submit additional information regarding the research contracts cancelled by Defendants, how they fulfilled statutory requirements before being cancelled, and how the cancellations cause harms to Plaintiffs' members.

Plaintiffs maintain that the Research Termination Action and the IES Staff Termination Action—sweeping actions to stop the work of the Institute of Education Sciences ("IES")—can be considered as discrete unlawful acts that have deprived Plaintiffs' members of required functions—beyond information injuries alone—on which they have relied. However, understanding the Court's desire to understand the direct relationships between individual contracts and IES's statutory requirements and the harms suffered by Plaintiffs' members, Plaintiffs here submit additional information about the specific statutory provisions requiring functions that were being carried out by specific contracts, as well as the harms caused to Plaintiffs' members as a result of the cancellation of those contracts.

While Plaintiffs believe that the harm caused by these actions dismantling IES goes beyond informational injury—as they stand to destroy the entire field of education research and deprive Plaintiffs of access to services provided by IES—the information provided here shows that Plaintiffs have suffered informational injuries sufficient to confer standing. Defendants have ceased to carry out numerous statutorily required functions to collect data, conduct research, and disseminate that data and research to Plaintiffs' members. IES's governing statutes make clear that Plaintiffs are entitled to the benefit of this data, research, and dissemination. And Plaintiffs' members are suffering and will suffer concrete harms to their work and careers as a result of this deprivation.

## SUPPLEMENTAL INFORMATION

Numerous contracts cancelled by Defendants were fulfilling specific statutory functions, and Plaintiffs' members are both entitled to the data and research outputs of those functions and harmed by the cancellations. Below, Plaintiffs include the statutory requirements placed on Defendants; the cancelled contracts that were carrying out those statutory functions to collect data, conduct research, or disseminate data and research; and the harms caused to Plaintiffs' members by the cessation of those functions. Plaintiffs have organized this submission by statutory requirement, with information concerning the contracts that have cut off IES statutory functions and the harms experienced as a result by Plaintiffs' members. For the Court's reference, a chart summarizing this information is attached as an appendix directly to this submission.

As noted here, Defendants have provided no evidence that they are carrying out these statutory functions despite repeated opportunities to do so. *See* Prelim. Inj. Hr'g Tr. 30:6–9 (when the Court asked Defendants if any studies other than the National Assessment for Educational Progress ("NAEP") are on track to be completed, Defendants' counsel answered, "I don't have any -- I can't make any representations to those other studies at this time.") Defendants have pointed only to their intention to conduct NAEP in 2026 as evidence of their fulfillment of statutory obligations. Prelim. Inj. Hr'g Tr. 29:21–30:5 ("[W]e're not contesting any of the facts that plaintiffs have brought"); 36:3–12 (Defendants have "no specifics" to explain how the Department plans to meet its statutory requirements) (May 21, 2025). But conducting NAEP is just *one* of the required functions of IES contained within *one* section of its governing statutes. *Compare* 20 U.S.C. § 9622 (NAEP), *with* 20 U.S.C. §§ 9501–9584. Defendants have not shown how, following the cancellation of contracts, they are carrying out IES's other statutory requirements to conduct longitudinal studies, conduct data collections in specific areas, carry out required evaluations,

conduct required peer review of grant applications, provide access to existing data, operate required Regional Education Laboratories, provide technical assistance, or meet other required dissemination functions. The cessation of all these required functions is undisputed and has harmed Plaintiffs' members.

## I.    Plaintiffs' members have standing to challenge the Research Termination Action and IES Staff Termination Action.

### A.    Plaintiffs' members' injuries are significantly broader than informational injuries.

In this Court, to have standing, a party must satisfy "three well established elements: (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 25-1411, 2025 WL 1249608, at *27 (4th Cir. Apr. 30, 2025) (cleaned up) (collecting cases). Plaintiffs' members have alleged and submitted declarations showing actual harms that have and will continue to imminently occur as a result of the evisceration of IES caused by the Defendants' Research and Staff Termination Actions. *See generally* AERA-0053–142, AERA-0443–537. While some of these harms are informational, *see infra* I.B., many of them are not, and as in many similar cases, can be analyzed under the general standing test, *see Nat'l Treasury Emps. Union v. Vought*, No. 25-CV-0381, 2025 WL 942772, at *14–*18 (D.D.C. Mar. 28, 2025) (hereinafter "*CFPB*"); *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump,* No. 25-CV-03698, 2025 WL 1482511, at *8–*11 (N.D. Cal. May 22, 2025) (hereinafter "*AFGE v. Trump*"); *New York v. McMahon*, No. 25-10601, 2025 WL 1463009, at *17-19 (D. Mass. May 22, 2025).

For example, Plaintiffs have lost and will continue to lose access to technical assistance and support from IES. Ex. G to PI, Weiss Decl. ¶¶ 9, 10 (AERA-0056–57) (discussing lost technical assistance and training, including that "RELs are not providing technical assistance").

The agency, statutorily required to prioritize "customer service," for years has been responsive to Plaintiffs' members' questions and concerns; now, they are unable to obtain the necessary services they need from IES, and calls and emails to IES centers go unanswered. 20 U.S.C. § 9575; *see* Ex. L to PI, Garvey Decl. ¶¶12, 26 (AERA-0094, AERA-0096) ("NCES staff that work on HSLS09 have been fantastic and supportive of QTPiE and our Emerging Scholars Program.. . . [after the Termination Actions] the staff at NCES that I have worked with are gone. The people who could have possibly helped me are no longer there.").

As another example, Plaintiffs have also relied on and benefited from the evidentiary standards developed by the What Works Clearinghouse, which serve as a benchmark for much of Plaintiffs' members' own research. *See* Ex. CC, Shankar Giani Decl. ¶ 18 (AERA-0484) ("The What Works Clearinghouse provides a number of invaluable services to me and the field. . . . The WWC's Standards and Procedures Handbook is also one of the most important sources for standardizing educational research methods to ensure researchers are producing high-quality evidence."); Ex. Q to PI, Boulay Decl. ¶ 10 (AERA-0126) ("WWC provides me with research standards that are built by consensus and are constantly improved and updated. The evaluations I was supporting were all to be reviewed by the WWC to make sure that they produce credible findings, and without that review process, we won't have clear quality controls for the evaluations that I supported.") The WWC also serves as a clearinghouse for the entire field of education research and development—not just a publishing site for government-directed research—providing Plaintiffs' members with a platform to promote their work if it meets certain evidentiary standards. *See* Ex. J to PI, Tipton Decl. ¶ 24 (AERA-0083) ("The failure to support the continued availability and functionality of the WWC will frustrate the purpose of [my] research and prevent me from effectively improving the accuracy of the public, policymakers' and educators

interpretation of education research.")*; Ex. D to PI, Pollard Young Decl. ¶ 12 (AERA-0027–28) ("the cancellation of the WWC support contracts means that the Department cannot review new studies and publish reviews to its website."); Ex. CC, Shankar Giani Decl. ¶ 18 (AERA-0484). Plaintiffs' members have benefited from attending IES events and conferences. *See, e.g.*, Ex. G to PI, Weiss Decl. ¶ 10 (AERA-0057). And the agency has offered significant amounts of technical assistance in the past—technical assistance that IES is no longer able to provide. *See* Ex. A to PI, Whitehurst Decl. (AERA-0001–09); Ex. G to PI, Weiss Decl. ¶¶ 9–10 (AERA-0056–57); Ex. L to PI, Garvey Decl. ¶¶ 12, 26 (AERA-0094, AERA-0096). And further, the IES Staff Termination action did not only terminate staff exclusively dedicated to managing contracts. These employees contributed to the functioning of IES on which Plaintiffs' members relied. *See generally* Ex. A to PI, Whitehurst Decl. (AERA-0001–09); Ex. D to PI, Pollard Young Decl. ¶¶ 18–20 (AERA-0030–31). These cuts are so sweeping, they, taken together, destroy the apparatus and infrastructure of the agency that has served as the foundation and leader in educational research for more than two decades. These injuries go well beyond access to information. These injuries are clearly traceable to the agency's actions, and they would be redressed by setting these actions aside, or with respect to preliminary relief from this Court, a stay of both actions.

Several other courts have recently found that similarly situated third parties suffered injuries sufficient to confer standing where they have benefited from the work of an agency, and where the government has taken agency actions that would destroy an agency's ability to fulfill its statutory mandates. For example, the court in *CFPB* found that the NAACP had standing to challenge the CFPB's broad decimation because one of its members suffered an injury in fact as a result of the agency's halting of its work, because at least one representative member "planned to take advantage of and rely on CFPB's assistance, but defendants' stop work order and other actions

leave her and other NAACP members at risk of becoming victims of financial predators." *CFPB*, 2025 WL 942772, at *16. Similarly, the court in *American Federation of Government Employees v. Trump* considered a challenge to significant federal workforce cuts—none of which appeared as severe as the 90 percent cut to IES here. *See AFGE v. Trump*, 2025 WL 1482511, at *4–*5. There, the court found standing by looking to far-reaching harms non-profit and municipal plaintiffs would face as a result of the unlawful truncation of those agencies' abilities to carry out their functions, with a handful of illustrative examples cited even as the harms were sweeping. *Id.* at *8–*11. And indeed, many of the declarants for plaintiffs in that case complained of research and scientific agencies failing to collect data and carry out scientific responsibilities. *See, e.g.,* Pls.' Mem. ISO TRO at 18–20, 56–57, *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, No. 25-CV-03698 (N.D. Cal. May 1, 2025) (discussing numerous plaintiffs deprived of data and research functions by agency truncations). And further, where a government agency has afforded "interested individuals and organizations a generous flow of information," and then taken steps to "significantly restrict [the] flow" of that information, injury is established. *Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 937 (D.C. Cir. 1986).

Other courts have come to similar conclusions. In the case pertaining to the destruction of the entirety of the Department of Education, the court found that "Plaintiffs have provided an extensive record, particularly through supporting declarations from former Department employees, that their harms stem from the Department's inability to effectuate vital statutory functions specifically tasked to it." *New York v. McMahon*, 2025 WL 1463009, at *19. In this case, too, declarants pointed to harms including a loss of technical support and a lack of responsiveness from the Department. Reply ISO Pls.' Mot. for Prelim. Inj. at 2-3, *Somerville Public Schools v. Trump*, No. 1:25-cv-10677 (D. Mass. Apr. 18, 2025). Plaintiffs' varied injuries here stemming

from the Terminations Actions, which eviscerate IES's ability to carry out its statutory functions, confer standing to challenge those acts as courts have found for similarly situated parties with less support and harms that are less far-reaching than those Plaintiffs have presented here.

**B. Plaintiffs have also suffered informational injuries, as they are education researchers with an explicit statutory entitlement to IES's data and research.**

**1. The statutes governing IES explicitly require the agency to disseminate data and research to researchers.**

The statutory provisions that govern IES create a requirement that the agency disseminate *all* of its research and data to education researchers like Plaintiffs' members. In defining "dissemination" within the statute, Congress specifically dictated that IES communicate and transfer "the results of scientifically valid research, statistics, and evaluations, in forms that are understandable, easily accessible, and usable" to "researchers." 20 U.S.C. § 9501(10).[1] The Education Sciences Reform Act ("ESRA") creates a broad obligation that IES "shall … widely disseminate" its "findings and results," which by reference to the statute's definition section encompasses the obligation to disseminate that data and research to "researchers." 20 U.S.C. §§ 9512; 9501(10). The statute repeatedly reiterates this requirement to disseminate data and research, employing the term "dissemination" or a variant thereof nearly four dozen times, to emphasize that the requirements to conduct certain research and collect certain data also require that research and data be shared with researchers. *See* 20 U.S.C. §§ 9501–9584. In addition to specifically reiterating the requirement to disseminate data and research throughout, the statute also requires that "data collected by the Institute . . . shall be made available to the public, including through use of the Internet," 20 U.S.C. § 9574, and the IES "Director shall ensure" the "[d]isseminating [of]

---

[1] The statute also includes "practitioners" and "policymakers" as classes entitled to dissemination, and some of Plaintiffs' members also fall within these classes, particularly those members who are school district leaders or instructors. *See, e.g.*, Ex. G to PI, Weiss Decl. ¶ 9 (AERA-0056); Ex. R to PI, Watkins Decl. ¶ 3 (AERA-0131); Ex. Z, Velazquez-Bryant Decl. ¶ 7 (AERA-0467); Ex. K to PI, Talbott Decl. ¶¶ 8, 12 (AERA-0088–89).

information in a timely fashion and in formats that are easily accessible and usable by researchers." 20 U.S.C. § 9575.

ESRA also reiterates the obligation of IES centers to disseminate their findings to education researchers numerous times. The first section of the statute following its definitions provides that IES is established to provide "reliable information" about the condition of education, education practices, and program effectiveness to "researchers" and other classes. 20 U.S.C. § 9511(b). The National Center for Education Statistics ("NCES") is statutorily required to "collect, analyze, and report education information and statistics in a manner that . . . is relevant and useful to . . . researchers." 20 U.S.C. § 9541(3). The National Center for Education Evaluation and Regional Assistance ("NCEE"), is required to "make such information [regarding NCEE's evaluations] accessible in a user-friendly, timely, and efficient manner" to "researchers." 20 U.S.C. § 9562(a)(3). NCEE is also required "to respond…to inquiries" from "researchers." 20 U.S.C. § 9562(b)(4). The National Center on Education Research is required to "synthesize and disseminate, through the [NCEE], the findings and results of education research conducted or supported by the [NCER]." 20 U.S.C. § 9533(a)(7).

### 2. Plaintiffs have standing to challenge the Termination Actions as a result of their informational injuries.

Given these explicit and repeated statutory requirements to disseminate its data and research to researchers, Plaintiffs, as associations of education researchers, easily meet the test for informational standing to challenge the Termination Actions that ceased IES's data, research, and dissemination functions. To establish informational injury, Plaintiffs must now "lack access to information to which [they are] legally entitled," and that "the denial of that information creates a 'real' harm with an adverse effect." *Dreher v. Experian Info. Sols., Inc*., 856 F.3d 337, 345 (4th Cir. 2017). Plaintiffs' members are "legally entitled to" IES's data and research and now lack

8

access to that information, and they have provided extensive evidence to the "'real harm" and "adverse effect" they have suffered as a result. *Id*.

This certainly applies to the statutorily required data collection and research studies that IES is required to conduct by specific statutory provisions—as Plaintiffs have detailed extensively below to show the ways in which the specific contracts cancelled in the Research Termination Action ceased specific statutorily required functions to collect data, conduct research, and disseminate data and research to researchers in the quality, timely manner required by Congress. These harms flow not just from the failures to meet statutory requirements to disseminate existing research and data, but also from the failure to create and collect required timely research and data. *See Akins v. FEC*, 524 U.S. 11 (1998) (informational standing can stem from the failure to take required actions to collect information, as well as from failure to carry out required dissemination functions).

Defendants essentially concede that where there is a specific statutory requirement that they conduct research and disseminate it to Plaintiffs, that Plaintiffs have standing. *See* Prelim. Inj. Hr'g Tr. 30:13–30:15. But Plaintiffs' members do not *only* have a legal entitlement to the IES data and research that is explicitly statutorily required by a particular statutory provision. That is a misreading of the standard for informational injury and IES statutory provisions. Because ESRA states that any data and research produced by IES must be disseminated to researchers, Plaintiffs' members' entitlement is to *all* of the agency's data and research, not just that data and research which is statutorily required by specific provisions. 20 U.S.C. §§ 9512; 9511(b); 9501(10); 9574; 9575; 9541(3); § 9562(a)(3); 9533(a)(7). At the moments prior to the Mass Termination Actions, Plaintiffs were legally entitled to *all* of the data and research that was being collected and conducted by IES. The unlawful actions taken by IES denied Plaintiffs that information, which

they have shown created "'real harm' with an adverse effect." *Id.* If Plaintiffs had claimed only that these acts violated the APA because they were not in accordance with law, Defendants' position that Plaintiffs are only entitled to relief with respect to contracts fulfilling statutory requirements might hold more water. *See* Prelim. Inj. Hr'g Tr. 40:5–40:8. But Plaintiffs also claim that Defendants actions are arbitrary and capricious and the process by which the terminations occurred was unlawful. *See* Plaintiffs' Mem. in Supp. Of Prelim. Inj. ("Pls.' Br."), ECF No. 12, at 19–32. So even for those contracts that were not carrying out specifically statutorily required research before their cancellation, and for staff that were necessary to manage contracts or programs that generated and disseminated data and research that was not explicitly statutorily required, Plaintiffs have standing to challenge the Termination Actions as an unlawful termination of IES research that necessarily deprived Plaintiffs' members of information to which they were legally entitled.

## II.    NCES is statutorily required to collect, compile, and disseminate significant amounts of specific data and to do so in a "timely" and "relevant" manner.

Congress has directed NCES to "collect, report, analyze, and disseminate statistical data related to education" in numerous specific categories discussed below. 20 U.S.C. § 9543(a). This statutory requirement to collect, analyze, and disseminate data is ongoing and bounded by Congress's direction that it be reported "in a timely manner" and be "relevant and useful to … researchers." 20 U.S.C. § 9541(b). NCES cannot abandon whole categories of data collection and analysis that Congress has specifically required it to undertake for an extended period of time and meet its requirement to collect and disseminate that data to researchers in a "timely manner." *Id*. § 9541(b)(2). As discussed below, Plaintiffs' members as education researchers have relied on NCES carrying out its statutory obligation to disseminate this timely data to them, and their work

10

is harmed by the Research Termination Action which cut off NCES's required functions in numerous areas.

### A. NCES is required to collect, compile, and disseminate early childhood education data. 20 U.S.C. §§ 9543 (a)(1)(B), (L).

Under ESRA, Congress has directed NCES to "collect, report, analyze, and disseminate statistical data" on "early childhood school readiness activities," and "access to, and opportunity for, early childhood education." 20 U.S.C. §§ 9543(a)(1)(B), (L). NCES is required to disseminate this information to "researchers" in a format that is "relevant and useful" to them and in "a timely manner." 20 U.S.C. §§ 9501(10); 9511; 9541(b)(2), (3); 9543(a). As described below, before the Research Termination Action in February 2025, this statutory requirement was met through two studies, operated under the following contracts:

- 91990019C0002[2]
- ED-IES-12-D-0002/91990021F0343[3]
- ED-ESE-15-A-0015/91990020F0309[4]

NCES was carrying out these statutory requirements to collect timely and relevant data concerning early childhood education through two studies, which relied on three contracts. First, through a contract NCES was conducting the Early Childhood Longitudinal Study; Kindergarten ("ECLS-K"), which provides "important information on children's early learning and development, preschool/early care and education experiences, transition into kindergarten, and

---

[2] The contract itself indicates it was fulfilling a statutory function pursuant to "Title 20, USC, Section 9543a, 2006," which provides that the "Statistics Center shall collect, report, analyze, and disseminate statistical data related to education in the United States and in other nations, including [. . . .]conducting longitudinal and special data collections necessary to report on the condition and progress of education." EDAERA_07_00042 (quoting 20 U.S.C. § 9543(a)(7)). Note: Plaintiffs attempted to use public information or Defendants non-confidential descriptions where possible in light of the protective order, however, where it was necessary to cite to the contract itself, Plaintiffs have indicated that by citing Defendants bates numbers in the format "EDAERA_XX_XXXX."
[3] The contract itself indicates it was fulfilling a statutory function pursuant to "The Education Science Reform Act of 2002 (ESRA – 20 U.S.Code § 9543), and the yearly appropriations Congress makes supporting ESRA provides funding to National Center of Education Statistics within the Institute for Education Science (IES)." EDAERA_23_00011.
[4] Ex. NN, Defs.' Descriptions of Cancelled Contracts (hereinafter "Defs.' Descriptions") (AERA-0543).

progress through the elementary grades, building upon knowledge acquired from the previous Early Childhood Longitudinal Studies."[5] *See* Contract No. 91990019C0002; Compl. ¶¶ 63(c), 97–98, 152(b); Pls. Br., ECF No. 12, at 7, 14; Ex. I to PI, Reardon Decl. ¶ 18 (AERA-0075). Second, NCES was carrying out this requirement by conducting the National Household Education Surveys ("NHES"), which collected data on "early childhood care and education" as well as homeschooling. The NHES was being carried out through one significant contract, ED-IES-12-D-0002/91990021F0343,[6] and supported by a second contract supporting operations for survey collections, ED-ESE-15-A-0015/91990020F0309.[7]

Defendants cancelled the contracts necessary to conduct these studies and fulfill the statutory requirements to collect and disseminate data on early childhood education. Defendants have provided no evidence showing how they are meeting, or will meet, these statutory requirements. *See* Contract Nos. 91990019C0002, ED-IES-12-D-0002/91990021F0343, ED-ESE-15-A-0015/91990020F0309; Prelim. Inj. Hr'g Tr. 29:21–22, 30:6–9, 36:3–12 (May 21, 2025).

Plaintiffs' members are harmed by the cancellation of these contracts because they rely on NCES carrying out its required data collection and dissemination functions concerning early childhood education. Ex. I to PI, Reardon Decl. ¶ 18 (AERA-0075); Ex. V, Suppl. Levine Decl. ¶ 4 (AERA-0445); Ex. W, Suppl. Weiss Decl. ¶ 4 (AERA-0450a–0451). As Plaintiffs have

---

[5] *See* Ex. NN, Defs.' Descriptions (AERA-0552). Defendants provided Plaintiffs' counsel with a spreadsheet listing each contract number, vendor, contract description, and contract status. Much, but not all, of these descriptions and statuses align with the later-produced contracts. Thus, Plaintiffs cite to this spreadsheet and public information wherever possible, as it was received before the protective order in this matter was put in place and Defendants have not asserted that it is confidential. In instances where the contract description does not appear entirely accurate or is insufficiently detailed, Plaintiffs cite directly to individual contracts. Due to the preliminary and expedited nature of this briefing, Plaintiffs have taken the approach described but do not waive any potential arguments or disputes regarding the accuracy of the information Defendants have produced.

[6] *National Household Education Surveys Program (NHES)*, NCES, https://perma.cc/K7BW-DDP2 (last visited May 31, 2025).

[7] *See* Ex. NN, Defs.' Descriptions (AERA-0543) ("[T]his requirement necessitates the services of a contractor to support mailout operations for … the National Household Education Survey").

12

explained previously, Plaintiffs' members have specifically planned to rely on the landmark, longitudinal study of the ECLS-K, and have relied on earlier versions of that study in their research and work. More than 100 of Plaintiffs' members reported that they planned to use NHES data in their work prior to the study's termination. Ex. V, Suppl. Levine Decl. ¶ 4 (AERA-0445); Ex. W, Suppl. Weiss Decl. ¶ 4 (AERA-0450a–0451). For example, one member of SREE reported:

> I was using and planned to continue to use ECLS-K:2011 for my dissertation research which examines how families from different backgrounds engage in education in different ways and how family engagement affects students' attendance. I also planned to use NHES as a supplementary dataset to unpack family engagement patterns by diverse families. To the best of my knowledge, there is no other student-level longitudinal dataset with as rich information on family engagement as ECLS-K. Not having access to the data greatly affects my work.

Ex. W, Suppl. Weiss Decl. ¶ 4 (AERA-0450a–451); *see also* Ex. BB, Logan Doe Decl. ¶ 6 (AERA-0475).

## B. NCES is required to collect, compile, and disseminate data on "access to, and opportunity for, postsecondary education, including data on financial aid." 20 U.S.C. § 9543 (a)(1)(E); 20 U.S.C. § 1015a(k).

Under ESRA, Congress has directed NCES to "collect, report, analyze, and disseminate statistical data" on "access to, and opportunity for, postsecondary education, including data on financial aid to postsecondary students." 20 U.S.C. § 9543(a)(1)(E). NCES is required to disseminate this information to "researchers" in a format that is "relevant and useful" to them and in "a timely manner." 20 U.S.C. §§ 9501(10); 9511; 9541(b)(2), (3); 9543(a). As described below, before the Research Termination Action in February 2025, this statutory requirement was met through two studies, operated under the following contracts:

- 91990018C0039[8]
- 91990022C0017[9]
- 91990023D0005/91990024F0330[10]

NCES was meeting this statutory requirement through the National Postsecondary Student Aid Study ("NPSAS"), a study "designed to describe (1) how students and their families finance postsecondary education and (2) students' persistence, attainment, and workforce outcomes."[11] Not only is this study the way in which NCES was meeting its statutory obligation under 20 U.S.C. § 9543(a)(1)(E), Defendants' own description of the study also acknowledges this it was designed to "fulfill a requirement to conduct a series of studies . . .to comply with the Higher Education Opportunity Act of 2008," which requires NCES to collect and analyze data about higher education spending and costs, as well as financial aid and student debt not less than every four years, with the last NPSAS study being conducted in 2020.[12] 20 U.S.C. § 1015a(k); Compl. ¶ 53. NPSAS was being carried out through Contracts No. 91990018C0039 and 91990022C0017, and also being supported by a second contract, 91990023D0005/91990024F0330.[13]

---

[8] The contract itself indicates it was fulfilling a statutory function "in compliance with the mandate stated in the Education Sciences Reform Act of 2002, (Public Law [P.L.] 107-279, Title I, Part C), which requires NCES to 'collect, report, analyze, and disseminate statistical data related to education in the United States and in other nations.'" EDAERA_02_00044 (quoting 20 U.S.C. § 9543(a)). The contract also cites Higher Education Act of 1965, as amended in the Higher Education Opportunity Act of 2008, 20 U.S.C. § 1015a, which "requires NCES to conduct a student aid recipient survey at least once every four years." *Id.*

[9] The contract itself indicates it was fulfilling a statutory function as "The National Center for Education Statistics (NCES) of the Institute of Education Sciences (IES), within the Department, conducts this study in compliance with the mandate stated in the Education Sciences Reform Act of 2002, Public Law [P.L.] 107-27, Title I, Part C), which requires NCES to "collect, report, analyze, and disseminate statistical data related to education in the United States and other nations." The Higher Education Act of 1965, as amended in the Higher Education Opportunity Act of 2008, 20 U.S.C. § 1015a, also requires NCES to conduct a student aid recipient survey at least once every 4 years." EDAERA_37_00034.

[10] The contract itself indicates it was fulfilling a statutory function pursuant to the Education Sciences Reform Act of 2002 (Pub. L. No. 107-279, Part C, § 153, 116 Stat. 1940 (2002)), which provides that "The Statistics Center shall collect, report, analyze, and disseminate statistical data related to education in the United States and in other nations, including ... (1) collecting, acquiring, compiling (where appropriate, on a State-by-State basis), and disseminating full and complete statistics (disaggregated by the population characteristics described in paragraph (3)) on the condition and progress of education, at the preschool, elementary, secondary, postsecondary, and adult levels in the United States." EDAERA_77_00021 (quoting 20 U.S.C. § 9543(a)(1)).

[11] *See* Ex. NN, Defs.' Descriptions (AERA-0542).

[12] *See* Ex. NN, Defs.' Descriptions (AERA-0542).

[13] *See* Ex. NN, Defs.' Descriptions (AERA-0547).

Defendants cancelled the contracts necessary to conduct this study and fulfill these statutory requirements. Defendants have provided no evidence showing how they are meeting or will meet this obligation. *See* Prelim. Inj. Hr'g Tr. 29:21–22, 30:6–9, 36:3–9 (May 21, 2025).

Plaintiffs' members are harmed by the cancellation of these contracts because they rely on NCES carrying out its required data collection and dissemination functions concerning access to and financing of postsecondary education. *See* Ex. T to PI, Radwin Decl. ¶ 11 (AERA-0141); Pls. Br., ECF No. 12, at 7, 28. A member has also reported the particular relevance of the ongoing NPSAS as they "planned to use new NPSAS 24 data to better understand how students use student financial aid to navigate affording college post-onset of the COVID-19." Ex. V, Suppl. Levine Decl. ¶ 5 (AERA-0445); *see also* Ex. X, Baker Decl. ¶¶ 6–7 (AERA-0456–57) ("I had plans to explore students' . . . experiences relating to the COVID-19 pandemic using data that will now no longer be produced" from the NPSAS and its component study of "Beginning Postsecondary Students (BPS)."); Ex. O to PI, Wong Decl. ¶¶ 6–9 (AERA-0111) (describing NPSAS as "the most detailed data available on undergraduate and graduate student aid," without which Wong's research would not be possible).

### C. NCES is required to collect, compile, and disseminate data "on the condition and progress of education" at the "postsecondary" and "adult levels," including "secondary school completions, dropout, and adult literacy and reading skills." 20 U.S.C. § 9543(a)(1)(D).

Under ESRA, Congress has directed NCES to collect, compile, and disseminate data "on the condition and progress of education" at the "postsecondary" and "adult levels," including "secondary school completions, dropout, and adult literacy and reading skills." 20 U.S.C. § 9543(a)(1)(D). NCES is required to disseminate this information to "researchers" in a format that is "relevant and useful" to them and in "a timely manner." 20 U.S.C. §§ 9501 (10); 9511;

15

9541(b)(2), (3). As described below, before the Research Termination Action in February 2025, this statutory requirement was met through functions operated under the following contracts:

- 91990023D0042/91990024F0321[14]
- GS00Q140ADU217/91990018F0018[15]
- GS00Q14OADU223/91990019F0025[16]

Defendants cancelled the contracts conducting the High School Longitudinal Study of 2009 ("HSLS"), the High School and Beyond Longitudinal Study ("HS&B"), and the Program for International Assessment of Adult Competencies ("PIAAC"). The HSLS is a "[n]ationally representative, longitudinal study" of a cohort of more than 23,000 individuals who entered high school in 2009 across 944 U.S. schools. *See* 91990023D0042/91990024F0321.[17] The HS&B is a nationally representative study of high school cohorts with data collected "throughout their postsecondary years" and including surveys of "students, teachers, and parents," with the cancelled study collecting data from a cohort of 9th graders from the Fall of 2022. *See* GS00Q140ADU217/91990018F0018.[18] The PIAAC is a "large-scale international study of key cognitive and workplace skills of adults" that collects data from adults in the U.S. and other countries. *See* GS00Q14OADU223/91990019F0025.[19]

Defendants cancelled the contracts necessary to conduct these studies and thus meet these statutory requirements, and have provided no other information or evidence regarding other means through which they are meeting these statutory requirements.

---

[14] Ex. NN, Defs.' Descriptions (AERA-0547).
[15] Ex. NN, Defs.' Descriptions (AERA-0543).
[16] Ex. NN, Defs.' Descriptions (AERA-0550).
[17] Ex. NN, Defs.' Descriptions (AERA-0547); *High School Longitudinal Study of 2009 (HSLS:09),* NCES, https://perma.cc/5Y6G-6VJA (last visited June 2, 2025).
[18] Ex. NN, Defs.' Descriptions (AERA-0543); *High School & Beyond Longitudinal Studies*, NCES, https://perma.cc/B4YX-BH8W (last visited June 2, 2025).
[19] Ex. NN, Defs.' Descriptions (AERA-0550: NCES, *Program for the International Assessment of Adult Competencies (PIAAC)*, https://perma.cc/L4BW-F5DC (last visited June 2, 2025).

Plaintiffs' members rely on these significant studies tracking secondary students as they transition to postsecondary education and adulthood and of adult education. As one AERA member here explains, the data PIAAC "collected on adult participation in learning and the workforce" was "critical" and this "nationally representative data exist nowhere else." Ex. GG, Becker Patterson Decl. ¶ 5 (AERA-0502). And "[w]ithout access to USA-specific PIAAC variables, I cannot conduct the cycle 2 research I planned . . . and the questions that the [adult education] field has on the needs of and programming for adult learners since the pandemic remain unanswered." *Id.* ¶ 6 (AERA-0503). And many of Plaintiffs' members have reported they planned to use HSLS data, with many, as previously discussed, reporting having also planned to use HS&B data. *See* Ex. L to PI, Garvey Decl. ¶ 9 (AERA-0093); Ex. N to PI, Alex Doe ¶ 8 (AERA-0106).

### D. NCES is required to collect, compile, and disseminate data on "teaching" and "the conditions of the education workplace, and the supply of, and demand for, teachers." 20 U.S.C. §§ 9543 (a)(1)(F), (G).

Under ESRA, Congress has directed NCES to "collect, report, analyze, and disseminate statistical data" on "teaching" and "instruction, the conditions of the education workplace, and the supply of, and demand for, teachers." 20 U.S.C. §§ 9543(a)(1)(F), (G). NCES is required to disseminate this information to "researchers" in a format that is "relevant and useful" to them and in "a timely manner." 20 U.S.C. §§ 9501 (10); 9511, 9541(b)(2), (3); 9543(a). As described below, before the Research Termination Action in February 2025, this statutory requirement was met through studies operated under the following contracts:

- 91990020A0014/91990022F0328[20]

---

[20] The contract itself indicates it was fulfilling a statutory function pursuant to the "Education Sciences Reform Act of 2002 (ESRA – 20 U.S. Code § 9543), and the yearly appropriations Congress makes supporting ESRA [which] provides funding to NCES within the Institute for Education Sciences (IES) to collect, report, analyze, and disseminate statistical data related to education in the United States, including data on the condition and progress of education, at the preschool, elementary, secondary, postsecondary, and adult levels throughout the country." EDAERA_47_00011.

- ED-ESE-15-A-0015/91990020F0309[21]

NCES was carrying out these statutory requirements regarding data on teaching and instruction through the National Teacher and Principal Survey ("NTPS") and its follow-up surveys. The NTPS "collects data on core topics including teacher and principal preparation, classes taught, school characteristics, and demographics of the teacher and principal labor force," as well as "professional development, working conditions, and evaluation."[22]

Defendants cancelled the contract carrying out NTPS, *see* Contract No. 91990020A0014/91990022F0328[23], to perform these required statutory functions, *see* 20 U.S.C. §§ 9543(a)(1)(F), (G). Defendants also cancelled a contract supporting the operations necessary for the NTPS and other surveys. *See* Contract No. ED-ESE-15-A-0015/91990020F0309.[24] Defendants have provided no other information regarding other means through which they are meeting these statutory requirements.

Plaintiffs' members, many of whom study the education profession and recruitment and retention of staff within the education system, use the data from the NTPS and planned to continue using that data in their research and teaching going forward. As one AERA member explained:

> My work relates specifically to the recruitment and retention of teachers. Without some of the information from the National Teacher and Principal Survey and some of the NCES longitudinal studies related to demographic trends, this data becomes extremely difficult to analyze at a national level, exacerbating potential teacher crises.

---

[21] This contract indicated that it responded to an "immediate concern of NCES:" "mailout operations for Census-administered survey collections under the Sample Survey Division, including the National Training, Education, and Workforce Survey (NTEWS), National Household Education Survey (NHES), National Teacher and Principal Survey (NTPS), School Survey on Crime and Safety (SSOCS), and the Private School Survey (PSS)." EDAERA_16_00005. "NCES requires the assistance of an external expert to consult on mailout operations." *Id.*

[22] *National Teacher and Principal Survey*, NCES, https://perma.cc/FE2X-UULL (last visited May 31, 2025).

[23] Ex. NN, Defs.' Descriptions (AERA-0545).

[24] *See* Ex. NN, Defs.' Descriptions (AERA-0543)("This requirement necessitates the services of a contractor to support mailout operations for a number of survey collections under the Sample Survey Division, including. . . National Teacher and Principal Survey... The National Center for Education Statistics requires the assistance of an external expert to consult on mailout operations for these survey collections.")

Ex. V, Suppl. Levine Decl. ¶ 6 (AERA-0445–46).

Many of Plaintiffs' members have reported that they planned to use the data from the NTPS in their work going forward, including for other very specific purposes such as analyzing the "working conditions of music and arts educators." *Id.* As one AERA member explained, NTPS "data are vital to understanding the nation's ongoing issues with teacher recruitment and retention, and our teacher shortage, which started prior to the pandemic and continues today." *Id.*

### E. NCES is required to collect, compile, and disseminate data on "the incidence, frequency, seriousness, and nature of violence affecting students, school personnel, and other individuals participating in school activities, as well as other indices of school safety." 20 U.S.C. § 9543(a)(1)(H).

Under ESRA, Congress has directed NCES to "collect, report, analyze, and disseminate statistical data" on "violence affecting students [and] school personnel," and "other indices of school safety." 20 U.S.C. § 9543(a)(1)(H). NCES is required to disseminate this information to "researchers" in a format that is "relevant and useful" to them and in "a timely manner." 20 U.S.C. §§ 9501(10); 9511, 9541(b)(2), (3). As described below, before the Research Termination Action in February 2025, this statutory requirement was met through operation of two contracts:

- 91990020A0017/91990023F0316[25]
- 91990022C0048[26]

NCES was carrying out these statutory requirements to collect timely and relevant data concerning school safety and violence affecting students and school personnel through these two

---

[25] The contract itself indicates it was fulfilling a statutory function pursuant to the "Education Sciences Reform Act of 2002 (ESRA – 20 U.S. Code § 9543), and the yearly appropriations Congress makes supporting ESRA [which] provides funding to NCES within the Institute for Education Sciences (IES) to collect, report, analyze, and disseminate statistical data related to education in the United States, including data on the condition and progress of education, at the preschool, elementary, secondary, postsecondary, and adult levels throughout the country." EDAERA_60_00011.

[26] The contract itself indicates it was fulfilling a statutory function pursuant to the "Education Sciences Reform Act of 2002 (ESRA – 20 U.S. Code § 9543), and the yearly appropriations Congress makes supporting ESRA [which] provides funding to NCES within the Institute for Education Sciences (IES) to collect, report, analyze, and disseminate statistical data related to education in the United States, including data on the condition and progress of education, at the preschool, elementary, secondary, postsecondary, and adult levels throughout the country." EDAERA_38_00027.

contracts, the first of which supports "the publication and dissemination of data products, documentation materials, and reports using data from the SCS [School Crime Supplement to the National Crime Victimization Survey] 2022," and other responsibilities "necessary for collecting and releasing data for the SCS 2025 and future iterations of the survey." *See* Contract No. 91990020A0017/91990023F0316.[27] The second contract is to "support the collection of descriptive data on the context of elementary and secondary education in the United States via nationally representative survey of schools, teachers and principals through the School Survey on Crime and Safety (SSOCS)." Contract No. 91990022C0048.[28] The contract requires the contractor to "review specifications, plans and documentation… necessary for collecting and releasing data from the SSOCS 2022 collection." *Id.*[29] The SSOCS is the "the primary source of school-level data on crime and safety" for NCES.[30]

Defendants cancelled the contracts necessary to support these surveys and the dissemination that follows and fulfill these statutory requirements. Defendants have provided no evidence showing how they are meeting, or will meet, these statutory requirements. *See* Contract Nos. 91990020A0017/91990023F0316[31], 91990022C0048[32]; Prelim. Inj. Hr'g Tr. 29:21–22, 30:6–9, 36:3–9 (May 21, 2025).

Plaintiffs' members are harmed by the cancellation of these contracts because they rely on NCES carrying out its required data collection and dissemination functions concerning school

---

[27] EDAERA_60_00011–12; *see also School Crime Supplement (SCS) to the National Crime Victimization Survey (NCVS)*, NCES, https://perma.cc/4VY7-QAKM (last visited May 31, 2025) ("The SCS was first conducted in 1989, followed by administrations in 1995 and 1999, and was conducted every other year thereafter, from 2001 to 2019. Data collection was postponed during the COVID-19 pandemic and resumed in 2022. The next collection of SCS is scheduled for 2025.").
[28] Ex. NN, Defs.' Descriptions (AERA-0550).
[29] EDAERA_38_00027.
[30] *School Survey on Crime and Safety (SSOCS)*, NCES, https://perma.cc/D7NE-3W4F (last visited May 31, 2025); *see* Contract No. 91990022C0048 (Ex. NN, Defs.' Descriptions (AERA-0550)).
[31] Ex. NN, Defs.' Descriptions (AERA-0548).
[32] Ex. NN, Defs.' Descriptions (AERA-0550).

safety and violence against students and school personnel. Many of Plaintiffs' members indicated

that they were planning to use the School Crime Supplement to the National Crime Victimization

Survey, and many members rely on all data collected and disseminated in connection with this

statutory provision. For example, one AERA member stated that "[t]hese surveys guide and inform

our research on school safety and the prevention of school violence." Ex. V, Suppl. Levine Decl.

¶ 7 (AERA-0446). Another stated that he planned to use the SCS data "to understand the

prevalence of bullying victimization among music and theater students as well as student athletes."

*Id.* And yet another member put it:

> I use the School Crime and Safety dataset to predict risk factors for those involved
> in the bullying dynamic. I also use it to inform and predict other risk factors for
> students who may be potentially involved in crisis or safety risks at school. This
> informs how I support teachers in intervening and giving students mental health or
> social and communication skill help before they become involved in safety concerns.

*Id.*

**F. NCES is required to collect, compile, and disseminate data, including "assisting public and private educational agencies, organizations, and institutions in improving and automating statistical and data collection activities" and "determining voluntary standards and guidelines to assist State educational agencies in developing statewide longitudinal data systems that link individual student data" consistent with other statutory requirements. 20 U.S.C. §§ 9543(a)(4), (5).**

Under ESRA, Congress has directed NCES to "collect, report, analyze, and disseminate

statistical data" including:

> assisting public and private educational agencies, organizations, and institutions in
> improving and automating statistical and data collection activities, which may
> include assisting State educational agencies and local educational agencies with the
> disaggregation of data and with the development of longitudinal student data
> systems; [and]

> determining voluntary standards and guidelines to assist State educational agencies
> in developing statewide longitudinal data systems that link individual student data
> consistent with the requirements of the Elementary and Secondary Education Act
> of 1965 (20 U.S.C. 6301 et seq.), promote linkages across States, and protect

student privacy consistent with section 9573 of this title, to improve student academic achievement and close achievement gaps.

20 U.S.C. §§ 9543 (a)(4), (5).

As described below, before the Research Termination Action in February 2025, this statutory requirement was met through two projects, operated under the following contracts:

- 91990023 D0008/91990024F0367[33]
- GS10F035AA/91990021F0031[34]

The first contract focused on "promot[ing] the continued and coordinated growth of education data systems across the country through the increased voluntary adoption of data standards and the improved use of products which facilitate data collection and use that have been developed" by NCES.[35] This work directly supported states' data modernization and longitudinal data system standardization efforts, to enable states to share data between them. *See* Contract No. 91990023 D0008/91990024F0367. The second contract is to "improve the quality, comparability, and accessibility of elementary/secondary education data. This work will support joint efforts by the Department, state, local education agencies, and national associations with an interest in education data to develop, disseminate, and adopt data standards, and best practices for data collection and reporting." *See* Contract No. GS10F035AA/91990021F0031.[36]

Defendants cancelled these contracts and thus terminated the ability to meet these statutory requirements. Defendants have provided no evidence showing how they are meeting, or will meet,

---

[33] The contract itself indicates it was fulfilling a statutory function pursuant to the Education Science Reform Act of 2002 (Pub. L. No. 107-279) which "gives NCES the responsibility to establish voluntary standards and guidelines to: assist State education agencies in developing statewide longitudinal data systems, promote data linkages across States, protect student privacy, and improve student academic achievement and close achievement gaps." EDAERA_85_00031 (citing Section 153 (a)(5)).
[34] Ex. NN, Defs.' Descriptions (AERA-0543).
[35] *See* Ex. NN, Defs.' Descriptions (AERA-0539).
[36] *See* Ex. NN, Defs.' Descriptions (AERA-0543).

these statutory requirements. *See* Contract Nos. 91990023  D0008/91990024F0367[37], GS10F035AA/91990021F0031[38]; Prelim. Inj. Hr'g Tr. 29:21–22, 30:6–9, 36:3–12 (May 21, 2025).

Plaintiffs' members are harmed by the cancellation of these contracts because many themselves engage in data collection activities, and many of them rely on state data as well. *See* Ex. W, Suppl. Weiss Decl. ¶ 8 (AERA-0451a); Ex. V, Suppl. Levine Decl. ¶ 8 (AERA-0446). They rely on NCES's efforts to improve data collection activities generally, and to improve state longitudinal systems. For example, one SREE member explained that "[e]ven the most robust state P-20 data systems can't follow their student outside the state." Ex. W, Suppl. Weiss Decl. ¶ 5 (AERA-0451). Another explained that "[o]ne of the great services NCES provides is working to ensure that data is comparable across states and districts." *Id.*

### G. NCES is required to collect, compile, and disseminate data on "on educational activities and student achievement . . . in the United States compared with foreign nations." 20 U.S.C. § 9543 (a)(6).

Under ESRA, Congress has directed NCES to collect, compile, and disseminate data "on educational activities and student achievement (such as the Third International Math and Science Study [TIMSS]) in the United States compared with foreign nations." 20 U.S.C. § 9543(a)(6). NCES is required to disseminate this information to "researchers" in a format that is "relevant and useful" to them and in "a timely manner." 20 U.S.C. §§ 9501 (10); 9511; 9541(b)(2), (3); 9543(a). As described below, before the Research Termination Action in February 2025, this statutory requirement to compare U.S. student achievement with foreign nations was met through two large projects, operated under the following contracts:

---

[37] *See* Ex. NN, Defs.' Descriptions (AERA-0539).
[38] *See* Ex. NN, Defs.' Descriptions (AERA-0543).

- GS00Q14OADU223/91990019F0025[39]
- GS00Q14OADU217/91990021F0001[40]
- 91990021C0052[41]
- 91990023D0005/91990024F0348[42]
- 91990023C0002[43]

First, Defendants cancelled the contract that was being used to operate the Program for International Student Assessment ("PISA"), the Progress in International Reading Literacy Study ("PIRLS"), and Program for the International Assessment of Adult Competencies ("PIAAC"). *See* Contract No. GS00Q14OADU223/91990019F0025. With $25 million yet unobligated in the contract's total potential performance, Defendants partially reinstated this contract on March 6,

---

[39] The contract itself indicates it was fulfilling a statutory function pursuant to "NCES' longstanding mission to 'collect, and analyze and disseminate statistics and other information related to education in the United States and in other nations,'" EDAERA_13_00040 (citing § 406 of the General Education Provisions Act, as amended (20 U.S.C. §1221e-1)), and the Education Sciences Reform Act of 2002 (Pub. L. No. 107-279, Part C, § 153), which provides that "Statistics Center shall collect, report, analyze, and disseminate statistical data related to education in the United States and in other nations, including...(6) acquiring and disseminating data on educational activities and student achievement (such as the Third International Math Study) in the United States compared with foreign nations," EDAERA_13_00040 (quoting 20 U.S.C. § 9543(a)(6)).

[40] The contract itself indicates it was fulfilling a statutory function pursuant to "NCES' longstanding mission to 'collect, and analyze and disseminate statistics and other information related to education in the United States and in other nations,'" EDAERA_20_00015 (citing § 406 of the General Education Provisions Act, as amended (20 U.S.C. 1221e-1)), and the Education Sciences Reform Act of 2002 (Pub. L. No. 107-279, Part C, § 153), which provides that "Statistics Center shall collect, report, analyze, and disseminate statistical data related to education in the United States and in other nations, including...(6) acquiring and disseminating data on educational activities and student achievement (such as the Third International Math Study) in the United States compared with foreign nations," EDAERA_20_00015 (quoting 20 U.S.C. § 9543(a)(6)).

[41] The contract itself indicates it was fulfilling a statutory function pursuant to "NCES' longstanding mission to 'collect, and analyze and disseminate statistics and other information related to education in the United States and in other nations,'" EDAERA_19_00036 (citing § 406 of the General Education Provisions Act, as amended (20 U.S.C. 1221e-1)), and the Education Sciences Reform Act of 2002 (Pub. L. No. 107-279, Part C, § 153), which provides that "Statistics Center shall collect, report, analyze, and disseminate statistical data related to education in the United States and in other nations, including...(6) acquiring and disseminating data on educational activities and student achievement (such as the Third International Math Study) in the United States compared with foreign nations," EDAERA_19_00036 (quoting 20 U.S.C. § 9543(a)(6)).

[42] The contract itself indicates it was fulfilling a statutory function pursuant to "NCES' longstanding mission to 'collect, and analyze and disseminate statistics and other information related to education in the United States and in other nations,'" EDAERA_83_00015 (citing § 406 of the General Education Provisions Act, as amended (20 U.S.C. 1221e-1)), and the Education Sciences Reform Act of 2002 (Pub. L. No. 107-279, Part C, §153), which provides that "Statistics Center shall collect, report, analyze, and disseminate statistical data related to education in the United States and in other nations, including...(6) acquiring and disseminating data on educational activities and student achievement (such as the Third International Math Study) in the United States compared with foreign nations," EDAERA_83_00015 (quoting 20 U.S.C. § 9543(a)(6)).

[43] The contract itself indicates it was fulfilling a statutory function "in compliance with the mandate stated in Section 406 of the General Education Provisions Act, as amended (20 U.S.C. § 1221e-1) and in the Education Sciences Reform Act of 2002 (Pub. L. No. 107-279, Part C, § 153)." EDAERA_52_00035.

2025, with a task order of just $420,000 labeled "DESCOPE,"[44] and shortly thereafter IES staff were designated for termination *en masse*. This contract operated PISA, which "is an international assessment that measures 15-year-old students' reading, mathematics, and science literacy."[45] The contract also operated the PIRLS which "is an international assessment and research project designed to measure reading achievement at the fourth-grade level, as well as school and teacher practices related to instruction."[46] Second, Defendants were fulfilling the requirement to compare U.S. student achievement with students in foreign nations through what Defendants' own description acknowledges was a "legislative requirement" to carry out the Trends in International Mathematics and Science Study ("TIMSS").[47] *See* Contract No. GS00Q14OADU217/91990021F0001. The TIMSS "provides reliable and timely trend data on the mathematics and science achievement of U.S. students compared to that of students in other countries" collecting such data every 4 years for the last 30 years.[48] Third, Defendants were fulling this requirement through the Teaching and Learning International Survey ("TALIS") study, the "only comparative international education study that collects data on nationally representative samples of teachers."[49] The study "provides key information on teachers and principals and how they and their working and learning environments compare internationally."[50] *See* Contract No.

---

[44] USASpending.Gov, Dep't of Educ. to WeStat, Inc. (91990019F0025) [https://perma.cc/WB8T-LMN3?type=image] (last visited May 31, 2025).

[45] *Program for International Student Assessment (PISA)*, NCES, https://perma.cc/T2F2-YCF4 (last visited May 31, 2025).

[46] *Progress in International Reading Literacy Study (PIRLS)*, NCES, https://perma.cc/SV5B-QJJD (last visited May 31, 2025).

[47] *See* Ex. NN, Defs.' Descriptions (AERA-0547) ("This requirement is for The National Center for Education Statistics' legislative requirement to participate in and gather data from international assessment like Trends in International Mathematics and Science Study. The Trends in International Mathematics and Science Study is an international assessment that focuses on the mathematics and science knowledge and skills of fourth and eighth graders.")

[48] *Trends in International Mathematics and Science Study (TIMSS)*, NCES, https://perma.cc/X6Q6-K5NA (last visited May 31, 2025).

[49] *Teaching and Learning International Survey (TALIS)*, NCES, https://perma.cc/Q3KZ-U6HH (last visited May 31, 2025).

[50] *Id.*

91990021C0052. The fourth contract provided necessary supports for these studies, which Defendants describe as performing activities that will allow NCES to "provide accurate and timely policy relevant data for comparisons of the U.S. education system with those of other countries." *See* Contract No. 91990023D0005/91990024F0348.[51] This contract also involves "technical review of datasets for high quality prior to release."[52] The fifth contract also provides necessary support for these studies. It "develops instruments for the national data collection and creates[s] the survey assessment items and questions for the development and implementation of the next iterations of several international education studies," including TIMSS and PIRLS. Contract No. 91990023C0002.[53] Such work is required to ensure continued compliance with these statutory requirements.

Plaintiffs' members rely on NCES carrying out its international comparison functions and had plans to use the products of these cancelled studies. Numerous members of Plaintiffs have communicated that they planned to rely on the data generated by these data collections regarding comparisons of U.S. and foreign student achievement. For example, one SREE member explained about TIMSS, PISA, PIRLS, as well as NAEP:

> These data sources were essential for conducting original research on education policy in both domestic and international contexts. We planned to use them to generate new analysis, build evidence-based arguments, and benchmark our findings. Without access, we lose the ability to produce informed inferences or contribute meaningfully to policy discussions.

Ex. W, Suppl. Weiss Decl. ¶ 7 (AERA-0451a).

And an AERA member reported that "I planned to use TIMSS and PISA to teach my method courses for preservice math teachers and as well as my international research baseline

---

[51] Ex. NN, Defs.' Descriptions (AERA-0548).
[52] Ex. NN, Defs.' Descriptions (AERA-0548).
[53] Ex. NN, Defs.' Descriptions (AERA-0542).

data." Ex. V, Suppl. Levine Decl. ¶ 9 (AERA-0446–47); *see also* Ex. AA, Dierking Decl. ¶ 5 (AERA-0472) ("I use the Trends in International Mathematics and Science Study (TIMSS) cross-sectional dataset and findings. . . . Canceling this important research and other work of IES . . . will limit or entirely shut off my access . . . to critical datasets and evaluation-research findings. This will severely diminish the quality of my work."). AERA members also use data from TALIS and PIAAC. *See* Ex. V, Suppl. Levine Decl. ¶ 9 (AERA-0446 –47) (TALIS); Ex. GG, Becker Patterson Decl. ¶¶ 5–6 (AERA-502–03) (PIAAC).

### H. NCES is required to collect, compile, and disseminate data, including "conducting longitudinal and special data collections necessary to report on the condition and progress of education." 20 U.S.C. § 9543 (a)(7).

Under ESRA, Congress has directed NCES to "collect, report, analyze, and disseminate statistical data" including "conducting longitudinal and special data collections necessary to report on the condition and progress of education." 20 U.S.C. § 9543(a)(7). NCES is required to disseminate this information to "researchers" in a format that is "relevant and useful" to them and in "a timely manner." 20 U.S.C. §§ 9501 (10); 9511, 9541(b)(2, 3); 9543(a). As described below, before the Research Termination Action in February 2025, this statutory requirement was met through functions being carried out under the following contracts:

- GS00Q140ADU217/91990018F0018[54]
- 91990023D0042/91990024F0321[55]
- 91990023D0005/91990024F0330[56]

---

[54] The contract itself acknowledges that it is carrying out a statutory function as it notes the NCES's charge to "conduct[]longitudinal and special data collections necessary to report on the condition and progress of education," EDAERA_06_00035 (quoting 20 U.S.C. § 9543(a)(7)), and that it functions "in compliance with the mandate stated in Title 20, USC, Section 9543a, 2006," *id.* (citing §§ 9543(a)(1)(C), (D), (J), (N)).

[55] The contract itself indicates it was fulfilling a statutory function pursuant to 20 U.S.C. § 9543(a)(7), which provides for "conducting longitudinal and special data collections necessary to report on the condition and progress of Education." EDAERA_75_00027 (quoting § 9543(a)(7)).

[56] The contract itself indicates it was fulfilling a statutory function pursuant to the Education Sciences Reform Act of 2002 (Pub. L. No. 107-279, Part C, §153), which directs that the Statistics Center will engage in "collecting, acquiring, compiling (where appropriate, on a State-by-State basis), and disseminating full and complete statistics (disaggregated

27

- 91990023D0006/91990023F0034[57]

NCES was carrying out these statutory requirements to collect timely and relevant data by conducting longitudinal data collections through three significant projects, which relied on at least four contracts. First, NCES was conducting the High School and Beyond Longitudinal Studies ("HS&B"), a "national study of 9th and 12th graders as they progress through high school and beyond."[58] *See* Contract No. GS00Q140ADU217/91990018F0018. NCES was also conducting a follow-up study for the High School Longitudinal Study of 2009 ("HSLS"), a "large, complex study collects data to track the critical transitions experienced by young adults, as they progress through high school to postsecondary education and into the world of work."[59] *See* Contract No. 91990023D0042/91990024F0321; Pls. Br., ECF No. 12, at 33; Ex. L to PI, Garvey Decl. ¶ 9 (AERA-0093); Ex. N to PI, Alex Doe ¶ 8 (AERA-0106). NCES also met this statutory requirement by conducting the ECLS-K as described in *supra* Sec. II.A. *See* Contract No. 91990019C0002; Compl. ¶¶ 63(c), 97–98, 152(b); Pls. Br., ECF No. 12, at 7, 14; Ex. I to PI, Reardon Decl. ¶ 18 (AERA-0075). These longitudinal studies were supported by two additional contracts, one supporting publications of key outcomes of longitudinal studies and one supporting longitudinal study design and reporting activities. *See* Contract Nos. 91990023D0005/91990024F0330, 91990023D0006/ 91990023F0034.[60]

---

by the population characteristics described in paragraph (3)) on the condition and progress of education, at the preschool, elementary, secondary, postsecondary, and adult levels in the United States." EDAERA_77 _00021 (quoting 20 U.S.C. § 9543(a)(1)).

[57] Ex. NN, Defs.' Descriptions (AERA-0545).

[58] *High School and Beyond Longitudinal Study of 2022*, NCES, https://perma.cc/U8JL-CJXB (last visited May 31, 2025).

[59] *See* Ex. NN, Defs.' Descriptions (AERA-0547).

[60] *See* Ex. NN, Defs.' Descriptions (AERA-0545) ("The task will support across the full range of design and reporting activities associated with major data collection projects and statistical studies. The task will support work conducted over the lifecycle of the Branch's studies, including: study development and clearance activities; questionnaire testing; field test and national data collection activities; review of data files and data documentation; report review and development; and outreach, user support, and training activities.")

Defendants cancelled the contracts necessary to conduct these studies and fulfill the statutory requirement to carry out timely longitudinal studies and have provided no evidence showing how they are meeting, or will meet, these statutory requirements. *See* Contract Nos. GS00Q140ADU217/91990018F0018[61], 91990023D0005/91990024F0330[62], 91990023D0042/91990024F0321[63], 91990023D0006/91990023F0034[64]; Prelim. Inj. Hr'g Tr. 29:21–22, 30:6–9, 36:3–12 (May 21, 2025).

Plaintiffs' members are harmed by the cancellation of these contracts because they rely on NCES carrying out longitudinal studies necessary to report on the condition and progress of education. Plaintiffs have previously stated how the high school longitudinal studies are critical to their work. Ex. L to PI, Garvey Decl. ¶ 9 (AERA-0093); Ex. M to PI, Brady Doe Decl. ¶¶ 8–9 (AERA-100). In addition, many of Plaintiffs' members have reported that they specifically planned to rely on the High School and Beyond Longitudinal Study. For example, one member of SREE reported that "the HS&B survey is integral to my work looking at the transition of youth between secondary education and postsecondary education and the workforce." The national scope of that study provides "larger context" and the ability to do comparisons within regions, which is "not possible when working with only one states' data." Ex. W, Suppl. Weiss Decl. ¶ 6 (AERA-0451). Another SREE member stated that "breaks" in high school longitudinal data studies will disrupt "long term analysis and make us unable to understand how high school graduation rates and college attainment rates are changing over time, and how this varies at the state and districts level. State level data is not a substitute for the NCES data." *Id.*; *see also* Ex. CC, Shankar Giani Decl. ¶ 15 (AERA-0483); Ex. II, Viano Decl. ¶ 6 (AERA-0513–14).

---

[61] *See* Ex. NN, Defs.' Descriptions (AERA-0543).
[62] *See* Ex. NN, Defs.' Descriptions (AERA-0546).
[63] *See* Ex. NN, Defs.' Descriptions (AERA-0547).
[64] *See* Ex. NN, Defs.' Descriptions (AERA-0545).

As Plaintiffs have explained previously, Plaintiffs' members have specifically planned to rely on the landmark, longitudinal study of the ECLS-K, and have relied on earlier versions of that study in their research and work. *See* PI. Ex. I, Reardon Decl. ¶ 16–19 (AERA-0075–76); Ex. V, Suppl. Levine Decl. ¶ 4 (AERA-0445); Ex. W, Suppl. Weiss Decl. ¶ 4 (AERA-0450a–51).

## I. NCES data must "meet[] the highest methodological standards" and "report education information and statistics in a timely manner" in a way that is "relevant and useful" to "researchers." 20 U.S.C. § 9541.

NCES is the nation's federal statistical agency responsible for collecting, analyzing, and reporting data on the condition of U.S. education. Six additional contracts are critical to NCES fulfilling its statutory and requirement to disseminate high quality, timely data to Plaintiffs' members:

- 91990020A0014/91990022F0350[65]
- 91990023D0029/91990024F0345[66]
- 91990023D0046/91990024F0327[67]
- 91990023D0008/91990024F0331[68]
- 91990023D0039/91990024F0344[69]
- 91990020A0032/91990022F0337[70]

The Education Demographic and Geographic Estimates (EDGE) IT program is critical to NCES functioning. EDGE

---

[65] Ex. NN, Defs.' Descriptions (AERA-0551).

[66] The contract itself indicates it was fulfilling a statutory function pursuant to the "Education Sciences Reform Act of 2002 (ESRA – 20 U.S. Code § 9543), and the yearly appropriations Congress makes supporting ESRA [which] provides funding to NCES within the Institute for Education Sciences (IES) to collect, report, analyze, and disseminate statistical data related to education in the United States, including data on the condition and progress of education, at the preschool, elementary, secondary, postsecondary, and adult levels throughout the country." EDAERA_81_00008.

[67] *See* Ex. NN, Defs.' Descriptions (AERA-0552) (Defendants' document indicates this contract has now been "approved for reinstatement" but is not reinstated. Defendants also provide no information about the extent to which it will be reinstated.).

[68] The contract itself indicates it was fulfilling a statutory function pursuant to three legislative authorities: "ESRA is the legislative authority for collecting the non-fiscal Common Core of Data surveys"; "Every Student Succeeds Act (ESSA) is the legislative authority for data collections from ESSA formula grantees"; "Individuals with Disabilities Education Act (IDEA) is the legislative authority for data collections from IDEA formula grantees." EDAERA_78_00031.

[69] Ex. NN, Defs.' Descriptions (AERA-0539).

[70] Ex. NN, Defs.' Descriptions (AERA-0545).

uses data from the U.S. Census Bureau's American Community Survey to create custom indicators of social, economic, and housing conditions for school-age children and their parents. EDGE also uses spatial data collected by NCES and the Census Bureau to create geographic locale classifications, school geocodes, school district boundaries, and other types of data to support spatial analysis. As the primary collector and distributor of geospatial data within the U.S. Department of Education, the EDGE program also provides geospatial data required for policymaking and statutory purposes and works to ensure the Department's compliance with the Geospatial Data Act of 2018.[71]

NCES has operated the EDGE program through a contract. The EDGE contract is "designed to support all aspects of the program mission and all stages of product cycles."[72] *See* Contract No. 91990023D0046/91990024F0327. Another critical component of NCES is EDFacts, the Department's "initiative to collect, analyze, and promote the use of high-quality, pre-kindergarten through grade 12 data."[73] EdFacts is also the "centralized data collection system for [NCES] survey data, as well as [select] grant administration data."[74] EdFacts is also operated by contract. Pursuant to the contract, "there are three statutes that provide NCES with the burden justification and statutory authority to collect data using the EDFacts IT system," and "ESRA is the legislative authority for collecting the non-fiscal Common Core of Data surveys. Those surveys make up approximately 10% of the content in the EDFacts system. Every Student Succeeds Act (ESSA) is the legislative authority for data collections from ESSA formula grantees. OESE data is approximately 50% of the content in the EDFacts system. The Individuals with Disabilities Education Act (IDEA) is the legislative authority for data collections from IDEA formula grantees. OSEP data is approximately 40% of the content in the EDF acts systems."[75] *See* Contract No.

---

[71] *Education Demographic and Geographic Estimates (EDGE): About*, NCES, https://perma.cc/97VG-SCT9 (last visited May 31, 2025).
[72] *See* Ex. NN, Defs.' Descriptions (AERA-0552).
[73] *The EDFacts Initiative*, U.S. Dep't of Educ. (Oct. 31, 2024), https://perma.cc/QNZ6-SL8X.
[74] *See* Ex. NN, Defs.' Descriptions (AERA-0552).
[75] EDAERA_78_00031.

91990023D0008/91990024F0331. As Plaintiffs previously acknowledged this contract was reinstated just before the IES Staff Termination Action, but the scope of reinstatement is unclear and IES now lacks the staff to properly oversee its execution. Pls. Br., ECF No. 12, at 8 n.16. Further, as Defendants have only offered NAEP as the means by which they are meeting all of IES's statutory obligation, it is worth noting that this contract and the Common Core of Data are critical to carrying out NAEP in the quality manner required by statute. *See* Compl. ¶ 87.

Another three contracts provide critical support to the Annual Reports and Information Staff (ARIS). ARIS "produces several reports each year that draw from over 25 surveys by NCES and other government agencies," including "The Condition of Education," the "Digest of Education Statistics," some of the most widely used NCES publications.[76] One contract supports ARIS "in a technical advisory capacity," one other provides support "for the production and dissemination of reports and web products" for the ARIS staff, and one is a support contract for annual report data tools, providing technological support to produce "reliable statistical reports" and "other web-based statistical products.[77] *See* Contracts No. 91990023D0039/91990024F0344, 91990023D0042/91990024F0347, 91990020A0032/91990022F0337. Two additional contracts operate to fulfill NCES's statutory requirements regarding dissemination and data quality. One contract provides support to ensure NCES "data quality, improve statistical methodology, and increase production efficiency of data files and reports."[78] *See* Contract No. 91990020A0014/91990022F0350.[79] Another contract provides support "for outreach and

---

[76] *Introduction to the Annual Reports and Information Staff*, at 3, NCES, https://nces.ed.gov/training/datauser/AR_01.html (last visited May 31, 2025) [https://perma.cc/8EH7-Q28R].
[77] *See* Ex. NN, Defs.' Descriptions (AERA-0545).
[78] *See* Ex. NN, Defs.' Descriptions (AERA-0551).
[79] Defendants indicate this contract has been "reinstated," but the scope of the reinstatement is unclear as USASpending indicates only a supplemental agreement for $412,000 when nearly $2 million in potential additional funds were designated for this contract's performance. USASpending.Gov, *IES to Am. Inst. for Rsch. in Behavioral Scis.* (91990022F0350) [https://perma.cc/RSS9-HCF8?type=image]; NCES, *Administrative Data Collections at NCES*, https://perma.cc/NG99-BYD4 (last visited June 2, 2025).

dissemination" of NCES's "different types of reports and data products on all data collections and surveys covered by the [NCES] statistics line."[80] *See* Contract No. 91990023D0029/91990024F0345.

All of these contracts operate or support critical NCES activities, and Plaintiffs' members are and will continue to be harmed by the termination of these contracts carry out NCES's mission and statutory requirements. For example, the termination of the contract supporting EdFacts will drastically impact the work of Plaintiffs' members. *See, e.g.*, Ex. I to PI, Reardon Decl. ¶ 11(AERA-0074) ("These data are the only source for comprehensive data on academic performance patterns in each public school in the U.S."). And will destroy the Common Core of Data, which serves as the base of data used for NAEP, Compl. ¶ 87, and on which Plaintiffs' members rely, *see, e.g.,* Ex. J to PI, Tipton Decl. ¶ 14 (AERA-0081); Ex. K to PI, Talbott Decl. ¶ 8 (AERA-0088); Ex. P to PI, Hedges Decl. ¶ 8 (AERA-0118); Ex. FF, Krowka Decl. ¶¶ 9–11, 13 (AERA-0498–99). A member of SREE also indicated that "[i]n the absence of EdFacts data, we must rely on publicly reported state data," which is often "not reported in sufficient detail in many states. Resulting data is less comprehensive." Ex. W, Suppl. Weiss Decl. ¶ 8 (AERA-0451a). Another member explained that he has "regularly used" the "Digest of Education Statistics," and another noted that they use the Digest of Education Statistics and Condition of Education "to inform and educate governing board members across the U.S. who request national data analyses for comparative purposes." Ex. V, Suppl. Levine Decl. ¶ 11 (AERA-0447). Numerous members of Plaintiffs will be harmed if NCES fails to adhere to its statutory requirements to "meet[] the highest methodological standards" and "report education information and statistics in a timely manner" in a way that is "timely" and "relevant and useful" to "researchers," to which these four

---

[80] *See* Ex. NN, Defs.' Descriptions (AERA-0552).

contracts are central. 20 U.S.C. § 9541; *see, e.g.*, Ex. J to PI, Tipton Decl. ¶ 15 (AERA-0081) ("Without these and other sources of data, the Generalizer tool will quickly become out-of-date and unreliable."); Ex. I to PI, Reardon Decl. ¶ 16 (AERA-0075) (noting how the decimation of IES will "prevent [him] from using up-to-date, high-quality data in my research").

## III.    NCEE is required to conduct evaluations and carry out critical dissemination functions.

NCEE is required by Congress to conduct education evaluations and to disseminate data, research, and evaluation information through specified means, including through a "timely" online database and through the Regional Education Laboratories. These dissemination requirements on NCEE include the requirement to "transfer the results of . . . evaluations" to "researchers." 20 U.S.C. § 9501(10).

NCEE is required to "conduct evaluations" of education programs and is specifically required to "conduct evaluations of Federal education programs administered by the Secretary [of Education] … to determine the impact of such programs (especially on student academic achievement in the core academic areas of reading, mathematics, and science)." 20 U.S.C. §§ 9561(a)(2); 9562 (a)(1). NCEE is further required to conduct specific evaluations under the Every Student Succeeds Act, the Individual with Disabilities Education Act, the Perkins Act, and the Workforce Innovation and Opportunity Act.

NCEE is further charged with "widely disseminat[ing] information on scientifically valid research, statistics, and evaluation" in an "accessible . . . user-friendly, timely and efficient manner" including through a "searchable online database" to "researchers." 20 U.S.C. §§ 9562(a)(2), (3). And NCEE is also required to operate 10 Regional Education Laboratories, to both conduct research and evaluations and to "disseminat[e] scientifically valid research, information, reports and publications" to improve educational outcomes. 20 U.S.C. §§ 9564 (a), (f).

Plaintiffs' researcher members are entitled by statute to receive the results of NCEE's evaluations and to receive other research, data, and information through NCEE's specifically required dissemination functions. Plaintiffs' members had planned to use numerous ongoing evaluation studies that Defendants had been carrying out to meet their statutory obligations, and Plaintiffs relied on Defendants' operation, to conform with specific statutory requirements, of the What Works Clearinghouse and Regional Education Laboratories to disseminate scientifically valid research and data.

### A. NCEE is required under ESRA to "conduct evaluations" of federal education programs. 20 U.S.C. §§ 9561; 9562(a)(2).

ESRA requires NCEE to "conduct evaluations," and specifically to "conduct evaluations of Federal education programs administered by the Secretary [of Education] … to determine the impact of such programs (especially on student academic achievement in the core academic areas of reading, mathematics, and science)." 20 U.S.C. §§ 9561(a)(2); 9562 (a)(1). And NCEE is required to "widely disseminate information on scientifically valid research, statistics, and evaluations" including these evaluation studies to "researchers." 20 U.S.C. §§ 9562(a)(2), (3); 9501(10). Before the Research Termination Action, NCEE was carrying out these statutory requirements to evaluate federal education programs through the following contracts:

- 91990021D0004/91990022F0057 (English Learner Classification Study)[81]
- ED-IES-17-C0066 (Impact Study of Magnet Schools)[82]
- 91990019C0066 (Evaluation of Teacher Residency Programs)[83]

---

[81] Ex. NN, Defs.' Descriptions (AERA-0544).

[82] The contract itself indicates it was fulfilling a statutory function pursuant to the ESSA "which allows the Department to pool resources across ESEA programs in order to fund rigorous evaluations of individual Federal education programs that currently lack sufficient evaluation dollars or to evaluate the impact of various strategies that cut across a wide range of ESEA programs." EDAERA_98_00032.

[83] The contract itself indicates it was fulfilling a statutory function pursuant to Title II, Part A of the Elementary and Secondary Education Act (ESEA), section 2121-2123 as amended by the Every Student Succeeds Act (ESSA, Pub. L. No. 114-95). EDAERA_10_00010.

- ED-PEP-16-A-0003/91990019F0334 (Study of implementation of Student Support and Academic Enrichment ("SSAE") grants)[84]
- 91990021D0001/91990024F0362 (Impact Study of Strategies to Accelerate Math Learning: Phase III Activities)[85]
- 91990021D0001/91990025F0023 (Impact Study of Strategies to Accelerate Math Learning: Phase IV Activities) [86]
- 91990019C0056 (An Impact Evaluation to Inform the 21st Century Community Learning Centers ("CCLC") Program)[87]
- ED-IES-11-C-0063/91990022F0051(Implementation of Title I/II-A Program Initiatives)[88]
- 91990024D0007/91990024F0006 (Evaluation of Grant Programs to Increase School-Based Mental Health Services)[89]
- 91990024D0007/91990025F0012(Evaluation of Grant Programs to Increase School-Based Mental Health Services)[90]
- 91990019D0003/91990020F0369 (Evaluations of Federal Financial Aid Information and Delivery Strategies)[91]
- 91990022A0017/91990024F0369 (Evaluation to understand the implementation and impacts of satisfactory academic progress (SAP) policy for students to maintain eligibility for federal financial aid)[92]
- 91990022A0016/91990022F0377 (Evaluating Programs and Strategies to Improve Postsecondary Access: Study of Strategies to Promote Access to Dual Enrollment)[93]

Defendants cancelled the contracts carrying out the statutory requirement to evaluate "programs administered by the Secretary," 20 U.S.C. §§ 9561(a)(2); 9562(a)(1), by evaluating numerous federal programs under the Every Student Succeeds Act ("ESSA"), which is the most

---

[84] Ex. NN, Defs.' Descriptions (AERA-0550).
[85] The contract itself indicates it was fulfilling a statutory function pursuant to Section 8601 of the Elementary and Secondary Education Act (ESEA), as amended by the Every Student Succeeds Act (ESSA). EDAERA_84_00009.
[86] The contract itself indicates it was fulfilling a statutory function pursuant to Section 8601 of the Elementary and Secondary Education Act (ESEA), as amended by the Every Student Succeeds Act (ESSA). EDAERA_06_00007.
[87] Ex. NN, Defs.' Descriptions (AERA-0547).
[88] The contract itself indicates it was fulfilling a statutory function pursuant to Section 8601 of the Elementary and Secondary Education Act (ESEA), as amended by the Every Student Succeeds Act (ESSA). EDAERA_43_00009.
[89] Ex. NN, Defs.' Descriptions (AERA-0539).
[90] The contract itself indicates it was fulfilling a statutory function pursuant to the ESSA, which "provides funding for IES to conduct impact evaluations that build ED's evidence base in education, implementation evaluations that describe how ED's programs function, and other types of analysis that will help ED and recipients of ESEA funding to improve their programs and practices." EDAERA_93_00009–10 (citing Pub. L. No. 114-95, 129 Stat. 1802, available at https://perma.cc/9R94-ZSQJ).
[91] Ex. NN, Defs.' Descriptions (AERA-0543).
[92] Ex. NN, Defs.' Descriptions (AERA-0548).
[93] Ex. NN, Defs.' Descriptions (AERA-0545).

recent reauthorization of the Elementary and Secondary Education Act ("ESEA"). In cancelling the English Learner Classification Study, Defendants cancelled a study considering the entry and exit policies for English learning programs across 30 states following ESSA's requirement for state standardization of those policies. *See* 91990021D0004/91990022F0057.[94] In cancelling the Impact Study of Magnet Schools, Defendants halted a study evaluating magnet schools that had received federal grants through the Magnet School Assistance Program. *See* EDIES17C0066.[95] In cancelling the Evaluation of Teacher Residency Programs study, Defendants halted "the first large-scale in-depth" look at teacher residency programs which was initiated more than 5 years ago following "the federal Every Student Succeeds Act (ESSA) which now allows states and districts to use Title II funds to support teacher residencies."[96] *See* 91990019C0066. In the study of implementation of Student Support and Academic Enrichment ("SSAE") grants, Defendants were evaluating grants under ESSA that sought to provide a well-rounded education, positive school environment, and improved learning through technology. *See* ED-PEP-16-A-0003/91990019F0334.[97] Defendants also cancelled contracts carrying out impact studies of strategies to improve math learning, with a focus on "supplemental instruction in math in low-performing schools."[98] Contract No. 91990021D0001/91990024F0362; *see also* Contract No. 91990021D0001/91990025F0023.[99] Defendants also cancelled a contract carrying out a study of the 21st Century Community Learning Centers ("CCLC") Program under ESSA. *See*

---

[94] *Study of the Impact of English Learner Classification and Reclassification Policies*, IES, https://perma.cc/S645-M4NK (last visited May 31, 2025).
[95] USASpending.Gov, *Dep't of Educ. to Mathematica, Inc.* (EDIES17C0066), https://perma.cc/8MUV-GUP5?type=image (last visited May 31, 2025).
[96] *Evaluation of Teacher Residency Programs*, IES, https://perma.cc/S587-YWEY (last visited May 31, 2025).
[97] *National Implementation Study of Student Support and Academic Enrichment Grants (Title IV, Part A)*, IES, https://perma.cc/JX7Q-MKQZ (last visited May 31, 2025).
[98] EDAERA_84_00009.
[99] The contract itself notes that it is carrying out a statutory function of "Section 8601 of the Elementary and Secondary Education Act (ESEA), as amended by the Every Student Succeeds Act (ESSA)." EDAERA_84_00009.

91990019C0056.[100] Defendants were also conducting a study of ESSA "Title I and Title II-A implementation at three key points (2013-14, 2017-18, and 2021-22)" and would have provided a final key point if not for the cancellation. *See* 91990021D0002/91990022F0051.[101] Defendants also cancelled an evaluation of Department grant programs expanded by the Bipartisan Safer Communities Act of 2022 to improve mental health services for students. *See* 91990024D0007/91990024F0006[102]; 91990024D0007/91990024F0012.[103]

Defendants also cancelled contracts carrying out studies of federal policies on postsecondary students' federal financial aid and other postsecondary support programs. Defendants cancelled a contract carrying out "Evaluations of Federal Financial Aid Information and Delivery Strategies: An Experiment Requiring Additional Loan Counseling for Student Borrowers," which "was to have assessed" loan counseling effectiveness for student borrowers. *See* 91990019D0003/91990020F0369.[104] Defendants also cancelled an evaluation of the Department's Satisfactory Academic Progress ("SAP") policy, Defendants halted research on the effectiveness and impact of a Department policy and criteria requiring students to maintain academic progress to continue to receive federal financial aid. *See* 91990022A0017/91990024F0369.[105] Defendants also cancelled a study evaluating programs and

---

[100] The contract states "The 21st CCLC program was reauthorized in ESSA and was funded at $1.2 billion in 2018." EDAERA_08_00028.
[101] *Implementation of Title I/II-A Program Initiatives*, IES, https://perma.cc/ZW73-FFE6 (last visited May 31, 2025).
[102] Ex. NN, Defs.' Descriptions (AERA-0546).
[103] *Evaluation of Grant Programs to Increase School-Based Mental Health Services*, IES, https://perma.cc/7HCG-6UG4 (last visited June 2, 2025).Defendants' chart shows two contracts, both 91990024D0007/91990024F0006 and 91990024D0007/91990024F0012 carrying out this evaluation, but Defendants' website and production of contracts shows only 91990024D0007/91990024F0006.
[104] *Evaluations of Federal Financial Aid Information and Delivery Strategies: An Experiment Requiring Additional Loan Counseling for Student Borrowers*, IES, https://perma.cc/7HCG-6UG4 (last visited June 2, 2025).
[105] USASpending.Gov, *Dep't of Educ. to Mathematica, Inc.* (91990024F0369) [https://perma.cc/PT5S-ME7D?type=image].

strategies to improve postsecondary access, with a particular look at dual enrollment in the federal GEAR UP program. *See* 91990022A0016/91990022F0377.[106]

Defendants cancelled the contracts necessary to conduct these studies and fulfill their statutory requirement to evaluate federal education programs and have provided no evidence showing how they are meeting, or will meet, these statutory requirements. *See* Prelim. Inj. Hr'g Tr. 29:21–22, 30:6–9, 36:3–12 (May 21, 2025).

Plaintiffs' members rely on Defendants conducting required evaluations of federal programs, including both ESSA programs and federal financial aid programs, and were planning on integrating the results of these and similar studies into their work. As one AERA member explained, the cancellation of these studies has had a "direct negative impact on my work," as for example, the cancellation of the English Learner Classification Study prevented the "national research-practice partnership I facilitate" from using "evidence from this 30-state study" to inform English Learner "entry and exit policies." Ex. JJ, Weddle Decl. ¶ 4 (AERA-0518); *see also* Ex. EE, Kieffer Decl. ¶ 5 (AERA-0493–94) ("I had intended to use the findings from this study to inform my own research on English learner classification and to understand the variation in effects of reclassification across states."); Ex. HH, Umansky Decl. ¶¶ 7–10 (AERA-0508–09) (detailing planned uses of English learner classification study results). Similarly, an AERA and SREE member explained that, given his work and research examining "policies and programs to support the retention and recruitment of high-quality teachers," where he relies on federal research the cancellation of the Evaluation of Teacher Residency Programs study "causes harm to my ability to draw robust inferences about the success of this type of teacher training" and the cancellation

---

[106] USASpending.Gov, *Dep't of Educ. to ABT Global LLC* (91990022A0016) [https://perma.cc/HF8B-CVTP]; EDAERA_51_00010.

of the TSL study "harms my own work around teacher incentives, where I also conduct research to inform local policies and programs in service of improving student outcomes." Ex. BB, Logan Doe Decl. ¶¶ 4–5 (AERA-0475). And many of Plaintiffs' members reported their plans to use the impact studies to accelerate math learning, as one SREE member explained:

> I planned to use this evaluation to identify effective, scalable approaches to accelerating math achievement, particularly for students who begin school behind their peers. Findings would inform the development of dynamic assessments and teacher training modules I am building, with an emphasis on early identification and support for math difficulties.

Ex. W, Suppl. Weiss Decl. ¶ 9 (AERA-0451a); *see also* Ex. DD, Jordan Decl. ¶¶ 4–5 (AERA-0488–0489) (highlighting the importance of the math study for researchers, educators, and students).

Numerous members of Plaintiffs have similarly reported that they intended to rely on the study of the effectiveness of the CCLC program, including a SREE member who reported:

> I planned to use this evaluation to investigate the role of afterschool programs in promoting academic and social-emotional development, especially for children from historically underserved communities. As someone who studies intervention effectiveness, I was interested in how program dosage, staffing, and alignment with school-day instruction influence student outcomes.

Ex. W, Suppl. Weiss Decl. ¶ 10 (AERA-0451a–52); *see also* Ex. MM, Foster Decl. ¶¶ 9–10 (AERA-0536–37) (discussing the CCLC study as among those relied on for gaining data).

And AERA members were similarly planning on using the evaluations of federal financial aid in their work and research. Ex. X, Baker Decl. ¶ 9 (AERA-0458) ("I planned to use" the Evaluation of Federal Financial Aid Delivery "final report," in "my research, teaching, and as I provide evidence-based policy recommendations to the public, institutional leaders, and policymakers."). Many of Plaintiffs' members also reported that they planned to use the study of postsecondary access and dual enrollment strategies to further their research, including one AERA

member who "planned to use this study to explore how dual enrollment strategies can reduce opportunity gaps for linguistically and culturally diverse students." Ex. V, Suppl. Levine Decl. ¶ 5 (AERA-0445).

### B.   NCEE is required to conduct evaluations by ESSA. 20 U.S.C. §§ 6645; 6491(j); 6633(c)(2).

In addition to fulfilling NCEE's requirement to conduct evaluation studies of federal programs in 20 U.S.C. §§ 9561; 9562(a), NCEE is also required by ESSA to conduct certain evaluations of reading programs, state innovation with flexibility in per-pupil funding, and teacher and school leader incentives. 20 U.S.C. §§ 6645 (IES "shall conduct national evaluation of" reading grant programs in comprehensive literacy state development grants program); 6491(j) (IES "shall . . .evaluate … implementation … and … impact" of flexibility agreements under ESSA); 6633(c)(2) (IES "shall carry out an independent evaluation" of teacher and school leader incentive program). And NCEE is required to "widely disseminate information on scientifically valid research, statistics, and evaluations" including these evaluation studies to "researchers." 20 U.S.C. §§ 9562(a)(2), (3); 9501(10). Before the Research Termination Action, NCEE was carrying out these statutory requirements to evaluate federal education programs through the following contracts:

- 91990018C0020[107]
- 91990019C0059[108]
- 91990018C0044[109]

---

[107] The contract itself indicates that "Section 1502(b) requires the Department to evaluate demonstration projects supported under Section 1502, such as SRCL," and that "[a]n evaluation of the CLD program is mandated by Section 2225 of ESSA." EDAERA_01_00032.

[108] The contract itself indicates that "[a]n evaluation of the Innovative Assessment and Accountability Demonstration Authority is mandated by Title I, § 1204 of the Elementary and Secondary Education Act" and "[a]n evaluation of the Flexibility for Equitable Per-Pupil Funding is mandated by Title I, Section 1501 of ESEA." EDAERA_09_00007

[109] The contract itself indicates that "TSL is authorized in the Elementary and Secondary Education Act of 1965 as amended through P.L. 115-64," and in turn "[t]he Director of IES is directed to conduct an independent evaluation to measure the effectiveness of the program." EDAERA_03_00038.

Defendants' cancellation of the Evaluation of the Comprehensive Literacy State Development Program ("CLSD") and the Striving Readers Comprehensive Literacy Program ("SRCL") ended an evaluation of "whether states, districts, and schools used the grant funds [from those programs] as intended and to inform program improvement," and impacts on reading achievement, which was specifically required by 20 U.S.C. § 6645, as Defendants' acknowledge in the contract itself.[110] *See* 91990018C0020.[111] In the Evaluation of Title I State Assessment Pilots and Flexibility under ESSA, NCEE was evaluating state implementation of states' piloting of "new types of assessment systems," and of flexibilities in per-pupil spending assessment of which was "mandated by" ESSA according to Defendants' statements, and is specifically required by 20 U.S.C. § 6491(j). *See* 91990019C0059.[112] And through the Evaluation of the Teacher and School Leader Incentive Program ("TSL"), NCEE was evaluating the TSL program as required specifically 20 U.S.C. § 6633(c)(2), which Defendants' themselves describe required by Congress. *See* 91990018C0044.[113]

Defendants cancelled the contracts necessary to conduct these studies and fulfill their statutory requirement to evaluate federal education programs and have provided no evidence showing how they are meeting, or will meet, these statutory requirements. *See* Prelim. Inj. Hr'g Tr. 29:21–22, 30:6–9, 36:3–12 (May 21, 2025).

---

[110] The contract itself indicates that "Section 1502(b) requires the Department to evaluate demonstration projects supported under Section 1502, such as SRCL," and that "[a]n evaluation of the CLD program is mandated by Section 2225 of ESSA." EDAERA_01_00032.

[111] *National Evaluation of the Comprehensive Literacy State Development (CLSD) and Striving Readers Comprehensive Literacy (SRCL) Programs*, IES, https://perma.cc/7SFS-TBAS (last visited May 31, 2025).

[112] EDAERA_09_00007; *Evaluation of Title I State Assessment Pilots That Provide Flexibility Under the Every Student Succeeds Act*, IES, https://perma.cc/4X56-48U8 (last visited May 31, 2025).

[113] "TSL is authorized in the Elementary and Secondary Education Act of 1965 as amended through P.L. 115-64. The Director of IES is directed to conduct an independent evaluation to measure the effectiveness of the program. Further, the evaluation must "measure the effectiveness of the program in improving student academic achievement, the satisfaction of the participating teachers, principals, or other school leaders, and the extent to which the program assisted the eligible entities in recruiting and retaining high quality teachers, principals, or other school leaders, especially in high-need subject areas." EDAERA_03_00038.

Plaintiffs' members are harmed by the cancellations of these required studies. As one member of AERA declares here, the cancellation of the TSL study "harms my own work around teacher incentives, where I also conduct research to inform local policies and programs in service of improving student outcomes." Ex. BB, Logan Doe Decl. ¶ 5 (AERA-0475). Plaintiffs' members similarly planned to use the studies of flexibilities granted under ESSA and the effectiveness of reading grant programs in their work. *See* Ex. KK, Chow Decl. ¶¶ 4–5 (AERA-0522–23) ("The results of the" CLSD and SRCL study are "vital to my research and teaching . . . I have relied on the Comprehensive Literacy State Development (CLSD) and Striving Readers Comprehensive Literacy (SRCL) Programs as demonstrations of essential and effective research and technical assistance entities . . . To illustrate, I have plans with one of my doctoral students, to leverage CLSD and SRCL to develop and implementation plan and school consultation model to support special education coaches at the district and state level."); Ex. LL, Francis Decl. ¶¶ 8–10 (AERA-0528–30); Ex. W, Suppl. Weiss Decl. ¶ 12 (AERA-0452) ("Our members regularly rely on and integrate the findings of evaluations of literacy, reading, and school funding programs and innovations into their research and work."); Ex. V, Suppl. Levine Decl. ¶ 13 (AERA-0448).

## C. NCEE is required to conduct evaluations of special education by the IDEA. 20 U.S.C. § 1464.

In addition to fulfilling NCEE's requirement to conduct evaluation studies of federal programs in 20 U.S.C. §§ 9561; 9562(a), NCEE is also required by the Individuals with Disabilities Education Act ("IDEA") to conduct evaluations of schools' and states' efforts to "provide a free, appropriate public education to children with disabilities" either directly or through contracts. 20 U.S.C. § 1464. And NCEE is required to "widely disseminate information on scientifically valid research, statistics, and evaluations" including these evaluation studies to "researchers." 20 U.S.C. §§ 9562(a)(2), (3); 9501(10). As described below, before the Research Termination Action in

February 2025, NCEE was meeting this responsibility through contracts carried out through three evaluation studies of supports for students with disabilities:

- 91990018C0046[114]
- 91990019C0078[115]
- ED-IES-15-C-0046[116]

Defendants cancelled these contracts which were carrying out the Multi-Tier Systems of Support for Reading ("MTSS-R"), "Charting My Path" Evaluation of Transition Supports for Youth with Disabilities, and the National Longitudinal Transition Study 2012 ("NLTS 2012"). *See* 91990019C0078[117]; ED-IES-15-C-0046.[118] The MTSS-R was a large-scale study of reading interventions for struggling readers more than 6 years into performance. *See* 91990018C0046.[119] The "Charting My Path" study sought to provide high school students with services intended to enhance their life and academic skills for transitioning to postsecondary education and employment and to assess the effectiveness of those services. *Id*. The NTLS "was to provide an updated national picture of students' paths through high school and beyond" and "measure the progress youth" with disabilities had made since the 2004 reauthorization of IDEA. *Id*. The study had been ongoing for more than a decade. *Id*.

---

[114] The contract itself indicates it was fulfilling a statutory function pursuant to Section 664 of the Individuals with Disabilities Education Act (IDEA, Pub. L. No. 108-446, 118 Stat. 2647 (2004) ) ), as amended, "which assigns to IES the responsibility to conduct studies and evaluations of the implementation and impact of programs supported under IDEA." EDAERA_04_00039.

[115] The contract itself indicates it was fulfilling a statutory function pursuant to Section 664 of the Individuals with Disabilities Education Act (IDEA, Pub. L. No.108-446), as amended, "which assigns to IES the responsibility to conduct studies and evaluations of the implementation and impact of programs supported under IDEA." EDAERA_11_00010.

[116] The contract itself indicates it was fulfilling a statutory function pursuant to Section 664 of the Individuals with Disabilities Education Act, "which requires IES to conduct the National Assessment of IDEA." EDAERA_97_00037.

[117] *Evaluation of Transition Supports for Youth with Disabilities*, IES, https://perma.cc/HJ5A-2LRG (last visited May 31, 2025).

[118] *National Longitudinal Transition Study 2012 (NLTS 2012)*, IES, https://perma.cc/ZHN9-XRJU (last visited May 31, 2025).

[119] *Impact Evaluation of Training in Multi-Tiered Systems of Support for Reading in Early Elementary School*, IES, https://perma.cc/PX9X-SM4D (last visited May 31, 2025).

Defendants cancelled the contracts necessary to conduct these studies and fulfill these statutory requirements and have provided no evidence showing how they are meeting, or will meet, these statutory requirements.[120] *See* 91990018C0046,[121] 91990019C0078,[122] ED-IES-15-C-0046[123]; Prelim. Inj. Hr'g Tr. 29:21–22, 30:6–9, 36:3–12 (May 21, 2025).

Plaintiffs' members rely on studies evaluating the services provided to students with disabilities in their research. As discussed in Plaintiffs' prior filings, the MTSS study was a critical effort that Plaintiffs' members planned to rely on for their research on an issue of critical national importance. *See* Pls. Br., ECF No. 12, at 7, 14; Ex. F to PI, Gersten Decl. ¶¶ 9–15 (AERA-0050–52). Many of Plaintiffs' members have also indicated that they intended to integrate the NTLS and Charting My Path studies into their research. *See* Ex. V, Suppl. Levine Decl. ¶ 14 (AERA-0448). As AERA member Susan Baglieri has explained, these studies were anticipated to provide invaluable large-scale data and information about services and outcomes for students with disabilities that she would use in "my teaching, research, and program development." Ex. Y, Baglieri Decl. ¶ 4 (AERA-0462).

### D. NCEE is required to conduct a career and technical education evaluation under the Perkins Act. 20 U.S.C. §§ 2324(a)(1); (d)(1)(A).

The Secretary of Education and IES Director are required to "collect performance information about, and report on, the condition of career and technical education" ("CTE") including in an annual report to Congress, and the IES Director is required to implement an "evaluation" that "adheres to the highest standards of quality" in carrying out this responsibility. 20 U.S.C. §§ 2324(a)(1); (d)(1)(A). And NCEE is required to "widely disseminate information on

---

[120] Defendants represent that MTSS-R is now "approved for reinstatement," but provide no information about how, when, or to what extent it will be reinstated. Ex. NN, Defs.' Descriptions (AERA-0552).
[121] Ex. NN, Defs.' Descriptions (AERA-0552).
[122] Ex. NN, Defs.' Descriptions (AERA-0548).
[123] Ex. NN, Defs.' Descriptions (AERA-0550).

scientifically valid research, statistics, and evaluations" including these evaluation studies to "researchers." 20 U.S.C. §§ 9562(a)(2), (3); 9501(10). Prior to the Research Termination Action, Defendants were carrying out this statutory requirement through the following contract:

- 91990024D0012/91990024F0394[124]

Defendants cancelled the contract carrying out this study which they acknowledge was "for the congressionally-mandated National Evaluation of Career and Technical Education under Perkins V."[125] Defendants cancelled the contracts necessary to meet this statutory requirement and have provided no evidence showing how they are meeting, or will meet, these statutory requirements. *See* Prelim. Inj. Hr'g Tr. 29:21–22, 30:6–9, 36:3–12 (May 21, 2025).

Plaintiffs' members will be harmed by this cancellation as they would have relied on its findings in their own work. As one SREE member reported:

> My research is largely focused on studying career & technical education and dual enrollment programs - how they are implemented and their effects on student outcomes. I typically work in partnership with state and local education agencies to study these types of programs and identify ways to improve them. . . . CTE in particular lacks a robust evidence base. . . .[T]he evaluation of career & technical education programs federally funded through the Perkins Act would have generated new evidence about modern-day implementation of CTE, which students access it, and program quality, which my partners and I would have used to plan future initiatives and decide where to focus future state-specific CTE studies.

Ex. W, Suppl. Weiss Decl. ¶ 11 (AERA-0452); *see also* Ex. CC, Shankar Giani Decl. ¶ 11 (AERA-0480–81).

---

[124] Ex. NN, Defs.' Descriptions (AERA-0540).
[125] Ex. NN, Defs.' Descriptions (AERA-0540).

**E.  NCEE adult education evaluation required by WIOA. 29 U.S.C. § 3332.**

The Workforce Innovation and Opportunity Act ("WIOA") requires the Secretary of Education to "establish and carry out a program" of "rigorous research and evaluation on effective adult education and literacy activities," coordinated across relevant agencies explicitly "including the Institute of Education Sciences." 29 U.S.C. § 3332. And NCEE and IES are required to "widely disseminate information on scientifically valid research, statistics, and evaluations" including this evaluation of adult education and literacy to "researchers." 20 U.S.C. §§ 9562(a)(2), (3); 9501(10). As described below, before the Research Termination Action, Defendants were carrying out the statutory requirement to conduct rigorous research and evaluation of adult education and literacy through the following contract:

- 91990018C0057[126]

This contract was carrying out what Defendants themselves describe as the "Congressionally-mandated National Assessment of Adult Education," with the aim to "identify promising adult education strategies and design approaches to evaluate them." *See* 91990018C0057.[127] Defendants' description of the study also notes that "WIOA mandates an independent national evaluation of adult education programs" and "this study was designed to provide implementation information on such programs."[128]

Defendants cancelled the contract necessary to conduct this study and fulfill this statutory requirement under WIOA, and they have provided no evidence showing how they are meeting, or

---

[126] The contract itself indicates it was fulfilling a statutory function pursuant to WIOA § 242(b), which "mandates that ED carry out rigorous research and evaluation on effective adult education and literacy activities, one component of which is an independent evaluation of Title II programs and activities," and also § 242(c) which "authorizes ED to examine various issues related to the effectiveness of adult education programs and services." EDAERA_05_00028.
[127] *See* Ex. NN, Defs.' Descriptions (AERA-0552).
[128] *National Study of the Implementation of Adult Education Under the Workforce Innovation and Opportunity Act*, IES, https://perma.cc/B7U7-4K7X (last visited May 31, 2025).

will meet, these statutory requirements. *See* Prelim. Inj. Hr'g Tr. 29:21–22, 30:6–9, 36:3–12 (May 21, 2025).

Plaintiffs' members rely on NCEE and IES conducting this required evaluation study of adult education. Many of Plaintiffs' members have reported that they were planning to incorporate this evaluation of adult education into their research and work. *See* Ex. V, Suppl. Levine Decl. ¶ 16 (AERA-0449). One AERA member, for example, reported that this was among the studies that he intended to use his research and reports "examining specific populations in depth such as adult learners," and due to the cancellation of this and other NCEE studies his "ability to inform and instruct is severely hampered." *Id.*

   **F. NCEE must "widely disseminate information on scientifically valid research, statistics, and evaluation" in an "accessible . . . user-friendly, timely and efficient manner" including through a "searchable online database" to "researchers." 20 U.S.C. §§ 9562(a)(2), (3).**

Under ESRA, Congress has directed required that NCEE "widely disseminate information on scientifically valid research, statistics, and evaluation" in an "accessible. . . user-friendly timely and efficient manner" including through a "searchable online database" to "researchers." 20 U.S.C. §§ 9562(a)(2), (3). As described below, a critical and widely used project that was designed to meet this statutory requirement was the What Works Clearinghouse (WWC).[129] But since the Research Termination Action in February 2025, the WWC is no longer able to provide data in a "timely and efficient manner" as a result of the following contract terminations:

- 91990021A0004/91990023F0072[130]

---

[129] *WWC Content Teams*, IES, https://perma.cc/4ZRL-ZWAP (last visited May 31, 2025).
[130] The contract itself indicates it was fulfilling a statutory function pursuant to Title I, Part D of the Education Sciences Reform Act of 2002 (Pub. L. No. 107-279), Section 171(b). EDAERA_55_00012. The contract further pointed to the 2015 reauthorization of the Elementary and Secondary Education Act (Pub. L. No. 114-95), which emphasized "need for educators and policy makers to identify 'evidence-based' practices to improve student outcomes and other outcomes relevant for education," specifically the ESEA amendments that "include[ed] definitions of 'moderate evidence' and 'strong evidence' (as defined in 20 U.S.C. 7801, § 21), corresponding with statistically significant and favorable findings from 'well-designed and well-implemented' quasi-experimental and experimental studies." *Id.*

- 91990021A0003/91990021F0370[131]
- 91990021A0022/91990022F0342[132]
- 91990021A0004/91990023F0325[133]
- 91990021A0003/91990023F0336[134]
- 91990021A0022/91990024F0342[135]
- 91990023 D0002/91990025F0014[136]

---

[131] The contract itself indicates it was fulfilling a statutory function pursuant to Title I, Part D of the Education Sciences Reform Act of 2002 (Pub. L. No. 107-279), Section 171(b). EDAERA_26_00010–11. The contract further pointed to the 2015 reauthorization of the Elementary and Secondary Education Act (Pub. L. No. 114-95), which emphasized "need for educators and policy makers to identify 'evidence-based' practices to improve student outcomes and other outcomes relevant for education," specifically the ESEA amendments that "include[ed] definitions of 'moderate evidence' and 'strong evidence' (as defined in 20 U.S.C. 7801, § 21), corresponding with statistically significant and favorable findings from 'well-designed and well-implemented' quasi-experimental and experimental studies." *Id.*

[132] The contract itself indicates it was fulfilling a statutory function pursuant to Title I, Part D of the Education Sciences Reform Act of 2002 (Pub. L. No. 107-279), Section 171(b). EDAERA_49_00010. The contract further pointed to the 2015 reauthorization of the Elementary and Secondary Education Act (Pub. L. No. 114-95), which emphasized "need for educators and policy makers to identify 'evidence-based' practices to improve student outcomes and other outcomes relevant for education," specifically the ESEA amendments that "include[ed] definitions of 'moderate evidence' and 'strong evidence' (as defined in 20 U.S.C. § 7801 (21)), corresponding with statistically significant and favorable findings from 'well-designed and well-implemented' quasi-experimental and experimental studies." *Id.*

[133] The contract itself indicates it was fulfilling a statutory function pursuant to Title I, Part D of the Education Sciences Reform Act of 2002 (Pub. L. No. 107-279), § 171(b). EDAERA_61_00008–09. The contract further pointed to the 2015 reauthorization of the Elementary and Secondary Education Act (Pub. L. No. 114-95), which emphasized "need for educators and policy makers to identify 'evidence-based' practices to improve student outcomes and other outcomes relevant for education," specifically the ESEA amendments that "include[ed] definitions of 'moderate evidence' and 'strong evidence' (as defined in 20 U.S.C. 7801, § 21), corresponding with statistically significant and favorable findings from 'well-designed and well-implemented' quasi-experimental and experimental studies." *Id.*

[134] The contract itself indicates it was fulfilling a statutory function pursuant to Title I, Part D of the Education Sciences Reform Act of 2002 (Pub. L. No. 107-279), § 171(b). EDAERA_64_00010–11. The contract further pointed to the 2015 reauthorization of the Elementary and Secondary Education Act (Pub. L. No. 114-95), which emphasized "need for educators and policy makers to identify 'evidence-based' practices to improve student outcomes and other outcomes relevant for education," specifically the ESEA amendments that "include[ed] definitions of 'moderate evidence' and 'strong evidence' (as defined in 20 U.S.C. 7801, § 21), corresponding with statistically significant and favorable findings from 'well-designed and well-implemented' quasi-experimental and experimental studies." *Id.*

[135] The contract itself indicates it was fulfilling a statutory function pursuant to Title I, Part D of the Education Sciences Reform Act of 2002 (Pub. L. No. 107-279), § 171(b). EDAERA_79_00016–17. The contract further pointed to the 2015 reauthorization of the Elementary and Secondary Education Act (Pub. L. No. 114-95), which emphasized "need for educators and policy makers to identify 'evidence-based' practices to improve student outcomes and other outcomes relevant for education," specifically the ESEA amendments that "include[ed] definitions of 'moderate evidence' and 'strong evidence' (as defined in 20 U.S.C. 7801, § 21), corresponding with statistically significant and favorable findings from 'well-designed and well-implemented' quasi-experimental and experimental studies." *Id.*

[136] The contract itself indicates it was fulfilling a statutory function pursuant to Title I, Part D of the Education Sciences Reform Act of 2002 (Pub. L. No. 107-279), § 171(b). EDAERA_95_00008. The contract further pointed to the 2015 reauthorization of the Elementary and Secondary Education Act (Pub. L. No. 114-95), which emphasized "need for educators and policy makers to identify 'evidence-based' practices to improve student outcomes and other outcomes relevant for education," specifically the ESEA amendments that "include[ed] definitions of 'moderate evidence' and 'strong evidence' (as defined in 20 U.S.C. 7801, § 21), corresponding with statistically significant and favorable findings from 'well-designed and well-implemented' quasi-experimental and experimental studies." *Id.*

- 91990020D0005/91990021F0365[137]
- 91990020D0005/91990024F0310[138]
- 91990023 D0031/91990024F0304[139]
- 91990023A0001/91990023F0308[140]
- 91990023A0001/91990024F0316[141]

The What Works Clearinghouse plays a crucial role in ensuring that IES research and evaluations are disseminated in a manner that is "accessible," "user-friendly," and "most current." NCEE had entered into numerous contracts to ensure that the WWC is meeting these statutory obligations. For example, one WWC project, the Ad-Hoc Reviews of Individual Studies in Education (ARISE), is responsible for reviewing studies and presenting those findings in the WWC.[142] The Preschool-to-Postsecondary Evidence Synthesis Task Orders (PESTO) are designed to "produce practices

---

[137] The contract itself indicates it was fulfilling a statutory function pursuant to Title I, Part D of the Education Sciences Reform Act of 2002 (Pub. L. No. 107-279), § 171(b). EDAERA_24_00006. The contract further pointed to the 2015 reauthorization of the Elementary and Secondary Education Act (Pub. L. No. 114-95), which emphasized "need for educators and policy makers to identify 'evidence-based' practices to improve student outcomes and other outcomes relevant for education," specifically the ESEA amendments that "include[ed] definitions of 'moderate evidence' and 'strong evidence' (as defined in 20 U.S.C. § 7801(21)), corresponding with statistically significant and favorable findings from 'well-designed and well-implemented' quasi-experimental and experimental studies." *Id.*

[138] The contract itself indicates it was fulfilling a statutory function pursuant to Title I, Part D of the Education Sciences Reform Act of 2002 (Pub. L. No. 107-279), Section 171(b). EDAERA_73_00017. The contract further pointed to the 2015 reauthorization of the Elementary and Secondary Education Act (Pub. L. No. 114-95), which emphasized "need for educators and policy makers to identify 'evidence-based' practices to improve student outcomes and other outcomes relevant for education," specifically the ESEA amendments that "include[ed] definitions of 'moderate evidence' and 'strong evidence' (as defined in 20 U.S.C. § 7801(21)), corresponding with statistically significant and favorable findings from 'well-designed and well-implemented' quasi-experimental and experimental studies." *Id.*

[139] The contract itself indicates it was fulfilling a statutory function pursuant to Title I, Part D of the Education Sciences Reform Act of 2002 (Pub. L. No. 107-279), Section 171(b). EDAERA_72_00025–26. The contract further pointed to the 2015 reauthorization of the Elementary and Secondary Education Act (Pub. L. No. 114-95), which emphasized "need for educators and policy makers to identify 'evidence-based' practices to improve student outcomes and other outcomes relevant for education," specifically the ESEA amendments that "include[ed] definitions of 'moderate evidence' and 'strong evidence' (as defined in 20 U.S.C. § 7801( 21)), corresponding with statistically significant and favorable findings from 'well-designed and well-implemented' quasi-experimental and experimental studies." *Id.*

[140] The contract itself indicates it was fulfilling a statutory function pursuant to Title I, Part D of the Education Sciences Reform Act of 2002 (Pub. L. No. 107-279), Section 171(b). EDAERA_58_00011–12. The contract further pointed to the 2015 reauthorization of the Elementary and Secondary Education Act (Pub. L. No. 114-95), which emphasized "need for educators and policy makers to identify 'evidence-based' practices to improve student outcomes and other outcomes relevant for education," specifically the ESEA amendments that "include[ed] definitions of 'moderate evidence' and 'strong evidence' (as defined in 20 U.S.C. § 7801( 21)), corresponding with statistically significant and favorable findings from 'well-designed and well-implemented' quasi-experimental and experimental studies." *Id.*

[141] Ex. NN, Defs.' Descriptions (AERA-0547).

[142] *WWC Content Teams*, IES, https://perma.cc/4ZRL-ZWAP (last visited June 2, 2025).

guides and intervention reports" in areas like students struggling with behavior in grades K-12, promoting student attendance, and literacy interventions.[143] Another WWC project, Supporting and Analyzing Grantee Evaluations (SAGE), provides technical assistance to external evaluators to ensure their evaluations meet WWC research standards, a critical component to ensuring the research is high quality and scientifically valid as required by ESRA.[144] These contracts conducting and supporting this work were cancelled. *See* 91990020D0005/91990021F0365,[145] 91990020D0005/91990024F0310,[146]                91990023D0031/91990024F0304,[147] 91990023A0001/91990023F0308,[148] 91990023A0001/91990024F0316.[149]

The "Find What Works" webpage on the WWC, designed to "find the information you need to make evidence-based decisions in your classrooms and schools," highlights "What's New at the WWC." The last update on this page, the release of a new practice guide, is dated December 9, 2024. Defendants have cancelled the contracts necessary to keep the WWC updated with "most current" findings, as required by statute. Defendants cannot meet these statutory obligations by preserving a static website that does not benefit from new data and research, and they have provided no other information or evidence regarding other means through which they are meeting these statutory requirements. *See* Prelim. Inj. Hr'g Tr. 29:21–22, 30:6–9, 36:3–12 (May 21, 2025).

Plaintiffs' members are harmed by the cancellation of these contracts because it will result in the loss of "extensively vetted education research studies as well as practice guides created using these studies to make them useful for practical application." Ex. S to PI, Pigott Decl. ¶¶ 9, 10

---

[143] *Id.*
[144] *Id.*
[145] Ex. NN, Defs.' Descriptions (AERA-0544).
[146] Ex. NN, Defs.' Descriptions (AERA-0546).
[147] Ex. NN, Defs.' Descriptions (AERA-0546).
[148] Ex. NN, Defs.' Descriptions (AERA-0545).
[149] Ex. NN, Defs.' Descriptions (AERA-0547).

(AERA-0136). "The lack of availability or degraded capacity of the WWC would be personally devastating because as an academic and practitioner it is essential to my work and career." *Id.*; *see also* Ex. G to PI, Weiss Decl. ¶ 9 (AERA-0056–57); Ex. J to PI, Tipton Decl. ¶¶ 21–22; Ex. K to PI, Talbott Decl. ¶ 11 (AERA-0089); Ex. P to PI, Hedges Decl. ¶ 9 (AERA-0118); Ex. Q to PI, Boulay Decl. ¶ 11 (AERA-0127); Ex. R to PI, Watkins Decl. ¶ 7 (AERA-0132); Ex. CC, Shankar Giani Decl. ¶ 18 (AERA-0484); Ex. GG, Becker Patterson Decl. ¶ 7 (AERA-0503–04); Ex. II, Viano Decl. ¶ 8 (AERA-0514).

### G. NCEE is required by ESSA to provide technical assistance to "rigorously evaluate" Education Innovation and Research projects. 20 U.S.C. § 7261.

Each year, the Department issues competitive grants through the Education Innovation and Research (EIR) program to create, develop, and implement "entrepreneurial, evidence-based, field-initiated innovations to improve student achievement and attainment for high-needs students."[150] These grants are provided to state education agencies, school districts, and nonprofit organizations, among others.[151] The Every Student Succeeds Act states that "the Secretary shall make grants eligible" under this program. 20 U.S.C. § 7261.

To make the most of these investments, the Department "has a requirement to provide technical assistance" to Education Innovation and Research ("EIR") grantees." Contract No. 91990020A0028/91990021F0304; *see also* Contract Nos. ED-ESE-15-A-0005/91990020F0305, 91990020A0028/91990022F0303, 91990020A0028/91990024F0303, 91990021F0302. To "ensure that funded projects make a significant contribution to improving the quality and quantity of information available to practitioners and policymakers about which practices improve students' educational outcomes, EIR grantees are required to und an independent evaluation of their

---

[150] *Education Innovation and Research Grant: Home*, OESE, Dep't of Educ. (Apr. 22, 2025), https://perma.cc/9MVG-GJXZ.
[151] *Id.*

projects' effectiveness. The Department requires that these evaluations "are aligned with the What Works Clearinghouse (WWC) evidence standards." The Department had assigned NCEE responsibility to meet this statutory requirement, and the Secretary is permitted by statute to set aside funds for such purposes.

Before the Research Termination Action in February 2025, the statutory requirement to "rigorously evaluate such innovations"[152] produced by the EIR program was fulfilled through several NCEE contracts:

- ED-ESE-15-A-0005/91990020F0305[153]
- 91990020A0028/91990022F0303[154]
- 91990020A0028/91990024F0303[155]
- 91990021F0302[156]
- 91990020A0028/91990021F0304[157]

---

[152] 20 U.S.C. § 7261.

[153] The contract itself indicates it was fulfilling a statutory "requirement" that the Department of Education "provide technical assistance support to the 2019 cohort of Education Innovation and Research (EIR) grantees to help them implement and report findings from their evaluations and maximize the extent to which the evaluations produce credible evidence on the Department's key questions." EDAERA_15_00006. The 60-month contract was intended to "provide technical assistance on the conduct of these evaluations to maximize the strength of their causal conclusions and the quality of their implementation data." *Id.*

[154] The contract itself indicates it was fulfilling a statutory "requirement" that the Department of Education "provide technical assistance support to the 2021 cohort of Education Innovation and Research (EIR) grantees to help them implement and report findings from their evaluations and maximize the extent to which the evaluations produce credible evidence on the Department's key questions." EDAERA_46_00012–13. The 60-month contract was intended to "provide technical assistance on the conduct of these evaluations to maximize the strength of their causal conclusions and the quality of their implementation data." *Id.*

[155] The contract itself indicates it was fulfilling a statutory "requirement" that the Department of Education "provide technical assistance support to the 2023 cohort of Education Innovation and Research (EIR) grantees to help them implement and report findings from their evaluations and maximize the extent to which the evaluations produce credible evidence on the Department's key questions." EDAERA_71_00023. The 60-month contract was intended to "provide technical assistance on the conduct of these evaluations to maximize the strength of their causal conclusions and the quality of their implementation data." *Id.*

[156] The contract itself indicates it was fulfilling a statutory "requirement" that the Department of Education "provide technical assistance support to the 2022 cohort of Education Innovation and Research (EIR) grantees to help them implement and report findings from their evaluations and maximize the extent to which the evaluations produce credible evidence on the Department's key questions." EDAERA_56_0009. The 60-month contract was intended to "provide technical assistance on the conduct of these evaluations to maximize the strength of their causal conclusions and the quality of their implementation data." *Id.*

[157] The contract itself indicates it was fulfilling a statutory "requirement" that the Department of Education "provide technical assistance support to the 2020 cohort of Education Innovation and Research (EIR) grantees to help them implement and report findings from their evaluations and maximize the extent to which the evaluations produce

Each of these contracts provides technical assistance to a "cohort of Education Innovation and Research grantees to help them implement and report findings from their evaluations and maximize the extent to which the evaluations produce credible evidence on the Department's key questions."[158] Defendants cancelled the contracts necessary to conduct these studies and fulfill these statutory requirements, and have provided no evidence showing how they are meeting, or will meet, these statutory requirements. *See* Contract Nos. 91990020A0028/91990021F0304[159], ED-ESE-15-A-0005/91990020F0305,[160] 91990020A0028/91990022F0303,[161] 91990020A0028/91990021F0302[162]; Prelim. Inj. Hr'g Tr. 29:21–22, 30:6–9, 36:3–12 (May 21, 2025).

Plaintiffs' members are harmed by the cancellation of these contracts because they rely on the support from NCEE in making the EIR program work. As one Plaintiff member explained:

> The Education and Innovation Research ("EIR") program is an ongoing ED program that requires its grantees to conduct evaluations of various education programs—for example, teacher retention in rural school districts and STEM pathways to prepare students for careers in the 21st century. A single researcher like me cannot possibly produce evidence of what works for students across different outcomes (reading, math, computer science) and across the wide range of contexts in the U.S. IES oversaw contracts that supported researchers like me to ensure that many more researchers produced credible evidence of the impact of these programs in their local states and districts.

Ex. Q to PI, Boulay Decl. ¶ 9 (AERA-0126); *see also* Ex. J to PI, Tipton Decl. ¶ 12 (AERA-0080).

---

credible evidence on the Department's key questions." EDAERA_22_00004. The 60-month contract was intended to "provide technical assistance on the conduct of these evaluations to maximize the strength of their causal conclusions and the quality of their implementation data." *Id.*

[158] *See* Ex. NN, Defs.' Descriptions (AERA-0543).
[159] *See* Ex. NN, Defs.' Descriptions (AERA-0544).
[160] *See* Ex. NN, Defs.' Descriptions (AERA-0543).
[161] *See* Ex. NN, Defs.' Descriptions (AERA-0545).
[162] *See* Ex. NN, Defs.' Descriptions (AERA-0548).

**H.  NCEE must operate Regional Education Laboratories. 20 U.S.C. § 9564(a).**

IES is required to "enter into contracts with entities to establish a networked system of 10 regional educational laboratories" ("RELs") which are required "at a minimum" to "develop[] and widely disseminat[e] . . . scientifically valid research, information, reports and publications" to improve educational outcomes. 20 U.S.C. §§ 9564 (a), (f). In addition to incorporating the broad statutory definition of dissemination, the RELs are required to disseminate this research and information to "educators" and "policymakers." Before the Research Termination Action, Defendants were carrying out the required operation of the RELs through the following contracts:

- 91990022C0003[163] (REL West)
- 91990022C0008[164] (REL Appalachia)
- 91990022C0009[165] (REL Northwest)
- 91990022C0010[166] (REL Pacific)

---

[163] The contract itself indicates it was fulfilling a statutory function pursuant to the Education Sciences Reform Act (ESRA) of 2002, Part D, Section 174 (20 U.S.C. § 9564), which "directs RELs to carry out applied research and development, disseminate findings from scientifically valid research, provide support for using research in education decision-making, and coordinate their activities with other technical assistance entities funded through the U.S. Department of Education, such as the Comprehensive Centers and the Equity Assistance Centers." EDAERA_28_00038.

[164] The contract itself indicates it was fulfilling a statutory function pursuant to the Education Sciences Reform Act (ESRA) of 2002, Part D, Section 174 (20 U.S.C. § 9564), which "directs RELs to carry out applied research and development, disseminate findings from scientifically valid research, provide support for using research in education decision-making, and coordinate their activities with other technical assistance entities funded through the U.S. Department of Education, such as the Comprehensive Centers and the Equity Assistance Centers." EDAERA_28_00035 (Note that this contract is actually Contract No. 29 in Defendants' production, but was errantly Bates stamped as contract 28).

[165] The contract itself indicates it was fulfilling a statutory function pursuant to the Education Sciences Reform Act (ESRA) of 2002, Part D, Section 174 (20 U.S.C. § 9564), which "directs RELs to carry out applied research and development, disseminate findings from scientifically valid research, provide support for using research in education decision-making, and coordinate their activities with other technical assistance entities funded through the U.S. Department of Education, such as the Comprehensive Centers and the Equity Assistance Centers." EDAERA_30_00035.

[166] The contract itself indicates it was fulfilling a statutory function pursuant to the Education Sciences Reform Act (ESRA) of 2002, Part D, Section 174 (20 U.S.C. § 9564), which "directs RELs to carry out applied research and development, disseminate findings from scientifically valid research, provide support for using research in education decision-making, and coordinate their activities with other technical assistance entities funded through the U.S. Department of Education, such as the Comprehensive Centers and the Equity Assistance Centers." EDAERA_31_00039.

- 91990022C0011[167] (REL Midwest)
- 91990022C0012[168] (REL Mid-Atlantic)
- 91990022C0013[169] (REL Northeast)
- 91990022C0014[170] (REL Southeast)
- 91990022C0015[171] (REL Central)
- 91990023C0003 (REL Southwest)[172]
- 91990023D0050/91990024F0386 REL Evaluation[173]

Defendants cancelled the contracts carrying out these functions and have provided no other information regarding other means through which they are meeting these functions. *See* 91990022C0003 (REL West); 91990022C0008 (REL Appalachia); 91990022C0009 (REL Northwest); 91990022C0010 (REL Pacific); 91990022C011 (REL Midwest); 91990022C012

---

[167] The contract itself indicates it was fulfilling a statutory function pursuant to the Education Sciences Reform Act (ESRA) of 2002, Part D, Section 174 (20 U.S.C. § 9564), which "directs RELs to carry out applied research and development, disseminate findings from scientifically valid research, provide support for using research in education decision-making, and coordinate their activities with other technical assistance entities funded through the U.S. Department of Education, such as the Comprehensive Centers and the Equity Assistance Centers." EDAERA_32_00042.

[168] The contract itself indicates it was fulfilling a statutory function pursuant to the Education Sciences Reform Act (ESRA) of 2002, Part D, Section 174 (20 U.S.C. § 9564), which "directs RELs to carry out applied research and development, disseminate findings from scientifically valid research, provide support for using research in education decision-making, and coordinate their activities with other technical assistance entities funded through the U.S. Department of Education, such as the Comprehensive Centers and the Equity Assistance Centers." EDAERA_33_00038.

[169] The contract itself indicates it was fulfilling a statutory function pursuant to the Education Sciences Reform Act (ESRA) of 2002, Part D, Section 174 (20 U.S.C. § 9564), which "directs RELs to carry out applied research and development, disseminate findings from scientifically valid research, provide support for using research in education decision-making, and coordinate their activities with other technical assistance entities funded through the U.S. Department of Education, such as the Comprehensive Centers and the Equity Assistance Centers." EDAERA_34_00038.

[170] The contract itself indicates it was fulfilling a statutory function pursuant to the Education Sciences Reform Act (ESRA) of 2002, Part D, Section 174 (20 U.S.C. § 9564), which "directs RELs to carry out applied research and development, disseminate findings from scientifically valid research, provide support for using research in education decision-making, and coordinate their activities with other technical assistance entities funded through the U.S. Department of Education, such as the Comprehensive Centers and the Equity Assistance Centers." EDAERA_35_00039.

[171] The contract itself indicates it was fulfilling a statutory function pursuant to the Education Sciences Reform Act (ESRA) of 2002, Part D, Section 174 (20 U.S.C. § 9564), which "directs RELs to carry out applied research and development, disseminate findings from scientifically valid research, provide support for using research in education decision-making, and coordinate their activities with other technical assistance entities funded through the U.S. Department of Education, such as the Comprehensive Centers and the Equity Assistance Centers." EDAERA_36_00036.

[172] The contract numbers for REL West and REL Southwest appear to be the same, but the contracts produced are distinct.

[173] *Evaluation of the Regional Educational Laboratories*, IES, https://perma.cc/L6RB-X6NM (last visited June 2, 2025).

(REL Mid-Atlantic); 91990022C013 (REL Northeast); 91990022C014 (REL Southeast); 91990022C015 (REL Central); 91990023C0003 (REL Southwest).[174] Defendants also were conducting an evaluation of the RELs, which Defendants state was "mandated under ESRA," to both ensure their quality and disseminate information about their effectiveness. *See* 91990023D0050/91990024F0386.[175]

Plaintiffs' members, including educators and school district staff who evaluate programs and develop curricular policies for school districts, regularly rely on the RELs to provide valid research and implementation resources based on that research for practical application in their education practice and policymaking. *See* Ex. Z, Velasquez-Bryant Decl. ¶¶ 8, 10–11, 15 (AERA-0467–69) (I regularly use the . . . Regional Education Laboratory ("REL") in my work to determine the evidence base for ascertaining the effectiveness of educational programs . . . I have consequently long been dependent in my work on high quality research and implementation guides from IES functions, particularly . . . the Western region REL, as well as RELs for other regions . . . [through the cancellations the threat that] the RELs will cease to function or provide access to up-to-date, reliable research will harm my ability to achieve the purpose of my profession."); Ex. G to PI, Weiss Decl. ¶ 9 (AERA-0056–57); Ex. K to PI, Talbott Decl. 13 (AERA-0089–90). And Plaintiffs' members also planned to integrate the REL evaluation study into their own work. Ex. W, Suppl. Weiss Decl. ¶ 13 (AERA-0452). Without the statutorily required operation of the RELs, Plaintiffs' members will be deprived of research and dissemination resources that they are entitled to access under 20 U.S.C. §§ 9501 (10); 9511; 9562(a)(2); 9564(f), that they have relied on, and that are required by statute. *Id*. at § 9564(a).

---

[174] *See* Ex. NN, Defs.' Descriptions (AERA-0549–51)
[175] *See* Ex NN, Defs.' Descriptions (AERA-0540).

**IV.    Subject to privacy protections "data collected by the Institute . . . shall be made available to the public, including through use of the Internet," 20 U.S.C. § 9574, and the IES "Director shall ensure" the "[d]isseminating [of] information in a timely fashion . . . usable by researchers." 20 U.S.C. § 9575.**

IES is required to make "data collected by the Institute," "available to the public, including through use of the Internet." 20 U.S.C. § 9574. This requirement is to be met in a manner that complies with "confidentiality standards" to protect individuals' and institutions' confidentiality in providing this data. *Id.* §§ 9573; 9574. The IES Director is further required to ensure that information is disseminated "in a timely fashion and in formats that are easily accessible and usable by researchers." 20 U.S.C. § 9575(2).

As described below, Defendants were carrying out this requirement to make data available to researchers, but to do so in a manner that protected confidentiality, through contracts and staff that provided access to "restricted-use" data to researchers under circumstances that would protect confidentiality but also allow researchers to use IES data in their research. In the Research Termination Action in February 2025, Defendants cancelled those contracts:

- GS-35F-0329Y/91990019F0001[176]
- GS-00F-428GA/91990022F0006[177]
- GS-35F-0329Y/91990022F0007[178]

Access to and use of restricted-use data is absolutely critical to the education research community. *See* Pls. Br., ECF No. 12, at 8–9, 13, 41–42; Pls. Reply, ECF No. 30, at 22; Ex. L to PI, Garvey ¶¶ 19, 26–27 (AERA-0095–96). The first of these contracts, the "Datalab" contract,

---

[176] Ex. NN, Defs.' Descriptions (AERA-0551).

[177] Ex. NN, Defs.' Descriptions (AERA-0539).

[178] The contract itself indicates it was fulfilling a statutory function pursuant to the "Education Sciences Reform Act of 2002 (ESRA – 20 U.S. Code § 9543), and the yearly appropriations Congress makes supporting ESRA [which] provides funding to NCES within the Institute for Education Sciences (IES) to collect, report, analyze, and disseminate statistical data related to education in the United States, including data on the condition and progress of education, at the preschool, elementary, secondary, postsecondary, and adult levels throughout the country." EDAERA_41_000029.

provided "web-based data analysis tools" NCES data, facilitating access to NCES restricted-use data for researchers. *See* GS-35F-0329Y/91990019F0001.[179] The second of these contracts provided support to "the Statistical Standards and Data Confidentiality Staff related to statistical standards, confidentiality, and data security."[180] The functions of this contract included "the protection of confidentiality in the data that are entrusted to The National Center for Statistics."[181] The third contract supports "the protection of confidentiality in the data that are entrusted to the Institute of Education Sciences." *See* GS-35F-0329Y/91990022F0007.[182] These contracts, and the associated NCES staff, supported researcher access to data to comply with 20 U.S.C. §§ 9573; 9574.

Defendants cancelled the contracts carrying out these functions and have provided no other information regarding other means through which they are currently meeting these functions.

Plaintiffs' members have been harmed in their work by the abrupt cessation of IES's ability to support access to restricted-use data that has already been collected, and to conduct pre-publication disclosure review of research based on that protected data. The lack of access has caused Plaintiffs' members to cancel planned programs, rework dissertation plans in graduate programs, and to experience difficulty publishing research because of the inability to receive approval in the disclosure review process. *See, e.g.*, Ex. L to PI, Garvey Decl. ¶¶ 19–25 (AERA-

---

[179] *See* Ex. NN, Defs.' Descriptions (AERA-0551) (Defendants' document indicates this contract has now been "approved for reinstatement" but is not reinstated. Defendants also provide no information about the extent to which it will be reinstated.).

[180] *See* Ex. NN, Defs.' Descriptions (AERA-0539) (Defendants' document indicates this contract has now been "approved for reinstatement" but is not reinstated. Defendants also provide no information about the extent to which it will be reinstated.).

[181] *Id.*

[182] *See* Ex. NN, Defs.' Descriptions (AERA-0550) ("The responsibilities of the tasks range from the development, maintenance, and promulgation of Statistical Standards and Guidelines to the protection of confidentiality in the data that are entrusted to the Institute of Education Sciences."). Defendants indicate this has now been "reinstated" but provide no information about the extent to which it has been reinstated.

0095–96); Ex. O to PI, Wong Decl. ¶ 14 (AERA-0112); Ex. M to PI, Brady Doe Decl. ¶¶ 11–19

(AERA-0100–01); Ex. H to PI, Levine Decl. ¶ 15 (AERA-0067–68).

## V.  NCER must carry out a research plan for "scientifically valid research" that "meets the procedures for peer review." 20 U.S.C. § 9533(a).

The National Center for Education Research ("NCER") is required to carry out a plan for

"scientifically valid research" that "meets the procedures for peer review" that the Director is

required to establish. 20 U.S.C. § 9533(a)(4). NCER is also required to "maintain published peer-

review standards" for all research carried out through NCER. 20 U.S.C. § 9533(a)(1). Specifically,

the IES Director is required to "establish a peer review system, involving highly qualified

individuals with an in-depth knowledge of the subject to be investigated" that must review all

significant NCER research grant awards. 20 U.S.C. § 9534. The NCER Commissioner is required

to support research on 11 education topics, including adult literacy, assessment, early childhood

education, English language learning, improving low achieving schools, innovation, reading,

teacher quality, state and local policy, rural education, and postsecondary education. 20 U.S.C. §

9533(c)(2). And NCER is required to "synthesize and disseminate" through NCEE, the "findings

and results" of any research "conducted or supported" by NCER. 20 U.S.C. § 9533(a)(7). As

described below, Defendants were carrying out this statutory requirement through support

provided by the following contract before the Research Termination Action:

- 91990022C0066[183]

---

[183] The contract itself indicates it was fulfilling a statutory function under ESRA in which "IES is required to establish a peer review system, involving highly qualified individuals with an in-depth knowledge of the subject to be investigated, for reviewing and evaluating all applications for grants and cooperative agreements that exceed $100,000," and also requires "all research, statistics, and evaluation reports conducted by, or supported through IES shall be subject to rigorous peer review before being published or otherwise made available to the public." EDAERA_39_00006.

As Defendants have described it, this contract was a comprehensive means of supporting Defendants' obligation to meet their requirement to conduct research in conformance with peer review standards its statutory obligations.

> Provide[d] integrated support for the full range of scientific peer review activities conducted at the Institute of Education Sciences, including the review of applications submitted to the discretionary research grant competitions and the external scientific peer review of report manuscripts and unsolicited grant applications…

Contract No. 91990022C0066.[184]

Plaintiffs' members rely on the quality research generated as a result of this system of peer review for integration into their work, and the cancellation of peer review has ground review of grant applications to a halt. *See* Ex. I to PI, Reardon Decl. ¶ 20 (AERA-076); Ex. K to PI, Talbott Decl. ¶ 6 (AERA-0087). This effectively cuts off NCER's function by making approval of research grants impossible. Without new research generated by the functions carried out by the peer review contract—which functions cuts off *all* of NCER's research functions by preventing the approval of research grants—Plaintiffs' members will not have access to the "timely" and relevant research required to be created by NCER and disseminated by NCEE. 20 U.S.C. §§ 9533; 9562(a)(3). As Plaintiffs have discussed, this contract cancellation is accompanied by a reduction in NCER staff to a single employee, Ex. D to PI, Pollard Young Decl. ¶ 16(b) (AERA-0029), and it is simply impossible for NCER to produce the research it is required to, and thus to disseminate it to Plaintiffs' members without this contract and with so little staff, *see* Ex. A to PI, Whitehurst Decl. ¶¶ 8–10 (AERA-0004–06). This contract cancellation has thus globally prevented NCER from continuing to meet its obligations to support education research.

---

[184] Ex. NN, Defs.' Descriptions (AERA-0541); *see also* USASpending.Gov, *IES to General Dynamics Information Technology, Inc.* (91990022C0066) [https://perma.cc/ZH4Q-DBZ2?type=image].

**VI.    Numerous support contracts are necessary to ensure the require dissemination of "timely," "relevant" data and research to "researchers."**

In addition to the contracts entered to meet the statutory requirements set forth *supra*, Defendants terminated numerous additional support contracts that IES and its centers use to meet its statutory obligations. Congress intended, in ESRA, to significantly strengthen the quality and rigor of educational research in the United States 20 U.S.C. § 9511(b). The statute's requirements that IES activities "conform to high standards of quality, integrity, and accuracy," and that IES "strengthen the national capacity to conduct, develop, and widely disseminate scientifically valid research in education," are flexible, but meaningful. *Id*. Defendants can choose *how* to meet these statutory requirements, but they must take steps to meet them. IES expert staff had, for years, determined that numerous support contracts were necessary to ensure that IES activities and products confirm to these high standards. And the agency has been historically, and compared to similar agencies, very leanly-staffed. *See* Ex. A to PI, Whitehurst Decl. ¶ 5 (AERA-0003). Following the 2025 Research Termination Action, the following contracts that supported these efforts were terminated:

- 91990023D0041/91990024F0387[185]
- 91990023D0005/91990025F0009[186]
- 47QTCK18D0036/91990022F0042[187]
- 91990020A0032/91990022F0302[188]
- 91990020A0032/91990022F0337[189]

---

[185] The contract itself indicates it was fulfilling a statutory function pursuant to the "requirement" in Part C of the Education Sciences Reform Act of 2002 in 20 U.S.C. § 9544(3). EDAERA_89_00012.

[186] Ex. NN, Defs.' Descriptions (AERA-0541).

[187] Ex. NN, Defs.' Descriptions (AERA-0544).

[188] The contract itself indicates it was fulfilling a statutory function pursuant to Pub. L. No. 107-279, Part C, §§ 151 (b) and 153(a), of the Education Sciences Reform Act of 2002, under which "NCES is required" to "(1) to collect and analyze education information and statistics in a manner that meets the highest methodological standards; (2) to report education information and statistics in a manner that (A) is objective, secular neutral, and non-ideological and is free of partisan political influence and racial, cultural, gender, or regional bias; and (B) is relevant and useful to practitioners, researchers, policymakers, and the public." EDAERA_45_00009.

[189] Ex. NN, Defs.' Descriptions (AERA-0545).

- 91990023 D0046/91990023F0330[190]

These support contracts—ranging from legal support to technical assistance to IT support—appear critical to the functioning of IES. Without any one of these contracts, it is not clear to Plaintiffs how IES and its centers will fulfil their statutory duties. For example, one contract fulfils NCES's statutory duty to "enter into interagency agreements for the collection of statistics," and "arrange with any agency, organization, or institution for the collection of statistics." 20 U.S.C. § 9544(b)(3). It does so by "reviewing Memorandum of Understandings and legal agreements required to share data" and by assisting staff with "coordinating contractors and projects interacting with State Education Agencies, Local Education Agencies (LEA), and postsecondary institutions."[191] Such MOUs and legal agreements are critical to the functioning of NCES, particularly with respect to sensitive data. *See* Contract No. 91990023D0041/91990024F0387. Another contract is, as described by Defendants, "related to Department-wide efforts on the Office of Management and Budget's revised standards for maintaining, collecting, and presenting race/ethnicity data across federal agencies."[192] This likely also supports NCES in meeting its statutory requirement to collect, analyze, cross-tabulate, and report, "to the extent feasible, information by gender, race, ethnicity," and other population characteristics. 20 U.S.C. § 3543(a)(3). *See* Contract No. 91990023D0005/91990025F0009. One contract focuses on the digital modernization of IES, to "rebuild" its digital portfolio, "focusing on the needs of internal (staff) and external customers." The project seeks to launch "a modern,

---

[190] The contract itself indicates it was fulfilling a statutory function pursuant to the Education Sciences Reform Act of 2002 (ESRA) through providing "IT Investment Project Management Support for the Institutes for Education Sciences (IES) Sample Surveys Information Technology (IT) investment, managed primarily by the Sample Surveys Division (SSD), which supports data collection from students, families, and educational institutions; secure storage of data in accordance with applicable laws; data processing; and dissemination of data and reports to the public." EDAERA_62_00015.

[191] *See* Ex. NN, Defs.' Descriptions (AERA-0540).

[192] *See* Ex. NN, Defs.' Descriptions (AERA-0541).

user-centric website" to ensure that "critical audiences have easy access to the best information available when they need it and how they need it."[193] *See* Contract No. 47QTCK18D0036/91990022F0042. This project helps IES meet its statutory function to "make customer service a priority," "utilize[e] the most modern technology" to ensure the "timely distribution of information, including data and reports," and to disseminate "information in a timely fashion and in formats that are easily accessible." 20 U.S.C. §§ 9575 (2), (3). Another project relates to the IES Sample Surveys Information Technology (IT) program. This program works with the Sample Surveys Division, which supports the collection of significant amounts of sensitive data. The contract involves "an ongoing management process designed to monitor the progress of IT initiatives against planned cost, schedule, performance, and expected mission benefits." Contract No. 91990023D0046/91990023F0330.[194] This project provides "a well-defined process of risk identification, assessment, and planning focused on safeguarding IT assets, which Defendants' contract description states "can help to ensure that NCES fulfills its legislative mandate in a cost- and time-effective manner."[195]

## VII.    Additional Contracts

Plaintiffs have tied the contracts above to specific statutory functions and documented harms to Plaintiffs' members. Beyond those more than 80 contracts, there is an additional group that are a mix of contracts that are largely either supporting specific research and evaluation projects or general support contracts. Like the contracts above, these too were entered into because expert staff at IES had previously determined they were important to the agency fulfilling its statutorily-articulated mission. They were cancelled without any explanation or consideration of

---

[193] *See* Ex. NN, Defs.' Descriptions (AERA-0544).
[194] EDAERA_62_00015.
[195] *See* Ex. NN, Defs.' Descriptions (AERA-0544).

the Research Termination Action's impact. Plaintiffs continue to assert that the Research Termination action and the IES Staff Termination Action were discrete acts with sweeping effects that broadly eviscerated IES's capacity to carry out its required data, research, and dissemination functions, and were arbitrary and capricious, and thus unlawful. Because of the interlocking nature of the IES contracts cancelled *en masse*, along with the staff designated for termination, Plaintiffs were, on the face of the remaining contracts and information publicly available and at this preliminary juncture, unable to tie each one to a specific statutory requirement or specific documented harms suffered by Plaintiffs' members.

However, these contracts were carrying out functions that expert IES staff determined contributed to the Institute's functioning. Several of the contracts are for communications, meetings, and outreach services related to IES work; Plaintiffs believe these contracts are fulfilling one or more dissemination and publication mandates written into many of the statutory provisions directing IES's work. Plaintiffs believe a reasonable inference is that they thus are contributing to IES meeting its statutory functions. That said, the following 15 contracts are those where Plaintiffs cannot, at this time, identify either precise statutory functions being carried out or specific harms to Plaintiffs' members. Plaintiffs note, however, that this is a preliminary assessment based on the information available.

- 91990020A0002/91990025F0013[196]
- 91990023D0029/91990024F0373[197]
- 91990023D0003/91990024F0376[198]
- 91990023D0049/91990024F0389[199]
- 91990021D0004/91990024F0393[200]
- 91990020A0032/91990022F0302[201]

---

[196] Ex. NN, Defs.' Descriptions (AERA-0539).
[197] Ex. NN, Defs.' Descriptions (AERA-0540).
[198] Ex. NN, Defs.' Descriptions (AERA-0540).
[199] Ex. NN, Defs.' Descriptions (AERA-0540).
[200] Ex. NN, Defs.' Descriptions (AERA-0540).
[201] Ex. NN, Defs.' Descriptions (AERA-0544).

- 91990019C0004[202]
- 91990021P0005[203]
- 91990024C0043[204]
- 91990019D0002/91990020F0346[205]
- 91990019D0002/91990021F0368[206]
- 91990023D0046/91990023F0334[207]
- 03310320D0223/LCFDL20D022/91990024F0026[208]
- 91990020A0031/91990023F0310[209]
- 91990024C0044[210]

Plaintiffs further note, as previously argued, that they have standing to challenge the evisceration of the agency that they rely on, and which is statutorily required  to serve their interests, through the refusal to expend congressionally-appropriated funds on its functions. Even as Plaintiffs may not have specific injuries flowing directly from the cancellation of these particular contracts, Defendants' sweeping refusal to expend congressionally appropriated funds on IES—characterizing their contract cancellations as "savings"—harms Plaintiffs concretely by decimating the functioning of IES. *See* Pls. Br., ECF No. 12, at 7, 12–16 (citations omitted).

## CONCLUSION

For the foregoing reasons, as well as those previously set forth in this matter, Plaintiffs have standing to challenge the Research Termination Action and IES Staff Termination Action and ask that the Court enter preliminary relief to prevent the ongoing and imminent harms being experienced by Plaintiffs as a result of the evisceration of IES wrought by Defendants' Termination Actions.

---

[202] Ex. NN, Defs.' Descriptions (AERA-0541).
[203] Ex. NN, Defs.' Descriptions (AERA-0542).
[204] Ex. NN, Defs.' Descriptions (AERA-0543).
[205] Ex. NN, Defs.' Descriptions (AERA-0543).
[206] Ex. NN, Defs.' Descriptions (AERA-0544).
[207] Ex. NN, Defs.' Descriptions (AERA-0546).
[208] Ex. NN, Defs.' Descriptions (AERA-0546).
[209] Ex. NN, Defs.' Descriptions (AERA-0548).
[210] Ex. NN, Defs.' Descriptions (AERA-0553).

Dated: June 2, 2025

Respectfully submitted,

*/s/ Daniel A. McGrath*
Daniel A. McGrath (Bar No. 31501)
Madeline H. Gitomer (Bar No. 31518)
Emma R. Leibowitz (Bar No. 31568)
Kayla M. Kaufman (Bar No. 31479)*
Victoria S. Nugent (Bar No. 15039)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 812-7824
dmcgrath@democracyforward.org
mgitomer@democracyforward.org
eleibowitz@democracyforward.org
kkaufman@democracyforward.org
vnugent@democracyforward.org
*Counsel for Plaintiffs*

**Notice of Appearance Forthcoming*

| Statutory Requirement | Contracts Fulfilling Statutory Requirement [Production No.] | Representative Harms to Plaintiffs' Members |
|---|---|---|
| NCES is required to collect, compile, and disseminate early childhood education data. 20 U.S.C. § 9543 (a)(1)(B), (L). | • 91990019C0002 [07]<br>• ED-IES-12-D-0002/91990021F0343 [23]<br>• ED-ESE-15-A-0015/91990020F0309 [16] | • Ex. I, Reardon Decl. ¶ 18<br>• Ex. V, Suppl. Levine Decl. ¶ 4<br>• Ex. W, Suppl. Weiss Decl. ¶ 4<br>• Ex. BB, Logan Doe Decl. ¶ 6 |
| NCES is required to collect, compile, and disseminate data on "access to, and opportunity for, postsecondary education, including data on financial aid." 20 U.S.C. § 9543 (a)(1)(E); 20 U.S.C. § 1015a(k). | • 91990018C0039 [02]<br>• 91990022C0017 [37]<br>• 91990023D0005/91990024F0330 [77] | • Ex. O, Wong Decl. ¶ 6–9<br>• Ex. T, Radwin Decl. ¶ 11<br>• Ex. V., Suppl. Levine Decl. ¶ 5<br>• Ex. X, Baker Decl. ¶ 6–7 |
| NCES collection, compilation, and dissemination of data "on the condition and progress of education" at the "postsecondary" and "adult levels," including "secondary school completions, dropout, and adult literacy and reading skills." 20 U.S.C. § 9543(a)(1)(D). | • 91990023D0042/91990024F0321 [75]<br>• GS00Q140ADU217/91990018F0018 [06]<br>• GS00Q14OADU223/91990019F0025 [13] | • Ex. L, Garvey Decl. ¶ 9<br>• Ex. N, Alex Doe ¶ 8<br>• Ex. GG, Patterson Decl. ¶¶ 5–6 |
| NCES is required to collect, compile, and disseminate data on "teaching" and "the conditions of the education workplace, and the supply of, and demand for, teachers." 20 U.S.C. § 9543 (a)(1)(F), (G). | • 91990020A0014/ 91990022F0328 [47]<br>• ED-ESE-15-A-0015/91990020F0309 [16] | • Ex. V, Suppl. Levine Decl. ¶ 6 |
| NCES is required to collect, compile, and disseminate data on "the incidence, frequency, seriousness, and nature of violence affecting students, school personnel, and other individuals participating in school activities, as well as other indices of school safety." 20 U.S.C. § 9543(a)(1)(H). | • 91990020A0017/91990023F0316 [60]<br>• 91990022C0048 [38] | • Ex. V, Suppl. Levine Decl. ¶ 7 |

| | | |
|---|---|---|
| **NCES is required to collect, compile, and disseminate data, including "assisting public and private educational agencies, organizations, and institutions in improving and automating statistical and data collection activities" and "determining voluntary standards and guidelines to assist State educational agencies in developing statewide longitudinal data systems that link individual student data" consistent with other statutory requirements. 20 U.S. Code § 9543(a)(4), (5).** | • 91990023 D0008/91990024F0367 [85]<br>• GS10F035AA/91990021F0031 [21] | • Ex. V, Suppl. Levine Decl. ¶ 8<br>• Ex. W, Suppl. Weiss Decl. ¶¶ 5, 8 |
| **NCES is required to collect, compile, and disseminate data on "on educational activities and student achievement . . . in the United States compared with foreign nations." 20 U.S.C. § 9543 (a)(6).** | • GS00Q14OADU223/91990019F0025 [13]<br>• GS00Q14OADU217/91990021F0001 [20]<br>• 91990021C0052 [19]<br>• 91990023D0005/91990024F0348 [83]<br>• 91990023C0002 [52] | • Ex. V, Suppl. Levine Decl. ¶ 9<br>• Ex. W, Suppl. Weiss Decl. ¶ 7<br>• Ex. AA, Dierking Decl. ¶ 5<br>• Ex. GG, Becker Patterson Decl. ¶¶ 5–6 |
| **NCES is required to collect, compile, and disseminate data, including "conducting longitudinal and special data collections necessary to report on the condition and progress of education." 20 U.S.C. § 9543 (a)(7).** | • GS00Q140ADU217/91990018F0018 [06]<br>• 91990023D0005/91990024F0330 [77]<br>• 91990023D0042/91990024F0321 [75]<br>• 91990023D0006/91990023F0034 [54] | • Ex. I, Reardon Decl. ¶ 18<br>• Ex. L, Garvey Decl. ¶ 9<br>• Ex. M, Brady Doe Decl. ¶¶ 8–9<br>• Ex. N, Alex Doe Decl. ¶ 8<br>• Ex. V, Suppl. Levine Decl. ¶ 4<br>• Ex. W, Suppl. Weiss Decl. ¶¶ 4, 6<br>• Ex. CC, Shankar Giani Decl. ¶ 15<br>• Ex. II, Viano Decl. ¶ 6 |

| | | |
|---|---|---|
| NCES data must "meet[] the highest methodological standards" and "report education information and statistics in a timely manner" in a way that is "relevant and useful" to "researchers." 20 USC § 9541. | • 91990020A0014/91990022F0350 [50]<br>• 91990023D0029/91990024F0345 [81]<br>• 91990023D0046/91990024F0327 [76]<br>• 91990023D0008/91990024F0331 [78]<br>• 91990023D0039/91990024F0344 [80]<br>• 91990020A0032/91990022F0337 [48] | • Ex. I, Reardon Decl. ¶¶ 11, 16<br>• Ex. J, Tipton Decl. ¶¶ 14, 15<br>• Ex. K, Talbott Decl. ¶ 8<br>• Ex. P, Hedges Decl. ¶ 8<br>• Ex. V, Suppl. Levine Decl. ¶ 11<br>• Ex. W, Suppl. Weiss Decl. ¶ 8<br>• Ex. FF, Krowka Decl. ¶ 9–11, 13 |
| NCEE is required under ESRA to "conduct evaluations" and of federal education programs. 20 U.S.C. §§ 9561; 9562(a)(2). | • 91990021D0004/91990022F0057 [44]<br>• EDIES17C0066 [98]<br>• 91990019C0066 [10]<br>• ED-PEP-16-A-0003/91990019F0334 [14]<br>• 91990021D0001/91990024F0362 [84]<br>• 91990021D0001/91990025F0023 [06]<br>• 91990019C0056 [08]<br>• ED-IES-11-C-0063/91990022F0051 [43]<br>• 91990024D0007/91990024F0006 [68]<br>• 91990024D0007/91990025F0012 [93]<br>• 91990019D0003/91990020F0369 [18]<br>• 91990022A0017/91990024F0369 [86]<br>• 91990022A0016/91990022F0377 [51] | • Ex. E, Keiffer Decl. ¶ 5<br>• Ex. V, Suppl. Levine Decl. ¶ 5<br>• Ex. W, Suppl. Weiss Decl. ¶¶ 9–10<br>• Ex. X, Baker Decl. ¶ 9<br>• Ex. BB, Logan Doe Decl. ¶ 4–5<br>• Ex. DD, Jordan Decl. ¶ 4–5<br>• Ex. HH, Umansky Decl. ¶¶ 7–10<br>• Ex. LL, Weddle Decl. ¶ 4<br>• Ex. MM, Foster Decl. ¶¶ 9–10 |
| NCEE is required to conduct evaluations by ESSA. 20 U.S.C. §§ 6645; 6491(j); 6633(c)(2). | • 91990018C0020 [01]<br>• 91990019C0059 [09]<br>• 91990018C0044 [03] | • Ex. V, Suppl. Levine Decl. ¶ 13<br>• Ex. W, Suppl. Weiss Decl. ¶ 12<br>• Ex. BB, Logan Doe Decl. ¶ 5<br>• Ex. KK, Chow ¶¶ 4–5<br>• Ex. LL, Francis Decl. ¶¶ 8–10 |
| NCEE is required to conduct evaluations of special education by the IDEA. 20 U.S.C. § 1464. | • 91990018C0046 [04]<br>• 91990019C0078 [11]<br>• ED-IES-15-C-0046 [97] | • Ex. F, Gersten Decl. ¶¶ 9–15<br>• Ex. V, Suppl. Levine Decl. ¶ 14<br>• Ex. Y, Baglieri Decl. ¶ 4 |
| NCEE is required to conduct a career and technical education evaluation under the Perkins Act. 20 U.S.C. § 2324(a)(1), (d)(1)(A). | • 91990024D0012/91990024F0394 [91] | • Ex. W, Suppl. Weiss Decl. ¶ 11<br>• Ex. CC, Shankar Giani Decl. ¶ 11 |

| | | |
|---|---|---|
| **NCEE adult education evaluation required by WIOA. 29 U.S.C. § 3332.** | • 91990018C0057 [05] | • Ex. V, Suppl. Levine Decl. ¶ 16 |
| **NCEE must "widely disseminate information on scientifically valid research, statistics, and evaluation" in an "accessible . . . user-friendly, timely and efficient manner" including through a "searchable online database" to "researchers." 20 U.S.C. § 9562(a)(2), (3).** | • 91990021A0004/91990023F0072 [55]<br>• 91990021A0003/91990021F0370 [26]<br>• 91990021A0022/91990022F0342 [49]<br>• 91990021A0004/91990023F0325 [61]<br>• 91990021A0003/91990023F0336 [64]<br>• 91990021A0022/91990024F0342 [79]<br>• 91990023 D0002/91990025F0014 [95]<br>• 91990020D0005/91990021F0365 [24]<br>• 91990020D0005/91990024F0310 [73]<br>• 91990023D0031/91990024F0304 [72]<br>• 91990023A0001/91990023F0308 [58]<br>• 91990023A0001/91990024F0316 [74] | • Ex. G, Weiss Decl. ¶ 9<br>• Ex. J, Tipton Decl. ¶¶ 21–22<br>• Ex. K, Talbott Decl. ¶ 11<br>• Ex. P, Hedges Decl. ¶ 9<br>• Ex. Q, Boulay Decl. ¶ 11<br>• Ex. R, Watkins Decl. ¶ 7<br>• Ex. S, Pigott Decl. ¶¶ 9, 10<br>• Ex. CC, Shankar Giani Decl. ¶ 18<br>• Ex. GG, Becker Patterson Decl. ¶ 7<br>• Ex. II, Viano Decl. ¶ 8 |
| **NCEE is required by ESSA to provide technical assistance to "rigorously evaluate" Education Innovation and Research projects. ESSA Sec. 4611.** | • ED-ESE-15-A-0005/91990020F0305 [15]<br>• 91990020A0028/91990022F0303 [46]<br>• 91990020A0028/91990024F0303 [71]<br>• 91990021F0302 [56]<br>• 91990020A0028/91990021F0304 [22] | • Ex. J, Tipton Decl. ¶ 12<br>• Ex. Q, Boulay Decl. ¶ 9 |
| **NCEE must operate Regional Education Laboratories. 20 U.S.C. § 9564(a).** | • 91990022C0003 [28]<br>• 91990022C0008 [29]<br>• 91990022C0009 [30]<br>• 91990022C0010 [31]<br>• 91990022C0011 [32]<br>• 91990022C0012 [33]<br>• 91990022C0013 [34]<br>• 91990022C0014 [35]<br>• 91990022C0015 [36]<br>• 91990023C0003 [28]<br>• 91990023D0050/91990024F0386 [88] | • Ex. G, Weiss Decl. ¶ 9<br>• Ex. K, Talbott Decl. ¶ 13<br>• Ex. W, Suppl. Weiss Decl. ¶ 14<br>• Ex. Z, Velasquez-Bryant Decl. ¶¶ 8, 10–11, 15 |

| | | |
|---|---|---|
| **Subject to privacy protections "data collected by the Institute . . . shall be made available to the public, including through use of the Internet," 20 U.S.C. § 9574, and the IES "Director shall ensure" the "[d]isseminating [of] information in a timely fashion . . . usable by researchers." 20 U.S.C. § 9575.** | • GS-35F-0329Y/91990019F0001 [12]<br>• GS-00F-428 GA/91990022F0006 [40]<br>• GS-35F-0329Y/91990022F0007 [41] | • Ex. H, Levine Decl. ¶ 15<br>• Ex. L, Garvey Decl. ¶¶ 19–27<br>• Ex. M, Brady Doe Decl. ¶¶ 11–19<br>• Ex. O, Wong Decl. ¶ 14 |
| **NCER must carry out a research plan for "scientifically valid research" that "meets the procedures for peer review." 20 U.S.C. § 9533(a).** | • 91990022C0066 [39] | • Ex. A, Whitehurst Decl. ¶¶ 8–10<br>• Ex. D, Pollard Young Decl. ¶ 16(b)<br>• Ex. I, Reardon Decl. ¶ 20<br>• Ex. K, Talbott Decl. ¶ 6 |
| **Numerous support contracts are necessary to ensure the require dissemination of "timely," "relevant" data and research to "researchers."** | • 91990023D0041/91990024F0387 [89]<br>• 91990023D0005/91990025F0009 [92]<br>• 47QTCK18D0036/91990022F0042 [42]<br>• 91990020A0032/91990022F0302 [45]<br>• 91990020A0032/91990022F0337 [48]<br>• 91990023 D0046/91990023F0330 [62] | • Ex. A, Whitehurst Decl. ¶ 5 |

| **Additional Contracts Fulfilling IES Statutory Functions [Production No.]** |
|---|

- 91990020A0002/91990025F0013 [94]
- 91990023D0029/91990024F0373 [87]
- 91990023D0003/91990024F0376
- 91990023D0049/91990024F0389
- 91990021D0004/91990024F0393 [90]
- 91990020A0032/91990022F0302 [45]
- 91990019C0004
- 91990021P0005 [27]
- 91990024C0043 [66]
- 91990019D0002/91990020F0346 [17]
- 91990019D0002/91990021F0368 [25]
- 91990023D0046/91990023F0334 [63]
- 03310320D0223/LCFDL20D022/91990024F0026 [69]
- 91990020A0031/91990023F0310 [59]
- 91990024C0044 [67]

**CERTIFICATE OF SERVICE**

I, Daniel A. McGrath, certify that I filed the foregoing with the Clerk of Court for the United States District Court for the District of Maryland by using the CM/ECF system, which sent a notice of such filing to all registered CM/ECF users who have appeared in this case.

/s/ Daniel A. McGrath

*Counsel for Plaintiffs*