# Exhibit 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                              )
                                                              )
NIKKI S. CARTER et al.,                          )
                                                              )
                    Plaintiffs,                          )
                                                              )
          v.                                                )          Civil Action No. 25-0744 (PLF)
                                                              )
UNITED STATES DEPARTMENT            )
OF EDUCATION et al.,                            )
                                                              )
                    Defendants.                       )
_____)


OPINION

      This case arises out of the U.S. Department of Education's (the "Department")

recent actions taken with respect to its Office for Civil Rights ("OCR"). OCR, established by

Congress when the Department of Education was created, investigates civil rights complaints at

schools across the country. In March 2025, the Department took two actions that are the subject

of this litigation: first, as part of a Department-wide reduction in force, the Department reduced

OCR's staff by approximately fifty percent; and second, the Department closed seven of OCR's

twelve regional offices.

      Plaintiffs are a group of parents and students who have civil rights complaints

pending before OCR, and an organization, the Council of Parent Attorneys and Advocates, Inc.

("COPAA"), that is a "national not-for-profit membership organization whose membership

comprises parents of children with disabilities, their attorneys, and their advocates." First

Amended Complaint for Declaratory and Injunctive Relief ("Am. Compl.") [Dkt. No. 15] ¶ 22.

Plaintiffs filed a motion for a preliminary injunction on May 2, 2025. They argue that the

Department's recent actions significantly reduce OCR's ability to investigate civil rights complaints, if not functionally preventing it from doing so. The delays caused by the reductions in OCR's "investigative capacity," plaintiffs contend, cause significant harm to students facing discrimination in school and to the parents of those students.

The Court held oral argument on the motion on May 20, 2025. Upon careful consideration of the parties' written submissions, their oral arguments, and the relevant authorities, the Court must deny plaintiffs' motion for a preliminary injunction.[1]

## I. BACKGROUND

### A. *The Department of Education Organization Act and The Office for Civil Rights*

Congress established the Department of Education in 1979 after enacting the Department of Education Organization Act, Pub. L. No. 96-88, § 101, 93 Stat. 668, 669 (1979). In passing the statute, Congress recognized that "education is fundamental to the development of individual citizens and the progress of the Nation," and that "equal access for all Americans to educational opportunities . . . should not be denied because of race, creed, color, national origin, or sex." 20 U.S.C. §§ 3401(1)-(2).

Among other provisions in the statute, Congress established the Office for Civil Rights ("OCR"). See 20 U.S.C. § 3413. OCR is tasked with "assum[ing] responsibility for effectively carrying out the nation's civil rights laws in education," which includes enforcing

---

[1]     The papers reviewed by the Court in connection with this matter include:  First Amended Complaint for Declaratory and Injunctive Relief ("Am. Compl.") [Dkt. No. 15]; Plaintiffs' Motion for Preliminary Injunction ("Pls.' Mot.") [Dkt. No. 52]; Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction ("Pls.' Mem.") [Dkt. No. 52-1]; Memorandum in Opposition to Plaintiff's Motion for a Preliminary Injunction ("Opp.") [Dkt. No. 58]; and Plaintiffs' Reply to Defendants' Opposition to Motion for Preliminary Injunction ("Pls.' Reply") [Dkt. No. 65].

federal statutes prohibiting discrimination on the basis of race (Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq.), sex (Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq.), and disability (Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131, et seq.).  See S. Rep. No. 96-49, at 35-36 (Mar. 27, 1979); see also 34 C.F.R. Part 100; 34 C.F.R. Part 106; 28 C.F.R. § 35.171.  To that end, the statute provides that the Assistant Secretary of Education for Civil Rights – the officer responsible for administering the functions of OCR, 20 U.S.C. § 3413(a) – shall:

> make an annual report to the Secretary, the President, and the Congress summarizing the compliance and enforcement activities of the Office for Civil Rights and identifying significant civil rights or compliance problems as to which such Office has made a recommendation for corrective action and as to which, in the judgment of the Assistant Secretary, adequate progress is not being made.

20 U.S.C. § 3413(b)(1).  While not specific to the functions of OCR, Congress has expressly required the Department to "effectuate" the provisions of Title VI and Title IX of the Civil Rights Act of 1964.  See 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682 (directing "[e]ach Federal department and agency which is empowered to extend Federal financial assistance to" educational programs and activities "to effectuate the provisions of" Title VI and Title IX, respectively).

Federal regulations set forth the procedure by which the Department – through OCR – conducts its investigative and enforcement activities.  With respect to Title VI, related to discrimination on the basis of race, the Department is required to "make a prompt investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply with" Title VI.  34 C.F.R. § 100.7(c).  If the Department determines that there

has been noncompliance with Title VI, it must "inform the recipient [of federal funding]" and

resolve the matter "by informal means whenever possible."  34 C.F.R. § 100.7(d)(1).  If the

action "cannot be resolved by informal means," id., "compliance . . . may be effected by the

suspension or termination of or refusal to grant or to continue Federal financial assistance [to the

recipient of federal funding] or by any other means authorized by law."  34 C.F.R. § 100.8(a).

On the other hand, if the recipient of federal funding is in fact in compliance with Title VI, the

Department must "inform the recipient and the complainant, if any, in writing."  34 C.F.R.

§ 100.7(d)(2).  The procedures for investigating noncompliance with the provisions of Title IX,

governing sex discrimination, are the same.  See 34 C.F.R. § 106.81 ("[T]he procedural

provisions applicable to Title VI of the Civil Rights Act of 1964 are hereby adopted and

incorporated herein.").  As it relates to Title II, respecting disability discrimination, the

Department must "promptly review the complaint to determine whether it has

jurisdiction . . . under section 504" and, if jurisdiction exists, "promptly notify the complainant

and the public entity of the receipt and acceptance of the complaint," and "process the complaint

according to its procedures for enforcing section 504."  28 C.F.R. §§ 35.171(a)(3)(i), (c)(1).

OCR will then perform an investigation and if the Assistant Secretary finds that "a recipient has

discriminated against persons on the basis of handicap," the Department can order the recipient

of federal funds to "take such remedial action as the Assistant Secretary deems necessary to

overcome the effects of the discrimination."  34 C.F.R. § 104.6(a)(1).

## B.  Factual Background

On March 3, 2025, following her confirmation as Secretary of the Department of

Education, Secretary Linda McMahon released a statement outlining the "Department's Final

Mission."  See Pls.' Ex. 1 [Dkt. No. 52-4] ("Final Mission").  In the statement, Secretary

McMahon describing her vision for the Department, stated:

> After President Trump's inauguration last month, he steadily signed a slate of executive orders to keep his promises: combatting critical race theory, DEI, gender ideology, discrimination in admissions, promoting school choice for every child, and restoring patriotic education and civics.  He has also been focused on eliminating waste, red tape, and harmful programs in the federal government. The Department of Education's role in this new era of accountability is to restore the rightful role of state oversight in education and to end the overreach from Washington.

Id. at 2.  Secretary McMahon closed by explaining that the Department had the "opportunity to perform one final, unforgettable public service" and urged the Department employees to join "in this historic final mission."  Id. at 3-4.

Several days later, on March 11, 2025, the Department took two major actions affecting OCR.  First, the Department announced that it was closing seven of OCR's twelve regional offices.  See Pls.' Mem. at 1, 5, 8; Declaration of Doe Declarant 7 ("Doe 7 Decl.") [Dkt. No. 52-22] ¶ 15.  Second, the Department announced that it was initiating a reduction in force that would impact "nearly 50% of the Department's workforce" "across "[a]ll divisions within the Department."  See Pls.' Ex. 2 [Dkt. No. 52-5] ("RIF Press Release").  Employees affected by the reduction in force were to be placed on administrative leave beginning on March 21, 2025, and then would be permanently terminated on June 9, 2025.  See id. at 2.  In a document sent to employees subject to the reduction in force, the Department explained that it "made the determination to initiate RIF procedures as part of the agency's restructuring process" and in "support [of] Executive Order (EO) 14158, Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative."  See Pls.' Ex. 3 [Dkt. No. 52-6] at ECF 7.  Executive Order 14158 directed agencies to "promptly undertake preparations to initiate large-scale reductions in force."  See Exec. Order No. 14158 § 3(c), 90 Fed. Reg. 9669

(Feb. 11, 2025). The Department-wide reduction in force reduced OCR's staff by half, with "no more than 151 OCR investigators" remaining. Pls.' Mem. at 8; see Declaration of Doe Declarant 3 ("Doe 3 Decl.") [Dkt. No. 52-18] ¶¶ 18, 20; Jodi S. Cohen & Jennifer Smith Richards, Massive Layoffs at the Department of Education Erode Its Civil Rights Division, PROPUBLICA (Mar. 12, 2025), available at https://www.propublica.org/article/education-department-civil-rights-division-eroded-by-massive-layoffs [https://perma.cc/QZE4-HHAP]. The reduction in force also included three of OCR's four Enforcement Directors, who provide certain required approvals in "cases of interest." Doe 7 Decl. ¶¶ 17, 27; see Declaration of Doe Declarant 8 ("Doe 8 Decl.") [Dkt. No. 52-23] ¶ 20.[2]

       Plaintiffs have provided substantial evidence that the Department's actions have impacted OCR's operations and will make it difficult – or impossible – for OCR to conduct investigations. For example, plaintiffs provide a series of declarations from current and former OCR employees explaining that caseloads of OCR staff now "exceed[] any approximation of reasonableness" in light of the reduction in force. Pls.' Mem. at 9; see Doe 3 Decl. ¶¶ 20-21; Declaration of Doe Declarant 4 ("Doe 4 Decl.") [Dkt. No. 52-19] ¶¶ 20, 22; Doe 8 Decl. ¶ 18; Declaration of Catherine E. Lhamon ("Lhamon Decl.") [Dkt. No. 52-8] ¶¶ 28, 30, 43.[3] For

---

      [2]      On March 20, 2025, several days after the Department's RIF Press Release, President Trump issued an executive order titled "Improving Education Outcomes by Empowering Parents, States, and Communities." Exec. Order No. 14242, 90 Fed. Reg. 13679 (Mar. 20, 2025) ("Executive Order"). After listing several purported "failures" of the Department of Education, the Executive Order provides that "[t]he Secretary of Education shall, to the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education . . . ." Executive Order § 2. Plaintiffs state that they do "not challenge[] the Executive Order or the government's plan to fully dismantle the Department of Education." See Pls.' Reply at 13.

      [3]      A minority staff report from the U.S. Senate Committee on Health, Education, Labor and Pensions analyzed the impact of the Department's actions on OCR, including on the

example, Catherine Lhamon, a former "Assistant Secretary for the United States Department of

Education, Office for Civil Rights (OCR)," Lhamon Decl. ¶ 2, stated that when she left OCR in

January 2025, the average caseload was "already [ ] untenable" at approximately 50 cases per

OCR investigator.  Id. ¶¶ 25-27.  According to a current senior attorney at OCR – who creates a

"dashboard" on, inter alia, "the total number of active cases" at OCR, see Doe 3 Decl.

¶¶ 7-8 – the average caseload has doubled to approximately 106 cases per investigator.  Id. ¶ 20.

The senior attorney states that based on their "18 years of experience at OCR," such a caseload

would require an investigator either to "conduct cursory investigations that are investigations in

name only in order to resolve the cases in a timely fashion or allow cases to languish for an

unreasonably long time."  Id. ¶ 23.  Other employees have echoed this sentiment.  See Doe 7

Decl. ¶ 20 ("My caseload is completely unmanageable at this point.  I cannot thoroughly

investigate all of my cases within a reasonable timeframe.");  Doe 4 Decl. ¶ 20; Doe 8 Decl. ¶ 18.

Outside of the substantial uptick in caseload, the termination of three of the four OCR

Enforcement Directors means that "approval process[es]" critical for resolving certain cases

cannot be received in a "timely manner."  Pls.' Mem. at 10; see Doe 7 Decl. ¶ 27.

           Plaintiffs also explain that OCR's ability to resolve cases is impacted by the

regional office closures.  See Pls.' Mem. at 8-10.  For example, while the Department has

indicated that it will transition the cases from the closed offices to the offices that remain open,

the Department has not created a "standard mechanism for employees . . . to transfer their cases,

---

number of staff affected and the increase in OCR case load per OCR staff member.  See
President Trump's Decision to Gut the Office for Civil Rights has Left Over 46 Million Students
Without Protection from Discrimination, U.S. Senate Committee on Health, Education, Labor
and Pensions, Minority Staff Report (Mar. 27, 2025), available at
https://www.sanders.senate.gov/wp-content/uploads/03.27.25-OCR-Report-Draft-v9.pdf
[https://perma.cc/XN74-JZ97]; see also Am. Compl. ¶ 75 n.58 (citing report).

and accordingly, most were not transferred." Id. at 8; see Doe 4 Decl. ¶ 13; Doe 6 Decl.

¶¶ 15, 17; Doe 7 Decl. ¶ 21. The lack of a procedure for transferring cases means that "OCR

staff at some open offices have been unable to access and/or make changes to necessary

information and records for transferred cases . . . ." Pls.' Mem. at 9; see Doe 7 Decl. ¶ 21; Doe 8

Decl. ¶ 15. Furthermore, the closure of the regional offices makes it difficult for OCR

investigators to handle cases since they are "now geographically much further from some of the

places they investigate." Pls.' Mem. at 10; see Doe 7 Decl. ¶ 26; Doe 8 Decl. ¶¶ 18-19.

### C. The Instant Litigation

The plaintiffs fall into three categories. First, plaintiffs Nikki S. Carter, Melissa

Combs, Elizabeth Stewart-Williams, Amy Cupp, A.W., K.D., and A.M. are the parents of

students who have pending civil rights complaints with OCR. See Am. Compl. ¶¶ 15-21.

Second, plaintiffs M.W., D.P., A.S., G.C. are students who have pending civil rights complaints

with OCR. See id. ¶¶ 17-18, 20-21. Plaintiffs M.W. and G.C. are minors. See id. ¶¶ 17, 21.

Finally, plaintiff Council of Parent Attorneys and Advocates, Inc. ("COPAA") is a "national not-

for-profit membership organization whose membership comprises parents of children with

disabilities, their attorneys, and their advocates." Id. ¶ 22. COPAA "frequently advises, trains,

and assists parents, attorneys, and advocates filing complaints with OCR." Id. ¶ 23.

The plaintiffs filed an amended complaint on April 10, 2025. See Am. Compl.

The plaintiffs bring five counts: (1) a claim under the Administrative Procedure Act ("APA")

that defendants' actions with respect to OCR are arbitrary and capricious, see id. ¶¶ 133-40;

(2) an APA claim that defendants' actions are not in accordance with law, see id. ¶¶ 141-46;

(3) an APA claim that defendants' have unlawfully withheld or unreasonably delayed the

investigation of plaintiffs' OCR complaints, see id. ¶¶ 147-51; (4) a claim that defendants'

actions are ultra vires, see id. ¶¶ 152-56; and (5) a Fifth Amendment claim – brought only by

plaintiffs Nikki S. Carter, K.D., M.W., Melissa Combs, D.P, and A.S. – that defendants' actions

represent unlawful discrimination on the basis of race, sex, sexual orientation, and gender

identity. See id. ¶¶ 157-63.[4]  As for relief, plaintiffs request an order declaring defendants'

actions taken with respect to OCR unlawful and a preliminary and permanent injunction

(1) "[c]ompelling Defendants to restore the investigation and processing capacity of OCR and to

process OCR complaints promptly and equitably;" (2) "[o]rdering additional appropriately

tailored remedies to ensure Defendants' future compliance with their obligations, such as

periodic public reporting to this Court regarding OCR's processing and enforcement of

complaints;" and (3) "[r]etaining continuing jurisdiction to oversee compliance with the Court's

order." See id. at 56-57.


## II.  LEGAL STANDARD

A movant seeking preliminary injunctive relief must make a "clear showing that

four factors, taken together, warrant relief:  likely success on the merits, likely irreparable harm

in the absence of preliminary relief, a balance of the equities in its favor, and accord with the

public interest." Archdiocese of Washington v. Wash. Metro. Area Transit Auth., 897 F.3d 314,

321 (D.C. Cir. 2018) (quoting League of Women Voters v. Newby, 838 F.3d 1, 6 (D.C.

Cir. 2016)); see also Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011) (noting that a

preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to

such relief (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008))).  Of these,

the most important factor is whether a movant has established a likelihood of success on the

---

[4]      Plaintiffs do not address their Fifth Amendment claim in their motion for a
preliminary injunction.  The Court therefore does not address the claim at this juncture.

merits.  See Aamer v. Obama, 742 F.3d 1023, 1038 (D.C. Cir. 2014); Bailey v. Fed. Bureau of

Prisons, Civil Action No. 24-1219 (PLF), 2024 WL 3219207, at *3 (D.D.C. June 28, 2024).

   Before the Supreme Court's decision in Winter, courts in this Circuit weighed

these four factors on a "sliding scale," under which the movant need not "make as strong a

showing" on one factor if they "make[ ] an unusually strong showing" on another.  Davis v.

Pension Benefit Guar. Corp., 571 F.3d 1288, 1291-92 (D.C. Cir. 2009) (quoting Davenport v.

Int'l Bhd. of Teamsters, 166 F.3d 356, 361 (D.C. Cir. 1999)); accord Damus v. Nielsen, 313 F.

Supp. 3d 317, 326 (D.D.C. 2018).  This Circuit has suggested, however, that "a likelihood of

success" and "a likelihood of irreparable harm" are "independent, free-standing requirement[s]

for a preliminary injunction."  Sherley v. Sebelius, 644 F.3d at 392-93 (quoting Davis v. Pension

Benefit Guar. Corp., 571 F.3d at 1296 (Kavanaugh, J., concurring)); see Archdiocese of

Washington v. Wash. Metro. Area Transit Auth., 897 F.3d at 334 (declining to resolve whether

the "sliding scale" approach is still valid after Winter); Nat'l Treasury Emps. Union v. Vought,

Civil Action No. 25-0381 (ABJ), 2025 WL 942772, at *19 (D.D.C. Mar. 28, 2025).  Regardless,

"a failure to show a likelihood of success on the merits alone is sufficient to defeat a

preliminary-injunction motion."  Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, 205

F. Supp. 3d 4, 26 (D.D.C. 2016) (citing Ark. Dairy Coop. Ass'n v. U.S. Dep't of Agric., 573

F.3d 815, 832 (D.C. Cir. 2009)); see also M.G.U. v. Nielsen, 325 F. Supp. 3d 111, 117-18

(D.D.C. 2018).

   For each of its claims, plaintiffs bear the burden of persuasion.  Chaplaincy of

Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006).  Plaintiffs also "bear[] the

burden of producing credible evidence sufficient to demonstrate [their] entitlement to injunctive relief."  Workman v. Bissessar, 275 F. Supp. 3d 263, 267 (D.D.C. 2017).[5]

### III. DISCUSSION

#### A. Likelihood of Success on the Merits

##### 1. APA Claims

The plaintiffs seek remedies for injuries resulting from the impact that the Department's recent actions – that is, the initiation of the reduction in force and the closure of OCR's regional offices – have on OCR's "investigation and enforcement capacity."  See Pls.' Mem. at 2-3.  Plaintiffs' injuries are caused principally by OCR's failure to investigate plaintiffs' civil rights complaints or its unreasonable delay in doing so.  Plaintiffs bring two related but distinct sets of APA claims.  First, pursuant to 5 U.S.C. § 706(2), plaintiffs contend that the

---

[5]    Defendants argue that all of the plaintiffs lack standing.  See Opp. at 5-8.  As to COPAA specifically, defendants argue that the organization does not satisfy the requirements of associational or organizational standing.  See id. at 7-8; see also New York Ctr. for Foreign Pol'y Affs. v. United States Dep't of State, Civil Action No. 20-3847 (PLF), 2024 WL 3400122, at *4 (D.D.C. July 12, 2024) (discussing organizational standing); Sec. Indus. & Fin. Markets Ass'n v. United States Commodity Futures Trading Comm'n, 67 F. Supp. 3d 373, 400-01 (D.D.C. 2014) (discussing associational standing).

The defendants also argue that the Court lacks jurisdiction over this case because plaintiffs are required to channel their claims through the "alternative statutory scheme for administrative and judicial review" set up by Congress in the Civil Service Reform Act and Federal Service Labor-Management Relations Statute – such as the Merit Systems Protection Board or the Federal Labor Relations Authority.  See Opp. at 8-9 (quoting Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 929 F.3d 748, 754 (D.C. Cir. 2019)); see also Nat'l Treasury Emps. Union v. Trump, Civil Action No. 25-0935 (PLF), 2025 WL 1218044, at *4 (D.D.C. Apr. 28, 2025) (discussing test for determining whether a district court's jurisdiction is precluded by a "special statutory review scheme").

The Court need not reach these issues at this juncture because it concludes that even assuming the plaintiffs have standing and the Court has jurisdiction, plaintiffs' motion for a preliminary injunction must be denied because they have failed to show a likelihood of success on the merits of their claims.

Department's <u>actions</u> reducing the capacity of OCR violate the APA because they "foreclos[e]" OCR's ability to perform its "statutory and regulatory responsibilities . . . in a prompt manner." <u>See</u> Pls.' Mem. at 22.  In other words, the Department's actions are "arbitrary and capricious" or "contrary to law," <u>see</u> 5 U.S.C. § 706(2)(A), because they are tantamount to closing OCR or, at a minimum, prevent OCR from performing its statutory and regulatory duties.  <u>See</u> Pls.' Mem. at 22-32.  Second, pursuant to 5 U.S.C. § 706(1), plaintiffs challenge the Department's <u>inaction or delay</u> in investigating plaintiffs' complaints.  <u>See id.</u> at 32-34.  More specifically, plaintiffs argue that "[b]y decimating OCR's" investigative capacity, the Department "cannot promptly investigate complaints," thereby "unlawfully with[holding] and/or unreasonably delay[ing] investigations . . . ."  Am. Compl. ¶ 151.

The Court interprets plaintiffs' APA claims as challenging three separate things: (1) the specific agency actions, <u>i.e.</u>, the reduction in force and office closures; (2) the effect those agency actions will have on OCR's ability to investigate civil rights complaints; and (3) the agency's inaction or unreasonable delay.  First, plaintiffs contend that they are directly harmed by the challenged agency actions – the reduction in force and closure of OCR regional offices – because those decisions are tantamount to discontinuing OCR's operations.  <u>See</u> Pls.' Mem. at 21-29.  Second, plaintiffs argue that the challenged actions "will undoubtedly" have the effect of limiting – or entirely preventing – OCR's ability to process civil rights complaints "moving forward."  <u>See id.</u> at 10, 21-29.  Finally, plaintiffs contend that they are harmed by the unreasonable delay or inaction in processing their civil rights complaints.  <u>See id.</u> at 32-34.

The Court concludes that plaintiffs are unlikely to succeed on the merits of any of these challenges.  This conclusion is reached both because (1) plaintiffs have not offered sufficient evidence demonstrating that OCR has failed to perform its statutory and regulatory

duties, and (2) plaintiffs' challenge that OCR will be unable to perform its duties represents a

"broad programmatic attack" on the agency's operations that is not cognizable under the APA.

See Norton v. S. Utah Wilderness All., 542 U.S. 55, 62 (2004).  The Court begins by addressing

plaintiffs' claims brought pursuant to 5 U.S.C. § 706(2) before turning to the claim brought

pursuant to 5 U.S.C. § 706(1).

### a.  5 U.S.C. § 706(2):  Agency Action

Under the APA, "[a] person suffering legal wrong because of agency action, or

adversely affected or aggrieved by agency action . . ., is entitled to judicial review thereof."

5 U.S.C. § 702.  A reviewing court shall "hold unlawful and set aside agency action, findings,

and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  5 U.S.C. § 706(2)(A); see Battineni v. Mayorkas, 752 F. Supp. 3d 195,

206-07 (D.D.C. 2024).  The APA defines "agency action" as "the whole or part of an agency

rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."

5 U.S.C. § 551(13).  The definition "is expansive . . . [and] is 'meant to cover comprehensively

every manner in which an agency may exercise its power.'"  Fund for Animals, Inc. v. U.S.

Bureau of Land Mgmt., 460 F.3d 13, 19 (D.C. Cir. 2006) (Whitman v. Am. Trucking Ass'ns,

Inc., 531 U.S. 457, 478 (2001)); accord Drs. for Am. v. Off. of Pers. Mgmt., Civil Action

No. 25-0322 (JDB), 2025 WL 452707, at *5 (D.D.C. Feb. 11, 2025).  The APA defines "order"

as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or

declaratory in form, of an agency in a matter other than rule making but including licensing."

5 U.S.C. § 551(6).  In determining whether an agency action is "final," "[t]he Supreme Court

applies a two-part test":  "(1) [the agency action] 'mark[s] the consummation of the agency's

decisionmaking process . . .'; and (2) the action 'must be one by which rights or obligations have

been determined or from which legal consequences will flow.'" Domestic Securities, Inc. v.
S.E.C., 333 F.3d 239, 246 (D.C. Cir. 2003) (quoting Bennett v. Spear, 520 U.S. 154, 177-78
(1997)); see Friends of Animals v. Ashe, 174 F. Supp. 3d 20, 36 (D.D.C. 2016)).

      In the instant case, plaintiffs contend that they are challenging two final agency
actions:  (1) the Department's decision to institute a reduction in force; and (2) the Department's
decision to close several OCR regional offices.  See Pls.' Mem. at 21-22.  Plaintiffs argue that
their injury – stemming from OCR's failure or delay in investigating civil rights
complaints – necessarily flows from the Department's actions because those actions are
tantamount to discontinuing OCR's operations.[6]  At the most fundamental level, this argument
fails because OCR is in fact investigating civil rights complaints despite the regional office
closures and the reduction in force – albeit now likely at a much slower pace.

      The case plaintiffs primarily rely on to support their argument illustrates the
problem for plaintiffs.  In Nat'l Treasury Emps. Union v. Vought, Judge Amy Berman Jackson
concluded that the plaintiffs were likely to succeed on the merits of their APA claim that
challenged "the implementation of the President's unlawful decision to close the" Consumer
Financial Protection Bureau ("CFPB").  See Nat'l Treasury Emps. Union v. Vought, Civil

---

[6]    See Pls.' Mem. at 2 ("Defendants' recent evisceration of OCR's capacity to
address and fully investigate students' and families' complaints by gutting OCR's workforce and
closing several regional offices has effectively halted OCR's statutorily mandated investigations
of Plaintiffs' complaints."); id. at 22 ("Clearly, Defendants' dismissal of OCR staff and their
closure of seven OCR offices is final agency action that is foreclosing the statutory and
regulatory responsibilities of OCR to investigate Plaintiffs' complaints in a prompt manner."); id.
at 35 ("The Department's gutting of OCR prevents it from 'carry[ing] out [its] functions' and
from effectuating the purposes of Title IX and Title VI."); id. at 31 (stating that Department's
decisions "prevent" OCR from complying with its regulations); Pls.' Reply at 1
("Defendants . . . do not have discretion to act in ways that render OCR incapable of meeting
their legal obligations."); id. at 16 ("OCR no longer has the staffing or resources necessary to
meet its statutory responsibilities.").

Action No. 25-0381 (ABJ), 2025 WL 942772, at *41 (D.D.C. Mar. 28, 2025). Critical to Judge

Jackson's decision was a February 10, 2025 order from the Acting Director of the CFPB, Russell

Vought, instructing CFPB employees to "stop[] all work, including statutorily mandated

work . . . ." Id. at *40. Judge Jackson concluded that this order provided "at least one discrete,

final action taken in violation of law and without a rational basis to support it . . . ." Id.

       The order in the instant case is not as draconian as the one at issue in Nat'l

Treasury Emps. Union v. Vought. If that were the case here, plaintiffs would undoubtedly have

a strong argument that it was "suffering legal wrong because of [the] agency action, or [was]

adversely affected or aggrieved by [the] agency action." See 5 U.S.C. § 702. But no such order

exists here. As discussed below, it is undisputed that OCR is currently still investigating civil

rights complaints.

       Plaintiffs nonetheless argue that the Department's actions "prevent OCR from

carrying out its mission and statutory duties," which in turn harms plaintiffs. See Pls.' Mem.

at 10-11. To that end, plaintiffs identify two obligations – one statutory and one regulatory – that

they assert OCR is or will be unable to perform in light of the Department's actions reducing

OCR's investigative capacity. First, plaintiffs assert that the agency actions reducing OCR's

capacity means that OCR necessarily will fail to satisfy its statutory mandate requiring the

Department of Education to "effectuate" the provisions of Title VI and Title IX of the Civil

Rights Act of 1964. See 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682; see also supra Section I.A

(discussing the Department's statutory obligations to enforce civil rights laws).

       Unfortunately for plaintiffs, the evidence they offer does not support their claim

that OCR is failing to satisfy its statutory obligations; indeed, it unequivocally shows that OCR is

still investigating complaints. The declarations plaintiffs provide either state in conclusory terms

that the declarant does "not think that the Department of Education can meet its statutory obligations . . . given the downsizing," Declaration of Doe Declarant 5 ("Doe 5 Decl.") [Dkt. No. 52-20] ¶ 23; see Declaration of Doe Declarant 6 ("Doe 6 Decl.") [Dkt. No. 52-21] ¶ 32 (same); Declaration of Doe Declarant 1 [Dkt. No. 52-16] ("Doe 1 Decl.") ¶ 26 (same); Lhamon Decl. ¶ 30 (same), or describe "[t]he long-term impact of significantly downsizing OCR . . . ." Declaration of Doe Declarant 2 ("Doe 2 Decl.") [Dkt. No. 52-17] ¶ 25.[7]  While these declarations offer evidence that the Department's actions will have significant impacts on OCR's efficiency in investigating civil rights complaints moving forward, the declarations do not show that the Department currently is failing to "carry[] out its dut[y]" to effectuate the civil rights statutes. See Pls.' Reply at 17.  The fact that OCR is still investigating civil rights complaints not only distinguishes this case from Nat'l Treasury Emps. Union v. Vought – where the challenged agency action was a directive to stop performing statutorily mandated work – but also demonstrates that plaintiffs' APA challenge is better understood as a challenge to unreasonable delay pursuant to 5 U.S.C. § 706(1), not to an agency action pursuant to 5 U.S.C. § 706(2). Accordingly, the Court concludes that the Department's actions do not prevent it from complying with the identified statutory mandates.

    Plaintiffs next argue that OCR's downsizing prevents it from complying with its regulatory obligations requiring "prompt" investigation of civil rights complaints.  See Pls.'

---

[7]    See Doe 1 Decl. ¶ 26 ("Closing [offices] and transferring their large number of cases to the remaining offices will overburden the remaining offices and severely diminish the overall efficiency and productivity of OCR."); Doe 3 Decl. ¶ 23 (stating that OCR's reduced capacity will force declarant to either "conduct cursory investigations . . . or allow cases to languish for an unreasonably long time"); Doe 7 Decl. ¶ 20 ("I cannot thoroughly investigate all of my cases within a reasonable timeframe."); Lhamon Decl. ¶ 43 ("If this RIF proceeds as announced, it is impossible to conceive how OCR can service its function and fulfill Congress's promise for the nation's families.").

Mem. at 4 (citing 34 C.F.R. § 100.7(c), 34 C.F.R. § 106.81, 28 C.F.R. § 35.171).  As will be discussed in connection with plaintiffs 5 U.S.C. § 706(1) unreasonable delay claim, plaintiffs do not substantively argue that OCR currently is unlawfully withholding or unreasonably delaying the investigation of plaintiffs' civil rights complaints.  While the Department's actions may eventually have the effect of preventing OCR from conducting "prompt investigations," the challenged agency actions do not themselves violate the Department's regulatory obligations.[8]

In sum, the challenged agency actions are not directly in violation of the Department's statutory and regulatory obligations, and do not directly prevent OCR from complying with its statutory and regulatory requirements.  As a result, plaintiffs have not been injured by the Department's actions themselves.  Indeed, plaintiffs essentially concede the point that they are not challenging the agency actions directly, stating that "[i]f, instead of terminating OCR employees, the government had ordered them to go to work but process no complaints, Plaintiffs' claims would be unchanged."  See Pls.' Reply at 7-8.  Accordingly, because plaintiffs' "prediction" that OCR's reduced investigatory capacity will mean that OCR is unable to satisfy its statutory and regulatory duties "in the future" is not "a challenge . . . [to] a 'final agency action under" the APA, plaintiffs fail to show a likelihood of success on the merits of their claim.  See Friends of Animals v. Ashe, 174 F. Supp. 3d at 37; see also In re Aiken Cnty., 645 F.3d 428, 437 (D.C. Cir. 2011) ("At least to this date, the [agency] has not failed to take any discrete agency action that Congress ordered it to take.").

---

[8]    Plaintiffs' reliance on the Accardi doctrine, see Pls.' Mem. at 30-31 (citing Accardi v. Shaughnessy, 347 U.S. 260, 268 (1954)), is unavailing.  That doctrine provides that a plaintiff can bring an APA claim challenging an agency's failure to follow their own "existing valid regulations."  See Accardi v. Shaughnessy, 347 U.S. at 268.  Plaintiffs, however, "must nevertheless challenge a discrete and final action that is required by law" and that is not being performed by the agency.  See S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec., Civil Action No. 18-0760 (CKK), 2023 WL 2564119, at *4 (D.D.C. Mar. 15, 2023).

b.  5 U.S.C. § 706(2):  Future Effects of Agency Action

The gravamen of plaintiffs' Section 706(2) claims relates to the effect the

Department's actions "will undoubtedly" have "moving forward" on OCR's ability to carry out

"its mission and statutory duties."  See Pls.' Mem. at 10.  Put differently, plaintiffs' APA claims

are a challenge to OCR's general operations and the speed at which OCR will be able to process

civil rights complaints in the future.  Because this is not a challenge to a discrete "agency

action," plaintiffs are unlikely to succeed on the merits of their APA claims brought pursuant to

5 U.S.C. § 706(2).

As a general matter, agency actions subject to review under the APA "must be

'circumscribed [and] discrete.'"  Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, Civil

Action No. 25-0239 (LLA), 2025 WL 597959, at *13 (D.D.C. Feb. 25, 2025) (quoting Norton v.

S. Utah Wilderness All., 542 U.S. at 62) (alteration in original).  "The limitation to discrete

agency action precludes . . . broad programmatic attack[s]" on an agency's operations, Norton v.

S. Utah Wilderness All., 542 U.S. at 64, and does not allow a court to review an agency's "day-

to-day operations."  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. at 899.

In Lujan, the plaintiffs challenged what they deemed to be a "land withdrawal

review program" of the Bureau of Land Management ("BLM").  Lujan v. Nat'l Wildlife

Fed'n, 497 U.S. at 875.  The Supreme Court, however, found that this program was not "a single

BLM order or regulation," but rather shorthand for "the continuing (and thus constantly

changing) operations of the BLM in reviewing withdrawal revocation applications and the

classifications of public lands and developing land use plans as required by the [Federal Land

Policy and Management Act of 1976]."  Id. at 890.  Highlighting the fact that the challenged

"program" was "no more an identifiable 'agency action' . . . than a 'weapons procurement

program' of the Department of Defense or a 'drug interdiction program' of the Drug

Enforcement Administration," id., the Supreme Court held that such challenges were

non-justiciable, reasoning:

> [Plaintiff] cannot seek wholesale improvement of [agency] program[s] by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made. Under the terms of the APA, [plaintiff] must direct its attack against some particular "agency action" that causes it harm. . . . [A] regulation is not ordinarily considered the type of agency action "ripe" for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.
>
> [. . .]
>
> In the present case, the individual actions of the BLM identified in the six affidavits can be regarded as rules of general applicability . . . announcing, with respect to vast expanses of territory that they cover, the agency's intent to grant requisite permission for certain activities, to decline to interfere with other activities, and to take other particular action if requested. It may well be, then, that even those individual actions will not be ripe for challenge until some further agency action or inaction more immediately harming the plaintiff occurs. But it is at least entirely certain that the flaws in the entire "program" – consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well – cannot be laid before the courts for wholesale correction under the APA, simply because one of them that is ripe for review adversely affects one of respondent's members.

Id. at 891-93 (footnote omitted) (emphasis in original); see Garcia v. Stewart, 531 F. Supp. 3d

194, 211 (D.D.C. 2021) (summarizing Lujan).

Plaintiffs dispute the relevance of <u>Lujan</u>, arguing that they are "challeng[ing] a specific decision and its ramifications."  <u>See</u> Pls.' Reply at 12.  Plaintiffs' own arguments, however, contradict this assertion.  In relevant part, plaintiffs argue:

> Moreover, Plaintiffs do not challenge the legality of an adverse employment action, as Defendants suggest.  Plaintiffs challenge OCR's unlawful failure to carry out its statutorily-mandated functions.  <u>If, instead of terminating OCR employees, the government had ordered them to go to work but process no complaints, Plaintiffs' claims would be unchanged.</u>
>
> [. . .]
>
> Nor do Plaintiffs identify the terminations as the sole cause of OCR's failures:  <u>the preliminary injunction and supporting declarations identify a host of related factors which have prevented OCR from carrying out its statutory responsibilities.</u>  Most importantly, OCR shut down seven of its twelve offices.  No effort was made to preserve documents for cases when they were transferred from closed offices, meaning that new attorneys taking them on lost the benefit of already-completed work.  Travel is often required to effectively investigate complaints, yet Defendants have cut off all travel funding.  OCR staff rely on information technology systems to manage the complaint process, but staff who remain are unable to access information about cases transferred to them due to inadequate IT support.

Pls.' Reply at 7-8 (internal citations omitted) (emphasis added).  The arguments show that plaintiffs are not challenging "specific [agency] decision[s]," <u>see id.</u> at 12, since – according to plaintiffs – their "claims would be unchanged" if other actions were taken that had similar effects on OCR's investigatory capacity.  <u>See id.</u> at 7-8.  Rather, by their own admission, plaintiffs are challenging "a host of related factors which have prevented OCR from carrying out its statutory responsibilities," including general operational decisions such as policies related to document preservation, the "cut[ting] off of all travel funding," and "inadequate IT support."  <u>See id.</u> at 8.  Plaintiffs' challenge to this "host of related factors" is foreclosed by <u>Lujan</u>, which squarely held that such challenges to the "flaws in the entire 'program'" "cannot be laid before the courts for

wholesale correction under the APA . . . ."  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. at 892-93;

see also Norton v. S. Utah Wilderness All., 542 U.S. at 66.

   Indeed, the relief plaintiffs request in their motion for a preliminary injunction

further illustrates that they seek correction of the entire operation of OCR.  See Lujan v. Nat'l

Wildlife Fed'n, 497 U.S. at 893-94.  As defendants put it, plaintiffs' requested relief "in effect,

place[s] the Department's OCR operations into receivership."  Opp. at 1.  Plaintiffs proposed

order provides:

> Within seven calendar days of this Order, Defendants shall submit
> to this Court and Plaintiffs a restoration plan that would enable OCR
> to process complaints promptly and equitably, as required by law.
> Defendants shall include in the restoration plan an expeditious
> timetable to carry out the Court's preliminary injunction and a
> thorough explanation for the basis of the restoration plan with
> relevant and accurate data and supporting credible facts that provide
> a reasoned basis for the proposed plan.  Defendants shall provide
> Plaintiffs a copy of all documents supporting the reasoned basis for
> the plan.  Plaintiffs shall present to this Court and Defendants any
> responses and objections to the plan within seven calendar days of
> receiving the plan and documentation from Defendants.  Once the
> plan is approved by the Court, Defendants are Ordered to fully
> implement the plan and shall not take further action to frustrate or
> delay the plan's implementation.
>
> Furthermore, Defendants shall submit to this Court and Plaintiffs
> periodic status reports on their compliance and implementation
> beginning fourteen calendar days following the date of this Order
> and on the first Monday of each month thereafter.  At least three
> business days prior to the submission of each status report,
> Defendants shall present to and confer with Plaintiffs on the status
> report.  Plaintiffs shall have an opportunity to submit a response to
> the status reports within seven calendar days.  It is further Ordered
> that Plaintiffs shall have a right to conduct discovery related to
> Defendants' status reports.

Proposed Order Granting Plaintiffs' Motion for Preliminary Injunction ("Prop. Order") [Dkt.

No. 52-2].  As the Supreme Court explained in Norton v. S. Utah Wilderness All., such sweeping

relief "is not contemplated by the APA," nor is it compatible with a court's role:

> The principal purpose of the APA limitations we have discussed . . . is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve.  If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved – which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management. . . .  The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA.

Norton v. S. Utah Wilderness All., 542 U.S. at 66-67.[9]

At oral argument, the plaintiffs argued that the D.C. Circuit's decision in Adams v. Richardson, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (en banc), supported their request for relief. In that case, the district court granted summary judgment for plaintiff after finding that the Department of Health, Education, and Welfare's Office of Civil Rights ("DHEW OCR") – the predecessor to OCR – had "been derelict in [its] duty to enforce Title VI of the Civil Rights Act of 1964 because [it] had not taken appropriate action to end segregation in public educational

---

[9]    Plaintiffs argue that their requested relief only seeks to "compel [the Department] to perform a . . . non-discretionary act . . . without directing how it shall act."  See Pls.' Reply at 13 (quoting Norton v. S. Utah Wilderness All., 542 U.S. at 64).  The Court disagrees. According to plaintiffs, the Court would be required to determine whether "the agency is operating within the boundaries of its legal mandates," including whether OCR's operations allow for "prompt" investigations of civil rights complaints.  See Pls.' Reply at 12-13 (citing the Department's regulations requiring "prompt" investigations of civil rights complaints).  This places the Court in the position of having to opine on whether OCR's allocation of resources allow it to conduct "prompt" investigations.  This inevitably requires the Court to "direct[] how [OCR] shall act."  See Norton v. S. Utah Wilderness All., 542 U.S. at 64.  Such "pervasive oversight by federal courts" is "not contemplated by the APA."  Id. at 67.

institutions receiving federal funds." See Adams v. Richardson, 480 F.2d at 1161. As a result,

the district court entered an injunction requiring DHEW OCR to:

> (1) institute compliance procedures against ten state-operated
> systems of higher education, (2) commence enforcement
> proceedings against seventy-four secondary and primary school
> districts found either to have reneged on previously approved
> desegregation plans or to be otherwise out of compliance with
> Title VI, (3) commence enforcement proceedings against forty-two
> districts previously deemed by HEW to be in presumptive violation
> of the Supreme Court's ruling in Swann v. Charlotte-Mecklenburg
> Board of Education, 402 U.S. 1 (1971), (4) demand of eighty-five
> other secondary and primary districts an explanation of racial
> disproportion in apparent violation of Swann, (5) implement an
> enforcement program to secure Title VI compliance with respect to
> vocational and special schools, (6) monitor all school districts under
> court desegregation orders to the extent that HEW resources permit,
> and (7) make periodic reports to appellees on their activities in each
> of the above areas.

Adams v. Richardson, 480 F.2d at 1161.

The D.C. Circuit affirmed the district court's decision almost in its entirety. See

Adams v. Richardson, 480 F.2d at 1161. The court of appeals reasoned that there was extensive

evidence in the record demonstrating that DHEW OCR had been derelict in its duties to enforce

Title VI. For example, the district court had found that DHEW OCR "ha[d] neither instituted

any enforcement proceedings itself nor referred any of the cases to the Department of Justice"

despite Title VI setting forth "specific enforcement procedures." Id. at 1164. Furthermore, it

found that DHEW OCR was "actively supplying segregated institutions with federal funds,

contrary to the expressed purposes of Congress." Id. at 1162. The court of appeals concluded

that DHEW OCR could "not neglect" its enforcement responsibilities, and that the injunction

therefore was proper "to assure that the agency properly construes its statutory obligations, and

that the policies it adopts and implements are consistent with those duties and not a negation of

them." Id. at 1164.

Adams v. Richardson therefore stands for the proposition that "[w]hen agency recalcitrance is in the face of a clear statutory duty or is of such magnitude that it amounts to an abdication of statutory responsibility, the court has the power to order the agency to act to carry out its substantive statutory mandates."  Pub. Citizen Health Rsch. Grp. v. Comm'r, Food & Drug Admin., 740 F.2d 21, 32 (D.C. Cir. 1984) (citing Adams v. Richardson).  It does not, however, permit the Court to step into a supervisory role or preemptively assess whether operational decisions such as an agency's staffing levels permit an agency to accomplish its statutory mandates.  Because plaintiffs seek broad court intervention "into day-to-day agency management," see Norton v. S. Utah Wilderness All., 542 U.S. at 66-67 – rather than just an order directing the Department to comply with its statutory mandates – Adams v. Richardson does not provide support for plaintiffs' requested relief.

In sum, because "'[g]eneral deficiencies in compliance' with an agency's obligations 'lack the specificity requisite for agency action,'" plaintiffs are unlikely to succeed on their APA claims brought pursuant to 5 U.S.C. § 706(2).  Friends of Cap. Crescent Trail v. Fed. Transit Admin., Civil Action No. 17-1811 (RJL), 2019 WL 1046889, at *9 (D.D.C. Mar. 5, 2019) (quoting Norton v. Southern Utah Wilderness Alliance, 542 U.S. at 66); see In re Aiken Cnty., 645 F.3d at 437 ("At least to this date, the DOE has not failed to take any discrete agency action that Congress ordered it to take.  Petitioners' general complaints about the DOE's new policy . . . are simply not justiciable."); Cobell v. Kempthorne, 455 F.3d 301, 307 (D.C. Cir. 2006) ("Because an on-going program or policy is not, in itself, a 'final agency action' under the APA, our jurisdiction does not extend to reviewing generalized complaints about agency behavior.") (citation omitted); S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec., Civil Action No. 18-0760 (CKK), 2023 WL 2564119, at *5 (D.D.C. Mar. 15, 2023) (rejecting APA claim

where the "[p]laintiff's challenge [did] not center on any individual, discrete determination of rights or responsibilities, but [was] rather a broad attack on Defendant's supervision" of a program); C.G.B. v. Wolf, 464 F. Supp. 3d 174, 225 (D.D.C. 2020) (rejecting APA claim where plaintiffs did "not identify any discrete final agency decision not to implement" a regulatory program).

### c.   5 U.S.C. § 706(1):  Agency Inaction

In evaluating a claim of unreasonable delay under 5 U.S.C. § 706(1), a court must "consider whether the agency's failure to respond is 'so egregious' as to warrant relief." Tate v. Pompeo, 513 F. Supp. 3d 132, 147 (D.D.C. 2021) (quoting Telecommunications Rsch. & Action Ctr. v. F.C.C., 750 F.2d 70, 79 (D.C. Cir. 1984)).  The D.C. Circuit has instructed that in an unreasonable delay case, courts must analyze six factors – called the "TRAC factors" – in determining whether an agency's delay is unreasonable:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

Telecommunications Rsch. & Action Ctr. v. F.C.C., 750 F.2d at 80 (internal citations and quotations marks omitted).

In the instant case, plaintiffs' unreasonable delay claim essentially is a recasting of its Section 706(2) claims challenging the Department's reduction in force and closure of OCR

offices – that is, they argue that the Department's "gutting of OCR prevents any effective response to [plaintiffs'] complaints." See Pls.' Reply at 19; see also Pls.' Mem. at 32-33 ("Defendants' delay will ensure discrimination of many forms goes unaddressed . . . ."). But the precise delay plaintiffs seek to challenge is unclear. On the one hand, plaintiffs suggest that the particular delay they contend is unreasonable is the several "months" between the Department's "decimation" of OCR and the filing of the instant action. See Pls.' Mem. at 33 ("Most Plaintiffs still have not heard from OCR for months, even those whose [ ] cases were very close to resolution."). Plaintiffs do not provide any support or argument suggesting that an agency delay of several months is "so egregious as to warrant relief." See Tate v. Pompeo, 513 F. Supp. 3d at 147 (citation omitted); see also Opp. at 22.

Plaintiffs' arguments also suggest that they seek to challenge future delays that "will undoubtedly" occur "moving forward" as a result of the Department's "gutting of OCR[]." See Pls.' Mem. at 10-11. This argument fails for the simple reason that the purported delay serving as the basis for plaintiffs' claim has not yet occurred. In other words, the agency action plaintiffs seek, therefore, has not been "unlawfully withheld or unreasonably delayed." See 5 U.S.C. § 706(1) (emphasis added). Such a challenge is also plainly "premature and therefore unripe for judicial review." See Saline Parents v. Garland, 88 F.4th 298, 306 (D.C. Cir. 2023).

Finally, to the extent plaintiffs are instead challenging the delays that have already occurred in the processing of their civil rights complaints, plaintiffs fail to show that they are entitled to the relief they seek. The declarations provided by plaintiffs – which plaintiffs do not discuss in the context of their unreasonable delay claim – reveal that several plaintiffs have had civil rights complaints pending before OCR for years. See Declaration of K.D. [Dkt. No. 52-10] ¶ 32 (investigation opened in July 2023); Declaration of Melissa Combs [Dkt. No. 52-11] ¶ 12

(civil rights complaint filed on June 10, 2022); Declaration of Declaration of Nikki S. Carter [Dkt. No. 52-14] ¶ 40 (civil rights complaint filed on September 23, 2022). But the arguments in plaintiffs' motion as well as those presented by counsel at oral argument do not suggest that plaintiffs are challenging the particular delays suffered by individual plaintiffs. Indeed, plaintiffs do not request an order compelling OCR to conclude its investigations on plaintiffs' civil rights complaints. Even if the Court were to interpret plaintiffs' unreasonable delay claim as challenging these delays, however, success on this claim would not entitle plaintiffs to the sweeping relief they request. At best, the Court can compel the Department to investigate plaintiffs' civil rights complaints. See 5 U.S.C. § 706(1). Accordingly, to the extent plaintiffs' challenge is to the delays particular plaintiffs have experienced in OCR's investigation of their civil rights complaints, success on such a claim would not be a basis for granting the preliminary relief plaintiffs seek.

In sum, plaintiffs have not shown a likelihood of success on the merits of their Section 706(1) claim.

2.  <u>Ultra</u> <u>Vires</u> Claim

The D.C. Circuit has repeatedly held that an <u>ultra</u> <u>vires</u> claim will succeed only if, <u>inter</u> <u>alia</u>, "the agency plainly acts 'in excess of its delegated powers and contrary to a specific prohibition in the' statute that is 'clear and mandatory.'" <u>Nyunt v. Chairman, Broad. Bd. of Governors</u>, 589 F.3d 445, 449 (D.C. Cir. 2009) (Kavanaugh, J.) (quoting <u>Leedom v. Kyne</u>, 358 U.S. 184, 188 (1958)). A plaintiff in an <u>ultra</u> <u>vires</u> action therefore must show "that the agency action go[es] beyond mere legal or factual error and amount[s] to a 'clear departure by the agency from its statutory mandate' or [is] 'blatantly lawless' agency action." <u>Federal Express Corp. v. U.S. Dep't of Commerce</u>, 39 F.4th 756, 764 (D.C. Cir. 2022) (alteration omitted)

(quoting <u>Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11</u>, 393 U.S. 233, 238 (1968)); <u>see</u> <u>Nyunt v. Chairman, Broad. Bd. of Governors</u>, 589 F.3d at 449 (describing an <u>ultra</u> <u>vires</u> claim as "a Hail Mary pass – and in court as in football, the attempt rarely succeeds.").

   Defendants argue that plaintiffs <u>ultra</u> <u>vires</u> claim essentially is a "repackaging [of] their APA claims."  <u>See</u> Opp. at 22.  The Court agrees.  The basis of plaintiffs' <u>ultra</u> <u>vires</u> claim is identical to that of their APA claims – that is, "[t]he decimation of OCR's ability to process and investigate complaints violates the clear [statutory] mandates . . . ."  <u>See</u> Pls.' Mem. at 34; Pls.' Reply at 20 (arguing that this case is "more analogous" to a situation where the Food and Drug Administration "ceased investigating and approving all drugs").  As the Court explained above, <u>see</u> <u>supra</u> Section III.A.1.a, the Department's reduction in force and closure of numerous OCR regional offices does not violate its statutory mandates to "effectuate" the provisions of the civil rights statutes.  Accordingly, plaintiffs are unlikely to succeed on the merits of their <u>ultra</u> <u>vires</u> claim because they have not shown "a 'clear departure by the agency from its statutory mandate' or 'blatantly lawless' agency action."  <u>Federal Express Corp. v. U.S. Dep't of</u> <u>Commerce</u>, 39 F.4th at 764 (D.C. Cir. 2022) (alteration omitted).

IV. CONCLUSION

For the foregoing reasons, the Court concludes that plaintiffs have failed to show a likelihood of success on the merits of their claims. Because "a failure to show a likelihood of success on the merits alone is sufficient to defeat a preliminary-injunction motion," Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, 205 F. Supp. 3d at 26, plaintiffs' Motion for a Preliminary Injunction [Dkt. No. 52] is hereby DENIED.

An Order consistent with this Opinion will issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE:  5/21/25