**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT OF EDUCATION, *et al.*, <br><br> *Defendants*. | Case No. 8:25-cv-01230 (SAG) |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..............................................................................................iii

GLOSSARY ADDENDUM ...............................................................................................ix

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

I.     Congress Established IES to Be the Nation's Cornerstone of Education Research, Evaluation, and Statistics, and Has Funded It to Carry Out This Role.............................. 2

II.    IES Functions Are Statutorily Required and Critical to the Nation's Education Research Infrastructure. ..................................................................................................... 4

III.   Defendants Carried Out Mass Termination Actions that Destroyed IES's Ability to Serve Its Congressionally Created Role. ...................................................................... 8

       A.   The Contract Termination Action Was Rushed and Cut Critical IES Functions........................................................................................................... 9

       B.   The Workforce Termination Action Cut IES's Staff by 90 Percent. ........................ 13

IV.    In the Wake of These Actions, IES Was Left Incapacitated........................................... 16

V.     Defendants' Acts After the Termination Actions Concede "Mistakes" Were Made. ........................................................................................................................... 20

VI.    Following the Actions, IES Is Expending Congressionally Appropriated Funds at a Dramatically Lower Level. ......................................................................................... 21

VII.   The Dissolution of IES has Harmed Plaintiffs............................................................... 22

VIII.  Procedural History ......................................................................................................... 32

STANDARD OF REVIEW .............................................................................................. 32

ARGUMENT.................................................................................................................... 33

I.     Plaintiffs and Their Members Have Standing................................................................. 34

       A.   AERA and SREE Have Standing on Behalf of Their Members............................. 34

            i.  Plaintiffs' members suffer informational injuries that confer standing..........35

            ii. Plaintiffs' members have been harmed by loss of technical assistance, career development support, grant opportunities, and public recognition opportunities.............................................................................................37

       B.   AERA and SREE Have Organizational Standing.................................................... 40

II.    There Are No Jurisdictional Bars to Plaintiffs' Claims.................................................. 44

A.  The Tucker Act Does Not Bar Plaintiffs' Challenge to the Contract Termination Action. ............................................................................... 44

B.  The Civil Service Reform Act Does Not Channel Plaintiffs' APA Claims to a Venue That Cannot Hear Them. ........................................ 46

III.  The Actions Are Unlawful and Arbitrary ........................................................ 47

A.  Plaintiffs Challenge Discrete, Final Agency Actions Subject to APA Review. ........ 47

i.  The Actions are Final Agency Actions. ................................................... 47

ii.  The Actions Are Discrete, Not Programmatic. ...................................... 49

B. The Actions Are Arbitrary and Capricious. ................................................... 50

i.  The Department failed to provide adequate explanation for the Actions. ........ 51

ii.  The Department failed to rely on prior factual findings and available evidence. ........ 52

iii.  The Department failed to address important aspects of the problem and relied on factors other than those Congress intended. ........ 54

iv.  The Department failed to consider reliance interests. ........ 56

IV.  The Actions are Contrary to Law. .................................................................... 57

A.  20 U.S.C. § 9543: Failure to Conduct Longitudinal Studies. .................................. 57

B.  20 U.S.C. §§ 9573, 9574, 9575: Failure to Make Existing Data Usable by Researchers. ........................................................................ 58

C.  20 U.S.C. § 9534(b)(1); 20 U.S.C. § 9520: Failure to Conduct Peer-Review Process. ........................................................................ 59

V.  The Relief Requested Is Necessary and Appropriate. ........................................ 59

CONCLUSION ............................................................................................................. 60

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Abbott Lab'ys v. Gardner*, 387 U.S. 136 (1967) ........................................................................ 44

*Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931 (D.C. Cir. 1986) ................................................................................................................................ 35

*Alston v. Balt. Gas & Elec. Co., No. 1:22-cv-01061*, 2023 WL 1472020 (D. Md. Feb. 1, 2023) .............................................................................................................................. 48

*Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*, 25 F.4th 1 (D.C. Cir. 2022) ................................................................................................................................ 53

*Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014) .................................................. 52

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .............................................................. 32

*Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon, No. 1:25-cv-00999*, 2026 WL 523023 (D.D.C. Feb. 25, 2026) .................................................................................................. 35

*Aviation Found. v. DOD*, 785 F.3d 719 (D.C. Cir. 2015) ........................................................... 38

*Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023) ......................................................................... 46

*Bennett v. Spear*, 520 U.S. 154 (1997) ............................................................................... 47, 48

*Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014) ..................................................................... 36

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) .......................... 50, 51, 52, 53

*Casa de Maryland v. Dep't of Homeland Sec.*, 924 F.3d 684 (4th Cir. 2019) ............................ 56

*Cath. Legal Immigr. Network, Inc. v. EOIR*, 513 F. Supp. 3d 154 (D.D.C. 2021) ....................... 43

*CC Distribs., Inc. v. United States*, 883 F.2d 146 (D.C. Cir. 1989) ............................................ 38

*Child Trends, Inc. v. U.S. Dep't of Educ.*, 795 F. Supp. 3d 700 (D. Md. 2025) ......... 32, 44, 45, 60

*ChildTrends, Inc. v. Dep't of Education*, 2025 No. 8:25-cv-01154 (D. Md. 2025) ....................... 8

*City of Columbus v. Cochran*, 523 F. Supp. 3d (D. Md. 2021) ...................................... 32, 33, 51

iii

*Cmty. Legal Servs. v. HHS*, 155 F.4th 1099 (9th Cir. 2025)..........................................................45

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024)..........................59

*Ctr. for Sci. in the Pub. Int. v. Perdue*, 438 F. Supp. 3d 546 (D. Md. 2020) ...............................32

*Dep't of Com. v. New York*, 588 U.S. 752 (2019)..........................................................................50

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ....................50, 53, 56

*Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337 (4th Cir. 2017) ........................................35, 36

*Edmondson Cmty. Org. v. Mayor of Baltimore*, 797 F. Supp. 3d 497 (D. Md. 2025)..................43

*Elev8 Balt., Inc. v. Corp. for Nat'l & Cmty. Serv.*, 804 F. Supp. 3d 524
    (D. Md. 2025) ...............................................................................................................45, 46, 49

*Env't Def. v. Leavitt*, 329 F. Supp. 2d 55 (D.D.C. 2004)...............................................................59

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)......................................................50, 51

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ...............................................................40

*FEC v. Akins*, 524 U.S. 11 (1998)..................................................................................................35

*Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581 (4th Cir. 2012)......................56

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ...............................................................40

*Holbrook v. Tenn. Valley Auth.*, 48 F.4th 282 (4th Cir. 2022) .....................................................44

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ..............................................34

*Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613 (4th Cir. 2018).......................34

*Lance v. Coffman*, 549 U.S. 437 (2007) ........................................................................................34

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) .....................................................................49

*Maryland v. Corp. for Nat'l & Cmty. Serv.*, 785 F. Supp. 3d 68 (D. Md. 2025).........................49

*Megapulse v. Lewis*, 672 F.2d 968 (D.C. Cir. 1982) ....................................................................44

*Michigan v. EPA*, 576 U.S. 743 (2015) .........................................................................................50

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)... 50, 52, 54, 55

*N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295 (4th Cir. 2020)................................. 40

*N.W. Immigr. Rts. Project v. USCIS*, 496 F. Supp. 3d 31 (D.D.C. 2020).................................... 43

*Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762 (D.C. Cir. 2025).................................... 40

*Nat'l Treasury Emps. Union v. Vought,* 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025).............. 40

*New Jersey v. DOT, No. 1:26-cv-00939*, 2026 WL 323341 (S.D.N.Y. Feb. 6, 2026) ................ 45

*New York v. Kennedy*, 155 F.4th 67 (1st Cir. 2025) ........................................................ 47

*NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025)................................................. 45

*NTEU v. Vought*, 774 F. Supp. 3d 1 (D.D.C. 2025) ....................................................... 40

*PETA v. Dep't of Agric.*, 797 F.3d 1087 (D.C. Cir. 2015)............................................... 41

*POET Biorefining, LLC v. EPA*, 970 F.3d 392 (D.C. Cir. 2020) ..................................... 48

*Reuters Ltd. v. FCC*, 781 F.2d 946 (D.C. Cir. 1986)................................................... 57

*Rhode Island v. Trump*, 810 F. Supp. 3d 283 (D.R.I. 2025)........................................... 47

*RNC v. N.C. State Bd. of Elections*, 120 F.4th 390 (4th Cir. 2024)................................. 43

*Sierra Club v. U.S. Army Corps of Engineers*, 909 F.3d 635 (4th Cir. 2018) ................ 59

*Spirit Airlines, Inc. v. DOT*, 997 F.3d 1247 (D.C. Cir. 2021)....................................... 53

*Tate v. Pompeo*, 513 F. Supp. 3d 132 (D.D.C. 2021) ................................................. 52

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)........................................... 44, 46

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) ................................. 48

*United States v. J&E Salvage Co.*, 55 F.3d 985 (4th Cir. 1995).................................... 44

*Wash. State Ass'n of Head Start & Early Childhood Assistance & Educ. Program v. Kennedy, No. 2:25-cv-00781*, 2026 WL 35858 (W.D. Wash. Jan. 6, 2026) ............. 47, 49

*Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41 (D.D.C. 2016)....................... 53

*West Virginia v. Thompson*, 475 F.3d 204 (4th Cir. 2007)........................................... 50

*Widakuswara v. Lake*, 2026 Case No. 1:25-cv-01015 (D.D.C. 2026)................................... 49, 50

*Wiley v. Kennedy*, 789 F. Supp. 3d 447 (S.D. W. Va. 2025) ........................................ 47

## STATUTES & REGULATIONS

5 U.S.C.

§ 551(13)............................................................................................................. 49
§ 706(2)(A) .................................................................................................... 32, 50
§ 7103(a)(4) ........................................................................................................ 46
§ 7701(a) ............................................................................................................ 46

20 U.S.C.

§ 1015a(k) ........................................................................................................... 55
§ 1464(2)(A) ....................................................................................................... 55
§ 9501.......................................................................................................... 3, 4, 55
§ 9501(3)............................................................................................................... 4
§ 9501(10)..................................................................................................... 3, 4, 34
§ 9511.................................................................................... 2, 3, 17, 35, 54, 57
§ 9511(2)(A) ...................................................................................................... 17
§ 9511(b)(1) ...................................................................................................... 54
§ 9512....................................................................................................... 3, 4, 54, 57
§ 9520......................................................................................................... 38, 59
§ 9533......................................................................................................... 3, 54
§ 9534............................................................................................................... 54
§ 9534(b)(1) ...................................................................................... 6, 7, 38, 59
§ 9541.................................................................................................................. 3
.............................................................................................................................. 3
§ 9541(b)(3)(B) .................................................................................................. 35
§ 9543.................................................................................................... 3, 54, 57
§ 9543(1)............................................................................................................... 5
§ 9543(a) .............................................................................................................. 5
§ 9543(a)(7) ........................................................................................................ 58
§ 9545............................................................................................................... 54
§ 9546............................................................................................................... 54
§ 9561................................................................................................................. 3,
§ 9562............................................................................................................... 54
§ 9562(a)(3) ........................................................................................................ 35
§ 9562(b)(4) ........................................................................................................ 35
§ 9563.............................................................................................................. 3, 6
§ 9563(a)(2)(A)..................................................................................................... 4
§ 9564............................................................................................................... 54
§ 9567b......................................................................................................... 3, 54
§ 9567b(b)(1) ....................................................................................................... 4
§ 9573................................................................................................................... 6
§ 9573(c)............................................................................................................. 58

§ 9574...................................................................................................................... 6, 58

§ 9575...................................................................................................................... 4, 7, 58

§ 9575(2) .................................................................................................................. 35

29 U.S.C.

§ 3332(b)(3) ............................................................................................................. 55

90 Fed. Reg. 46,187 ............................................................................................................. 51

Cont. Res. Mar. 2025, Pub. L. No. 118-47, 138 Stat. 693 ...................................................... 21, 54

**FEDERAL RULES**

Fed. R. Civ. P.

Rule 56 ...................................................................................................................... 32

Rule 56(a)................................................................................................................. 32

**OTHER AUTHORITIES**

*Accessing and Using Restricted-Use Data FAQ*, Statistical Standards Program,
NCES, https://perma.cc/38LS-CU86 ....................................................................... 6

Budget, *Circular No. A-11: Preparation, Submission, and Execution of the Budget*
(Aug. 2025)*, available at* https://perma.cc/73D7-P7AE .................................................. 22

*Dep't of Educ. to Am. Inst. for Rsch. in Behavioral Scis. (91990018C0046)*,
https://perma.cc/J22W-4849 ................................................................................... 48

*Education Department*, Wash. Post (Feb. 14, 2025), https://perma.cc/4KDD-2PA3 .................. 13

*Educational and Labor Market Outcomes*, https://perma.cc/F7PJ-DMSH ................................... 4

HigherGov, *The Design and Conduct of the Early Childhood Longitudinal Study,
Kindergarten Class of 2022 through 2023*, https://perma.cc/9NN4-T6F9...................... 12

IES, *Education Research Grants Program* (May 2024)*, https://perma.cc/BX66-YJJW ......... 7, 19

IES, *Grant Peer Review Guide* (revised Sep. 25, 2024), https://perma.cc/T8U7-45JC ................ 7

IES, *Restricted-use Data Licenses*, https://perma.cc/Y552-GT8U............................................... 58

Interagency Council on Statistical Pol'y, *ResearchDataGov.Org User Guide* (updated
Mar. 2025), https://perma.cc/8975-XVPK.......................................................................... 58

*Kids' reading scores have soared in Mississippi 'miracle,'* PBS (May 17, 2023),
https://perma.cc/SP35-9RHL ............................................................................................. 4

*Licensing Procedures FAQ*, *Statistical Standards Program*, NCES,
https://perma.cc/JY9P-F7T6 ................................................................................ 6

*Mission,* Soc'y for Rsch. on Educ. Effectiveness, https://perma.cc/BHM8-D7YY ..................... 42

Molly Faulkner-Bond, *Supporting California's English Learner Students Who Have
the Most Significant Cognitive Disabilities*, IES (Sept. 11, 2023),
https://perma.cc/2NU4-5KJN ................................................................................ 4

Nat'l Acads. of Scis., Eng., and Med., *The Future of Education Research at IES:
Advancing an Equity-Oriented Science* 1 (2022), *available at*
https://perma.cc/RAM4-4CRU .............................................................................. 1

OpenOMB, *TAFS: 091-1100* (2025/2026) – Inst. of Educ. Scis.,
https://perma.cc/Z8TL-B5BR ............................................................................ 22

OpenOMB, *TAFS: 091-1100* (2026/2027) – Inst. of Educ. Scis.,
https://perma.cc/V8TB-5FGN ............................................................................ 22

ResearchDataGov, https://perma.cc/2CPS-35QN ................................................... 18, 58

*Restricted Use Data Licenses*, *Statistical Standards Program*, NCES,
https://perma.cc/7G86-59UJ .............................................................................. 58

USASpending.Gov, *Dep't of Educ. to Mathematica, Inc. (91990024F0369)*),
https://perma.cc/PT5S-ME7D?type=image ........................................................ 12

USASpending.Gov, *IES to Applied Enter. Mgmt. Corp. (91990024F0367)*,
https://perma.cc/LM4E-ME8P?type=image ........................................................ 48

USASpending.Gov, *IES to WeStat, Inc. (91990019C0002)*, https://perma.cc/9XBU-
EWJ6 ................................................................................................................ 48

**GLOSSARY ADDENDUM**

AERA: American Educational Research Association

CCD: Common Core Data

CLSD: Comprehensive Literacy State Development Grants

DOGE: Department of Government Efficiency, alternatively known as United States DOGE Service or United States Digital Service

EDCDSS: EdFacts Data Collection and Dissemination Support Services

ESRA: Education Sciences Reform Act

IADA: Innovative Assessment Demonstration Authority

IES: Institute of Education Sciences

ECLS-K: Early Child Longitudinal Study, Kindergarten

HS&B: High School and Beyond (Study)

MTSS: Multi-Tiered Systems of Support

NAEP: National Assessment of Educational Progress

NCEE: National Center for Education Evaluation

NCER: National Center for Education Research

NCES: National Center for Education Statistics

NCSER: National Center for Special Education Research

NPSAS: National Postsecondary Student Aid Study

POC: Principal Operating Component

REL: Regional Educational Laboratory

RIF: Reduction In Force

SREE: Society for Research on Educational Effectiveness

TSL: Teacher and School Leader (Incentive Grant)

**INTRODUCTION**

Since its establishment in 2002, the Institute of Education Sciences ("IES") "has had a field-defining impact on education research in the United States."[1] So too did the actions Defendants took to tear it apart.

The facts are clear: in two discrete actions—an order terminating almost 100 IES contracts and an order terminating 90 percent of IES staff (together "the Termination Actions" or "Actions")—Defendants halted critical and required work conducted by IES. Defendants offered little explanation for the Actions. Nor could they; they were indisputably arbitrary and capricious and contrary to Congress's instructions in creating and funding IES.

At the preliminary stage of this case, there were factual questions before the Court as to what occurred. This case now has had the benefit of an administrative record and discovery. The picture that emerges is clear and devastatingly simple: people outside IES made two rash decisions, on short timeframes, without regard to Congressional directions and appropriations, evidence and expertise, or reliance interests. The Acting Director of IES was cut out of the process completely. The Department concedes that through its hasty actions, "mistakes" were made.

Plaintiffs are neither IES employees nor contractors—they are researchers, policymakers, and practitioners. Plaintiffs are not challenging the terminations of individual contracts or employees. Defendants' determinations were not individualized to contracts or employees, and thus, neither are Plaintiffs' challenges. Nor do Plaintiffs seek reinstatement of any particular employee or contract. Instead, Plaintiffs seek vacatur of the two Actions Defendants took, to require IES to restore its functioning to its previous level.

These two Actions have resulted in the decimation of the institution at the center of the

---

[1] Nat'l Acads. of Scis., Eng., and Med., *The Future of Education Research at IES: Advancing an Equity-Oriented Science* 1 (2022), *available at* https://perma.cc/RAM4-4CRU.

nation's infrastructure for education research. They halted multi-year, nationwide surveys and studies with no notice. Researchers are unable to access the data that has served as the basis for their work. The cadre of experts at IES that helped researchers work through that data, and offered trainings and technical expertise, are gone. Graduate students cannot publish their dissertations, no longer able to secure approval for IES data use. Academics struggle to improve their work, having no ability to receive feedback or awards through the IES peer-review process. And without ongoing data collection by IES, many are considering different areas of research or leaving the field altogether. As a result, Plaintiffs and their members are suffering. Our nation's students and the public suffer too, as IES has abandoned the responsibilities Congress assigned to it: to lead, and to ensure timely, quality education research as the nation faces critical questions about the education system's recovery from the pandemic and impacts from novel education technology. Thus, Plaintiffs seek to vacate Defendants' unlawful Actions to remedy their harms and restore IES's critical role in our nation's education system.

## BACKGROUND

**I.      Congress Established IES to be the Nation's Cornerstone of Education Research, Evaluation, and Statistics, and Has Funded It to Carry Out This Role.**

Congress created IES to serve as the center of the national education research infrastructure—to "provide national leadership in expanding fundamental knowledge and understanding of education . . . to provide parents, educators, students, researchers, policymakers, and the general public with reliable information" about our country's education system and the effectiveness of education practices and policies. 20 U.S.C. § 9511. To carry out this mission, Congress directed IES to "compile statistics, . . . and conduct research, evaluations, and wide

dissemination activities." *Id.*; *id.* § 9512.[2] These projects, "supported by Federal funds appropriated to the Institute," must "conform to high standards of quality, integrity, and accuracy." *Id.* § 9511.

Within IES, Congress established four centers for national education research. The National Center for Education Statistics ("NCES") was incorporated into IES and has functioned to collect, analyze, and report education data for more than 150 years. 20 U.S.C. §§ 9541, 9543. Congress created the National Center for Education Research ("NCER") and National Center for Special Education Research ("NCSER") to sustain quality education research to improve the nation's education system for all learners. *Id.* §§ 9531, 9533, 9567, 9567b. Finally, the National Center for Education Evaluation and Regional Assistance ("NCEE") was established to evaluate educational programs, provide training and technical assistance, and disseminate research and evaluation results. *Id.* §§ 9561, 9563.

In creating IES, two broad directives are repeated by Congress. First, IES must be a leader in education research. To fill this role, it must produce scientifically valid, high quality, and timely data and research, and it must elevate the standards of the entire field. This work must be comprehensive, focused on "areas of demonstrated national need" throughout "early childhood through postsecondary study." *Id.* § 9511(b). In instructing IES on how to carry out its mission, Congress directed the agency to "conform to high standards of quality, integrity, and accuracy." *Id.* § 9511(b)(2). Each center is obligated to do so as well.[3]

---

[2] The Education Sciences Reform Act ("ESRA") underscores these by defining key functions in 20 U.S.C. § 9501. This highlights ESRA's emphasis on scientifically valid research, § 9501(18)–(20), technical assistance, § 9501(23), and dissemination, § 9501(10).

[3] NCES must "collect and analyze education information and statistics in a manner that meets the highest methodological standards" and report it "in a timely manner." *Id.* § 9541(b). NCER must "promote quality and integrity" in research, in part by maintaining "published peer-review standards," and must also "promote scientifically valid research findings" to improve education. *Id.* §§ 9531(b), 9533(a). Each evaluation conducted by NCEE must "adhere to the highest possible standards of quality for conducting scientifically valid education evaluation" and NCEE must make such information available in a "timely" manner. 20 U.S.C.

Second, IES must widely disseminate this work, including research, statistics, evaluations, and publications, in a timely manner. *Id*. § 9511(b)(1), (2). Variations of the term "disseminate" appear in the ESRA statute no less than 48 times—and in the first instance, "dissemination" is defined to include a duty to disseminate to researchers, which extends to each reference throughout. *See id.* § 9501(10), *see generally* 20 U.S.C. §§ 9501 *et seq.* Congress also directed IES to "promote" the use, application, and coordination of research it conducts. *Id*. § 9512(3)–(6). And "all activities conducted or supported" by IES must "make customer service a priority." *Id*. § 9575. Congress directed that such service must include "[d]isseminating information in a timely fashion . . . easily accessible and usable by researchers." *Id.*

## II.     IES Functions Are Statutorily Required and Critical to the Nation's Education Research Infrastructure.

The nation's education research infrastructure has relied on and benefited from IES's rigorous data collection and analysis, research regarding education practices, and dissemination of critical findings to researchers, educators, and policymakers. Through research funded and disseminated by IES, policymakers have been able to make informed choices to support schools, teachers, and students. IES research has supported significant educational improvements: vastly improving literacy through the "Mississippi Miracle" in one of the nation's poorest states, transforming English language learning in California, and improving community college graduation rates across the country.[4]

Certain IES activities were particularly critical to IES meeting its statutory obligations and

---

§ 9563(a)(2)(A). NCSER activities must "conform to high standards of quality, integrity, accuracy, validity, and reliability." 20 U.S.C. § 9567b(b)(1).

[4] *See Kids' reading scores have soared in Mississippi 'miracle,'* PBS (May 17, 2023), https://perma.cc/SP35-9RHL; Molly Faulkner-Bond, *Supporting California's English Learner Students Who Have the Most Significant Cognitive Disabilities*, IES (Sept. 11, 2023), https://perma.cc/2NU4-5KJN; IES, *Ten-Year Follow-up of Two RCTs of CUNY 's ASAP Model – Educational and Labor Market Outcomes*, https://perma.cc/F7PJ-DMSH.

to serving as the "national leader" of education research:

*Data collection and analysis.* Prior to the Termination Actions, IES collected, reported, analyzed, and disseminated statistical data on a wide variety of education topics, in accordance with its statutory obligations. 20 U.S.C. § 9543(a). This included high quality data collection and analysis related to early childhood education, postsecondary education, teachers and school leadership, national education performance compared to other countries, and school violence, *Id*. § 9543(a)(1). It also included datasets like the Common Core of Data, which is relied upon by other offices at the Department of Education, Matthew Soldner Dep.[5] at 31:1–22; 117:18–118:2 (hereinafter "Soldner"), and researchers as "the only source of comprehensive data on academic performance patterns" in U.S. schools, ECF 12-3, Reardon Decl. ¶ 11 (AERA-0074). [6] IES also conducted numerous longitudinal studies, such as the National Teacher and Principal study and the Early Childhood Longitudinal Study, Kindergarten ("ECLS-K). Soldner 29:1–4. The data collected by IES are "uniquely valuable" as they allow education researchers to "study issues at a national scale and over time," Saw Decl. ¶ 5 (AERA-0690), and similarly, many longitudinal studies went on to "generate[] a substantial amount of research in the field." Soldner 30:2–6.

*Evaluation*. IES conducted many evaluations of federally supported education programs and strategies, in accordance with its statutory obligations and decades-long practices. IES selected evaluations through "a mix of policymaker priorities and requirements in specific statutes." Soldner 17:14–17. As of 2024, NCEE was carrying out "around 50" evaluations. Soldner 20:6.

---

[5] Counsel has filed with this Memorandum a declaration authenticating each exhibit that is not self-authenticating. *See* Daniel A. McGrath Decl. (AERA-0720–0725).

[6] All declarations from prior filings in this case that are cited in this brief are re-filed with this Motion. Declarations with Bates numbers from AERA-0001–0442 can be found as Exhibits A–U to ECF 12, filed in conjunction with the Motion for a Preliminary Injunction. ECF 12-3–12-6. Declarations with Bates numbers from AERA-0443–0553 can be found as Exhibits V–NN to ECF 44, filed in conjunction with the Supplemental Response in Support of the Motion for a Preliminary Injunction. ECF 44-1. Declarations with Bates numbers AERA-0554–0725 are Exhibits OO–JJJ to this filing, the Motion for Summary Judgment. *See* Index of Exhibits in Support of Motion for Summary Judgment.

IES's evaluations assessed the efficacy of particular education supports and interventions to use in improving education. 20 U.S.C. §§ 9561, 9563. These evaluations seek "to understand if programs meant to improve student outcomes work as intended – that is, if they cause student outcomes to improve"—and "no other government agency [besides IES] funds studies of this size and scope in education." ECF 12-3, 1st Weiss (SREE) Decl. ¶¶ 4, 14 (AERA-0054–55, AERA-0059).

*Restricted-use data.* IES is required to make its data and research publicly available. 20 U.S.C. § 9574. Because some of the most valuable IES data contains individually identifiable information, it can only be made accessible by license because IES is also required to protect confidentiality. *Id*. § 9573. Researcher applicants "submit[ed] an application," which was "reviewed by a subject matter expert." Soldner 38:25–39:13. Prior to the Termination Actions, restricted-use data requests were typically processed in two weeks.[7] IES's restricted-use data serves as "the only source for nationally representative, large-scale, reliable longitudinal muti-level studies on schools and students." Irizarry Decl. ¶ 24 (AERA-0632–33).

*Disclosure review.* Disclosure review is the process by which an education researcher receives required IES permission to share or publish research using restricted-use data.[8] This includes publishing articles, presenting at conferences, and presenting dissertations.[9] Prior to 2025, IES stated that it would adhere to a review timeline of five to ten business days.[10]

*Peer-review process.* IES (and NCER specifically) is statutorily required to operate a peer-review program to "continue to support education research writ large." Soldner 136:19–16, 25:2–15; 20 U.S.C. § 9534(b)(1). NCER must "maintain published peer-review standards" and fund

---

[7] *Licensing Procedures FAQ*, *Statistical Standards Program*, NCES, https://perma.cc/JY9P-F7T6 (last viewed Mar. 14, 2026).

[8] *Accessing and Using Restricted-Use Data FAQ*, *Statistical Standards Program,* NCES, https://perma.cc/38LS-CU86 (last viewed Mar. 21, 2026).

[9] *Id.*

[10] *Licensing Procedures FAQ*, *Statistical Standards Program*, NCES, https://perma.cc/JY9P-F7T6.

projects following peer-review of research proposals. 20 U.S.C. § 9534(b)(1). IES solicits research applications through requests for applications—the most prominent being NCER Education Research Grants.[11] The peer-review process involves academics and researchers serving as peer reviewers, and every proposal submitted, if it meets minimum requirements, receives feedback. 2d Tipton Decl. ¶¶ 14–19 (AERA-0707–09).[12] Typically, "the highest scoring applications would then be funded." Soldner 25:2–15. But in all cases, funded or not, applicants would receive peer-review feedback on their proposal.

*What Works Clearinghouse*. The What Works Clearinghouse ("WWC") "sought to review existing education research, synthesize that research, and make the synthesized findings broadly available." Soldner 34:11–22. The WWC would also create and publish practice guides and intervention reports—which "depend on a strong and continuously updated research base." 2d Foster Decl. ¶ 24 (AERA-0624–25). The WWC also provided researchers with a platform to promote and disseminate their work if it meets certain evidentiary standards. *See* T. Doe Decl. ¶¶ 6–9 (AERA-0614–15) (describing the process of disseminating work through the WWC). These standards led the WWC to become "one of the most important sources for standardizing education research methods to ensure researchers are producing high-quality evidence." ECF 44-1, Shankar Giani Decl. ¶ 18 (AERA-0484). The WWC also offered "webinars, brown bags, [and] other ways in which they provided technical assistance or disseminated information." Soldner 40:14–17.

*Technical assistance and support.* IES is also statutorily mandated to "make customer service a priority," 20 U.S.C. § 9575, and routinely provided technical assistance and support to education researchers. NCES program officers would offer guidance on data structure, documentation, and technical questions, and help researchers "navigate and understand NCES

---

[11] IES, *Education Research Grants Program* (May 2024), https://perma.cc/BX66-YJJW.
[12] IES, *Grant Peer Review Guide* (revised Sep. 25, 2024), https://perma.cc/T8U7-45JC.

data." Saw Decl. ¶ 20 (AERA-0694–95); *see also* 2d Becker Patterson Decl. ¶¶ 10–12 (AERA-0590–91). Researchers with IES research grants worked closely with their program officers and "discuss project progress and potential changes," Nelson Decl. ¶ 20 (AERA-0679–70), and offer "expertise and critical feedback." May Decl. ¶ 11 (AERA-0655). IES employees also provided technical assistance and "guidance in designing research that meets WWC standards." Loomis Decl. ¶ 10 (AERA-0651). The technical assistance would "improve the quality" of research proposals the agency received. Soldner 79:3–12. It also supported IES in fulfilling its mission because "NCER is charged with supporting scientifically valid research," and providing technical assistance "aligned with that charge improves the quality of research generally." Soldner 41:5–17.

IES also offered trainings and meetings for researchers to not only "network and learn about best practices," Nelson Decl. ¶ 23 (AERA-0681), but also "to gain insights into the data, practice the nuances of analytical software, and ask questions of [data] experts," 2d Becker Patterson Decl. ¶ 12 (AERA-0591). And finally, IES employees often attended other research conferences, meetings, and trainings, sharing their expertise and experience with the research community. See *e.g. id*. ¶ 11 (AERA-0590). These were key functions that IES fulfilled prior to the Termination Actions in order to meet its statutory mandates, including of providing national leadership in education research.

## III.    Defendants Carried Out Mass Actions That Destroyed IES's Ability to Serve Its Congressionally Created Role.

In early 2025, Defendants undertook two sweeping actions[13] affecting IES's capacity to carry out its work: terminating contracts *en masse* ("the Contract Termination Action") and

---

[13] On February 13, Defendants took an additional action to close the Regional Education Laboratories ("RELs"). In another District of Maryland case, *ChildTrends, Inc. v. Dep't of Education*, the court declared that action was contrary to law. Order, No. 8:25-cv-01154 (D. Md. Aug. 15, 2025), ECF 62. That case provided the relief necessary with respect to the RELs, and as such, Plaintiffs do not move for relief with respect to the RELs Termination Action.

advancing a RIF to eliminate 90% of the agency's staff ("the Workforce Termination Action") (together the "Termination Actions" or "Actions"). Each Action was carried out in one fell swoop, under a single order, and together the Actions profoundly compromised IES's ability to carry out its functions. The Actions were undertaken with dramatic speed and without consideration of their impacts. Defendants themselves admit "mistakes" were made and standard processes—like reviewing contracts before cancelling them or conducting a workload analysis before terminating swaths of employees—were not undertaken before the Actions.

### A. The Contract Termination Action Was Rushed and Cut Critical IES Functions.

On February 10, 2025,[14] Defendants terminated, *en masse*, 89 contracts that supported or carried out IES programs and functions. EDAERA_AR_00003; *see* ECF 44-1, Defs.' Descriptions of Cancelled Contracts (AERA-0538–53). IES's Acting Director had "no input" into the process; he did not know how the termination decisions were made, or who made them. Soldner 93, 98:5-8. The entire process spanned only a few days, and there is no evidence anyone at IES was aware of the process prior to 11:00 pm on February 6, 2025. EDAERA_00005676. The Department [15] did not look at contracts or contract performance records. Christopher Joseph Rosier Dep. 21:11–21; 115:7–116:3 (hereinafter "Rosier"). There is no indication that the Department evaluated how IES's statutory functions would continue after the Termination Action; the few relevant meetings included no minutes or notes. Rosier 197:5–198:3. The Department described the Action as rapid and flawed: "it was fast," and "there were mistakes made." Rosier 205:22–206:14; 176:9–21.

---

[14] In one order, Defendants slated so many contracts for cancellation that they may not have completed all of the steps for each cancellation on February 10, so some cancellations may have been effectuated on February 11. Rosier 28:3–10.

[15] The Department of Education presented two employees to serve as its 30(b)(6) representatives. Throughout this memorandum, their statements are referred to as statements of the Department, with citations indicating which individual made each respective statement.

***A rushed process led to a single termination order.*** At 11:06 pm on February 6, 2025, IES employee Jonathan Bettis wrote to other IES staff that he just found out a "review" was underway, and that he was invited to a meeting the next day. EDAERA_00005676. He "d[id] not know the purpose of the review." *Id*. Nor did he know who was "undertaking this review, or when/what we will hear." *Id*. He asked for details related to some IES contracts by 9:50 am the next morning. *Id*. IES employees had less than one business hour to collect that information. *Id*.

The next day, February 7, 2025, Mr. Bettis asked that Acting IES Director Soldner be permitted to attend a meeting concerning the contracts for "his subject matter expertise." *Id*. That request was denied. *Id*. No one at IES with programmatic expertise was included in the meeting or process. Defs.' Resp. to Interrog. 3.

Late on that same afternoon—less than two hours after the meeting—Mr. Lucas, the [Director] of the Office of Finance and Operations, shared a list of the contracts that were the subject of the meeting with Conor Fennessy, of the Secretary's office. EDAERA_00001145. Ten minutes later, Mr. Fennessy responded, writing that Mr. Lucas "can simply send to Chris [Rosier] for termination to begin." EDAERA_AR_00003–04. On Monday, February 10, Mr. Lucas gave that order to Chris Rosier, executive director of contracting activity, and his team, writing "move out on terminating the contracts in the attachment" today, "starting with those with the highest dollar value of implied savings." EDAERA_AR_00017. There was no individual discussion or order for separate contracts. By Defendants' own admission, Mr. Lucas gave "an order" to cancel these contracts on February 10, 2025. RFA No. 4.

The same day, the mass contract termination began. EDAERA_AR_00017; RFA No. 4. Though the order had been given and effectuated, IES remained in the dark. The only advance notice Acting Director Soldner received was that, at some point, Mr. Fennessy stopped by his

10

office to tell him in person that "a substantial portion of IES contracts would be cancelled." Soldner 111:20–25. That afternoon, Soldner still did not know "which contracts [would] be affected." EDAERA_00001133. The atmosphere was chaotic. IES employees received emails from contractors regarding the terminations, without knowing what was terminated or whether the process was complete, and a scramble ensued to preserve data in contractors' possession. EDAERA_00001040; EDAERA_00001523 (Soldner wrote "settlement is being rushed . . . increasingly worried" about not "getting data"). Soldner described the process of understanding of how the termination impacted IES programs as a "post-mortem." EDAERA_00001949.

The Department admitted that the contract review process "wasn't extensive," Rosier 47:4–6, and it could not recall an instance of terminating for convenience more than one contract at a time in the prior two years—let alone nearly 100. Rosier 114:10–115:4. The "fast" pace at which the termination decision was made did not allow for an actual review of the contracts at issue. Rosier 21:11–23:7; 61:19–21. Defendants also did not rely on the Contractor Performance Assessment Reporting System ("CPARS") used to evaluate contract performance. Rosier 108:20–109:21; 115:7–19. The Department was not aware of any concerns raised with the contracts involved prior to February 2025. Rosier 120:4–20.

Instead, the Department stated that to get a real sense of what contracts should be terminated, one would need to look at the "reality on the ground" and a review of "deliverables," both of which could be provided by IES. Rosier 116:4–117:11. But both Acting Director Soldner's testimony and the record show that he had "no input" prior to the decision to terminate. Soldner 98:5–13; EDAERA_00001145. The Department was unaware of any "deliverables" reviewed to inform the termination decision. Rosier 119:6–16. Acting Director Soldner could not recall being asked for any information about stakeholders that may rely on programs impacted by the

11

Termination Action. Soldner 113:18–114:1. IES's leader also had no knowledge, prior to termination, of any plans to rebid the work that was terminated, or to bring that work in-house (which Dr. Soldner said IES did not have the capacity to do). Soldner 115:5–13. The staff that engaged with the contractors on these IES projects—that oversee their work—were not consulted prior to the Action. Soldner 125:21–126:7.

*The Contract Termination Action immediately halted IES programs and services.* Because IES relied heavily on contractors as partners in its work, any contract that was terminated "would have resulted in the cessation of that activity." Soldner 110:6–19. The cancelled functions were important to IES's work. Soldner 112:14–17. The Action abruptly halted nationwide data collections, longitudinal studies, program evaluations, the research grant applications peer-review and funding process, researchers' access restricted-use data, the disclosure review process, work to update the What Works Clearinghouse ("WWC"), and many other IES functions.

Specifically, numerous studies were halted immediately and with no notice, including the ECLS-K early childhood longitudinal study, the High School and Beyond Longitudinal Study ("HS&B"), the National Postsecondary Student Aid Study ("NPSAS"), and the Multi-Tiered Systems of Support ("MTSS") study, which evaluated reading interventions. ECF 44-1, Defendants' Descriptions of Cancelled Contracts (ECLS-K (AERA-0552), HS&B (AERA-0543), NPSAS (AERA-0542, AERA-0547), MTSS (AERA-0552)). IES had invested tens of millions, over many years, into many of these studies.[16] Where data had been collected but analyses or reports had not been finalized, the prior investment resulted in no return for IES or its stakeholders. *See, e.g.* Soldner 99 :10–101:19; EDAERA_00001157–58 (explaining that for one study, $3

---

[16] For example, for HS&B, nearly $50 million had been obligated, and for NPSAS, $68 million had already been invested. HigherGov, *The Design and Conduct of the Early Childhood Longitudinal Study, Kindergarten Class of 2022 through 2023*, https://perma.cc/9NN4-T6F9; USASpending.Gov, *Dep't of Educ. to Mathematica, Inc. (91990024F0369)*), https://perma.cc/PT5S-ME7D?type=image.

million of a $3.6 million contract had already been spent, with "only analysis and report writing left to be done"). The loss of investment was only half the equation; knowledge was also lost. For example, Acting Director Soldner testified that MTSS "would have added evidence to an important debate in reading instruction," Soldner 102:6–10, and NPSAS was the "only source of national data on how students . . . pay for college." Soldner 117:5–12.

The Department conceded that the Action would have "some impact" on IES's ability to meet its congressionally mandated standards of quality, integrity, and accuracy. Rosier 191:20–192:9. Others were more direct. IES is "completely crippled," said one employee.[17]

### B.    The Workforce Termination Action Cut IES's Staff by 90 Percent.

The Department announced a massive reduction in force ("RIF") for IES in March 2025, where the "vast majority"—approximately 90 percent—of IES's staff were terminated. EDAERA_00003899; Jacqueline Clay Dep. 21:19–22 (hereinafter "Clay"). Prior this March 2025 Workforce Termination Action, IES functioned as a leanly staffed agency, with around 200 employees. ECF 12-3, Whitehurst Decl. ¶¶ 11–14 (AERA-0006–08). In response to a departmental request, in mid-February 2025, the Acting IES Director submitted a spreadsheet to the Office of the Secretary and the Department of Government Efficiency ("DOGE") lead specifying the number full-time employee equivalents ("FTEs") that were necessary for IES to meet each of its statutory duties. Clay 41:22–44:10, 103:9–104:22. That submission was included in a full spreadsheet that included information on IES and other Department offices, broken down by IES component, workload description, and statutory provision. EDAERA_00005680*91–*100. It indicated that 166 full-time employees, out of the 177 considered in the document, were necessary for IES to meet its statutorily required work. EDAERA_00005680*91–*99. Nonetheless, a month

---

[17] Laura Meckler & Hannah Natanson, *DOGE rips through Education Department*, Wash. Post (Feb. 14, 2025), https://perma.cc/4KDD-2PA3.

later, the RIF left IES with only about 20 employees. Clay 55:1–4, 126:10–15. Acting Director Soldner believed that IES staff "were making important contributions to the nation's education system" and "the staff that were terminated were, in the main, supporting the mission of IES." Soldner 156:14–25. They could not be easily replaced. *Id*. at 157:1–21.

***Another process was rushed and undocumented.*** On March 12, 2025, the Department announced a notice of intent, designating about 90 percent of IES to be subject to the RIF. Clay 90:13–91:16. The record shows that Defendants did not meaningfully consider IES input on the staff resources needed for the agency to carry out its functions.

Typically, before a RIF, Defendants would conduct a workload analysis involving six months of employee interviews, reviews of job descriptions and performance evaluations, and reviews of statutory functions. Clay 83:11–86:11, 89:15–90:6. This analysis would produce a report concerning how statutory functions would be carried out following the RIF. Clay 87:17–88:3. Here, Defendants did not conduct a workload analysis or any similar review before terminating 90 percent of IES's staff, and there was no record that IES recommended these terminations. Clay 86:19–20, 97:14–22; Clay 53:7–12:7–12. The Department stated, with no supporting evidence, that IES's statutory functions could continue following the RIF. Clay 51:5–9. For example, the Department offered no support for the proposition NCEE's "statutory functions would continue" with Acting Director Soldner also serving as "the sole employee of NCEE" in addition to leading all of IES. Clay 77:4–19.

In the administrative record compiled by Defendants, the Department indicated it relied on only one document in making IES RIF determinations: a one-page IES organization chart with certain boxes in red, indicating sections of the agency to eliminate (along with a general executive order and a governmentwide memorandum concerning "efficiency" and stating the "Federal

14

bureaucracy" was "bloated" and "corrupt"). EDAERA_AR_0028-38.

Later, during discovery, the Department stated that it had considered a "list [of IES] statutory functions" (that was not included in the administrative record) submitted by Acting Director Soldner, Clay 41:7–43:2—which indicated 166 full-time employee equivalents ("FTEs") out of 177 considered were necessary to the agency's functioning. EDAERA_00005680*91–*99 (enumerating statutory functions requiring a total of 166 FTE in tab labeled "IES Statutory" and 11 FTE carrying out functions in tab labeled "IES Non-Statutory" in native excel file, *see* 2d McGrath Decl. ¶ 26 (AERA-0723–24)). However, there is no evidence Defendants relied on this list or any reasoned analysis in determining that only 20 employees were necessary. *See* Clay 41:7–43:2, 86:8–18. Defendants identified just one meeting, which included *all* Department components, at which RIFs were discussed with IES (and all other office leaders) before the Workforce Termination Action. Clay 50:10–20. It is unclear that the meeting was a forum for deliberation at all, and the Department stated "[t]hey did not go through each statutory requirement" at the meeting. Clay 101:5–14.

On the evening of the mass RIF notice, IES Acting Director Soldner still did not know which IES staff members had been designated for termination. EDAERA_00003670; Soldner 149:2–20. Acting Director Soldner characterized the mass elimination of his colleagues as a "professional loss" of their "capacity, [] intellect, and [] contributions" to the agency that was "hard[] to genuinely understand." EDAERA_00003899.

On April 10, 2025, the RIF took effect. Approximately 20 employees were left to work at IES, down from nearly 200. Clay 55:1–4. As a result of the RIF, NCES dropped from approximately 110 full time employees to three, even though IES had determined that 89 were necessary to meet statutory obligations. ED_00005680*94–*99. NCEE dropped to just *one*

15

employee, who was also the Acting Director of IES, Clay 77:4–19; IES had determined 33 were necessary. ED_00005680*91–*92. NCER dropped to *one* employee; IES had determined 19 were necessary. ED_00005680*92–*93.

*The Workforce Termination Action further decimated IES functions.* In the aftermath of the RIF, IES lacked staff to fulfill statutory functions. *See* Soldner 191:2–193:12. "[T]he pace at which IES performs the work has decreased." Clay 104:14–20. The Department indicated that the RIF included individuals who were completing statutory functions, without whom there were delays. Clay 107:12–15. The decreased staff has left IES unable to meet the research and dissemination demands it could once meet with its prior force. Clay 137:1–20. IES's components could not carry out their required functions at the staffing levels created by the Termination Action; indeed, the components generally need *substantially* more employees to carry out those functions. Soldner 191:2–193:12. Though the Department repeatedly asserted that "all statutory requirements or functions are being performed at IES," the Department provided no evidence to support the assertion. Clay 108:19–109:12, 121:7–17; *see also* Clay 110:15–111:18 (lacking "specific information" about whether IES was conducting longitudinal studies), 113:2–10 ("can't speak directly" to how NCES employees are dividing their "required duties"), 121:7–17 (could not discuss how IES *is* meeting each of its "individual" statutory responsibilities).

**IV.    In the Wake of These Actions, IES Was Left Incapacitated.**

Following the Actions, IES's functioning has been dramatically reduced. Numerous statutory obligations go unmet. IES is not conducting any longitudinal studies. Defs.' Resp. to Interrog. 5; Soldner 131:19–22. The number of evaluations dropped steeply. Soldner 131:8–14 (from around 50 to a dozen). Technical assistance and support previously provided to researchers is gone, indefinitely paused, or diminished. McClelland Decl. ¶ 7 (AERA-0664–65). The agency

16

is a shell of its former self. It is no longer able to act as the "national leader[] in expanding fundamental knowledge and understanding of education." 20 U.S.C. § 9511. It no longer is able to "conform to high standards of quality, integrity, and accuracy." *Id.* § 9511(b)(2)(A).

***Data collection and analysis.*** Every single longitudinal study was terminated; IES is not conducting any. Soldner 131:19–22; Defs.' Resp. to Interrog. 5. Other data collections, including those that (1) compared U.S. student achievement with foreign nations; (2) concerned how students finance postsecondary education; and (3) collected data on teacher and principal preparation, were also halted. "These datasets are uniquely valuable because they allow [researchers] to study issues at a national scale and over time." Saw Decl. ¶ 5 (AERA-0690). States cannot replicate this work on a national scale. Soldner 58:24–25 ("I'm unaware of any state agency collecting national data."); Irizarry Decl. ¶ 24 (AERA-0632–33) (IES is "the only source for nationally representative, large-scale, reliable longitudinal multi-level studies on schools and students.").

***Evaluation****.* Evaluations were abruptly cancelled, resulting in significantly fewer studies. Rather than conducting 50 evaluations of education programs on an annual basis, IES conducted work on approximately 12 in 2025. Soldner 131:8–14. Among those cancelled included an evaluation of strategies to accelerate math learning, as well as an evaluation of programs to improve support for students with disabilities. Put simply, important evaluations were cancelled. Soldner 180:16–19. The few remaining evaluations have little oversight, as only one full NCEE employee remains. *Id.* 163:17–20.

***Restricted-use data.*** Following the Actions, the restricted-use data program has faced enormous delays. *See* Saw Decl. ¶ 13 (AERA-0692) (describing a seven-month delay in IES's distribution of restricted-use data that "limited [his] ability to conduct planned analyses"); Soldner 174:24–25 ("I can imagine" the RIF caused delays in responding to requests for restricted-use

17

data). The agency itself warned users of restricted-use data to expect delays in distribution "[a]s IES adjusts to a recent reduction in force." Saw Decl. ¶ 12 (AERA-0691–92). The program is suspended. Soldner 174:4–14 ("a decision was taken . . . to halt research use of the portal via which researchers make requests for restricted-use data"). NCES has notified researchers that it "is not accepting new proposals or reviewing proposals."[18] It offers no timeline for when proposals may be accepted or reviewed. *Id.*

*Disclosure review.* Prior to the Actions, disclosure review was typically handled by contractors and overseen by IES staff. Soldner 55:23–56:6. Following the Actions, disclosure review has been delayed by months. Any researcher whose work is based on restricted-use data must seek IES approval through disclosure review before sharing or publishing that work. Where before last year, "the disclosure-review process would usually take two to three weeks," Saw Decl. ¶ 16 (AERA-0692), or within "five to ten business days," 2d A. Doe Decl. ¶ 5 (AERA-0599), after the Actions, the same process now often takes months. *See* Saw Decl. ¶ 17 (AERA-0693) (disclosure-review took more than four months); 2d A. Doe Decl. ¶¶ 5–6 (AERA-0599) (disclosure review took more than eight months). Another researcher who submitted for disclosure review in March 2025 has still never received a final answer, even after resubmitting a year later. Miratrix Decl. ¶ 5–6 (AERA-0669–70).

*Peer-review process.* The IES peer-review process was "managed jointly by IES staff and contractors." Soldner 137:11–19 (noting that 17 to 32 employees previously participated in the peer-review process). Absent the support of contractors and the work done by staff, IES was "not able to continue the review process as [it] would have." Soldner 136:16–23, 137:11–19; *see also* EDAERA_00001056. For example, NCER published a Request for Applications for the FY2025

---

[18] ResearchDataGov, https://perma.cc/2CPS-35QN (last viewed Mar. 14, 2026).

Education Research Grants in mid-2024.[19] It listed possible start dates between July 1, 2025, and September 1, 2025, allowing nearly a year for the peer-review process to progress.[20] In prior years, applications would have been reviewed, and applicants would have received peer-review feedback about their research proposal. 2d Tipton Decl. ¶ 15 (AERA-0708). For the pending NCER and NCSER research grant competitions, as a result of the Actions, all 588 grant applications were unreviewed as of December. Soldner 136:24–137:7. Typically, about 50 or 60 awards would have been made from those applications. Soldner 139:12–18; EDAERA_00001056. Instead, earlier this month, IES notified applicants that "IES is closing out the competition without making new awards." May Decl. Ex. 2 (AERA-0661). Applicants to the FY2025 Research Training Programs in the Education Sciences competition received a similar notice. May Decl. Ex. 1 (AERA-0659). Neither gave an explanation for why the competitions closed without providing funding for any new research. Neither offered applicants any feedback as the peer-review process would have afforded.

**What Works Clearinghouse.** The Actions involved both contracts and staff that supported the WWC. Soldner 35:21–37:6 (describing how NCEE staff and contractors support WWC), 161:7–8 (confirming only one staffer in all of NCEE post-RIF). IES has dramatically slowed its updates to the WWC and other dissemination resources. Though the website "remains available," IES has "not released a publication . . . since the terminations." Soldner 134:6–10.

**Technical assistance and support.** IES has gutted its ability to provide technical assistance and guidance to researchers. The "valuable technical assistance and resources that helped researchers and evaluators [] to ensure the quality of trial and study designs" is no longer available. McClelland Decl. ¶ 7 (AERA-0664–65). IES no longer provides guidance on research and data,

---

[19] IES, *Education Research Grants Program* (May 2024), https://perma.cc/BX66-YJJW
[20] *Id.*

19

which "slows down the analysis process and heightens the possibility of inadvertently introducing error," 2d Becker Patterson Decl. ¶ 10 (AERA-0590). IES employees no longer host trainings or conferences, nor does agency staff attend researcher gatherings as they had before. *See* Nelson Decl. ¶ 23 (AERA-0681); 2d Becker Patterson Decl. ¶¶ 10–11 (AERA-0590); 2d Umansky Decl. ¶¶ 9–10 (AERA-0716–17); D. Doe Decl. ¶¶ 5–8 (AERA-0610); 3d Weiss (SREE) Decl. ¶ 21 (AERA-0574). The disappearance of these opportunities created by IES impacts researchers' ability to disseminate "research to reach other researchers and policymakers," and "opportunities to learn from and collaborate with others in [the] field." D. Doe Decl. ¶ 7 (AERA-610). The technical assistance that helped "improve[] the quality of research," Soldner 41:13–17, is no longer available with the staff gone. And a key resource researchers had relied on to generate and develop new grant proposals is gone, forcing them to shelve promising works in progress. *See* Saw Decl. ¶ 20 (AERA-0694–95) (describing need to put potential grant proposal on hold after losing the IES staff member he was working with to develop it).

## V.  Defendants' Acts After the Actions Concede "Mistakes" Were Made.

Following the Actions, Defendants took steps that reinforce that the Actions were rushed and without adequate consideration. In the days immediately following the Contract Termination Action, IES experts learned of the cancellations and, having had no opportunity to do so prior to the Action, began documenting details about IES functions that were statutorily required or otherwise imperative. *See e.g.,* EDAERA_00000005 (describing EdFacts as "[m]ission-critical data collections mandated under three laws"); EDAERA_00001139 (Comprehensive Literacy State Development ("CLSD") is "Congressionally-mandated"); EDAERA_00001158 (Innovative Assessment Demonstration Authority ("IADA") is "required by law"); EDAERA_00001174

20

(Teacher and School Leader ("TSL") is "required by law"); EDAERA_00001090 (16 contracts "supported required data collections and/or represent data used by a wide array of stakeholders.").

The Department conceded repeatedly that there were "mistakes" made in the Contract Termination Action. Rosier 75:20–76:8, 151:9–11, 163:3–13, 176:1–6.[21] IES staff documented, after the fact, that many of the contracts terminated would result in a loss for IES and taxpayers— not savings.[22] The Termination Action resulted in work "not be[ing] completed" despite having paid for almost all of it. EDAERA_00001174. In addition, difficulties with meeting IES's statutory functions following the Workforce Termination Action led to Defendants' need to hire additional staff. Clay 155:20–156:8. Dr. Soldner conceded that "[h]ad the staff . . . not been terminated, we would not have needed to hire additional employees." Soldner 177:23–25. The Department summed it up thusly: "[W]e're doing some unique things, and during unique things, maybe there were mistakes made." Rosier 162:21–163:13.

## VI.    Following the Actions, IES Is Expending Congressionally Appropriated Funds at a Dramatically Lower Level.

Following the Actions, the agency has expended its congressionally appropriated funds on IES functions at a dramatically reduced rate.[23] As of September 2025, IES only obligated (and has not yet fully spent) a little more than $300 million of the $800 million appropriated for that Fiscal

---

[21] For example, the Department conceded that "maybe it was an oversight" that the contract that supported the CLSD program evaluation was included in the Termination Action. Rosier 148:12–18. The Department also indicated the termination of the Teacher and School Leader Incentive Program evaluation "could [] have been a mistake." Rosier 176:1–6.

[22] For example, IES explained that the total contract of the TSL incentive program "was worth approximately $10.6 million, of which $9.9 million had already been obligated." Soldner 125:5–10; EDAERA_00001173.

[23] On March 15, 2025, Congress enacted a full year continuing resolution funding IES at $793 million for Fiscal Year 2025, available through September 30, 2026. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat. 9 (Mar. 15, 2025) (hereinafter "Cont. Res. Mar. 2025") (continuing levels of Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 693 (Mar. 23, 2024)). When asked if IES would expend all of its nearly $800 million Fiscal Year 2025 appropriated funds—which are available until September 30, 2026—the Department answered "I don't know. I'm not sure." Clay 148:9–11.

Year. That includes expenses from *before* the Actions, in the period from October 1, 2024, until February 10, 2025. Clay 147:4–149:9; Defs.' Resp. to Interrog. 4.[24] With six months left to spend those funds, nearly $300 million in funding from the March 2025 continuing resolution remains "unallocated" for any IES functions.[25] These unallocated funds are those for which there is not even an approved "plan" for spending.[26] Acting IES Director Soldner conceded IES's rate of obligating appropriated funds is "objectively lower" due to the "lower rate [of] new grant awards" and the "studies that have been terminated" following IES's "winnowing [its] work down," as well as its reduced staff. Soldner 184:23–186:20.

On February 3, 2026, Congress enacted nearly the same level of appropriations for FY26 to IES, at $789.6 million (and available through September 2027), indicating its continued prioritization of IES. H.R.7148 - 119th Congress (2025-2026): Consolidated Appropriations Act, 2026, Div. B., Title III, p.131, https://perma.cc/4GZA-2ADX. But IES has left $584 million of that appropriation unallocated. Defendants have allocated $0 for each of "Research, Development, and Dissemination," "Research in Special Education," "Special education studies," and "Statistics,"—showing Defendants have not planned to spend anything in this appropriation on IES centers' key functions—including NCER, NCSER, and NCES's non-NAEP activities[27]

## VII.    The Dissolution of IES Has Harmed Plaintiffs.

Plaintiffs AERA and SREE, and their members, have been harmed by the Actions. Both

---

[24] The Office of Management and Budget apportionment database shows the remaining $500 million appropriated in March 2025 remained *entirely* unallocated until weeks ago, when the agency's allocation of $210 million of those funds were approved for potential expenditure. OpenOMB, *TAFS: 091-1100* (2025/2026) – Inst. of Educ. Scis., https://perma.cc/Z8TL-B5BR (data available for download at https://tinyurl.com/3fup287n).

[25] *See id.*

[26] Off. of Mgmt. & Budget, *Circular No. A-11: Preparation, Submission, and Execution of the Budget* (Aug. 2025)*, available at* https://perma.cc/73D7-P7AE ("An apportionment is an OMB-approved plan to use budgetary resources").

[27] OpenOMB, *TAFS: 091-1100* (2026/2027) – Inst. of Educ. Scis., https://perma.cc/V8TB-5FGN.

Plaintiff organizations and their members have long relied on IES to support their mission and work. The American Educational Research Association ("AERA") brings education researchers and graduate students into their membership, and "strives to advance knowledge about education, to encourage scholarly inquiry related to education, and to promote the use of research to improve education and serve the public good." Chavous (AERA) Decl. ¶ 6 (AERA-0556). The Society for Research on Educational Effectiveness ("SREE") is "dedicated to advancing the generation and use of effectiveness research to solve pressing challenges in education," through and with their membership of researchers, policymakers, practitioners, and students. 3d Weiss (SREE) Decl. ¶ 3 (AERA-0568–69). Historically, the missions of both AERA and SREE have aligned closely with that of IES—dedicated to excellence in education research, to guide policymaking and practice—and both organizations have long benefitted from close collaboration with the agency. In the face of these devastating changes to IES, AERA and SREE have, in turn, been impacted. The loss of critical IES functions has also damaged the nation's infrastructure for education research and devastated career prospects for Plaintiffs' members.

*Data collection and analysis.* Plaintiffs and their members have long relied on data and statistics collected through and disseminated by IES. In planning their work and research, they have centered projects around the existence and continuation of various IES data collections and studies and "relied heavily" on their availability. 2d Becker Patterson Decl. ¶ 7 (AERA-0588–89); *see also, id.* ¶ 8 (AERA-0589–90) ("The lack of . . . [PIAAC] data restricts my abilities as a researcher and limits further . . . my career."); ECF 12-3, Reardon Decl. ¶ 18 (AERA-0075) ("The inability to use this rich and important data source [the new ECLS-K study data] will diminish our ability to conduct effective research."); 2d Talbott Decl. ¶ 8 (AERA-0701–02). The loss of data reduces Plaintiffs' ability to conduct their related work, including non-federally funded research.

ECF 12-4, 1st Talbott Decl. ¶¶ 8–13 (AERA-0088–90); ECF 12-3, Reardon Decl. ¶¶ 16–20 (AERA-0075–76); ECF 12-3, Gersten Decl. ¶¶ 9–16 (AERA-0050–52); Saw Decl. ¶ 23 (AERA-0696); McClelland Decl. ¶ 12 (AERA-0666); 2d Becker Patterson Decl. ¶ 8 (AERA-0589–90); 2d Umansky Decl. ¶ 11 (AERA-0718).

*Evaluation.* IES evaluations have long supported the work of Plaintiffs and their members. *See* ECF 12-4, 1st Tipton Decl. ¶¶ 8–17 (AERA-0079–81) (up-to-date education data from evaluations used in her work); ECF 12-4, Boulay Decl. ¶¶ 5, 8, 14 (AERA-0124–26, AERA-0128); ECF 44-1, Baglieri Decl. ¶¶ 4, 7–9 (AERA-0462–64); ECF 44-1, L. Doe Decl. ¶¶ 4, 5 (AERA-0475); ECF 44-1, Shankar Giani Decl. ¶¶ 12–14 (AERA-0481–83). The benefits of these evaluations—essential for understanding what education strategies work and which do not—are impossible to reap without the national scale of IES. ECF 12-4, Boulay Decl. ¶ 14 (AERA-0128) ("It is not possible for me to effectively continue my work to improve education as an isolated, independent researcher in the dark about other evaluations . . . and no nongovernmental resource is sufficient to replace the IES databases."); ECF 44-1, Baglieri Decl. ¶ 9 (AERA-0463–64); ECF 44-1, Shankar Giani Decl. ¶¶ 12–14 (AERA-0481–83).

*Restricted-use data.* The terminated access to restricted-use data has left many researchers' projects incomplete. ECF 12-4, B. Doe Decl. ¶ 13 (AERA-0100) ("[My dissertation] examines information about students that is not publicly available . . . . All of these variables are only accessible through the restricted license."); ECF 12-4, 1st A. Doe Decl. ¶¶ 7–8 (AERA-0105–06) (research relies on information available only in the restricted-use dataset); ECF 12-4, Garvey Decl. ¶ 19 (AERA-0095). Researchers' projects have been "delayed and ultimately set aside" as a result of the lack of access. 2d Foster Decl. ¶ 20 (AERA-0624); *see also* Saw Decl. ¶ 12 (AERA-0691–92) ("the lack of availability has delayed projects and limited my ability to conduct planned

24

analyses."). Unsurprisingly, these changes have "harmed" members' "productivity and professional progress." Irizarry Decl. ¶ 23 (AERA-0632). The lack of data access has also hindered researchers' ability to plan future activities that would require the availability of the restricted-use data. Saw Decl. ¶ 12–13 (AERA-0691–92) (IES's failure to provide access to restricted-use data derailed planned projects); 2d Foster Decl. ¶ 19 (AERA-0624) (delays in access to restricted data "disrupt research timelines and impede student training"); Irizarry Decl. ¶ 19 (AERA-0631–32).

***Disclosure review.*** Researchers who use IES's restricted-use data no longer have access to the pre-publication review required for their work to be approved for publishing. Where researchers previously received a response in "two to three weeks," Saw Decl. ¶¶ 16–17 (AERA-0692–93), members now either cannot obtain review at all or must wait many months. One member simply never heard back from the agency after submitting his work for disclosure review in March 2025. *See* Miratrix Decl. ¶ 5 (AERA-0669). When he submitted the work again in March 2026, IES acknowledged the submission and warned that "disclosure risk review is proceeding at a slower pace as the work has been shifted to a smaller team." *Id.*; *see also* Saw Decl. ¶¶ 16–17 (AERA-0692–93) (review now takes at least "three to four months."); 2d A. Doe ¶¶ 5–9 (AERA-0599–600) (six months). The failures to respond and extended delays in approval have led to an inability to publish dissertations, research, and other papers in journals and at conferences, which have had a detrimental impact on Plaintiffs' members' career advancement. Members are no longer "able to meet the deadlines to submit our research for these conference presentations and journal publications," Saw Decl. ¶ 17 (AERA-0693), or "submit [a] dissertation to a journal for publication." 2d A. Doe Decl. ¶ 8 (AERA-0599). "After considerable effort and cost getting the data ready and analyzed," one member had to "remove that entire part of the paper" after IES failed to review it, "undermin[ing] the quality of [the] paper," causing the researcher "some reputational

25

harm" and depriving the field of useful guidance. Miratrix Decl. ¶ 5–6 (AERA-0669–70). These failures "disrupt[] [the] ability to publish research and therefore harms the trajectory of [members'] careers." Saw Decl. ¶ 17 (AERA-0693). For others—and in particular recent graduates—the IES delays have "hampered [career] progress." 2d A. Doe Decl. ¶ 8 (AERA-0599).

*Peer-review process.* The unexplained and abrupt closure of grant programs, after months of delays and without the provision of the required peer-review feedback, has harmed Plaintiffs' members. It has left Plaintiffs' members' research proposals, into which they put enormous time and work, and on which their career advancement often depends, pending and unreviewed. *See* 2d Foster Decl. ¶ 16 (AERA-0623) ("The end result of losing out on IES funding for my proposals is that the probability of my advancement to full professor will be delayed, if I am able to secure it at all."). Indeed, "[o]btaining grant funding is the primary requirement of advancement in academia within research intensive (R1) institutions." 2d Foster Decl. ¶ 16 (AERA-0623). And while members do not expect grant funding each year, the ability to participate in the peer-review grant program is "instrumental" to career advancement. Loomis Decl. ¶ 9 (AERA-0651).

Plaintiffs have invested "many hours of time and significant effort" to prepare their research proposals. 2d Talbott Decl. ¶ 6 (AERA-0700–01); T. Doe Decl. ¶ 11 (AERA-0615) ("spent at least 100 hours" to prepare "a proposal seeking funding, review, and feedback"); Loomis Decl. ¶ 5 (AERA-0649) ("spent several months writing a resubmission for an IES research proposal that had received promising feedback and scores the year prior."). The Actions have left the agency unable to manage review of the proposals. None of the applicants received any return on their investments—in the form of funding or feedback. Soldner 136:24–137:7 (explaining that 588 grant applications pending peer review had still not been reviewed). Each researcher that submitted a proposal had an expectation that they would receive back, at the very least, feedback

26

from two peer reviewers. *See* Loomis Decl. ¶ 6 (AERA-0649) ("reviewer feedback is an important part of the grant development process"). And for researchers in the early stages of their career, the peer-review process "serves as a valuable source of experience and career development." C. Doe Decl. ¶¶ 6–7 (AERA-0603) ("whether it was approved or denied with feedback . . . this grant proposal was a huge piece of my academic plan"); *see also* 2d Foster Decl. ¶ 17 (AERA-0623) ("No feedback was offered to me regarding the grant proposals I had pending when the competition was cancelled."); Loomis Decl. ¶ 6 (AERA-0649).

Other researchers had received feedback in prior years recommending changes to the proposal, and, upon making those changes, had been encouraged that they might receive funding in 2025. Instead, they never heard back. Loomis Decl. ¶ 5 (AERA-0649) ("This proposal had been three years in the making, it had incorporated all the feedback we had received from prior IES reviews, and it felt like a launch point for my career."); C. Doe Decl. ¶ 7 (AERA-0603) (previous version received "largely positive feedback," encouragement to re-apply, and had "made changes to the earlier proposal"). For some researchers, disruptions to the normal grant process have also caused reputational harm that has "undermine[d]" partnerships and "ma[d]e[] it more difficult to sustain collaborative research efforts in the future." Loomis Decl. ¶ 8 (AERA-0650–51); Nelson Decl. ¶¶ 10, 12 (AERA-0677). These unexpected, unexplained delays threaten members' "quality of [] work" and the "trajectory of [their] career[s]." Loomis Decl. ¶ 8 (AERA-0650–51). And now, the closure of these competitions without awarding funding has resulted in further harm. May Decl. ¶¶ 14–18 (AERA-0656–57). From a funding perspective, IES's abandonment of the peer-review grant program altogether has had significant impact on Plaintiffs' members. *See* Miratrix Decl. ¶ 11 (AERA-0672–73) ("IES is a primary source of funding and support in this field, and that funding and support is collapsing."). Lack of federal grants has forced researchers to rely heavily

27

on smaller foundations who are more interested in smaller-scope projects, limiting the breadth of insight Plaintiffs' members can contribute to their chosen field. C. Doe Decl. ¶¶ 11–15 (AERA-0604–05) (scaling back a proposal in absence of IES competitions).

In addition, IES had previously recruited researchers to serve as external research proposal reviewers. *See* May Decl. ¶ 13 (AERA-0655). Working as a grant reviewer "is itself a source of professional development." *Id.* at ¶ 14 (AERA-0656). When IES cancelled the reviews, they deprived the reviewers of "experience evaluating grant proposals" and "participating in the full panel review discussions"—opportunities which "could have helped [the reviewers] in [their] own work." *Id.* What's more, to the extent reviewers had already spent time reviewing proposals before the competitions were cancelled, their "time and effort spent on those reviews was completely wasted." *Id.* at ¶ 13 (AERA-0655–56). "That was time and effort that [they] could have spent on other projects or proposals that would have been beneficial to [their] career[s]." *Id.*

***What Works Clearinghouse***. Members have also been harmed by the loss of opportunity to have their work reviewed and disseminated through the WWC. 2d Talbott Decl. ¶ 5 (AERA-0699–700) ("I have lost mechanisms through which my work would have been effectively disseminated."); 2d Foster Decl. ¶ 23 (AERA-0624); T. Doe Decl. ¶¶ 5–9 (AERA-0614–15). Many researchers depend on the WWC as an abundant resource that further supports their research. 2d Foster Decl. ¶ 9 (AERA-0621) (career and work depend "heavily" on "dissemination platforms such as" WWC). Absent new WWC publications, Plaintiffs' members are left without this important resource. ECF 44-1, Shankar Giani Decl. ¶ 18 (AERA-0484); McClelland Decl. ¶ 8 (AERA-0665); 2d Foster Decl. ¶ 21 (AERA-0624). No longer held to the high standards required by the WWC, researchers fear a decline in the quality of education research published moving forward—their own and research they rely on. 2d Chow Decl. ¶ 6 (AERA-0595–96); 2d Pigott

Decl. ¶¶ 9–10 (AERA-0685–86); Saw Decl. ¶¶ 20–21 (AERA-0694–95); Loomis Decl. ¶ 10 (AERA-0651); Miratrix Decl. ¶¶ 6–7 (AERA-0669–70).

*Technical assistance and support.* Members suffer harms from the lack of IES technical assistance, expertise, and support. Loomis Decl. ¶ 10 (AERA-0651) ("Cancellations and the loss of access to IES staff have limited [researchers'] ability to seek guidance or technical assistance from program officers."). This loss has "significantly impaired" the ability to "resolve data questions, obtain guidance, and proceed efficiently with research projects" that depend on IES data. Saw Decl. ¶ 19 (AERA-0693–94); *see also* ECF 12-3, 1st Weiss (SREE) Decl. ¶ 10 (AERA-0057). And the "[l]oss of that expertise and critical feedback from an expert intimately familiar with [their] research has had a negative effect on the quality of the project and on [their] personal research productivity." May Decl. ¶ 11 (AERA-0655). In other words, "[w]ithout that guidance and assistance, the quality of [their] work—and therefore the trajectory of [their] career[s]—is threatened." *Id.*; *see also* Irizarry Decl. ¶ 27 (AERA-0633) ("I have not been able to reach anyone that I used to work with for help navigating the restricted-use datasets that I use. The quality and pace of my work has suffered as a result.") Researchers' connections to other researchers, centers, and stakeholders, once facilitated through IES, have dissolved, injuring their ability to spread their research farther and increase the quality of their research through collaboration with others. C. Doe Decl. ¶¶ 13–17 (AERA-0605–07).

* * *

On all these fronts and beyond, the diminution of IES away from its mandated leadership role has harmed the national education research infrastructure and the careers of Plaintiffs' members. The specific harms detailed above have led to a complete devastation of education research: the "capacity for the education research field to continue to produce relevant and actional

research for practitioners is greatly diminished." C. Doe Decl. ¶ 15 (AERA-0605–06); *see also* Bastedo Decl. ¶ 4 (AERA-0581) (describing certain IES longitudinal studies as "uniquely nationally representative"); Nelson Decl. ¶ 22 (AERA-0680–81) (describing "cascading effect" of lack of funding opportunities); 2d Foster Decl. ¶ 24 (AERA-0624–25); Miratrix Decl. ¶ 8 (AERA-0670–71). The devastation of the field has "dissuaded people from going into or remaining in education research." Miratrix Decl. ¶ 10 (AERA-0672). The Actions "undermine" the ability of "the education research community to produce reliable evidence that informs educational practice and policy." 2d Foster Decl. ¶ 26 (AERA-0625).

The Actions have harmed the careers of Plaintiffs' members. Lack of data access has "limit[ed] the scope of work" possible, which "is directly connected to [] performance as a researcher." Bastedo Decl. ¶¶ 10–11 (AERA-0583). Trainings by more established researchers through IES are gone, leaving newer researchers analyzing complex datasets early in their career prone "to inadvertent, serious misinterpretation." 2d Becker Patterson Decl. ¶¶ 10–12 (AERA-0590–91). Opportunities for junior staff at research centers are fewer and they must put on hold their plans to seek new positions that would advance their careers. *See* C. Doe Decl. ¶ 17 (AERA-0606–07); 2d Foster Decl. ¶ 18 (AERA-0623) ("I have fewer resources available to support student researchers, limiting their opportunities to gain research experience and pursue careers in education science."); 2d Umansky Decl. ¶ 8 (AERA-0716) (describing terminated part-time and graduate positions that previously supported her research). And opportunities for getting their foot in the door via publication are indefinitely halted, ECF 12-4, 1st A. Doe Decl. ¶¶ 14, 23 (AERA-0106, AERA-0107), which "hamper[s their] progress as a scholar right out of the gate." 2d A. Doe Decl. ¶ 8 (AERA-0599). Students are "graduating, but not finding jobs in the education research field, meaning a loss of high-quality researchers moving forward." Miratrix Decl. ¶ 10 (AERA-

30

0672).

Members further along in their careers have shifted the trajectory of their careers from a research-forward role to a teaching-forward role as a result of the Actions. 2d Umansky Decl. ¶ 12 (AERA-0718–19). Other members are considering whether the Actions "may force [them] to leave a career [they] love." C. Doe Decl. ¶ 19 (AERA-0607). The lack of support from IES impacts the "ability to conduct research, obtain funding, train students, and contribute to evidence-based education practices." 2d Foster Decl. ¶ 28 (AERA-0625–26). Because these are "metrics against which [] performance as a professor is evaluated," the Actions "limit the progress" some members can make in their career. 2d Foster Decl. ¶ 28 (AERA-0625–26). Quite simply, "The dismantling of IES programs and the termination of IES contracts have directly harmed [members'] professional work." 2d Foster Decl. ¶ 11 (AERA-0622).

Without the critical work that Congress requires IES to support, "policy decisions that affect our children, ranging from which curriculums are most effective to whether school reform policy approaches are effective, will be closer to guess work than motivated by high quality research and evidence." Miratrix Decl. ¶ 11 (AERA-0672–73). "[O]ur education systems will not be as strong as they could be, our children will not be served as well as they could be, and our international standing as a leader along all sorts of dimensions will be compromised." *Id.* And, though AERA and SREE's members—as dedicated education-research professionals—are often more likely to put the public interest ahead of their own, for them "personally, it means reduced productivity and reduced financial compensation . . . , which means a substantially reduced satisfaction with [their] work and contribution to society." *Id.* It means the kinds of losses that "could drive [them] from the field entirely." *Id.*

31

## VIII. Procedural History

On April 14, 2025, Plaintiffs brought suit against the U.S. Department of Education, the Institute of Education Sciences, and the heads of each agency. Compl., ECF 1. Plaintiffs sought review of the final agency actions to terminate a massive number of contracts and 90% of the staff of the Institute under the Administrative Procedure Act ("APA"), asserting that those actions were either contrary to law, arbitrary and capricious, and/or ultra vires. *See id.* § Claims for Relief, ¶¶ 157–72. Shortly after, Plaintiffs filed a motion for preliminary relief, ECF 12, which this Court denied, ECF 49. The Court ordered discovery to provide more information for considering the merits of the case. *Id*. The parties subsequently engaged in limited discovery.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In the APA context, "[s]ummary judgment thus serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Ctr. for Sci. in the Pub. Int. v. Perdue*, 438 F. Supp. 3d 546, 557 (D. Md. 2020); *see also City of Columbus v. Cochran*, 523 F. Supp. 3d 731, 743 (D. Md. 2021). Here, where limited discovery was appropriate, the relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Child Trends, Inc. v. U.S. Dep't of Educ.,* 795 F. Supp. 3d 700, 712 (D. Md. 2025) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

Under the APA, courts shall "hold unlawful and set aside agency action, findings and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Generally, an agency decision is arbitrary and capricious if the

32

agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ctr. for Sci. in the Pub. Int.*, 438 F. Supp. 3d at 557 (cleaned up). "Courts will vacate agency action if it is not based on a consideration of the relevant factors or where there has been a clear error of judgment." *Id.* (cleaned up). "Section 706(2)(A) requires federal courts to set aside federal agency action that is not in accordance with law." *City of Columbus*, 523 F. Supp. 3d at 772 (cleaned up).

## ARGUMENT

At the initial stages of this case, the Court had concerns regarding jurisdiction, standing, and final agency action. Production of the administrative record, discovery information, and Plaintiffs' ongoing harms have clarified each of these issues. There are no threshold barriers to this Court's review. *First*, Plaintiffs and their members have amply demonstrated their standing to challenge these actions. *Second*, the Tucker Act and the Civil Service Reform Act ("CSRA") cannot preclude Plaintiffs—who are neither contractors nor federal employees—from seeking relief under the APA, as other courts have confirmed since the time of the parties' preliminary briefing. *Third*, the record now clearly shows that the two Actions were discrete and unitary sweeping acts, and Plaintiffs' challenge is not "programmatic." Courts in this district and elsewhere have confirmed as much on less compelling facts.

And when the merits are considered, there is no question that Defendants' Actions were arbitrary and capricious. Defendants did not consider the many mandated functions assigned to IES in taking these Actions, the facts and expertise available, the reliance interests of researchers, or the level of spending on functions Congress had directed. The record is replete with evidence that the Actions were substantively non-sensical—indeed the Department admits "mistakes" were

33

made—as IES assessed 166 employees were needed for its functions yet its staff was cut to 20, and Defendants cut numerous contracts that their own records deemed to be critical, required, or nearly complete. The Actions also violated the law by ceasing important required IES functions. Plaintiffs seek vacatur of these Actions, restoring the status quo level of IES's functions.

## I.    Plaintiffs and Their Members Have Standing.

### A.    AERA and SREE Have Standing on Behalf of Their Members.

An association may assert standing as the representative of its members where (1) "its members would have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). This is just such a case. Taking the second two prongs first, the continued operation of the nation's education research agency is unquestionably germane to Plaintiffs' missions as associations of education researchers. ECF 12-3, 1st Levine (AERA) Decl. ¶¶ 4–9 (AERA-0064–66); ECF 12-3, 1st Weiss (SREE) Decl. ¶ 6 (AERA-0055); Chavous Decl. ¶ 6 (AERA-0556); 3d Weiss Decl. ¶ 3 (AERA-0568–69). And the relief sought here, the restoration of agency functions, does not require individual participation of Plaintiffs' members.

Plaintiffs' members also have standing to sue in their own right. To have standing, a plaintiff must "demonstrate the now-familiar elements of injury in fact, causation, and redressability." *Lance v. Coffman*, 549 U.S. 437, 439 (2007). Plaintiffs' members easily satisfy that three-part test. Plaintiffs' members have suffered numerous "concrete and particularized" and "actual or imminent" injuries as a result of Defendants' actions. *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 621 (4th Cir. 2018) (cleaned up). The record is replete with evidence that the Actions were the direct cause of Plaintiffs' harms sufficient to show "a causal

connection" to their injuries. *Id*. And a "favorable judicial decision" here to vacate those Actions would redress those harms. *Id.*

### i. Plaintiffs' members suffer informational injuries that confer standing.

An "informational injury" is a type of intangible injury that can constitute an Article III injury in fact. *Dreher v. Experian Info. Sols., Inc*., 856 F.3d 337, 345 (4th Cir. 2017) (citing *FEC v. Akins*, 524 U.S. 11, 24 (1998)). To establish informational injury sufficient to confer standing, Plaintiffs must "lack access to information to which [they are] legally entitled," and "the denial of that information [must] create[] a 'real' harm with an adverse effect." *Id*. The record is filled with an accounting of the harms that Plaintiffs' members have suffered and currently face as a result of the Actions. Plaintiffs' members are researchers and have a statutory right to IES information: research, statistics, and evaluations. This right is different in kind, and more explicit, than the general interest the public might assert to government information, because the statutory requirements to create and disseminate information to "researchers" are repeatedly stated throughout the Congressional scheme set forth in ESRA. 20 U.S.C. §§ 9501(10), 9511, 9541(b)(3)(B), 9562(a)(3), 9562(b)(4), 9575(2). It is "an act to provide for improvement of Federal education, research statistics, evaluation, information, and *dissemination.*" (emphasis added). Where an agency has afforded "interested individuals and organizations a generous flow of information," and then acted to "significantly restrict [the] flow" of that information, injury is established. *Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 937 (D.C. Cir. 1986). Indeed, another court found that researchers have a statutory right to IES information sufficient to confer standing, both when IES denies access to existing information *and* where IES effects a "cancellation and failure to replace" ongoing studies. *Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, No. 1:25-cv-00999, 2026 WL 523023, at *5 (D.D.C. Feb. 25, 2026) ("*AEFP*").

Plaintiffs have standing to bring claims challenging both Actions because both Actions

caused their members to lose access to information that they had statutory rights to obtain. *See Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (standing requirement applies to each claim). The Contract Termination Action shut down surveys and studies; researchers were entitled to the data collected, which was never disseminated. *Supra* Background II, III.A. Evaluations were ongoing, conducted, and many nearly finalized; but the results were never disseminated. *Id*. IES did not have the staff to take over the cancelled studies and evaluations without contractor support, even before the Workforce Termination Action, Soldner 115:9–13, and the RIF's gutting of its workforce made doing so plainly impossible. The Workforce Termination imposed additional informational injuries. The restricted-use data program ceased to accept applications after the Contract Termination Action, and with the RIF, researcher access to the restricted-use portal was cut off, leaving researchers with no way to access this important data. Soldner 174:4–14; *see also* Irizarry Decl. ¶¶ 13–18 (AERA-0630–31) (citing Exs. 1–4); Saw Decl. ¶¶ 11–12 (AERA-0691–92); 2d Foster Decl. ¶ 20 (AERA-0624). The WWC has "not released a new publication . . . since the terminations." Soldner 134:6–10. After the Workforce Termination Action, NCEE as a whole had only one employee, and reviewing research for publication was significantly delayed. Soldner 168:9–12. The quantity of research that IES is conducting or supporting also dropped dramatically, the number of evaluations and new research grant awards each dropped by 80 percent, Soldner 131:8–18, 139:12–21, depriving Plaintiffs' education researcher members of the flow of timely, updated research to use in their work.

Plaintiffs' members' inability to obtain IES's research and data has had "'real' harm[s] with adverse effect[s]," *Dreher*, 856 F.3d at 345, frustrating their abilities to conduct and publish their research, advance in their careers, and carry out their public-interested career ambitions. Bastedo Decl. ¶ 7 (AERA-0582) (lost "opportunities for financial support from foundations" due

to lack of IES data access); 2d Becker Patterson Decl. ¶ 8 (AERA-0589–90) (lost consulting opportunities due to lack of updated IES data); 2d Foster Decl. ¶ 20 (AERA-0624) (delay in IES data assistance led to project being set aside); D. Doe Decl. ¶ 8 (AERA-0610) (loss of opportunity to implement workshop for policymakers in partnership with IES); 2d Pigott Decl. ¶¶ 15–16 (AERA-0687); ECF 44-1, Baker Decl. ¶ 9 (AERA-0458).

### ii. Plaintiffs' members have been harmed by loss of technical assistance, career development support, grant opportunities, and public recognition opportunities.

Plaintiffs' members suffer concrete and particularized injuries-in-fact other than those caused by the lack of information access as a result of the Actions. These injuries do not, as is required for informational standing, require statutory entitlement. Members have suffered setbacks in both specific research and their careers more broadly as a direct result of the Actions.

The Actions decimated IES's function as the leader of the education research field, and they have destroyed the apparatus and infrastructure that Plaintiffs' members relied on. This has, in turn, wreaked havoc on the careers and contributions of many of Plaintiffs' members. 2d Umansky Decl. ¶ 12 (AERA-0718–19) (adjusting career "toward a future of more teaching and less research"); 2d Foster Decl. ¶ 28 (AERA-0625–26) (actions "limit the progress" he can make in career because "ability to conduct research, obtain funding, train students . . . will be significantly impaired").

In addition, the Actions ended numerous programs and services that Plaintiffs' members relied on for professional support and development, and without which they (and their careers) are harmed. For years, WWC was a key platform on which members' research was reviewed, published, and disseminated—which is critical for employment and advancement as an academic. The Actions stalled the WWC, and it no longer serves as a trusted, timely mechanism for research publication and dissemination. *See* McClelland Decl. ¶ 10 (AERA-0665) (IES not disseminating

her work as it had previously); 2d Talbott Decl. ¶ 5 (AERA-0699–700) ("Because IES has largely ceased to carry out its dissemination functions [through WWC and other means] I have lost mechanisms through which my work would have been effectively disseminated."). Plaintiffs have also benefited from the WWC evidentiary standards, which serve as a benchmark for much of Plaintiffs' members' own research. *See* Nelson Decl. ¶ 21 (AERA-0680); 2d Tipton Decl. ¶¶ 24–7 (AERA-0710–11); ECF 44-1, Shankar Giani Decl. ¶ 18 (AERA-0484) ("The WWC's Standards and Procedures Handbook is also one of the most important sources for standardizing educational research methods to ensure researchers are producing high-quality evidence."); ECF 12-4, Boulay Decl. ¶ 10 (AERA-0126–27).

The Actions shut down IES's grant application peer-review process, resulting in Plaintiffs' members losing (1) the ability to have their research proposals (in which they had invested significant time) actually considered for funding, and (2) peer-review feedback that is critical to their career development. 2d Talbott Decl. ¶ 6 (AERA-0700–01); T. Doe Decl. ¶ 11 (AERA-0615) ("spent at least 100 hours" to prepare "a proposal seeking funding, review, and feedback"); Loomis Decl. ¶ 5 (AERA-0649); Soldner 139:12–24 (actions resulted in no review of 588 submitted applications and failure to make "50 or 60" grant awards that would have been issued).

First, the termination of peer review has injured Plaintiffs' members' procedural right to apply for IES grants and to have those applications acted on in accordance with statutory requirements. *See* 20 U.S.C. §§ 9534(b)(1), 9520. A plaintiff "suffers a constitutionally cognizable injury by the loss of an opportunity to pursue a benefit . . . even though the plaintiff may not be able to show that it was certain to receive that benefit had it been accorded the lost opportunity." *Teton His. Aviation Found. v. DOD*, 785 F.3d 719, 724 (D.C. Cir. 2015) (quoting *CC Distribs., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989)). Indeed, another court has found the

failure of IES to actually peer review members' grant applications sufficient to confer standing. *AEFP*, 2026 WL 523023, at \*5. Plaintiffs' members have lost this opportunity, even if it is uncertain whether IES would ultimately award the grants to them. Loomis Decl. ¶¶ 6–7 (AERA-0649–50); T. Doe Decl. ¶¶ 17–18 (AERA-0616–17); 2d Foster Decl. ¶ 16 (AERA-0623); Saw Decl. ¶ 21 (AERA-0695); Miratrix Decl. ¶ 7 (AERA-0670). IES also has failed to make new funding and review opportunities available despite constant congressional funding, continuing the harm to Plaintiffs' members' ability to continue to seek funding and receive peer-review feedback. McClelland Decl. ¶ 9 (AERA-0665); D. Doe Decl. ¶ 9 (AERA-0611).

Beyond funding, the peer-review process offers Plaintiffs' members valuable feedback, without which they suffer career harms. The grant cycle offers potentially two opportunities for such feedback—at least one of which is provided for nearly every proposal submitted. *See* 2d Tipton Decl. ¶¶ 14–19 (AERA-0707–09). The absence of that feedback causes professional harms for Plaintiffs' members. *See, e.g.*, 2d Foster Decl. ¶ 16 (AERA-0623); T. Doe ¶ 17 (AERA-0616) ("As an early career scholar, the opportunity to receive substantive feedback from expert reviewers was part of my motivation for submitting [a] proposal. This feedback would have helped me to improve and strengthen the work.") And many members served as peer reviewers in the process, which is a valuable career experience that is no longer available. 2d Becker Patterson Decl. ¶¶ 6, 9 (AERA-0588, AERA-0590); May Decl. ¶¶ 12–13 (AERA-0655–56).

The Workforce Termination has also resulted in a severe lack of technical assistance and support that IES's expert staff used to provide. McClelland Decl. ¶ 7 (AERA-0664–65) (unable to use IES technical expertise and resources for study designs and statistical analysis as in past); Saw Decl. ¶ 20 (AERA-0694–95); 2d Becker Patterson Decl. ¶ 10 (AERA-0590). Plaintiffs' members previously benefited from attending IES trainings, events, and conferences, and benefitted from

39

staff attending other education research events. *See, e.g.*, ECF 12-3, 1st Weiss (SREE) Decl. ¶ 10 (AERA-0057); 2d Becker Patterson Decl. ¶¶ 11–12 (AERA-0590–91) (describing the loss of training opportunities hosted by IES); 2d Umansky Decl. ¶¶ 9–10 (AERA-0716–17) (loss of forums, once coordinated by IES staff, for research collaboration).

Other courts have found that similarly situated third parties suffered injuries sufficient to confer standing where they have benefited from the work of an agency, and where the government has taken agency actions that would destroy an agency's ability to fulfill its statutory mandates. For example, the court in *NTEU v. Vought* found that the NAACP had standing to challenge the CFPB's broad decimation because one of its members suffered an injury in fact as a result of the agency's halting of its work, as that member "planned to take advantage of and rely on CFPB's assistance, but defendants' stop work order and other actions leave her and other NAACP members at risk of becoming victims of financial predators." 774 F. Supp. 3d 1, 51 (D.D.C. 2025).[28] The Actions have harmed Plaintiffs' members in numerous, concrete ways akin to—and even identical to—injuries other courts have found amply sufficient to confer standing.

### B.    AERA and SREE Have Organizational Standing.

Organizations suffer injuries-in-fact "[w]hen an action 'perceptibly impair[s]'" their "ability to carry out its mission and 'consequent[ly] drain[s] . . . the organization's resources.'" *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 301 (4th Cir. 2020) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Organizations may not manufacture injury by expending resources merely advocating against a defendant's actions*, FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024), but satisfy the injury requirement where the

---

[28] Even the D.C. Circuit panel that stayed the District Court's ruling—before the stay opinion was itself vacated for rehearing *en banc*—found that this one member's inability to use CFPB services was sufficient to confer standing. *Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 776 (D.C. Cir. 2025), *reh'g en banc granted, opinion vacated*, No. 25-5091, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025).

challenged conduct impedes their ability to provide "services" or conduct "core business activities," *id*. (citing *Havens*, 455 U.S. at 379).

The Termination Actions have (1) impaired Plaintiffs' ability to provide services to carry out their missions and (2) drained their resources. AERA's mission includes "advancing knowledge about education," "encouraging scholarly inquiry related to education and evaluation," and "promoting the dissemination and practical application of research results." Chavous (AERA) Decl. ¶ 6 (AERA-0556). The Actions have interfered with its "daily operations" and the "specific . . . work in which [it is] engaged." *PETA v. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (citation omitted).

The Actions have forced AERA to redirect resources away from its core work—promoting the production, use, and dissemination of education research—to provide emergency support. For example, AERA has shifted employee time and resources from substantive trainings on a "variety of subject matters" to refocus on activities like "helping early-career researchers swim against the tide to advance professionally." Chavous (AERA) Decl. ¶¶ 42–43 (AERA-0565–66). Instead of disseminating research based on federal datasets, it must now guide members who are navigating interrupted data systems and investigate methods of documenting irreplaceable datasets and technical supports. *Id.* ¶¶ 24, 31 (AERA-0560–62). Instead of discussing advancements in education research, it must work with university partners on dissertation contingency planning. *Id.* ¶¶ 26–27 (AERA-0561). Its ability to advance knowledge and research through its key communications, education-research, and professional-development programs has been fundamentally frustrated by the Actions, which have undermined the infrastructure necessary to further those goals. *Id.* ¶ 19 (AERA-0559). AERA continues to focus its time and staff on its new "compensatory role," diverting its resources away from its mission and into efforts to "protect or

41

recreate at least some of the infrastructure that IES used to provide," though no single private organization can replace IES. *Id.* ¶ 29 (AERA-0562).

SREE's mission—to advance "the generation and use of effectiveness research to solve pressing challenges in education"—has also been impaired by the Actions.[29] SREE's efforts to encourage effectiveness research have been hamstrung as IES's federal evaluations have slowed dramatically, and the agency's mechanisms for supporting research evaluation are shells of their former selves. SREE holds a conference each year to further its mission. 3d Weiss (SREE) Decl. ¶ 13 (AERA-0571–72). Unlike in past years, the Actions prevented SREE from including a job fair last year. *Id.* ¶ 16 (AERA-0572). SREE was also financially unable to support undergraduate students interested in education effectiveness research, as it had in the past, frustrating its ability to introduce new students to the field. *Id.* ¶ 33 (AERA-0577). And the Actions have forced SREE to make significant changes to its academic journal. Because the Actions have significantly cut the production of new research, the journal is now shifting some of its capacity away from publishing new research and to surveys of existing research. *Id*. ¶ 25 (AERA-0575). That frustrates SREE's ability to disseminate meaningful primary research, forcing it to spend more resources on research with less impact. *Id.* SREE's trainings have also been impacted. SREE had recently undertaken an effort to diversify the field and encourage students to pursue careers in education research. *Id.* ¶ 27 (AERA-0576). Now, SREE has no capacity to pursue these efforts, and these efforts are no longer realistic given the impact of the Actions on the education research infrastructure at large. *Id*. Instead, SREE has had to redirect its efforts to hardship grants and support for those already in the field. *Id.* ¶¶ 28–29 (AERA-0576). This also frustrates its mission of expanding knowledge and support for education research.

---

[29] *Mission,* Soc'y for Rsch. on Educ. Effectiveness, https://perma.cc/BHM8-D7YY.

In addition, the Actions have so shaken the field of education research that many SREE members were financially incapable of attending its annual conference, leading to a 6% decrease overall and a 15% decrease in attendance among members not receiving SREE hardship funding. *Id.* ¶¶ 17–20 (AERA-0572–74). SREE's conference registration revenue dropped by $36,000 from the prior year. *Id.* ¶ 19 (AERA-0573–74). SREE also lost sponsorships and philanthropic support. *Id.* ¶¶ 31–32 (AERA-0577). Many of SREE's donors redirected funding to support researchers whose studies were almost complete when the Actions occurred. *Id.* ¶ 31 (AERA-0562). SREE has been forced to spend more staff time fundraising to make up the revenue and to seek support for members now unable to afford its conference. *Id.* ¶ 21 (AERA-0560). As a result, SREE has decreased its staff from three to two people and has terminated support from a long-standing contractor. *Id.* ¶¶ 23, 34 (AERA-0560, AERA-0563). SREE has not signed a contract for a 2027 conference given the uncertainty in the field. *Id.* ¶ 23 (AERA-0560).

These are precisely the sorts of harms sufficient to confer organizational standing. *See, e.g.*, *RNC v. N.C. State Bd. of Elections*, 120 F.4th 390 (4th Cir. 2024) (impeding RNC's voter-outreach work and causing diversion of resources to combat election fraud conferred standing); *Edmondson Cmty. Org. v. Mayor of Baltimore*, 797 F. Supp. 3d 497, 519–21 (D. Md. 2025); *Cath. Legal Immigr. Network, Inc. v. EOIR*, 513 F. Supp. 3d 154, 170 (D.D.C. 2021) (loss of clients and diversion of resources from client service were "concrete drains on" organization's "time and resources" sufficient for standing); *N.W. Immigr. Rts. Project v. USCIS,* 496 F. Supp. 3d 31, 46–47 (D.D.C. 2020) (standing where rule would make serving existing clients more difficult and time-consuming, reducing number of clients served).

43

**II.    There Are No Jurisdictional Bars to Plaintiffs' Claims.**

Plaintiffs and their members were neither contractors nor employees of IES, and the existence of statutory schemes for adjudicating contract and employment disputes (the Tucker Act and the CSRA) cannot displace the "'basic presumption of judicial review'" in favor of reviewing Defendants' actions here. *Holbrook v. Tenn. Valley Auth.*, 48 F.4th 282, 287 (4th Cir. 2022) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967)). The Court of Federal Claims and Merit Systems Protection Board afford them no avenue at all for review or relief. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). Plaintiffs challenge Defendants' Actions because they have cut Plaintiffs' members off from IES functions, not because they violated contract terms or fired them. And at this stage in the litigation (unlike when Plaintiffs sought preliminary relief), Plaintiffs do not seek reinstatement of particular contracts and staff. Instead, Plaintiffs seek vacatur of the Actions, which would require restarting work and re-hiring without prescribing the particular contracts or employees to be restored. This Court's jurisdiction is not displaced by the Tucker Act or CSRA.

### A.    The Tucker Act Does Not Bar Plaintiffs' Challenge to the Contract Termination Action.

Under *Megapulse, Inc. v. Lewis*, whether an action is "at its essence a contract action," and thus district court jurisdiction is precluded by the Tucker Act, "depends both on [1] the source of the rights upon which the plaintiff bases its claims, and [2] upon the type of relief sought (or appropriate)." 672 F.2d 959, 968 (D.C. Cir. 1982) (internal quotations omitted). As the court noted in *Child Trends, Inc.*, "the Fourth Circuit endorsed" the *Megapulse* test in *United States v. J&E Salvage Co.*, 55 F.3d 985, 987–88 (4th Cir. 1995), and it has been consistently applied in this Circuit. 795 F. Supp. 3d at 716.

*First*, the source of the rights cannot be the contracts because Plaintiffs here are neither contractors themselves nor do they seek to enforce contractual terms. Instead, Plaintiffs seek to require IES to carry out its assigned and funded functions. The mere referencing of "a contract" does not mean that a case is based "on the contract and therefore directly within the Tucker Act." *Megapulse*, 672 F.2d at 968. Plaintiffs' claims concern the Action that cut off IES's capacity to perform its functions. These claims in no way depend on contract terms or performance of those specific contracts. Instead, they seek restoration of statutory *functions* IES has been instructed by Congress to carry out and longstanding functions that were, under the APA, unlawfully halted, and on which Plaintiffs rely. *See Child Trends*, 795 F. Supp. 3d at 717 (Tucker Act did not displace APA claims since they did "not rest . . . on those agreements."); *accord Elev8 Balt., Inc. v. Corp. for Nat'l & Cmty. Serv.*, 804 F. Supp. 3d 524, 547 (D. Md. 2025). Particularly where, as here, plaintiffs were not parties to the cancelled contracts, courts have found the Tucker Act's application to be inappropriate. *See Cmty. Legal Servs. v. HHS*, 155 F.4th 1099, 1103 (9th Cir. 2025); *New Jersey v. DOT*, No. 1:26-cv-00939, 2026 WL 323341, at *4 (S.D.N.Y. Feb. 6, 2026) (Tucker Act did not prevent states' claims as they "could not themselves bring claims in the Court of Federal Claims").

*Second*, Plaintiffs do not seek money damages or anything akin to a contract remedy. Instead, Plaintiffs seek declaratory and equitable relief to require Defendants to vacate their unlawful Action and restore the previous *functions* of IES. *See NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring in partial grant, partial denial) (even where plaintiffs' own agreements were cancelled, grantees could seek APA vacatur of agency action that did not require remedy of their specific terminations). Although this Court expressed concern at the preliminary stage of this matter that reinstatement of particular contracts resembled the remedy

45

of specific performance, the ultimate relief sought, Compl., ECF 1 ("Requested Relief"), is "at its essence," *Megapulse*, 672 F.2d at 968, the performance of statutorily required research and dissemination functions however accomplished, not any contractual remedy. *Id.*

### B. The Civil Service Reform Act Does Not Channel Plaintiffs' APA Claims to a Venue That Cannot Hear Them.

This Court has jurisdiction to consider Plaintiffs' claims related to the IES Workforce Termination Action under *Thunder Basin*, 510 U.S. at 213–15. The Civil Service Reform Act ("CSRA") and the Federal Service Labor-Management Relations Statute ("FSL-MRS") enacted within the CSRA, provide administrative procedures that *federal employees* and *their unions*, respectively, may employ in employment and labor disputes. *See* 5 U.S.C. §§ 7701(a), 7103(a)(4). Plaintiffs here are neither federal employees nor unions and do not seek relief from any employment action, or even the reinstatement of particular individuals.

In determining whether a scheme like the CSRA precludes judicial review, three factors control: *First*, would precluding jurisdiction "'foreclose all meaningful judicial review'[]?" *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023) (quoting *Thunder Basin Coal Co.*, 510 U.S. at 212–13). *Second*, "is the claim 'wholly collateral to [the] statute's review provisions?'" *Id*. *Third*, "is the claim 'outside the agency's expertise'?" *Id*. When "the answer to all three questions is 'yes,'" there is a strong presumption that Congress did not limit jurisdiction. *Id*. All of these factors confirm this Court has jurisdiction. Plaintiffs have no way to obtain *any* "judicial review" under the CSRA. *Axon,* 598 U.S. at 186. Plaintiffs' claims that the Action unlawfully ceased IES functions is "wholly collateral" to the employment provisions of the CSRA. *Id*. And relatedly, the MSPB and FLRA have no expertise in IES's work or its decisionmaking. *Id*.

Courts in analogous cases have accordingly concluded that non-employees' APA claims are not channeled. *Elev8*, 804 F. Supp. 3d at 554 (APA claims concerning RIF by beneficiaries of

46

AmeriCorps program were not precluded by the CSRA). Where "the central claim in this case is about the services offered" by an agency, "not the direct impact of the employment terminations on employees," impacted non-employees cannot have all review foreclosed by the existence of an employment dispute resolution scheme. *Wiley v. Kennedy*, 789 F. Supp. 3d 447, 464 (S.D. W. Va. 2025). The Supreme Court's more recent preliminary stay orders do not disturb the conclusion that non-employees can bring APA claims to challenge RIFs. *See, e.g., New York v. Kennedy*, 155 F.4th 67, 71 (1st Cir. 2025); *Rhode Island v. Trump*, 810 F. Supp. 3d 283, 299 (D.R.I. 2025) ("CSRA does not divest . . . jurisdiction to review the States' claims relating in part to the mass terminations of federal employees"); *Wash. State Ass'n of Head Start & Early Childhood Assistance & Educ. Program v. Kennedy*, No. 2:25-cv-00781, 2026 WL 35858, at *6 (W.D. Wash. Jan. 6, 2026) (CSRA did not channel challenges to RIFs by program participants).

## III.  The Actions Are Unlawful and Arbitrary.

### A.  Plaintiffs Challenge Discrete, Final Agency Actions Subject to APA Review.

At the preliminary stage of this case, with only public reporting available and few factual representations from Defendants, the Court expressed uncertainty about whether the Actions were discrete, final agency actions of the type subject to challenge under the APA or a collection of numerous contracting and staffing decisions. Op., ECF 49. Now the facts are clear, and they demonstrate that the two Actions were both discrete final agency actions—not a fractal collection of acts and decisions. Each is a reviewable final agency action under the APA.

#### i.  The Actions are final agency actions.

Each Termination Action was a final agency action subject to review under the APA. An agency's action is final when it (1) represents "the consummation of the agency's decisionmaking process," and (2) either determines legal "rights or obligations" or is an action "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotations omitted). Finality

47

for the purpose of reviewability under the APA is assessed in a "pragmatic" manner. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 591 (2016).

The Contract Termination Action, effectuated by a single emailed order directing mass cancellation on February 10, 2025, represents the consummation of Defendants' decision-making. EDAERA_AR_00017; RFA No. 4 (admitting that cancellations were pursuant to a single order). This was not a tentative statement that the work being performed was being paused for review; this was a single directive that ceased work immediately. EDAERA_AR_00003–04 ("Can simply send to Chris for termination to begin."). The Workforce Termination Action order, similarly, was plainly the consummation of Defendants' decision-making, as the Acting Head of IES communicated this decision to subordinates with a clear indication that the termination decision was final. EDAERA_00003899; *see POET Biorefining, LLC v. EPA*, 970 F.3d 392, 404 (D.C. Cir. 2020) (finding finality where indication came from "no mere subordinate").[30]

The Actions also determined "rights and obligations" and produced "legal consequences." *Bennett*, 520 U.S. at 178. As described *supra* Argument I.A.i., the Actions impacted researchers' statutory rights to IES data. Further, the Contract Termination Action involved abrupt cancellations of contracts, altering Defendants' legal obligations to other parties.[31] *See Alston v. Balt. Gas & Elec. Co.*, No. 1:22-cv-01061, 2023 WL 1472020, at *10 (D. Md. Feb. 1, 2023) (contracts involve "legal consequences"). The Workforce Termination Order, similarly, determined rights and obligations and had legal consequences as it ended employees' employment.

---

[30] That Defendants have backtracked in some respects, *supra* Background V, does not alter the finality of these actions. *POET Biorefining*, 970 F.3d at 404 (quoting *Hawkes Co.*, 578 U.S. at 598) ("possibility of revision . . . does not make an otherwise definitive decision nonfinal").

[31] *See, e.g.,* USASpending.Gov, *IES to Applied Enter. Mgmt. Corp. (91990024F0367)*, https://perma.cc/LM4E-ME8P?type=image; USASpending.Gov, *IES to WeStat, Inc. (91990019C0002)*, https://perma.cc/9XBU-EWJ6; *Dep't of Educ. to Am. Inst. for Rsch. in Behavioral Scis. (91990018C0046)*, https://perma.cc/J22W-4849 (showing contracts were "terminated for convenience").

*See Elev8*, 804 F. Supp. 3d at 557 ( "RIF [of] AmeriCorps employees" was "clearly reviewable under the APA"). Both Actions are final agency actions subject to judicial review.

### ii. The Actions are discrete, not programmatic.

The record makes unequivocally clear that each of the Actions was a discrete agency action. Plaintiffs' challenge is not a barred "programmatic" challenge to disparate agency acts alleged to be a program. *Wash. State Ass'n of Head Start*, 2026 WL 35858, at *7 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (finding challenge to RIF by organizations who relied on agencies discrete and not "programmatic" under *Lujan*)).

For one, the Actions were each unitary actions codified in discrete "orders," 5 U.S.C. § 551(13) (defining "agency action" to include "orders") which resulted in wide-ranging impacts. An "order" is definitionally a single action under the APA. *Id.*[32] That these actions were sweeping and "categorical in nature" does not transform Plaintiffs' challenge into a barred programmatic attack. *Maryland v. Corp. for Nat'l & Cmty. Serv.*, 785 F. Supp. 3d 68, 91 (D. Md. 2025) (rejecting government's "programmatic" argument where "[t]he decision to terminate grant funding and close over 1,000 AmeriCorps programs on the same day . . . and for the same reason . . . was 'categorical in nature'" and finding it was "discrete agency action"); *Elev8*, 804 F. Supp. 3d at 557 (85% RIF and mass grant terminations were "discrete agency actions" not "programmatic challenge"). The *Elev8* court relied on the fact that these terminations "each occurred within a singular and brief time frame" to conclude they were sufficiently discrete. *Id*. The same is true in this case, where the contract cancellations and staff terminations occurred in unified fashion on single days. That the actions' *consequences* are far-ranging does not transmute Plaintiff's claims into a barred challenge to numerous disparate acts. *See also* Op. at 24, *Widakuswara v. Lake*, Case

---

[32] Even if not considered "orders," the nature of these actions is "equivalent" such that they are "discrete," just as an order is. *See* 5 U.S.C. § 551(13).

No. 1:25-cv-01015 (D.D.C. Mar. 17, 2026), ECF 223 at 24 ("even under" Government's "preferred view of the law" mass "firing employees" and "cancelling contracts" are "discrete actions" "undoubtedly subject to APA review").

### B. The Actions Are Arbitrary and Capricious.

The APA "requires agencies to engage in reasoned decisionmaking," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (cleaned up), so any action lacking "genuine justification" based on the facts before the agency must be vacated as arbitrary and capricious. *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019); *see also* 5 U.S.C. § 706(2)(A); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962) (noting the reasoned explanation requirement is "strict and demanding"). An agency's decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *West Virginia v. Thompson*, 475 F.3d 204, 212 (4th Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)).

Further, the agency's explanation must reflect "consideration of the relevant factors," *Michigan v. EPA*, 576 U.S. 743, 750 (2015), including "the advantages and the disadvantages of agency decisions," *id*. at 753, and the "serious reliance interests" engendered by prior agency policy, *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009) (citation omitted); *see also State Farm*, 463 U.S. at 43. Discovery proves that both Actions lacked reasoning and that the Department failed to consider important aspects of the problem and reliance interests. To the extent that *reasons*—not reasoning—supported these actions, those reasons were contrary to Congress's

50

intent and instructions. The record merely shows an agency speedrunning significant decisions without reason.[33] This is arbitrary and capricious.

### i. The Department failed to provide adequate explanation for the Actions.

It is a cardinal principle of administrative law that an agency "disclose the basis of its order." *See Burlington Truck Lines*, 371 U.S. at 168. An agency must "show that there are good reasons" for its actions. *Fox Television*, 556 U.S. at 515; *see also City of Columbus v. Cochran*, 523 F. Supp. 3d 731, 754 (D. Md. 2021) (action arbitrary and capricious when the agency failed to articulate why it changed positions "suddenly, and in contradiction to its previous position").

***Contract Termination.*** The Department offered no reasoned explanation for the Contract Termination Action—not even to the head of IES. Soldner 94:20–23, 95:17–24. There was no consultation with expert staff at IES. *See* EDAERA_00003156. The Department repeatedly admitted that "mistakes" were made. Rosier 75:20–76:8, 151:9–11, 163:3–13, 176:1–6. The Department pointed to "efficiencies," "savings" and "administrative priorities" after the fact, to justify the Termination Action, Rosier 23:10–24:3; *cf.* Clay 30:6–7, but it did not attempt to offer any explanation as to how the Termination would further these goals. It was unable to explain how the Contract Termination Action was reasonable. *See, e.g.,* Rosier 134:13–144:1 (discussing the termination of the 8.5 year CLSD contract where more than $12 million of the $14 million had been spent, and all that was left to do was data analysis and report writing); Soldner 126:20–127:14 (describing the "significant investment in financial and time resources" for the CLSD contract,

---

[33] IES understands what a more thoughtful approach to agency change looks like, because it recently initiated a process for changes to IES. On September 25, 2025, the Department issued a Request for Information (RFI) on Feedback on Redesigning IES. 90 Fed. Reg. 46,187. Both AERA and SREE submitted comments, offering their views on issues raised in the RFI. On February 27, 2025, the Department released a 95-page report of recommendations to "reimagine" IES. The report offers several recommendations, which the Department "looks forward to considering," but has not yet been implemented. Such a process could serve as a reasonable way to make significant changes to an agency, had it occurred *before*, and not a year (and counting) after the Termination Actions.

where the work was "almost completed"); EDAERA_00001139.[34]

*Workforce Termination.* Defendants offered no explanation for the Workforce Termination Action either. The totality of the reasoning contained in the administrative record compiled by Defendants was an executive order and related governmentwide memo—which cannot replace agency decisionmaking reasoning, *Tate v. Pompeo*, 513 F. Supp. 3d 132, 143 (D.D.C. 2021)—and a chart highlighting IES components to cut, EDAERA_AR_0038; Clay 47:5–20. No further explanation was offered by the agency outsiders who ordered the incapacitating decision. In short, "[t]here are no findings and no analysis," let alone a sufficiently "rational connection between the facts found and the choice made." *Burlington Truck Lines,* 371 U.S. at 167–68*; see also State Farm*, 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action."). A Defendant's "conclusory statements will not do." *Amerijet Int'l, Inc. v. Pistole,* 753 F.3d 1343, 1350 (D.C. Cir. 2014).

### ii. The Department failed to rely on prior factual findings and available evidence.

An action must reflect "consideration of the relevant factors," *Michigan*, 576 U.S. at 750 (citation omitted), including "the advantages and the disadvantages of agency decisions," *id*. at 753. Despite an abundance of data, evidence, and expertise to consider, Defendants used none of it. The Department could have considered data from the CPARS system tracking contract performance. It did not. Rosier 115:7–16. The Department could have interviewed IES staff to learn about the work supported by the contracts. It did not. Soldner 125:21–126:7. The Department could have analyzed the *actual* contracts, or the prior deliverables they had generated. It did not. Rosier 21:11–22:14. Had the agency engaged in any of the process required to take such actions,

---

[34] *See also* EDAERA_00001173 (Teacher and School Leader incentive program evaluation had $9.9 million of $10.6 million already spent); EDAERA_00001157 (IADA contract with over $3 million of $3.6 million already spent).

it may have avoided the many "mistakes" involved in the Contract Termination Action. Rosier 75:20–76:8, 151:9–11, 163:3–13, 176:1–6. Indeed, the later reversal of some of the cancellations involved in that Action illustrates the lack of analysis conducted prior to the action having been taken. *See Water Quality Ins. Syndicate v. U.S.*, 225 F. Supp. 3d 41, 68 (D.D.C. 2016) (courts have "not hesitated to reject agency determinations . . . when an agency ignores factual matters").

Further, the Department was required to "consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Spirit Airlines, Inc. v. DOT*, 997 F.3d 1247, 1255 (D.C. Cir. 2021); *accord Regents of the Univ. of Cal.*, 591 U.S. at 32–33. The Department never explained why it did not, in the first instance, fully evaluate statutory requirements, or attempt to renegotiate contracts, as opposed to cancelling every contract outright and reinstating some on an ad hoc basis, adding to costs, delays, and confusion.

RIFs, too, have a historical framework that has been used in the past to facilitate reasoned decisionmaking: workload analysis. Clay 83:11–85:21. This standard procedure ensures statutorily required duties of an agency can still be carried out with a reduced workforce. Clay 87:6–90:6. Defendants did not conduct one before slashing IES's staff. Clay 86:12–20. Discovery revealed that IES had determined that 166 full-time employees were needed for the agency's statutory duties, and only 11 FTEs were not. EDAERA_00005680*91–*99, *100. And yet, the RIF proceeded to cut IES to only *20* employees. No explanation is provided for why the IES assessment was wholly disregarded.

In short, "[t]here are no findings and no analysis," let alone a sufficiently "rational connection between the facts found and the choice made." *Burlington Truck Lines*, 371 U.S. at 167–68; *see also Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.,* 25 F.4th 1, 10 (D.C. Cir. 2022) (agency acted arbitrarily when there was no "factual basis" for its conclusions).

### iii. The Department failed to address important aspects of the problem and relied on factors other than those Congress intended.

Defendants' actions are also inconsistent with Congress's directives and thus fail to address an important aspect of the problem. *See State Farm*, 463 U.S. at 55 (agency must "bear in mind that Congress intended safety to be the preeminent factor" in applicable act). The Department failed to consider Congress's directives to the agency with respect to its mission and key functions and the level of funding Congress directed IES to spend on its many statutory functions. 20 U.S.C. §§ 9511–9584; Cont. Res. Mar. 2025.

In its establishment, Congress created an agency that would "provide national leadership in expanding fundamental knowledge and understanding of education" for the benefit of "parents, educators, students, researchers, policymakers, and the general public." 20 U.S.C. § 9511(b)(1). The scope of this national knowledge and understanding the agency provides is far reaching, including "reliable information" on "the condition and progress of education," "educational practices that support learning," and "the effectiveness of Federal and other education programs." *Id.* The mission was intended to create an Institute with national impact, supporting researchers and strengthening our education system. To carry out this expansive charge, Congress enumerated numerous activities that IES must carry out, including through the collection of data on numerous topics, the conduct of peer-review research, evaluation of education programs, provision of technical assistance, and the dissemination of research and data.[35] Further, Congress provided instructions to IES on the extent of resources to be utilized and activities conducted in carrying out its many statutory functions through congressional appropriations, setting at an annual level of funding of nearly $800 million. Cont. Res. Mar. 2025.

---

[35] *See* 20 U.S.C. §§ 9511, 9512, 9533, 9534, 9543, 9545, 9546, 9562, 9564, 9567b.

54

Instead, in carrying out the Actions, Defendants "relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. The only reasoning Defendants have offered for their slashing actions is finding "efficiencies" and "cost savings," as well as "align[ment] with the administration's priorities." Rosier 23:10–24:14; *see also* Clay 36:19–37:2. But as the Department concedes, "government efficiency" is not one of the factors Congress intended for the Department to consider in carrying out IES's mission, Clay 30:5–7, and certainly not in place of the many other Congressional directives and priorities set forth in its establishment of IES. 20 U.S.C. §§ 9501 *et seq*. It is particularly contrary to Congress's intent to consider "efficiency," when any "savings" generated are used not to improve or expand IES's assigned functions, but to instead achieve a "winnowing" of IES's work through a refusal to spend appropriated funds. Soldner 184:4–186:20; s*ee also supra* Background IV; VI (detailing truncated agency function and hundreds of millions in appropriations unspent and unallocated to agency functions); Op. at 25–26, *Widakuswara*, No. 1:25-cv-1015, ECF 223 (appropriations considered in arbitrary and capricious finding).

Further, the Department failed to consider that numerous other offices within the Department relied on IES functions to meet their statutory obligations. *See* Soldner 41:18–42:16. Statutes governing education at the federal level, including the Higher Education Act, the Elementary and Secondary Education Act, the Workforce Innovation and Opportunity Act, and the Individuals with Disabilities Education Act, all require evaluations of certain federal programs.[36] The offices running those programs relied on IES to conduct those evaluations, which

---

[36] *See, e.g.*, 20 U.S.C. § 1464(2)(A) (IDEA requirement to conduct evaluations of schools' and states' efforts to "provide a free, appropriate public education to children with disabilities"); 29 U.S.C. § 3332(b)(3) (WIOA requirement to conduct "rigorous research and evaluation on effective adult education and literacy activities"); 20 U.S.C. § 1015a(k) (HEA requirement to collect data regarding higher education spending and costs).

were stopped as a result of the Termination Actions. The Department's "material misapprehension of the baseline conditions existing in advance of an agency action" resulted in arbitrary and capricious Actions. *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012).

### iv.     The Department failed to consider reliance interests.

"When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Regents of the Univ. of Cal.*, 591 U.S. at 30 (cleaned up). The Department fails to do so here. The lack of consideration of reliance interests is staggering; Defendants' decisionmakers did not even solicit information from IES's leader about education researchers' reliance on ongoing research before the Termination Actions. Soldner 113:18–114:9, 158:15 ("I have no idea what factors were considered"). And there is no indication that Defendants considered the serious reliance interests of Plaintiffs' members—or other IES stakeholders like policymakers, school districts, and states— in any way. *Casa de Maryland v. Dep't of Homeland Sec.*, 924 F.3d 684, 703 (4th Cir. 2019). These stakeholders rely on IES carrying out its mission: to facilitate a national infrastructure of high-quality education data and research, and to disseminate that data and research to stakeholders like Plaintiffs' members. ECF 12-4, Hedges Decl. ¶ 23 (AERA-0120). Plaintiffs' members have dedicated decades of time and enormous resources into careers in education research that rely on IES functioning as Congress has directed. *See supra* Argument I.A. Plaintiffs' members relied on IES actually considering the grant applications they invested time and resources into. *Id*. And their members relied on IES's quality data and research—including specific studies that were cancelled—for their own research designs, meta-analysis, dissertations, and application in education settings to address educational challenges. *Id*.; *see also*, McClelland Decl. ¶ 12 (AERA-0666); 2d Patterson Decl. ¶¶ 7–9 (AERA-0588–90); ECF 12-3, Reardon Decl. ¶ 18 (AERA-0075);

ECF 12-4, 1st Tipton Decl. ¶¶ 8, 10, 14–15 (AERA-0079, AERA-0081); ECF 12-4, Garvey Decl. ¶¶ 19, 26–27 (AERA-0095–96); ECF 12-4, Boulay Decl. ¶¶ 7, 12–13 (AERA-0125, AERA-0127–28); ECF 12-4, 1st Talbott Decl. ¶¶ 3–4 (AERA-0085–86). Plaintiffs' members' reliance on IES was justified: Congress created IES to serve the role of national leader in education research, required IES to carry out numerous functions to achieve that end, has funded the agency every year since 2002, and has specifically directed it to account for and disseminate data and research to education researchers. 20 U.S.C. §§ 9511, 9512 ("Functions"). Defendants' failure to consider reliance interests was arbitrary and capricious.

## IV.    The Actions Are Contrary to Law.

Agency action is contrary to law if it violates a federal statute or regulation. *See, e.g.*, *Reuters Ltd. v. FCC*, 781 F.2d 946, 950 (D.C. Cir. 1986) ("[I]t is elementary that an agency must adhere to its own rules and regulations."). As an initial matter, the Termination Actions so degraded IES's ability to function as the "national leader[] in expanding fundamental knowledge and understanding of education" and to carry out any of its key functions, that they are contrary to the entirety of ESRA. 20 U.S.C. §§ 9511, 9512 (requiring IES to "widely disseminate" findings and research, to "promote the use, development and application" of knowledge gained from research, and to "strengthen the national capacity" to conduct and widely disseminate research in education). IES's Acting Director conceded that the Actions caused IES to fail to carry out its critical functions. Soldner 179:17–180:4. In addition, the Actions clearly violated numerous statutory provisions and are thus contrary to law under the APA.

### A.    20 U.S.C. § 9543: Failure to Conduct Longitudinal Studies.

Following the Contract Termination Action, all longitudinal and special data collections were discontinued. Defs.' Resp. to Interrog. 5; Soldner 131:19–22. ESRA requires that IES

57

conduct "longitudinal and special data collections necessary to report on the condition and progress of education." 20 U.S.C. § 9543(a)(7). Prior to the Actions, IES was conducting a number of longitudinal studies like the ECLS-K and HS&B. Soldner 29:2–4, 29:18–30:1. Now IES is not conducting any longitudinal studies. Defs.' Resp. to Interrog. 5. Demonstrating that the Actions were a determination *not* to carry out required studies at all, in cancelling the contracts supporting ongoing longitudinal studies, Defendants had neither a plan to rebid contracts to carry out longitudinal studies nor the staff capacity to carry them out without contractors. Soldner 115:5–13. ESRA cannot be read to allow IES to stop longitudinal data collections altogether.

### B.    20 U.S.C. §§ 9573, 9574, 9575: Failure to Make Existing Data Usable by Researchers.

ESRA requires IES to "make available to the public" any data collected by the Institute. 20 U.S.C. § 9574. IES is also required to "disseminat[e] information in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public," and by "utilizing the most modern technology and other methods." *Id*. Because some data collected by IES contains individually identifiable information, 20 U.S.C. § 9573(c) requires IES to develop confidentiality standards regarding access to and use of that data, which IES refers to as "restricted-use data."[37] Access to restricted-use data is provided through a strict licensing process, administered by NCES.[38] Soldner 32:15–33:9. As a result of the Actions, IES stopped taking new applications for access to data, Soldner 174:4–14, a "pause" that remains in place today.[39] Despite

---

[37] IES, *Restricted-use Data Licenses*, https://perma.cc/Y552-GT8U.
[38] *Id*.
[39] *Restricted Use Data Licenses*, *Statistical Standards Program*, NCES, https://perma.cc/7G86-59UJ; *see also* Interagency Council on Statistical Pol'y, *ResearchDataGov.Org User Guide* (updated Mar. 2025), https://perma.cc/8975-XVPK ("The National Center for Education Statistics NCES is currently not accepting new applications for access to data through the Standard Application Process. Review of applications for access to data from NCES is also paused until further notice."); ResearchDataGov, https://perma.cc/2CPS-35QN ("The National Center for Education Statistics (NCES) is currently not accepting new applications for access to data through the Standard Application Process. Review of applications for access to data from the National Center for Education Statistics is also paused until further notice.")

58

IES's inconsistent representations about reviving or continuing access, researchers still lack meaningful data access. *See* Irizarry Decl. Exs. 2–4 (AERA-0637–42). Not making restricted-use data available to researchers is a violation of this statutory provision and thus the Contract Termination Action, which caused this unavailability of data, is contrary to law.

**C.  20 U.S.C. § 9534(b)(1); 20 U.S.C. § 9520: Failure to Conduct Peer-Review Process.**

IES is required to establish a peer-review system for assessing applications for grants and cooperative agreements that exceed $100,000. 20 U.S.C. § 9534(b)(1); *id*. § 9520. The Contract Termination Action ended support for the peer-review system. Soldner 139:12–24. Plaintiffs' members' research proposals were not peer reviewed, and competitions were closed without awards made. *Id*.; Loomis Decl. ¶¶ 5–6 (AERA-0649); 2d Foster Decl. ¶¶ 12–13, 17 (AERA-0622–23); C. Doe Decl. ¶¶ 6–9 (AERA-0603–04); May Decl. ¶¶ 14–19 (AERA-0656–57). Any determinations regarding awarding (or not awarding) funds were required to be made using a peer-review process. 20 U.S.C. § 9534(b)(1). Thus, the Contract Termination Action is contrary to these statutory provisions as well.

**V.    The Relief Requested Is Necessary and Appropriate.**

Defendants' actions are arbitrary and capricious and contrary to law, and therefore they should be vacated. *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 831 (2024) ("the ordinary result is that the [actions] are vacated") (Kavanaugh, J., concurring) (citation omitted); *see also Sierra Club v. U.S. Army Corps of Engineers*, 909 F.3d 635, 655 (4th Cir. 2018). The consequence of vacatur is that Defendants restore the state of affairs before they took their challenged action. *Env't Def. v. Leavitt*, 329 F. Supp. 2d 55, 64 (D.D.C. 2004) (*"*vacatur restores the status quo before the invalid [action] took effect"). Vacatur of the Actions would require IES to restore the capacity and achieve the output that it eliminated pursuant to the Actions. The

59

record demonstrates what functions and programs the Actions interrupted and what workforce levels (and levels of expertise) were necessary to support that activity. Restoration of the status quo would require Defendants to: (1) reconstitute a workforce sufficient–in number, expertise, and experience—to support pre-Termination Action functions, including (but not limited to) peer-review grant-making, providing technical assistance and expert guidance, maintaining timely access to restricted-use data access, timely processing of disclosure risk review requests, fostering collaboration among scholars through a variety of media and means, and facilitating publication and widespread dissemination of research; (2) provide all supports needed, through contracts or otherwise, to resume the scope and quality of data collection and research that was interrupted by the Actions, including longitudinal studies, evaluations, data collection of core data sets, and grant-supported research previously conducted. This would necessarily entail spending all funds that Congress appropriated for IES functions before they expire, as IES had in years prior.

Other courts have understood vacatur—restoration to the agency's earlier status quo—to be appropriate where agencies have taken similar actions. *See*, *e.g.*, Order at 8, *Widakuswara*, Case No. 25-cv-1015 (D.D.C. Mar. 17, 2026), ECF 228 (following vacatur ordering defendants to file a "Reconstitution Plan" for the agency); *Child Trends*, 795 F. Supp. 3d at 732 (directing parties "to confer on the most workable option for Defendants to comply" following summary judgment). Defendants, if they wish to make changes (which they of course have ample discretion to do), must justify them in the orderly and reasoned way required by the APA. Acknowledging that discretion, Plaintiffs do not seek reinstatement of specific contracts or rehiring of specific employees. Defendants can determine *how* to carry out those functions, but they must be carried out. *See* Op. at 29*, Widakuswara*, ECF 223.

## CONCLUSION

For these reasons, the Court should award summary judgment in favor of Plaintiffs.

Dated: March 27, 2026

Respectfully submitted,

*/s/ Daniel A. McGrath*
Daniel A. McGrath (Bar No. 31501)
Madeline H. Gitomer (Bar No. 31518)
Kayla M. Kaufman (Bar No. 31479)
J. Sterling Moore (Bar No. 31562)
Victoria S. Nugent (Bar No. 15039)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
dmcgrath@democracyforward.org
mgitomer@democracyforward.org
kkaufman@democracyforward.org
smoore@democracyforward.org
vnugent@democracyforward.org

*Counsel for Plaintiffs*