# Exhibit PPP

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION (AERA) and SOCIETY FOR RESEARCH ON EDUCATIONAL EFFECTIVENESS (SREE),<br>        Plaintiffs,<br>vs.<br><br>U.S. DEPARTMENT OF EDUCATION, INSTITUTE OF EDUCATIONAL SCIENCES, LINDA MCMAHON and MATTHEW SOLDNER,<br>        Defendants. | Case Number:<br><br>25-cv-1230 |

Video Deposition of

JACQUELINE CLAY

Tuesday, December 16, 2025

at 9:12 a.m.

in Washington, D.C.

Reported by: Jeaninn Alexis, Stenographic Reporter

Job no: 11587

December 16, 2025

9:12 a.m.

Video deposition of JACQUELINE CLAY, held in person, with the witness and all parties participating in person, pursuant to the Rules of the United States District Court for the District of Maryland, Southern Division, subject to such stipulations as may be recited herein or attached hereto, before JEANINN ALEXIS, Stenographic Reporter and notary public of the District of Columbia, who officiated in administering the oath to the witness.

A-P-P-E-A-R-A-N-C-E-S

ON BEHALF OF PLAINTIFFS:

        Democracy Forward Foundation

        1445 New York Avenue

        Washington, D.C. 20005

        (202)448-9090

        By:  Madeline H. Gitomer, Esquire

        Daniel A. McGrath, Esquire

        Kayla M. Kaufman, Esquire

        Victoria Nugent, Esquire

        Mgitomer@democracyforward.org

ON BEHALF OF THE DEFENDANTS:

        U.S. Department of Justice

        1100 L Street, Northwest

        Washington, D.C. 20012

        (202)514-4011

        By: Michael Bruns, Esquire

        Michael.bruns@usdoj.gov

ALSO PRESENT:

        Jason Levin, Videographer

        Jessica Lee, Paralegal

EXAMINATION INDEX

| | PAGE |
|---|---|
| EXAMINATION BY MS. GITOMER | 6 |
| EXAMINATION BY MR. BRUNS | 159 |

E X H I B I T S

| EXHIBITS: | DESCRIPTION: | PAGE: |
|---|---|---|
| Exhibit A | Plaintiff's Notice of Rule 30(b)(6) Deposition of U.S. Department of Education | 9 |
| Exhibit B | 20 U.S.C.A. 9511 Effective: December 2. 2024 | 16 |
| Exhibit J | Chart EDAERA_00038 | 46 |
| Exhibit L | Email Chain EDAERA_00003670 | 94 |
| Exhibit M | 20 U.S.C.A. 9543 Effective: October 1, 2016 | 109 |
| Exhibit R | Email Chain EDAERA_00003673 | 127 |
| Exhibit X | 20 U.S.C.A. 9519 9519 Biennial Report Effective: November 5, 2022 | 135 |
| Exhibit Y | Defendant's First Supplemental Objections and Answers to Plaintiff's First Interrogatories to Defendant | 135 |

----------------------------------------------------------

P-R-O-C-E-E-D-I-N-G-S

----------------------------------------------------------

THE VIDEOGRAPHER:  This is the video deposition of Jacqueline Clay in the matter of American Educational Research Association, et al., versus U.S. Department of Education, et al.

This deposition is being held at 1445 New York Avenue, Northwest, Washington, D.C., on December 16th, 2025, and the time is approximately 9:12 a.m. Eastern.

My name is Jason Levin from the firm TransPerfect, and I'm the legal video specialist.  The court reporter is Jeaninn Alexis, also in association with TransPerfect.

Will counsel please state their appearances for the record, and the court reporter will swear in the witness.

MS. GITOMER:  Madeline Gitomer with Democracy Forward for the plaintiffs.

MR. McGRATH:  Daniel McGrath with Democracy Forward for the plaintiffs.

MS. KAUFMAN:  Okay.  Um, Kayla Kaufman with

Democracy Forward for the plaintiffs, and Victoria Nugent with Democracy Forward for plaintiffs.

MR. BRUNS: Michael Bruns, United States Department of Justice, on behalf of all defendants. I'm joined by Kevin Smoot and Candice Jackson from the Department of Education. They are currently not in the room but will be in the next ten minutes.

Whereupon,

JACQUELINE CLAY,

the deponent herein, called for oral examination in the matter pending, being first duly sworn to tell the truth, the whole truth, and nothing but the truth, testifies as follows:

EXAMINATION

BY MS. GITOMER:

Q   Good morning.

A   Good morning.

Q   Ms. Clay, could you please state and spell your full name for the record?

A   Yes. My name is Jacqueline Clay, J-A-C-Q-U-E-L-I-N-E, C-L-A-Y.

Q   Have you ever been deposed before, Ms. Clay?

A    About 20 years ago.  So treat me as a new person.

Q    Okay.  So never in your position in the Department of Education?

A    No.  Not at all.

Q    There's a court reporter writing down everything we say, so it's very important to give verbal answers rather than gestures, and it's also important that you and I not talk over each other.  So I'll wait until you've answered to ask a new question, and if you could wait to answer until I've completed the question.

Does that sound okay to you?

A    Yes.

Q    Okay.  Um, if you ever feel like you don't fully understand the question I've asked, please let me know, and I'll try to clarify.  Um, if you don't, I will assume that you understand it as I've asked it.

Is that fair?

A    Yes.

Q    Counsel may make an objection to a question I ask.  That's fine.  He's making an objection for the record.  But unless he specifically instructs you not to

answer, you should go ahead and answer the question.

Can you do that?

A    Yes.

Q    If at some point in the deposition, you remember something from earlier that you wanted -- or you wanted to add something, will you just let me know?

A    Yes.

Q    And if you ever feel like you need a break, please let me know.  Um, we're going to plan to proceed for about an hour at a time, with a five- to ten-minute break at the end of each hour.

A    Okay.

Q    Um, and do you understand that you're testifying today on behalf of the Department of Education?

A    Yes.

Q    Okay.  And have you reviewed the deposition notice?

A    Uh, not that I recall.

Q    Okay.  Um, the deposition notice listed topics, um, that, uh, we plan to ask the department about.  Um, and so we understand that you are -- um,

well, why don't we use Exhibit A. I'm sorry. Those are internal.

A Thank you.

Q There is a page -- this doesn't have page numbers, but several pages in, there's a header that says "examination topics."

A Okay.

(Clay Deposition Exhibit A marked for identification.)

BY MS. GITOMER:

Q This is a list of the topics that we noticed that the Department of Education would be, uh, asked questions about for this deposition. Um, the department has indicated -- or I guess the government has indicated that you would be testifying on certain topics. So that would include topics 1 and 2 on this page.

A Mm-hmm.

Q Are you aware that you're testifying today on behalf of those topics?

A Yes.

Q Okay. And then topics 5 and 7 on the next page?

A    Yes.

Q    Okay.  And then on topics 3, 4, 6, 8, and 9 as to the RIFs as opposed to contracts?

A    Okay.

Q    Okay.  And so -- so you're aware that you are testifying on behalf --

A    Yes.

Q    -- of those topics?

A    I do.  I am.

Q    Okay.  And are you represented by counsel today?

A    Yes.

Q    And who's representing you?

A    Michael Bruns.

Q    And without revealing to me anything your counsel may have said to you, um, what do you know about this lawsuit?

A    Um, what I know is, um, simply that, um, it's about some -- the contracts and the RIFs and whether or not, um, IES, Institute of Education Sciences, can continue to do statutory, um, requirements based on certain cuts at the department.

Q    Okay.  And can you think of anything that may affect your ability to testify today?

A    No.

Q    Um, in preparing for this deposition, did you make any notes for yourself?

A    No.

Q    And did you review any documents to prepare for today?

A    Um, I reviewed some example documents that may be shared with me by my counsel.

Q    Okay.  Do -- what documents?

A    Um, I believe actually -- so let me go back -- that this might have been shared with me on some of the examination topics.

Q    Okay.

A    Um, I think an organizational chart may be -- um, that I'm familiar with.

Q    Okay.

A    But I can't recall all the documents specifically.

Q    Okay.  Um, and did you speak with anyone else about the deposition today?

A    No.

Q    Okay.  Um, and did you do anything else to prepare for the deposition today?

A    No.

Q    Okay.  Did you, um, bring any documents with you today?

A    No.

Q    Okay.  Uh, and do you understand that you are testifying under the penalty of perjury today?

A    Yes.

Q    Okay.  Okay.  Can you briefly explain your educational and professional background before you came to the Department of Education?

A    Okay.  Yes.

Um, so I, um, went to Montgomery Community College to obtain a certificate in mental health.  Later went to Bowie State University to pursue a degree --

THE REPORTER:  May you slow down your speaking?  I have to type everything, so can you slow it down?

THE WITNESS:  Sorry.

THE REPORTER:  It's all right.  It's all

right.

THE WITNESS: Yes, yes. yes.

To pursue a degree in psychology. Um, I actually was a stay-in-school student. Um, I started with the Department of Agriculture and worked my way through various agencies in the federal government prior to coming to the Department of Education. I was at the General Services Administration as an executive, and then I joined the Department of Education.

BY MS. GITOMER:

Q   And when did you join the Department of Education?

A   Uh, this is 2025, I believe in 2020, 2021. I cannot remember the exact date, but I do know it was June of whatever year that was.

Q   Fair enough.

Um, and what positions have you held at the Department of Education?

A   Deputy chief human capital officer, uh, chief human capital officer, principal deputy assistant secretary for the Office of Finance and Operations, chief financial officer. Um, and that's -- that's the

current position, which is the principal deputy

assistant secretary, chief financial officer, acting

chief human capital officer.

Q    And for how long have you held each of those

positions?

A    So principal deputy assistant secretary, um,

that was recent, um, about, um, November.  Um, chief

human capital officer about three years.  And then

deputy chief, uh, human capital officer for the

remaining time.

Q    And so you -- to clarify, you currently serve

as the chief human capital officer and the deputy chief

human capital officer?

A    No.

Q    Okay.

A    I -- I currently serve as the principal deputy

assistant secretary --

Q    Yup.

A    -- for the Office of Finance and Operations.

Q    Yup.

A    I am the acting chief human capital officer.

The deputy chief human capital officer is filled.

Q   Okay.  Understood.  Thank you for that clarification.

A   Mm-hmm.

Q   Okay.  Let's move on to talk about IES's mission and leadership su- -- structure.

What is IES's mission?

A   IES's mission is to, um -- they're of the Department of Education primarily to do, um, evaluation, um, collect data, statistics, and, um, do research to help inform educational policy, but they do not write policy.

Q   Okay.  And where does that mission come from?

A   That mission primarily comes from ESRA.  Uh, that's the Education Sciences Reform Act, which established IES.

Q   Okay.  And who sets that mission?

A   Um, that mission is set primarily by the, um, by the secretary on administration that comes in based on administration priorities.

Q   And stepping back, you said the mission is within ESRA.

Who sets that mission --

A    ESRA defines what IES does.

Q    Okay.

A    The roles of IES, and the mission itself and the priorities for which they do the evaluation, the research, and the -- the -- the -- the -- collect data, um, statistics that comes from the -- um, the secretary or the head of the agency or administration priorities.

Q    Okay.  And who authors ESRA?

A    Um, that was a congressional act.

Q    Congressional act.  Okay.

A    Mm-hmm.

Q    Um, so every time I hand you an exhibit, the court reporter --

A    She -- okay.

(Clay Deposition Exhibit B marked for identification.)

BY MS. GITOMER:

Q    Um, so I'm -- I'm going to represent that what I just handed you --

A    Mm-hmm.

Q    -- is a provision of ESRA that sets forth the mission of IES.

A    Yes.

Q    Do you agree?

A    Yes.

Q    Okay.  Um, and is this mission the same now as it has been since January of 2025?

A    Yes.

Q    Okay.  And does the mission change with the administration?

A    The mission doesn't change with the administration, but the priority set forth or what they do the research on it, um, may influence.

Q    Okay.  But the mission stays the same?

A    The mission stays the same.

Q    So the priority set must be within that mission?

A    Yes, that's correct.

Q    Okay.  So, um, B states the mission, and C states carrying out of the mission?

A    Mm-hmm.

Q    Is that correct?

A    Yes.

Q    The statute says that "in carrying out its

mission, IES shall conduct research, evaluations, and dissemination activities in areas that are supported by federal funds."

A    Mm-hmm.

Q    Is that correct?

A    That's correct.

Q    So is the department able to fulfill its mission without spending the federal funds, given that language?

A    No.

Q    And so you would agree that where it says that there are needs supported by federal funds, it is part of carrying out its mission to conduct work in those areas?

A    Correct.

Q    Okay.  And would you also agree in this mission -- I'm sorry, in carrying out the mission in number 2, it states that the institute must conform to high standards of quality, integrity, and accuracy?

A    Yes, that's correct.

Q    And how does IES ensure high standards of quality, integrity, and accuracy?

A    So, um, I just -- I want to be clear that I am, um, more on compliance with certain laws, um, specifically under the human capital arena, but based on my -- um, my understanding and working relationship with, um, IES, the way that they, um, go about having high standards is they have high-quality employees that work there with the knowledge to do the research, the evaluations, to collect the data statistics.

They also, um, make sure that they, um, uh, when they -- when they do deliver their findings, that they disseminate it to the public, um, to make sure that they have the right evidence-based approach.

Q    Thank you.

And do you agree that this -- that the mission is for the institute to provide national leadership in expanding fundamental knowledge and understanding of education?

A    Yes, as outlined.

Q    And how does the institute provide national leadership?

A    Um, from my understanding, um, the way that they provide national leadership is, um, through

outreach, working with different -- um, working with the public, different, um, researchers, um, working with different institutes, um, understanding, um, the, uh -- understanding the educational statistics that are out there for them to then do, um, their -- their current evaluations.

Q    Got it.

And you mentioned the high quality of individuals that work at IES.

A    Mm-hmm.

Q    How did the RIF impact IES's ability to fulfill its mission?

A    IES is -- they still have the ability to, um, continue their core functions as I know it.

Q    Okay.  So were the individuals that were part of the RIF not doing work that was contributing to fulfilling its statutory mission?

A    The RIF isn't based on individuals.  The RIF is based on positions.

Q    Okay.  And so those positions were ones that were not contributing to fulfillment of the statutory mission?

A    I would not say that.

Q    What would you say?

A    I would simply say that, in conducting the RIF, those positions were impacted, but that does not mean that they were not contributing to the mission.

Q    And so if the -- if they -- so -- so you're suggesting they -- they weren't contributing to the mission?

A    I'm suggesting that I'm -- I'm pretty sure they were contributing to the mission, but that does not define what a RIF entails.

Q    Okay.  Let's -- let's put aside the RIF for a second.

A    Mm-hmm.

Q    Let's talk about those individuals.

Um, and I understand you said that wasn't an individual --

A    Right.

Q    -- employee, but, um, would you agree that 90 percent of IES was -- employees were involved in the RIF?

A    Yes.

Q   Okay.

A   Approximately 90 percent.

Q   Okay.  So those 90 percent, putting the RIF aside, those -- those employees, you were -- you were at the department when they were serving the department.

Were they, at that time, contributing to the fulfillment of the statutory obligations set forth in ESRA?

A   I would answer it like this:  Um, I did not have direct oversight of those employees.  I would only assume that, as employees are fulfilling their position, that they are contributing to the mission.

Q   Okay.  And you -- you would assume that they're contributing to the mission.

Did you have any reason to believe, at that time, they were not contributing to fulfilling statutory obligations?

A   Not to my knowledge.

Q   Okay.  And -- okay.  Why don't we come back to that.

Did canceling almost 90 active contracts advance the mission set forth by Congress?

A    So I can't speak specifically to all the contracts that were canceled.  Um, I do know that, um, the cancellation of those con- -- contracts were, um, revised.  Um, so I believe that there was some discussion to re- -- take a look at that --

Q    Okay.

A    -- understanding the benefit of the contracts.

Q    Okay.  So just -- I want to make sure I understand.

So -- so certain contracts that may have been ter- -- that -- that were terminated may have been contra- -- may have been contributing to the statutory requirements --

A    Correct.

Q    -- and so were reinstated?

A    Correct.

Q    Okay.  Just um, -- okay.

Um, are you aware of whether dissemination is part of IES's responsibilities?

A    Dissemination of the NAEP?

Q    Let me rephrase.  I apologize.

A    Okay.

Q    Is dissemination of federal education, research, and statistics part of IES's mission?

A    Yes.

Q    Okay.  And how does IES fulfill that part of its mission?

A    IES fulfills that part of its mission by -- um, they do -- they do use -- utilize contractors.  Um, and the way that they fulfill that mission is they do -- they collect the, um -- they collect the data, the statistical data that informs, um, nationally how, um, students are performing, and then they publicly, um, disseminate their findings.

Q    Okay.  Thank you.

Okay.  Um, let's talk about IES leadership in January of this year.

A    Mm-hmm.

Q    Um, so, yeah, earlier in the year.

Um, who was part of IES leadership at that time?

A    Uh, Matt Soldner, um, was part of -- whoa -- let me -- let me take a step back.

Um, are you talking post-administration or

pre-administration of January -- are you talking after January 20th or --

Q     Let's start with before January 20th.

A     Um, before January 20th, I believe, um -- and I can't recall his last name -- Mark was in place as the director, uh, for IES.  I can't recall what time he actually left.  Um, but you also had, um, Matt Soldner was in place, um, with IES.  You had Peggy Carr that was over NCES.  Um, that's the National Centers for Education Sciences (sic).  I can't recall all of the leadership that was in place, but those were the primarily individuals (sic) that I worked with.  And Jonathan Bettis.

Q     Okay.  And at that time, who in IES leadership communicated with department leadership?

A     Primarily, it was, um -- so it was a combination depending on the topic.  Um, mark, at the time, would do most of the communication to, um, agency leadership, and then you had, um, Jonathan, who was really, um, functioning as a, um -- I'll call him an -- a -- deputy assistant secretary for management and planning.  So he did a lot of administrative, um,

functions, administrative communication with the department, um, but that was primarily it.  And Peggy Carr -- Peggy Carr's role at NCE -- NCES, and then the dissemination of, um, the NAEP.

Q    Okay.  And, um, so Mr. Soldner didn't communicate with --

A    I don't know how much Mr. Soldner communicated with the, um, with the department.

Q    Okay.

A    When he -- um, so post-administration --

Q    Sure.

A    -- coming in, um, Mr. Soldner, um, was the, um, acting, um, director, and he also -- um, I know he did communicate with the department as the acting director, um, and facilitating, um, you know, his team through, um, various discussions.  But, again, I don't have direct insight into that.

Q    Okay.  That's fine.

How did the Office of the Secretary convey priorities and directives to IES traditionally?

A    Traditionally, um, again, I didn't have direct involvement in how they conveyed their priorities to,

um, IES.  Uh, based on my understanding, based on the way things are happening at the department, um, there would be several meetings held in the secretary's conference room where they would meet with all of the principal operating components, which I will refer to as POCs, P-O-C-S, um, but they will communicate the priorities, um, in those type of settings.

Q    And who, on, say, February 1st, would have been the POCs or the POC -- is that --

A    POCs, yes.

Q    -- for -- for -- who would have been the POC for IES?

A    Matt Soldner.

Q    Okay.  Um, and how were decisions regarding IES activities -- or -- I'm sorry.

Who made, for example, budgetary decisions prior to February 6th for IES?

A    Um, budgetary decisions, um, were still made in -- um, in combination with budget services with um, Matt Soldner's office.  Now, IES does have multiyear funds.  They have a separate appropriation.  Um, so while they would make decisions, they will still confer,

um, with our office of budget services.

Q   So if it -- so they would make the decisions, but they would confer and work with --

A   Yes.

Q   -- budgets services?

A   Yes.

Q   Okay.  What about hiring decisions?

A   Um, same thing.  IE- -- IES would -- um, would make hiring decisions, um, but they would confer with the Office of Human Resources.  Um, on occasion, um, they may have referred to department personnel, um, for those actions.

Q   Okay.  And what about, um, decisions to enter into or -- um, or exit or end contracts?  Who would they -- how -- who would make those decisions?

A   Again, um, the -- the department, um, particularly may have made those decisions working with IES.  But I want to also point out for the record that, um, on or about in February, um, when decisions were made, there was the executive order, I believe, 14210 --

Q   Okay.

A   -- that established the, um, Department of

Government Efficiency, which identified them as the lead in making, um, some of the agency decisions as it relates to hiring and some other factors.

Q    Okay.  So there was -- in early February, there was an executive order that came out?

A    Yes.

Q    And that executive order said that the Department of Government Efficiency, which we'll use DOGE --

A    DOGE, mm-hmm.

Q    -- was in charge of -- was -- was in charge of making decisions related to --

A    Was a lead.

Q    Was a lead?

A    Yes.

Q    Okay.  And does the ESRA statute mention involvement by DOGE in those decisions?

A    No, ESRA, um, precedes DOGE.

Q    Okay.  And so did -- did Congress, in -- in setting forth the IES mission consider DOGE's involvement?

MR. BRUNS:  Objection.  Form.

BY MS. GITOMER:

Q   In -- in its -- um, does the IES statute -- does -- does ESRA, the IES statute mission mention DOGE?

A   No.

Q   Okay.  And does the -- the mission of IES mention governmental efficiency?

A   No.

Q   Um, prior to February 6th -- uh, actually, I'm sorry.  Um, le- -- let's -- um, let's -- let's continue.

Um, you alluded to this DOGE executive order --

A   Mm-hmm.

Q   -- or you explicitly referenced this DOGE executive order.

Um, did that impact who was involved in control over IES decisions?

A   I would not say control over IES decisions, but the lead for DOGE was involved in all decisions at the department as prescribed by the executive order.

Q   Okay.  And who was that lead?

A   There -- there was a DOGE team --

Q   Okay.

A -- um, that was at the department, as with many other departments.

Q Okay. Who was on that team?

A Um, I don't have all of their names. I know that, um -- and I -- and I don't have last names.

Q Okay.

A Um, I remember Brooks, as an example, um, was the actual lead for DOGE, but I can't recall Brooks' last name.

Q Brooks.

And so there was an individual named Brooks --

A Mm-hmm.

Q -- who was the lead for DOGE, who -- who was in- -- involved in IES decision-making?

A Who -- yes.

Q Okay. Give me one second.

Okay. Can you recall anyone else's name who was involved in IES decision-making -- or DOGE -- on the DOGE team for -- um, for --

A Not on the DOGE team, no.

Q Okay. Um, does the name Conor Fennessy mean anything to you?

A    Yes.  Conor Fennessy was a political appointee, Schedule C.

Q    Okay.  Was he --

A    Which is distinct from DOGE.

Q    Okay. Was he working with DOGE?

A    Yes.  In the sense that political appointees and career staff was working with DOGE.

Q    Okay.  Um, and who is Conor Fennessy?

A    Again, Conor Fennessy is a political -- was a political appointee at the Department of Education.  He came in as a Schedule C with the other political appointees at the department.

Q    And what was his position?

A    He was a senior adviser to the administrative office.

Q    Okay.

A    To the secretary's office, sorry.

Q    Do you recall when or approximately when he was, um, appointed?

A    I do.  I have -- I have to say around end of February, early March, maybe, but I don't have the exact dates.

Q    Okay.  What expertise does Conor Fennessy have in education policy?

A    I'm not sure.

Q    Okay.  What expertise does he have in education research?

A    I am not sure.

Q    When did he first begin reviewing IES contracts?

A    To my knowledge -- I didn't have direct involvement in that.  Um, I would estimate that it was early March, maybe end of February.

Q    Okay.  Um --

A    I didn't have involvement in that, so I -- I just can't speak to that.

Q    Okay.  Um, so I -- I want to make sure -- okay.  So let's talk about the decision-making that changed pursuant to the executive order.

A    Mm-hmm.

Q    How did decision-making within the Office of the Secretary and Department of Education change following the executive order?

A    I think it was more of a, um, collaborative

effort between the department, um, leadership and the team that came on that was identified as the lead, as it relates to the, um, executive order, and decisions we've made, uh, together.

Q    Okay.

MS. GITOMER:  And for the record, two additional individuals just stepped into the room.

Would you like them to announce their names?

MS. JACKSON:  Also present, Candice Jackson.

MR. SMOOT:  Kevin Smoot.

MS. GITOMER:  Thank you.

BY MS. GITOMER:

Q    Um, and so when you say the "team leads," you're talking about the DOGE team leads?

A    DOGE lead, yes, that's correct.

Q    And they would work in conjunction with who?

A    The Office of the Secretary.

Q    The Office of the Secretary.

And you mentioned that, earlier, budgetary, um, decisions were made between -- by IES --

A    Mm-hmm.

Q    -- in conjunction with the office of budget.

Did that change --

A    No.

Q    -- upon this executive order?

A    No.  I said they would confer --

Q    Right.

A    -- with.

Q    They would confer with the --

A    The office of budget.

Q    Okay.

A    All decisions, um, for the respective POCs, they worked in conjunction with the Office of the Secretary.

Q    Okay.  Um, let's -- um, so with respect to IES, what influence did DOGE have over decision-making at IES following that executive order?

A    Um, I wouldn't say that they had influence over, um, IES per se.  The executive order specifically called out what, um, DOGE and all departments were to do, which is to look at its organization in its entirety and to consider restructuring, which included a reduction in force, um, to look at re-skilling, duplicative functions.  So, um, I believe they went and

pursued that role in that manner.

Q   Okay.  And what would happen if the DOGE executive order and what it -- what you just stated it intended to do conflicted with an effort to fulfill a statutory obligation?

A   So, again, my role is to ensure compliance with executive orders and all of RIF regulations.  Um, in a sense, in what DOGE and the department achieved with the production in force, I did not foresee, or I could state clearly that there was a -- that it went against the ESRA.  I'm assuming that's what you're talking about.

Q   Okay.

A   Yeah.

Q   Let's keep going.

So are you familiar with the RIF at IES that took place in March of 2025?

A   I am.

Q   And why did the Department of Education initiate the RIF?

A   Again, the Executive Order 14210 laid out that departments would look at restructuring its

organizations.  The RIF in and of itself is -- um, is also to -- to help reorganize.

Q   Okay.  And so when did the Department of Education begin planning for the RIF?

A   I would say the department started planning in February.

Q   Do you know when in February?

A   Mid-February sometime, yeah.

Q   Okay.  And was IES always part of the RIF planning?

A   Yes.

Q   Okay.  So they began planning in mid-February.

What did that process of planning involve?

A   So in mid-February, a couple of steps.  One -- and I'm -- I have to keep going back to the executive order that we referenced.  We also, um, went out to all of the POCs to obtain the -- um, their competitive areas.  We went out to the POCs to obtain their, uh, statutory requirements.  We pulled data of personnel on, um, every, um, POC, um, organizational charts.  Um, we -- uh, we went to the Office of Personnel Management to ensure that we could conduct the -- um, change

competitive areas to meet the -- um, to request a waiver
of the 90-day, um, competitive area requirement.  Um,
and we -- we deferred to all the material that we
obtained and collected.  Um, and we moved forward with
the RIF.

Q   Okay.  Let's take those one by one.

You mentioned that, um, you asked each POC --

A   Mm-hmm.

Q   -- which, in IES's case, was Matt Soldner --
Mr. Soldner?

A   It was within his office.  I believe that the
notice went out to -- initially, the notice went out to
the deputy assistant secretary for management and
planning at that time.

Q   Okay.  And who would that be?

A   Jonathan Bettis.

Q   Okay.  Um, and you asked for information on,
um, the competitive areas.  Is that correct?

A   Correct.

Q   Okay.  And what was provided in response?

A   Um, they provided a -- um, a list of what they
perceived as their competitive areas.

Q   Okay.  And you also mentioned that you, um, pulled data on all personnel.  Is that correct?

A   That is correct.

Q   And what type of data was that?

A   So in order for us to conduct a RIF, you need to understand, um, the position of the employee, um, their veteran's preference, their tenure, or their performance, so, um, anything needed to run a RIF, we pulled in my office for each -- each person.

Q   Okay.  And earlier you said the RIFs were not about individual performance.  Is that correct?

A   Correct.  They were not.

Q   Okay.  But you just mentioned that you needed to pull information --

A   That's --

Q   -- on individual performance; correct?

A   So when you ha- -- when you do -- when you conduct a RIF --

Q   Yeah.

A   -- and when you -- um, when you define the competitive areas --

Q   Okay.

A    -- the competitive areas are the organizational structure and geographic location for which each employee competes in a RIF.

Q    Okay.

A    In order for an employee to compete in a RIF, you have to pull all the fields that I just mentioned so that you can do a RIF properly if you need to make sure, um, you're competing for each of the emplo- -- so each of the employees are competing appropriately in accordance with the regulations.

Q    And what do you mean by "competing appropriately"?

A    So in other words, if you have -- um, I'll use me an -- as an example.

Q    Sure.

A    I have 34 years of service.  Um, I also -- for the sake of this testimony and I'll just say I had perfect performance for the last three years.  And say that you was competing with me, and you had 20 years of service and you, um, not to -- you have fully successful performance, right, for -- um, for three years, then I would -- I would be able to obtain more time in service.

If we were the same grade --

Q    Okay.

A    -- and we were in the same position, I would have more time, then, to bump you from your position, and then you would be impacted.  So that's basically why we pull the information for RIF purposes.

Q    And what information is part of the RIF process that determines who -- how statutory functions are being met within a competitive area or a depart- -- or a -- or component?

A    So, um, again, early on, I think I mentioned that the first thing, um, or one of the things that we considered and we did, was, um, we went out to all of the, um, POCs, and we requested their statutory requirements for their respective areas.  Um, that list was obtained.  I did not, um, obtain that list, um, but that list was obtained.  Um, and it was a review of the statutory, uh, requirements for each of the POCs to determine whether or not, um, based on recommendations of a RIF, what -- would they be able to continue to perform their functions based on certain cuts.

Q    So -- so Mr. Bettis or Mr. Soldner, someone at

IES --

A    Correct.

Q    -- created a list of the statutory functions --

A    Yes.

Q    -- of IES?

A    Yes.

Q    You did not see that list?

A    No.  I saw the list, but I was not the -- I was not the keeper of the list.  I did not go out and do the call for the statutory requirements.  That wasn't part of my office --

Q    Who did --

A    -- responsibility.

Q    Who did that call?

A    Uh, Richard Smith.

Q    Richard Smith.

And what is his position?

A    Richard Smith was serving at that time as the acting deputy secretary for, um, education.

Q    And was that list, um, considered in evaluating the RIFs?

A    That was one of the factors that was considered, yes.

Q    Okay.

MS. GITOMER:  Counsel, we'd like a copy of that list.

MR. BRUNS:  We'll look into it.

BY MS. GITOMER:

Q    Um, and was that list a report?  Was it an Excel spreadsheet?  What did that list look like?  You said you had seen it.

A    I believe it was an Excel spreadsheet.

Q    Okay.  And so did it include statutory provisions?

A    Yes, to my --

Q    Did it --

A    -- knowledge.

Q    And did it include names of individuals who were meeting those statutory --

A    Not -- no.

Q    Okay.

A    No.

Q    How did it describe the ways in which -- let

me ask this a different way.

What information did that list provide with respect to how a RIF would affect those statutory provisions?

A   It basically gave insight into the statutory requirements for each of the POCs, um, so that we -- so that the agency would know, um, that we needed to continue with these statutory requirements.  So we needed to make sure that we had, um, staff to fulfill those functions.

Q   But it didn't list staff?

A   No.

Q   Did it list competitive areas?

A   No.  The competitive area, those were two separate -- um, that was a -- two separate task.  The competitive area document was with my office.

Q   Okay.  So it -- it -- it only listed the statutory functions?

A   Correct.

Q   And so you mentioned, um, Richard Smith --

A   Yes.

Q   -- received this list.

Who -- who was determining what was necessary to meet the statutory provisions on that list?

A    I don't want to speculate.  Um, so I -- I can't directly answer that.  But I would assume that the DOGE lead and the Office of the Secretary had that list.

Q    So it was DOGE's responsibility to determine how IES was fulfilling its statutory obligations?

A    Again, um, I don't want to -- um, you seem to appear to want to say DOGE responsibility, and what I am and have repeatedly said is that DOGE, per the executive order, had the lead, but they also worked with the Office of the Secretary to make those decisions.

Q    Understood.

Who did DOGE work with in the Office of the Secretary?

A    The chief of staff.

Q    And who's the chief of staff?

A    Rachel Oglesby.

Q    Okay.  And so IES provided Richard Smith --

A    Mm-hmm.

Q    -- with a list of statutory provisions.  That list was shared or given to the Office of the Secretary

and DOGE, and that group of individuals in leadership was determining who -- I'm sorry, how those statutory decisions would be met within IES. Is that correct?

A    Correct.

Q    Okay. Was Mr. Soldner or Mr. Bettis involved in that beyond providing a list of the provisions?

A    I can't speculate on that.

Q    Do you have any reason to believe or any evidence to show that they were involved?

A    Um, I know that there was a meeting that was held with all the POC leadership, where Matt Soldner was involved. So he had some knowledge of -- it was, um, some knowledge of the reduction in force that was happening at the agency, specifically with IES.

Q    Okay.

MS. GITOMER:  Um, can we have Exhibit J?

(Clay Deposition Exhibit J marked for identification.)

BY MS. GITOMER:

Q    Ms. Clay, for your reference, this was an organizational chart that was produced as part of the administrative record in this case.

A    Yes.

Q    Okay.  Um, are you familiar with this?

A    Yes.

Q    Okay.  Thank you.

Um, how was this organizational chart used in making RIF decisions?

A    So I don't want to -- the organizational chart in and of itself was not specifically used in making RIF decisions.  The organizational chart is a result of RIF decisions that were made, um, and that's why you see the red boxes.  So the red boxes are -- indicated where decisions were made that, um, the RIFs would take place.

Q    Okay.  So what does the red shading indicate?

A    The RIF -- the RIF would take place in that box completely.

Q    And so -- to make sure I understand, any red box means that the employees --

A    In that box --

Q    -- in that box would be RIF'd?

A    Correct.

Q    Okay.  And who made the decision that those red boxes would be RIF'd?

A    That decision was made with the Office of the Secretary and in conjunction with the DOGE lead and after meeting with all of the agency POC leadership.

Q    Okay.  So there was a meeting with all of the agency POC leadership.

Do you -- when was that meeting?

A    I can't recall when that meeting was exactly.

Q    Okay.  But it was one -- it was one meeting?

A    Yes.

Q    With all agency leadership?

A    Correct.

Q    Okay.  And then the decision was made by the Office of the Secretary in conjunction with JO -- DOGE?

A    Mm-hmm.

Q    Okay.  Um, and what factors were considered -- we talked about this a little earlier, but what factors were considered in determining which components would be RIF'd -- or, I'm sorry, which competitive areas would be RIF'd?

A    Whether or not the organization could continue to perform its core statutory functions.

Q    And as we discussed, that was also determined

by DOGE and the Office of the Secretary?

A    Yes.

Q    Okay.  And did the decision makers consider the work by each of the individuals subject to the RIF?

A    No.  Because a RIF is for -- a -- a RIF is not about the individual's performance of work.  The RIF is about positions, so they did not consider each individual subject to a RIF.

Q    So if an individual was performing work that was contributing to the statutory obligations or the mission, that would not be considered?

A    So in considering that, is it that it will be considered or considered that it can still continue by other employees within the organization.  So as long as the statutory function can continue and the organization can continue to meet its core statutory functions, it's not based on a specific employee that was performing that function.

Q    Okay.  And the -- the chief of staff --

A    Mm-hmm.

Q    -- am I correct in assuming she began her -- in her position after January 20th?

A    Correct.

Q    Okay.  And the DOGE individuals, am I correct in assuming they joined after January 20th?

A    Correct.

Q    Okay.  So the individuals who are determining whether each competitive area could meet its statutory function had been with the agency no earlier than January 20th?

A    Yes.

Q    And the information that they received in making those decisions was a list of statutory provisions that IES was required to continue.

A    Mm-hmm.

Q    And one meeting that included all of the --

A    One --

Q    -- peer --

A    -- one meeting that I am aware of.

Q    Okay.  Is there any record, to your knowledge, of any other meetings?

A    No, not to my knowledge.

Q    Okay.  And if you look at this organizational chart -- let's look, for example, under National Center

for Education Research -- it appears that both competitive areas under the commissioner were RIF'd. Is that correct?

A    That's correct.

Q    Does that mean a determination was made that the commissioner's office alone could fulfill all of the statutory requirements for NCER?

A    The determination was made that core statutory functions will continue.

Q    What is a "core statutory function"?

A    So any of the -- the -- the statutory functions under, um, IES. So any of the evaluation, any of the collection of data statistics, um, any of the research, um, posting of any of the findings, all was determined that the functions could continue under IES.

Q    So I -- I want to make sure I understand. You mentioned core statutory functions.

Is there a distinction between --

A    There is not a distinction, no.

Q    -- between statutory function --

A    No.

Q    -- or core --

A No.

Q -- functions?

A No.

Q Okay. So it was the position that NCER --

A Mm-hmm.

Q -- could meet its statutory obligations with the commissioner's office alone?

A Yes.

Q Okay. And -- one moment.

Um, why did IES have the largest percentage of employees involved in the RIF?

A I can't speak to that. I'm not sure of the rationale.

Q Why were so many entire offices within IES eliminated?

A Entire offices and several of the POCs were eliminated.

Q Mm-hmm.

A So they were not set aside. They were no different than that.

Q Okay. And who was making those decisions to -- who made the decision, for -- for example, for IES

to have the largest percentage of employees involved in the RIF?

A    Again, decisions were made with, um, the DOGE lead and with the Office of the Secretary, and that was a meeting that I am aware of.  Again, there could have been more with, um, IES leadership.

Q    Did IES leadership support these cuts?

A    I can't speak to whether or not IES leadership supported the cuts or not.

Q    Is there any record that they recommended these cuts?

A    Not to my knowledge.

Q    And prior to this RIF, was it the depi- -- was it the position of the department that the components, for example, of the National Center for Education Research were not necessary to meet the statutory function of NCER?

A    Repeat that.

Q    Pri- --

A    Prior to --

Q    Prior to this RIF, was it the position of the Department of Education that those competitive areas

were not necessary to meet the statutory obligations of that -- um, of that office, the National Center for Education and Research?

A Based on the RIF, it was determined that NCER could continue to meet its statutory functions with the -- um, with the RIF that is taking place.

Q So pro- -- prior to the RIF, was it the -- was it the position of the department that those individuals were not necessary to meet the statutory obligations --

A I wasn't involved in those discussions. I can't answer that question. I can't speculate on what --

Q Okay.

A -- they determined.

Q Were there any discussions prior to January 20th about the components in red having performance issues?

A Not that I'm aware of.

Q Were there any discussions prior to January 20th about those competitive areas not being necessary in order to meet statutory obligations?

A Not that I'm aware of.

Q   Okay.  Is it accurate to say that IES was reduced in size from around 200 employees to about 20 employees?

A   Yes.

Q   Okay.  And did the department consider that the determination of all individuals within competitive areas would leave no one to continue the functions of those areas?

A   I think it's expected that that, um, would be in consideration, that when you have a RIF, um, that you would lose a certain amount of employees.  Um, but, again, um, it was also determined that with the staff in place, they could continue their statutory functions.

Q   And how was that determined?

A   It was determined by reviewing the statutory functions and then the statutory information that was provided by IES.

Q   It's the list of statutory conditions?

A   Correct.

Q   Okay.  Was there any examination of how IES had been meeting those statutory obligations in the past?

A   I wasn't involved in that.

Q   Is there any evidence that that was considered?

A   One would suspect that that was a part of the consideration based on the discussions with -- um, with Matt and DOGE and agency leadership.

Q   You said discussions.

Is there any evidence there was more than discussion that included all of the POCs?

A   I don't have evidence, um, where I can point to a date, but I'm almost certain that other discussions occurred.

Q   Why are you so certain?

A   Because this wasn't a, um, one-and-done, and I know that there was meetings that occurred with POC leadership.

Q   So in this case, the -- the department provided an administrative record of --

A   Mm-hmm.

Q   -- how these decisions were made.  Um, we have not seen evidence of additional meetings.

Are -- are you aware of other meetings that

took place or discussions?

A    So I'm not aware.  I don't have evidence, but, um, I do believe -- and that's what I said, I do believe that the leadership did meet with other POC leaders --

Q    And --

A    -- and organization.

Q    -- and why do -- and -- and Mr. Soldner or Mr. Bettis specifically?

A    I would say Mr. Soldner.

Q    Okay.  And why do you believe that?

A    Um, because Mr. Soldner, um, had discussions with me about some of the -- um, the RIF changes in the -- the organizational chart.  Um, and I believe he was meeting with other agency leadership based on discussions he had.

Q    Okay.  Were those discussions before or after the rift (sic) occurred -- RIF occurred?

A    It was before and after.

Q    Okay.  What did you discuss with him before the RIF occurred?

A    Before the RIF occurred, he asked just the decisions around it.  Um, he wanted to know specifically

what offices, um, were going to be impacted but nothing more.  It was more --

Q    And what did --

A    -- more about compliance.

Q    And what did you tell him?

A    I talked to him about the organization and the organizational impact for his particular office.

Q    So he, as the head of the organization, was asking you what the RIFs -- how the RIFs would affect IES?

A    Yes.

Q    So he was not aware of how they would affect IES at that time?

A    Not at that time.

MS. GITOMER:  Okay.  I'm noticing the time.  I think it's probably a good time to take a break.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  Going off the record at 10:09 a.m.

(Short recess taken.)

THE VIDEOGRAPHER:  We are going back on the records at 10:23 a.m.

MS. GITOMER: Thank you.

BY MS. GITOMER:

Q I wanted to follow up on few things we discussed earlier.

A Okay.

Q You had mentioned that Conor Fennessy was an employee at the Department of Education.

A Correct.

Q When did he leave the Department of Education?

A Conor Fennessy -- what's this? What it -- what month are we in, December?

His appointment changed. I cannot recall the time frame. It had to be before the shutdown.

Q Okay.

A So his appointment changed. Again, he was a political appointee, came in as a schedule C, um, but he is now an expert and consultant.

Q Still with the Department of Education?

A Yes.

Q So he is a consultant and expert but not employed by the Department of Education. Is that correct?

A    Still employed by --

Q    Okay.

A    -- Department of Education but in a different type of appointment -- or authority to bring him on board.  He's an expert and consultant, no longer a political appointee.

Q    Okay.  Is he a full-time employee?

A    Yes.

Q    Okay.  What office is he currently ...

A    Conor Fennessy is with the Office of the Secretary.

Q    The Office of the Secretary?

A    Mm-hmm.

Q    And you mentioned Brooks before, and you couldn't his last name.

A    Yes.

Q    Was that Brooks Morgan?

A    Yes.

Q    Does that sound right?

A    Yes.

Q    Okay.  And was Brooks Morgan an employee of the Department of Education?

A    He was an employee, expert, and consultant.

Q    Okay.  Is he still with the Department of Education?

A    Um, as of -- yes, I believe so.  I think his appointment is about to expire.

Q    Okay.  And who sets the appointment length?

A    Office of the Secretary.

Q    Okay.  Um, and so he has been appointed since -- sometime in January, February --

A    Mm-hmm.

Q    -- I think you mentioned, until now?

A    Correct.

Q    But that's set to expire soon?

A    Yes.

Q    And Conor Fennessy was a political appointee?

A    Yes.

Q    And is now an expert and/or con- -- expert contract or --

A    Expert a- --

Q    Sorry.

Can you tell me exactly again?

A    Expert and consultant appointee.

Q   Okay.  Expert and consultant.

And that switch happened sometime before the shutdown?

A   Yes.

Q   Did it happen sometime before the summer? Like, do we have a ...

A   No.

Q   So after the summer before the shutdown?

A   Yes.

Q   So maybe within the time frame of August to October?

A   Correct.

Q   Okay.  And why did his position change?

A   As an expert and consultant, he can function in a role to support, um, multiple organizations to include other departments outside of education.

Q   So when he was a political appointee --

A   He was strictly serving ...

Q   -- he was strictly serving the Department of Education.

In a role of, um, expert or consultant, he is also serving other agencies?

A     Yes.

Q     Okay. and so does that mean that Brooks Morgan in his role can also serve other agencies?

A     Yes.

Q     Okay.  Um, thank you.

Um, I want to go back to -- we were in the middle of talking about the RIF process --

A     Mm-hmm.

Q     -- when we took a break.

Um, I want to go back to how the statutory information was used to determine the size of the RIF. So there was a -- a -- a list of statutory provisions, and you mentioned that the Office of the Secretary and some -- and -- and DOGE were determining the RIF.

How did they use that list to determine the size of the RIF at IES?

MR. BRUNS:  Objection.

To the extent that this might reveal an internal conversations -- decision, I instruct you not to answer.  You can answer otherwise.

THE WITNESS:  Again -- um, and I believe I've answered this the best that I could previously in that

the decisions that were made, um, in -- the decisions were made specifically stating that the core func- -- the statutory functions -- sorry, I was going to say core functions again -- the statutory functions would continue in IES.

BY MS. GITOMER:

Q    And let's -- let's look at the first exhibit I had given you which is the deposition notice.

And so on the page with the header examination topics --

A    Mm-hmm.

Q    -- number 2B, that talks about the impact of the RIF on IES's ability to carry out statutory functions.

A    Mm-hmm.

Q    Is that correct?

A    Mm-hmm.

Q    Okay.  And so were you prepared to discuss that today?

A    Yes.

Q    Okay.  Great.

Um, and so can you walk me through the process

the Department of Education took to determine the impact of the RIF on IES's ability to carry out its statutory functions?

MR. BRUNS:  Objection.  Same instruction -- process. (inaudible whispering)

MS. GITOMER:  So I -- I do -- Counsel, I want to make sure I understand.  This is part of the notice, and we never met and conferred because you had said that was not needed.  This is central to the case, right, the -- the impact of the RIF on abilities to meet statutory function?

MR. BRUNS:  We maintain obje- -- objections on privilege whenever -- from a legal -- privilege when we agreed to these topics. (inaudible whispering)

MS. GITOMER:  But you would agree that deliberative process, privilege only extends to the extent that it's not central to the claims in the case?

MR. BRUNS:  No, I -- deliberative process privilege would extend, uh, to its full extent regardless of the claim.

MS. GITOMER:  There was a final decision to make a RIF.

MR. BRUNS: Correct.

MS. GITOMER: And that RIF was made, according to the documents you've provided and to the deponent, had involved an evaluation of the impact on statutory functions.

MR. BRUNS: Correct.

MS. GITOMER: So that is what I'm asking about as it was noticed in the examination topics.

MR. BRUNS: I'm instructing her -- she can answer as to what the process was, but she cannot disclose any internal deliberative discussions except in -- discussions if they were not reflected in the final decision. (inaudible whispering)

MS. GITOMER: Okay.

BY MS. GITOMER:

Q Can you please discuss the process by which the decision was made to carry out the RIF -- let me rephrase.

Can you please dis- -- can you please tell me what the process was to evaluate how the RIF would impact IES's ability to carry out its statutory functions?

A    Again, um, there was an election of the statutory functions.  That review of the statutory functions and those discussions were held with the Office of the Secretary.  Um, I was not directly involved in all of those, um, discussions, but the process, um, as I know it, is that there was a review of statutory functions, um, that was considered, and it was determined that IES could perform its statutory functions with the -- at -- at the adjusted scale.

Q    Okay.  And what do you mean by "adjusted scale"?

A    At a re- -- at -- at the reduction enforced that took place.

Q    So adjusted scale means the number of individuals --

A    Yes.

Q    -- not an adjusted scale of the functions?

A    No, no, the individuals.

Q    Okay.  And I do want to just remind you, you're -- you're testifying here on behalf of the Department of Education --

A    Yes.

Q  -- is that correct, not in your personal capacity?

A  Correct.

Q  Okay.  So when I ask you about the process, are you prepared to -- to talk about that process?

A  Yes.

Q  Okay.  So I want to ask again.  You mentioned there was a process you weren't involved in.

But what was the process by which those statutory functions were reviewed?

A  So Richard Smith --

Q  Okay.

A  -- acting deputy secretary --

Q  Yes.

A  -- and then, um, acting secretary, Denise Carter, who was in place --

Q  Okay.

A  -- went out to all POCs to request statutory functions so that they can review it to ensure that if any RIF occurred, that the offices or the POCs would be able to continue to perform those functions.  So that process existed within the Office of the Secretary,

within the deputy secretary, with DOGE, and the chief of staff.

It was a review of all statutory functions before any final decisions were made on the RIF, and it was not just limited to statutory functions. Again, a RIF, you have to look at everything.

Q    What do you mean by "everything"?

A    You have to look at the purpose of a RIF, whether or not it is for restructuring purposes, if it's to rescale the workforce, um, to meet the administration -- administration priorities. So all of those things, I believe, were taken into consideration.

Q    And so what was the purpose of this RIF?

A    The purpose of this RIF was -- um, it was multifold. So the purpose of this RIF was to -- um, to restructure the -- the organization, again, to align to administration priorities, to eliminate duplicative functions, and to rescale the workforce.

Q    And let's take those one by one.

Why did the department want to re-skill the workforce?

A    I think with any re-skilling, it's because you

want to get in more -- more skills.  As an example, you
want to bring in AI folks that understand or have
knowledge of that particular skill set.  You may want to
bring in other particular data fields that may lean more
heavily to what the administration priorities are, um,
geared to right now.  You may want to eliminate some
manual activities so you re-skill the workforce to bring
in those individuals that can make some determinations
on what that would look like in the organization.

Q    So you just gave a few hypotheticals.

A    Mm-hmm.

Q    You used the word "may."

Which of those were the reasons for why, in
this case, there was a re-skilling of the workforce?

A    Re-skilling of the workforce in full, again,
um, we wanted to look at how we could bring in system
engineers to help with some of the technology,
particularly bring in data scientists maybe to do more
of, um, that type of, um, activity.  Um, we look at a
variety of different skills on how to -- um, levels
that -- and how to shave off some of the current skills
that we have that we know are duplicative.

Q    And so at IES, which skills were duplicative?

A    Um, I can't speak to IES directly, um, on which skills were duplicative.  I do know that -- as an example, Jonathan Bettis, your Exhibit J, that particular box, um, was being performed at multiple offices doing similar activity, multiple administrative functions that they -- that were now being streamlined into one single office.

Um, I'm not sure if some of the other functions or skills within IES were being changed or upgraded to bring in, um, uh, like, um, data scientists, um, data analysis, things like that.  I do know they do have some statisticians, um, so there were some changes there.

Q    Which office is now doing the work that you -- you pointed to Jonathan Bettis's office?  Which -- which office is that --

A    Office of finance and operation.

Q    Is that on this --

A    No.

Q    So functions that were within IES are now outside of IES?

A    Yes.

Q    Which functions?

A    Again, those were the administrative functions so those were -- um, some of the administrative functions would be your HR liaison functions.  It would be responses to FOIAs, it would be responses to GAO requests, it could be performance management, labor relations, time and attendance, the variety of different functions that that particular office was doing, even coordination with budget to office of budget services, that office that Jonathan Bettis kind of led.  All of those functions are now being consolidated into one central location.

Q    So was there a determination that there was not a need for IES-specific expertise for those functions?

A    There was a determination made that while those functions are needed at the department, you did not need them in every single organization.

Q    So that decision was not specific to IES?

A    No.

Q    Okay.  Um, so you talked about re-skilling the

workforce and mentioned data scientists --

A    Mm-hmm.

Q    -- and AI.

Were those reasons why -- were those reasons part of the reason why IES had a RIF?

A    They were a consideration.

Q    How were they considered?

A    Um, again, looking at the -- the workforce, looking at what, um, is currently being performed and how things are being performed in IES, I do believe that the -- um, that was one of the things that the agency considered when it was determining a RIF.  But, again, it was not the sole --

Q    Okay.

A    -- factor.

Q    What -- what functions at IES did they consider could be replaced or substituted with data scientists or AI?

A    Right now -- and I do know that IES is hiring, so specifically for NCES, and they have replaced that skill set with data scientists.

Q    And so it's -- so they are hiring data

scientists.

Are those also statisticians?

A    No.

Q    Okay.  And so are they replacing -- are -- are the individuals they are hiring conducting work that was done by prior employees?

A    Um, not -- not fully.  So when you conduct a -- a reduction in force, when you abolish a position, you -- you're basically abolishing the -- some of the functions of that parti- -- that position.  Um, so the work that the employees are performing now on the skill set is probably multifaceted.  So it may be some of what the statisticians may have been doing, but it probably also includes other aspects of the work.

Again, I am only coming in, um, the perspective of a human capital, so I can only provide you what my conversations with Matt, um, has been about those positions.

Q    Okay.  And I -- I -- I apologize to keep revisiting it.

But just to be clear, you -- you are coming in as the representative --

A    I am.  Yes.

Q    -- for the department that -- that defendants have designated as the expert on those issues --

A    Yes.

Q    -- is that correct?

A    Yes.

Q    Okay.  Um, okay.  So we talked about re-skilling the workforce.  Um, you gave as an example that the Office, um, of the Deputy Director for Administrative Policy was duplicative in the department's opinion.

A    Mm-hmm.

Q    Did the department make any determinations that any other functions of IES were duplicative?

A    No.

Q    So each of the other components -- I'm sorry, competitive areas that had a RIF was not because they were duplicative?

A    No.

Q    Okay.  So why were those offices RIF'd -- I'm sorry, those competitive areas RIF'd?

A    Those competitive areas were RIF'd because it

was determined, again, based on a review of the statutory, um, requirements that -- and based on the executive order for all the departments to consider reducing or restructuring those -- those particular competitive areas were eliminated because it was determined that IES can still perform its full statutory functions or statutory function.  Sorry.

Q    Core statutory functions or --

A    Statutory -- statutory functions.

Q    -- statutory functions?

Okay.  So let's look at -- um, I'm still looking at Exhibit J or --

A    Mm-hmm.

Q    -- sorry.

What's the number there?

A    J.

Q    Yeah, J.  Okay.  Perfect.

So for NCEE, do you know how many people -- I'm sorry.

How many people were -- remained at NCEE after the RIF?

A    I'm not sure.  About three.

Q    Okay.  It was -- it was one.

Does that sound right?

A    That's the number you have.

Q    Okay.  Um, we understand that at NCEE, the only employee who was left was Mr. Soldner.

Did he also serve at the head -- as the head of IES at that time?

A    Yes.

Q    And who made the determination that all of the statutory responsibilities of NCEE could be fulfilled by Mr. Soldner alone in his capacity as head of NCEE as he was also commissio- -- a director of IES?

A    The Office of the Secretary made the decision that the core function -- the -- sorry.  I keep saying core functions.  Statutory functions would continue with Matt Soldner as the lead of IES and the lead of NCEE.

Q    And when you say the "lead of NCEE," do you also mean as the sole employee of NCEE?

A    As the sole employee of NCEE.

Q    Okay.  And you said the Office of the Secretary made that decision.

Who made the final decision?

A    So, as you know, um, it was an active secretary in place, uh, a DOGE lead was in place, in accordance with the executive order, as I discussed. Um, those decisions were made at that level, and then, um, with the chief of staff, the Department of Education, the secretary came in, um, a little bit prior -- prior to the RIF.  I can't remember her exact date.

Q    So --

A    But the decisions were made at the Office of the Secretary.

Q    Let's say two people in the Office of the Secretary -- let's say -- let's say Acting Secretary Carter --

A    Mm-hmm.

Q    -- and DOGE disagreed.

Who -- who made the final decision?

A    Um, if acting secretary and DOGE were in place, the chief of staff also had a role in making a, um, decision.

Q    So the chief of staff made the final decision?

A    Yes.

Q    Okay.  And the chief of staff dec- -- so -- so was the chief of staff's determination in conjunction with the other people that you mentioned --

A    Mm-hmm.

Q    -- that one individual was sufficient to meet all of the statutory functions of NCEE?

A    Decision -- the decision was made that IES is continuing to meet its statutory functions.

Q    And that decision was made by chief of staff, Ms. Oglesby?

A    By the DOGE lead -- in collaboration, the DOGE lead, the Office of the Secretary, um, and the chief of staff.

Q    So would you agree that even if decisions are discussed, someone needs to make the final decision; right?

A    Yes.

Q    And so would that be Ms. Oglesby?

A    It would be the secretary that makes the final decision.

Q    It will be the secretary.

And at what point did that transition from

Acting Secretary Carter to Secretary McMahon?

A    Um, secretary Carter, Secretary -- Acting Car- -- Act- -- Acting Secretary Carter left the agency, um, and then the secretary came in, I want to say, at the beginning of March, end of February.  I can't remember the exact date, but it's around that time frame.

Q    Okay.  And to clarify, you -- you mentioned again the DOGE lead.

A    Mm-hmm.

Q    To whom are you referring?

A    Brooks.

Q    Brooks.  Okay.

And was Conor Fennessy involved in these decisions?

A    Conor Fennessy was not involved in any RIF decisions.

Q    Okay.  But Brooks Morgan was involved?

A    Yes.

Q    And what was Brooks' role in those decisions?

A    Brooks' role in those decisions was primarily providing guidance on the restructuring of the agency,

looking at, again, with the Office of the Secretary, the statutory requirements, um, and each of the organizations, and having those conversations with the Office of the Secretary so the decisions could be made about how they proceed with the RIF.

Q   Okay.  And apologies, I -- I was saying Brooks because we didn't know his last name earlier.  I will refer to him as Mr. Morgan.

So -- so Mr. Morgan was involved in determining how the statutory functions were being met?

A   Yes.  With the Office of the Secretary, yes.

Q   Okay.  And what is his expertise in education research?

A   Um, I can't speak directly or speculate on his -- um, his expertise with education research, but I do believe that his background is in education.

Q   Okay.  Um, and I want to, uh, just put in front of you the response -- the -- the supplementary responses to interrogatories.

A   Thank you.

Q   And -- you know what, I'm going to hold on to that.  Apologies for the -- for -- for that.  Let's --

I -- I apologize. We're going to -- I'm -- I'm not going to use that document right now.

A    Okay.

Q    Um, let's talk about NCES.

A    Mm-hmm.

Q    Approximately how many employees did NCES have prior to the RIF?

A    I can't recall the -- the -- the approximate size, but they was one of the largest organizations in IES.

Q    Would you agree with me if I said it was approximately a hundred employees?

A    Yes.

Q    Okay. And do you -- and how many employees were at NCES following the RIF?

A    Um, I'm not sure. Maybe there was a few that remained.

Q    Would you agree with me if I said it was between three and six?

A    Yes.

Q    Okay. And so Rachel Oglesby -- Ms. Oglesby, in conjunction with the Office of the Secretary and

DOGE, determined that the 100 individuals previously had been conducting the work of NCES, NCES could meet all of its statutory functions with three to six individuals?

A    Yes.

Q    Can you walk me through how that determination was made, please?

A    I cannot walk you through how that determination was made.  Again, it was, um, an evaluation of their statutory requirements and familiarity with NCES and NAEP, um, requirements.

Q    Okay.  Let's talk about -- how -- how does the Department of Education typically determine how many people to take to do a job?

A    Um, a workload analysis would be --

Q    I'm sorry, a work -- okay.

A    A workload analysis.

Q    What's a "workload analysis"?

A    So a workload analysis would be looking at the enti- -- looking at the program in its entirety, um, the work that's promulgated out of that particular program, um, each of the functions within that organization, the, um, positions within that program, how long it takes to

do each of those functions.  So that would go into a workload analysis.

Q    Who conducts the workload analysis?

A    It can be twofold.  Sometimes the Office of Human Resources or the Chief Human Capital Office can conduct a workload analysis, or a workload analysis can be conducted by a vendor if you so choose to seek outside support in conducting it.

Q    And so if it was conducted by a vendor, it would be, like, overseen by --

A    By the Office of Human Resources --

Q    Okay.

A    -- and the organization, yes.

Q    Okay.  And who would -- who would ask for that to be done?

A    Typically, it's the POC leadership that asks for --

Q    Okay.

A    -- a workload analysis to be done.

Q    Okay.  And what -- what type -- are there any written products that come from a workload analysis?

A    Yes, the actual report, finding of -- of the

types of positions, the number of FTE that would need to

support the organization, um, if there were any, um,

duplicative functions within the organization.  They

would also, um, potentially talk about redundant or

re-skilling of functions, um, based on, um, say, new,

emerging factors, they would consider all that.  They

would put all of that in the report.

Q    Okay.  That makes sense.

How long would a workload analysis typically

take?

A    Typically, a workload analysis, um, if it was

a full-time job to conduct, um, could take up to

six months.

Q    Six months.  And that is for, like, one

department?  I'm sorry.  One component of the

department?  Is it for one competitive area?  One

position?  What does --

A    It would --

Q    -- what does it typically entail?

A    -- it would -- that would typically be for one

POC in -- within a department.

Q    And with -- apologies.

Can you remind me what POC stands for?

A    Principal operating component.

Q    Principal operating component.

And so IES has one POC?

A    IES is a POC.

Q    Got you.

A    Mm-hmm.

Q    So IES is a POC.

Um, and so a typical workload analysis for a POC like IES would take about six months?

A    Yes.

Q    Okay.  Was a workload analysis conducted for IES prior to the RIF?

A    Not that I'm aware of.

Q    Okay.  And in speaking for the department, you would be aware of whether one was conducted.  Is that correct?

A    Yes.

Q    Okay.  So -- so one was not conducted?

A    No.

Q    Okay.  Do you know when the last competitive analysis was conducted for --

A   I do not know that.

Q   -- IES?  Okay.

Can you recall any other RIFs at IES that have taken place in your tenure?

A   No.

Q   Okay.  So to determine -- to determine how you typically figure out how many people are needed to do a job, you would do a competitive analysis?

A   A workload analysis, yeah.

Q   I'm sorry.  I'm so sorry.  A workload analysis.

And that was not done prior to the RIFs?

A   Nor is it required.

Q   But -- but it wasn't con- -- but it wasn't done?

A   No.

Q   Okay.  So the typical process to determine how many people would be necessary to do certain jobs was not done prior to the RIF?

A   A process that could determine how many people could do a particular function -- or function or -- or, you know, position, functions within an office, could be

done by a workload analysis.  But that is not something that has to be done to determine FTE levels or -- nor is it considered as part of a RIF or required by a RIF.

Q   Okay.  But you did state, did you not, that that was the typical process the department would use to determine how --

A   We have used that process.

Q   Okay.  You have used that process?

A   Mm-hmm.

Q   And is that the process that the department previously typically would use to determine?

A   No.  I can't -- I can't speak to that that was the process.  So in my tenure -- so let me speak to my tenure at the department.  Um, I've only done two workload analysis.  So perhaps, "typical" is not the right word.  Workload analysis is a consideration of how you can determine FTE levels.

Q   Okay.  So when I asked earlier about the typical --

A   Mm-hmm.

Q   -- approach to determining workload levels, you -- why -- why did you mention a workload analysis?

A    Because workload analysis is one way where you can certainly determine that just based on the amount of work that goes into that particular office.

Q    Okay.  And it takes about six months?

A    Yes.

Q    And that -- that analysis is produced by which office?

A    Um, again, um, you could contract out --

Q    Right.

A    -- for that or you can ask the Office of Human Resources to conduct that analysis, but typically, we contract it out --

Q    Okay.

A    -- for that type of work.

Q    Would it include interviews with --

A    Yes.

Q    -- employees in that POC?

A    Yes.

Q    Okay.  Would it include reviews of job descriptions?

A    Yes.

Q    Would it include reviews of evaluations?

A    Performance evaluations.

Q    Performance evaluations?

A    It could but that's not necessary.

Q    Okay.  Would it include reviews of statutory functions?

A    Yes.

Q    Okay.  And you said it takes six months approximately?

A    Yes.

Q    Okay.  And when did planning for the RIF begin?

A    February.

Q    And the RIF took place on March 12.  Is that correct?

A    The notice of intent to RIF took place in March.

Q    In March.

A    The RIF occurred in April.

Q    When were individuals notified that they were --

A    The intent was in March.

Q    Okay.  And so what were they notified in

March?

A    That the department plans to conduct a RIF and their position has been identified.  I believe that's what the notice said.

Q    So did the positions between March and April change?

A    I believe some positions between March and April did change.

Q    Did they change at IES?

A    No.

Q    Okay.  So even if not final until April, the decisions with respect to who at IES was being RIF'd happened by the intent --

A    Notice.

Q    -- notice on March 12?

A    Yes.

Q    Okay.  And so it started in -- in February, final decision, for all intents and purposes, by March 12 with respect to IES.  How many POCs were involved in the RIF?

A    Sorry.

Q    That's okay.  Take your time.

A     Oh, my goodness.  I feel like I have to name all the POCs, so if my memory --

Q     It -- it can be approximate to be helpful.

A     All POCs were involved with the exception of OIG.

Q     Okay.  And is that five, a dozen, 20?

A     A dozen.

Q     A dozen --

A     -- with --

Q     -- more or less?  Okay.

Okay.  And was a competitive analysis conducted for any of the POCs prior to the RIF?

A     A workload analysis.

Q     Workload analysis.  Thank you.

A     Um, the only workload analysis that was conducted -- um, but this was prior to the RIF -- was the Federal Student Aid Office.

Q     Okay.

A     But that wasn't as a result of the RIF.

Q     Okay.  Thank you.

And was the Office of the Secretary aware that there was an ability to conduct workload analysis --

analyses if they had sought to do so?

A   No, I can't speculate that they had awareness from that.  I didn't have a discussion with the front office about workload analysis.

Q   Did the front office ask whether there were any tools available that they could use to determine workload analysis?

A   No.

Q   Did DOGE ask?

A   No.

Q   Okay.  Thank you.  Okay.  One moment, please.

So you -- you mentioned that after the RIF, you had meetings with Mr. Soldner.  Is that correct -- I'm sorry, discussions with Mr. Soldner.  Is that correct?

A   Correct.

Q   What did those discussions after the RIF -- following the RIF involve?

A   Um, so some of the discussions -- um, Matt wanted to clear the -- um, have a list of all, um, impacted employees, I provided that to him.  Um, and, um, he also -- again, since, um, the deputy director for

administration and policy was RIF'd, he wanted to

understand how those functions would be performed so

there was discussions about the central consolidation.

And then most recently, we have had hiring discussions.

Q    And did you have the answers to all of his

questions at that time?

A    Yes.

MS. GITOMER:  Okay.  Um, can we do Exhibit L?

(Clay Deposition Exhibit L marked for

identification.)

BY MS. GITOMER:

Q    So I apologize.  I had said that the RIFs took

place on March 12.  I believe it was March 11.

Does that sound correct?

A    The --

Q    The initial notice -- notice.

A    The notice of intent, yes.

Q    The notice of intent.  Okay.

And so I'll give you a moment to read this

email.  This email was sent by Matt Soldner on

March 11th at 8:00 p.m.  Is that correct?  Based on what

you --

A    Yeah, based on the time stamp.

Q    Yes.

A    Mm-hmm.

Q    Thank you.

Was he aware at this time of who was affected by the RIF?

A    Yes, he was aware of these.  He was aware of Exhibit J.

Q    He was aware of Exhibit J.

Did he have a list of the individuals affected by the RIF at this time?

A    I cannot recall if he had a specific list at this time.

Q    Mm-hmm.  So based on this email, he states, "I expect by tomorrow morning I will have a person-level list of staff directly affected by the RIF."

Would you agree that suggests he didn't have a list at that time?

A    It suggests that.

Q    Okay.  And this was after the RIF was announced, the intent to RIF was announced?

A    Yes.

Q    So would it be fair to say that the head of IES did not know who individually was im- -- was impacted by the RIF prior to the announcement of the RIF?

A    No, it's not fair to say that.  He had knowledge of Exhibit J.

Q    Does Exhibit J list the individuals?

A    No, but IES -- as the director of IES, he did have some knowledge of how that would impact individuals in those particular boxes.

Q    He had some knowledge?

A    Yeah.

Q    What -- so what knowledge did he have?

A    He --

MR. BRUNS:  Objection.  Form.

BY MS. GITOMER:

Q    What knowledge did he have?

A    The knowledge he had was, as an example, Matt is aware Jonathan Bettis sat in the director box.

Q    Okay.  But --

A    So he had some knowledge of those individuals that sat in that box.  He had knowledge of the

individuals that may have sat in ERTK.  He may have had knowledge of the other individuals working directly with Peggy Carr who sat in those boxes and as well as NCER.

Q He may have had knowledge of those?

A Yes.

Q Okay.  But you would agree that he didn't have a person-level list?

A No.

Q Okay.  Was that provided to him?

A Yes.

Q Do you know when?

A Um, I don't have the exact date, but all offices received the list.

Q Okay.  Um, so you said that individuals making the decisions about the RIF evaluated the RIF's impact on IES's ability to meet its statutory obligations.  Is that correct?

A Yes.

Q Is there any evidence of that evaluation?

A I don't have evidence of that evaluation.

Q Was it written down somewhere?

A Not to my knowledge.  Again, we have a

statutory list of functions that was reviewed by the Office of the Secretary and active secretary, chief of staff, DOGE lead, where they had discussions.

Q   And -- and so help me understand this because we have this list and there's a determination --

A   Mm-hmm.

Q   -- that the competitive areas identified for the RIFs are not needed to meet the statutory functions.

So how did you get from that -- how did the department get from that list to those determinations?

A   Discussions were held about each statutory function.

Q   Okay.

A   And each of the respective boxes and whether or not the -- the organization could continue to perform those functions with the top boxes or the boxes that were left in the organization.

Q   Okay.  So is there a list of which -- of these boxes are currently working to meet each of the statutory provisions on that list?

A   Any box that's not highlighted in red, they -- they are still in IES and able to perform the core

func- -- the core -- the statutory functions of IES.

Q   Got it.

And which statutory functions are each of these boxes performing?

A   So any of the statutory functions that are outlined in ESRA, any of the NCES statutory requirements for NAEP, um, all of the statutory, um, functions based on my understanding of IES, they're able to continue to perform those duties with the current staff that they have.

Q   Okay.  And so there was a list of the provisions.

A   Mm-hmm.

Q   And then that determination was made?

A   Yes.

Q   And the department did not record that determination anywhere?

A   Not to my knowledge.

Q   Okay.  And in a workload analysis, would -- you mentioned there would be a report.  Is that correct?

A   In a typical workload analysis, we would have a report.

Q    And you said that re- -- report would include an analysis of how statutory functions --

A    Yes.

Q    -- would be met.  So that would be written down --

A    Yes.

Q    -- in a typical workload report -- analysis?

Okay.  But it wasn't written down here?

A    We did not do a workload analysis.

Q    Right.

But -- but -- but the analysis of stat- -- of how statutory functions would be met following the RIF was not written down?

A    No.

Q    Okay.  And so how does -- how does IES, following the rift (sic) know -- RIF know how the Office of the Secretary intends for these statutory functions to be met if that was not written down?

A    Through discussions.

Q    Who were involved in those discussions?

A    So, again, a meeting was held with the secretary's office, all of the POC leadership, they

received -- all received the organizational charts, um, and discussions were held, um, openly in that room about the agencies -- I mean, the POC's ability to continue to perform.

Q    So in that meeting, the office of leadership and DOGE went through with each POC at -- all in the same meeting, went through each POC's individual statutory obligations and went through how they would be -- how they should meet them going forward?

A    They did not go through each statutory requirement.  There were discussions about the statutory requirement and the -- and the recommendations for the RIF and discussions were had at -- with the POC leadership and others in that room.

Q    Did POC leadership raise any concerns about their abilities to meet statutory functions?

A    Let me answer it this way because I don't want to say that there was concerns raised, but, um, a POC received their chart, they said -- they spoke openly, "Let's talk about this," what -- what -- what can be changed, um, and based on where they believed they needed to meet their statutory requirements, that was

heard by the secretary's office, and changes were made to how the RIF would proceed for that office.

Q   Okay.  You said you don't want to say concerns were raised.

Why do you not want to say that?

A   Because I don't want to say it as a -- as a concern.  It was -- it was more of, "I want to bring your attention" --

Q   Okay.

A   -- "to this before we proceed."

Q   Okay.  And remind me, what was the date of this meeting that you're -- to which you're referring?

A   I can't remember the date of the meeting, but it was prior to any March 11th notice.

Q   Okay.  Um, let's go back to the mission, uh, of the agency.  This was the document that looks like -- yup.  You already have it.

Um, if you look at carrying out the mission, 2A, it states that, "IES will conform to high standards of quality, integrity, and accuracy."

How did the Office of the Secretary and DOGE consider the impact of the RIF on its ability to conform

to those high standards of quality, integrity, and accuracy?

A    I believe that the Office of the Secretary determined that they continued to conform to those high standards of quality, integrity, and accuracy, even with the reduction in force that took place.

Q    But walk me through that process.

How did they make that determination?

A    Again, there was a review of, um, the statutory programs or statutory requirements, um, looking at the particular offices, how many people were in the offices.  Um, and they determined whether or not, um, with any reduction they could still conform to these high standards, and that decision was made, again, by the Office of the Secretary, um, with the DOGE lead. And -- and then the subsequent meeting that was held with the POC leadership.

Q    Okay.  And, um, I think what you just mentioned -- I had heard earlier that you mentioned there was a statutory -- a list of statutory provisions?

A    Yes.

Q    You just also mentioned that there was a

review of statutory programs?

A    Stat- -- stat- -- it's the statutory list. It's the same list.  Statutory requirements, statutory lists --

Q    Okay.

A    -- statutory programs.

Q    So -- so was there a review of the programs that were currently underway at IES as part of the RIF?

A    When there was a review of the stat- -- so when there was a collection of the statutory requirements, um, each POC identified the respective programs related to those statutory requirements.  So I would say yes.

Q    Okay.  Has the volume of IES work that can be performed decreased significantly since the RIF?

A    I would say that the volume of work has decreased.

Q    In what ways?

A    I do believe that the -- um, the pace at which IES performs the work has decreased.  Um, but the work in and of itself, um, is still continuing to get done, um, as it relates to the statutory requirements.

Q    What -- what effect on timing did the RIF have?

A    Um, I'm not sure, um, there was a specific effect on timing, um, that the RIF may have had with, um, IES.  Um, I am aware that, um, there was some, um, concern with NCES in particular and NAEP for the 26 and 28 due-outs or deliverables, but, um, they was able to, um, get those back on track.

Q    What were those concerns?

A    Um, they wanted to make sure that they had, um, the right individuals on staff that needed to review some of the activities.  So we, um, detailed some people to, um, NCES from, um, NAGB, National, um, Assessment Governor's Board, I think.  I can't remember their -- that name.  But we detailed some of those individuals over to, um, NCES to help.  And, again, um, Matt, um, has also, um, began hiring into that area.

Q    Were -- were any of the people that were RIF'd at NCES previously working on the work that you just mentioned for which folks were detailed?

A    Yes, I believe so.

Q    And so they were -- their -- their work was

completing statutory-required functions?

A    Yes.

Q    And without them, there was a concern that those functions would not be --

A    There was a concern that there would be a delay.

Q    A delay.

And so folks from NAGB were detailed --

A    Mm-hmm.

Q    -- to complete the work that had previously been done by NCES employees?

A    To assist the NCE- -- NCES employees that are currently -- I think that's me.  So sorry.

Q    No problem.

And so -- so NCES -- there was -- there was a RIF that --

MS. GITOMER:  Let's -- let's go off the record for one second.

THE WITNESS:  Okay.  Sorry.

THE VIDEOGRAPHER:  Off the record at 11:19.

(Short recess taken.)

THE VIDEOGRAPHER:  We are going back on the

record at 11:20 a.m.

BY MS. GITOMER:

Q    Okay.  So NCES had a RIF from about a hundred people to about three people -- three to six people. And after which, there were concerns that certain NAEP functions may be delayed?

A    Yes.

Q    And those concerns were addressed by detailing individuals from NAGB to assist NCES with those duties. Is that correct?

A    Yes.  We detailed a couple of folks from NAGB.

Q    Okay.  So the RIF included individuals who were completing statutory functions without whom there were delays?

A    Yes.

Q    Okay.  Um, are the -- are there currently enough qualified staff at IES to supervise IES contracts?

A    I would say yes, and I do know that they are also hiring staff.

Q    And why are they hiring staff?

A    Um, again, when you do a RIF, a RIF isn't just

about abolishing a position or eliminating a position. It's also about re-skilling so Matt was looking to, um, bring in different skill sets within the organization, um, that can help IES perform -- continue to perform its statutory requirements.

Q   What skill set was he looking to bring in?

A   Um, recently, he brought in a few data scientists in particular.

Q   Okay.  And what will -- what's their role?

A   Um, I believe he brought the data scientists into, um, NCES.  Um, and they are, um, looking at some of the contracts as well.  Um, and I believe he's hiring for a couple of other positions, but I'm not sure, um, the specific positions at this time.

Q   Okay.  So you mentioned one impact of the RIF was timeliness --

A   Mm-hmm.

Q   -- potentially.

What functions are no longer being performed because of the RIF at IES?

A   I believe all functions are still being performed at IES.

Q    All functions that were --

A    All statutory -- all statutory requirements or functions are being performed at IES even with a reduced staff or with a delay.

Q    Okay.  Beyond the statutory functions, what -- what you say are the statutory functions, were there any, um, functions that were happening that are no longer happening?

A    Uh, functions such as -- any of the administrative functions, as I mentioned before, those are duplicative functions throughout the department. They are no longer being performed at IES as a whole.

Q    Okay.

MS. GITOMER:  Um, let's look at Exhibit M.

(Clay Deposition Exhibit M marked for identification.)

BY MS. GITOMER:

Q    All right.  Would -- would you agree that this is the duties of the National Center for Education Statistics, part of the ESRA statute?

A    Yes.

Q    So this is what Congress has determined are

the duties of NCES.  Is that correct?

A    That is correct.

Q    Okay.  And if you look on page 3, could you read number 7?

A    "Conducting longitudinal and special data collections necessary to report in the condition and progress of education" --

THE REPORTER:  Read slower.  I can't understand what you're saying.

THE WITNESS:  Oh.  "Conducting" -- my apologies.  "Conducting longitudinal and special data collections necessary to report on the condition and progress of education."

BY MS. GITOMER:

Q    What longitudinal data collections is IES currently engaged in?

A    Um, I'm -- I don't have, um, specific information about, um, some of the studies.  I believe that, um, one of the studies, if I recall correctly -- um, I thought it was, um, like, pre-K, following pre-K all the way through.  Um, I know that there were some other, um, studies that were conduc- -- um, being

conducted on -- um, I think it was reading achievement longitudinal. But I -- I -- that one, I can't recall, like, directly.

Q Okay. Um, so understanding you aren't aware of the contracts, terminations, tho- -- those contracts were terminated.

So how did the Office of the Secretary and DOGE determine that given that all longitudinal studies, contracts were terminated that NCES could meet this requirement wh- -- in reducing its staff from 100 to a handful?

A So I can't speak to the cancellation of the contracts because I'm not sure which ones are, um, canceled or continued to be canceled. Um, I do know that evaluations, um, did occur to look at, again, what was required and then look at those contracts to, um, reinstate some of them so that they can ensure that they are meeting their statutory requirements.

Q And so those reinstatements were to ensure that statutory requirements were being met?

A Yes.

Q Okay. And so an analysis was done prior --

A   Mm-hmm.

Q   -- to that to ensure that statutory requirements were being met, but then these reinstatements were to correct the termination?

A   If I understand correctly, um, and, again, I'm not the person to speak to contracts, but the NCES contracts were not terminated.

Q   No NCES --

A   No.

Q   -- contracts were terminated?

A   No.

Q   Okay.  I -- um, so -- so -- do you want to look at the spreadsheet?

MS. GITOMER:  Oh, no, I'm sorry.  No.

BY MS. GITOMER:

Q   Let's -- we can move on.  We can -- yeah, we'll discuss that with Mr. Rosier.

Okay.  Um, so we understand that three individuals are currently at NCES.  And to your point, they may be hiring new data scientists.

A   Mm-hmm.

Q   Is that correct?

A    Correct.

Q    Okay.  So you have in front of you the duties of NCES.

How are those three employees dividing these general duties?

A    Um, I can't speak directly to how they are dividing those general duties, but the three to six employees, to include anyone that has been detailed to NCES, are able to perform the -- the required duties for NCES or functions within NCES.

Q    Okay.  You -- you mentioned that you can't speak to how they're doing it, but I want to make sure I understand.  This is the deposition notice.

A    Mm-hmm.

Q    And I believe you were res- -- assigned to speak to the ways in which IES is currently complying with its statutory requirements.  Is that correct?

A    That is correct.

Q    Okay.  And so how is NCES complying with the statutory requirements set forth in here?

A    So, again, the employees, the three to six that are there, the employees that are being detailed

are all working to meet the statutory requirements for

NCES working on the activity found in this document.

Q How?

A They're dividing up the tasks, they are

collaborating with Matt who is -- actually is now

serving as the NCES acting director. They are still

meeting with some of the, um -- I know they had a

meeting with the contract staff. They're making sure

the assessments and studies are going on. And I -- I

know, based on my conversations with Matt, they're also

on target for 26 and 28 NAEP --

Q Okay.

A -- due-outs.

Q So NAEP is in a different part of the statute;

right?

A Mm-hmm.

Q Do you -- do you see NAEP mentioned here?

A No.

Q Okay. How is NCES collecting, acquiring and

compiling and disseminating, which is the words in the

beginning of one, data on state and local educational

reform activities?

A    I can't speak to that directly.

Q    Okay.  And, again, I want to go back to the deposition notice.  I'm sorry to keep going back there.

But has the department designated you as the individual --

A    They -- they have -- they designated me as the individual to speak on behalf of the department.  And while I can speak on behalf of the department, the assignment of work and the program responsibilities and how those are dulled out within IES is made by the determination of Matt Soldner who is the program officer.

Q    Okay.

A    So to that level, I do not get involved in those discussions.

Q    Understood.

Let's not talk about the -- um, the -- the division of work between the employees.

How are those employees -- how is NCES, right, the -- the organization --

A    Mm-hmm.

Q    -- of NCES, meeting its statutory requirement

to collect, acquire, compile, and disseminate data on state and local educational form activities?

A    They are still working with, um, vendors, to my knowledge, to collect that information and to gather that data.

Q    I thought you didn't have knowledge of the contracts that were in place?

A    I have peripheral knowledge of the contracts that are in place, so I know that they are still working through those contracts to help collect this information.

Q    Okay.  So with respect, you had said that no NCES contracts were terminated, which we understand from the information provided from the department to not be correct.

So are you now saying that some of those contracts that were terminated were -- are the ones that are carrying out this work?

A    I can only speak to the information that, um, my staff have discussed with me about --

Q    Okay.

A    -- contract -- contracts and my limited

knowledge of what has been going on with contracts.  Um, while there may have been discussions about termination of certain contracts, um, and while you may have a list of contracts, um, it is my belief, okay -- so let me be clear -- that we did not go forward with termination of NCES contracts.

Q    Okay.  So, Ms. Clay --

A    Mm-hmm.

MS. GITOMER:  I'm talking to Counsel.  Ms. -- Ms. Clay is identified as the individual who is able to talk about how IES is currently complying with its statutory requirements.

MR. BRUNS:  Correct.

MS. GITOMER:  She is saying that that is through contracts but has acknowledged that she's not aware of this current contract terminations.

So how can we address this required topic?

MR. BRUNS:  I believe that she answered that IES is fulfilling its obligations through a combination of its employees and contracts.  And I think that satisfies the topic.

MS. GITOMER:  So -- so I asked Ms. Clay how

specifically you were meeting provision 1A, that requirement, and she said contracts. And she -- but she had already said that she doesn't have knowledge of the contract.

Do you -- do you see the position that we're in when we're asked -- you know, we -- we had expected her to come prepared to discuss statutory obligations and how they're being met. And we provided the list of the statutory provisions.

MR. BRUNS: Our position is that she's -- our argument, we can do it off the record and maybe bring it to the court if need be. (inaudible whispering)

MS. GITOMER: Okay. Let's go off the record.

THE VIDEOGRAPHER: Going off the record at 11:35 a.m.

(Short recess taken.)

THE VIDEOGRAPHER: We are going back on the record at 11:46 a.m.

BY MS. GITOMER:

Q   All right. Thank you, Ms. Clay.

How long did you meet with counsel to prepare for this deposition?

A    Um, a day.

Q    A full day?

A    Mm-hmm.

Q    So eight hours?

A    Not that much.

Q    Five hours?

A    Potentially.

Q    What -- what do you mean by that?

A    Approximately around -- I'd say around -- excuse me -- four to five hours.

Q    Four to five hours?

A    Yeah.

Q    In person?

A    No.

Q    Okay.  And how did you prepare specifically to talk about number 5, the department's ability to meet the statutory functions?

A    Um, so specifically, um, I did have a conversation with -- um, since Chris Rosier is on my team.

Q    I'm sorry, who?

A    Chris Rosier.

Q    Okay.

A    About contracts.

Q    Okay.

A    Because I wanted to understand what was terminated --

Q    Okay.

A    -- or reinstated.

Q    Okay.

A    Um, I had those conversations with him.

Q    Okay.

A    Um, but it was limited in his knowledge of, um, IES's as well.  Um, and just simply talking to counsel, but that's -- that's about it.

Q    Did you review the statute?

A    I did.  I reviewed ESRA, um, as -- um, as I could, but I don't think that I reviewed it in complete fullness all the way down to every subsection.

Q    And so how did you obtain the knowledge in representing the department as to how they were meeting that statutory functions?

A    So -- um, and I know I've said this, um, multiple times, um, that in the knowledge that they are

meeting that statutory functions, that was determined,

um, at the Office of the Secretary and, um, the Office

of the Secretary level.  Also, in my current

conversations with Matt, as I know that he is currently

hiring, he has also stated that they, um, are continuing

to meet even with delays their core statutory functions.

Q    And so in preparing for this deposition, did

you think about or obtain information on how IES is

meeting each of its individual statutory functions or

instead an assurance or knowledge in -- that they were,

in general, meeting their statutory functions?

A    An assurance that they were generally

continuing to meet its statutory functions.

Q    So you did not prepare to speak about how IES

is meeting each of its individual statutory

responsibilities and functions?

A    Not each.  No.

Q    No?  Okay.

Okay.  So I want to go back to the list of

statutory functions.  I know we've talked about that a

few times.

What do you mean by "statutory" -- Like, what

was on that list?  Was it a list of citations?

A    The statutory list -- I don't have it in front of me, but, yes, it was a list of, um, all related statutory requirements for each of the POCs.

Q    Was it a list of statutory language?

A    It was -- so it was a few things.  You had the -- the citation.

Q    Okay.

A    You, too, had the legal citation --

Q    Okay.

A    -- of the statutory -- where the statutory requirement came from.  You had the statutory program -- um, and I'm going off of memory thinking about what this list looked like -- the statutory program, um, and I believe there might have been that.  So there was the citation, the -- the actual act, and then the statu- -- stat- -- statutory program.

Q    The "act" meaning, like, the language in the statutory --

A    Mm-hmm.

Q    Okay.  And what do you mean by "statutory program"?

A    So, um, if there was a program that, um, is impacted by that statutory requirement, they actually listed the program.  So if it was a program office that performed that statutory requirement, they listed the specific program.

Q    When -- when was the last time you reviewed that list?

A    Um, April.

Q    Okay.  So you didn't review that list in preparing for this deposition?

A    No.  That -- no.  That list was a complete list of the entire department.

Q    Okay.

A    I did not read that entire list.

Q    Okay.  Um, statutory citation and statutory language and an identification of the programs that IES indicated were meeting those statutory provisions?

A    Yes.

Q    Okay.  Did the Office of the Secretary and DOGE consider proposals from IES on how to improve research?

A    I can't speculate if they did.

Q   Did it -- do you know if they did?

A   I don't.

Q   Do you have any evidence that they did?

A   I do not.

Q   Did they consider any information about specific studies that IES had indicated are really valuable to obtaining knowledge about the condition of education?

A   Um, I believe that the Office of the Secretary had received the NAEP, if I remember correctly, but I can't remember the specific details.

Q   Who did they receive that from?

A   I believe IES.

Q   And when you say they received NAEP, what do you -- what do you mean by that?

A   The -- the report of findings.

Q   Okay.

A   Um, and I believe they received information directly from Peggy Carr.

Q   Okay.

A   I believe that was actually sent to the acting secretary.

Q   Okay.  So -- so they reviewed the NAEP report?

A   Yes.

Q   Okay.  Did they review any other outputs, reports?

A   I'm not sure.

Q   But you -- you have no evidence that they did?

A   I have no evidence that they didn't.

Q   But you do have evidence that they reviewed NAEP?

A   Yes.

Q   And not any others?

A   To my knowledge.

Q   But again, as a reminder, you are speaking on behalf of the department --

A   And I'm saying I -- that's correct.

Q   Okay.

A   And I'm saying, to my knowledge, I don't know if other documents were shared with them.  I just specifically recall NAEP because the acting secretary mentioned that to me in a discussion.

Q   Okay.  And so in preparing for this deposition, you were not made aware of any other reports

of IES that were reviewed by the department?

A    No.

Q    Okay.  Okay.  Are you aware of the report on the condition of education?

A    No.

Q    Okay.

MS. GITOMER:  Let's do -- actually, you know what, we'll just move on.

BY MS. GITOMER:

Q    Okay.  Um, when IES conducted a RIF of 90 percent of -- I'm sorry, when the department conducted a RIF at IES of 90 percent of employees, did that affect the quantity of work that IES is able to conduct?

A    Yes, I believe it did.

Q    In what ways?

A    And -- um, and again, without the number of staff and only in peripheral conversations with Matt, it did impact the quantity of work of -- at IES.

Q    Okay.

MS. GITOMER:  Let's look at Exhibit R.

Can you pull it up this time?

Okay. Thank you.

(Clay Deposition Exhibit R marked for identification.)

BY MS. GITOMER:

Q   Take a moment to look at this email.

Who sent this email?

A   It looked like Matt sent it.

Q   And who did he send it to?

A   It looked like Jonathan Bettis.

Q   Okay. And when was this sent?

A   March 12th.

Q   Would you agree that's a day after the initial notice was announced?

A   Mm-hmm.

Q   Okay. Um, was there an instruction given to halt all fiscal year '25 activities for people at IES?

A   What activities is this referring to?

Q   So all -- is it -- that's -- that's my question to you.

Was there an instruction given --

A   Not to my knowledge.

Q   Okay. So the Office of the Secretary, DOGE,

leader of education --

A   None.

Q   -- Department of Education leadership did not -- okay.

Do you know what Mr. -- if -- if you look at the hea- -- there's a couple of headers in this email. One of them says "administrator."

A   Yup.

Q   Mr. Soldner says, "Halt all FY activities until further notice.  No comment."

Do you know what he means by that?

A   I do not.

Q   Why would he say that?

A   I don't know.  That's probably a question for Matt.  I have no idea why would he say that.

Q   Okay.  And so this was only about halfway through the fiscal year.

Would --

A   Mm-hmm.

Q   Would it make sense for all fiscal year '25 work to stop at that point?

A   No, no.

Q   Okay.  Okay.  How does IES think about its responsibility to provide national leadership as set forth in its mission?

A   Um, that's more of, um, an IES-specific, Matt Soldner question.  I don't think I can answer that directly, speaking on behalf of the department.

Q   Okay.  Um, and so you had said right after the break that you were prepared to talk generally about how IES is meeting its statutory functions in general, but not with respect to specific provisions.

Um, this is part of the mission; is that correct, that IES provide national leadership?

A   Yes.

Q   And so did you prepare for how to talk about how IES is able to fulfill its mission?

A   What I'm prepared to talk about is that, um, IES is continuing to, um, meet its mission with, um, the reductions that have taken place with the remaining staff that are on board.  Um, and if that is also -- um, or entails meeting its national leadership directive, it is my understanding and belief that they are continuing to meet that also.

While I recognize that there are some delays in some of the work and the quantity of work that they are doing --

Q    Okay.  So --

A    -- they're producing.

Q    So what I've heard is that you are prepared to say that they are continuing to meet their statutory functions.

A    Mm-hmm.

Q    And you've mentioned NAEP as one way in which they are doing so, there were some concerns about timeliness, those have been addressed.

And what I am asking is, how do you know that they are meeting their statutory functions?

A    So there's nothing -- um, I know that they are meeting their statutory functions because, um, again, in my pers- -- in -- in discussions with leadership, um, and discussions with Matt Soldner himself, um, while this RIF may have been hard on them, which any RIF is, they are continuing to meet its obligation.

He has not raised a specific concern that I am aware of at least to my attention or in a room with me

with other leaders that he is unable to meet his -- his -- um, his mission.

Q So is it fair to say that, in your conclusion, that they are meeting their statutory functions, you are relying on representations from Matt Soldner and the leadership?

A Yes.

Q But you are not independently aware of how they are meeting their statutory functions?

A That's correct.

Q Okay. What studies is IES currently conducting to expand knowledge in understanding early childhood as set forth in the mission?

A I don't have the specific set of studies that they are doing right now.

Q Okay. So let's go back to the mission.

MS. GITOMER: And for timing purposes, I'll just say I think we'll continue to finish with Ms. Clay on this before the next break, and then at that point, take a break for lunch and switch to Mr. Rosier.

MR. BRUNS: Sounds good.

BY MS. GITOMER:

Q Um, so going back to the mission, um, do you agree that the mission states that -- on number 2, that IES shall carry out the mission by conducting research evaluation and wide dissemination activities in areas of demonstrated national need that are supported by federal funds appropriate to the institute?

A Yes.

Q Okay. Okay. And in fiscal year '25, did IES spend all of the funds Congress appropriated to it?

A Um, IES has multiyear funds, um, so they are able to use it, um, more than that single year, so -- so, no, I don't think they expended all of their funds.

Q Do you know approximately what percentage or how many of their funds they spent in -- of their FY '25 funds?

A I don't.

Q Okay. Are you aware of whether it was significantly less than years prior?

A No.

Q Would a RIF of 90 percent of staff affect the amount of funds spent on staff at that agency?

A    I guess it would depend on how you look at it. A RIF is expensive.

Q    How much was spent on a RIF for IES?

A    I don't know IES specifically, but again, a RIF is costly.  So if you have a RIF, you're going to have retirees, and you're going to also have annual leave payout which can be costly if we have an employee with 240 hours or 720 hours.  If you have an employee that's not eligible for retirement, then you have to pay severance pay in addition to annual leave.

So the funds are being expended, and, in fact, they may -- you may expend more than what you typically allocated during that period of time.  So it's not just basic salary and benefits, you are now having to spend more based on the RIF.

Q    And is that money coming from the IES budget?

A    Yes.

Q    Okay.

A    It's coming from the appropriations or POCs received, what we call PC&B, payroll, compensation and benefits.

Q    Okay.  And so the statute says that, "IES

shall carry out its mission in conducting these

activities, research, evaluation, and dissemination, in

areas that demonstrated national needs that are

supported by federal funds.

A   Mm-hmm.

Q   So Congress identified the amount of funding

it thought was needed to address demonstrated national

needs; yes?

A   Yes.

Q   Okay.  And some of that money was spent on

RIFs?

A   Yes.

Q   So can -- so if Congress thinks the money

should be used to meet these demonstrated national

needs, and the department directed that money to conduct

RIFs, is it possible to meet that mission if that's how

much Congress identified was necessary?

A   So Congress allocates funding.  Part of that

funding includes payroll, compensation, and benefits,

for which the agency can make determinations on its use.

Q   Okay.

A   So any allocation that is funded for IES to

meet its mission, they still have the necessary funding to complete that. Now, the funding for the payroll, compensation and benefits where they have to pay for annual leave and any other severance, they will take it out of that fund.

Q    Okay.  Understood.

MS. GITOMER:  Let's look at Exhibit X.

(Clay Deposition Exhibit X marked for identification.)

BY MS. GITOMER:

Q    I will give you a moment to review.

(Plaintiff's Deposition Exhibit Y marked for identification.)

MS. GITOMER:  This is -- we will say this is Exhibit Y.

BY MS. GITOMER:

Q    Okay.  And I will give you a moment to review it.

I'm going to represent that this is a provision of the ESRA statute.

Do you agree that this provision states that IES shall make customer service a priority?

A    That's what it says, yes.

Q    Okay.  Who does IES consider to be its customers?

A    Um, IES considers the -- um, I would say the, um, public to be its customer.

Q    In subsection 2 here, it references "researchers, practitioners, and the general public."

Are they IES customers?

A    Yes.

Q    Okay.  And number 6 states that, "IES shall make information available to the public in an expeditious fashion."  Is that correct?

A    Yes.

Q    And so you had mentioned that the RIF affected timeliness.

How is IES ensuring that information is made available to the public in an expeditious fashion following the RIF?

A    Um, I can only state that, um, IES is making information available to the best of their ability as expeditiously as possible with the current resources that they have.

Q    And so has -- is IES providing information less expeditiously?

A    I think they are providing it as expeditiously as they can.

Q    Was it possible with 200 employees to provide information more expeditiously than it is with 20 employees?

A    Yes.

Q    And has the RIF impacted IES's ability to disseminate information in a timely fashion?

A    Um, I would say potentially.  Um, I do believe, um, Matt has stated that there are some timeliness factors that come into play, but for the most part, they are still, um, disseminated information.

Q    What -- what timeliness factors did Matt mention -- Mr. Soldner mention?

A    Um, just the -- the -- the delay, because you have more -- um, well, you have less employees doing more with the task at hand.  So there's a delay in some of the information getting disseminated.

Q    Did the office of the secretary and DOGE consider the impact of those -- the RIF on timeliness

and those delays?

A    I would say that there was consideration, um, given to it, but with any reduction in force, um, it is expected that until you fully, um, do your restructuring, um, reorganizing, um, that you will have some impact, um, to delivery of service.

Q    What was the anticipated impact to the delivery of service that the office of leadership and DOGE --

A    Again, until -- until it fully, um, look at whether or not -- well, look at how we would reorganize, um, which we are all still in the midst of doing right now, and how long that would take to make sure that people are in the right positions, perform the right functions, um, there were some expected delays.

Q    So the reorganization wasn't planned prior to the RIF taking place?

A    Not fully, no.

Q    When you say "not fully," which parts were planned of the reorganization, which parts weren't?

A    So we knew as a -- as a whole in the department that we would -- um, we will restructure the

organization, um, that we would look at duplicative functions throughout the organization, which we did do. We would assess where, um, work needed to be performed. We would allow all of the organizations -- excuse me -- to include, um, IES, which IES is currently working on, um, to submit a reorganization structure, um, that continues to allow them to meet their statutory requirements and also perform -- perform their function. So IES is doing that now along with other POCs.

Q   So has IES submitted its reorganization structure?

A   I believe -- um, I'm not sure which stage IES is in, um, because I get several of them, so I -- I don't know what stage IES is in, but, um, Matt has looked at the organization.  I believe he has determined how his organization will be, um, reorganized for the -- um, for the future.  So he is working on it now.

Q   So it sounds like there was a time period before the RIFs --

A   Mm-hmm.

Q   -- with the organization, where IES had a plan to meet its statutory functions, and it sounds like they

are currently reorganizing to determine how they are

going to meet their statutory functions.

What -- what -- if -- if that isn't complete

yet, how are they meeting their statutory function --

A    So --

Q    -- in the interim?

A    I didn't say that.

Q    Okay.

A    I said that, um, IES -- um, so pre-RIF, IES

met statutory functions; post-RIF, IES is continuing to

meet its statutory functions and they are reorganizing

the office based on the current work size and the

current needs that IES is determining, and that would be

Matt Soldner, uh, to bring into the organization, and

they are reorganizing based around that.

So it's not that Matt didn't consider

reorganizing prior to the RIF, um, and it's not that

they are not meeting statutory requirements now.  They

were continuing to meet statutory requirements after the

restructuring or reorganization.

Q    Okay.  And why did the department decide to

conduct the RIF first and then plan the reorganization?

A     So go back to, um, the executive order.  The executive order specifically, um, stated that all departments throughout the federal government will identify reduction in force within its organization, reorganization, restructuring, workforce optimization, all of that, that you -- we would move forward with that expeditiously.

Q     But why not expeditiously resubmit plans to reorganize first and then conduct a RIF?

A     The department was adhering to, um, the executive order to reduce in its size and then continue to look at restructuring to meet its -- um, to meet its current mission and to meet the -- the reduced size that it had.

Q     So there was a decision first to terminate employees and then to submit plans to reorganize based on those levels?

A     The RIF is what -- the RIF was, um, a part of its reorganization plan.

Q     So could Matt Soldner come back to leadership, and say, "Actually, we think we need 100 or 200 employees as we had prior to meet our statutory

functions"?

A    Um, yes, Matt can come back and say a lot of things to leadership on what we would like to see in IES.

Q    And does leadership have in its plans a determination of how many individuals are necessary to conduct the work at IES?

MR. BRUNS:  Objection.  These plans aren't part of the decision.  I would instruct you not to answer because they would be -- (inaudible whispering)

THE WITNESS:  Okay.

BY MS. GITOMER:

Q    Does the department have a determination of how many individuals approximately are necessary to do the work of IES?

A    The department is in discussions with Matt directly on how to reorganize IES.

Q    So if the department -- so if the office of the secretary determined that IES could conduct its work with 20 individuals, is that not a determination that 20 individuals aren't necessary to do the work of IES?

A    No.  Again, I think I mentioned before, it was

a RIF. Um, it's also about workforce restructuring, workforce realignment, workforce re-skilling. In -- in accordance with federal regulations, when you have a RIF, you can also continue to fill positions. And so that is an option that the department has and that is a part of what Matt is considering.

Q Okay. So 20 people was sufficient to fulfill all of IES's statutory functions?

A Correct.

Q The department made that --

A Correct.

Q -- determination?

Okay. So -- so the distinction between what we just discussed is that it may not be the final decision on how many are necessary to do the work going forward, but 20 individuals, at the time of the RIF, was enough to complete all of its statutory functions?

A Yes.

Q Okay. Has IES determined whether it will conduct any longitudinal studies in the future?

MR. BRUNS: Objection. If there has been a final decision, the answer is duplicative.

MS. GITOMER: Okay. So to be clear, I asked about any determinations.

BY MS. GITOMER:

Q So any determinations as to whether it will conduct longitudinal studies?

A I haven't been in -- in conversation with IES about that.

Q Okay. And just -- I do want to go back to the deposition notice one more time. Um, I believe that you were designated to discuss number 7, which is plans related to the reexamination of IES on behalf of the department. Is that correct?

A Yes.

Q Okay. And how did you prepare for that?

A So, again, I have -- so a couple of things, and you cited the -- the federal register which is one.

Q Okay.

A And also, conversations with, um, leadership on the reexamination of IES which full decisions have not been made, so I'm not at liberty to discuss those right now because we haven't made any final determinations.

But, um, there -- there -- again, based on the federal register, IES does want to reimagine, um, how its workforce would look like, our workforce structure, um, and to ensure that there's no dup- -- duplicity in the function that's being performed, um, so they are moving forward with that reexamination.

Q    So you said you discussed with the department of leadership.

Was that to prepare for this deposition?

A    No.

Q    Okay.

A    Just in my conversations.

Q    Okay.  Thank you.

Um, has IES published any request for proposals regarding longitudinal studies since March?

A    Not that I'm aware of.

Q    Has IES hired anyone to oversee longitudinal studies that are planned for the future?

A    Based on my knowledge of the hires, I do not believe so.

Q    How long does it typically take to put together a proposal for a large study?  A bid for

proposal?

A    It can take anywhere from 60 to 120 days.

Q    And how long does it take to accept -- to select a bid, finalize the bid, and then begin the work on a contract?

A    I know my counsel didn't say this, but that's a question for Chris Rosier.  Sorry.

Q    Okay.  And how long does it typically take to hire someone from the point at which the POC says -- like, to hire someone all the way to boarding them?

A    So there's various factors in that that you would have to consider.  If it's a direct hire authority, it takes less time.  So I would say you could potentially bring them on board, um, 60 to 80 days.

Q    Okay.

A    Um, if you have to do a full competition, it can take up to 120 days.  And that's security clearance, all of that, to get through.

Q    And other than the individuals that you mentioned -- I'm sorry, you mentioned NCES was hiring a few data scientists.

A    Mm-hmm.

Q    That process has not started for any other positions?

A    Not that I'm aware of.

Q    Okay.  Let's talk a bit about the appropriation of funds.

Um, defendants have represented that with a few days left in fiscal year 2025, IES had only expended a little more than 300 million in fiscal year 2025, out of an appropriation totaling about 800 million.

A    Mm-hmm.

Q    Um, to your understanding, is that an accurate reflection of IES's expenditures --

A    Yes.

Q    -- in fiscal year 2025?  Okay.

Um, approximately how much of that 300 million was obligated before February?  So from October 2024 through January 2025?

A    Probably a good portion of it since they have multi-year funds.

Q    Okay.  And, um, has IES increased its rate of expenditure -- expenditure -- excuse me -- significantly in fiscal year '26?

A    Not to my knowledge.

Q    Is IES on track to expend its funds at the 800 million annual rate currently appropriated by Congress?

A    Again, we have multi-year funds.  Um, it would really depend on all of the activity that they already have planned and the funds that they have already obligated.  It would --

Q    Are they on track to expend their -- their annual funds from this year -- this year?

A    I don't know.  I'm not sure.

Q    Are you mentioned -- you -- you stated that last year, you understood that -- or you -- you agreed that approximately 300 million, uh, was spent of appropriation totaling 800 million.  You had said this year, they have not significantly increased their rate.

So do you think they're on track to spend all of that money this year?

A    I don't know if they are on track to spend all of that money this year, um, but it doesn't mean they can't get on track.  So I want to be careful about how I answer that.

Q   With -- without a change, are they on track?

A   Without a change, they may not be.

Q   Okay.  They may not be.

Why do you say "may"?

A   Because it's only without a change.

Q   Okay.

A   So without a change, they may not be on track. I can't give it a definitive because I'm not -- I'm just not sure.

Q   Okay.  Why is IES not expending a substantial share of its appropriated funding?

A   I think some of it has to do with -- and I'm saying I think -- I -- I believe, I think some of it has to do with a pause of some of the -- potentially halt some of the activity so that Matt can reevaluate, reassess, and then determine how they move forward.

Q   Pause some activities.

Which -- which -- which activities?

A   I'm not sure.  That -- that -- Matt would have to address that.  So, you know, I can only speak to Matt stepping back, looking at his organization now, where they are, um, in trying to reassess, okay, what do I

put -- put fir- -- first.

Q But -- but none of the activities that were paused were contributing to IES meeting its statutory obligations?

A Not that I'm aware of.

Q And who decides how much funding IES is permitted to expend on its functions?

A Um, IES.

Q And going back to the chart, I was under the impression that you had said budget was handled by Mr. Bettis. Is that correct?

A He's in I -- yeah, he was in IES.

Q Right.

And so -- but I also was under the impression that following the RIF, the functions in his office were moved outside of IES?

A To the office of finance and operations, which is still itself restructuring and making sure that we have the teams appropriate to provide the administrative support to all of the POCs.

In the meantime, which I also mentioned previously, is that with every POC, they are assigned --

they are assigned a budget analyst, a budget officer,

and the office of budget services.

Q    Okay.  But IES determines how much it is
permitted to expend on its functions?

A    Yes.

Q    So if Mr. Soldner tomorrow wanted to spend all
800 million of its appropriate funding, he could?

A    If it's allocated to the different programs,
he can make that determination on whether -- where that
money is to be expended.

Q    Leadership wouldn't be involved in that at
all?

A    I'm certain that Matt would have conversation
with leadership as I think anyone would, if they decided
to expend that much money.

Q    So he would -- but he wouldn't have to get
approval from the office of the secretary?

A    I don't believe it's a matter of direct
approval, but making sure that everyone is on the same
page on the use of those funds.

Q    But his is the page that matters, is what you
said, decision-making wise?

A   Matt makes the decisions on where they should expend the funds, but he will confer with the office of the secretary to make sure they are all aligned.

Q   So Matt decides where the funds are spent -- I'm sorry, Mr. Soldner.  Apologies.  Mr. Soldner decides where the funds are spent.

The RIF was conducted -- the decision to -- to RIF at IES was made by the office of the secretary and DOGE as we discussed.  Is that correct?

A   Mm-hmm.

Q   So was that Mr. Soldner's decision?

A   Mr. Soldner had awareness.

Q   Okay.  So Mr. Soldner had awareness, but he didn't decide to spend IES funds on the RIF.  Is that correct?

A   Not directly.

Q   So was that an exception to the rule he gets to decide?

A   No, it's not an exception to the rule.  Um, Matt had awareness of the RIF action.  Matt also had the chart.  Matt had the opportunity if he wanted to to discuss changing the way the RIF occurred.

Q   So Mr. Soldner could have just stopped the RIF?

A   He could have made recommendations.  All offices are going to be impacted by the RIF regardless.

Q   So he could have made recommendations.

Is it fair to say that suggests he wasn't the person who decides --

A   He did not make the ultimate decision.

Q   Okay.  So he didn't decide in that case how much money would be spent on which functions at IES?

A   No.

Q   Okay.  Could Mr. Soldner decide tomorrow to hire 100 people?

A   He would need to go to the office of the secretary and confer with them as with every other POC. It is a hiring freeze in place at the federal government right now.  The only individuals that can make decisions about hires is through a submission of a hiring plan and through conversations with the agency leadership.  No one has authority at the department to hire without going to the office of the secretary.  That includes IES.

Q   Okay.  So when you -- so when you say who decides how much funding IES is permitted to expend on its functions, some of that is limited -- is -- is limited by needing approval by leadership?

A   Yes.

Q   Okay.  At least --

A   Based on --

Q   -- with respective --

A   -- current --

Q   -- staff?

A   -- executive orders.  Correct.

Q   Okay.  Can IES carry out the same quantity of research, data collection, and dissemination as it did previously while spending at this lower appropriations?

A   No, they couldn't.

Q   What is the minimum amount of money IES would need to conduct all of its statutory functions?

A   I'm not sure.

Q   Okay.

MS. GITOMER:  I need a couple of minutes to review my notes, but I think we are done here.  So if you don't mind sticking around for a couple of minutes

during the break so that we can review -- there's -- there's lunch -- that would be great.

Let's go off the record.

THE VIDEOGRAPHER: Going off the record at 12:35 p.m.

(Short recess taken.)

THE VIDEOGRAPHER: We are going back on the record at 12:39 p.m.

BY MS. GITOMER:

Q Okay. Ms. Clay, since the RIF, ha- -- has the department done anything to measure how IES is meeting its statutory functions?

A I don't believe that, um, they've done anything specifically to measure how IES has met their statutory functions. Um, but I do know, um, through involvement, um, Matt does regularly meet with the office of the secretary, um, and sometimes I'm involved where they specifically have some discussions about how things are moving forward with IES.

Q So how are they measuring compliance with the statutory in those discussions?

A I can only state that in those discussions,

Matt, himself, has made it clear that they are -- again, and I'm going to -- you know, he acknowledged that it's been difficult, um, but they are continuing to meet their statutory functions. Um, the areas where he asked for assistance, which I talked about, were specifically, um, related to NCES, which they did the detail and, subsequently, the hiring of additional staff, the data scientists.

Q   Was he concerned NCES was not meeting its statutory function?

A   No, he was not concerned that they are not meeting the statutory function, but rather he wanted to make sure that they met the statutory function timely.

Q   Okay.  Um, and when you said -- he said it's been difficult.

What's been difficult?

A   I think the difficulty of losing any staff. The RIF in itself is hard.  Um, so I think that impacted Matt as it did with multiple people, um, going through a RIF and just trying to, again, look at their organization, um, and determining, okay, how do I restructure, recalibrate, um, and support the employees

that are remaining.  So I think that -- that's what he meant by difficult.

Q    That makes a lot of sense.

Um, what -- how often is Mr. Soldner briefing the office of the secretary and DOGE on meeting the statutory requirements?

A    The DOGE is no longer in place.

Q    Okay.  When -- when did DOGE stop in -- was that fol- -- like, right after the RIF or ...

A    Potentially, yeah.  Like, probably around, I want to say, June.

Q    Okay.  Thank you.

A    But, um, DOGE is not a factor at the department right now.

Q    Okay.  And -- okay.  So how often does Mr. Soldner, um, brief the office of the secretary or have these discussions as you said before?

A    I don't know how often he meets them.  Um, I do know that there are, um, regular meetings only because I've been involved in a few --

Q    Okay.

A    -- of the discussions.

And, again, my involvement at these meetings are foc- -- were focused more on hiring.

Q   And the meetings you've been involved in --

A   Mm-hmm.

Q   -- the way that leadership is assessing that they're meeting statutory functions is through a representation and explanation by Mr. Soldner.  But to your knowledge, there haven't -- he hasn't been presenting them with any measurements or metrics?

A   Not to my knowledge, no.

Q   So any of the meetings you were at, he didn't present that?

A   No, no.

Q   You haven't seen that from IES?

A   No.

Q   Okay.  So you are not aware of any current measurements or metrics that show how IES is meeting its statutory functions?

A   No.

MS. GITOMER:  I think that's all the questions we have for Ms. Clay.

Do you have questions?

MR. BRUNS: Just briefly.

EXAMINATION

BY MR. BRUNS:

Q   Ms. Clay, um, do you recall plaintiff's counsel asking you about contract terminations of NCES?

A   Do I recall -- repeat that for me.

Q   Um, plaintiff's counsel asking you questions about contract terminations at NCES?

A   No, not directly.

Q   Do you recall answering a question that, um, to the best of your knowledge, contracts were not terminated?

A   Yes.

Q   Were you referring to their present status or their past status?

A   Um, to the present status.

MR. BRUNS: No further questions.

MS. GITOMER: Okay. Thank you very much, Ms. Clay.

We can go off the record.

THE VIDEOGRAPHER: Going off the record at 12:45 p.m.

(Discussions held off the record.)

(Signature having been reserved, the video deposition of MS. JACQUELINE CLAY was concluded at 12:45 p.m.)

ACKNOWLEDGEMENT OF WITNESS

I, Jacqueline Clay, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any corrections appear on the attached Errata sheet signed by me.

_____  _____
(DATE)                  (SIGNATURE)

E R R A T A   S H E E T

IN RE: AERA vs. EDU

RETURN BY:

PAGE          LINE          CORRECTION AND REASON

____          ____          _____

____          ____          _____

____          ____          _____

____          ____          _____

____          ____          _____

____          ____          _____

____          ____          _____

____          ____          _____

____          ____          _____

____          ____          _____

____          ____          _____

____          ____          _____

____          ____          _____

____          ____          _____

____          ____          _____

____          ____          _____

____          ____          _____

(DATE) (SIGNATURE)

REPORTER'S CERTIFICATE

DISTRICT OF COLUMBIA

I, Jeaninn Y. Alexis, a Notary Public of the District of Columbia, do hereby certify that the with-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to law, was examined by counsel.

I further certify that the examination was recorded stenographically by me, and that this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor an employee of counsel, nor related to any of the parties nor in any way interested in the outcome of the action as witness my hand and seal this 28th day of December, 2025.

_____
JEANINN ALEXIS
My Commission Expires: 1/14/2029

## A

a- 61:19
A-P-P-E-A-R-A-... 3:1
a.m 1:16 2:7 5:10 58:19,22 107:1 118:15,18
abilities 65:10 101:16
ability 11:2 20:11 20:13 64:13 65:2 66:21 92:22 97:16 101:3 102:22 119:16 136:20 137:9
able 18:7 40:22 41:20 68:21 98:22 99:8 105:7 113:9 117:10 126:13 129:15 132:12
abolish 74:8
abolishing 74:9 108:1
accept 146:3
accuracy 18:19,22 102:20 103:2,5
accurate 55:1 147:11
achieved 36:8
achievement 111:1
acknowledge 161:5
acknowledged 117:15 156:2
ACKNOWLED... 161:4
acquire 116:1
acquiring 114:19
act 15:14 16:9,10 122:16,18
Act- 80:3
acting 14:2,21 26:13,14 42:20 68:13,15 78:13,18 80:1,2,3 114:6 124:21 125:19
action 152:20

163:16
actions 28:12
active 22:21 78:1 98:2
activities 18:2 27:15 70:7 105:12 114:22 116:2 127:16,17 128:9 132:5 134:2 149:17,18 150:2
activity 70:19 71:6 114:2 148:6 149:15
actual 31:8 84:22 122:16
add 8:6
addition 133:10
additional 34:7 56:21 156:7
address 117:17 134:7 149:20
addressed 107:8 130:12
adhering 141:10
adjusted 67:9,10 67:14,17
administering 2:16
administration 13:8 15:18,19 16:7 17:8,10 69:11,11,17 70:5 94:1
administrative 25:22 26:1 32:14 46:22 56:18 71:6 72:3,4 75:10 109:10 150:19
administrator 128:7
advance 22:22
adviser 32:14
AERA 1:5 162:2
affect 11:2 44:3 58:9,12 126:13 132:21
agencies 13:6 62:22 63:3 101:3

agency 16:7 25:18 29:2 44:7 46:14 48:3,5,10 50:7 56:6 57:14 73:11 80:3,22 102:16 132:22 134:20 153:19
ago 7:1
agree 17:2 18:11,16 19:14 21:19 65:15 79:14 82:11,18 95:17 97:6 109:18 127:12 132:3 135:21
agreed 65:14 148:13
Agriculture 13:5
ahead 8:1
AI 70:2 73:3,18
Aid 92:17
al 5:6,7
Alexis 1:19 2:14 5:13 163:4,19
align 69:16
aligned 152:3
allocated 133:13 151:8
allocates 134:18
allocation 134:22
allow 139:4,7
alluded 30:10
American 1:4 5:5
amount 55:11 89:2 132:22 134:6 154:16
analyses 93:1
analysis 71:12 83:14,16,17,18 84:2,3,6,6,19,21 85:9,11 86:9,12 86:22 87:8,9,11 88:1,15,16,22 89:1,6,11 92:11 92:13,14,15,22 93:4,7 99:19,21 100:2,7,9,11 111:22

analyst 151:1
and/or 61:17
announce 34:8
announced 95:21 95:21 127:13
announcement 96:3
annual 133:6,10 135:4 148:3,10
answer 7:11 8:1,1 22:9 45:4 54:11 63:20,20 66:10 101:17 129:5 142:10 143:22 148:22
answered 7:10 63:22 117:18
answering 159:10
answers 4:18 7:8 94:5
anticipated 138:7
apologies 81:6,22 85:22 110:11 152:5
apologize 23:21 74:19 82:1 94:12
appear 45:9 161:8
appearances 5:15
appeared 163:6
appears 51:1
appointed 32:19 61:8
appointee 32:2,10 59:16 60:6 61:15 61:22 62:17
appointees 32:6,12
appointment 59:12 59:15 60:4 61:5,6
approach 19:12 88:21
appropriate 132:7 150:19 151:7
appropriated 132:10 148:3 149:11
appropriately 40:9 40:12

appropriation 27:21 147:5,9 148:15
appropriations 133:19 154:14
approval 151:17,19 154:4
approximate 82:8 92:3
approximately 5:10 22:2 32:18 82:6,12 90:8 119:9 132:14 142:14 147:15 148:14
April 90:18 91:5,8 91:11 123:8
area 38:2 41:9 44:14,16 50:6 85:16 105:17
areas 18:2,14 37:18 38:1,18,22 39:21 40:1 41:15 44:13 48:18 51:2 53:22 54:20 55:7,8 75:17,21,22 76:5 98:7 132:5 134:3 156:4
arena 19:3
argument 118:11
aside 21:12 22:4 52:19
asked 7:15,17 9:12 38:7,17 57:21 88:18 117:22 118:6 144:1 156:4
asking 58:9 66:7 130:13 159:5,7
asks 84:16
aspects 74:14
assess 139:3
assessing 158:5
Assessment 105:13
assessments 114:9
assigned 113:15 150:22 151:1
assignment 115:9

assist 106:12 107:9
assistance 156:5
assistant 13:20
14:2,6,17 25:21
38:13
association 1:4 5:6
5:13
assume 7:17 22:11
22:13 45:4
assuming 36:11
49:21 50:3
assurance 121:10
121:12
attached 2:14
161:9
attendance 72:8
attention 102:8
130:22
August 62:10
authority 60:4
146:13 153:20
authors 16:8
available 93:6
136:11,17,20
Avenue 3:4 5:9
aware 9:18 10:5
23:18 50:17 53:5
54:18,22 56:22
57:2 58:12 86:14
86:16 92:21 95:5
95:7,7,9 96:19
105:5 111:4
117:16 125:22
126:3 130:22
131:8 132:18
145:16 147:3
150:5 158:16
awareness 93:2
152:12,13,20

**B**

B 4:7,10 16:15
17:17
back 11:12 15:20
22:19 24:21 37:15
58:21 63:6,10
102:15 105:8

106:22 115:2,3
118:17 121:19
131:16 132:2
141:1,20 142:2
144:8 149:21
150:9 155:7
background 12:12
81:16
based 10:21 15:18
19:3 20:18,19
27:1,1 41:19,21
49:17 54:4 56:5
57:14 76:1,2 85:5
89:2 94:21 95:1
95:14 99:7 101:21
114:10 133:15
140:12,15 141:16
145:1,19 154:7
basic 133:14
basically 41:5 44:5
74:9
began 37:12 49:21
105:17
beginning 80:5
114:21
behalf 3:2,12 6:4
8:14 9:19 10:6
67:20 115:7,8
125:14 129:6
144:11
belief 117:4 129:21
believe 11:12 13:13
22:15 23:4 25:4
28:20 35:22 38:11
43:11 46:8 57:3,3
57:10,13 61:4
63:21 69:12 73:10
81:16 91:3,7
94:13 103:3
104:19 105:21
108:10,12,21
110:18 113:15
117:18 122:15
124:9,13,18,21
126:15 137:12
139:12,15 144:9
145:20 149:13

151:18 155:13
believed 101:21
benefit 23:7
benefits 133:14,21
134:19 135:3
best 63:22 136:20
159:11
Bettis 25:13 38:16
41:22 46:5 57:8
71:4 72:11 96:19
127:9 150:11
Bettis's 71:16
beyond 46:6 109:5
bid 145:22 146:4,4
Biennial 4:16
bit 78:6 147:4
board 60:5 105:14
129:19 146:14
boarding 146:10
Bowie 12:17
box 47:15,17,18,19
71:5 96:19,22
98:21
boxes 47:11,11,22
96:10 97:3 98:14
98:16,16,19 99:4
break 8:8,11 58:16
63:9 129:8 131:19
131:20 155:1
brief 157:16
briefing 157:4
briefly 12:11 159:1
bring 12:5 60:4
70:2,4,7,16,18
71:11 102:7 108:3
108:6 118:11
140:14 146:14
Brooks 31:7,10,11
60:14,17,21 63:2
80:12,13,18 81:6
Brooks' 31:8 80:20
80:21
brought 108:7,10
Bruns 3:17 4:4 6:3
6:3 10:14 29:22
43:6 63:17 65:4
65:12,18 66:1,6,9

96:15 117:13,18
118:10 131:21
142:8 143:21
159:1,3,17
budget 27:19 28:1
34:22 35:8 72:10
72:10 133:16
150:10 151:1,1,2
budgetary 27:16,18
34:19
budgets 28:5
bump 41:4

**C**

C 17:17 32:2,11
59:16
C-L-A-Y 6:21
call 25:20 42:11,15
133:20
called 6:10 35:18
canceled 23:2
111:14,14
canceling 22:21
cancellation 23:3
111:12
Candice 6:5 34:9
capacity 68:2 77:11
capital 13:19,20
14:3,8,9,12,13,21
14:22 19:3 74:16
84:5
Car- 80:3
career 32:7
careful 148:21
Carr 25:8 26:3
97:3 124:19
Carr's 26:3
carry 64:13 65:2
66:17,21 132:4
134:1 154:12
carrying 17:18,22
18:13,17 102:18
116:18
Carter 68:16 78:14
80:1,2,3
case 1:6 38:9 46:22
56:17 65:9,17

70:14 153:9
Center 50:22 53:15
54:2 109:19
Centers 25:9
central 65:9,17
72:13 94:3
certain 9:15 10:22
19:2 23:10 41:21
55:11 56:11,13
87:18 107:5 117:3
151:13
certainly 89:2
certificate 12:16
163:1
certify 163:5,10,13
Chain 4:13,15
change 17:7,9
33:20 35:1 37:22
62:13 91:6,8,9
149:1,2,5,7
changed 33:17
59:12,15 71:10
101:21
changes 57:12
71:13 102:1
changing 152:22
charge 29:11,11
chart 4:12 11:16
46:21 47:5,7,9
50:22 57:13
101:19 150:9
152:21
charts 37:20 101:1
chief 13:19,19,22
14:2,3,7,9,12,12
14:21,22 45:16,17
49:19 69:1 78:5
78:19,21 79:1,2,9
79:12 84:5 98:2
childhood 131:13
choose 84:7
Chris 119:19,22
146:7
citation 122:7,9,16
123:15
citations 122:1
cited 144:16

claim 65:20
claims 65:17
clarification 15:2
clarify 7:16 14:11
  80:8
Clay 1:14 2:9 5:5
  6:9,18,20,22 9:8
  16:15 46:17,20
  94:9 109:15 117:7
  117:10,22 118:20
  127:2 131:18
  135:8 155:10
  158:21 159:4,19
  160:3 161:5
clear 19:1 74:21
  93:20 117:5 144:1
  156:1
clearance 146:17
clearly 36:10
collaborating
  114:5
collaboration
  79:11
collaborative 33:22
collect 15:9 16:5
  19:8 24:9,9 116:1
  116:4,10
collected 38:4
collecting 114:19
collection 51:13
  104:10 154:13
collections 110:6
  110:12,15
College 12:16
Columbia 2:16
  163:2,5
combination 25:17
  27:19 117:19
come 15:12 22:19
  84:21 118:7
  137:13 141:20
  142:2
comes 15:13,18
  16:6
coming 13:7 26:12
  74:15,21 133:16
  133:19

comment 128:10
commissio- 77:12
Commission
  163:20
commissioner 51:2
commissioner's
  51:6 52:7
communicate 26:6
  26:14 27:6
communicated
  25:15 26:7
communication
  25:18 26:1
Community 12:15
compensation
  133:20 134:19
  135:3
compete 40:5
competes 40:3
competing 40:8,9
  40:11,19
competition 146:16
competitive 37:17
  38:1,2,18,22
  39:21 40:1 41:9
  44:13,14,16 48:18
  50:6 51:2 53:22
  54:20 55:6 75:17
  75:21,22 76:5
  85:16 86:21 87:8
  92:11 98:7
compile 116:1
compiling 114:20
complete 106:10
  120:16 123:11
  135:2 140:3
  143:17 161:7
completed 7:11
completely 47:15
completing 106:1
  107:13
compliance 19:2
  36:6 58:4 155:20
complying 113:16
  113:19 117:11
component 41:10
  85:15 86:2,3

components 27:5
  48:17 53:14 54:16
  75:16
con- 23:3 61:17
  87:14
concern 102:7
  105:6 106:3,5
  130:21
concerned 156:9,11
concerns 101:15,18
  102:3 105:9 107:5
  107:8 130:11
concluded 160:3
conclusion 131:3
condition 110:6,12
  124:7 126:4
conditions 55:18
conduc- 110:22
conduct 18:1,13
  37:22 39:5,18
  74:7 84:6 85:12
  89:11 91:2 92:22
  126:14 134:15
  140:22 141:9
  142:7,19 143:20
  144:5 154:17
conducted 84:7,9
  86:12,16,19,22
  92:12,16 111:1
  126:10,12 152:7
conducting 21:3
  74:5 83:2 84:8
  110:5,10,11
  131:12 132:4
  134:1
conducts 84:3
confer 27:22 28:3,9
  35:4,7 152:2
  153:15
conference 27:4
conferred 65:8
conflicted 36:4
conform 18:18
  102:19,22 103:4
  103:13
Congress 22:22
  29:19 109:22

132:10 134:6,13
  134:17,18 148:4
congressional 16:9
  16:10
conjunction 34:16
  34:22 35:11 48:2
  48:13 79:2 82:22
Conor 31:21 32:1,8
  32:9 33:1 59:6,10
  60:10 61:15 80:14
  80:16
consider 29:20
  35:20 49:3,7 55:5
  73:17 76:3 85:6
  102:22 123:20
  124:5 136:2
  137:22 140:16
  146:12
consideration
  55:10 56:5 69:12
  73:6 88:16 138:2
considered 41:13
  42:21 43:2 48:15
  48:17 49:11,13,13
  56:3 67:7 73:7,12
  88:3
considering 49:12
  143:6
considers 136:4
consolidated 72:12
consolidation 94:3
consultant 59:17
  59:20 60:5 61:1
  61:22 62:1,14,21
continue 10:21
  20:14 30:9 41:20
  44:8 48:20 49:13
  49:15,16 50:12
  51:9,15 54:5 55:7
  55:13 64:5 68:21
  77:15 98:15 99:8
  101:3 108:4
  131:18 141:11
  143:4
continued 103:4
  111:14
continues 139:7

continuing 79:8
  104:21 121:5,13
  129:17,21 130:7
  130:20 140:10,19
  156:3
contra- 23:12
contract 61:18 89:8
  89:12 114:8
  116:22 117:16
  118:4 146:5 159:5
  159:8
contractors 24:7
contracts 10:3,19
  22:21 23:2,3,7,10
  28:14 33:8 107:18
  108:12 111:5,5,9
  111:13,16 112:6,7
  112:10 116:7,8,10
  116:13,17,22
  117:1,3,4,6,15,20
  118:2 120:2
  159:11
contributing 20:16
  20:21 21:5,7,10
  22:6,12,14,16
  23:12 49:10 150:3
control 30:16,17
conversation
  119:19 144:6
  151:13
conversations
  63:19 74:17 81:3
  114:10 120:9
  121:4 126:18
  144:18 145:12
  153:19
convey 26:19
conveyed 26:22
coordination 72:10
copy 43:4
core 20:14 48:21
  49:16 51:8,10,17
  51:22 64:2,4 76:8
  77:14,15 98:22
  99:1 121:6
correct 17:16,20
  18:5,6,15,20

23:14,16 34:15
38:18,19 39:2,3
39:11,12,16 42:2
44:19 46:3,4
47:20 48:11 49:21
50:1,2,4 51:3,4
55:19 59:8,22
61:12 62:12 64:16
66:1,6 68:1,3 75:5
86:17 90:14 93:13
93:15,16 94:14,21
97:17 99:20
107:10 110:1,2
112:4,22 113:1,17
113:18 116:15
117:13 125:15
129:12 131:10
136:12 143:9,11
144:12 150:11
152:9,15 154:11
161:7
**CORRECTION**
162:4
**corrections** 161:8
**correctly** 110:19
112:5 124:10
**costly** 133:5,7
**counsel** 5:15 7:20
10:10,16 11:10
43:4 65:6 117:9
118:21 120:13
146:6 159:5,7
163:9,13,14
**couple** 37:14
107:11 108:13
128:6 144:15
154:20,22
**court** 1:1 2:12 5:13
5:16 7:6 16:13
118:12
**created** 42:3
**current** 14:1 20:5
70:21 99:9 117:16
121:3 136:21
140:12,13 141:13
154:9 158:16
**currently** 6:6 14:11

14:16 60:9 73:9
98:19 104:8
106:13 107:16
110:16 112:19
113:16 117:11
121:4 131:11
139:5 140:1 148:3
**customer** 135:22
136:5
**customers** 136:3,8
**cuts** 10:22 41:21
53:7,9,11

### D
**D.C** 1:17 3:5,15 5:9
**Daniel** 3:8 5:20
**data** 15:9 16:5 19:8
24:9,10 37:19
39:2,4 51:13 70:4
70:18 71:11,12
73:1,17,21,22
108:7,10 110:5,11
110:15 112:20
114:21 116:1,5
146:21 154:13
156:7
**date** 13:14 56:11
78:8 80:6 97:12
102:11,13 161:13
162:22
**dates** 32:22
**day** 119:1,2 127:12
163:17
**days** 146:2,14,17
147:7
**dec-** 79:1
**December** 1:15 2:6
4:10 5:9 59:11
163:17
**decide** 140:21
152:14,18 153:9
153:12
**decided** 151:14
**decides** 150:6 152:4
152:5 153:7 154:2
**decision** 47:21 48:1
48:12 49:3 52:22

63:19 65:21 66:13
66:17 72:20 77:13
77:21,22 78:17,20
78:21 79:7,7,9,15
79:20 91:18
103:14 141:15
142:9 143:15,22
152:7,11 153:8
**decision-making**
31:14,18 33:16,19
35:14 151:22
**decisions** 27:14,16
27:18,22 28:2,7,9
28:13,15,17,19
29:2,12,17 30:16
30:17,18 34:3,20
35:10 45:12 46:3
47:6,9,10,12
50:11 52:21 53:3
56:20 57:22 64:1
64:1 69:4 78:4,10
79:14 80:15,17,20
80:21 81:4 91:12
97:15 144:19
152:1 153:17
**decreased** 104:15
104:17,20
**Defendant** 4:18
**Defendant's** 4:17
**defendants** 1:11
3:12 6:4 75:2
147:6
**deferred** 38:3
**define** 21:11 39:20
**defines** 16:1
**definitive** 149:8
**degree** 12:17 13:3
**delay** 106:6,7 109:4
137:17,19
**delayed** 107:6
**delays** 107:14
121:6 130:1 138:1
138:15
**deliberative** 65:16
65:18 66:11
**deliver** 19:10
**deliverables** 105:7

**delivery** 138:6,8
**Democracy** 3:3
5:18,20 6:1,2
**demonstrated**
132:6 134:3,7,14
**Denise** 68:15
**depart-** 41:9
**department** 1:8
3:13 4:9 5:7 6:4,6
7:4 8:14,21 9:12
9:13 10:22 12:13
13:5,7,9,11,18
15:8 18:7 22:5,5
25:15 26:2,8,14
27:2 28:11,16,22
29:8 30:19 31:1
32:10,12 33:20
34:1 36:8,19 37:3
37:5 53:14,22
54:8 55:5 56:17
59:7,9,18,21 60:3
60:22 61:2 62:19
65:1 67:21 69:20
72:18 75:2,13
78:5 83:12 85:15
85:16,21 86:15
88:5,10,14 91:2
98:10 99:16
109:11 115:4,7,8
116:14 120:19
123:12 125:14
126:1,11 128:3
129:6 134:15
138:22 140:21
141:10 142:13,16
142:18 143:5,10
144:12 145:7
153:20 155:11
157:14
**department's** 75:11
119:16
**departments** 31:2
35:18 36:22 62:16
76:3 141:3
**depend** 133:1 148:6
**depending** 25:17
**depi-** 53:13

**deponent** 6:10 66:3
**deposed** 6:22
**deposition** 1:13 2:9
4:9 5:5,8 8:4,17
8:20 9:8,13 11:4
11:22 12:3 16:15
46:17 64:8 94:9
109:15 113:13
115:3 118:22
121:7 123:10
125:22 127:2
135:8,12 144:9
145:9 160:3
**deputy** 13:19,20
14:1,6,9,12,16,22
25:21 38:13 42:20
68:13 69:1 75:9
93:22
**describe** 43:22
**DESCRIPTION**
4:8
**descriptions** 89:20
**designated** 75:3
115:4,6 144:10
**detail** 156:6
**detailed** 105:12,15
105:20 106:8
107:11 113:8,22
**detailing** 107:8
**details** 124:11
**determination** 51:5
51:8 55:6 72:14
72:17 77:9 79:2
83:5,8 98:5 99:14
99:17 103:8
115:11 142:6,13
142:20 143:12
151:9
**determinations**
70:8 75:13 98:10
134:20 144:2,4,22
**determine** 41:19
45:6 63:11,15
65:1 83:12 87:6,6
87:17,20 88:2,6
88:11,17 89:2
93:6 111:8 140:1

149:16
**determined** 48:22
51:15 54:4,14
55:12,14,15 67:8
76:1,6 83:1 103:4
103:12 109:22
121:1 139:15
142:19 143:19
**determines** 41:8
151:3
**determining** 45:1
46:2 48:17 50:5
63:14 73:12 81:10
88:21 140:13
156:21
**different** 20:1,2,3
44:1 52:20 60:3
70:20 72:8 108:3
114:14 151:8
**difficult** 156:3,15
156:16 157:2
**difficulty** 156:17
**direct** 22:10 26:17
26:21 33:9 146:12
151:18
**directed** 134:15
**directive** 129:20
**directives** 26:20
**directly** 45:4 67:4
71:2 81:14 95:16
97:2 111:3 113:6
115:1 124:19
129:6 142:17
152:16 159:9
**director** 25:6 26:13
26:15 75:9 77:12
93:22 96:8,19
114:6
**dis-** 66:19
**disagreed** 78:16
**disclose** 66:11
**discuss** 57:19 64:18
66:16 112:17
118:7 144:10,20
152:22
**discussed** 48:22
59:4 78:3 79:15

116:20 143:14
145:7 152:9
**discussion** 23:5
56:9 93:3 125:20
**discussions** 26:16
54:10,15,19 56:5
56:7,11 57:1,11
57:15,16 66:11,12
67:3,5 93:14,17
93:19 94:3,4 98:3
98:11 100:19,20
101:2,11,13
115:15 117:2
130:17,18 142:16
155:18,21,22
157:17,22 160:1
**disseminate** 19:11
24:12 116:1
137:10
**disseminated**
137:14,20
**disseminating**
114:20
**dissemination** 18:2
23:18,20 24:1
26:4 132:5 134:2
154:13
**distinct** 32:4
**distinction** 51:18
51:19 143:13
**District** 1:1,1 2:12
2:12,15 163:2,5
**dividing** 113:4,7
114:4
**division** 1:2 2:13
115:18
**document** 44:16
82:2 102:16 114:2
**documents** 11:7,9
11:11,19 12:5
66:3 125:18
**DOGE** 29:9,10,17
29:18 30:3,10,13
30:18,21 31:8,13
31:18,19,20 32:4
32:5,7 34:14,15
35:14,18 36:2,8

45:5,9,10,14 46:1
48:2,13 49:1 50:2
53:3 56:6 63:14
69:1 78:2,16,18
79:11,11 80:9
83:1 93:9 98:3
101:6 102:21
103:15 111:8
123:20 127:22
137:21 138:9
152:9 157:5,7,8
157:13
**DOGE's** 29:20 45:6
**doing** 20:16 71:6
71:15 72:9 74:13
113:12 130:3,11
131:15 137:18
138:12 139:9
**dozen** 92:6,7,8
**due-outs** 105:7
114:13
**dulled** 115:10
**duly** 6:11 163:8
**dup-** 145:4
**duplicative** 35:22
69:17 70:22 71:1
71:3 75:10,14,18
85:3 109:11 139:1
143:22
**duplicity** 145:4
**duties** 99:9 107:9
109:19 110:1
113:2,5,7,9

---

**E**

**E** 4:7 162:1,1,1
**earlier** 8:5 24:17
34:19 39:10 48:16
50:7 59:4 81:7
88:18 103:19
**early** 29:4 32:21
33:11 41:11
131:12
**Eastern** 5:10
**EDAERA_00003...**
4:13
**EDAERA_00003...**

4:15
**EDAERA_00038**
4:12
**EDU** 162:2
**education** 1:9 4:9
5:7 6:6 7:4 8:15
9:12 10:20 12:13
13:7,9,12,18 15:8
15:14 19:17 24:1
25:10 32:10 33:2
33:5,20 36:19
37:4 42:20 51:1
53:15,22 54:3
59:7,9,18,21 60:3
60:22 61:3 62:16
62:20 65:1 67:21
78:6 81:12,15,16
83:12 109:19
110:7,13 124:8
126:4 128:1,3
**educational** 1:4,5,9
5:6 12:12 15:10
20:4 114:21 116:2
**effect** 105:1,4
**Effective** 4:10,14
4:16
**EFFECTIVENE...**
1:6
**efficiency** 29:1,8
30:6
**effort** 34:1 36:4
**eight** 119:4
**election** 67:1
**eligible** 133:9
**eliminate** 69:17
70:6
**eliminated** 52:15
52:17 76:5
**eliminating** 108:1
**else's** 31:17
**email** 4:13,15 94:20
94:20 95:14 127:5
127:6 128:6
**emerging** 85:6
**emplo-** 40:8
**employed** 59:21
60:1

**employee** 21:19
39:6 40:3,5 49:17
59:7 60:7,21 61:1
77:5,18,19 133:7
133:8 163:14
**employees** 19:6
21:20 22:4,10,11
40:9 47:17 49:14
52:11 53:1 55:2,3
55:11 74:6,11
82:6,12,14 89:17
93:21 106:11,12
113:4,8,21,22
115:18,19 117:20
126:12 137:5,7,18
141:16,22 156:22
**enforced** 67:12
**engaged** 110:16
**engineers** 70:17
**ensure** 18:21 36:6
37:22 68:19
111:17,19 112:2
145:4
**ensuring** 136:16
**entail** 85:19
**entails** 21:11
129:20
**enter** 28:13
**enti-** 83:19
**entire** 52:14,16
123:12,14
**entirety** 35:19
83:19
**Errata** 161:9
**ERTK** 97:1
**Esquire** 3:7,8,9,10
3:17
**ESRA** 15:13,21
16:1,8,21 22:8
29:16,18 30:3
36:11 99:6 109:20
120:15 135:20
**established** 15:15
28:22
**estimate** 33:10
**et** 5:6,7
**evaluate** 66:20

evaluated 97:15
evaluating 42:22
evaluation 15:8
16:4 51:12 66:4
83:9 97:19,20
132:5 134:2
evaluations 18:1
19:8 20:6 89:22
90:1,2 111:15
evidence 46:9 56:2
56:8,10,21 57:2
97:19,20 124:3
125:6,7,8
evidence-based
19:12
exact 13:14 32:21
78:7 80:6 97:12
exactly 48:7 61:21
examination 4:1,3
4:4 6:10,14 9:6
11:14 55:20 64:9
66:8 159:2 163:10
examined 161:6
163:8
example 11:9 27:16
31:7 40:14 50:22
52:22 53:15 70:1
71:4 75:8 96:18
Excel 43:9,11
exception 92:4
152:17,19
excuse 119:10
139:4 147:21
executive 13:8
28:20 29:5,7
30:10,14,19 33:17
33:21 34:3 35:3
35:15,17 36:3,7
36:21 37:15 45:10
76:3 78:3 141:1,2
141:11 154:11
exhibit 4:9,10,12
4:13,14,15,16,17
9:1,8 16:12,15
46:16,17 64:7
71:4 76:12 94:8,9
95:8,9 96:6,7

109:14,15 126:21
127:2 135:7,8,12
135:15
EXHIBITS 4:8
existed 68:22
exit 28:14
expand 131:12
expanding 19:16
expect 95:15
expected 55:9
118:6 138:4,15
expeditious 136:12
136:17
expeditiously
136:21 137:2,3,6
141:7,8
expend 133:12
148:2,9 150:7
151:4,15 152:2
154:2
expended 132:13
133:11 147:7
151:10
expending 149:10
expenditure 147:21
147:21
expenditures
147:12
expensive 133:2
expert 59:17,20
60:5 61:1,17,17
61:19,22 62:1,14
62:21 75:3
expertise 33:1,4
72:15 81:12,15
expire 61:5,13
Expires 163:20
explain 12:11
explanation 158:7
explicitly 30:13
extend 65:19
extends 65:16
extent 63:18 65:17
65:19

F

facilitating 26:15

fact 133:11
factor 73:15 157:13
factors 29:3 43:1
48:15,16 85:6
137:13,15 146:11
fair 7:18 13:16 96:1
96:5 131:3 153:6
familiar 11:17
36:16 47:2
familiarity 83:10
fashion 136:12,17
137:10
February 27:8,17
28:19 29:4 30:8
32:21 33:11 37:6
37:7 61:9 80:5
90:12 91:17
147:16
federal 13:6 18:3,8
18:12 24:1 92:17
132:6 134:4 141:3
143:3 144:16
145:2 153:16
feel 7:14 8:8 92:1
Fennessy 31:21
32:1,8,9 33:1 59:6
59:10 60:10 61:15
80:14,16
fields 40:6 70:4
figure 87:7
fill 143:4
filled 14:22
final 65:21 66:12
69:4 77:22 78:17
78:21 79:15,19
91:11,18 143:14
143:22 144:21
finalize 146:4
finance 13:21 14:19
71:18 150:17
financial 13:22
14:2
finding 84:22
findings 19:10
24:12 51:14
124:16
fine 7:21 26:18

finish 131:18
fir- 150:1
firm 5:11
first 4:17,18 6:11
33:7 41:12 64:7
140:22 141:9,15
150:1
fiscal 127:16
128:17,20 132:9
147:7,8,14,22
five 92:6 119:6,10
119:11
five- 8:10
foc- 158:2
focused 158:2
FOIAs 72:6
fol- 157:9
folks 70:2 105:20
106:8 107:11
follow 59:3
following 33:21
35:15 82:15 93:18
100:12,16 110:20
136:18 150:15
follows 6:13
force 35:21 36:9
46:13 74:8 103:6
138:3 141:4
foregoing 161:6
foresee 36:9
form 29:22 96:15
116:2
forth 16:21 17:10
22:7,22 29:20
113:20 129:3
131:13
forward 3:3 5:19
5:21 6:1,2 38:4
101:9 117:5 141:6
143:16 145:6
149:16 155:19
found 114:2
Foundation 3:3
four 119:10,11
frame 59:13 62:10
80:7
freeze 153:16

front 81:18 93:3,5
113:2 122:2
FTE 85:1 88:2,17
fulfill 18:7 20:12
24:4,8 36:4 44:9
51:6 129:15 143:7
fulfilled 77:10
fulfilling 20:17
22:11,16 45:7
117:19
fulfillment 20:21
22:7
fulfills 24:6
full 6:19 65:19
70:15 76:6 119:2
144:19 146:16
full-time 60:7
85:12
fullness 120:17
fully 7:15 40:20
74:7 138:4,10,18
138:19
func- 64:2 99:1
function 49:15,18
50:7 51:10,20
53:17 62:14 65:11
76:7 77:14 87:21
87:21 98:12 139:8
140:4 145:5
156:10,12,13
functioning 25:20
functions 20:14
26:1 35:22 41:8
41:21 42:4 44:10
44:18 48:21 49:16
51:9,12,15,17
52:2 54:5 55:7,13
55:16 64:3,4,4,14
65:3 66:5,22 67:2
67:3,7,9,17 68:10
68:19,21 69:3,5
69:18 71:7,10,21
72:2,3,5,5,9,12,16
72:18 73:16 74:10
75:14 76:7,8,9,10
77:15,15 79:6,8
81:10 83:3,21

84:1 85:3,5 87:22 90:5 94:2 98:1,8 98:16 99:1,3,5,7 100:2,12,17 101:16 106:1,4 107:6,13 108:19 108:21 109:1,3,5 109:6,7,9,10,11 113:10 119:17 120:20 121:1,6,9 121:11,13,16,20 129:9 130:8,14,16 131:4,9 138:15 139:2,22 140:2,10 140:11 142:1 143:8,17 150:7,15 151:4 153:10 154:3,17 155:12 155:15 156:4 158:6,18
**fund** 135:5
**fundamental** 19:16
**funded** 134:22
**funding** 134:6,18 134:19 135:1,2 149:11 150:6 151:7 154:2
**funds** 18:3,8,12 27:21 132:7,10,11 132:13,15,16,22 133:11 134:4 147:5,19 148:2,5 148:7,10 151:20 152:2,4,6,14
**further** 128:10 159:17 163:10,13
**future** 139:17 143:20 145:18
**FY** 128:9 132:15

**G**

**GAO** 72:6
**gather** 116:4
**geared** 70:6
**general** 13:8 113:5 113:7 121:11 129:9 136:7

**generally** 121:12 129:8
**geographic** 40:2
**gestures** 7:8
**getting** 137:20
**Gitomer** 3:7 4:3 5:18,18 6:15 9:10 13:10 16:17 30:1 34:6,11,12 43:4,7 46:16,19 58:15 59:1,2 64:6 65:6 65:15,21 66:2,7 66:14,15 94:8,11 96:16 106:17 107:2 109:14,17 110:14 112:14,15 117:9,14,22 118:13,19 126:7,9 126:21 127:4 131:17 132:1 135:7,10,14,16 142:12 144:1,3 154:20 155:9 158:20 159:18
**give** 7:7 31:16 94:19 135:11,17 149:8
**given** 18:8 45:22 64:8 111:8 127:15 127:20 138:3 161:8
**go** 8:1 11:12 19:5 42:10 63:6,10 84:1 101:10 102:15 106:17 115:2 117:5 118:13 121:19 131:16 141:1 144:8 153:14 155:3 159:20
**goes** 89:3
**going** 8:9 16:18 36:15 37:15 58:1 58:18,21 64:3 81:21 82:1,2 101:9 106:22 114:9 115:3 117:1

118:14,17 122:13 132:2 133:5,6 135:19 140:2 143:15 150:9 153:4,21 155:4,7 156:2,19 159:21
**good** 6:16,17 58:16 131:21 147:18
**goodness** 92:1
**government** 9:14 13:6 29:1,8 141:3 153:16
**governmental** 30:6
**Governor's** 105:14
**grade** 41:1
**great** 64:21 155:2
**group** 46:1
**guess** 9:14 133:1
**guidance** 80:22

**H**

**H** 3:7 4:7 162:1
**ha-** 39:17 155:10
**halfway** 128:16
**halt** 127:16 128:9 149:14
**hand** 16:12 137:19 163:16
**handed** 16:19
**handful** 111:11
**handled** 150:10
**happen** 36:2 62:5
**happened** 62:2 91:13
**happening** 27:2 46:14 109:7,8
**hard** 130:19 156:18
**hea-** 128:6
**head** 16:7 58:8 77:6 77:6,11 96:1
**header** 9:5 64:9
**headers** 128:6
**health** 12:16
**heard** 102:1 103:19 130:6
**heavily** 70:5
**held** 2:9 5:8 13:17

14:4 27:3 46:11 67:3 98:11 100:21 101:2 103:16 160:1
**help** 15:10 37:2 70:17 98:4 105:16 108:4 116:10
**helpful** 92:3
**hereto** 2:14
**high** 18:19,21 19:6 20:8 102:19 103:1 103:4,14
**high-quality** 19:6
**highlighted** 98:21
**hire** 146:9,10,12 153:13,20
**hired** 145:17
**hires** 145:19 153:18
**hiring** 28:7,9 29:3 73:19,22 74:5 94:4 105:17 107:20,21 108:12 112:20 121:5 146:20 153:16,18 156:7 158:2
**hold** 81:21
**hour** 8:10,11
**hours** 119:4,6,10 119:11 133:8,8
**HR** 72:5
**human** 13:19,20 14:3,8,9,12,13,21 14:22 19:3 28:10 74:16 84:5,5,11 89:10
**hundred** 82:12 107:3
**hypotheticals** 70:10

**I**

**idea** 128:15
**identification** 9:9 16:16 46:18 94:10 109:16 123:16 127:3 135:9,13
**identified** 29:1 34:2

91:3 98:7 104:11 117:10 134:6,17
**identify** 141:4
**IE-** 28:8
**IES** 10:20 15:15 16:1,3,22 18:1,21 19:5 20:9,13 21:20 24:4,6,14 24:18 25:6,8,14 26:20 27:1,12,15 27:17,20 28:8,18 29:20 30:2,3,5,16 30:17 31:14,18 33:7 34:20 35:14 35:15,17 36:16 37:9 42:1,6 45:7 45:19 46:3,14 50:12 51:12,15 52:10,14,22 53:6 53:7,8 55:1,17,20 58:10,13 63:16 64:5 67:8 71:1,2 71:10,21,22 72:20 73:5,10,16,19 75:14 76:6 77:7 77:12,16 79:7 82:10 86:4,5,8,10 86:13 87:2,3 91:9 91:12,19 96:2,8,8 98:22 99:1,8 100:15 102:19 104:8,14,20 105:5 107:17,17 108:4 108:20,22 109:3 109:12 110:15 113:16 115:10 117:11,19 121:8 121:14 123:16,20 124:6,13 126:1,10 126:12,13,19 127:16 129:1,9,12 129:15,17 131:11 132:4,9,11 133:3 133:4,16,22 134:22 135:22 136:2,4,8,10,16 136:19 137:1

139:5,5,9,10,12 139:14,21 140:9,9 140:10,13 142:4,7 142:15,17,19,21 143:19 144:6,11 144:19 145:2,14 145:17 147:7,20 148:2 149:10 150:3,6,8,12,16 151:3 152:8,14 153:10,22 154:2 154:12,16 155:11 155:14,19 158:14 158:17

**IES's** 15:4,6,7 20:11 23:19 24:2 38:9 64:13 65:2 66:21 97:16 120:12 137:9 143:8 147:12

**IES-specific** 72:15 129:4

**im-** 96:2

**impact** 20:11 30:15 58:7 64:12 65:1 65:10 66:4,21 96:9 97:15 102:22 108:15 126:19 137:22 138:6,7

**impacted** 21:4 41:5 58:1 93:21 96:3 123:2 137:9 153:4 156:18

**important** 7:7,8

**impression** 150:10 150:14

**improve** 123:20

**in-** 31:14

**inaudible** 65:5,14 66:13 118:12 142:10

**include** 9:16 43:12 43:17 62:16 89:15 89:19,22 90:4 100:1 113:8 139:5

**included** 35:20 50:14 56:9 107:12

**includes** 74:14 134:19 153:21

**increased** 147:20 148:16

**independently** 131:8

**INDEX** 4:1

**indicate** 47:13

**indicated** 9:14,14 47:11 123:17 124:6

**individual** 21:17 31:11 39:11,16 49:8,9 79:5 101:7 115:5,7 117:10 121:9,15

**individual's** 49:6

**individually** 96:2

**individuals** 20:9,15 20:18 21:15 25:12 34:7 43:17 46:1 49:4 50:2,5 54:8 55:6 67:15,18 70:8 74:5 83:1,3 90:19 95:10 96:7 96:9,21 97:1,2,14 105:11,15 107:9 107:12 112:19 142:6,14,20,21 143:16 146:19 153:17

**influence** 17:11 35:14,16

**inform** 15:10

**information** 38:17 39:14 41:6,7 44:2 50:10 55:16 63:11 110:18 116:4,11 116:14,19 121:8 124:5,18 136:11 136:16,20 137:1,6 137:10,14,20

**informs** 24:10

**initial** 94:16 127:12

**initially** 38:12

**initiate** 36:20

**insight** 26:17 44:5

**institute** 1:9 10:20 18:18 19:15,19 132:7

**institutes** 20:3

**instruct** 63:19 142:9

**instructing** 66:9

**instruction** 65:4 127:15,20

**instructs** 7:22

**integrity** 18:19,22 102:20 103:1,5

**intended** 36:4

**intends** 100:17

**intent** 90:15,21 91:13 94:17,18 95:21

**intents** 91:18

**interested** 163:15

**interim** 140:6

**internal** 9:2 63:19 66:11

**interrogatories** 4:18 81:19

**interviews** 89:15

**involve** 37:13 93:18

**involved** 21:20 30:15,18 31:14,18 46:5,9,12 52:11 53:1 54:10 56:1 66:4 67:5 68:8 80:14,16,18 81:9 91:20 92:4 100:20 115:14 151:11 155:17 157:20 158:3

**involvement** 26:22 29:17,21 33:10,13 155:16 158:1

**issues** 54:17 75:3

**J**

**J** 4:12 46:16,17 71:4 76:12,16,17 95:8,9 96:6,7

**J-A-C-Q-U-E-L-...** 6:21

**Jackson** 6:5 34:9,9

**Jacqueline** 1:14 2:9 5:5 6:9,20 160:3 161:5

**January** 17:5 24:15 25:1,2,3,4 49:22 50:3,8 54:16,20 61:9 147:17

**Jason** 3:20 5:11

**Jeaninn** 1:19 2:14 5:13 163:4,19

**Jessica** 3:21

**JO** 48:13

**job** 1:20 83:13 85:12 87:8 89:19

**jobs** 87:18

**join** 13:11

**joined** 6:5 13:9 50:3

**Jonathan** 25:13,19 38:16 71:4,16 72:11 96:19 127:9

**June** 13:15 157:11

**Justice** 3:13 6:4

**K**

**Kaufman** 3:9 5:22 5:22

**Kayla** 3:9 5:22

**keep** 36:15 37:15 74:19 77:14 115:3

**keeper** 42:10

**Kevin** 6:5 34:10

**kind** 72:11

**knew** 138:21

**know** 7:16 8:6,9 10:16,18 13:14 20:14 23:2 26:7 26:13,15 31:4 37:7 44:7 46:10 56:15 57:22 67:6 70:22 71:3,12 73:19 76:18 78:1 81:7,21 86:21 87:1,22 96:2 97:11 100:16,16 107:19 110:21

**111:14 114:7,10** 116:9 118:6 120:21 121:4,20 124:1 125:17 126:7 128:5,11,14 130:13,15 132:14 133:4 139:14 146:6 148:11,19 149:20 155:15 156:2 157:18,19

**knowledge** 19:7,16 22:18 33:9 43:16 46:12,13 50:18,20 53:12 70:3 96:6,9 96:11,13,17,18,21 96:22 97:2,4,22 99:18 116:4,6,8 117:1 118:3 120:11,18,22 121:10 124:7 125:12,17 127:21 131:12 145:19 148:1 158:8,10 159:11

**L**

**L** 3:14 4:13 94:8,9

**labor** 72:7

**laid** 36:21

**language** 18:9 122:5,18 123:16

**large** 145:22

**largest** 52:10 53:1 82:9

**law** 163:8

**laws** 19:2

**lawsuit** 10:17

**le-** 30:9

**lead** 29:1,13,14 30:18,20 31:8,13 34:2,15 45:5,11 48:2 53:4 77:16 77:16,17 78:2 79:11,12 80:9 98:3 103:15

**leader** 128:1

**leaders** 57:4 131:1

leadership 15:5
19:15,20,22 24:14
24:18 25:11,14,15
25:19 34:1 46:1
46:11 48:3,5,10
53:6,7,8 56:6,16
57:4,14 84:16
100:22 101:5,14
101:15 103:17
128:3 129:2,12,20
130:17 131:6
138:8 141:20
142:3,5 144:18
145:8 151:11,14
153:19 154:4
158:5
leads 34:13,14
lean 70:4
leave 55:7 59:9
133:7,10 135:4
led 72:11
Lee 3:21
left 25:7 77:5 80:3
98:17 147:7
legal 5:12 65:13
122:9
length 61:6
let's 15:4 21:12,12
21:15 24:14 25:3
30:9,9,9 33:16
35:13 36:15 38:6
50:22 64:7,7
69:19 76:11 78:12
78:13,13 81:22
82:4 83:11 101:20
102:15 106:17,17
109:14 112:16
115:17 118:13
126:7,21 131:16
135:7 147:4 155:3
level 78:4 115:14
121:3
levels 70:20 88:2,17
88:21 141:17
Levin 3:20 5:11
liaison 72:5
liberty 144:20

limited 69:5 116:22
120:11 154:3,4
LINDA 1:10
LINE 162:4
list 9:11 38:21
41:15,16,17 42:3
42:8,9,10,21 43:5
43:8,9 44:2,11,13
44:22 45:2,5,21
45:22 46:6 50:11
55:18 63:12,15
93:20 95:10,12,16
95:18 96:7 97:7
97:13 98:1,5,10
98:18,20 99:11
103:20 104:2,3
117:3 118:8
121:19 122:1,1,2
122:3,5,14 123:7
123:9,11,12,14
listed 8:20 44:17
123:3,4
lists 104:4
little 48:16 78:6
147:8
local 114:21 116:2
location 40:2 72:13
long 14:4 49:14
83:22 85:9 118:21
138:13 145:21
146:3,8
longer 60:5 108:19
109:8,12 157:7
longitudinal 110:5
110:11,15 111:2,8
143:20 144:5
145:15,17
look 23:5 35:19,21
36:22 43:6,9
50:21,22 64:7
69:6,8 70:9,16,19
76:11 102:18
109:14 110:3
111:15,16 112:13
126:21 127:5
128:5 133:1 135:7
138:10,11 139:1

141:12 145:3
156:20
looked 122:14
127:7,9 139:15
looking 73:8,9
76:12 81:1 83:18
83:19 103:11
108:2,6,11 149:21
looks 102:16
lose 55:11
losing 156:17
lot 25:22 142:2
157:3
lower 154:14
lunch 131:20 155:2

——————————
**M**
——————————
M 3:9 4:14 109:14
109:15
Madeline 3:7 5:18
maintain 65:12
makers 49:3
making 7:21 29:2
29:12 47:6,8
50:11 52:21 78:19
97:14 114:8
136:19 150:18
151:19
management 25:21
37:21 38:13 72:7
manner 36:1
manual 70:7
March 32:21 33:11
36:17 80:5 90:13
90:16,17,21 91:1
91:5,7,15,19
94:13,13,21
102:14 127:11
145:15
mark 25:5,17
marked 9:8 16:15
46:17 94:9 109:15
127:2 135:8,12
Maryland 1:1 2:12
material 38:3
Matt 24:20 25:7
27:13,20 38:9

46:11 56:6 74:17
77:16 93:19 94:20
96:18 105:16
108:2 114:5,10
115:11 121:4
126:18 127:7
128:15 129:4
130:18 131:5
137:12,15 139:14
140:14,16 141:20
142:2,16 143:6
149:15,19,20
151:13 152:1,4,20
152:20,21 155:16
156:1,19
matter 5:5 6:11
151:18
matters 151:21
MATTHEW 1:10
McGrath 3:8 5:20
5:20
McMahon 1:10
80:1
mean 21:5 31:21
40:11 51:5 63:2
67:10 69:7 77:18
101:3 119:8
121:22 122:21
124:15 148:20
meaning 122:18
means 47:17 67:14
128:11
meant 157:2
measure 155:11,14
measurements
158:9,17
measuring 155:20
meet 27:4 38:1 45:2
49:16 50:6 52:6
53:16 54:1,5,9,21
57:4 65:10 69:10
79:5,8 83:2 97:16
98:8,19 101:9,16
101:22 111:9
114:1 118:21
119:16 121:6,13
129:17,22 130:7

130:20 131:1
134:14,16 135:1
139:7,22 140:2,11
140:19 141:12,12
141:13,22 155:16
156:3
meeting 43:18
46:10 48:3,4,6,7,8
50:14,17 53:5
55:21 57:14
100:21 101:5,7
102:12,13 103:16
111:18 114:7,8
115:22 118:1
120:19 121:1,9,11
121:15 123:17
129:9,20 130:14
130:16 131:4,9
140:4,18 150:3
155:11 156:9,12
157:5 158:6,17
meetings 27:3
50:19 56:15,21,22
93:13 157:19
158:1,3,11
meets 157:18
memory 92:2
122:13
mental 12:16
mention 29:16 30:3
30:6 88:22 137:16
137:16
mentioned 20:8
34:19 38:7 39:1
39:13 40:6 41:11
44:20 51:17 59:6
60:14 61:11 63:13
68:7 73:1 79:3
80:8 93:12 99:20
103:19,19,22
105:20 108:15
109:10 113:11
114:17 125:20
130:10 136:14
142:22 146:20,20
148:12 150:21
met 41:9 46:3 65:8

81:10 100:4,12,18
111:20 112:3
118:8 140:10
155:14 156:13
**metrics** 158:9,17
**Mgitomer@dem...**
3:11
**Michael** 3:17 6:3
10:14
**Michael.bruns@...**
3:18
**Mid-February** 37:8
37:12,14
**middle** 63:7
**midst** 138:12
**million** 147:8,9,15
148:3,14,15 151:7
**mind** 154:22
**minimum** 154:16
**minutes** 6:7 154:20
154:22
**mission** 15:5,6,7,12
15:13,16,17,20,22
16:3,22 17:4,7,9
17:12,13,15,17,18
18:1,8,13,17,17
19:14 20:12,17,22
21:5,8,10 22:12
22:14,22 24:2,5,6
24:8 29:20 30:3,5
49:11 102:15,18
129:3,11,15,17
131:2,13,16 132:2
132:3,4 134:1,16
135:1 141:13
**mm-hmm** 9:17
15:3 16:11,20
17:19 18:4 20:10
21:14 24:16 29:10
30:12 31:12 33:18
34:21 38:8 45:20
48:14 49:20 50:13
52:5,18 56:19
60:13 61:10 63:8
64:11,15,17 70:11
73:2 75:12 76:13
78:15 79:4 80:10

82:5 86:7 88:9,20
95:3,14 98:6
99:13 106:9
108:17 112:1,21
113:14 114:16
115:21 117:8
119:3 122:20
127:14 128:19
130:9 134:5
139:20 146:22
147:10 152:10
158:4
**moment** 52:9 93:11
94:19 127:5
135:11,17
**money** 133:16
134:10,13,15
148:18,20 151:10
151:15 153:10
154:16
**Montgomery** 12:15
**month** 59:11
**months** 85:13,14
86:10 89:4 90:7
**Morgan** 60:17,21
63:2 80:18 81:8,9
**morning** 6:16,17
95:15
**move** 15:4 112:16
126:8 141:6
149:16
**moved** 38:4 150:16
**moving** 145:6
155:19
**multi-year** 147:19
148:5
**multifaceted** 74:12
**multifold** 69:15
**multiple** 62:15 71:5
71:6 120:22
156:19
**multiyear** 27:20
132:11

—————————
**N**
—————————
**NAEP** 23:20 26:4
83:10 99:7 105:6

107:5 114:11,14
114:17 124:10,14
125:1,9,19 130:10
**NAGB** 105:13
106:8 107:9,11
**name** 5:11 6:19,20
25:5 31:9,17,21
60:15 81:7 92:1
105:15
**named** 31:11
**names** 31:4,5 34:8
43:17
**national** 19:15,19
19:22 25:9 50:22
53:15 54:2 105:13
109:19 129:2,12
129:20 132:6
134:3,7,14
**nationally** 24:10
**NCE** 26:3
**NCE-** 106:12
**NCEE** 76:18,20
77:4,10,11,16,17
77:18,19 79:6
**NCER** 51:7 52:4
53:17 54:4 97:3
**NCES** 25:9 26:3
73:20 82:4,6,15
83:2,2,10 99:6
105:6,13,16,19
106:11,12,15
107:3,9 108:11
110:1 111:9 112:6
112:8,19 113:3,9
113:10,10,19
114:2,6,19 115:19
115:22 116:13
117:6 146:20
156:6,9 159:5,8
**necessary** 45:1
53:16 54:1,9,21
87:18 90:3 110:6
110:12 134:17
135:1 142:6,14,21
143:15
**need** 8:8 39:5 40:7
72:15,19 85:1

118:12 132:6
141:21 153:14
154:17,20
**needed** 39:8,13
44:7,9 65:9 72:18
87:7 98:8 101:22
105:11 134:7
139:3
**needing** 154:4
**needs** 18:12 79:15
134:3,8,15 140:13
**never** 7:3 65:8
**new** 3:4 5:8 7:1,10
85:5 112:20
**Northwest** 3:14 5:9
**notary** 2:15 163:4
**notes** 11:5 154:21
**notice** 4:9 8:18,20
38:12,12 64:8
65:7 90:15 91:4
91:14,15 94:16,16
94:17,18 102:14
113:13 115:3
127:13 128:10
144:9
**noticed** 9:11 66:8
**noticing** 58:15
**notified** 90:19,22
**November** 4:16
14:7
**Nugent** 3:10 6:2
**number** 1:6 18:18
64:12 67:14 76:15
77:3 85:1 110:4
119:16 126:17
132:3 136:10
144:10
**numbers** 9:5

—————————
**O**
—————————
**oath** 2:16
**obje-** 65:12
**objection** 7:20,21
29:22 63:17 65:4
96:15 142:8
143:21
**objections** 4:17

65:12
**obligated** 147:16
148:8
**obligation** 36:5
130:20
**obligations** 22:7,17
45:7 49:10 52:6
54:1,9,21 55:21
97:16 101:8
117:19 118:7
150:4
**obtain** 12:16 37:17
37:18 40:22 41:16
120:18 121:8
**obtained** 38:4
41:16,17
**obtaining** 124:7
**occasion** 28:10
**occur** 111:15
**occurred** 56:12,15
57:17,17,20,21
68:20 90:18
152:22
**October** 4:14 62:11
147:16
**office** 13:21 14:19
26:19 27:20 28:1
28:10 32:15,17
33:19 34:17,18,22
35:8,11 37:21
38:11 39:9 42:12
44:16 45:5,12,14
45:22 48:1,13
49:1 51:6 52:7
53:4 54:2 58:7
60:9,10,12 61:7
63:13 67:4 68:22
71:8,15,16,17,18
72:9,10,11 75:9
77:13,20 78:10,12
79:12 81:1,4,11
82:22 84:4,5,11
87:22 89:3,7,10
92:17,21 93:4,5
98:2 100:16,22
101:5 102:1,2,21
103:3,15 111:7

121:2,2 123:3,19
124:9 127:22
137:21 138:8
140:12 142:18
150:15,17 151:2
151:17 152:2,8
153:14,21 155:17
157:5,16
**officer** 13:19,20,22
14:2,3,8,9,12,13
14:21,22 115:12
151:1
**offices** 52:14,16
58:1 68:20 71:6
75:20 97:13
103:11,12 153:4
**officiated** 2:16
**Oglesby** 45:18
79:10,18 82:21,21
**Oh** 92:1 110:10
112:14
**OIG** 92:5
**okay** 5:22 7:3,12,14
8:12,17,20 9:7,21
10:2,4,5,10 11:1
11:11,15,18,21
12:2,5,8,11,11,14
14:15 15:1,4,12
15:16 16:2,8,10
16:14 17:4,7,12
17:17 18:16 20:15
20:20 21:12 22:1
22:3,13,19,19
23:6,8,17,17,22
24:4,13,14 25:14
26:5,9,18 27:14
28:7,13,21 29:4
29:16,19 30:5,20
30:22 31:3,6,16
31:17,21 32:3,5,8
32:16 33:1,4,12
33:15,16 34:5
35:9,13 36:2,13
37:3,9,12 38:6,15
38:17,20 39:1,10
39:13,22 40:4
41:2 43:3,12,20

44:17 45:19 46:5
46:15 47:2,4,13
47:21 48:4,8,12
48:15 49:3,19
50:2,5,18,21 52:4
52:9,21 54:13
55:1,5,20 57:10
57:16,19 58:15,17
59:5,14 60:2,7,9
60:21 61:2,6,8
62:1,13 63:2,5
64:18,21 66:14
67:10,19 68:4,7
68:12,17 72:22
73:14 74:4,19
75:7,7,20 76:11
76:17 77:1,4,20
79:1 80:8,13,18
81:6,12,17 82:3
82:14,21 83:11,15
84:12,14,18,20
85:8 86:12,15,19
86:21 87:2,6,17
88:4,8,18 89:4,13
89:19 90:4,7,10
90:22 91:11,17,22
92:6,10,11,18,20
93:11,11 94:8,18
95:20 96:20 97:6
97:9,14 98:13,18
99:11,19 100:8,15
102:3,9,11,15
103:18 104:5,14
106:19 107:3,12
107:16 108:9,15
109:5,13 110:3
111:4,22 112:12
112:18 113:2,11
113:19 114:12,19
115:2,13 116:12
116:21 117:4,7
118:13 119:15
120:1,3,6,8,10
121:18,19 122:8
122:10,21 123:9
123:13,15,19
124:17,20 125:1,3

125:16,21 126:3,3
126:6,10,20 127:1
127:10,15,22
128:4,16 129:1,1
129:7 130:4
131:11,16 132:9,9
132:18 133:18,22
134:10,21 135:6
135:17 136:2,10
140:8,21 142:11
143:7,13,19 144:1
144:8,14,17
145:11,13 146:8
146:15 147:4,14
147:20 149:3,6,10
149:22 151:3
152:13 153:9,12
154:1,6,12,19
155:10 156:14,21
157:8,12,15,15,21
158:16 159:18
**one-and-done**
56:14
**ones** 20:20 111:13
116:17
**openly** 101:2,19
**operating** 27:5 86:2
86:3
**operation** 71:18
**operations** 13:21
14:19 150:17
**opinion** 75:11
**opportunity** 152:21
**opposed** 10:3
**optimization** 141:5
**option** 143:5
**oral** 6:10
**order** 28:20 29:5,7
30:11,14,19 33:17
33:21 34:3 35:3
35:15,17 36:3,21
37:16 39:5 40:5
45:11 54:21 76:3
78:3 141:1,2,11
**orders** 36:7 154:11
**organization** 35:19
48:20 49:14,15

57:6 58:6,8 69:16
70:9 72:19 83:21
84:13 85:2,3
98:15,17 108:3
115:20 139:1,2,15
139:16,21 140:14
141:4 149:21
156:21
**organizational**
11:16 37:20 40:2
46:21 47:5,7,9
50:21 57:13 58:7
101:1
**organizations** 37:1
62:15 81:3 82:9
139:4
**outcome** 163:16
**outlined** 19:18 99:6
**outputs** 125:3
**outreach** 20:1
**outside** 62:16 71:22
84:8 150:16
**oversee** 145:17
**overseen** 84:10
**oversight** 22:10

**P**

**P-O-C-S** 27:6
**P-R-O-C-E-E-D-...**
5:2
**p.m** 94:21 155:5,8
159:22 160:4
**pace** 104:19
**page** 4:2,8 9:4,4,16
9:22 64:9 110:3
151:20,21 162:4
**pages** 9:5
**Paralegal** 3:21
**part** 18:12 20:15
23:19 24:2,4,6,18
24:20 37:9 41:7
42:12 46:21 56:4
65:7 73:5 88:3
104:8 109:20
114:14 129:11
134:18 137:14
141:18 142:9

143:6
**parti-** 74:10
**participating** 2:10
**particular** 58:7
70:3,4 71:5 72:9
76:4 83:20 87:21
89:3 96:10 103:11
105:6 108:8
**particularly** 28:17
70:18
**parties** 2:10 163:14
163:15
**parts** 138:19,20
**pause** 149:14,17
**paused** 150:3
**pay** 133:9,10 135:3
**payout** 133:7
**payroll** 133:20
134:19 135:2
**PC&B** 133:20
**peer** 50:16
**Peggy** 25:8 26:2,3
97:3 124:19
**penalty** 12:9
**pending** 6:11
**people** 76:18,20
78:12 79:3 83:13
87:7,18,20 103:11
105:12,18 107:4,4
107:4 127:16
138:14 143:7
153:13 156:19
**perceived** 38:22
**percent** 21:20 22:2
22:3 126:11,12
132:21
**percentage** 52:10
53:1 132:14
**perfect** 40:18 76:17
**perform** 41:21
48:21 67:8 68:21
76:6 98:15,22
99:9 101:4 108:4
108:4 113:9
138:14 139:8,8
**performance** 39:8
39:11,16 40:18,21

49:6 54:17 72:7 90:1,2
**performed** 71:5 73:9,10 94:2 104:15 108:19,22 109:3,12 123:4 139:3 145:5
**performing** 24:11 49:9,17 74:11 99:4
**performs** 104:20
**period** 133:13 139:18
**peripheral** 116:8 126:18
**perjury** 12:9
**permitted** 150:7 151:4 154:2
**pers-** 130:17
**person** 2:10,11 7:2 39:9 112:6 119:13 153:7
**person-level** 95:15 97:7
**personal** 68:1
**personally** 163:6
**personnel** 28:11 37:19,21 39:2
**perspective** 74:16
**place** 25:5,8,11 36:17 47:12,14 54:6 55:13 57:1 67:13 68:16 78:2 78:2,19 87:4 90:13,15 94:13 103:6 116:7,9 129:18 138:17 153:16 157:7 163:7
**plaintiff's** 4:9,18 135:12 159:4,7
**plaintiffs** 1:6 3:2 5:19,21 6:1,2
**plan** 8:9,21 139:21 140:22 141:19 153:18
**planned** 138:16,20

145:18 148:7
**planning** 25:22 37:4,5,10,12,13 38:14 90:10
**plans** 91:2 141:8,16 142:5,8 144:10
**play** 137:13
**please** 5:15 6:18 7:15 8:9 66:16,19 66:19 83:6 93:11
**POC** 27:9,11 37:20 38:7 46:11 48:3,5 56:15 57:4 84:16 85:21 86:1,4,5,8 86:10 89:17 100:22 101:6,13 101:15,18 103:17 104:11 146:9 150:22 153:15
**POC's** 101:3,7
**POCs** 27:6,9,10 35:10 37:17,18 41:14,18 44:6 52:16 56:9 68:18 68:20 91:19 92:2 92:4,12 122:4 133:19 139:9 150:20
**point** 8:4 28:18 56:10 79:22 112:19 128:21 131:19 146:9
**pointed** 71:16
**policy** 15:10,11 33:2 75:10 94:1
**political** 32:1,6,9 32:10,11 59:16 60:6 61:15 62:17
**portion** 147:18
**position** 7:3 14:1 22:11 32:13 39:6 41:3,4 42:18 49:22 52:4 53:14 53:21 54:8 62:13 74:8,10 85:17 87:22 91:3 108:1 108:1 118:5,10

**positions** 13:17 14:5 20:19,20 21:4 49:7 74:18 83:22 85:1 91:5,7 108:13,14 138:14 143:4 147:2
**possible** 134:16 136:21 137:5
**post-administrat...** 24:22 26:10
**post-RIF** 140:10
**posting** 51:14
**potentially** 85:4 108:18 119:7 137:11 146:14 149:14 157:10
**practitioners** 136:7
**pre-administration** 25:1
**pre-K** 110:20,20
**pre-RIF** 140:9
**precedes** 29:18
**preference** 39:7
**prepare** 11:7 12:3 118:21 119:15 121:14 129:14 144:14 145:9
**prepared** 64:18 68:5 118:7 129:8 129:16 130:6
**preparing** 11:4 121:7 123:10 125:21
**prescribed** 30:19
**present** 3:19 34:9 158:12 159:14,16
**presenting** 158:9
**pretty** 21:9
**previously** 63:22 83:1 88:11 105:19 106:10 150:22 154:14
**Pri-** 53:19
**primarily** 15:8,13 15:17 25:12,16 26:2 80:21
**principal** 13:20

14:1,6,16 27:5 86:2,3
**prior** 13:6 27:17 30:8 53:13,20,21 54:7,15,19 74:6 78:7,7 82:7 86:13 87:12,19 92:12,16 96:3 102:14 111:22 132:19 138:16 140:17 141:22
**priorities** 15:19 16:4,7 26:20,22 27:7 69:11,17 70:5
**priority** 17:10,14 135:22
**privilege** 65:13,13 65:16,19
**pro-** 54:7
**probably** 58:16 74:12,13 128:14 147:18 157:10
**problem** 106:14
**proceed** 8:9 81:5 102:2,10
**proceedings** 163:12
**process** 37:13 41:8 63:7 64:22 65:5 65:16,18 66:10,16 66:20 67:6 68:4,5 68:8,9,22 87:17 87:20 88:5,7,8,10 88:13 103:7 147:1
**produced** 46:21 89:6
**producing** 130:5
**production** 36:9
**products** 84:21
**professional** 12:12
**program** 83:19,20 83:22 115:9,11 122:12,14,17,22 123:1,3,3,5
**programs** 103:10 104:1,6,7,12 123:16 151:8

**progress** 110:7,13
**promulgated** 83:20
**properly** 40:7
**proposal** 145:22 146:1
**proposals** 123:20 145:15
**provide** 19:15,19 19:22 44:2 74:16 129:2,12 137:5 150:19
**provided** 38:20,21 45:19 55:17 56:18 66:3 93:21 97:9 116:14 118:8
**providing** 46:6 80:22 137:1,3
**provision** 16:21 118:1 135:20,21
**provisions** 43:13 44:4 45:2,21 46:6 50:12 63:12 98:20 99:12 103:20 118:9 123:17 129:10
**psychology** 13:3
**public** 2:15 19:11 20:2 136:5,7,11 136:17 163:4
**publicly** 24:11
**published** 145:14
**pull** 39:14 40:6 41:6 126:22
**pulled** 37:19 39:2,9
**purpose** 69:8,13,14 69:15
**purposes** 41:6 69:9 91:18 131:17
**pursuant** 2:11 33:17
**pursue** 12:17 13:3
**pursued** 36:1
**put** 21:12 81:17 85:7 145:21 150:1 150:1
**putting** 22:3

**Q**

**qualified** 107:17
**quality** 18:19,22 20:8 102:20 103:1 103:5
**quantity** 126:13,19 130:2 154:12
**question** 7:10,11,15 7:20 8:1 54:11 127:19 128:14 129:5 146:7 159:10
**questions** 9:13 94:6 158:20,22 159:7 159:17

**R**

**R** 4:15 126:21 127:2 162:1,1
**Rachel** 45:18 82:21
**raise** 101:15
**raised** 101:18 102:4 130:21
**rate** 147:20 148:3 148:16
**rationale** 52:13
**re-** 23:5 67:12 100:1
**re-skill** 69:20 70:7
**re-skilling** 35:21 69:22 70:14,15 72:22 75:8 85:5 108:2 143:2
**read** 94:19 110:4,8 123:14 161:6
**reading** 111:1
**realignment** 143:2
**really** 25:20 124:6 148:6
**reason** 22:15 46:8 73:5 162:4
**reasons** 70:13 73:4 73:4
**reassess** 149:16,22
**recalibrate** 156:22
**recall** 8:19 11:19 25:5,6,10 31:8,17

32:18 48:7 59:12 82:8 87:3 95:12 110:19 111:2 125:19 159:4,6,10
**receive** 124:12
**received** 44:22 50:10 97:13 101:1 101:1,19 124:10 124:14,18 133:20
**recess** 58:20 106:21 118:16 155:6
**recited** 2:13
**recognize** 130:1
**recommendations** 41:19 101:12 153:3,5
**recommended** 53:10
**record** 5:16 6:19 7:22 28:18 34:6 46:22 50:18 53:10 56:18 58:18 99:16 106:17,20 107:1 118:11,13,14,18 155:3,4,8 159:20 159:21 160:1 163:12
**recorded** 163:11
**records** 58:22
**red** 47:11,11,13,16 47:22 54:16 98:21
**reduce** 141:11
**reduced** 55:2 109:3 141:13
**reducing** 76:4 111:10
**reduction** 35:21 46:13 67:12 74:8 103:6,13 138:3 141:4
**reductions** 129:18
**redundant** 85:4
**reevaluate** 149:15
**reexamination** 144:11,19 145:6
**refer** 27:5 81:8
**reference** 46:20

**referenced** 30:13 37:16
**references** 136:6
**referred** 28:11
**referring** 80:11 102:12 127:17 159:14
**reflected** 66:12
**reflection** 147:12
**reform** 15:14 114:22
**regarding** 27:14 145:15
**regardless** 65:20 153:4
**register** 144:16 145:2
**regular** 157:19
**regularly** 155:16
**regulations** 36:7 40:10 143:3
**reimagine** 145:2
**reinstate** 111:17
**reinstated** 23:15 120:7
**reinstatements** 111:19 112:4
**related** 29:12 104:12 122:3 144:11 156:6 163:15
**relates** 29:3 34:3 104:22
**relations** 72:8
**relationship** 19:4
**relying** 131:5
**remained** 76:20 82:17
**remaining** 14:10 129:18 157:1
**remember** 8:5 13:14 31:7 78:7 80:6 102:13 105:14 124:10,11
**remind** 67:19 86:1 102:11
**reminder** 125:13

**reorganization** 138:16,20 139:6 139:10 140:20,22 141:5,19
**reorganize** 37:2 138:11 141:9,16 142:17
**reorganized** 139:16
**reorganizing** 138:5 140:1,11,15,17
**repeat** 53:18 159:6
**repeatedly** 45:10
**rephrase** 23:21 66:18
**replaced** 73:17,20
**replacing** 74:4
**report** 4:16 43:8 84:22 85:7 99:20 99:22 100:1,7 110:6,12 124:16 125:1 126:3
**Reported** 1:19
**reporter** 1:19 2:15 5:13,16 7:6 12:18 12:22 16:13 110:8
**REPORTER'S** 163:1
**reports** 125:4,22
**represent** 16:18 135:19
**representation** 158:7
**representations** 131:5
**representative** 74:22
**represented** 10:10 147:6
**representing** 10:13 120:19
**request** 38:1 68:18 145:14
**requested** 41:14
**requests** 72:7
**required** 50:12 87:13 88:3 111:16 113:9 117:17

**requirement** 38:2 101:11,12 111:10 115:22 118:2 122:12 123:2,4
**requirements** 10:21 23:13 37:19 41:15,18 42:11 44:6,8 51:7 76:2 81:2 83:9,10 99:6 101:22 103:10 104:3,11,12,22 108:5 109:2 111:18,20 112:3 113:17,20 114:1 117:12 122:4 139:8 140:18,19 157:6
**res-** 113:15
**rescale** 69:10,18
**research** 1:4,5 5:6 15:9 16:5 17:11 18:1 19:7 24:2 33:5 51:1,14 53:16 54:3 81:13 81:15 123:21 132:4 134:2 154:13
**researchers** 20:2 136:7
**reserved** 160:2
**resources** 28:10 84:5,11 89:11 136:21
**respect** 35:13 44:3 91:12,19 116:12 129:10
**respective** 35:10 41:15 98:14 104:11 154:8
**response** 38:20 81:18
**responses** 72:6,6 81:19
**responsibilities** 23:19 77:10 115:9 121:16
**responsibility**

42:14 45:6,9
129:2
**restructure** 69:16
138:22 156:22
**restructuring**
35:20 36:22 69:9
76:4 80:22 138:5
140:20 141:5,12
143:1 150:18
**resubmit** 141:8
**result** 47:9 92:19
**retirees** 133:6
**retirement** 133:9
**RETURN** 162:3
**reveal** 63:18
**revealing** 10:15
**review** 11:7 41:17
67:2,6 68:19 69:3
76:1 103:9 104:1
104:7,9 105:11
120:14 123:9
125:3 135:11,17
154:21 155:1
**reviewed** 8:17 11:9
68:10 98:1 120:15
120:16 123:6
125:1,8 126:1
**reviewing** 33:7
55:15
**reviews** 89:19,22
90:4
**revised** 23:4
**revisiting** 74:20
**Richard** 42:16,17
42:19 44:20 45:19
68:11
**RIF** 20:11,16,18,18
21:4,11,12,21
22:3 36:7,16,20
37:1,4,9 38:5 39:5
39:8,18 40:3,5,7
41:6,7,20 44:3
47:6,8,9,14,14
49:4,5,5,6,8 52:11
53:2,13,21 54:4,6
54:7 55:10 57:12
57:17,20,21 63:7

63:11,14,16 64:13
65:2,10,22 66:2
66:17,20 68:20
69:4,6,8,13,14,15
73:5,12 75:17
76:21 78:7 80:16
81:5 82:7,15
86:13 87:19 88:3
88:3 90:10,13,15
90:18 91:2,20
92:12,16,19 93:12
93:17,18 95:6,11
95:16,20,21 96:3
96:4 97:15 100:12
100:16 101:13
102:2,22 104:8,15
105:1,4 106:16
107:3,12,22,22
108:15,20 126:10
126:12 130:19,19
132:21 133:2,3,5
133:5,15 136:14
136:18 137:9,22
138:17 140:17,22
141:9,18,18 143:1
143:4,16 150:15
152:7,8,14,20,22
153:2,4 155:10
156:18,20 157:9
**RIF'd** 47:19,22
48:18,19 51:2
75:20,21,22 91:12
94:1 105:18
**RIF's** 97:15
**RIFs** 10:3,19 39:10
42:22 47:12 58:9
58:9 87:3,12
94:12 98:8 134:11
134:16 139:19
**rift** 57:17 100:16
**right** 12:22 13:1
19:12 21:18 35:5
40:21 60:19 65:9
70:6 73:19 77:2
79:16 82:2 88:16
89:9 100:10
105:11 109:18

114:15 115:19
118:20 129:7
131:15 138:12,14
138:14 144:21
150:13 153:17
157:9,14
**role** 26:3 36:1,6
62:15,21 63:3
78:19 80:20,21
108:9
**roles** 16:3
**room** 6:7 27:4 34:7
101:2,14 130:22
**Rosier** 112:17
119:19,22 131:20
146:7
**rule** 4:9 152:17,19
**Rules** 2:11
**run** 39:8

---
### S
**S** 4:7 162:1
**sake** 40:17
**salary** 133:14
**sat** 96:19,22 97:1,3
**satisfies** 117:21
**saw** 42:9
**saying** 77:14 81:6
110:9 116:16
117:14 125:15,17
149:13
**says** 9:6 17:22
18:11 128:7,9
133:22 136:1
146:9
**scale** 67:9,11,14,17
**schedule** 32:2,11
59:16
**Sciences** 1:9 10:20
15:14 25:10
**scientists** 70:18
71:11 73:1,18,21
74:1 108:8,10
112:20 146:21
156:8
**se** 35:17
**seal** 163:16

**second** 21:13 31:16
106:18
**secretary** 13:21
14:2,6,17 15:18
16:6 25:21 26:19
33:20 34:17,18
35:12 38:13 42:20
45:5,12,15,22
48:2,13 49:1 53:4
60:11,12 61:7
63:13 67:4 68:13
68:15,22 69:1
77:13,21 78:2,6
78:11,13,14,18
79:12,19,21 80:1
80:1,2,2,3,4 81:1
81:4,11 82:22
92:21 98:2,2
100:17 102:21
103:3,15 111:7
121:2,3 123:19
124:9,22 125:19
127:22 137:21
142:19 151:17
152:3,8 153:15,21
155:17 157:5,16
**secretary's** 27:3
32:17 100:22
102:1
**security** 146:17
**see** 42:8 47:10
114:17 118:5
142:3
**seek** 84:7
**seen** 43:10 56:21
158:14
**select** 146:4
**send** 127:8
**senior** 32:14
**sense** 32:6 36:8
85:8 128:20 157:3
**sent** 94:20 124:21
127:6,7,10
**separate** 27:21
44:15,15
**serve** 14:11,16 63:3
77:6

**service** 40:16,20,22
135:22 138:6,8
**services** 13:8 27:19
28:1,5 72:10
151:2
**serving** 22:5 42:19
62:18,19,22 114:6
**set** 15:17 17:10,14
22:7,22 52:19
61:13 70:3 73:21
74:12 108:6
113:20 129:2
131:13,14 163:7
**sets** 15:16,22 16:21
61:6 108:3
**setting** 29:20
**settings** 27:7
**severance** 133:10
135:4
**shading** 47:13
**share** 149:11
**shared** 11:10,13
45:22 125:18
**shave** 70:21
**sheet** 161:9
**Short** 58:20 106:21
118:16 155:6
**show** 46:9 158:17
**shutdown** 59:13
62:3,8
**sic** 25:10,12 57:17
100:16
**Signature** 160:2
161:13 162:22
**signed** 161:9
**significantly**
104:15 132:19
147:21 148:16
**similar** 71:6
**simply** 10:18 21:3
120:12
**single** 71:8 72:19
132:12
**six** 82:19 83:3
85:13,14 86:10
89:4 90:7 107:4
113:7,21

size 55:2 63:11,16 82:9 140:12 141:11,13
skill 70:3 73:21 74:11 108:3,6
skills 70:1,20,21 71:1,3,10
slow 12:18,19
slower 110:8
Smith 42:16,17,19 44:20 45:19 68:11
Smoot 6:5 34:10,10
SOCIETY 1:5
Soldner 1:10 24:20 25:7 26:5,7,12 27:13 38:9,10 41:22 46:5,11 57:7,9,11 77:5,11 77:16 93:13,14 94:20 115:11 128:9 129:5 130:18 131:5 137:16 140:14 141:20 151:6 152:5,5,12,13 153:1,12 157:4,16 158:7
Soldner's 27:20 152:11
sole 73:13 77:18,19
soon 61:13
sorry 9:1 12:21 18:17 27:15 30:9 32:17 46:2 48:18 61:20 64:3 75:16 75:21 76:7,14,19 77:14 83:15 85:15 87:10,10 91:21 93:14 106:13,19 112:14 115:3 119:21 126:11 146:7,20 152:5
sought 93:1
sound 7:12 60:19 77:2 94:14
sounds 131:21 139:18,22

Southern 1:2 2:12
speak 11:21 23:1 33:14 52:12 53:8 71:2 81:14 88:12 88:13 111:12 112:6 113:6,12,16 115:1,7,8 116:19 121:14 149:20
speaking 12:19 86:15 125:13 129:6
special 110:5,11
specialist 5:12
specific 49:17 72:20 95:12 105:3 108:14 110:17 123:5 124:6,11 129:10 130:21 131:14
specifically 7:22 11:20 19:3 23:1 35:17 46:14 47:8 57:8,22 64:2 73:20 118:1 119:15,18 125:19 133:4 141:2 155:14,18 156:5
speculate 45:3 46:7 54:11 81:14 93:2 123:22
spell 6:18
spend 132:10 133:14 148:17,19 151:6 152:14
spending 18:8 154:14
spent 132:15,22 133:3 134:10 148:14 152:4,6 153:10
spoke 101:19
spreadsheet 43:9 43:11 112:13
SREE 1:6
staff 32:7 44:9,11 45:16,17 49:19 55:12 69:2 78:5

78:19,21 79:1,9 79:13 95:16 98:3 99:9 105:11 107:17,20,21 109:4 111:10 114:8 116:20 126:18 129:19 132:21,22 154:10 156:7,17
staff's 79:2
stage 139:12,14
stamp 95:1
standards 18:19,21 19:6 102:19 103:1 103:5,14
stands 86:1
start 25:3
started 13:4 37:5 91:17 147:1
stat- 100:11 104:2 104:2,9 122:17
state 5:15 6:18 12:17 36:10 88:4 114:21 116:2 136:19 155:22
stated 36:3 121:5 137:12 141:2 148:12
states 1:1 2:11 6:3 17:17,18 18:18 95:14 102:19 132:3 135:21 136:10
stating 64:2
statistical 24:10
statisticians 71:13 74:2,13
statistics 15:9 16:6 19:8 20:4 24:2 51:13 109:20
statu- 122:16
status 159:14,15,16
statute 17:22 29:16 30:2,3 109:20 114:14 120:14 133:22 135:20
statutory 10:21

20:17,21 22:7,16 23:12 36:5 37:19 41:8,14,18 42:3 42:11 43:12,18 44:3,5,8,18 45:2,7 45:21 46:2 48:21 49:10,15,16 50:6 50:11 51:7,8,10 51:11,17,20 52:6 53:16 54:1,5,9,21 55:13,15,16,18,21 63:10,12 64:3,4 64:13 65:2,11 66:4,21 67:2,2,7,8 68:10,18 69:3,5 76:2,6,7,8,9,9,10 77:10,15 79:6,8 81:2,10 83:3,9 90:4 97:16 98:1,8 98:11,20 99:1,3,5 99:6,7 100:2,12 100:17 101:8,10 101:11,16,22 103:10,10,20,20 104:1,2,3,3,6,10 104:12,22 107:13 108:5 109:2,2,5,6 111:18,20 112:2 113:17,20 114:1 115:22 117:12 118:7,9 119:17 120:20 121:1,6,9 121:11,13,15,20 121:22 122:2,4,5 122:11,11,12,14 122:17,19,21 123:2,4,15,15,17 129:9 130:7,14,16 131:4,9 139:7,22 140:2,4,10,11,18 140:19 141:22 143:8,17 150:3 154:17 155:12,15 155:21 156:4,10 156:12,13 157:6 158:6,18
statutory-required

106:1
stay-in-school 13:4
stays 17:12,13
Stenographic 1:19 2:15
stenographically 163:11
step 24:21
stepped 34:7
stepping 15:20 149:21
steps 37:14
sticking 154:22
stipulations 2:13
stop 128:21 157:8
stopped 153:1
streamlined 71:7
Street 3:14
strictly 62:18,19
structure 15:5 40:2 139:6,11 145:3
student 13:4 92:17
students 24:11
studies 110:18,19 110:22 111:8 114:9 124:6 131:11,14 143:20 144:5 145:15,18
study 145:22
su- 15:5
subject 2:13 49:4,8
submission 153:18
submit 139:6 141:16
submitted 139:10
subsection 120:17 136:6
subsequent 103:16
subsequently 156:7
substantial 149:10
substituted 73:17
successful 40:20
sufficient 79:5 143:7
suggesting 21:7,9
suggests 95:17,19 153:6

summer 62:5,8
supervise 107:17
**Supplemental** 4:17
supplementary 81:18
support 53:7 62:15 84:8 85:2 150:20 156:22
supported 18:2,12 53:9 132:6 134:4
sure 19:9,11 21:9 23:8 26:11 33:3,6 33:15 40:7,15 44:9 47:16 51:16 52:12 65:7 71:9 76:22 82:16 105:3 105:10 108:13 111:13 113:12 114:8 125:5 138:13 139:12 148:11 149:9,19 150:18 151:19 152:3 154:18 156:13
suspect 56:4
swear 5:16
switch 62:2 131:20
sworn 6:11 163:8
system 70:16

**T**

T 4:7 162:1,1
take 23:5 24:21 38:6 47:12,14 58:16 69:19 83:13 85:10,12 86:10 91:22 127:5 131:20 135:4 138:13 145:21 146:2,3,8,17
taken 58:20 69:12 87:4 106:21 118:16 129:18 155:6
takes 83:22 89:4 90:7 146:13
talk 7:9 15:4 21:15

24:14 33:16 68:5 82:4 83:11 85:4 101:20 115:17 117:11 119:16 129:8,14,16 147:4
talked 48:16 58:6 72:22 75:7 121:20 156:5
talking 24:22 25:1 34:14 36:12 63:7 117:9 120:12
talks 64:12
target 114:11
task 44:15 137:19
tasks 114:4
team 26:15 30:21 31:3,19,20 34:2 34:13,14 119:20
teams 150:19
technology 70:17
tell 6:11 58:5 61:21 66:19
ten 6:7
ten-minute 8:10
tenure 39:7 87:4 88:13,14
ter- 23:11
terminate 141:15
terminated 23:11 111:6,9 112:7,10 116:13,17 120:5 159:12
termination 112:4 117:2,5
terminations 111:5 117:16 159:5,8
testifies 6:13
testify 11:2
testifying 8:14 9:15 9:18 10:6 12:9 67:20
testimony 40:17 161:6,8
thank 9:3 15:1 19:13 24:13 34:11 47:4 59:1 63:5 81:20 92:14,20

93:11 95:4 118:20 127:1 145:13 157:12 159:18
thing 28:8 41:12
things 27:2 41:12 59:3 69:12 71:12 73:10,11 122:6 142:3 144:15 155:19
think 11:1,16 33:22 41:11 55:9 58:16 61:4,11 69:22 103:18 105:14 106:13 111:1 117:20 120:16 121:8 129:1,5 131:18 132:13 137:3 141:21 142:22 148:17 149:12,13,13 151:14 154:21 156:17,18 157:1 158:20
thinking 122:13
thinks 134:13
tho- 111:5
thought 110:20 116:6 134:7
three 14:8 40:18,21 76:22 82:19 83:3 107:4,4 112:18 113:4,7,21
time 5:10 8:10 14:10 16:12 22:6 22:16 24:19 25:6 25:14,18 38:14 40:22 41:4 42:19 58:13,14,15,16 59:13 62:10 72:8 77:7 80:6 91:22 94:6 95:1,5,11,13 95:18 108:14 123:6 126:22 133:13 139:18 143:16 144:9 146:13 163:7
timeliness 108:16

130:12 136:15 137:13,15,22
timely 137:10 156:13
times 120:22 121:21
timing 105:1,4 131:17
today 8:14 9:18 10:11 11:2,8,22 12:3,6,9 64:19
tomorrow 95:15 151:6 153:12
tools 93:6
top 98:16
topic 25:17 117:17 117:21
topics 8:21 9:6,11 9:15,16,19,21 10:2,8 11:14 64:10 65:14 66:8
totaling 147:9 148:15
track 105:8 148:2,9 148:17,19,21 149:1,7
traditionally 26:20 26:21
transcript 163:12
transcription 161:7
transition 79:22
**TransPerfect** 5:12 5:14
treat 7:1
true 161:7 163:12
truth 6:12,12,12
try 7:16
trying 149:22 156:20
**Tuesday** 1:15
two 34:6 44:14,15 78:12 88:14
twofold 84:4
type 12:19 27:7 39:4 60:4 70:19 84:20 89:14
types 85:1

typical 86:9 87:17 88:5,15,19 99:21 100:7
typically 83:12 84:16 85:9,11,19 85:20 87:7 88:11 89:11 133:12 145:21 146:8

**U**

U.S 1:8 3:13 4:9 5:6
U.S.C.A 4:10,14,16
uh 8:19,21 9:12 12:8 13:13,19 14:9 15:13 19:9 20:3 24:20 25:6 27:1 30:8 34:4 37:18,21 41:18 42:16 65:19 71:11 78:2 81:17 102:15 109:9 140:14 148:14
ultimate 153:8
um 5:22 7:14,16 8:9,13,20,21,22 8:22 9:13 10:16 10:18,18,20,21 11:4,9,12,16,17 11:21 12:2,5,15 12:15 13:3,4,17 13:22 14:6,7,7,7 15:7,8,9,9,17,17 16:6,6,9,12,18 17:4,11,17 19:1,2 19:2,4,5,5,9,9,11 19:21,21,22 20:1 20:2,2,3,3,5,13 21:16,19 22:9 23:2,2,3,4,17,18 24:7,7,9,10,10,11 24:14,17,18,20,22 25:4,4,7,7,8,9,16 25:17,18,19,20,20 25:22 26:2,4,5,8 26:10,12,12,13,13 26:13,15,15,16,21 27:1,2,6,7,14,18

27:18,19,19,21
28:1,8,8,9,10,10
28:11,13,14,16,16
28:19,19,22 29:2
29:18 30:2,8,9,9
30:10,15 31:1,4,5
31:7,7,19,21 32:8
32:19 33:10,12,15
33:22 34:1,3,13
34:20 35:10,13,13
35:16,17,18,21,22
36:7 37:1,16,17
37:20,20,20,20,22
38:1,2,2,4,7,17,18
38:21,21 39:1,6,6
39:8,20 40:8,13
40:16,20,21 41:11
41:12,13,14,15,16
41:16,17,19 42:20
42:21 43:8 44:6,7
44:9,15,20 45:3,8
45:8 46:10,12,16
47:2,5,10,12
48:15 51:12,13,14
52:10 53:3,6 54:2
54:6 55:9,10,11
55:12 56:5,10,14
56:20 57:3,11,11
57:12,13,22 58:1
59:16 61:4,8
62:15,21 63:5,6
63:10,21 64:1,22
67:1,4,5,6,7 68:15
69:10,14,15 70:5
70:16,19,19,19,20
71:2,2,5,9,11,11
71:12,13 72:4,22
73:8,9,11 74:7,10
74:15,17 75:7,8,9
76:2,11 77:4 78:1
78:4,5,6,18,20
79:12 80:2,4 81:2
81:14,15,17 82:4
82:16 83:8,10,14
83:19,21,22 85:2
85:2,4,5,5,11,12
86:9 88:14 89:8,8

92:15,16 93:19,19
93:20,20,21,22,22
94:8 97:12,14
99:7,7 101:1,2,18
101:21 102:15,18
103:9,10,12,13,15
103:18 104:11,19
104:20,21,22
105:3,3,4,5,5,5,5
105:7,8,10,11,12
105:13,13,13,16
105:16,16,17
107:16,22 108:2,4
108:7,10,11,11,11
108:12,13 109:7
109:14 110:17,17
110:18,19,20,20
110:21,22,22
111:1,4,13,14,15
111:16 112:5,12
112:18 113:6
114:7 115:17
116:3,19 117:1,3
117:4 119:1,18,18
119:19 120:9,11
120:12,12,15,15
120:21,21,22
121:2,2,5 122:3
122:13,14 123:1,1
123:8,15 124:9,18
126:10,17 127:15
129:4,4,7,11,16
129:17,17,19,19
130:15,16,17,18
131:2 132:2,2,11
132:11,12 136:4,4
136:5,19,19
137:11,11,12,14
137:17,18 138:2,3
138:4,5,5,6,10,12
138:15,22 139:1,3
139:5,6,6,12,13
139:14,16,17
140:9,9,17 141:1
141:2,10,12,18
142:2 143:1 144:9
144:18 145:1,2,4

145:5,14 146:14
146:16 147:6,11
147:15,20 148:5
148:20 149:22
150:8 152:19
155:13,15,15,16
155:17 156:3,4,6
156:14,18,19,21
156:22 157:4,13
157:16,18,19
159:4,7,10,16
**unable** 131:1
**understand** 7:15,17
8:13,22 12:8
21:16 23:9 39:6
47:16 51:16 65:7
70:2 77:4 94:2
98:4 110:9 112:5
112:18 113:13
116:13 120:4
**understanding**
19:4,16,21 20:3,4
23:7 27:1 99:8
111:4 129:21
131:12 147:11
**understood** 15:1
45:13 115:16
135:6 148:13
**underway** 104:8
**United** 1:1 2:11 6:3
**University** 12:17
**upgraded** 71:11
**use** 9:1 24:7 29:8
40:13 63:15 82:2
88:5,11 93:6
132:12 134:20
151:20
**utilize** 24:7

_____
**V**
_____
**valuable** 124:7
**variety** 70:20 72:8
**various** 13:6 26:16
146:11
**vendor** 84:7,9
**vendors** 116:3
**verbal** 7:7

**versus** 5:6
**veteran's** 39:7
**Victoria** 3:10 6:1
**video** 1:13 2:9 5:4
5:12 160:2
**Videographer** 3:20
5:4 58:18,21
106:20,22 118:14
118:17 155:4,7
159:21
**volume** 104:14,16
**vs** 1:7 162:2

_____
**W**
_____
**wait** 7:9,11
**waiver** 38:1
**walk** 64:22 83:5,7
103:7
**want** 19:1 23:8
28:18 33:15 45:3
45:8,9 47:7 51:16
63:6,10 65:6
67:19 68:7 69:20
70:1,2,3,6 80:4
81:17 101:17
102:3,5,6,7
112:12 113:12
115:2 121:19
144:8 145:2
148:21 157:11
**wanted** 8:5,6 57:22
59:3 70:16 93:20
94:1 105:10 120:4
151:6 152:21
156:12
**Washington** 1:17
3:5,15 5:9
**wasn't** 21:16 42:11
54:10 56:1,14
87:14,14 92:19
100:8 138:16
153:6
**way** 13:5 19:5,21
24:8 27:2 44:1
89:1 101:17
110:21 120:17
130:10 146:10

152:22 158:5
163:15
**ways** 43:22 104:18
113:16 126:16
**we'll** 29:8 43:6
112:17 126:8
131:18
**we're** 8:9 82:1
118:5,6
**we've** 34:3 121:20
**went** 12:15,17
35:22 36:10 37:16
37:18,21 38:12,12
41:13 68:18 101:6
101:7,8
**weren't** 21:7 68:8
138:20
**wh-** 111:10
**whispering** 65:5,14
66:13 118:12
142:10
**whoa** 24:20
**wide** 132:5
**wise** 151:22
**with-named** 163:6
**witness** 2:10,17
5:17 12:21 13:2
58:17 63:21
106:19 110:10
142:11 161:4
163:6,16
**word** 70:12 88:16
**words** 40:13 114:20
**work** 18:13 19:7
20:9,16 28:3
34:16 45:14 49:4
49:6,9 71:15 74:5
74:11,14 83:2,15
83:20 89:3,14
104:14,16,20,20
105:19,22 106:10
115:9,18 116:18
126:13,19 128:21
130:2,2 139:3
140:12 142:7,15
142:19,21 143:15
146:4

worked 13:5 25:12 35:11 45:11

workforce 69:10,18 69:21 70:7,14,15 73:1,8 75:8 141:5 143:1,2,2 145:3,3

working 19:4 20:1 20:1,2 28:17 32:5 32:7 97:2 98:19 105:19 114:1,2 116:3,9 139:5,17

workload 83:14,16 83:17,18 84:2,3,6 84:6,19,21 85:9 85:11 86:9,12 87:9,10 88:1,15 88:16,21,22 89:1 92:13,14,15,22 93:4,7 99:19,21 100:7,9

wouldn't 35:16 151:11,16

write 15:10

writing 7:6

written 84:21 97:21 100:4,8,13,18

**X**

X 4:7,16 135:7,8

**Y**

Y 4:17 135:12,15 163:4

yeah 24:17 36:14 37:8 39:19 76:17 87:9 95:1 96:12 112:16 119:12 150:12 157:10

year 13:15 24:15 24:17 127:16 128:17,20 132:9 132:12 147:7,8,14 147:22 148:10,10 148:13,16,18,20

years 7:1 14:8 40:16,18,19,21 132:19

York 3:4 5:8

yup 14:18,20 102:17 128:8

**Z**

**0**

**1**

1 4:14 9:16

1/14/2029 163:20

10:09 58:19

10:23 58:22

100 83:1 111:10 141:21 153:13

109 4:14

11 94:13

11:19 106:20

11:20 107:1

11:35 118:15

11:46 118:18

1100 3:14

11587 1:20

11th 94:21 102:14

12 90:13 91:15,19 94:13

12:35 155:5

12:39 155:8

12:45 159:22 160:3

120 146:2,17

127 4:15

12th 127:11

135 4:16,17

14210 28:20 36:21

1445 3:4 5:8

159 4:4

16 1:15 2:6 4:10

16th 5:9

1A 118:1

1st 27:8

**2**

2 4:10 9:16 18:18 132:3 136:6

20 4:10,14,16 7:1 40:19 55:3 92:6 137:6 142:20,20

143:7,16

200 55:2 137:5 141:21

20005 3:5

20012 3:15

2016 4:14

202)448-9090 3:6

202)514-4011 3:16

2020 13:13

2021 13:13

2022 4:16

2024 4:11 147:16

2025 1:15 2:6 5:10 13:13 17:5 36:17 147:7,8,14,17 163:17

20th 25:2,3,4 49:22 50:3,8 54:16,20

240 133:8

25 127:16 128:20 132:9,15

25-cv-1230 1:8

26 105:6 114:11 147:22

28 105:7 114:11

28th 163:17

2A 102:19

2B 64:12

**3**

3 10:2 110:3

30(b)(6) 4:9

300 147:8,15 148:14

34 40:16

**4**

4 10:2

46 4:12

**5**

5 4:16 9:21 119:16

**6**

6 4:3 10:2 136:10

60 146:2,14

6th 27:17 30:8

**7**

7 9:21 110:4 144:10

720 133:8

**8**

8 10:2

8:00 94:21

80 146:14

800 147:9 148:3,15 151:7

**9**

9 4:9 10:2

9:12 1:16 2:7 5:10

90 21:20 22:2,3,21 126:11,12 132:21

90-day 38:2

94 4:13

9511 4:10

9519 4:16,16

9543 4:14