UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION., et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF EDUCATION, et al., <br><br> Defendants. | Civil Action No. 8:25-cv-01230 (SAG) |

**DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION
TO PLAINTIFFS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 2

I.      Statutory Background ............................................................................................ 2

II.     Factual Background ............................................................................................... 4

        A.      President Trump Signs Executive Orders to Streamline the Federal
                Government and the Department of Education, Including IES ............................ 4

        B.      Secretary McMahon Plans to Implement the President's Executive Orders .......... 5

        C.      The Department Reviews its Contracts Pursuant to the Contract Executive
                Order ........................................................................................................ 6

        D.      The Department Conducts a RIF to Retool its Workforce ................................... 9

        E.      IES Continues to Function After the RIF and Contract Cancellations ................. 11

        F.      IES Continues to Spend its Appropriated Funds .................................................. 14

        G.      IES Remains Functional ..................................................................................... 14

III.    Procedural Background .......................................................................................... 16

LEGAL STANDARDS ..................................................................................................... 17

ARGUMENT ..................................................................................................................... 18

I.      The Supreme Court's decisions in *California v. McMahon* and *New York v.
        McMahon* warrant judgment in favor of Defendants............................................. 18

II.     This Court Lacks Jurisdiction Over Plaintiffs' Claims......................................... 20

        A.      Plaintiffs Lack Article III Standing....................................................................... 20

                1.      Plaintiffs fail to allege an injury in fact to the cancellation of any
                        specific contract or the termination of any specific employee. ................. 22

                2.      There is no connection between specific alleged harms and failure
                        to perform statutory duties, and Plaintiffs' harms do not flow from
                        the challenged actions ................................................................................ 23

                3.      Plaintiffs' harms are not redressable by an Order of this Court ............... 28

B.     The Court Lacks Jurisdiction Over Plaintiff's Challenge to the Cancellation of the Institute's Contracts. ............................................... 32

C.     Congress Has Channeled Subject-Matter Jurisdiction Over Plaintiffs' Claims Arising from Federal Employment into a Distinct System, Not Review in This Court in the First Instance. ........................................... 38

III.    Plaintiff's APA Claim Fails. ....................................................................... 43

A.     Plaintiffs Do Not Seek Judicial Review of a Discrete Agency Action ................. 43

B.     There Are Adequate Alternative Remedies Available .......................................... 46

C.     The Department's Actions Were Not Arbitrary and Capricious. ......................... 46

D.     The Department's Termination Actions Were Neither Contrary to Law Nor in Excess of Defendants' Statutory Authority. ............................................... 52

E.     Plaintiffs Have Abandoned Their Constitutional Claim. ..................................... 53

IV.    The Court Should Limit any Remedy to Remand ............................................. 55

CONCLUSION .......................................................................................................... 60

## TABLE OF AUTHORITIES

**Cases**

*Alabama-Coushatta Tribe of Tex. v. United States*,
757 F.3d 484 (5th Cir. 2014) ................................................................................ 43

*Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
357 F.3d 62 (D.C. Cir. 2004) ................................................................................ 35

*Allen v. Wright*,
468 U.S. 737 (1984) .............................................................................................. 31

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) .............................................................................. 56

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*,
No. 25-1281, 2025 WL 1232337 (4th Cir. Apr. 10, 2025) .............................. 34, 37

*Am. Bioscience, Inc. v. Thompson*,
269 F.3d 1077 (D.C. Cir. 2001) ............................................................................ 49

*Am. Educ. Rsch. Ass'n v. Dep't of Educ.*,
Civ. Case No. SAG-25-1230, 2025 WL 1665401 (D. Md. June 12, 2025).............. 23, 32, 45

*Am. Fed'n of Gov't Emps., AFL-CIO v. Loy*,
367 F.3d 932 (D.C. Cir. 2004) .............................................................................. 42

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump* ("*AFGE*"),
929 F.3d 748 (D.C. Cir. 2019) .................................................................. 38, 39, 40

*Am. Great Lakes Ports Ass'n v. Zukunft*,
301 F. Supp. 3d 99 (D.D.C. 2018),
*aff'd sub nom. Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020) ......... 57

*Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*,
524 F. Supp. 2d 642 (D. Md. 2007) ...................................................................... 17

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023) .............................................................................................. 40

*Bayshore Cmty. Hosp. v. Azar*,
325 F. Supp. 3d 18 (D.D.C. 2018) ........................................................................ 57

*Bennett v. Spear*,
520 U.S. 154 (1997) .............................................................................................. 45

*Block v. Community Nutrition Institute*,
467 U.S. 340 (1984) .............................................................................................. 41

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ............................................................................... 34, 46

*Buscemi v. Bell*,
  964 F.3d 252 (4th Cir. 2020) ....................................................................... 29

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ..................................................................................... 32

*Camp v. Pitts*,
  411 U.S. 138 (1973) ....................................................................................... 7

*Catholic Legal Immigration Network, Inc. v. EOIR*,
  513 F. Supp. 3d 154 (D.D.C. 2021) ............................................................. 28

*Citrus HMA, LLC v. Becerra*,
  No. 20cv707, 2022 WL 1062990 (D.D.C. Apr. 8, 2022) ............................. 57

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ..................................................................................... 21

*Cobell v. Kempthorne*,
  455 F.3d 301 (D.C. Cir. 2006) ............................................................... 43, 44

*Consol. Edison Co. of N.Y. v. U.S. Dep't of Energy*,
  247 F.3d 1378 (Fed. Cir. 2001) ................................................................... 36

*CTS Corp. v. EPA*,
  759 F.3d 52 (D.C. Cir. 2014) ......................................................................... 7

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ..................................................................................... 32

*Dalton v. Specter*,
  511 U.S. 462 (1994) ..................................................................................... 55

*Deese v. Esper*,
  483 F. Supp. 3d 290 (D. Md. 2020) ............................................................. 17

*Defs. of Wildlife v. U.S. Dep't of the Interior*,
  931 F.3d 339 (4th Cir. 2019) ....................................................................... 18

*Department of Education v. California*,
  604 U.S. 650 (2025) ................................................................... 18, 33, 34, 37

*Dep't of Homeland Sec. v. New York*,
  589 U.S. 1173 (2020) ................................................................................... 60

*Dreher v. Experian Info. Sols., Inc.*,
856 F.3d 337 (4th Cir. 2017) ...................................................................................... 22

*Edmondson Community Organization, Inc. v. Mayor & City Council of Baltimore*,
797 F. Supp. 3d 497 (D. Md. 2025) ............................................................................ 28

*Elev8 Baltimore, Inc. v. Corporation for National & Community Service*,
804 F. Supp. 3d 524 (D. Md. 2025) ............................................................................ 42

*Elgin v. Dep't of the Treasury*,
567 U.S. 1 (2012) ................................................................................................. 39, 40

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .................................................................................................... 46

*Fed. Power Comm'n v. Idaho Power Co.*,
344 U.S. 17 (1952) ...................................................................................................... 56

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*,
423 U.S. 326 (1976) .................................................................................................... 47

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) ......................................................................................... 7, 49, 56

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ................................................................................. 20, 21, 22, 28

*Fornaro v. James*,
416 F.3d 63 (D.C. Cir. 2005) ...................................................................................... 40

*Gill v. Whitford*,
585 U.S. 48 (2018) ...................................................................................................... 59

*Global Van Lines, Inc. v. ICC*,
804 F.2d 1293 (D.C. Cir. 1986) .................................................................................. 57

*Graham v. Ashcroft*,
358 F.3d 931 (D.C. Cir. 2004) .................................................................................... 39

*Great-West Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204 (2002) .................................................................................................... 34

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ............................................................................................... 22, 28

*Heckler v. Chaney*,
470 U.S. 821 (1985) ......................................................................................... 48, 53, 54

*Holley v. United States*,
  124 F.3d 1462 (Fed. Cir. 1997) ............................................................................... 35

*Hollingsworth v. Perry*,
  558 U.S. 183 (2010) ................................................................................................ 20

*Ingersoll-Rand Co. v. United States*,
  780 F.2d 74 (D.C. Cir. 1985) ................................................................................. 37

*INS v. Orlando Ventura*,
  537 U.S. 13 (2002) .................................................................................................. 56

*James Madison Ltd. by Hecht v. Ludwig*,
  82 F.3d 1085 (D.C. Cir. 1996) ............................................................................... 49

*Karahalios v. Nat'l Fed'n of Fed. Emps.*,
  489 U.S. 527 (1989) ................................................................................................ 42

*Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*,
  56 F.3d 279 (D.C. Cir. 1995) ................................................................................. 34

*Lacson v. U.S. Dep't of Homeland Sec.*,
  726 F.3d 170 (D.C. Cir. 2013) ............................................................................... 49

*Lane v. Holder*,
  703 F.3d 668 (4th Cir. 2012) ........................................................................... 22, 27

*Larson v. Domestic & Foreign Comm. Corp.*,
  337 U.S. 682 (1949) ................................................................................................ 54

*Lewis v. Casey*,
  518 U.S. 343 (1996) ................................................................................................ 32

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ............................................................................... 47, 48, 53, 54

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ................................................................................................ 21

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ............................................................................... 24, 43, 44, 58

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) .......................................................................................... 32, 59

*Mahoney v. Donovan*,
  721 F.3d 633 (D.C. Cir. 2013) ............................................................................... 40

*Markland v. OPM*,
    140 F.3d 1031 (Fed. Cir. 1998)........................................................................................ 47

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989)........................................................................................................ 18

*Maryland v. U.S. Dep't of Agric.*,
    151 F.4th 197 (4th Cir. 2025) .................................................................................. 29, 31

*Mass. Fair Hous. Ctr. v. Dep't of Hous. & Urb. Dev.*,
    CIV. A. No. 25-30041-RGS, 2025 WL 1225481 (D. Mass. Apr. 14, 2025) ............................ 34

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012)........................................................................................................ 33

*McKenna v. Dep't of Interior*,
    996 F.2d 1235 (Fed. Cir. 1993)........................................................................................ 24

*McMahon v. New York,*
    606 U.S. ----, 145 S. Ct. 2643 (2025) (mem.)................................................................ 19

*Md. Highways Contractors Ass'n v. Maryland*,
    933 F.2d 1246 (4th Cir. 1991) ........................................................................................ 21

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982)................................................................................... 35, 36

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)........................................................................................................ 59

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).................................................................................................... 17, 18

*N.C. Fisheries Ass'n, Inc. v. Gutierrez*,
    550 F.3d 16 (D.C. Cir. 2008)........................................................................................... 57

*National Institutes of Health v. American Public Health Association* ("*NIH*")*,
    606 U.S. ----, 145 S. Ct. 2658 (2025) (mem.).......................................................... *passim*

*Nat'l Ass'n of Agric. Emps. v. Trump,*
    462 F. Supp. 3d 572 (D. Md. 2020)................................................................................. 39

*New York v. McMahon*,
    784 F. Supp. 3d 311 (D. Mass. 2025),
    *appeal dismissed*, Nos. 25-1495, 25-1500, 2025 WL 3451815 (1st Cir. Sep. 15, 2025) ......... 19

*New York v. U.S. Dep't of Def.*,
    913 F.3d 423 (4th Cir. 2019) .......................................................................................... 43

*Northwest Immigrant Rights Project v. USCIS,*
496 F. Supp. 3d 31 (D.D.C. 2020) ................................................................. 28

*Norton v. S. Utah Wilderness All.,*
542 U.S. 55 (2004) ............................................................................. 24, 43, 44

*Nyunt v. Chairman, Broad Bd. of Govs.,*
589 F.3d 445 (D.C. Cir. 2009) ...................................................................... 40

*O.A. v. Trump,*
404 F. Supp. 3d 109 (D.D.C. 2019) ............................................................... 59

*Ohio Valley Env't Coal. v. Aracoma Coal Co.,*
556 F.3d 177 (4th Cir. 2009) ............................................................. 17, 47, 49

*Perry Cap. LLC v. Mnuchin,*
864 F.3d 591 (D.C. Cir. 2017) ...................................................................... 35

*Pub. Citizen, Inc. v. Trump,*
297 F. Supp. 3d 6 (D.D.C. 2018) ................................................................... 20

*RNC v. North Carolina State Board of Elections,*
120 F.4th 390 (4th Cir. 2024) ....................................................................... 28

*Rogers v. Kelley,*
No. 8:22-CV-02924-PX, 2024 WL 1856305 (D. Md. Apr. 29, 2024) .................... 42

*S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC,*
713 F.3d 175 (4th Cir. 2013) ........................................................................ 21

*Shands Jacksonville Med. Ctr. v. Burwell,*
139 F. Supp. 3d  240 (D.D.C. 2014) .............................................................. 57

*Sheppheard v. Morrisey,*
143 F.4th 232 (4th Cir. 2025) ....................................................................... 29

*Sierra Club v. U.S. Dep't of the Interior,*
899 F.3d 260 (4th Cir. 2018) ........................................................................ 18

*Sols. in Hometown Connections v. Noem,*
CIV. A. No. 25-CV-00885-LKG, 2025 WL 1530318 (D. Md. May 29, 2025),
*aff'd,* 165 F.4th 835 (4th Cir. 2026) ............................................................. 37

*Spectrum Leasing Corp. v. United States,*
764 F.2d 891 (D.C. Cir. 1985) ................................................................. 36, 37

*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016) ..................................................................................... 22

*Standing Rock Sioux Tribe v. U.S. Army Corps. Of Eng'rs*,
985 F.3d 1032 (D.C. Cir. 2021) ................................................................................ 56

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ................................................................................... 28-29, 32, 33

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .................................................................................................. 21

*Sustainability Inst. v. Trump,*
No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) ........................................ 37

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) .................................................................................................. 40

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .................................................................................................. 22

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ............................................................................................ 20, 32

*Tucson Airport Auth. v. Gen. Dynamics Corp.*,
136 F.3d 641 (9th Cir. 1998) .................................................................................... 35

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*,
770 F. Supp. 3d 155 (D.D.C. 2025),
*dismissed,* No. 1:25-cv-00465-TNM, 2025 WL 1350103 (D.C. Cir. 2025) ................. 34, 36, 37

*United States v. Fausto*,
484 U.S. 439 (1988) ...................................................................................... 39, 40, 41

*United States v. Texas*,
599 U.S. 670 (2023) .................................................................................................. 20

*Up State Fed. Credit Union v. Walker*,
198 F.3d 372 (2d Cir. 1999) ..................................................................................... 36

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982) .................................................................................................. 21

*Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*,
714 F.3d 186 (4th Cir. 2013) .................................................................................... 43

*Vt. Yankee Nuclear Power Corp v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978) ............................................................................................ 47, 48

*Warth v. Seldin*,
422 U.S. 490 (1975) .................................................................................................. 31

*Wiley v. Kennedy,*
  789 F. Supp. 3d 447 (S.D. W. Va. 2025) ................................................................. 42

**Statutes**

5 U.S.C. § 701 ............................................................................................... 47, 53

5 U.S.C. § 702 ............................................................................................... 33, 34

5 U.S.C. § 704 ...................................................................................................... 46

5 U.S.C. § 706 ....................................................................................... 7, 17, 33, 52

5 U.S.C. § 1204 .................................................................................................... 39

5 U.S.C. § 7105 .................................................................................................... 39

5 U.S.C. § 7123 .................................................................................................... 39

5 U.S.C. § 7512 .................................................................................................... 39

5 U.S.C. § 7701 .................................................................................................... 39

5 U.S.C. § 7703 .................................................................................................... 39

7 U.S.C. § 608c .................................................................................................... 41

20 U.S.C. § 3402 ................................................................................................... 3

20 U.S.C. §§ 9501-9584 ........................................................................................ 3

20 U.S.C. §§ 9511-9567b ....................................................................................... 3

20 U.S.C. § 9511 ................................................................................................... 3

20 U.S.C. § 9512 .................................................................................................. 35

20 U.S.C. § 9543 .................................................................................................. 52

20 U.S.C. § 9574 ................................................................................................... 4

20 U.S.C. § 9575 ................................................................................................... 3

28 U.S.C. § 1295 .................................................................................................. 39

28 U.S.C. § 1331 .................................................................................................. 38

28 U.S.C. § 1346 .................................................................................................. 33

28 U.S.C. § 1491 ............................................................................................. 33, 34

Department of Education Organization Act,
　　Pub. L. No. 96-88, 93 Stat. 668 (1979)........................................................................ 2

Education Sciences Reform Act of 2002,
　　Pub. L. No. 107–279, 116 Stat. 1940........................................................................ 3

Full-Year Continuing Appropriations and Extensions Act, 2025,
　　Pub. L. No. 119-4, 139 Stat. 9 ........................................................................ 53, 54

Further Consolidated Appropriations Act, 2024,
　　Pub. L. No.118-47, 138 Stat. 690 (Mar. 23, 2024) ........................................... 53, 54

**Regulations**

5 C.F.R. pt. 2420 ................................................................................................... 39

5 C.F.R. § 2423.22 ........................................................................................... 39, 42

Implementing the President's 'Department of Government Efficiency' Cost Efficiency Initiative,
　　Exec. Order No. 14,222, 90 Fed. Reg. 11,095 (Feb. 26, 2025) .................... 4, 38, 49-50

Improving Education Outcomes by Empowering Parents, States, and Communities,
　　Exec. Order No. 14,242, 90 Fed. Reg. 13,679 (Mar. 20, 2025) ............................ 4, 5

**Other Authorities**

Amber M. Northern, *Reimagining the Institute of Education Sciences: A Strategy for Relevance and Renewal* (Feb. 2026),
　　https://ies.ed.gov/ies/2026/02/reimagining-ies ......................................................45-46

Filip Timotija, *Education secretary: Mass layoffs first step toward total shutdown*,
　　The Hill (Mar. 12, 2025),
　　https://thehill.com/homenews/education/5190161-linda-mcmahon-education-department-mass-layoffs/ ......................................................................................... 5, 6

Ingraham Angle, *Education secretary says department took first steps to eliminate 'bureaucratic bloat'*, Fox News (Mar. 11, 2025),
　　https://www.foxnews.com/video/6369901522112 ..................................................... 6

Lexi Lonas Cochran, *Linda McMahon gives Education staffers their 'final mission'*,
　　The Hill (Mar. 4, 2025),
　　https://thehill.com/homenews/education/5175086-linda-mcmahon-education-department-trump-musk/....................................................................................... 6

S. Rep. No. 118-84 (2023)................................................................................... 53, 54

U.S. Dep't of Educ., *Secretary McMahon: Our Department's Final Mission* (Mar. 3, 2025), https://www.ed.gov/about/news/speech/secretary-mcmahon-our-departments-final-mission ........................................................................................................... 5

U.S. Dep't of Educ., *U.S. Department of Education Initiates Reduction in Force* (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force ........................................................................................................ 5, 6

170 Cong. Rec. H1501 (Mar. 22, 2024) ............................................................... 53, 54

**INTRODUCTION**

Educational research organizations cannot bring claims in federal courts to challenge how an agency manages its headcount, its internal operations, or its contractual relationships. Yet that is what Plaintiffs here seek to do in this sprawling lawsuit challenging various management decisions taken over a year ago at the Department of Education ("Department"). The Court should dismiss Plaintiffs' claims for lack of subject matter jurisdiction or for failure to state a claim upon which relief can be granted. If the Court reaches the merits, it should find in favor of the Department on every count.

Plaintiffs lack standing. Even after receiving thousands of pages of documents, answers to interrogatories, and three depositions, Plaintiffs still fail to justify their broad relief of asking this Court to vacate the reduction in force ("RIF") of *every* employee and vacate the cancellation of *every* contract. Plaintiffs fail to show how the termination of any specific employee or group of employees brought them harm, nor do they identify which specific contracts' cancellation caused them harm. Plaintiffs similarly make no attempt to tie any employee or contract to a specific statutory duty. At the end of the day, Plaintiffs only allege that the Department has failed to provide three statutory duties, yet they request the reformation of the entirety of IES. And even if they could have surmounted these hurdles, it is highly unlikely that the Court can redress Plaintiffs' harms—separated employees have moved on and contractors would need to willingly reenter into new contracts.

Plaintiffs say they want the Court to order a return to the "status quo." Proposed Order at 1, ECF No. 75-2. In that request, they cross many jurisdictional lines. The vacatur of a contract is indistinguishable from its reinstatement, which places Plaintiffs' claims outside the jurisdiction of this Court and directly within the Court of Federal Claims. And by challenging the RIF generally, they channel themselves out of this Court and into a specialized statutory review scheme.

Their request is also a textbook programmatic attack. Plaintiffs ask the Court to manage and improve the programs within IES so that they resemble the services of the past administration. But a Plaintiff cannot improve an agency by Court order.

Plaintiffs have no better luck on the merits. As to their arbitrary and capricious claims, the way an agency discharges its statutory duties is entrusted to the agency as a matter of law. And the evidence shows that the Department is discharging its statutory duties, so the RIF and contract cancellations cannot be contrary to law.

Plaintiffs are not entitled to any relief. But should the Court disagree, it should reject Plaintiffs' proposed order, which goes far beyond redressing Plaintiffs' supposed harm to the extent it seeks to reform the entirety of IES. Instead, because IES is in the midst of hiring new employees with different skillsets than separated employees, has reinstated contracts and is in the process of entering new contracts, and because third parties would have to contract or return to IES if the Court vacated the Departments' actions, the Court should limit relief to a remand.

## BACKGROUND

### I.    Statutory Background

The Department of Education was established as part of the Department of Education Organization Act. Pub. L. No. 96-88, 93 Stat. 668 (1979). The purpose of the Department is principally

> (1) to strengthen the Federal commitment to ensuring access to equal educational opportunity for every individual; (2) to supplement and complement the efforts of States, the local school systems and other instrumentalities of the States, the private sector, public and private educational institutions, public and private nonprofit educational research institutions, community-based organizations, parents, and students to improve the quality of education; (3) to encourage the increased involvement of the public, parents, and students in Federal education programs; (4) to promote improvements in the quality and usefulness of education through federally supported research, evaluation, and sharing of information; (5) to improve the coordination of Federal education programs; (6) to improve the management

and efficiency of Federal education activities, especially with respect to the process, procedures, and administrative structures for the dispersal of Federal funds, as well as the reduction of unnecessary and duplicative burdens and constraints, including unnecessary paperwork, on the recipients of Federal funds; and (7) to increase the accountability of Federal education programs to the President, the Congress, and the public.

20 U.S.C. § 3402.

Under the Education Sciences Reform Act of 2002, Pub. L. No. 107–279, tit. I, 116 Stat. 1940 (codified at 20 U.S.C. §§ 9501-9584) (the "Act"), Congress established IES within the Department to:

compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need (including in technology areas) that are supported by Federal funds appropriated to the Institute and ensure that such activities-- (A) conform to high standards of quality, integrity, and accuracy; and (B) are objective, secular, neutral, and nonideological and are free of partisan political influence and racial, cultural, gender, or regional bias.

20 U.S.C. § 9511(b)(2). The Act also established within the Institute four centers: the National Center for Education Research, the National Center for Education Statistics, the National Center for Education Evaluation and Regional Assistance, and the National Center for Special Education Research and delineated the duties for each center. *Id.* §§ 9511-9567b.

Additionally, the Act states that the Institute shall "[d]isseminat[e] information in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public" and **"**[u]tiliz[e] the most modern technology and other methods available, including arrangements to use data collected electronically by States and local educational agencies, to ensure the efficient collection and timely distribution of information, including data and reports," and "[m]ak[e] information available to the public in an expeditious fashion." *Id.* § 9575(2), (3), (6). Additionally, "data collected by the Institute, including any office, board, committee, or center of the Institute, in carrying out the priorities and mission of the Institute, shall

- 3 -

be made available to the public, including through use of the Internet." *Id.* § 9574.

## II.   Factual Background

### A.   President Trump Signs Executive Orders to Streamline the Federal Government and the Department of Education, Including IES

On February 26, 2025, the President signed the "Implementing the President's 'Department of Government Efficiency' Cost Efficiency Initiative" Executive Order. Exec. Order No. 14,222, 90 Fed. Reg. 11,095 (Feb. 26, 2025) (the "Contract Executive Order"). The purpose of this order was to "commence[ ] a transformation in Federal spending on contracts, grants, and loans to ensure Government spending is transparent and Government employees are accountable to the American public." *Id.* § 1. Accordingly, this Executive Order instructed "[e]ach Agency Head, in consultation with the agency's DOGE Team Lead, [to] review all existing covered contracts and grants and, where appropriate and consistent with applicable law," "terminate or modify (including through renegotiation) such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of [the President's] Administration." *Id.* § 3(b). Covered contracts are defined as, among other things, "discretionary spending through Federal contracts," but excludes "direct assistance to individuals; expenditures related to immigration enforcement, law enforcement, the military, public safety, and the intelligence community; and other critical, acute, or emergency spending, as determined by the relevant Agency Head." *Id.* § 2(d). The Executive Order instructed the process to "commence immediately" and to "prioritize the review of funds disbursed under covered contracts and grants to educational institutions . . . for waste, fraud, and abuse." *Id.* § 3(b).

On March 20, 2025, President Trump signed the "Improving Education Outcomes by Empowering Parents, States, and Communities" Executive Order. Exec. Order No. 14,242, 90 Fed. Reg. 13,679 (Mar. 20, 2025) (the "Department Executive Order"). The Department Executive

Order found that the "Department of Education has entrenched the education bureaucracy" that "is not working." *Id.* § 1. For example, the Order identified the Department of Education's "public relations office that includes over 80 staffers at a cost of more than $10 million per year." *Id.* Ultimately, the Order contemplates that the "[c]losure of the Department of Education would drastically improve program implementation in higher education" and "would provide children and their families the opportunity to escape a system that is failing them." *Id.*

Under the Department Executive Order, the Secretary of Education was directed "to the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education." *Id.* § 2(a). The "Secretary of Education shall ensure that the allocation of any Federal Department of Education funds is subject to rigorous compliance with Federal law." *Id.* § 2(b). And the Department Executive Order states that it should "be implemented consistent with applicable law and subject to the availability of appropriations." *Id.* § 3(b).

**B.      Secretary McMahon Plans to Implement the President's Executive Orders**

The Secretary has described her role pursuant to the Department Executive Order as "an overhaul" of the Department of Education. U.S. Dep't of Educ., *Secretary McMahon: Our Department's Final Mission* (Mar. 3, 2025), https://www.ed.gov/about/news/speech/secretary-mcmahon-our-departments-final-mission. As part of the overhaul, the Department is implementing a reduction in force, which impacts "[a]ll divisions within the Department," and some divisions will require "significant reorganization to better serve students, parents, educators, and taxpayers." U.S. Dep't of Educ., *U.S. Department of Education Initiates Reduction in Force* (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force ("RIF Press Release"). The purpose of the reduction in force is "efficiency, accountability, and ensuring that resources are directed where they matter most: to students, parents, and teachers." *Id.* It is "the first step of eliminating . . . bureaucratic bloat," Filip Timotija, *Education*

- 5 -

*secretary: Mass layoffs first step toward total shutdown*, The Hill (Mar. 12, 2025), https://thehill.com/homenews/education/5190161-linda-mcmahon-education-department-mass-layoffs/ ("Hill Article"). The Department intends to "ke[ep] all of the right people and the good people to make sure that the outward-facing programs . . . the grants, the appropriations that come from Congress, all of that are being met, and none of that's going to fall through the cracks." *Id.* As part of the reduction in force, any staff that may be separated will first be put on administrative leave. RIF Press Release.

After the overhaul, the Department has stated that it "will continue to deliver on all statutory programs that fall under the agency's purview." *Id.* The Secretary stated that she planned to keep fifty percent of the Department "related to expenditures and key programs" for which Congress has appropriated money. Ingraham Angle, *Education secretary says department took first steps to eliminate 'bureaucratic bloat'*, at 02:00-02:08, Fox News (Mar. 11, 2025), https://www.foxnews.com/video/6369901522112.

Longer term, Secretary McMahon recognizes that shutting down the Department will require "work with Congress." Hill Article. The Secretary plans to partner with Congress and other federal agencies to determine the best path forward to fulfill the expectations of the President and the American people. Lexi Lonas Cochran, *Linda McMahon gives Education staffers their 'final mission'*, The Hill (Mar. 4, 2025), https://thehill.com/homenews/education/5175086-linda-mcmahon-education-department-trump-musk/.

### C.    The Department Reviews its Contracts Pursuant to the Contract Executive Order

The objective of the contract cancellation process was the elimination of waste, which meant the "procurement of services that were either unnecessary or priced at a level higher than was necessary." Deposition Excerpts of Matthew E. Soldner 92:4-13 ("Soldner Dep.") (attached

as Ex. 1).[1] Prior to the challenged contract cancellations, the Department had terminated contracts for convenience, Deposition Excerpts of Christopher Joseph Rosier 114:1-4 ("Rosier Dep.") (attached as Ex. 2), and had questioned the value of different lengths of longitudinal studies. Rosier Dep. 121:2-11.

The process to cancel contracts involved a global review. Rosier Dep. 14:14-15:1. The contract officers, acquisition professionals, and the program office reviewed each contract prior to termination. Rosier Dep. 21:4-10. Each contract was individually assessed by its description, the dollar amount, the value, the time left on the contract, whether the work was statutorily required, and whether there was any "fluff"—work that was not statutorily required or unnecessary. Rosier Dep. 20:9-20.

The contract review began to provide an overview of how the Department "was doing -- doing work[.]" Rosier Dep. 23:15-19. The review looked to increase efficiencies within the contracts and see if there was a way to capture cost savings while still doing everything statutorily required. Rosier Dep. 23:19-24:1. The review also sought to identify whether the contractor was delivering what was promised. Rosier Dep. 25:2-4.

---

[1] As a general rule, judicial review is limited to the administrative record, since "[i]t is black-letter administrative law that in an [Administrative Procedure Act] case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision." *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (internal quotation marks omitted; second alteration in original); *see also* 5 U.S.C. § 706 ("[T]he court shall review the whole record or those parts of it cited by a party...."); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (noting that when applying arbitrary and capricious standard under the APA, "[t]he focal point for judicial review should be the administrative record already in existence....") (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). Recognizing that the Court allowed discovery into the Departments' decisionmaking, and to respond to Plaintiffs' arguments on summary judgment, Defendants will rely on extra-record evidence in arguing the merits of Count I. There is no bar to considering this evidence with relation to standing.

The Department rescoped[2] the IES contracts to remove things that are not statutorily required. Rosier Dep. 234:1-235:1. For example, the focus of the NAEP rescopes was to take out what wasn't statutorily required. Rosier Dep. 231:6-10. When the Department rescoped a contract, they explicitly considered how it would affect the quality of a study and demanded that vendors did not degrade the quality of the final product. Rosier Dep. 235:2-18.

The review also looked to see if the contracts aligned with the administration's priorities as some contracts had been put in place up to ten years prior. Rosier Dep. 24:1-6. This was an opportunity for the administration to try to achieve the statutory requirements in different ways, based on each individual contract. Rosier Dep. 24:6-14. This review involved input from the Programs Office, with Jonathan Bettis taking the lead. Rosier Dep. 41:4-5.  Mr. Bettis was a senior individual who was well versed in IES programs as the procurement lead and had more knowledge than the head of IES on the details of the contracts. Rosier Dep. 44:1-19.

While the Department worked quickly to terminate these contracts, it had always been the practice of the Department to execute contract actions as soon as possible. Rosier Dep. 83:8-10.

If any contracts were cancelled, the Department planned that the data generated by the cancelled study would be transferred from the contractor to the Department on cancellation or settlement. Soldner Dep. 116:3-9. When contracts were terminated, there was an intention to recompete a good portion of the work that was cancelled. Rosier Dep. 164:7-10.

There was also a process by which contracts that were terminated were reviewed again and reinstated if needed. Rosier Dep. 151:8-22. The Department asked Matt Soldner, who is the current head of IES, to indicate whether the work was "required, allowed, or suggested by law." Soldner Dep. 113:1-6. Mr. Soldner considered whether a contract was critical if it was required by a specific

---

[2] Adding or removing portions of a contract was referred to within the Department as rescoping.

statute or essential to the function of another part of the Department. Soldner Dep. 109:6-11. He would also mark a contract critical if it substantively advanced the mission of the department in an area that was important. Soldner Dep. 112:2-10. Mr. Soldner did not consider other factors in determining whether a contract was critical. Soldner Dep. 109:12-17.

The vast majority of contracts identified by the head of IES as critical were reinstated. Soldner Dep. 181:5-13. For example, evaluations such as NPSAS National Household Education survey and the International Student Assessment were reinstated. Soldner Dep. 118:7-120:9. While staff within the Department generated a memorandum that identified contracts as critical after cancellation, many of these memos were "copy and paste." Rosier Dep. 195:14-20. The Department would follow-up with meetings, and there would be a consensus as to whether the contract was critical or not. Rosier Dep. 195:21-196:2. The head of IES is now part of the process, but prior it was the procurement lead, Jonathan Bettis. Rosier Dep. 196:17-22. Even where a contract was meant to be reinstated, the vendor might refuse because they were losing money on the contract. Rosier Dep. 196:7-11.

### D.    The Department Conducts a RIF to Retool its Workforce

The purpose of the RIF was to restructure the organization, align administration priorities, eliminate duplicative functions, and rescale the workforce. Deposition Excerpts of Jacqueline Clay 69:7-18 ("Clay Dep.") (attached as Ex. 3).

With respect to restructuring the organization, the Department focused on reskilling within IES. For example, the Department previously had several statisticians. Clay Dep. 74:4-18. The Department replaced the statisticians with data scientists. Clay Dep. 107:16-108:14. The data scientists review data like the statisticians did, but they now will also review contracts. *Id.* The Department wanted to reskill the workforce by bringing in system engineers and data scientists. Clay Dep. 70:12-22. Accordingly, the new positions aren't one-to-one replacements for old

positions, but rather new skillsets that, when taken together, fulfill the previous duties of the old workforce in a new way. Clay Dep. 74:4-18. Therefore, when the Department RIFs positions and creates new ones, the overlapping skillsets of the new positions replace the functions performed by the old positions. Clay Dep. 74:4-18. And because those skills overlap, the old positions would become duplicative if they were not eliminated. Clay Dep. 70:12-22.

With respect to eliminating duplicative functions, many Departmental functions were identified as needed across the Department, but not every silo of the Department (such as IES) needed its own dedicated office for that function. Clay Dep. 72:2-21. For example, IES previously had its own HR liaison functions, FOIA responses, GAO requests, labor relations, performance management, and time and attendance. Clay Dep. 72:2-21. These were streamlined into a single office for the entire Department. *Id.* As another example, Mr. Bettis's office was included in the RIF because its function was being performed at multiple offices doing a similar activity—they were streamlined into one office, the Office of Finance and Operations, within the Department. Clay Dep. 71:1-18.

The Department considered the views of IES personnel before conducting the RIF. Prior to the RIF, the heads of IES components were asked to complete a document that distinguished between "mandatory and non-mandatory" functions and workstreams within IES and to assign counts of positions conducting those workstreams. Soldner Dep. 146:7-15. The heads of IES components were also asked to array the units within IES into competitive areas. Soldner Dep. 144:24-145:16.

The Department reviewed the statutory requirements for each POC to determine whether IES could continue to perform their statutory functions based on the proposed cuts. Clay Dep. 41:7-21. The Department identified the statutory functions entrusted by Congress, reviewed the

functions, and then determined that it could perform those functions at the adjusted scale. Clay Dep. 66:16-67:9. Department POC leadership spoke openly about how the planned RIF would impact their ability to meet statutory functions. Clay Dep. 101:15-102:2. The Secretary's office heard their feedback, and changes were made to how the RIF would proceed based on that feedback. *Id.*

The Department also reviewed the current programs at IES. Clay Dep. 104:7-13. The Department identified statutory requirements and then identified the respective programs that related to those statutory requirements. *Id.* The decision to eliminate areas within IES was made by the Office of the Secretary in conjunction with the DOGE lead and after meeting with all of the agency leadership. Clay Dep. 47:21-48:3. The Department looked at each area subject to a RIF and discussed whether the organization could continue to perform the statutory functions with the areas that were left. Clay Dep. 98:7-17. DOGE was not in control of IES decisions. Clay Dep. 30:13-19. Decisionmaking was a collaborative effort between department leadership and DOGE leads. Clay Dep. 33:19-34:4.

The Department made the determination that 20 people were sufficient to fulfill all of IES's functions. Clay Dep. 143:7-11. And specifically, the determination was made that the statutory functions of NCER could be fulfilled by the Commissioner's office alone. Clay Dep. 52:4-8.

**E.    IES Continues to Function After the RIF and Contract Cancellations**

According to the head of IES, the RIF did not impact the ability of IES to continue to carry out statutory functions. Soldner Dep. 166:2-10. Indeed, during the contract cancellation the Department was committed to adhering to statutory requirements "at all times." Rosier Dep. 209:2-9. After the RIF and contract cancellations, the most mission critical work of IES continues. Soldner Dep. 153:7-14.

As described above, the Department reviewed its contracts and headcount to align IES with

- 11 -

administration priorities. The mission at IES stayed the same after the change in the administration, but the priorities shifted. Clay Dep. 17:4-16. It has been the practice of IES to choose which evaluations to carry out based on policymaker priorities and requirements in specific statutes. Soldner Dep. 17:14-17.  These evaluations would be devised based on the needs of political leadership. Soldner Dep. 17:18-24.

The main responsibilities of the people who remain at NCES is the execution of the National Assessment of Education Progress (NAEP), the ongoing maintenance of the restricted-use data licensing program, the ongoing operation of international surveys and planning for such surveys, and the operation of the disclosure review board. Soldner Dep. 170:14-25. NCES is currently working on longitudinal study activities. Soldner Dep. 132:9-12. At least two employees are working on them. Soldner Dep. 133:2-4, whereas prior to the RIF one to three staff would work on a longitudinal study. Soldner Dep. 44:8-11.  NCES is collecting data about secondary school completions through the common core of data on secondary school graduation rates. Soldner Dep. 142:8-12. NCES is collecting data on the supply of teachers by collecting data on the number of students who complete teaching credentials. Soldner Dep. 142:22-25.

NCER has issued new research grants since contract cancellations, at least nine, and perhaps a few more. Soldner Dep. 135:8-15.

NCEE is performing around a dozen or more evaluations. Soldner Dep. 131:8-11. The quality of evaluations NCEE conducts has not been impacted by the contract cancellations. Soldner Dep. 143:10-14. While NCEE is conducting less evaluations than before the RIF, there is no evidence the quality of the evaluations has decreased due to the RIF. Soldner Dep. 164:7-24. In fact, NCEE will endeavor to maintain the same quality and rigor as has historically been provided, and the contractors will continue to do the same high quality work. Soldner Dep. 165:7-22.

After contract cancellations, IES "continues to use many of the same dissemination channels it did prior to the terminations." Soldner Dep. 133:5-10. For example, the What Works Clearinhouse has been and is being updated with new information. Soldner Dep. 133:11-14. "The cadence of dissemination may be slower." Soldner Dep. 133:9-10. Prior to the RIF and contract cancellations, there was no evidence that there was an established timeline to respond to requests for restricted access use. Soldner Dep. 38:21-24. And prior to the RIF, it was the primary responsibility of two staff members to provide restricted access. Soldner Dep. 38:1-9.

While staffing at IES may be lower, the impact of the RIF on IES was to rearrange the workload among the remaining employees. Soldner Dep. 151:15-21. All statutory functions are being performed after the RIF at IES, Clay Dep. 108:19-22, and IES can continue to fulfill its statutory duties. Clay Dep. 20:11-14. As a result of the RIF, IES decreased the pace of its work but continues to fulfill its statutory requirements. Clay Dep. 104:14-22. None of the activities that were paused were contributing to IES meeting its statutory obligations. Clay Dep. 150:2-5.

The Department is not concerned about meeting statutory requirements. Clay Dep. 155:20-156:13. The Department is unaware whether the RIF affected timing of deliverables, with the exception of the NAEP 2026 and 2028 readouts. Clay Dep. 105:1-17. This concern was resolved by detailing staff and hiring additional staff. *Id.* After the contract cancellations, IES is managing contracts that are most mission critical or statutorily required. Soldner Dep. 130:12-18.

The Peer Review process will continue as it has traditionally. Soldner Dep. 165:15-19. The RIF has caused a slower pace of peer review, "but not dramatically so[.]" Soldner Dep. 169:10-15. And for those products that are in the pipeline to be released, there is not evidence that they will be released any more slowly than they would have been prior to the RIF or contract cancellations. Soldner Dep. 169:10-19.

### F.    IES Continues to Spend its Appropriated Funds

IES has multiyear funds. Clay Dep. 27:14-22. IES has decreased the speed of spending its appropriated funds because some activities have been halted. Clay Dep. 149:10-16. These activities have been halted so IES can reevaluate, reassess, and determine how to move forward with the activities. *Id.*

The number of contracts and activities declined post contract termination and RIF. Soldner Dep. 171:12-17. The smaller staff at IES is not necessarily contributing to the lower rate of obligation: the focus on mission critical activities has lowered the rate of obligation. Soldner Dep. 186:6-20. IES is planning on somewhere between 150 and 200 contract actions in the coming year, which will affect the amount of appropriated funds spent. Rosier Dep. 240:6-241:16. IES currently has work being obligated. Rosier Dep. 172:10-11.

IES spent some of its appropriated funds on the RIF itself. Clay Dep. 133:16-21. RIFs are costly. Clay Dep. 133:3-5. In a RIF, there are retirees, annual leave payout, and severance pay. Clay Dep. 133:5-10. Thus, in a RIF, there may be more expenditures on payroll than what would typically be allocated for that time period. Clay Dep. 133:11-15.

### G.    IES Remains Functional

**Data Collection and Analysis**: NCES is currently working on longitudinal study activity. Soldner Dep. 132:9-12. Plaintiffs allege the cancellation of longitudinal studies causes harm, but it is not a foregone conclusion that stopping and resettling a longitudinal study would result in an interruption of the data – it depends on when it happens in the year and what is in the data set. Rosier Dep. 179:2-19. The Department prioritized ensuring the integrity of the data for IES. *Id.*

While Plaintiffs are correct that "[o]ther data collections, including those that (1) compared U.S. student achievement with foreign nations; (2) concerned how students finance postsecondary education; and (3) collected data on teacher and principal preparation, were also halted[,]" Pls.'

Mem. in Supp. of their Mot. for Summ. J. at 17, ECF No. 75-1 ("MSJ"), they fail to mention that each of these data collections were reinstated. Soldner Dep. 142:8-12.

**Evaluations**: As Plaintiffs concede, IES is conducted at least 12 evaluations in 2025. MSJ at 17. Plaintiffs have not identified a statutory requirement for a specific number of evaluations.

**Restricted Use Data**: Plaintiffs have not alleged that current license holders cannot access restricted data. MSJ at 17-18. And while Plaintiffs allege that there is a delay in responding to restricted-use requests, *id.*, prior to the RIF and contract cancellations, there was no evidence that there was an established timeline to respond to requests for restricted access use. Soldner Dep. 38:21-24.

**Disclosure Review**: As Plaintiffs concede, disclosure review still occurs. MSJ at 18.

**Peer Review Process**: Plaintiffs have not alleged that the Department is not doing peer review, only that the peer review process is slower and not giving the feedback they are accustomed to. MSJ at 18-19. As the IES director explained, the Peer Review process will continue as it has traditionally. Soldner Dep. 169:10-15. The RIF has caused a slower pace of peer review, "but not dramatically so[.]" *Id.* And for those products that are in the pipeline to be released, there is no evidence that they will be released any more slowly than they would have been prior to the RIF or contract cancellations. Soldner Dep. 169:10-19. It is true that not all applications will be reviewed due to contract cancellations. Soldner Dep. 136:14-137:10.

**What Works Clearing House**: The What Works Clearinghouse has been and is being updated with new information. Soldner Dep. 133:11-14. "The cadence of dissemination may be slower." Soldner Dep. 133:9-10. But IES is planning on releasing three practice guides this year. Soldner Dep. 169:4-9. The number of practice guides released per year has varied even before the RIF and contract cancellations. *Id.*

**Technical Assistance**: IES is currently providing assistance to state and district partners to help them achieve education goals through RELs. Soldner Dep. 49:7-15.

### III.    <u>Procedural Background</u>

Plaintiffs, the American Educational Research Association and Society for Research on Educational Effectiveness, filed their Complaint on April 14, 2025. Plaintiffs allege that the Department has cancelled contracts necessary for IES to carry out its functions (which Plaintiffs refer to as the "Research Termination Action") and have, through a reduction in force, terminated nearly 90 percent of IES staff (which Plaintiffs refer to as the "IES Staff Termination Action"). Plaintiffs' Complaint contains two substantive counts. Count One alleges that the Department's actions violate the APA, whereas Count II alleges that the Department's actions are ultra vires. *See* Compl. ¶¶ 157-72, ECF No. 1.

Plaintiffs filed a motion for preliminary injunction on April 29, 2025. Pls.' Mot. for a Prelim. Inj., ECF No. 12. The Court denied Plaintiffs' motion for a preliminary injunction on June 12, 2025, holding that Plaintiffs had likely not demonstrated standing and were pressing a programmatic attack rather than challenging a discrete agency action. Mem. Op. at 1-2, ECF No. 49.

Following the preliminary injunction, Plaintiffs were afforded discovery. Order, ECF No. 60. Plaintiffs received documents, interrogatory responses, and conducted three depositions, including two 30(b)(6) depositions.

Plaintiffs moved for summary judgment on Count I of their complaint on March 27, 2026. Pls.' Mot. for Summ. J., ECF No. 75. Plaintiffs seek an order setting aside and declaring unlawful and arbitrary and capricious the Department's RIF and contract terminations. Proposed Order. Plaintiffs also seek an order "enjoin[ing] [the Department] from carrying out or effectuating the

Termination Actions and shall take steps to return to the operational status quo prior to the Actions, including by restoring the capacity of IES to carry out its functions at the level, and of the nature, as it did prior to the Termination Actions[.]" *Id.* at 1-2. Plaintiffs did not move on their *ultra vires* claim.

## LEGAL STANDARDS

Section 706 of the APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law," or decisions made "without observance of procedure[s] required by law." 5 U.S.C. § 706(2)(A), (D). APA claims "are adjudicated without a trial or discovery, on the basis of an existing administrative record, [and accordingly] are properly decided on summary judgment." *Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 660 (D. Md. 2007). But the ordinary summary judgment standard set forth in Rule 56 "does not apply because of the limited role of a court reviewing the administrative record." *Deese v. Esper*, 483 F. Supp. 3d 290, 304 (D. Md. 2020) (citation omitted). "Rather, summary judgment is the mechanism by which 'the court decides as a matter of law whether the administrative record permitted the agency to make the decision it did.'" *Id.* (citation omitted).

"Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). "Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes 'a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). But a court must "vacate agency action if it is not 'based on a

- 17 -

consideration of the relevant factors' or where 'there has been a clear error of judgment.'" *Defs. of Wildlife v. U.S. Dep't of the Interior*, 931 F.3d 339, 345 (4th Cir. 2019) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)); *see also id.* ("[W]e must ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action." (citation omitted)). "Generally, an agency decision is arbitrary and capricious if 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

## ARGUMENT

### I.    The Supreme Court's decisions in *California v. McMahon* and *New York v. McMahon* warrant judgment in favor of Defendants

In *National Institutes of Health v. American Public Health Association* ("*NIH*")*,* Justice Gorsuch reminded lower courts to give a Supreme Court decision on interim relief precedential weight. 606 U.S. ----, 145 S. Ct. 2658, 2665 (2025) (mem.) (Gorsuch, J., concurring). This case followed on the heels of *Department of Education v. California,* 604 U.S. 650 (2025), which granted a stay of a preliminary injunction on the termination of Department of Education grants. In *California*, the Court found that "the Government is likely to succeed in showing the District Court lack[s] jurisdiction to order the payment of money under the APA" because the APA's waiver of immunity does not apply to claims for money damages or where another statute forbids the relief sought. *Id.* at 651.

In *NIH*, Justice Gorsuch's concurrence affirmatively stated that *Department of Education v. California*, despite being a decision regarding interim relief, should still carry precedential

weight with respect to its reasoning. 145 S. Ct. at 2663-64 (Gorsuch, J., concurring). And Justice Gorsuch noted that "even probabilistic holdings—such as *California*'s top-line conclusion that 'the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA,' must 'inform how a [lower] court' proceeds 'in like cases,'" *Id.* at 2664 (Gorsuch, J., concurring) (citations omitted).

Accordingly, *California*— which dealt with many of the same grants at issue here— squarely controls. Plaintiffs cannot bring an APA action to compel the payment of money under the APA, and this Court should dismiss the contract-related claims on this basis alone.

Similarly, the Supreme Court entered a stay in *McMahon v. New York,* 606 U.S. ----, 145 S. Ct. 2643 (2025) (mem.). Like the Plaintiffs here, the plaintiffs in *McMahon* alleged that the RIFs across the entire Department were not only unlawful, but were also so severe and sweeping that they were an impermissible step toward dismantling the Department in its entirety. *New York v. McMahon*, 784 F. Supp. 3d 311, 311-12 (D. Mass. 2025), *appeal dismissed*, Nos. 25-1495, 25-1500, 2025 WL 3451815 (1st Cir. Sep. 15, 2025). And much like the Plaintiffs here, the plaintiffs in *McMahon* alleged the RIFs violated the Administrative Procedure Act ("APA") because they were contrary to law and arbitrary and capricious. *Id.*

In support of its request for a stay, the Government presented both threshold jurisdictional arguments as well as merits arguments to the Supreme Court. Specifically, the Government argued that plaintiffs lacked any non-speculative harm to support Article III standing, that the Civil Service Reform Act ("CSRA") is the exclusive means for challenging federal personnel actions, that the injunction exceeds courts' traditional remedial authority, and that the court-ordered reinstatement of nearly 1400 employees is not a remedy traditionally available in equity. Appl. to Stay the Inj. Issued by the U.S. District Ct. for the District of Massachusetts & Req. for an

- 19 -

Immediate Administrative Stay at 14, *McMahon v. New York*, No. 24A1203 (U.S. June 6, 2025). As to the remaining injunction factors, the Government argued that the district court's preliminary relief irreparably harmed the Executive Branch and that the balance of the equities and the public interest both cut in Defendants' favor. *Id.*

By granting Defendants' stay request, the Supreme Court necessarily accepted Defendants' arguments. *See, e.g., Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) (citing *Nken* factors and noting for a stay application to be granted, the applicant must make "a strong showing that [it] is likely to succeed on the merits" (citation omitted)); *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (weighing injunctive factors and granting stay pending appeal). The arguments the Supreme Court accepted are similar to the arguments presented here to dismiss this Plaintiffs' claims. Accordingly, this Court should dismiss Plaintiffs' claims.

## II.    This Court Lacks Jurisdiction Over Plaintiffs' Claims

"Before reaching the merits of Plaintiffs' challenge . . . the Court must first satisfy itself that it has Article III jurisdiction."  *Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 12 (D.D.C. 2018).  This Court does not have jurisdiction over Plaintiffs claims due to a lack of standing, the Tucker Act with respect to the contract-related claims, and the CSRA with respect to the RIF-related claims.

### A.    Plaintiffs Lack Article III Standing

Plaintiffs lack Article III standing, which is a "bedrock constitutional requirement." *United States v. Texas*, 599 U.S. 670, 675 (2023). It requires that a plaintiff "possess a personal stake" in the outcome, which "helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires[.]" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024). Standing doctrine thus "serves to protect the 'autonomy' of those who are most directly affected so that they can decide whether and how to challenge the defendant's action." *Id.* at 379–80

(quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982)).

Under any theory of standing, "the irreducible constitutional minimum" requires that, (1) the plaintiff have suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) there must exist "a causal connection between the injury and the conduct complained of"; and (3) it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted).

Membership-based associations like Plaintiffs can establish standing "either in [their] own right or as a representative of [their] members." *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013).

An organization establishes "representational standing" by demonstrating that: "(1) its own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit." *Id.* at 184 (quoting *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991)). To satisfy the first prong, organizational plaintiffs must offer specific facts "establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009); *Lujan*, 504 U.S. at 563. As with any injury, it must be "actual or imminent, not speculative" harm, "meaning that the injury must have already occurred or be likely to occur soon." *All. for Hippocratic Med.*, 602 U.S. at 381. If the injury has not come to pass, it must be "*certainly impending*"; "allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation modified). And it must be "'concrete'—that is, 'real, and

- 21 -

not abstract.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (citation omitted).

Under the organizational standing theory, "[a]n organization may suffer an injury in fact when a defendant's actions impede its efforts to carry out its mission." *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012); *see Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). A plaintiff-organization does not have standing just because it "diverts its resources in response to a defendant's actions." *All. for Hippocratic Med.,* 602 U.S. at 395. Rather, a plaintiff-organization must show that the defendant's "actions directly affected and interfered with [plaintiff's] core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.*

The nature of Plaintiffs' alleged injuries also matters. Plaintiffs here claim that their members suffer informational injuries—in other words, the cancellation of contracts and termination of employees will deprive Plaintiffs' members of information. Informational standing has its own set of requirements Plaintiffs must satisfy: 1) "that a person lack access to information to which he is legally entitled," and 2) "that the denial of that information creates a 'real' harm with an adverse effect." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)).

Plaintiffs cannot establish standing, either representationally or in their own right.

       1.    <u>Plaintiffs fail to allege an injury in fact to the cancellation of any specific contract or the termination of any specific employee.</u>

In its preliminary injunction opinion, this Court held:

The agency clearly has the authority to fire *some* people, but not so many that it functionally shutters its doors. Because Plaintiffs' standing is based on informational injury, they need to connect terminated employees to their loss of statutorily required data. *See Dreher*, 856 F.3d at 345. But Plaintiffs went for the broader approach, asking this Court to order everyone reinstated. Plaintiffs' asserted injury does not give them standing to challenge the termination of every employee at IES impacted by the RIF. Where an employee was not performing a function necessary to the accomplishment of an IES duty mandated by Congress, their

- 22 -

termination could not have caused any legally cognizable injury to Plaintiffs.

*Am. Educ. Rsch. Ass'n v. Dep't of Educ.*, Civ. Case No. SAG-25-1230, 2025 WL 1665401, at \*6 (D. Md. June 12, 2025). Plaintiffs have doubled down on their broad approach and continue to ask the Court to order every employee reinstated by vacating the entire RIF decision. As this Court recognized, Plaintiffs' asserted injury "does not give them standing to challenge the termination of every employee at IES impacted by the RIF." *Id.* Prior to discovery, Plaintiffs were not able to "connect terminated employees to their loss of statutorily required data." *Id.* And,

> Plaintiffs have not shown they were "legally entitled" to the products of *all* 99 terminated contracts. Put differently, they have not shown that *everything* IES once did, and now is not doing, amounts to IES shirking a statutory mandate.

*Id.* at \*4. Plaintiffs do not attempt to connect either groups of employees or specific contracts to their injuries. And certainly not every contract cancelled could plausibly give rise to an injury. For example, the Department cancelled a contract "to create three stakeholder groups to meet and provide input on the evaluation agenda for the Evaluation Division in the National Center for Education Evaluation and Regional Assistance in the Institute for Education Sciences." Ex. 1 at 2,[3] ECF No. 46-2. There is no statutory requirement for the Department to do this. Nor have Plaintiffs alleged any harm from the cancellation of this contract. Yet, Plaintiffs sweep this contract into their requested relief for vacatur (and resulting reinstatement).

       2.    <u>There is no connection between specific alleged harms and failure to perform statutory duties, and Plaintiffs' harms do not flow from the challenged actions</u>

Plaintiffs' members' harms can be grouped into two different categories: deprivation of their right to dissemination of information and deprivation of their right for certain services from

---

[3] This citation refers to the ECF header page numbers.

the Department. The Department is not required by statute, however, to provide any of the services Plaintiffs now allege they lack, and thus Plaintiffs were never deprived of any right by the Department. Without the deprivation of a right, there is no harm. And because the Plaintiff organizations are allegedly harmed in attempting to cure the harms their members face, they also fail to trace their harms to the failure to provide statutory services.

To set the table, the Department has the right to both reorganize itself and make programmatic decisions on how it discharges the duties entrusted it by Congress. "The decision to undertake a reorganization necessitating a [reduction in force] is within the discretion of the agency," *McKenna v. Dep't of Interior*, 996 F.2d 1235 (Fed. Cir. 1993) (unpublished table decision). And any other programmatic decisions regarding the Institute's handling of its statutorily required duties or responsibilities are likewise committed to agency discretion. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004).

**Dissemination Harms.** First, Plaintiffs allege that they were harmed by not receiving the data collected from cancelled evaluations and studies. MSJ at 36. But the record is void of any evidence that they have been harmed by not receiving impartial, incomplete datasets. While they may have put forward declarations that they were anticipating and relied upon using the completed dataset, there is no evidence that they would have any use from incomplete data. Additionally, Plaintiffs fail to trace this alleged failure to release information to the RIF or to the cancellation of any contract, nor do they seek an order from the Court to release this information.

Second, Plaintiffs allege harm from not having access to the restricted-use portal. MSJ at 36. But Plaintiffs' declarations confirm that at least some members still have access to restricted use data. For example, Yasmiyn Irizarry has had her restricted-use access license extended twice

since the RIF and contract cancellations. Decl. of Yasmiyn Irizarry, ECF No. 75-31 ("Irizarry Decl."), AERA-0631-32. Based on Plaintiffs' own evidence, the Department has the staffing and contracts necessary to provide restricted use access and respond to restricted use access requests. Even if individual members of the Plaintiff organizations do not have restricted access, there is no evidence that this lack of restricted access flows from contract cancellations or RIFs. Notably, Plaintiffs do not seek an order restoring restricted use for any of their members.

Third, Plaintiffs allege harm from the lack of publications on the WWC. Plaintiffs never identify a statutory requirement for a specific frequency of WWC publications. The What Works Clearinghouse has been and is being updated with new information. Soldner Dep. 133:11-14. While "[t]he cadence of dissemination may be slower," Soldner Dep. 133:9-10, IES is planning on releasing three practice guides this year. Soldner Dep. 169:4-9. The number of practice guides released per year has varied even before the RIF and contract cancellations. *Id.*

Fourth, Plaintiffs allege an injury based on the number of studies that IES is conducting or supporting. MSJ at 36. But there is no statutory requirement that IES perform a specific number of studies, and the parties agree that IES is doing at least some studies. *Id.* ("The quantity of research that IES is conducting or supporting also dropped dramatically, the number of evaluations and new research grant awards each dropped by 80 percent.")

**Departmental Services**: First, Plaintiffs allege that they are harmed because IES cannot "function as the leader of the education research field." MSJ at 37. How this would harm Plaintiffs, or how that fact could ever be proven, is not clear from Plaintiffs briefing.

Second, Plaintiffs allege harms in connection with the WWC. *Id.* at 37-38. Their first WWC-related harm is some inchoate "fear" that there will be a decline in the quality of education research published moving forward. *Id.* at 38. But this fear is speculation, pure and simple.

Plaintiffs have provided no evidence that the WWC is declining in quality. To the contrary, Mr. Soldner stated that IES will endeavor to maintain the same quality and rigor as has historically been provided, and the contractors will continue to do the same high-quality work. Soldner Dep. 165:7-22. The second WWC-related harm raised by Plaintiffs is an alleged lack of dissemination. But Mr. Soldner stated that the What Works Clearinghouse has been and is being updated with new information, Soldner Dep. 133:11-14, and IES is planning on releasing three practice guides this year. Soldner Dep. 169:4-8. There is no statutory requirement for any frequency of WWC updates.

Third, Plaintiffs allege harm stemming from the grant application peer review process. The first peer review process-related harm is an alleged procedural harm of not having grant applications reviewed. Plaintiffs base this harm on a mistaken premise, the "termination of peer review." MSJ at 38. As Mr. Soldner testified, at least some, but not likely all, of the grant applications will receive peer review. Soldner Dep. 137:1-10. And to the extent Plaintiffs' members grants are not reviewed, which Plaintiffs have not established, the correct relief would be an order to peer review those specific grants. The second peer review process-related harm is the lack of receiving feedback on grants. MSJ at 38-39. To the extent Plaintiffs' members' grants are peer reviewed, unrebutted testimony has stated that the Peer Review process will continue as it has traditionally. Soldner Dep. 165:15-19. The RIF has caused a slower pace of peer review, "but not dramatically so[.]" Soldner Dep. 169:10-15. And for those products that are in the pipeline to be released, there is no evidence that they will be released any more slowly than they would have been prior to the RIF or contract cancellations. Soldner Dep. 169:10-19. Nor is there any statutory requirement to provide the feedback Plaintiffs claim they are entitled to.

**Organizational Harms**: AERA's mission includes "advancing knowledge about

education," "encouraging scholarly inquiry related to education and evaluation," and "promoting the dissemination and practical application of research results." MSJ at 41-42 (citation omitted). Defendants have not frustrated AERA's mission. Reducing headcount at IES and eliminating unnecessary contracts do not in any way inhibit AERA from taking actions to advance knowledge about education, encourage the scholarly inquiry, or promote the dissemination and practical application of research.

As to AERA's allegations that it has diverted resources to alleviate harms its members face, AERA's expenditure of resources is intimately linked to the harms its members allege. Its claim to standing rises and falls with its members.  Nor have Defendants' actions forced AERA to divert resources: None of the actions that AERA has diverted its resources to are necessary for it to continue its core mission. "Although a diversion of resources might harm the organization by reducing the funds available for other purposes, it results not from any actions taken by the defendant, but rather from the organization's own budgetary choices." *Lane*, 703 F.3d at 675 (citation modified).

SREE's standing argument faces similar problems. SREE's mission is to advance "the generation and use of effectiveness research to solve pressing challenges in education." MSJ at 42 (citation omitted). SREE alleges that because of IES, it could not hold a job fair (MSJ at 42): a job fair is not germane to generating and using research to solve educational challenges. SREE also alleges that it is harmed because the rate of IES evaluations has slowed and the production of new research has slowed. *Id.* Like its members, SREE has not established a statutory right to a certain pace of evaluation or a certain amount of new research. SREE also alleges that it has stopped encouraging students to pursue education research, and instead supports current educational research. *Id.* By supporting current educational research, they are by definition advancing their

- 27 -

mission in the generation and use of effective research. Finally, SREE alleges that it has lost revenue because donors no longer donate and members no longer attend their conferences. But this cannot be traced to changing the headcount at IES or terminating certain contracts.

Taken together, SREE and AERA allege a generalized harm to their abstract societal interest in having IES perform non-statutorily required educational research and provide non-statutorily required technical support. But to assert associational standing, a plaintiff must show "far more than simply a setback to the organization's abstract social interests." *All. for Hippocratic Med.*, 602 U.S. at 394 (quoting *Havens Realty Corp.*, 455 U.S. at 379).

Plaintiffs' case law is inapposite. *RNC v. North Carolina State Board of Elections*, 120 F.4th 390 (4th Cir. 2024), is not helpful because the core mission of the RNC was outreach to voters, and the challenged action directly frustrated that mission because the RNC was not able to identify who could legally vote. Similarly, *Edmondson Community Organization, Inc. v. Mayor & City Council of Baltimore*, 797 F. Supp. 3d 497, 519–21 (D. Md. 2025), involved a tax sale system that would dispose of property in the historic district that the Plaintiff organization's mission was meant to revitalize. And in *Catholic Legal Immigration Network, Inc. v. EOIR*, 513 F. Supp. 3d 154, 170 (D.D.C. 2021), the core mission of providing pro bono services was frustrated because of a fee placed on pro bono services. Finally, *Northwest Immigrant Rights Project v. USCIS*, 496 F. Supp. 3d 31, 46–47 (D.D.C. 2020), involved a fee waiving rule that would impose fees for the very services that the organization provided. Each of these cases reinforces that associational standing requires some action that directly frustrates the core mission of the organization. Plaintiffs' harms are simply too attenuated.

        3.      <u>Plaintiffs' harms are not redressable by an Order of this Court</u>

"Redressability can still pose an independent bar," *All. for Hippocratic Med.*, 602 U.S. at 381 n.1, even where "the defendant has directly injured the plaintiff." *Steel Co. v. Citizens for a*

*Better Env't*, 523 U.S. 83, 106 n.7 (1998). The redressability element of standing "ensures that the court has the power to grant the plaintiff's requested relief, and that such relief would remedy the plaintiff's injury." *Sheppheard v. Morrisey*, 143 F.4th 232, 243 (4th Cir. 2025) (citing *Buscemi v. Bell*, 964 F.3d 252, 259 (4th Cir. 2020)).

Plaintiffs' claims, harms, and requested relief raise severe redressability concerns. First, it is highly unlikely that vacating the decision to terminate contracts and vacating the RIF will resolve Plaintiffs alleged harms. Second, in looking at Plaintiffs requested relief, Plaintiffs are not the "proper parties" seeking the "proper relief" to address their injuries. *Maryland v. U.S. Dep't of Agric.*, 151 F.4th 197, 212 (4th Cir. 2025) (citation omitted).

**The Relief will not redress Plaintiffs' harm.** Plaintiffs ask for four things: vacating and setting aside the RIF, vacating and setting aside the contract terminations, enjoining the Department from ever executing the RIF or contract terminations, and ordering the Department to "take steps to return [IES] to the operational status quo." Proposed Order at 1. Each of these is critically flawed for two reasons: it involves the active participation of third parties who are not subject to this Court's order and would not necessarily address the harm.

First, as to the RIF, even if the Court vacated the RIF and ordered the Department to "return to the status quo," the Department might not be able to comply. The employees that formerly worked at the Department might not return because they have found other employment or do not want to work at the Department anymore. And if the Department was ordered to hire other individuals, it is not clear whether they could find qualified applicants to return the Department to the status quo.

Plaintiffs and this Court previously recognized this. As counsel for Plaintiffs admitted, once the employees were "finally separated from the agency," this "really dramatically increas[es] the

likelihood that Humpty Dumpty can't be put back together again." Prelim. Inj. Hr'g Tr. (May 21, 2025) 57:1-6, ECF No. 34 ("PI Tr."). This is because, in counsel's own words, "after folks are definitely terminated and they're finding other employment, we won't be able to remedy those irreparable harms four months down the road." *Id.* It has not been four months, it has been almost a year. And the employees were finally separated last year. As this Court noted, Plaintiffs "might wind up in a position where [they are] suffering the same harm" because "a significant number of employees" say "You know what, we're out," which would leave Plaintiffs "in the same place that [they] are right now." PI Tr. 16:15-20.

And even if headcount were restored "to the status quo," the Department has the discretion to assign tasks to its employees to fulfill the priorities of the administration. There is no evidence that the Department would prioritize activities with this mandated workforce that would solve Plaintiffs harms.

Plaintiffs run into the same problem with their requested contractual relief. As discussed in more detail below, *infra* Section II.B., and as recognized by the Supreme Court, "[a]n order vacating the government's decision to terminate grants under the APA is in every meaningful sense an order requiring the government to pay those grants." *NIH*, 145 S. Ct. at 2664 (Gorsuch, J., concurring). Or put another way, vacating the termination of these contracts is an order to reinstate these contracts. But as this Court recognized, this would impose a contractual obligation on a third party. PI Tr. 17:24-18:8. ("If I suddenly reinstate those contracts, that person now has a contractual obligation that they were not otherwise going to have"). The Contractor might have made other arrangements or decided to move on and do something else. *Id.* Indeed, the Department might not be able to find anyone to perform the same studies as before in order to achieve "the status quo."

And if Plaintiffs' order were read more broadly to order the Department to do the same

volume of studies as prior to the cancellations, the Department could decide to do any study to fulfill the Court's order. These studies may not be beneficial to Plaintiffs or their members. In that case, Plaintiffs would be no better off after the Court's order.

**Plaintiffs are not the Proper Party Seeking the Proper Relief**: Plaintiffs' proposed relief is focused on vindicating the rights of third parties and the relief requested goes far beyond the violation of law alleged.

First, Plaintiffs' proposed relief vindicates the rights of employees and contractors rather than the Plaintiffs. A plaintiff may not normally seek relief in federal court to vindicate "the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). In other words, "standing doctrine strongly disfavors so-called third party standing" cases, where "even though the plaintiff *does* have an injury in fact and it *can* be redressed by her suit, she is denied standing nonetheless, because she is vindicating rights that more properly belong to somebody else." *Maryland*, 151 F.4th at 212 (citation omitted).

Plaintiffs' vacatur of the RIF would by necessity reinstate every employee that was separated. This would be vindicating the employees' alleged rights to their job, rather than the Plaintiffs' rights to certain statutory services. Similarly, vacatur of the contract action would necessarily reinstate every cancelled contract. This would vindicate the alleged rights of the contractors. Consider that Plaintiffs did not seek an order for specific statutory services. This reinforces the conclusion that Plaintiffs are seeking to restore the rights of the employees and contractors rather than remedy the alleged harms it is suffering from a lack of statutory services.

Second, Plaintiffs' vacatur of RIF (and subsequent reinstatement of every employee) and vacatur of the contracts (and subsequent reinstatement of every contract) "goes well beyond the violation of law alleged." *Maryland*, 151 F.4th at 212 (quoting *Allen v. Wright*, 468 U.S. 737, 753

n.19 (1984)). "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *see also CASA*, 606 U.S. at 852. The "remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)); *id.* (noting that plaintiffs' proposed theory of standing "would contravene this principle"). "The actual-injury requirement would hardly serve the purpose . . . of preventing courts from undertaking tasks assigned to the political branches [ ] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy *all* inadequacies in that administration." *Lewis*, 518 U.S. at 357.

As this Court recognized in the preliminary injunction opinion, and is true here now, Plaintiffs "have not shown that *everything* IES once did, and now is not doing, amounts to IES shirking a statutory mandate." *Am. Educ. Rsch. Ass'n*, 2025 WL 1665401, at *4. So too "[w]here an employee was not performing a function necessary to the accomplishment of an IES duty mandated by Congress, their termination could not have caused any legally cognizable injury to Plaintiffs." *Id.* at *6. By requesting the effective reinstatement of every contract, every employee, and a "return to the status quo," Plaintiffs relief goes well beyond the alleged violation of not fulfilling statutory functions.

**B.     The Court Lacks Jurisdiction Over Plaintiff's Challenge to the Cancellation of the Institute's Contracts.**

This Court does not have Article III jurisdiction because Plaintiffs' claims are in essence a contract claim. *Steel Co.,* 523 U.S. at 94 ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact

and dismissing the cause." (citation omitted)); *see also id.* ("We decline to endorse such an approach [of assuming jurisdiction] because it carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers."). Notwithstanding Plaintiffs' framing, they seek specific performance of the cancelled contracts—a contract remedy.  Compl., Prayer for Relief; Proposed Order at 1 ("**ORDERED** that Defendants' Termination Actions are declared contrary to law and arbitrary and capricious, and are accordingly **VACATED** pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2)[.]"). In asking the Court to vacate the cancellation of contracts, the Department will necessarily have to attempt to reinstate the contracts, and thus resume the payments terminated by the contract cancellations. Accordingly, the claims implicate the Tucker Act.

The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States."  28 U.S.C. § 1491(a)(1).  The Tucker Act precludes relief under the APA or otherwise because the APA's waiver of sovereign immunity is limited to claims "seeking relief other than money damages[,]" 5 U.S.C. § 702, and the APA does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought[,]"  *California*, 604 U.S. at 651 (quoting 5 U.S.C. § 702).  This exception "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). Moreover, Congress has by statute explicitly forbidden district court jurisdiction for such claims. 28 U.S.C. § 1346(a)(2) ("[T]he district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States [unless it is for less than $10,000].").  In sum, by statute and by virtue of the United States'

sovereign immunity, this action is founded upon contracts with the United States, must be dismissed for lack of jurisdiction.

The Supreme Court recently reaffirmed this jurisdictional line in *California*:

The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Nor does the waiver apply to claims seeking "money damages." *Ibid*. True, a district court's jurisdiction "is not barred by the possibility" that an order setting aside an agency's action may result in the disbursement of funds. *Bowen v. Massachusetts*, 487 U.S. 879, 910, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988). But, as we have recognized, the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered here. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

604 U.S. at 651; *see also U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 162 (D.D.C. 2025) (explaining that the D.C. Circuit has long "interpreted the Tucker Act as providing the exclusive remedy for contract claims against the government" (citation omitted)), *dismissed,* No. 1:25-cv-00465-TNM, 2025 WL 1350103 (D.C. Cir. 2025).  Since *California*, courts have recognized this jurisdictional bar in cases involving the types of remedies sought here.  *See, e.g.*, *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 25-1281, 2025 WL 1232337 (4th Cir. Apr. 10, 2025) (granting the Government's motion to stay a preliminary injunction because of *California*); *Mass. Fair Hous. Ctr. v. Dep't of Hous. & Urb. Dev.*, CIV. A. No. 25-30041-RGS, 2025 WL 1225481 (D. Mass. Apr. 14, 2025) (dissolving temporary restraining order considering the Supreme Court's decision in *California*).

Plaintiffs contend that the Tucker Act is not implicated because "Plaintiffs seek to require IES to carry out its assigned and funded functions."  MSJ at 45.  But that is of no moment.  Courts must look to the claims' "substance, not merely [their] form." *Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995).  Regardless of how a claim is styled, a

- 34 -

district court lacks jurisdiction if a case "is in 'its essence' contractual." *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)); *see also Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004); *Holley v. United States*, 124 F.3d 1462, 1466 (Fed. Cir. 1997) ("The presence of a constitutional issue does not erase the jurisdiction of the Court of Federal Claims based on a properly brought claim under the Tucker Act, or bar the court from considering the constitutional issue in the course of determining whether the [challenged action] was wrongful.").

The parties agree that the operative test is the *Megapulse* test. MSJ at 44. Determining whether "a particular action" is "at its essence a contract action" not within the jurisdiction of the district court requires looking at the two *Megapulse* factors: "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968.

First, the source of the rights Plaintiffs assert are the contracts themselves. The Department provided the services demanded by Plaintiffs via contracts with third parties. 20 U.S.C. § 9512 (permitting the Institute to perform its delineated functions "directly or through grants, contracts, or cooperative agreements.") But for the contracts, Plaintiffs would not receive the specific benefits they want reinstated, including the specific studies and technical support. And but for the contract terminations, Plaintiffs would not be harmed. Plaintiffs point to no other source of rights for *these* specific services provided by *these* contractors.

"Because the United States's obligation is in the first instance dependent on the contract, these claims are contractually-based" and "the district court lacks jurisdiction under the Tucker Act." *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 647 (9th Cir. 1998) (concluding

that district court lacked jurisdiction under the Tucker Act over constitutional claim because it was contractually based).  In other words, "it is likely that no cause of action would exist at all," in the absence of the contracts. *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 377 (2d Cir. 1999) (citation omitted).  That Plaintiffs' claims could not "exist[] prior to and apart from rights created under the [agreements]" weighs sharply against district court jurisdiction. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985)*; see also Consol. Edison Co. of N.Y. v. U.S. Dep't of Energy*, 247 F.3d 1378, 1385-86 (Fed. Cir. 2001) (directing court to transfer case asserting constitutional, including due process, claims to the Court of Federal Claims in a case sounding in contract).

Plaintiffs argue that their "claims in no way depend on contract terms or performance of [the] specific contracts." MSJ at 45. But Plaintiffs' request belies that intent.  Plaintiffs are not seeking to vindicate their rights to IES services, they are seeking to vindicate the contractual rights of the individual contractors by having their contracts reinstated and for the contractors to perform the studies the previous administration preferred. *See* Proposed Order at 1-2 (asking the Court to vacate the contract terminations and "return to the operational status quo prior to the Actions, including by restoring the capacity of IES to carry out its functions at the level, and of the nature, as it did prior to the Termination Actions.") These rights are only available via the specific contracts for those specific benefits, making Plaintiffs rights grounded in the contracts, not any statute.

In any event, the other *Megapulse*, 672 F.2d at 968, factor is dispositive here.  The nature of relief Plaintiffs seek sounds in contract.  *See Conf. of Cath. Bishops*, 770 F. Supp. 3d at 165-166.  Plaintiffs ask the Court to "set aside" the "Contract Termination Action[s]", "vacate[]" the "Termination Actions," and order the Department to "return to the operational status quo prior to the Actions, including by restoring the capacity of IES to carry out its functions at the level, and

of the nature, as it did prior to the Termination Actions."  Proposed Order at 1-2.  Thus, Plaintiffs "seek[] the classic contractual remedy of specific performance." *Spectrum Leasing Corp.*, 764 F.2d at 894.

But this Court cannot order the Government to continue to perform under a contract. *Id*. at 894-95. Such an order requiring that the government "must perform" on its contract is one that "must be resolved by the Claims Court." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985); *see also California*, 604 U.S. at 651 (the "Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA," and "as we have recognized, the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money[.]'" (citation omitted)).  Indeed, where a plaintiff "wants the Government to keep paying up[,]" that by itself is enough to trigger the Tucker Act. *Conf. of Cath. Bishops*, 770 F. Supp. 3d at 163.  That is effectively what Plaintiffs seek from this Court.

As recognized by the Supreme Court: "An order vacating the government's decision to terminate grants under the APA is in every meaningful sense an order requiring the government to pay those grants." *NIH*, 145 S. Ct. at 2664.  And as the D.C. Circuit wrote in *Conference of Catholic Bishops*: "[t]he Court squints in vain to see any daylight.  Like those plaintiffs, the [plaintiff] asks the Court to order the Government to cancel the termination, pay money due, and reinstate the contracts.  That is something this Court lacks the power to do."  770 F. Supp. 3d at 164; *accord Am. Ass'n of Colls. for Tchr. Educ.*, 2025 WL 1232337, at *1; *Sustainability Inst. v. Trump,* No. 25-1575, 2025 WL 1587100, at *1 (4th Cir. June 5, 2025); *Sols. in Hometown Connections v. Noem*, CIV. A. No. 25-CV-00885-LKG, 2025 WL 1530318, at *10 (D. Md. May 29, 2025), *aff'd,* 165 F.4th 835 (4th Cir. 2026).  If Plaintiffs' claims here succeed and the contracts are reinstated by

dint of the vacatur, the Department will necessarily be paying money on those contracts to continue providing services to Plaintiffs, and such money damages trigger the Tucker Act.

Plaintiffs invoke Justice Barrett's concurrence in *NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring in partial grant, partial denial) for support of their challenge to these contract terminations. But Justice Barrett simply made the anodyne observation that the Tucker Act does not foreclose challenges to agency guidance, even where a successful challenge to that guidance might result in reinstatement of contracts. But Plaintiffs here are not challenging President Trump's executive order to "review all existing covered contracts and grants and, where appropriate and consistent with applicable law," "terminate or modify (including through renegotiation) such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of [the President's] Administration." Contract Executive Order § 3(b). They challenge the termination of the contracts themselves and seek reinstatement. Thus, this Court lacks jurisdiction over the claims challenging the Departments' cancellation of contracts.

### C.  Congress Has Channeled Subject-Matter Jurisdiction Over Plaintiffs' Claims Arising from Federal Employment into a Distinct System, Not Review in This Court in the First Instance.

Even if Plaintiffs have Article III standing, this Court lacks jurisdiction to adjudicate plaintiffs' challenges to the employment decisions of federal agencies. Although district courts have jurisdiction over civil actions arising under federal law, *see* 28 U.S.C. § 1331, "Congress may preclude district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump ("AFGE")*, 929 F.3d 748, 754 (D.C. Cir. 2019). As detailed below, Congress has precluded jurisdiction for the claims brought by Plaintiffs challenging the Department's reductions in force.

The Civil Service Reform Act ("CSRA") and the Federal Service Labor-Management Relations Statute ("FSL-MRS"), which is set forth in the CSRA, together provide a comprehensive

"scheme of administrative and judicial review" for resolving both disputes between employees and their federal employers and disputes brought by unions representing those employees. *Id.* at 752 (regarding FSL-MRS); *see Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) (regarding CSRA more broadly). In passing the CSRA, Congress made the Merit Systems Protection Board[4] and Federal Labor Relations Authority ("FLRA")[5] the exclusive means for federal employees, labor unions, and other interested parties to raise challenges to final, non-discrimination-related, adverse employment actions. *See United States v. Fausto*, 484 U.S. 439, 455 (1988). CSRA channeling is required even when such disputes involve constitutional claims. *See Elgin v. Dep't of the Treasury*, 567 U.S. 1, 10–15 (2012) (citation omitted); *see also AFGE*, 929 F.3d at 752; *Nat'l Ass'n of Agric. Emps. v. Trump,* 462 F. Supp. 3d 572, 586 (D. Md. 2020) (adopting the reasoning of *AFGE*).

CSRA's channeling provisions preclude this Court's review of Plaintiffs' reduction in force claims. Everything about those claims, and the remedies Plaintiffs seek, derives from the relationship between the federal government and its employees, to which Plaintiffs and their members are strangers. Plaintiffs cannot step into the shoes of those employees and assert claims against the Department that the employees cannot themselves assert in federal district court but

---

[4] Congress established the MSPB to, among other things, hear employee appeals of final adverse actions as set out in 5 U.S.C. § 7512. *See* 5 U.S.C. § 1204(a)(1). The MSPB may order relief to prevailing employees, including reinstatement, backpay, and attorney's fees. *Id*. §§ 1204(a)(2), 7701(g). Employees may appeal adverse MSPB decisions to the Federal Circuit. *See id*. § 7703(b)(1)(A); *see also* 28 U.S.C. § 1295(a)(9).

[5] The FLRA was established by Congress as part of the FSM-LRS to conduct hearings and resolve complaints of unfair labor practices, *see* 5 U.S.C. § 7105(a)(2)(G). Direct review of the FLRA's decisions on unfair labor practice and negotiability issues is available in the courts of appeals. *See id*. § 7123(a). FLRA regulations are set out at 5 C.F.R. pt. 2420. Among other things, the regulations allow persons or organizations who show that the outcome of the proceeding is likely to directly affect their rights or duties to intervene. *See* 5 C.F.R. § 2423.22.

instead must pursue before the FLRA or the MSPB.

In *AFGE*, the D.C. Circuit applied the "two-step framework set forth in" *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), to conclude that the union plaintiffs in that case could not challenge in district court three executive orders related to federal employment. *AFGE*, 929 F.3d at 754. Under that framework, district courts lack jurisdiction over suits like this one when the intent for exclusive review in the court of appeals is "(i) fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure." *See id.* at 755 (citation modified).

The Supreme Court repeatedly has held that the CSRA provides the exclusive means of redressing employment disputes involving federal employees. *See Elgin*, 567 U.S. at 10-15; *Fausto*, 484 U.S. at 455. In other words, Congress intended to make the FSL-MRS and CSRA the exclusive scheme, and they satisfy the first step of the two-step *Thunder Basin* framework. As to covered actions, beyond restricting judicial review of covered constitutional claims, the CSRA prevents district courts from deciding the merits of APA claims challenging an agency's "'systemwide' . . . policy interpreting a statute," its "implementation of such a policy in a particular case," *Nyunt v. Chairman, Broad Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009) (quoting *Fornaro v. James*, 416 F.3d 63, 67-69 (D.C. Cir. 2005)), or its decision to engage in "'a *type* of personnel action' the [CSRA] does not cover," *Mahoney v. Donovan*, 721 F.3d 633, 635-36 (D.C. Cir. 2013) (emphasis in original); *but see Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023).

Indeed, it would be odd if a stranger to the federal-employment relationship—such as Plaintiffs here—could raise claims in this Court that the affected federal employees cannot themselves raise. In fact, it would upend the entire reticulated process Congress set out in the exclusive statutory schemes of the CSRA and other employment statutes. The "exclusion" of

- 40 -

Plaintiffs "from the provisions establishing administrative and judicial review for personnel action" of the type challenged here "prevents [Plaintiffs] from seeking review" under other provisions. *Fausto*, 484 U.S. at 455. When a comprehensive scheme of the sort at issue here permits review at the behest of some types of plaintiffs but not others, it implicitly precludes review by plaintiffs who are not authorized to bring claims.

For example, *Block v. Community Nutrition Institute*, 467 U.S. 340, 347 (1984), considered a statute that permitted dairy handlers to obtain review of certain "market orders" after exhausting administrative remedies, but did not authorize review by anyone else. *See id.* at 346 (citing 7 U.S.C. § 608c). When a group of dairy consumers sought review of a marketing order, the Supreme Court explained that the statute omits a "provision for participation by consumers in any proceeding," and that "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* at 347. Hence, the "structure of this Act indicates that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized." *Id.* And the "restriction of the administrative remedy to handlers strongly suggests that Congress intended a similar restriction of judicial review of market orders." *Id.* Any other holding would facilitate circumvention of the comprehensive statutory scheme. *See id.* at 348.

The principles described in *Block* fully apply to the CSRA and other employment statutory schemes. *See Fausto*, 484 U.S. at 448 (applying *Block* to conclude that certain employees who lack CSRA appeal rights "should not be able to demand juridical review for the type of personnel action covered by that chapter"). Because Congress intentionally foreclosed judicial review by parties other than those to whom it specifically authorized to seek relief, Plaintiffs, who are not employees of the Department, certainly cannot challenge the Department's employment actions

here.

"Although the [Plantiffs] Complaint avoids invoking the term 'unfair labor practice,' this is precisely what it attempts to allege." *Rogers v. Kelley*, No. 8:22-CV-02924-PX, 2024 WL 1856305, at *3 (D. Md. Apr. 29, 2024). "[N]o private cause of action exists to litigate unfair labor practice claims in federal court" *Id.* Here, the conduct being regulated is plainly the employment at the Department of Education. Because "district courts do not have concurrent jurisdiction over matters within the exclusive purview of the FLRA," this Court should reject Plaintiffs' effort to disrupt Congress's review scheme and to seek premature, improper review before this Court. *Am. Fed'n of Gov't Emps., AFL-CIO v. Loy*, 367 F.3d 932, 935 (D.C. Cir. 2004) (citing *Karahalios v. Nat'l Fed'n of Fed. Emps.,* 489 U.S. 527, 533 (1989)).

This result does not foreclose the RIF from meaningful judicial review. The employees can seek review of the reduction-in-force. And to the extent the reduction-in-force may affect Plaintiffs' rights or duties, the regulations governing these types of actions would allow Plaintiffs the opportunity to intervene. *See* 5 C.F.R. § 2423.22. Even if Plaintiffs could not ultimately bring the claims they raise here, there is no rule that every Plaintiff must be able to bring every claim – these Plaintiffs may not be able to bring claims challenging this reductions-in-force in any court under this set of facts.

Plaintiffs rely on *Wiley v. Kennedy,* 789 F. Supp. 3d 447 (S.D. W. Va. 2025), and *Elev8 Baltimore, Inc. v. Corporation for National & Community Service*,  804 F. Supp. 3d 524 (D. Md. 2025), to argue that the CSRA does not preclude their claims. But those cases are distinguishable. *Wiley* involved an office within HHS that had completely "paused." 789 F. Supp. 3d at 455. And in *Elev8,* the court had found the RIF had shut down the program. 804 F. Supp. 3d at 540-41. Here, there is no dispute that IES has continued to perform its statutory duties, albeit at a slower pace.

- 42 -

Thus, this case is effectively a dispute over the termination of staff at the Department, which should be channeled.

### III.    Plaintiff's APA Claim Fails.

Plaintiffs have failed to carry their burden on their motion for summary judgment, and this Court should grant summary judgment to Defendants on Plaintiffs' APA claims.

### A.    Plaintiffs Do Not Seek Judicial Review of a Discrete Agency Action

As a threshold matter, Plaintiffs do not identify an agency action that the Department has taken that could specifically be redressed by a federal court. Plaintiffs must plead "an identifiable action or event" and "direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan*, 497 U.S. at 891; *Norton*, 542 U.S. at 62 (APA limits judicial review to "circumscribed, discrete agency actions"). These final agency actions must be "circumscribed [and] discrete." *Norton*, 542 U.S. at 62. The APA does not provide for "general judicial review of [an agency's] day-to-day operations," *Lujan*, 497 U.S. at 899, like "constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). The APA thus contains "a prohibition on programmatic challenges," meaning "challenges that seek 'wholesale improvement' of an agency's programs by court decree." *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (cleaned up). "Because an on-going program or policy is not, in itself, a final agency action under the APA, [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted). The avoidance of such review reflects separation of powers concerns and seeks to prevent the "broad programmatic attacks" disfavored in agency review. *Norton*, 542 U.S. at 64; *see also New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (citation modified) ("When challenging agency action . . . the plaintiff must . . . identify specific and discrete governmental conduct, rather

- 43 -

than launch a broad programmatic attack on the government's operations.").

Plaintiffs' claims and requested relief present exactly the type of wholesale challenge that the APA forbids. Plaintiffs' allegations reveal that they do not seek judicial review of a discrete agency action. Rather, they seek wholesale judicial review of the Department's management of the Institute. Instead of presenting the Court with a "narrow question to resolve[,]" *Cobell*, 455 F.3d at 307, Plaintiffs challenge the Department's day to day operations regarding IES's staffing levels and contracts. Addressing this type of claim would require the Court to supervise IES's activities and determine how it would accomplish each statutorily-mandated function—an even more extreme kind of supervisory claim than was at issue and rejected in *Lujan*. *See Lujan*, 497 U.S. at 892-93. Such a claim would completely circumvent the purpose of the APA's discrete agency action requirement, which is to "protect agencies from undue judicial interference with their lawful discretion and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton*, 542 U.S. at 66-67.

Plaintiffs requested relief confirms their programmatic claims. Plaintiffs ask to vacate the contract terminations (reinstate the contracts) and vacate the reduction in force (reinstate employees). This alone would cause the Court to judicially control the agency's programs. But Plaintiffs go further. They ask for the Court to order the Department to "take steps to return to the operational status quo prior to the Actions, including by restoring the capacity of IES to carry out its functions at the level, and of the nature, as it did prior to the Termination Actions." Proposed Order at 1-2. Plaintiffs' requested relief makes this Court the superintendent of the Department of Education, requiring it to micromanage agency actions to maintain functions at the same "level and "nature" as the prior administration.

As this Court recognized, APA relief must be drawn by scalpel, not battering ram. *Am.*

- 44 -

*Educ. Rsch. Ass'n*, 2025 WL 1665401, at *4. With respect to Plaintiffs' contract related claims, Plaintiffs have persisted in framing them "as one sweeping agency action," which "seem[s] to make the kind of programmatic challenge the APA disfavors." *Id.* at *1.

So too have Plaintiffs continued their "struggle to demonstrate a singular final agency action." *Id.* Unrebutted testimony shows that each and every contract was reviewed prior to termination, Rosier Dep. 21:4-10, and that each contract was individually assessed by its description, the dollar amount, the value, the time left on the contract, whether the work was statutorily required, and whether there was any fluff. Rosier Dep. 20:9-20. Thus, each contract had an individual decision as to terminate, rescope, or leave in place. Rosier Dep. 23:15-24:1. That the order to "execute" each of these individual decisions came in one order does not undermine the individual decision made on each contract.

It's questionable whether the contract cancellations could be considered "final" agency actions at all, at least with respect to these Plaintiffs. An agency's action is final when it (1) represents "the consummation of the agency's decisionmaking process," and (2) either determines legal "rights or obligations" or is an action "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted). The framing of Plaintiffs' challenge is to the provision of statutory services: and the Department has by no means consummated its decision-making process with respect to the way it is managing its programs. IES currently has work being obligated, Rosier Dep. 172:10-11, and is planning on executing between 150 and 200 contract actions. Rosier Dep. 240:6-241:16. Even were the Court to find that IES is currently not delivering some statutory services right now—and to be clear, the Department is delivering all required statutory services—it would be premature for the Court to mandate a certain set of programs, studies, and contracts while IES is in the midst of reorganizing its portfolio. *See* Amber M.

- 45 -

Northern, *Reimagining the Institute of Education Sciences: A Strategy for Relevance and Renewal* (Feb. 2026), https://ies.ed.gov/ies/2026/02/reimagining-ies. At the end of the day, Plaintiffs may receive every statutory service that is allegedly not being provided now.

**B.    There Are Adequate Alternative Remedies Available.**

Review under the APA is available only where "there is no other adequate remedy in a court." 5 U.S.C. § 704. The requirement that a plaintiff have "no other adequate remedy in court," *id.*, reflects that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action[,]" *Bowen*, 487 U.S. at 903. As already described above, this is, in essence, an employment action, and there are CSRA and FSL-MRS remedies. To the extent this case rests on contract claims, then the Court of Federal Claims provides an adequate alternative under the Tucker Act.

**C.    The Department's Actions Were Not Arbitrary and Capricious.**

Plaintiffs present various arguments in support of their motion for summary judgment. *See* MSJ at 51-56. Specifically, Plaintiffs assert that the Defendants' failed to offer an adequate explanation for their actions, *see id.* at 51-52, that the Department failed to rely on prior factual findings and evidence, *see id.* at 52-53, that the Defendants' failed to consider important aspects of the problem act, *see id.* at 54-56, and that Defendants failed to consider fail to consider Plaintiffs' reliance interests, *see id.* at 56-57. These are, in essence, four different ways of asserting the same thing:  Plaintiffs claim that Defendants' actions are arbitrary and capricious because they failed to adequately explain why they conducted a reduction in force or terminated contracts.

"Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Rather, the Court must ensure "that the agency has acted within a zone of reasonableness[.]" *Id*. "Review under this standard is highly deferential" in determining

whether an action is arbitrary and capricious, *Ohio Valley Env't Coal.*, 556 F.3d at 192, and agency action regarding reallocation of resources, if reviewable at all, must be afforded highly deferential rational basis review, *cf. Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (noting that, absent a statutory directive to the contrary, an agency has unreviewable "capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way.").

As described above, President Trump and Secretary McMahon have repeatedly articulated the presence of inefficiency and waste at the Department. As noted, the Secretary has reorganized the Department of Education as part of an effort to right-size and streamline the Department's operations. Plaintiffs may disagree with that decision, but that does not give them the right to substitute their judgment for that of the Secretary's about how best to run IES. Ultimately, Courts lack the power to "dictat[e] to the agency the methods[] [and] procedures" it uses to complete its statutory obligations. *See Vt. Yankee Nuclear Power Corp v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 545 (1978) (quoting *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976)). To override these principles and enjoin agency leadership from exercising control over their own staffing and contracting issues would be an extraordinary violation of the separation of powers.

To that end, the reduction in force and contract terminations incorporate the type of actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Markland v. OPM*, 140 F.3d 1031, 1033 (Fed. Cir. 1998) ("We accord an agency wide discretion in conducting a reduction-in-force; absent a clear abuse of that discretion, a substantial departure from applicable procedures, a misconstruction of governing statutes, or the like, we do not upset a final agency decision.") (citation modified).

First, staffing decisions fit neatly among those "categories of administrative decisions that

courts traditionally have regarded as committed to agency discretion." *Lincoln*, 508 U.S. at 191-92 (citation omitted). After all, the point of the Department's actions is to improve efficiency, which allows the Department to "meet its statutory responsibilities in what [the new administration] sees as the most effective or desirable way." *Id.* at 192. Plaintiffs cannot point to a particular statute limiting the agency's inherent discretion to reduce headcount. Again, agencies generally have broad discretion to determine how to implement a statute. *See Vt. Yankee*, 435 U.S. at 543.

Second, the review of each individual contract—which led to some being cancelled, others rescoped, and still others maintained—closely examined whether each specific contract was needed to fulfill statutory duties. Rosier Dep. 208:2-9 (describing that the Department was "looking at what's statutory required and ensuring that we're adhering to that, like, at all times. Like, there wasn't a situation where we're try- -- where somebody was trying to loosely follow the statute, or, 'Hey, you know, we can kind of do this.' So it was a 100 percent, like, we wanted to ensure that we were meeting our statutory requirements regarding that.") Whether the Department made a mistake, *i.e.*, acted arbitrarily and capriciously, by terminating any individual contract is a separate challenge not brought by Plaintiffs here. Instead, they indiscriminately challenge all contract cancellations, imputing possible errors on *some* contracts to *all* contracts and ask this Court to reinstate each and every one.

The reduction-in-force and other decisions on program implementation reflects the Administration's effort to realign the Department to provide better service to the American people. "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985). But even if this Court were to conclude that the Department's explanation for the reductions in force or termination

of contracts is insufficient for judicial review, that would in no way justify a preliminary injunction. Rather, "the proper course" would be "to remand to the [Department] for additional . . . explanation," not any type of injunction. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

In APA cases such as this one, involving cross-motions for summary judgment, "the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote omitted) (collecting cases). Thus, this Court need not and ought not engage in lengthy fact finding,[6] since "[g]enerally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996); *see also Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 171 (D.C. Cir. 2013) (noting in an APA case that "determining the facts is generally the agency's responsibility, not ours"). Plaintiffs characterization of the Departments' decision is not adequate overcome the "highly deferential" standard of review under the APA. *Ohio Valley Env't Coal.*, 556 F.3d at 192.

**The Department Adequately Explained its Actions**: Plaintiffs allege that the Department did not adequately explain its actions. As described above, President Trump and Secretary McMahon have repeatedly articulated the presence of inefficiency and waste at the Department, and the Department was separately ordered to "terminate or modify (including through renegotiation) such covered contracts and grants to reduce overall Federal spending or reallocate

---

[6] As stated in fn. 1, extra-record evidence is not properly considered in resolving APA claims. Recognizing that discovery has taken place into the process by which the challenged decisions were made, and to respond to Plaintiffs use of extra-record evidence, Defendants will also rely on deposition testimony.

spending to promote efficiency and advance the policies of [the President's] Administration." Contract Executive Order § 3(b).

Plaintiffs repeatedly point to testimony that "mistakes" were made, MSJ at 51—but this is a backward-looking assessment that could not have possibly been considered by the decisionmaker when terminating the contracts. Plaintiffs also argue that there is no explanation for contract terminations leading to savings, *id.,* but it should be self-evident and a measure of common sense that ending payment on a contract would lead to savings. Additionally, Plaintiffs argue that cancelling contracts was not reasonable when there had already been investments made. *Id.* But these contracts still had millions left to pay, and those millions after cancellation would be a savings to the taxpayer. Finally, Plaintiffs misstate that there was no consultation with expert staff at IES, MSJ at 51: Johnathan Bettis, head of procurement at IES, was involved in the meetings and contract assessment. ROG 3, Rosier Dep. 117:14-18.

**The Department considered the appropriate information**: For the contract terminations, the Department reviewed each contract prior to termination. Rosier Dep. 21:4-10. Each contract was individually assessed by its description, the dollar amount, the value, the time left on the contract, whether the work was statutorily required, and whether there was any fluff. Rosier Dep. 20:9-20. This review involved input from the Programs Office, with Jonathan Bettis taking the lead. Rosier Dep. 41:4-5.  Mr. Bettis was a senior individual who was well versed in IES programs as the procurement lead, and had more knowledge than the head of IES on the details of the contracts. Rosier Dep. 44:1-19. As for the RIF, the Department solicited the views of POC's on headcount required for statutory duties, Clay Dep. 41:7-21, identified statutory functions within IES, Clay Dep. 66:16-67:9, reviewed IES programs, Clay Dep. 10:7-22, and made the determination that 20 people was sufficient to fulfill all of IES's functions. Clay Dep. 143:7-11.

Plaintiffs march through actions that the Department *could* have taken before conducting the RIF or contract cancellations. But there is no requirement that the Department interview staff before cancelling a contract or performing a RIF, or look at CPARS data. Nor is there a basis for the Department to perform a workload analysis before a RIF: Plaintiffs misstate that workload analysis are "typical" before a RIF. MSJ at 8; *see also id.* at 53. Ms. Clay was clear: "'typical' is not the right word." Clay Dep. 88:15-17.

**The Department considered only the factors Congress intended:** Throughout the RIF and the contract cancellations, the Department was laser focused on meeting the statutory requirements set out by Congress. Therefore, the Department considered the factors Congress intended, and the cancelled contracts and reduced headcount represent work at IES that Congress did not intend. The mission at IES stayed the same after the change in the administration, but the priorities shifted. Clay Dep. 17:4-16. The Department was committed to adhering to statutory requirements "at all times." Rosier Dep. 209:2-9. The Department identified the statutory functions entrusted by Congress, reviewed the functions, and then determined that it could perform those functions at the adjusted scale. Clay Dep. 66:16-67:9.

Plaintiffs argue that the Department impermissibly focused on savings and efficiencies when it cancelled contracts. MSJ at 55. But that interpretation is not borne out by the facts. Throughout the process, the Department prioritized statutory mandates. Rosier Dep. 209:2-9. If anything, winnowing contracts that were not statutorily required focused the agency on the work that Congress intended.

**Plaintiffs overstate their reliance interests**: Plaintiffs allege that the Department did not consider their reliance interest "on ongoing research." MSJ at 56-57. This research had not been published or disseminated before it was cancelled: no party could reasonably rely on data that did

not exist yet. And to the extent that Plaintiffs reliance interest stems from the dissemination of information generally, the Department did not consider that reliance interest because the Department was and is always going to disseminate data, as required by statute. After contract cancellations, IES "continues to use many of the same dissemination channels it did prior to terminations" Soldner Dep. 133:5-10.

> **D.      The Department's Termination Actions Were Neither Contrary to Law Nor in Excess of Defendants' Statutory Authority.**

Plaintiffs do not show that the Termination Actions are "not in accordance with law" and "in excess of statutory . . . authority." 5 U.S.C. § 706(2). Throughout their briefing, Plaintiffs grandiosely claim that the contract cancellations and RIF made it impossible for IES to perform numerous (unnamed) statutory duties, and yet in this claim they identify a mere three statutory duties that are not being fulfilled: longitudinal studies, dissemination, and peer review.

**Longitudinal Studies**: ESRA requires IES to "conduct[] longitudinal and special data collections necessary to report on the condition and progress of education." 20 U.S.C. § 9543(a)(7). There is no statutory deadline or frequency requirement for longitudinal studies. And NCES is currently working on longitudinal study activities, Soldner Dep. 132: 9-12: at least two employees are working on them. Soldner Dep. 133:2-4. As such, IES is not operating contrary to law.

**Dissemination, specifically Restricted Use Access**: Plaintiffs declarations confirm that at least some members still have access to restricted use data. For example, Yasmiyn Irizarry has had her restricted-use access license extended twice since the RIF and contract cancellations. Irizarry Decl., AERA-0631-32. Based on Plaintiffs own evidence, the Department has the staffing and contracts necessary to provide restricted use access and respond to restricted use access requests. Plaintiffs argue that the contract cancellations caused a "pause" of the restricted-use program, but there is no evidence to support that contention.

**Peer Review Process**: The Peer Review process will continue as it has traditionally. Soldner Dep. 165:15-19. The RIF has caused a slower pace of peer review, "but not dramatically so." Soldner Dep. 169:10-15. And for those products that are in the pipeline to be released, there is no evidence that they will be released any more slowly than they would have been prior to the RIF or contract cancellations. Soldner Dep. 169:10-19. It is true that not all applications will be reviewed due to the contract cancellations. Soldner Dep. 136:14-137:10.

E.        **Plaintiffs Have Abandoned Their Constitutional Claim.**

Plaintiffs appear to have abandoned their separation of powers and *ultra vires* claim at summary judgment. The Department is therefore entitled to summary judgment on these claims.

Any challenge to funding decisions by the Department are committed to the agency's discretion by law. *See* 5 U.S.C. § 701(a)(2). In appropriating funds for the Institute, Congress gave the agency broad discretion to decide when and how to spend funds consistent with the various purposes specified in the appropriations laws. Here, in 2024, Congress appropriated funds "[f]or necessary expenses for the Institute of Education Sciences." Further Consolidated Appropriations Act, 2024, Pub. L. No.118-47, 138 Stat. 690 (Mar. 23, 2024); S. Rep. No. 118-84, at 247 (2023) (incorporated into statute by Pub. L. No. 118-47 § 4 and Explanatory Statement, 170 Cong. Rec. H1501, 1886 (Mar. 22, 2024)). Congress continued funding at this level for 2025. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(8), 139 Stat. 9, 11.

Those appropriations provide no standards "against which to judge the agency's exercise of discretion" in making the many choices the agency must make concerning how to spend those funds. *See Heckler*, 470 U.S. at 830. The agency has unreviewable discretion to make choices on how the appropriations are spent. *Lincoln*, 508 U.S. at 192 ("the allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency

- 53 -

discretion."). The Department's decisions about how best to spend appropriated funds "requires 'a complicated balancing of a number of factors which are peculiarly within its expertise,'" and the "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 193 (quoting *Heckler*, 470 U.S. at 831–32).

Here, Congress merely appropriated funds for broad purposes, including for the expenses of Institute operations, and the further delineation of broad purposes does not require that the Government provide a specific amount of funds to particular contracts or employee salaries. *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 690 (Mar. 23, 2024) (appropriating funds "[f]or necessary expenses for the Institute of Education Sciences"); S. Rep. No. 118-84, at 247 (2023) (incorporated into statute by Pub. L. No. 118-47, § 4 and Explanatory Statement, 170 Cong. Rec. H1501, 1886 (Mar. 22, 2024)); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(8), 139 Stat. 9, 11. How those funds "could best be distributed" is not a judicially reviewable question, but instead is left to agency discretion.

Nor do Plaintiffs make any progress by repackaging their APA claims as ultra vires claims. "[S]uits for specific relief against officers of the sovereign" allegedly acting "beyond statutory authority or unconstitutionally" are not barred by sovereign immunity. *Larson v. Domestic & Foreign Comm. Corp.*, 337 U.S. 682, 689, 693 (1949). The exception to sovereign immunity is based on the principle that such *ultra vires* action by a federal officer "is beyond the officer's powers and is, therefore, not the conduct of the sovereign." *Id.* at 690. Here, Plaintiffs set forth no *ultra vires* claim that is distinct from their APA claims—Plaintiffs' *ultra vires* claim in Count II alleges that "Defendants lack the constitutional or statutory authority to determine not to carry out those functions by refusing to spend the appropriated funds on staff and contracts that carry out IES's data, research, and dissemination functions." Compl. ¶¶ 166-172. Aside from the allegations

- 54 -

regarding appropriations, this count is merely duplicative of the APA claim in Count I, which alleges violations of statutory requirements. Thus, Plaintiffs' *ultra vires* claim fails for the same reasons as does the APA claims.

Moreover, Plaintiffs' separation of powers *ultra vires* claim is barred at the outset because it is purely statutory. The Supreme Court has made clear that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review[.]" *Dalton v. Specter*, 511 U.S. 462, 473-74 (1994). This keeps with the long tradition of "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* at 472. The Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or if the executive officers rely on an unconstitutional statute. *Id.* at 473 n.5. Neither of those situations applies here.

Contending that the challenged actions violate the separation of powers, Plaintiffs are advancing the similar arguments the Supreme Court rejected in *Dalton*. Plaintiffs' alleged separation-of-powers claims hinge entirely on, respectively, whether Defendants acted in accordance with statutory obligations and appropriations law. MSJ at 33-35. The outcome of the issues Plaintiffs raises depends on resolution of statutory claims rather than any unique separation-of-powers principles. If Plaintiffs' argument were accepted, then every garden-variety action by a federal agency alleged to be in violation of a statutory provision could also for the same reason be alleged to violate the constitutional separation of powers. Thus, the Department is entitled to summary judgment on Claim 2.

## IV.    The Court Should Limit any Remedy to Remand

"If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances,

is to remand to the agency for additional investigation." *Fla. Power & Light Co.*, 470 U.S. at 744. *See also INS v. Orlando Ventura*, 537 U.S. 13, 16 (2002) ("Generally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands"). The function of a reviewing court ends when "an error of law is laid bare." *Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952). Courts remand to agencies and do not typically perform an "administrative function." *Id*. at 21.

Courts are "not without discretion… to leave agency action in place while the decision is remanded for further explanation." *Standing Rock Sioux Tribe v. U.S. Army Corps. Of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (citation omitted).  The decision whether to vacate depends on 'the seriousness of the order's deficiencies'" and "the disruptive consequences of an interim change that may itself be changed."  *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (citation omitted).  The seriousness of a deficiency "is determined at least in part by whether there is 'a significant possibility that the agency may find an adequate explanation for its actions' on remand."  *Standing Rock Sioux Tribe*, 985 F.3d at 1051 (citation omitted).  Courts must analyze "the disruptive consequences" that vacatur would engender. *Id*. at 1051 (quoting *Allied-Signal*, 988 F.2d at 150-151).

As to whether the Department "may find an adequate explanation for its actions," the Department could likely provide the Court information on its past, current, and planned operations to satisfy a statutory requirement that the Court identifies as not met. While the Department has provided a certified administrative record and Plaintiffs conducted discovery, this discovery was performed in support of a claim seeking programmatic improvements at the Department. A Court order focusing on a specific statutory requirement could likely result in additional explanation.

Even if the Department was found not to have adequately explained its actions, and that

this failure was a serious deficiency, that factor would not be dispositive. *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d  240, 270 (D.D.C. 2014) ("There is no rule requiring either the proponent or opponent of vacatur to prevail on both factors").  If it were dispositive, the answer would always be vacatur and remand, thereby swallowing the rule.  Instead, "resolution of the question turns on the Court's assessment of the overall equities and practicality of the alternatives," *id.*, and courts have often remanded without vacatur notwithstanding the seriousness of the agency order's deficiencies.  *See Citrus HMA, LLC v. Becerra*, No. 20cv707, 2022 WL 1062990, at \*10 (D.D.C. Apr. 8, 2022) (remanding without vacatur based on the second *Allied-Signal* factor); *Am. Great Lakes Ports Ass'n v. Zukunft*, 301 F. Supp. 3d 99, 105 (D.D.C. 2018), *aff'd sub nom. Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020) (remanding without vacatur even though the first *Allied-Signal* factor favored vacatur); *Shands Jacksonville Med. Ctr.*, 139 F. Supp. 3d at 270 (same); *see also N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 550 F.3d 16, 20 (D.C. Cir. 2008) (expressing preference for a "simple remand" (without vacatur) in a case in which the agency had been found to have violated a statute); *Global Van Lines, Inc. v. ICC*, 804 F.2d 1293, 1305 n. 95 (D.C. Cir. 1986) ("We agree with the Commission that when an agency committing an error of law has discretion to determine in the first instance how it should be rectified, the proper course is to remand the case for further agency consideration in harmony with the court's holding.") (citing cases); *Bayshore Cmty. Hosp. v. Azar*, 325 F. Supp. 3d 18, 24–25 (D.D.C. 2018) (remanding without vacatur where the agency had committed a legal error because "vacatur . . . exceeds what is required to resolve the parties' dispute").

Here, vacatur would be impracticable. Contracts have been terminated and employees have been separated for approximately a year. The Department has hired new employees with different skillsets to create a new workforce, has reinstated contracts and is planning 150 to 200 additional

contract actions. Even if old employees and contracts could be reinstated, it may cause severe complications within IES due to new employees overlapping skillsets with reinstated employees and duplicative, wasteful contracts.

If the Court were to vacate the decisions, it by no means should accept Plaintiffs invitation to manage the day-to-day operations and programs within IES by "restor[ing] [] the status quo." MSJ at 60. Plaintiffs style this request as vacatur in their brief, but their proposed order seems to present it as an injunction. Proposed Order at 1-2 ("**ORDERED** that Defendants are permanently enjoined from carrying out or effectuating the Termination Actions and shall take steps to return to the operational status quo prior to the Actions, including by restoring the capacity of IES to carry out its functions at the level, and of the nature, as it did prior to the Termination Actions"). Plaintiffs cannot "seek[] wholesale improvement of [a] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Lujan*, 497 U.S. at 891.

Yet is exactly wholesale improvement of IES by court decree that Plaintiff seeks:

Restoration of the status quo would require Defendants to: (1) reconstitute a workforce sufficient–in number, expertise, and experience—to support pre-Termination Action functions, including (but not limited to) peer-review grant-making, providing technical assistance and expert guidance, maintaining timely access to restricted-use data access, timely processing of disclosure risk review requests, fostering collaboration among scholars through a variety of media and means, and facilitating publication and widespread dissemination of research; (2) provide all supports needed, through contracts or otherwise, to resume the scope and quality of data collection and research that was interrupted by the Actions, including longitudinal studies, evaluations, data collection of core data sets, and grant-supported research previously conducted.

MSJ at 60. Plaintiffs' requested order would have the Court manage the composition of IES's workforce to provide functions, "including (but not limited to)" seven different aspirational goals, some related to statutes and others with no connection whatsoever. To ensure compliance, the Court would need to identify, monitor, and set, for perpetuity, the following metrics in IES (none

- 58 -

required by statute):

- the "scope and quality" of data collection and research

- the number, expertise, and experience of the workforce

- technical assistance and expert guidance

- collaboration among scholars through a variety of media and means

This type of programmatic management is flatly rejected by *Lujan*.

Moreover "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course' or where 'a less drastic remedy . . . [is] sufficient to redress' the plaintiffs' injury." *O.A. v. Trump*, 404 F. Supp. 3d 109, 154 (D.D.C. 2019) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)). The relief granted "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). The expansive relief that Plaintiffs seek flouts these well-established principles and should be significantly narrowed, if awarded at all.

As such, any equitable relief should do no more than necessary to alleviate the irreparable harm to any specific Plaintiff that the Court finds to have established such harm. Extending relief that is either broader in substance or scope (i.e., wholesale reinstatement of staffing at or any contracts for programs that Plaintiffs do not even utilize) would violate the foundational Article III principle that judicial remedies "must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). A federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." *Id.* at 66 (citation omitted). Principles of equity reinforce those limitations, and "[u]niversal injunctions have little basis in traditional equitable

practice." *Dep't of Homeland Sec. v. New York*, 589 U.S. 1173, 1175-76 (2020) (Gorsuch, J., concurring).

**CONCLUSION**

Plaintiffs' motion for summary judgment should be denied, and summary judgment should be granted on all claims for Defendants.

DATED: May 8, 2026                                    Respectfully submitted,

                                                      BRETT A. SHUMATE
                                                      Assistant Attorney General

                                                      BRAD P. ROSENBERG
                                                      Special Counsel

                                                      */s/ Michael Bruns*
                                                      Michael Bruns
                                                      Trial Attorney
                                                      United States Department of Justice
                                                      Civil Division, Federal Programs Branch
                                                      1100 L Street, N.W.
                                                      Washington, DC 20005
                                                      michael.bruns@usdoj.gov
                                                      (202) 514-4011

                                                      KELLY O. HAYES
                                                      United States Attorney
                                                      Charles R. Gayle (Bar No. 14706)
                                                      Assistant United States Attorney
                                                      U.S. Attorney's Office for the District of Maryland
                                                      36 South Charles St.,
                                                      Baltimore, MD 21201

                                                      *Counsel for Defendants*