# EXHIBIT 2

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

AMERICAN EDUCATIONAL              |
RESEARCH ASSOCIATION              |
(AERA) and SOCIETY FOR            |
RESEARCH ON EDUCATIONAL           |
EFFECTIVENESS (SREE),             |
     Plaintiffs,              |    Case Number:
vs.                               |
                                  |
                                  |    25-cv-1230
U.S. DEPARTMENT OF                |
EDUCATION, INSTITUTE OF           |
EDUCATIONAL SCIENCES,             |
LINDA MCMAHON and MATTHEW         |
SOLDNER,                          |
     Defendants.              |
_____|

Video Deposition of

CHRISTOPHER JOSEPH ROSIER

Tuesday, December 16, 2025

at 1:14 p.m.

in Washington, D.C.

Reported by: Jeaninn Alexis, Stenographic Reporter

Job no: 11587

position as executive director?

A    I think around two years, I would say.

Q    Okay.  I want to talk about the process of contract terminations.

Um, are you familiar with the IES contracts that were canceled on or around February 10th and February 13th?

A    Yes.

Q    Okay.  Um, I might refer to them collectly -- collectively as the February contract cancellations or respectively as the February 10th contract cancellations and then the RELs cancellations on the 13th.

A    Okay.

Q    Um, can you describe how the process of canceling these research data dissemination and support contracts began?

A    So we were doing a global review of all contracts at the department, so we were looking at every contract in the agency, making determinations on, um, statutory -- are they statutorily required, are they mission critical, are they operational backbones?  And so part of that analysis, those contracts were included

because they were part of the portfolio.

Um, and then as those reviews were occurring, we received notification from our chief acquisition officer, um, along with, um, either the -- the special advisory to the secretary that "Hey, we would like you to terminate these contracts as part of that review."

And so we -- I would receive an email, um, would either have a list of contracts, sometimes it would have an -- an attachment with that. And then I would begin, you know, executing the -- you know, what they -- what they asked me to terminate.

Q   Okay. Let's -- let's take that step by step.

A   Okay.

Q   So when did that -- you said that there was a global review --

A   Mm-hmm.

Q   -- of contracts.

A   Yup.

Q   When did that global review begin?

A   I ca- -- I don't know the specific date.

Q   Okay.

A   But, I mean, it pretty much began when the --

A    -- as precise when --

Q    I understand.

A    -- all this stuff occurred, but ...

Q    Okay.  Somewhere around that time period?

A    Right.

Q    Um, but it's fair to say it was after January 25th?

A    Yeah.

Q    Okay.  Um, what -- what does a global review entail?

A    Um, printing out all your contracts, looking at, um, you know, what is -- what is the description, um, what are the dollar amounts, what's the value, um, how much time is left on the contract.  And then we were also looking at it as a statutorily -- you know, making statutorily required recommendations or, um, looking at it for, you know, what was the statute that was requiring this and looking at that.  And we're also having kind of our teams look at it to see, you know, are there -- is there fluff in some of these contracts as well; right?  Um, and so that was -- that was a big piece of it as well.

Q     What do you mean by "fluff"?

A     Things that maybe are not statutorily required.

Q     And so, um, you said, "We were looking at this."

So who are the individuals reviewing the actual contracts?

A     So, um, at one point -- so all -- all the COs, all the acquisition professionals looked at them, and then the program office looked at them as well.

Q     Okay.  And when -- okay.  Um, and so the CAO, the senior adviser, and the SPC that you mentioned -- SPE that you mentioned, they weren't looking at the individual contracts; is that correct?

A     I can't say they took some time to look at each one individually, so I'm sure they took a list -- a look at the list --

Q     Okay.

A     -- at some point.  That some of these were -- were made -- like, I can't say what each of those individuals were doing themselves.

Q     Okay.  But the -- the contract office never

Page 23

statute -- whether statutorily required or not because there's several lists during that time, and they were trying to, um, figure out some of that information as well, um, and different people mark different things. And so, you know, it was just a list that was kind of giving a -- a broad overview of our -- of ED's portfolio.

Q   And it included not just IES?

A   Correct.

Q   Why was there a global review of contract terminations?

A   Well, so we d- -- it wasn't -- we didn't review termination, we reviewed all the contracts.

Q   Okay.

A   So I think that was all done as part of -- um, you know, we -- we knew there was an understanding when this digital service team was turning to DOGE that, um, they wanted to do some looking into our contracts, into how ED was doing -- doing work, period.  So I think that was done just to see where we could find efficiencies within our contracts, um, cost savings in some cases when we were doing everything that's statutorily

required, and then were there things in the contracts now, did they align -- all align with the administration's priorities.

You know, some of these contracts were put in place by previous administrations, could have been five years ago, could have been ten years ago.  We're spending millions of dollars if -- if -- if this administration says, Hey, well, we would want to do something a little bit different or in a different way, um, this was our opportunity to kind of see where that could happen, where we could make changes, you know, where things could happen various ways.  So, you know, there was different things done based on, you know, the different -- based on each individual contract.

Q    So the goal of the global review was to identify potential efficiencies?

A    I don't want to say it was to identify solely; right?  Like -- because I don't want to say that solely, so I think it was -- it was across.  It was, is there cost savings?  Is everything statutorily required that we're doing?  Um, was -- are there -- is there fluff in these contracts?  Um, yeah, are there some cost savings

we didn't realize?  Does this align with the administration's priorities at this point in time?  Are we actually -- is the reality of what we're paying for the reality of what we're getting as well?

So, you know, I think it was -- it's -- it's multifaceted, I guess, I would say as far as what they were looking for the outcome.  And so -- and I don't think any -- I don't think -- as I was looking at our team, it was a -- trying to have a predictive outcome. You know, I think it was just, Hey, let's look at it. And we're looking at the contracts.  What's going to rebuild the contract is -- is what's -- what's in it, what we're getting, what we're providing.  And all that was done in concert with the -- with the program office as well.

Q    So you said there was no predictive outcome --

A    From my perspective.

Q    Okay.

A    So --

Q    So it -- the review could have resulted in no contracts being terminated?

A    Yeah.  I mean, I -- we -- we didn't terminate

don't know if it was -- if Matt was a commissioner in

that role at that time or he was the highest person in

IES to make these decisions.

You know, I was thinking Jonathan was somebody

that could make these decisions as well.  So what I know

is that there was somebody from IES leadership involved.

So whether that was Matt, Jonathan, or somebody else

during that time, um, I'm not sure and I don't know who

has the rank to make that decision.  But I know --

Q    So --

A    -- they were part of the conversation; right?

It wasn't -- I don't think the- --

Q    Right.

A    -- these were done in a -- in a vacuum.

Q    And I just want to -- I want to clarify,

you're -- you're speaking as the department when you say

you don't know who had the rank to make those decisions;

is that correct?

A    No.  So I'm speaking of -- from IES; right?

So you -- you're pinpointing me on Matt Soldner, the

commissioner, wasn't there to make a decision.  And what

I'm saying is I don't -- there was somebody from IES

Page 44

Q    Okay.  Okay.  So was the department not interested in his expertise in those areas?

A    Maybe they thought Jonathan was good enough to make the determinations.  I don't -- I can't say something -- a meeting that I wasn't there and -- and somebody else denied that.  So that to me, I --

Q    But --

A    -- I wouldn't -- I wouldn't think that -- like, I mean, I think Jonathan was a senior individual within IES making a lot of these decisions and -- and Matt was not around for a lot of them.  Like, day-to-day, my team was not necessarily working with Matt, especially on these contracts, all the time.

Q    Okay.

A    Jonathan was very versed in everything IES. He was their procurement lead.

Q    Right.

A    So I -- I would think he probably has more knowledge than -- than Matt on a lot of these things.

Q    Right.

But he's saying in this email that he doesn't, that -- that Matt actually has expertise that would be

whatever the next thing we were trying do.  And so we were -- you know, some of these are being -- were identified maybe they weren't statutorily required.  Some of them might have been ending -- you know, whate- -- whatever reason they were, I mean, I think the urgency was to get the list, let's try to get it done as soon as possible, which is how we work.

Q    And that's how you've always worked?

A    We've always worked to get the things done as soon as possible, correct.

Q    Okay.  And there -- it says there was a meeting scheduled with the program at -- team at 10:00 a.m.

Were -- were you in that meeting?

A    I don't know.  I'd have to see.  I don't -- I'm not sure.

Q    You don't remember?

A    Yeah, I don't -- I don't recall.  I don't know if that's the program team where, hey, I'm going to relay some information to them or -- you know, I -- I don't recall.

Q    All right.  Let's look at Exhibit L.

Page 114

Q    Okay.  Prior to February 10th, had the department ever terminated a contract for convenience?

A    Yes, we've terminated contracts for convenience before that date.

Q    And prior to February 10th, has the department ever terminated an IES contract for convenience?

A    I can't say precisely, but I would assume we probably terminated some contracts in there for convenience, I would assume.

Q    Before February 10th, when was the last contracts for convenience terminated by IES?

A    That's a question I would have to ask, like, the co-CO, who is leading that team.  Because -- because -- because you're doing a T4C, it doesn't necessary require a higher, like, authority or signature other than the CO at the time, depending on what the contract is.  So I don't have any awareness of any we've done, like, maybe last year or the year before, but, you know, that's some data I'd have to pull.

Q    Okay.

A    I don't -- I don't know.

Q    So you're not aware of any one for IES in the

vendor's performing satisfactory -- in a satisfactory way across the board; right?

And -- but that may not -- and that means they're meeting their goals and objectives of what they're doing, so they're doing an okay job, but that doesn't mean, like, that is somebody we want to continue to do business with or we -- we should for other reasons -- you know, for whatever reasons.  So we also want to rely on, you know, the people that are doing the job and what they're delivering and things of that nature.

Q    So for IES, who would know the reality on the ground?

A    It'd be the individuals like Jonathan, Matt, you know, some of the individuals there.  Some of our acquisition professionals as well would have some -- some insight, but that insight would have to come from, you know, individuals.  A lot of that in IES as well.

Q    So the -- so IES primarily has the -- has the insight -- the reality as to how the contracts are performing on the ground?

A    In most cases, right, I mean, that's nuanced,

have been some concerns --

Q    Right.

A    -- that individuals have expressed over -- over some time, in some years, and then also, is the -- you know, some of these long longitudinal studies, some of these data things that we do is, like, is the value -- you know, in year one, is the value here, is it -- is the data still worth it in year five or year ten?  You know, I mean, it -- we've done so many reimagining of -- or doing things a little bit different for IES contracts over the last few years.

Q    Right.

A    So, you know, things are -- things are -- are changing -- but that was a thought as well, is, you know, some of these things, some that we're contracting for in year one, have they changed significantly so that in year five, is -- is actually useful, what we're receiving, or is it -- you know, we end up getting this data, it's stored on this website, it's going here for somebody, how many people are actually looking at this and, you know, we spent $50 billion on it or whatever -- you know, whatever it is.  You know, so those are things

Is that the department's position?

A    So my position is -- I guess, representing the department here -- is Jonathan's the expert on these things.  At the pace that we're moving, he should be able to make pretty good determinations for these things as well, knowing their entire portfolio and hired specifically to do this job.

Q    Yes.

A    And there may be cases where mistakes were made, and so there was a remedy for this.  This is an example of that.

Q    Okay.  So this is an example of a mistake being made --

A    Could -- it might have been a mistake.  I don't -- I can't tell you why ultimately because it was the CAO, our senior officer, and somebody in I- -- IES, whether it was Matt, whether it was Jonathan, made the decision, "Hey, we want to terminate this the first time"; right?  And then our team went and executed, but then two days later, like, "Hey, this wasn't something we should have done," and then he's following that process to say, "Hey, we need to try to reinstate that."

Page 164

A   -- right?

So if statutorily required work was indeed terminated and stopped, then it was -- it's going to be re-competed or redone or reimagined, you know, with the new vision of whatever IES was trying to do.  So I don't think the intention was to stop statutory requirements.

Q   So -- so when the contracts were terminated on February 10th, there was an intention to re-compete all of that work?

A   Yeah, a good portion of it.

Q   Really?

A   Yeah.  There would have been -- yeah.  So a lot of it -- I can't say all -- everything precisely --

Q   Mm-hmm.

A   -- but, yes, there were some contractors like, "Hey, we're going to redo this, reimagine it, look at it in a new way, rebuild."  IES was getting built back up, from my -- my understanding -- my knowledge of, A, is that they were going to rehire individuals, they're going to build back up, and then they were going to -- some of the stuff that were going to be terminated --

Q   So at the -- at the point these -- at the

Q    -- and how would we be able --

A    -- it's continuing -- continuing --

Q    Who has that information?  Where is that stored?

A    I mean, it's publicly available.  So, like, this FPDS shows all our obligations; right?  And then we have an acquisition management system that shows our obligations as well.  Any time we obligate a single dollar, it's in the public domain.

Q    Okay.

A    And IES has work being obligated.

Q    So you said a significant amount of the contracts terminated, the plan was to rebid them?

A    So I don't want you to take my words and -- and change them a little bit.  And so --

Q    Okay.

A    -- maybe I wasn't as precise in there.  So my intention -- my -- my understanding, and to my knowledge, is -- is that, yes, so -- like, if there were things that were statutorily required, something for that nature that we would want to rebuild.

         And so I will say, for example, like, the

information you have in front of you and that you reviewed for this deposition, you're not aware that this has been reinstated?

A    Not this particular contract, but I don't know if we haven't received the information that we contracted for under this contract.  I mean, if we spent $14 million of a 15-million-dollar contract, I would think that we probably received what we contracted for. But, you know, based on the information, you know, without looking specifically or knowing how that was precisely settled or what was the ultimate outcome, you know, I couldn't tell you precisely for this -- this one.

Q    All right.  But you did just tell me that you weren't aware of a situation where IES wrote one of these memos, said we need this data, we need this contract reinstated, and then that wasn't approved?

A    So this is after conversation; right?  So sometimes there's a conversation, and there's a copy and paste here, which is their impact.  They copy and paste and just change one word, that, after conversation, they may say, "Indeed, right, this isn't that critical.  We

can do this, this, and this, and these may be some other steps we take."

Q    Okay.

A    Sometimes it is, "Yeah, this is critical. We're going to do this, and we'll move this forward certain ways, you know."  Some of them will reinstate. Some of it is, "Hey, we'll settle.  Let's negotiate with the vendor."  Some of it is the vendor's like, "Okay. Here, you know what, we're done anyway," because, like, in some of these cases, you have some vendors, like, "We're losing money anyway on this."

Q    Right.

A    Like, we -- we -- "Here, take this, and we're ready to go."

Q    And so who's -- you said after some conversations.

Who's having those conversations?

A    So the review team, and it's usually with Matt.  Like, now it's Matt, but it could have been Jona- -- I don't know where he was in this process or anything.  So it's probably Jonathan, our OS senior advisers there, the individuals that are named that are

we're, "Hey, let's" -- "let's look to these scope, like, where can we look to do this, or let's stop the work, let's see what we're going to do here and" -- "and see, you know, if this is something we actually need.  This is something where" -- "where we want to do something."  You know, there was a -- over the course of this.  Like, "Hey, let's see if it can" -- "we can do these a little bit different, kind of still have a similar result."

Q    What was the administration's priorities as conveyed to, like, the team doing this review with respect to education research?

A    As far as educational research as a whole, or is that a comp- -- is that a vendor?  You're saying --

Q    No.  Sorry.  As a whole.

A    Okay.  I wasn't -- so to my knowledge, it wa- -- you know, we wanted to continue to do educational research, like that was part of what IES did, that was part of, you know, their mission, as you said.  And so, you know, part of that is continue, like, our statutory requirements in that realm.

Q    In looking for efficiencies, was the team doing the review encouraged to think about statutory

Page 209

requirements more expansively or more limitedly?

A    No.  I mean, looking at what's statutory required and ensuring that we're adhering to that, like, at all times.  Like, there wasn't a situation where we're try- -- where somebody was trying to loosely follow the statute, or, "Hey, you know, we can kind of do this."  So it was a 100 percent, like, we wanted to ensure that we were meeting our statutory requirements regarding that.  And so if there was, again, a contract that was terminated, that we need to reinstate for that, if there's something that's terminated, "Hey, we determine we need to re-compete this, and it's something that" -- or somebody determines in the program office that it needs to be re-competed or moved under another contract or something else.  Then, you know, the program office was leading those kind of ensuring those things happen, and our team would -- would ultimately execute based on ensuring that -- them ensuring they wanted to meet their mission -- to meet the mission.

Q    Do you know how many evaluations NCEE has published this year of federal programs?

A    NCEE --

Page 231

whole, our spend was -- was drastically lower than it --

than it ever was because we did a lot of steps for

contract statements over the year, which is -- you know,

and our savings numbers are based on terminations,

descopes, and renegotiations.

Q    Got it.

And what -- what was the focus of the NAEP

rescopes -- sorry, descopes?  Which --

A    So taking out what wasn't statutorily

required, what was some fluff in there is --

Q    Can you give me some examples?

A    Um, review cycles.  Do we need to -- you know,

some of the ways, mechanically, some of these

contractors were working things.  Some of these vendors,

G&A -- their OED profit and things on the -- on that as

well.  And so, you know, it's looking holistically at

"this is what we're paying for," what are we actually

getting.  You know, starting with the program office,

like, "Hey, are you going through this?  What do we" --

you know, "what is it" -- "what do we actually need?"

You know, "what" -- "what do we need to keep the

integrity of NAEP, which was the most" -- "which is very

Q   No.  Continue.  That was, I think, answering where I was going.

A   Okay.  Yeah.

So the descope is the program, you know, it's IES.  They're saying, "Hey, this is what is needed," but it's a -- it's a collective conversation because, um, if we -- some of these things, we knew -- although people are experts in these, we knew how to do it.  We do it in-house; right?

And so some of the conversations with the vendors is like, "No.  You need this because" -- because, you know, this, this, and this.  And so you'd have those conversations.  And it -- we -- we negotiate, and you'll see -- and you make sure -- you know, you're telling the vendors that we need to make sure the NAEP works.  It happens.  It's the, you know, integrity you -- you have in that conversation as well.

So it's really the program office going through seeing areas where things that are not either statutory required or things that are -- you know, aren't things that are necessarily needed, more enhancements, or extra -- extra work are -- are taken

out.

Q    Was there a consideration of how descoping certain reviews could impact quality?

A    Yes.

Q    And what was that determination?

A    Well, we would sit down with the vendors that are doing this, and we would say, "Is this going to impact the quality of what we're performing?"  And they would assert, they would say, "No, it's not."  And then we would agree to it if they said it's going to impact the quality we were receiving.  And we will say, how? "You do this."  And then we would adjust.

So this was -- these were conversations with the vendors as well.  Then ensuring from them that they could deliver.

Q    Okay.  And the conversations -- I know you were getting a lot of input from the program office.

A    Correct.

Q    But typically, those conversations with the vendor were, like, the contracting team; is that right?

A    Yes.  Well, the contracting team, that includes the program office, the core, the PM.

Page 240

and -- well, I know it's strong, but I don't know how.

So I think Congress appropriation comes through Congress, goes to OMB, they appropriate, then we allot it, then IES spend.  But I think IES has their own separate appropriation and things.

Q    Okay.  Do you know if IES is currently on track to expend its funds at the 800-million-dollar rate currently appropriated by Congress?

A    For '26?

Q    Yeah.

A    I mean, we're in a CR, so we don't -- we don't continue resolutions, so we don't have -- nobody has their funds right now.  So we're getting -- we're continuing resolution.  We're operating off this year's budget from last year doing that.  So I know they're going to request in funds.

So, you know, I think it would probably be too early to tell.  I know they have actions that they're -- they're planning to do this year.  I don't know how many new actions they are on, based on their plan.  But they are -- I don't know.  Probably -- I'm trying to -- somewhere between 150 to 200 actions that they're trying

to -- that they -- they want to accomplish this year. So ...

Q    IES?

A    Correct.

Q    What -- what's an action?

A    Contract action.  So it could be a modification to an existing contract.  It could be a exercising the option on existing contract in which would be the next con- -- contract term.

Q    Okay.

A    It could be a new contract.  It could be recompeting an -- an old contract as well.

Q    And -- and those 150 to 200 contract actions, do they go through approval process that we've talked about?

A    Yeah.  They're all going to go through.

Q    Okay.

A    So some have already -- I mean, we've been -- they -- so some have already gone through this process and have already been determined, "Hey, they're statutory required.  We're not trying to slow that." You know, this process has been going all of '25, so