# EXHIBIT 3

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

AMERICAN EDUCATIONAL          |
RESEARCH ASSOCIATION          |
(AERA) and SOCIETY FOR        |
RESEARCH ON EDUCATIONAL       |
EFFECTIVENESS (SREE),         |
          Plaintiffs,         |    Case Number:
vs.                           |
                              |
                              |    25-cv-1230
U.S. DEPARTMENT OF            |
EDUCATION, INSTITUTE OF       |
EDUCATIONAL SCIENCES,         |
LINDA MCMAHON and MATTHEW     |
SOLDNER,                      |
          Defendants.         |
_____|


Video Deposition of

JACQUELINE CLAY

Tuesday, December 16, 2025

at 9:12 a.m.

in Washington, D.C.



Reported by: Jeaninn Alexis, Stenographic Reporter

Job no: 11587

A    Yes.

Q    Okay.  And then on topics 3, 4, 6, 8, and 9 as to the RIFs as opposed to contracts?

A    Okay.

Q    Okay.  And so -- so you're aware that you are testifying on behalf --

A    Yes.

Q    -- of those topics?

A    I do.  I am.

Q    Okay.  And are you represented by counsel today?

A    Yes.

Q    And who's representing you?

A    Michael Bruns.

Q    And without revealing to me anything your counsel may have said to you, um, what do you know about this lawsuit?

A    Um, what I know is, um, simply that, um, it's about some -- the contracts and the RIFs and whether or not, um, IES, Institute of Education Sciences, can continue to do statutory, um, requirements based on certain cuts at the department.

A    Yes.

Q    Do you agree?

A    Yes.

Q    Okay.  Um, and is this mission the same now as it has been since January of 2025?

A    Yes.

Q    Okay.  And does the mission change with the administration?

A    The mission doesn't change with the administration, but the priority set forth or what they do the research on it, um, may influence.

Q    Okay.  But the mission stays the same?

A    The mission stays the same.

Q    So the priority set must be within that mission?

A    Yes, that's correct.

Q    Okay.  So, um, B states the mission, and C states carrying out of the mission?

A    Mm-hmm.

Q    Is that correct?

A    Yes.

Q    The statute says that "in carrying out its

Page 20

outreach, working with different -- um, working with the public, different, um, researchers, um, working with different institutes, um, understanding, um, the, uh -- understanding the educational statistics that are out there for them to then do, um, their -- their current evaluations.

Q   Got it.

And you mentioned the high quality of individuals that work at IES.

A   Mm-hmm.

Q   How did the RIF impact IES's ability to fulfill its mission?

A   IES is -- they still have the ability to, um, continue their core functions as I know it.

Q   Okay.  So were the individuals that were part of the RIF not doing work that was contributing to fulfilling its statutory mission?

A   The RIF isn't based on individuals.  The RIF is based on positions.

Q   Okay.  And so those positions were ones that were not contributing to fulfillment of the statutory mission?

um, IES. Uh, based on my understanding, based on the way things are happening at the department, um, there would be several meetings held in the secretary's conference room where they would meet with all of the principal operating components, which I will refer to as POCs, P-O-C-S, um, but they will communicate the priorities, um, in those type of settings.

Q    And who, on, say, February 1st, would have been the POCs or the POC -- is that --

A    POCs, yes.

Q    -- for -- for -- who would have been the POC for IES?

A    Matt Soldner.

Q    Okay. Um, and how were decisions regarding IES activities -- or -- I'm sorry.

Who made, for example, budgetary decisions prior to February 6th for IES?

A    Um, budgetary decisions, um, were still made in -- um, in combination with budget services with um, Matt Soldner's office. Now, IES does have multiyear funds. They have a separate appropriation. Um, so while they would make decisions, they will still confer,

BY MS. GITOMER:

Q    In -- in its -- um, does the IES statute -- does -- does ESRA, the IES statute mission mention DOGE?

A    No.

Q    Okay.  And does the -- the mission of IES mention governmental efficiency?

A    No.

Q    Um, prior to February 6th -- uh, actually, I'm sorry.  Um, le- -- let's -- um, let's -- let's continue.

Um, you alluded to this DOGE executive order --

A    Mm-hmm.

Q    -- or you explicitly referenced this DOGE executive order.

Um, did that impact who was involved in control over IES decisions?

A    I would not say control over IES decisions, but the lead for DOGE was involved in all decisions at the department as prescribed by the executive order.

Q    Okay.  And who was that lead?

A    There -- there was a DOGE team --

Q    Okay.

Q   Okay.  What expertise does Conor Fennessy have in education policy?

A   I'm not sure.

Q   Okay.  What expertise does he have in education research?

A   I am not sure.

Q   When did he first begin reviewing IES contracts?

A   To my knowledge -- I didn't have direct involvement in that.  Um, I would estimate that it was early March, maybe end of February.

Q   Okay.  Um --

A   I didn't have involvement in that, so I -- I just can't speak to that.

Q   Okay.  Um, so I -- I want to make sure -- okay.  So let's talk about the decision-making that changed pursuant to the executive order.

A   Mm-hmm.

Q   How did decision-making within the Office of the Secretary and Department of Education change following the executive order?

A   I think it was more of a, um, collaborative

effort between the department, um, leadership and the

team that came on that was identified as the lead, as it

relates to the, um, executive order, and decisions we've

made, uh, together.

Q    Okay.

MS. GITOMER:  And for the record, two

additional individuals just stepped into the room.

Would you like them to announce their names?

MS. JACKSON:  Also present, Candice Jackson.

MR. SMOOT:  Kevin Smoot.

MS. GITOMER:  Thank you.

BY MS. GITOMER:

Q    Um, and so when you say the "team leads,"

you're talking about the DOGE team leads?

A    DOGE lead, yes, that's correct.

Q    And they would work in conjunction with who?

A    The Office of the Secretary.

Q    The Office of the Secretary.

And you mentioned that, earlier, budgetary,

um, decisions were made between -- by IES --

A    Mm-hmm.

Q    -- in conjunction with the office of budget.

If we were the same grade --

Q    Okay.

A    -- and we were in the same position, I would have more time, then, to bump you from your position, and then you would be impacted.  So that's basically why we pull the information for RIF purposes.

Q    And what information is part of the RIF process that determines who -- how statutory functions are being met within a competitive area or a depart- -- or a -- or component?

A    So, um, again, early on, I think I mentioned that the first thing, um, or one of the things that we considered and we did, was, um, we went out to all of the, um, POCs, and we requested their statutory requirements for their respective areas.  Um, that list was obtained.  I did not, um, obtain that list, um, but that list was obtained.  Um, and it was a review of the statutory, uh, requirements for each of the POCs to determine whether or not, um, based on recommendations of a RIF, what -- would they be able to continue to perform their functions based on certain cuts.

Q    So -- so Mr. Bettis or Mr. Soldner, someone at

Page 47

A    Yes.

Q    Okay.  Um, are you familiar with this?

A    Yes.

Q    Okay.  Thank you.

Um, how was this organizational chart used in making RIF decisions?

A    So I don't want to -- the organizational chart in and of itself was not specifically used in making RIF decisions.  The organizational chart is a result of RIF decisions that were made, um, and that's why you see the red boxes.  So the red boxes are -- indicated where decisions were made that, um, the RIFs would take place.

Q    Okay.  So what does the red shading indicate?

A    The RIF -- the RIF would take place in that box completely.

Q    And so -- to make sure I understand, any red box means that the employees --

A    In that box --

Q    -- in that box would be RIF'd?

A    Correct.

Q    Okay.  And who made the decision that those red boxes would be RIF'd?

Page 48

A    That decision was made with the Office of the Secretary and in conjunction with the DOGE lead and after meeting with all of the agency POC leadership.

Q    Okay.  So there was a meeting with all of the agency POC leadership.

Do you -- when was that meeting?

A    I can't recall when that meeting was exactly.

Q    Okay.  But it was one -- it was one meeting?

A    Yes.

Q    With all agency leadership?

A    Correct.

Q    Okay.  And then the decision was made by the Office of the Secretary in conjunction with JO -- DOGE?

A    Mm-hmm.

Q    Okay.  Um, and what factors were considered -- we talked about this a little earlier, but what factors were considered in determining which components would be RIF'd -- or, I'm sorry, which competitive areas would be RIF'd?

A    Whether or not the organization could continue to perform its core statutory functions.

Q    And as we discussed, that was also determined

Page 52

A    No.

Q    -- functions?

A    No.

Q    Okay.  So it was the position that NCER --

A    Mm-hmm.

Q    -- could meet its statutory obligations with the commissioner's office alone?

A    Yes.

Q    Okay.  And -- one moment.

Um, why did IES have the largest percentage of employees involved in the RIF?

A    I can't speak to that.  I'm not sure of the rationale.

Q    Why were so many entire offices within IES eliminated?

A    Entire offices and several of the POCs were eliminated.

Q    Mm-hmm.

A    So they were not set aside.  They were no different than that.

Q    Okay.  And who was making those decisions to -- who made the decision, for -- for example, for IES

MR. BRUNS:  Correct.

MS. GITOMER:  And that RIF was made, according to the documents you've provided and to the deponent, had involved an evaluation of the impact on statutory functions.

MR. BRUNS:  Correct.

MS. GITOMER:  So that is what I'm asking about as it was noticed in the examination topics.

MR. BRUNS:  I'm instructing her -- she can answer as to what the process was, but she cannot disclose any internal deliberative discussions except in -- discussions if they were not reflected in the final decision. (inaudible whispering)

MS. GITOMER:  Okay.

BY MS. GITOMER:

Q    Can you please discuss the process by which the decision was made to carry out the RIF -- let me rephrase.

Can you please dis- -- can you please tell me what the process was to evaluate how the RIF would impact IES's ability to carry out its statutory functions?

A    Again, um, there was an election of the statutory functions.  That review of the statutory functions and those discussions were held with the Office of the Secretary.  Um, I was not directly involved in all of those, um, discussions, but the process, um, as I know it, is that there was a review of statutory functions, um, that was considered, and it was determined that IES could perform its statutory functions with the -- at -- at the adjusted scale.

Q    Okay.  And what do you mean by "adjusted scale"?

A    At a re- -- at -- at the reduction enforced that took place.

Q    So adjusted scale means the number of individuals --

A    Yes.

Q    -- not an adjusted scale of the functions?

A    No, no, the individuals.

Q    Okay.  And I do want to just remind you, you're -- you're testifying here on behalf of the Department of Education --

A    Yes.

within the deputy secretary, with DOGE, and the chief of staff.

It was a review of all statutory functions before any final decisions were made on the RIF, and it was not just limited to statutory functions.  Again, a RIF, you have to look at everything.

Q    What do you mean by "everything"?

A    You have to look at the purpose of a RIF, whether or not it is for restructuring purposes, if it's to rescale the workforce, um, to meet the administration -- administration priorities.  So all of those things, I believe, were taken into consideration.

Q    And so what was the purpose of this RIF?

A    The purpose of this RIF was -- um, it was multifold.  So the purpose of this RIF was to -- um, to restructure the -- the organization, again, to align to administration priorities, to eliminate duplicative functions, and to rescale the workforce.

Q    And let's take those one by one.

Why did the department want to re-skill the workforce?

A    I think with any re-skilling, it's because you

Page 70

want to get in more -- more skills.  As an example, you want to bring in AI folks that understand or have knowledge of that particular skill set.  You may want to bring in other particular data fields that may lean more heavily to what the administration priorities are, um, geared to right now.  You may want to eliminate some manual activities so you re-skill the workforce to bring in those individuals that can make some determinations on what that would look like in the organization.

Q    So you just gave a few hypotheticals.

A    Mm-hmm.

Q    You used the word "may."

Which of those were the reasons for why, in this case, there was a re-skilling of the workforce?

A    Re-skilling of the workforce in full, again, um, we wanted to look at how we could bring in system engineers to help with some of the technology, particularly bring in data scientists maybe to do more of, um, that type of, um, activity.  Um, we look at a variety of different skills on how to -- um, levels that -- and how to shave off some of the current skills that we have that we know are duplicative.

Q   And so at IES, which skills were duplicative?

A   Um, I can't speak to IES directly, um, on which skills were duplicative.  I do know that -- as an example, Jonathan Bettis, your Exhibit J, that particular box, um, was being performed at multiple offices doing similar activity, multiple administrative functions that they -- that were now being streamlined into one single office.

Um, I'm not sure if some of the other functions or skills within IES were being changed or upgraded to bring in, um, uh, like, um, data scientists, um, data analysis, things like that.  I do know they do have some statisticians, um, so there were some changes there.

Q   Which office is now doing the work that you -- you pointed to Jonathan Bettis's office?  Which -- which office is that --

A   Office of finance and operation.

Q   Is that on this --

A   No.

Q   So functions that were within IES are now outside of IES?

Page 72

A     Yes.

Q     Which functions?

A     Again, those were the administrative functions so those were -- um, some of the administrative functions would be your HR liaison functions.  It would be responses to FOIAs, it would be responses to GAO requests, it could be performance management, labor relations, time and attendance, the variety of different functions that that particular office was doing, even coordination with budget to office of budget services, that office that Jonathan Bettis kind of led.  All of those functions are now being consolidated into one central location.

Q     So was there a determination that there was not a need for IES-specific expertise for those functions?

A     There was a determination made that while those functions are needed at the department, you did not need them in every single organization.

Q     So that decision was not specific to IES?

A     No.

Q     Okay.  Um, so you talked about re-skilling the

scientists.

Are those also statisticians?

A    No.

Q    Okay.  And so are they replacing -- are -- are the individuals they are hiring conducting work that was done by prior employees?

A    Um, not -- not fully.  So when you conduct a -- a reduction in force, when you abolish a position, you -- you're basically abolishing the -- some of the functions of that parti- -- that position.  Um, so the work that the employees are performing now on the skill set is probably multifaceted.  So it may be some of what the statisticians may have been doing, but it probably also includes other aspects of the work.

Again, I am only coming in, um, the perspective of a human capital, so I can only provide you what my conversations with Matt, um, has been about those positions.

Q    Okay.  And I -- I -- I apologize to keep revisiting it.

But just to be clear, you -- you are coming in as the representative --

Page 88

done by a workload analysis. But that is not something that has to be done to determine FTE levels or -- nor is it considered as part of a RIF or required by a RIF.

Q Okay. But you did state, did you not, that that was the typical process the department would use to determine how --

A We have used that process.

Q Okay. You have used that process?

A Mm-hmm.

Q And is that the process that the department previously typically would use to determine?

A No. I can't -- I can't speak to that that was the process. So in my tenure -- so let me speak to my tenure at the department. Um, I've only done two workload analysis. So perhaps, "typical" is not the right word. Workload analysis is a consideration of how you can determine FTE levels.

Q Okay. So when I asked earlier about the typical --

A Mm-hmm.

Q -- approach to determining workload levels, you -- why -- why did you mention a workload analysis?

Page 98

statutory list of functions that was reviewed by the

Office of the Secretary and active secretary, chief of

staff, DOGE lead, where they had discussions.

Q    And -- and so help me understand this because

we have this list and there's a determination --

A    Mm-hmm.

Q    -- that the competitive areas identified for

the RIFs are not needed to meet the statutory functions.

So how did you get from that -- how did the

department get from that list to those determinations?

A    Discussions were held about each statutory

function.

Q    Okay.

A    And each of the respective boxes and whether

or not the -- the organization could continue to perform

those functions with the top boxes or the boxes that

were left in the organization.

Q    Okay.  So is there a list of which -- of these

boxes are currently working to meet each of the

statutory provisions on that list?

A    Any box that's not highlighted in red, they --

they are still in IES and able to perform the core

received -- all received the organizational charts, um, and discussions were held, um, openly in that room about the agencies -- I mean, the POC's ability to continue to perform.

Q   So in that meeting, the office of leadership and DOGE went through with each POC at -- all in the same meeting, went through each POC's individual statutory obligations and went through how they would be -- how they should meet them going forward?

A   They did not go through each statutory requirement.  There were discussions about the statutory requirement and the -- and the recommendations for the RIF and discussions were had at -- with the POC leadership and others in that room.

Q   Did POC leadership raise any concerns about their abilities to meet statutory functions?

A   Let me answer it this way because I don't want to say that there was concerns raised, but, um, a POC received their chart, they said -- they spoke openly, "Let's talk about this," what -- what -- what can be changed, um, and based on where they believed they needed to meet their statutory requirements, that was

heard by the secretary's office, and changes were made to how the RIF would proceed for that office.

Q    Okay.  You said you don't want to say concerns were raised.

Why do you not want to say that?

A    Because I don't want to say it as a -- as a concern.  It was -- it was more of, "I want to bring your attention" --

Q    Okay.

A    -- "to this before we proceed."

Q    Okay.  And remind me, what was the date of this meeting that you're -- to which you're referring?

A    I can't remember the date of the meeting, but it was prior to any March 11th notice.

Q    Okay.  Um, let's go back to the mission, uh, of the agency.  This was the document that looks like -- yup.  You already have it.

Um, if you look at carrying out the mission, 2A, it states that, "IES will conform to high standards of quality, integrity, and accuracy."

How did the Office of the Secretary and DOGE consider the impact of the RIF on its ability to conform

review of statutory programs?

A    Stat- -- stat- -- it's the statutory list. It's the same list.  Statutory requirements, statutory lists --

Q    Okay.

A    -- statutory programs.

Q    So -- so was there a review of the programs that were currently underway at IES as part of the RIF?

A    When there was a review of the stat- -- so when there was a collection of the statutory requirements, um, each POC identified the respective programs related to those statutory requirements.  So I would say yes.

Q    Okay.  Has the volume of IES work that can be performed decreased significantly since the RIF?

A    I would say that the volume of work has decreased.

Q    In what ways?

A    I do believe that the -- um, the pace at which IES performs the work has decreased.  Um, but the work in and of itself, um, is still continuing to get done, um, as it relates to the statutory requirements.

Q    What -- what effect on timing did the RIF have?

A    Um, I'm not sure, um, there was a specific effect on timing, um, that the RIF may have had with, um, IES.  Um, I am aware that, um, there was some, um, concern with NCES in particular and NAEP for the 26 and 28 due-outs or deliverables, but, um, they was able to, um, get those back on track.

Q    What were those concerns?

A    Um, they wanted to make sure that they had, um, the right individuals on staff that needed to review some of the activities.  So we, um, detailed some people to, um, NCES from, um, NAGB, National, um, Assessment Governor's Board, I think.  I can't remember their -- that name.  But we detailed some of those individuals over to, um, NCES to help.  And, again, um, Matt, um, has also, um, began hiring into that area.

Q    Were -- were any of the people that were RIF'd at NCES previously working on the work that you just mentioned for which folks were detailed?

A    Yes, I believe so.

Q    And so they were -- their -- their work was

record at 11:20 a.m.

BY MS. GITOMER:

Q    Okay.  So NCES had a RIF from about a hundred people to about three people -- three to six people. And after which, there were concerns that certain NAEP functions may be delayed?

A    Yes.

Q    And those concerns were addressed by detailing individuals from NAGB to assist NCES with those duties. Is that correct?

A    Yes.  We detailed a couple of folks from NAGB.

Q    Okay.  So the RIF included individuals who were completing statutory functions without whom there were delays?

A    Yes.

Q    Okay.  Um, are the -- are there currently enough qualified staff at IES to supervise IES contracts?

A    I would say yes, and I do know that they are also hiring staff.

Q    And why are they hiring staff?

A    Um, again, when you do a RIF, a RIF isn't just

about abolishing a position or eliminating a position. It's also about re-skilling so Matt was looking to, um, bring in different skill sets within the organization, um, that can help IES perform -- continue to perform its statutory requirements.

Q    What skill set was he looking to bring in?

A    Um, recently, he brought in a few data scientists in particular.

Q    Okay.  And what will -- what's their role?

A    Um, I believe he brought the data scientists into, um, NCES.  Um, and they are, um, looking at some of the contracts as well.  Um, and I believe he's hiring for a couple of other positions, but I'm not sure, um, the specific positions at this time.

Q    Okay.  So you mentioned one impact of the RIF was timeliness --

A    Mm-hmm.

Q    -- potentially.

What functions are no longer being performed because of the RIF at IES?

A    I believe all functions are still being performed at IES.

Page 133

A    I guess it would depend on how you look at it. A RIF is expensive.

Q    How much was spent on a RIF for IES?

A    I don't know IES specifically, but again, a RIF is costly.  So if you have a RIF, you're going to have retirees, and you're going to also have annual leave payout which can be costly if we have an employee with 240 hours or 720 hours.  If you have an employee that's not eligible for retirement, then you have to pay severance pay in addition to annual leave.

So the funds are being expended, and, in fact, they may -- you may expend more than what you typically allocated during that period of time.  So it's not just basic salary and benefits, you are now having to spend more based on the RIF.

Q    And is that money coming from the IES budget?

A    Yes.

Q    Okay.

A    It's coming from the appropriations or POCs received, what we call PC&B, payroll, compensation and benefits.

Q    Okay.  And so the statute says that, "IES

a RIF. Um, it's also about workforce restructuring, workforce realignment, workforce re-skilling. In -- in accordance with federal regulations, when you have a RIF, you can also continue to fill positions. And so that is an option that the department has and that is a part of what Matt is considering.

Q Okay. So 20 people was sufficient to fulfill all of IES's statutory functions?

A Correct.

Q The department made that --

A Correct.

Q -- determination?

Okay. So -- so the distinction between what we just discussed is that it may not be the final decision on how many are necessary to do the work going forward, but 20 individuals, at the time of the RIF, was enough to complete all of its statutory functions?

A Yes.

Q Okay. Has IES determined whether it will conduct any longitudinal studies in the future?

MR. BRUNS: Objection. If there has been a final decision, the answer is duplicative.

Q    With -- without a change, are they on track?

A    Without a change, they may not be.

Q    Okay.  They may not be.

Why do you say "may"?

A    Because it's only without a change.

Q    Okay.

A    So without a change, they may not be on track. I can't give it a definitive because I'm not -- I'm just not sure.

Q    Okay.  Why is IES not expending a substantial share of its appropriated funding?

A    I think some of it has to do with -- and I'm saying I think -- I -- I believe, I think some of it has to do with a pause of some of the -- potentially halt some of the activity so that Matt can reevaluate, reassess, and then determine how they move forward.

Q    Pause some activities.

Which -- which -- which activities?

A    I'm not sure.  That -- that -- Matt would have to address that.  So, you know, I can only speak to Matt stepping back, looking at his organization now, where they are, um, in trying to reassess, okay, what do I

put -- put fir- -- first.

Q But -- but none of the activities that were paused were contributing to IES meeting its statutory obligations?

A Not that I'm aware of.

Q And who decides how much funding IES is permitted to expend on its functions?

A Um, IES.

Q And going back to the chart, I was under the impression that you had said budget was handled by Mr. Bettis. Is that correct?

A He's in I -- yeah, he was in IES.

Q Right.

And so -- but I also was under the impression that following the RIF, the functions in his office were moved outside of IES?

A To the office of finance and operations, which is still itself restructuring and making sure that we have the teams appropriate to provide the administrative support to all of the POCs.

In the meantime, which I also mentioned previously, is that with every POC, they are assigned --

Page 155

during the break so that we can review -- there's -- there's lunch -- that would be great.

Let's go off the record.

THE VIDEOGRAPHER:  Going off the record at 12:35 p.m.

(Short recess taken.)

THE VIDEOGRAPHER:  We are going back on the record at 12:39 p.m.

BY MS. GITOMER:

Q    Okay.  Ms. Clay, since the RIF, ha- -- has the department done anything to measure how IES is meeting its statutory functions?

A    I don't believe that, um, they've done anything specifically to measure how IES has met their statutory functions.  Um, but I do know, um, through involvement, um, Matt does regularly meet with the office of the secretary, um, and sometimes I'm involved where they specifically have some discussions about how things are moving forward with IES.

Q    So how are they measuring compliance with the statutory in those discussions?

A    I can only state that in those discussions,

Matt, himself, has made it clear that they are -- again, and I'm going to -- you know, he acknowledged that it's been difficult, um, but they are continuing to meet their statutory functions.  Um, the areas where he asked for assistance, which I talked about, were specifically, um, related to NCES, which they did the detail and, subsequently, the hiring of additional staff, the data scientists.

Q    Was he concerned NCES was not meeting its statutory function?

A    No, he was not concerned that they are not meeting the statutory function, but rather he wanted to make sure that they met the statutory function timely.

Q    Okay.  Um, and when you said -- he said it's been difficult.

What's been difficult?

A    I think the difficulty of losing any staff. The RIF in itself is hard.  Um, so I think that impacted Matt as it did with multiple people, um, going through a RIF and just trying to, again, look at their organization, um, and determining, okay, how do I restructure, recalibrate, um, and support the employees