**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, et al.,** | * | |
| **Plaintiffs,** | * | **Civil Case No.: 8:25-cv-01230 (SAG)** |
| **v.** | * | |
| **U.S. DEPARTMENT OF EDUCATION, et al.,** | * | |
| **Defendants.** | * | |

* * * * * * * * * *

## MEMORANDUM OPINION

This Administrative Procedure Act ("APA") case stems from the Department of Education's efforts to dismantle its Institute of Education Sciences ("IES"). Congress created IES to create, collect, and disseminate research about education in a timely and technologically up-to-date fashion. Previously, IES relied on about 200 staff members and a large number of external contracts to fulfill its various statutory duties. But in early 2025, the new Administration summarily terminated 90% of IES's staff members (the "reduction in force" or the "RIF") and 89 of its outside contracts, leaving IES with few resources to accomplish its statutory directives.

Plaintiffs American Educational Research Association ("AERA") and Society for Research on Educational Effectiveness ("SREE"), two organizations of education researchers, filed this lawsuit seeking APA review of what they call the "Actions"—that is, the RIF and contract cancellations—arguing, among other things, that the Actions were either contrary to law or arbitrary and capricious. ECF 1 ¶¶ 157–65. Plaintiffs name the Department of Education, IES, the Secretary of Education Linda McMahon (the "Secretary") in her official capacity, and the Acting

Director of IES Matthew Soldner in his official capacity as defendants (collectively, the "Government"). *Id.* ¶¶ 34–39.

Pending before this Court are the parties' cross-motions for summary judgment on Plaintiffs' APA claims. ECF 75 (Plaintiffs' motion), ECF 79 (Government's cross-motion). Both sides have filed responses, ECF 79 (Government's response), ECF 83 (Plaintiffs' response), and replies, ECF 83 (Plaintiffs' reply), ECF 86 (Government's reply). On November 10, 2026, this Court held a hearing on both motions. ECF 92. For the reasons that follow, this Court will deny Plaintiffs' motion for summary judgment, ECF 75, and grant the Government's cross-motion for summary judgment, ECF 79.

## I. BACKGROUND

### A. Procedural History

Plaintiffs AERA and SREE initiated this action on April 14, 2025, seeking APA review of the Government's Actions. ECF 1. Originally, in its Complaint, Plaintiffs requested that this Court (1) declare both Actions unlawful, (2) order the Government to reinstate or re-bid the relevant cancelled contracts, (3) order the Government to preserve data from the cancelled contracts, (4) vacate the RIF action, (5) order the Government to place individuals designated for termination "back in their roles necessary to carry out IES functions," and (6) award Plaintiffs costs and fees. *Id.* at 46–47.

On June 12, 2025, this Court denied Plaintiffs' requests for preliminary relief and noted its concerns with Plaintiffs' standing and the breadth of relief they requested. ECF 49 at 1–2. This Court noted, however, that its decision was "based on a limited and quickly evolving record," *id.*

at 3, and thus ordered expedited discovery to better inform the merits of the case, *id.* at 13.[1] *See* ECF 60 (limiting each party to eight interrogatories, six requests for admission, four requests for production, and two depositions).

With discovery complete, the parties have now cross-motioned for summary judgment. ECF 75, 79. At summary judgment, Plaintiffs assert a single claim: that the Government's two Actions violated the APA, 5 U.S.C. § 706(2)(A)–(D).[2] ECF 1 ¶¶ 157–65. As to their relief, Plaintiffs no longer ask this Court for an order to reinstate the contracts or employees that were terminated by the Actions or to preserve data from the cancelled contracts. Instead, Plaintiffs request only an order from this Court (1) vacating the Actions pursuant to APA § 706(2), and (2) ordering the Government to "take steps to return to the operational status quo prior to the Actions, including by restoring the capacity of IES to carry out its functions at the level, and of the nature, as it did prior to the Termination Actions." ECF 75-2 (Plaintiffs' proposed order).

**B. About IES**

Congress created IES in 2002 to serve as the research arm of the Department of Education. The agency's authorizing statute provides:

> **(1) In general** The mission of the Institute is to provide national leadership in expanding fundamental knowledge and understanding of education from early

[1] The 38-page Administrative Record and other extra-record discovery materials have been filed as exhibits to Plaintiffs' Motion for Summary Judgment at ECF 76-1 through ECF 76-22. For all pincites other than paragraph pincites and deposition transcripts, ECF cites used herein refer to the ECF pagination in the header at the top of each page and not to any other pagination on the documents.

[2] Plaintiffs' Complaint also asserted a constitutional *ultra vires* claim against the Government. ECF 1 ¶¶ 166–72. Because Plaintiffs do not advance or defend that claim at summary judgment, the Court considers Plaintiffs to have abandoned the claim. *See, e.g.*, *Tartaro-mcGowan v. Inova Home Health, LLC*, No. 21-cv-298, 2022 WL 2232190, at *3 (E.D. Va. June 21, 2022) ("Generally, a party abandons claims when she fails to defend them in opposition to a motion for summary judgment.") (collecting cases), *aff'd*, 91 F.4th 158 (4th Cir. 2024).

> childhood through postsecondary study, in order to provide parents, educators, students, researchers, policymakers, and the general public with reliable information about—
>
> > **(A)** the condition and progress of education in the United States, including early childhood education and special education;
> > **(B)** educational practices that support learning and improve academic achievement and access to educational opportunities for all students; and
> > **(C)** the effectiveness of Federal and other education programs.

20 U.S.C. § 9511(b). To carry out this mission, Congress directs IES to "compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need[.]" *Id.* § 9511(b)(2). Each of these activities must "conform to the highest standards of quality, integrity, and accuracy[.]" *Id.* § 9511(b)(2)(A).

IES contains four centers, each created by Congress, that carry out unique missions. *Id.* § 9511(c)(3)(A)–(D). The National Center for Education Research ("NCER") "promotes research aimed at better understanding how to improve education across the country for all kinds of learners." *Nat'l Ctr. for Learning Disabilities v. Off. Mgmt. & Budget*, Civ. No. 26-13019, 2026 WL 2754447, at *2 (D. Mass. Sept. 17, 2026) (citing 20 U.S.C. § 9531). The National Center for Education Statistics ("NCES") "collect[s], analyze[s], and report[s] education information and statistics in a manner that[] . . . is relevant and useful to practitioners, researchers, policymakers, and the public." 20 U.S.C. § 9541(b). The National Center for Education Evaluation and Regional Assistance ("NCEE") evaluates Federal educational programs, provides training and technical assistance, and supports the synthesis and dissemination of education research. *Id.* § 9561. Finally, the National Center for Special Education Research ("NCSER") "sponsor[s] research to expand knowledge and understanding of the needs of infants, toddlers, and children with disabilities . . . [and] sponsor[s] research to improve services provided under, and support the implementation of, the Individuals with Disabilities Education Act[.]" *Id.* § 9567.

Throughout IES's authorizing statute, Congress instructs the agency and its centers to disseminate research, statistics, evaluations, and publications in a timely manner.[3] *See, e.g.*, *id.* § 9512(2) (stating IES "shall . . . widely disseminate the findings and results of scientifically valid research in education"); *id.* § 9533(a)(7) (stating NCER "shall . . . synthesize and disseminate, through [NCEE], the findings and results of education research conducted or supported by [NCER]."); *id.* § 9575(2) (ordering the IES Director to make "customer service a priority" by "[d]isseminating information in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public"). Congress also instructs that IES "shall," among other things, "conduct[] longitudinal and special data collections necessary to report on the condition and progress of education," *id.* § 9543(a)(7), and "establish a peer review system . . . for reviewing and evaluating all applications for grants and cooperative agreements that exceed $100,000," *id.* § 9534(b)(1).

Historically, IES has relied on a mix of full-time employees and contractor support to complete its varied duties. *See, e.g.*, ECF 76-3 at 55:23–56:6 (disclosure review "largely conducted by contractors" managed by IES staff); *id.* at 137:19–23 (peer review process handled "jointly by IES staff and contractors."); *id.* at 35:1–36:23 (IES's research clearinghouse supported by both IES staff and contractors). Prior to the Actions, IES hovered at around 200 full-time employees. *See* ECF 76-5 at 55:1–4.

---

[3] "Dissemination" is statutorily defined as: "the communication and transfer of the results of scientifically valid research, statistics, and evaluations, in forms that are understandable, easily accessible, and usable, or adaptable for use in, the improvement of educational practice by teachers, administrators, librarians, other practitioners, researchers, parents, policymakers, and the public, through technical assistance, publications, electronic transfer, and other means." 20 U.S.C. § 9501(10).

**C. The Contract Termination Action**

At 11:06 P.M. on Thursday, February 6, 2025, Jonathan Bettis, the Deputy Director for Administration and Policy at IES, emailed his teammates, informing them that he had learned that the Department of Education's Office of the Secretary had commenced a review of IES's contracts. ECF 76-21 at 3.[4] Bettis "d[id] not know the purpose of the review other than [that] [IES] ha[d] been asked to describe the work underway" at the agency. *Id.* Bettis requested that his team evaluate the contract list the Secretary's Office had sent him, provide a detailed description of each contract listed, and attempt to connect each contract to a specific statutory mission. *Id.* at 2–3. Bettis further instructed: "Please assume that our work is being reviewed for its statutory necessity and mission criticality." *Id.* at 3. Because Bettis had "just found out" that a team would be gathering to review the contract list at 10 A.M. on Friday, February 7, he requested that his team complete their review within eleven hours by 9:50 A.M. the next morning. *Id.*

The next day at 4:04 P.M., Richard Lucas, the Director of the Office of Finance and Operations, emailed a summary of the contracts that were reviewed at the February 7 meeting[5] to Conor Fennessy of the Secretary's Office. ECF 76-6 at 4. Eleven minutes later, at 4:15 P.M., Mr. Fennessy replied, stating that Mr. Lucas "[could] simply send to Chris for termination to begin." *Id.* In accordance with Mr. Fennessy's request, on Monday, February 10, Mr. Lucas ordered Chris Rosier, Executive Director of Contracting Activity, and his team to terminate 89 IES contracts. ECF 76-6 at 18; ECF 75-20 (cataloging the contracts to be cancelled); ECF 76-1 at 6 (Government

---

[4] Jonathan Bettis' February 6 email states that "OS" kicked off the contract review. ECF 76-21 at 3. "OS" refers to the Office of the Secretary at the Department of Education. ECF 76-3 at 106:18–19.

[5] Presumably, the 10 A.M. contract review meeting on Friday, February 7 proceeded as intended, however, no minutes from the meeting are in the administrative record.

admission that Richard Lucas "ordered, or communicated an order," to execute the cancellation of IES contracts on February 10, 2025). The individual contract cancellations began the same day. ECF 76-6 at 18.

Even after supplementing the administrative record with extra-record discovery, it is unclear how much consideration each of the 89 IES contracts received before Richard Lucas issued the termination order on February 10, 2025. In his deposition, Chris Rosier, one of the employees responsible for terminating the contracts, stated that leadership evaluated the contracts to determine if they were "mission critical or [a] statutorily required operational backbone." ECF 76-4 at 107:1–108:19. However, Rosier did not know what deliverables Mr. Lucas, Mr. Fennessy, or others in leadership examined within the contracts, whether those leaders considered data from the Contractor Performance Assessment Reporting System ("CPARS") when making their termination decisions, *id.* at 119:6–19, or whether leadership even looked at "each [contract] individually," *id.* at 21:11–21. No minutes were recorded for the meetings where agency leadership reviewed the contracts and determined which ones to terminate. *Id.* at 197:5–198:3.

As a result of the contract cancellations, numerous multi-year studies were halted, including the ECLS-K Early Childhood Longitudinal Study, the High School and Beyond Longitudinal Study, the National Postsecondary Student Aid Study, and the Multi-Tiered Systems of Support Study, which evaluated reading interventions. ECF 75-20 at 5, 6, 10, 15 (Defendants' descriptions of cancelled contracts). Some of these halted multi-year studies were nearing completion when they were cancelled. *See, e.g.*, ECF 76-3 at 101:20–102:5; ECF 76-14 at 2–3 (explaining that for one 7-year study, approximately $3 million of a $3.6 million contract had already been spent, with "only analysis and report writing left to be done."). As the Government admits, "mistakes were made" when cancelling the contracts and some ended up needing to be

reinstated to carry out the agency's mission. ECF 76-4 at 151:9–22. For example, on February 13, 2025, just a few days after the cancellations, Jonathan Bettis emailed Chris Rosier and his team, requesting that sixteen terminated contracts that "support and have historically supported required data collections" be revived to avoid "disupt[ing] core agency functions." ECF 76-10 at 2–5.

**D. The RIF Action**

In March 2025, one month after the large-scale contract terminations, "[a]pproximately 90 percent" of IES was subjected to a Department-wide RIF that reduced IES from approximately 200 employees to around 20. ECF 76-5 at 21:15–22:2, 55:1–4, 126:10–15; ECF 76-20 at 2.

Leading up to the RIF, in mid-February 2025, Acting IES Director Matthew Soldner submitted a spreadsheet—that the Secretary's Office had requested—detailing the number of full-time employee equivalents ("FTE" or "FTEs") needed for IES to satisfy its statutory duties. ECF 76-5 at 41:22–44:10, 103:9–104:22; ECF 76-3 at 146:7–147:15. To do so, Soldner's submission broke IES down by component and listed the workstreams that were required under IES's authorizing statutes. *See* ECF 76-22 at 92–100. The spreadsheet then estimated the number of FTEs required to carry out each workstream. *See id.* For example, Soldner determined that NCER required one FTE to perform "[d]aily oversight of sustained sponsor research in [the] mandated research topic of teacher quality" pursuant to Section 133(c)(2)(J) of the Education Sciences Reform Act. ECF 76-22 at 94; *see also* 20 U.S.C. § 9533(c)(2)(J) (requiring NCER to support "Teacher quality" research "through national research and development centers or through other means"). In total, Soldner estimated that IES required 166 FTEs to accomplish its varied statutory mandates. ECF 76-22 at 100.

Although the exact date is unclear from the record, in February or March 2025, leadership from the Secretary's Office and the Department of Government Efficiency ("DOGE") met to determine the final scope of the RIF that would take place at IES. ECF 76-5 at 47:16–48:14, 101:5–

14. As with the meetings that precipitated the contract termination Action, no minutes were created for the RIF meeting. The Government asserts that, at the RIF meeting, agency leadership made determinations of whether particular sections of IES were necessary to carry out the agency's statutory functions. *Id.* at 97:14–100:19. However, no record of those determinations was recorded, *id.* at 99:16–18, 100:11–14, and the Government cannot confirm that it evaluated "*each* statutory requirement" that IES was subject to when making its RIF determinations, *id.* at 101:5–14 (emphasis added).

In a significant departure from Soldner's estimate that IES required 166 FTEs to carry out its statutory duties, decisionmakers at the RIF meeting determined that the agency required only 20 FTEs. *Id.* at 143:7–18. Although Soldner's detailed spreadsheet was submitted to the Secretary's Office prior to the RIF meeting, it is unclear from the record how or even whether it was considered by the Government in the RIF decisionmaking process. *Id.* at 41:7–43:2. Seemingly, the only record memorializing the decision at the RIF meeting to terminate approximately 180 employees was a one-page organizational chart that used red highlighting to indicate which sections of IES would be eliminated. *See* ECF 76-6 at 39; ECF 76-5 at 47:4–48:3 (explaining that the red highlighting indicates which offices were subject to the RIF).

On April 10, 2025, the RIF took effect and reduced IES from approximately 200 employees to around 20. ECF 76-5 at 21:15–22:2, 55:1–4, 126:10–15. NCES was reduced to three employees, ECF 76-3 at 161:3–6, NCEE was reduced to one employee, *id.* at 161:7–8, and NCER was reduced to one employee, *id.* at 161:9–13. Notably, the lone employee left in NCEE, Matthew Soldner, also served simultaneously as the Acting Director of IES. *Id.* at 77:4–19.

**E. The Effects of the Actions**

Since the contract termination and RIF Actions, IES's capacity has decreased. Before the Actions, IES conducted several longitudinal studies, including the National Teacher and Principal

Study and the ECLS-K Early Childhood Longitudinal Study. ECF 76-3 at 28:24–29:4. After the Actions, no specific longitudinal studies are being conducted, ECF 76-2 at 8; ECF 76-3 at 131:19–22, although the agency continues to work on “longitudinal study activities,” *id.* at 132:8–12. The number of evaluations performed by IES has also declined from approximately 50 to “around a dozen.” *Id.* at 131:4–18. The pace of IES peer review, meanwhile, has “slowe[d] . . . but not dramatically so.” *Id.* at 169:10–15. Similarly, IES now disseminates research and data at a slower cadence. *Id.* at 133:5–10. In the past year, Plaintiffs have also experienced difficulties and delays in receiving (1) access to restricted-use data that IES stewards, (2) disclosure review for pre-publication research that contains restricted-use data that IES must approve, and (3) technical assistance, expertise, and support from the agency. *See* ECF 75-1 at 32–39 (cataloging Plaintiffs’ difficulties receiving service from IES following the Actions).

**F. About Plaintiffs**

Plaintiffs AERA and SREE are both membership organizations. AERA has approximately 25,000 members, “most of whom are education researchers,” including “university faculty, researchers, statisticians, data scientists, graduate students preparing for such careers, and other professionals with expertise in education research.” ECF 75-7 ¶ 5. Meanwhile, SREE has approximately a thousand members, including “researchers, practitioners, policymakers, and students with an interest in advancing education research to address challenges in education.” ECF 75-6 ¶ 5. Both organizations are dedicated to advancing educational research, *see* ECF 75-7 ¶ 4; ECF 75-6 ¶ 4, and have benefitted greatly from IES’s work in the past, including the agency’s original education research, its technical support for researchers evaluating complex datasets, and the peer-review process it offered for research proposals. *See* ECF 75-1 at 15–18 (cataloging the research and technical support that IES previously provided to Plaintiffs’ members).

Both Plaintiff organizations attribute harm to the Government's throttling of IES through the Actions. For example, because of the new difficulties with accessing IES's restricted-use datasets, AERA has had to spend less time disseminating education research and showcasing the work of its members and more time "issuing researcher guidance on navigating interrupted data systems." ECF 75-21 ¶¶ 21–25. AERA has similarly needed to shift time and resources toward helping graduate programs develop contingency plans for dissertations that once depended on federal studies and restricted-use datasets that are no longer reliably accessed. *Id.* ¶¶ 26–27, 35. Further, AERA has had to refocus its professional training program from substantive material toward navigating the reshaped federal funding landscape and "helping early-career researchers swim against the tide to advance professionally." *Id.* ¶¶ 39–43.

SREE meanwhile asserts that the Actions have significantly disrupted the research ecosystem that education researchers once depended on, leading many education researchers to lose their jobs or refocus their research towards other topics. ECF 75-22 ¶ 5–6. As a result of the industry tumult, SREE has seen decreased attendance at its annual conference (with a commensurate loss in revenue), *id.* ¶¶ 17–20, and has lost sponsorships and philanthropic support from donors who redirected their funds to support researchers whose studies were impacted by the Actions, *id.* ¶¶ 31–32. Due to the decreased revenue, SREE has allocated more staff time toward fundraising, decreased its staff from three to two employees, and terminated a long-standing contractor. *Id.* ¶¶ 20, 22, 34.

Individual members of the Plaintiff organizations also attribute harm to the Actions. First, members assert informational harms from the now-limited access to IES's restricted-use datasets which has frustrated research projects, and from the decreased output of IES evaluations and longitudinal studies which deprives members of "the flow of timely, updated research to use in

their work." ECF 75-1 at 46. As noted by members, many of the national-scale studies that IES once performed cannot be reproduced by independent researchers. ECF 75-4 ¶ 12. As for non-informational harms, members assert that they have been "unable to conduct the research they had planned, publish their work, and advance their careers" because of the degradation of IES's peer review, technical assistance, and disclosure review programs. ECF 83 at 15.

To redress their injuries, the Plaintiff organizations and their individual members seek APA vacatur of the Actions to "require IES to restore the capacity and achieve the output that it eliminated pursuant to the Actions." ECF 75-1 at 69.

## II. STANDING

The Constitution limits the judicial power of Article III courts to "Cases" or "Controversies." U.S. Const. Art. III, § 2, cl. 1. The doctrine of standing, among others, implements this Constitutional limit. *Carney v. Adams*, 592 U.S. 53, 58 (2020). Where a plaintiff lacks standing, "there is no case or controversy for the federal court to resolve." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019) (Barrett, J.)).

As the Fourth Circuit recently explained:

> Standing doctrine "is built on a single basic idea—the idea of separation of powers." *Allen v. Wright*, 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (The "central mechanism of separation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts."). Accordingly, Article III standing prohibits federal courts from "exercis[ing] general legal oversight of the Legislative and Executive Branches, or of private entities," and prevents federal courts from becoming "roving commission[s] to publicly opine on every legal question." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021).

*Sheppheard v. Morrisey*, 143 F.4th 232, 242 (4th Cir. 2025); *see also Maryland v. U.S. Dep't of Agric.*, 151 F.4th 197, 208 (4th Cir. 2025) ("Article III standing is an integral component of our nation's system of checks and balances and a key mechanism of judicial restraint.").

To establish standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). Plaintiffs bear the burden of proving each element of standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Organizations, like Plaintiffs here, can demonstrate standing in two ways: "either in their own right or as a representative of their members." *Md. Election Integrity, LLC v. Md. State Bd. of Elections*, 127 F.4th 534, 538 (4th Cir. 2025) (internal quotation marks and alterations omitted). Either way, the organization must satisfy the familiar elements of injury-in-fact, causation, and redressability to establish Article III standing. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982) ("In determining whether [an organizational plaintiff] has standing under the Fair Housing Act, we conduct the same inquiry as in the case of an individual.").

This Court starts its analysis of Plaintiffs' standing by turning to the redressability requirement. The redressability requirement ensures (1) that the court has the power to grant the plaintiff's requested relief, and (2) that such relief would remedy the plaintiff's injury. *See Buscemi v. Bell*, 964 F.3d 252, 259 (4th Cir. 2020). An injury is not redressable if the court is "powerless to provide the very relief" the plaintiff requests or if the requested relief would not do anything to remedy the plaintiff's injury. *Id.* (quoting *K.C. ex rel. Africa H. v. Shipman*, 716 F.3d 107, 116–17

(4th Cir. 2013)); *cf. Massachusetts v. EPA*, 549 U.S. 497, 525 (2007) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself." (quoting *Larson v. Valente*, 456 U.S. 228, 244 n.15 (1982)).

As discussed above, Plaintiffs' alleged injuries flow from IES's decreased capacity to conduct research, disseminate research, and provide research support services, as well as from the broader tumult that IES's abrupt downsizing has created in the educational research sector. ECF 83 at 20 ("Plaintiffs' members are suffering because IES, through its Termination Actions, dramatically scaled back or abandoned entirely the functions those members used to rely on the agency to perform."). Keeping these alleged injuries in mind, and assuming they are cognizable, this Court considers whether the relief requested by Plaintiffs would remedy their injuries. *See Sheppheard*, 143 F.4th at 245 ("In determining whether the court has the power to grant [the] requested relief, the court first reviews the relief requested." (internal quotation marks and citation omitted)). For the reasons discussed below, Plaintiffs have not demonstrated redressability because the Court is "powerless to provide the very relief" that Plaintiffs request. *Buscemi*, 964 F.3d at 259.

In this case, Plaintiffs seek an order (1) vacating the Actions and (2) directing the Government to "take steps to return to the operational status quo prior to the Actions, including by restoring the capacity of IES to carry out its functions at the level, and of the nature, as it did prior to the Termination Actions." ECF 75-2 at 1–2. As the Plaintiffs conceive it, these two orders are interconnected; that is, because "vacatur restores the status quo before the invalid [action] took effect," an order vacating the Actions would necessarily authorize this Court to order IES to "take steps" to restore itself to its pre-Action capacity. ECF 75-1 at 69 (quoting *Env't Def. v. Leavitt*,

329 F. Supp. 2d 55, 64 (D.D.C. 2004)). Through APA vacatur alone, then, Plaintiffs suggest this Court could *require* the Government to do all of the following:

> (1) reconstitute a workforce sufficient—in number, expertise, and experience—to support pre-Termination Action functions, including (but not limited to) peer review grant-making, providing technical assistance and expert guidance, maintaining timely access to restricted-use data access, timely processing of disclosure risk review requests, fostering collaboration among scholars through a variety of media and means, and facilitating publication and widespread dissemination of research; (2) provide all supports needed, through contracts or otherwise, to resume the scope and quality of data collection and research that was interrupted by the Actions, including longitudinal studies, evaluations, data collection of core data sets, and grant supported research previously conducted. This would necessarily entail spending all funds that Congress appropriated for IES functions before they expire, as IES had in years prior.

ECF 75-1 at 70. With IES taking these steps to rebuild itself, Plaintiffs assert they will be "substantially more likely to get what they need from the agency," thus redressing their injuries. ECF 83 at 20.

But Plaintiffs' conception of APA vacatur, and thus their demonstration of redressability, suffers from two significant defects. First, Plaintiffs expressly disclaim the more straightforward path by which vacatur of the Actions *could* redress their injuries; namely, by requiring the Government to reinstate the contracts and employees that were terminated pursuant to the Actions. Second, Plaintiffs' preferred form of APA vacatur—a broad order from this Court requiring IES to reconstitute itself and restore its service levels—would entail pervasive court oversight of IES's day-to-day management which this Court is "powerless" to provide. *Buscemi*, 964 F.3d at 259 (internal quotation marks omitted).

**A. Vacatur of the Actions Would Require Reinstatement of the Terminated Contracts or Employees**

Vacatur is the standard remedy for claims under APA § 706(2). "When a federal court sets aside an agency action" pursuant to APA § 706(2), "the federal court vacates that [action]—in much the same way that an appellate court vacates the judgment of a trial court." *Corner Post, Inc.*

*v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 830 (2024) (Kavanaugh, J., concurring); *see id.* at 829 (noting that "[w]hen Congress enacted the APA in 1946, the phrase 'set aside' meant 'cancel, annul, or revoke.'" (quoting Black's Law Dictionary 1612 (3d ed. 1933))). As Plaintiffs correctly note, vacatur of an agency action "restores the status quo before the invalid [action] took effect[.]" ECF 75-1 at 69 (quoting *Env't Def. v. Leavitt*, 329 F. Supp. 2d 55, 64 (D.D.C. 2004)). Thus, when an agency rule is vacated, "the invalid rule [is] eliminated and replaced by any preexisting rule it had superseded." *D.A.M. v. Barr*, 486 F. Supp. 3d 404, 415–16 (D.D.C. 2020) (emphasis in original); *see also Env't Def.*, 329 F. Supp. 2d at 64 (vacatur of EPA rules restored the prior absence of such rules). And when an agency order is vacated, the order is considered annulled, and further actions cannot be taken pursuant to its authority. *See Standing Rock Sioux Tribe v. U.S. Army Corps. of Eng'rs*, 985 F.3d 1032, 1053–54 (D.C. Cir. 2021) (collecting cases).

As applied here, vacating (*i.e.*, cancelling, annulling, or revoking) the Government's *decisions* to terminate the 89 contracts and 90% of IES's staff would restore the status quo by reinstating those terminated contracts and employees. *C.f. Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S.Ct. 2658, 2664 (Gorsuch, J., concurring in part and dissenting in part) ("[a]n order vacating the government's *decision* to terminate grants under the APA is in every meaningful sense an order requiring the government to pay those grants.") (emphasis added). That remedy, if granted, could very well redress Plaintiffs' injuries by restoring IES to its former capacity. However—perhaps wary of triggering the exclusive jurisdiction of the Tucker Act or the Civil Service Reform Act or perhaps understanding the difficulties inherent to reinstating specific

contracts and employees that were terminated over a year ago[6]—Plaintiffs expressly state that they do not "seek reinstatement of specific contracts or rehiring of specific employees." *See* ECF 75-1 at 70. Instead, Plaintiffs seek to restore the status quo through a much more flexible vacatur order, whereby the Government would "resume pre-Action status-quo operations through *any* combination of reassigning existing employees, hiring new ones, or contracting out duties to new contractors." ECF 83 at 42 (emphasis added).

The Government argues that Plaintiffs' conception of APA vacatur is incorrect and that vacating the RIF or contract termination Actions "would by necessity" reinstate the specific employees and contracts terminated by those Actions—the very outcome Plaintiffs disclaim. ECF 79 at 44, 50–51. In response, Plaintiffs lean on language in Justice Barrett's controlling concurrence[7] in *National Institutes of Health*. 145 S.Ct. at 2661. But Justice Barrett's concurrence does not help Plaintiffs. In that case, the National Institutes of Health (NIH) issued internal guidance documents explaining that the agency would no longer fund research relating to DEI objectives, gender identity, or COVID-19. *Id.* NIH then, in a separate set of actions, "issued numerous decisions terminating existing grants" in accordance with those guidance documents. *Id.* In her concurrence, Justice Barrett explained that the plaintiffs' APA challenge to NIH's

[6] At the preliminary injunction hearing, Plaintiffs' counsel acknowledged the practical difficulties with reinstating terminated employees: "after [IES employees] are definitely terminated and they're finding other employment, we won't be able to remedy those irreparable harms . . . months down the road." ECF 34 at 57:1–6; *see also id.* (stating that once "employees [are] finally separated" from IES, it "dramatically increase[es] the likelihood that Humpty Dumpty can't be put back together again.").

[7] *Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented [Supreme] Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" (omission in original) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976))).

guidance documents was "legally distinct" from their challenge to the grant terminations done pursuant to that guidance, and that an order "[v]acating the guidance [would] not reinstate [the] terminated grants." *Id.*

Here, unlike the plaintiffs in *National Institutes of Health*, Plaintiffs do not ask this Court to vacate a guidance, rule, or other final agency action that is upstream of the Government's ultimate decisions to terminate the 89 contracts and 90% of IES's employees. Instead, Plaintiffs directly challenge the Government's final decisions to cancel the contracts and terminate the employees *en masse*. *See* ECF 75-1 at 58. Because Plaintiffs challenge the actual termination decisions and not any upstream agency action, an order from this Court "vacating the government's decision to terminate [the contracts or employees] under the APA [would be] in every meaningful sense an order requiring the government to [reinstate those contracts and employees]." *Nat'l Insts. of Health*, 145 S.Ct. at 2664 (Gorsuch, J., concurring in part and dissenting in part). That, in turn, would raise significant feasibility issues with redressing Plaintiffs' injuries and potentially trigger the exclusive jurisdiction of the Tucker Act and Civil Service Reform Act. *See Sustainability Inst. v. Trump*, 165 F.4th 817, 828 (4th Cir. 2026).

But for the purposes of analyzing Plaintiffs' standing, this Court need not determine whether reinstatement of the terminated contracts or employees would trigger the Tucker Act or Civil Service Reform Act because Plaintiffs themselves foreclose that construction of APA vacatur and therefore reject that avenue for demonstrating redressability. As explained below, however, even Plaintiffs' preferred construction of APA vacatur fails to demonstrate redressability.

**B. This Court Cannot Grant Plaintiffs' Requested Form of Vacatur**

It is axiomatic that parties "cannot seek *wholesale* improvement of [an agency] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Norton v. S. Utah Wilderness All. (SUWA)*, 542

U.S. 55, 64 (2004) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)). Accordingly, when courts tailor APA relief, they must refrain from entering general orders that executive agencies comply with broad statutory mandates, lest they entangle themselves "in abstract policy disagreements which [they] lack both expertise and information to resolve." *Id.* at 67; *see also City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 432 (4th Cir. 2019). As the Supreme Court explained in *SUWA*:

> If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with [] broad statutory mandate[s], injecting the judge into day-to-day agency management. . . .
>
> [This] prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA.

542 U.S. at 67.

By asking this Court to define the "operational status quo" that IES achieved pre-Action and then determine when IES performed the proper "combination of reassigning existing employees, hiring new ones, or contracting out duties to new contractors" to achieve that status quo, ECF 83 at 42, Plaintiffs seek the exact type of programmatic management disallowed by *SUWA*. Indeed, to determine if the Government adequately complied with Plaintiffs' requested vacatur order, this Court would need to identify and monitor at least the following metrics at IES: (1) the "scope and quality" of data collection and research being performed, (2) the "number, expertise, and experience" of the reconstituted workforce, (3) the timeliness of responses to restricted-use data and disclosure risk review requests, and (4) the amount of "collaboration among scholars" fostered "through a variety of media and means." *See* ECF 75-1 at 70 (Plaintiffs' description of its requested remedy). But without discrete and measurable statutory standards to

guide this Court's supervision of these metrics, this supervision would clearly constitute the type of "pervasive oversight by federal courts over the manner and pace of agency compliance with [broad] congressional directives" that the APA precludes.[8] *SUWA*, 542 at 67.

To be sure, the APA does authorize parties to compel the government to accomplish statutory mandates in certain circumstances; however, those claims are properly brought under APA § 706(1) and are strictly limited to compelling "*discrete* agency action[s] that [the agency] is *required to take*." *Id.* at 64 (emphasis in original). Beyond IES's more general decline in overall capacity, Plaintiffs identify only three specific statutory mandates that IES assertedly now fails to perform entirely—its duty to conduct longitudinal studies, its duty to make data usable by researchers, and its duty to conduct peer review.[9] However, Plaintiffs argue that these three failures to act are "contrary to law" under APA § 706(2), not that they are actions unlawfully withheld under APA § 706(1). This Court cannot grant relief on claims and legal theories that Plaintiffs did not pursue. *Cf. Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985) (holding that even with pro se plaintiffs, courts may not rewrite a complaint to include claims that were never presented and arguments that were never made). As such, this Court is powerless to order the APA

---

[8] It is also doubtful that this Court could enter such a detailed order as Plaintiffs seek without going through the traditional four-factor test for issuing an injunction—an analysis which neither party has briefed. *See Standing Rock Sioux Tribe v. U.S. Army Corps. of Eng'rs*, 985 F.3d 1032, 1054 (D.C. Cir. 2021) ("If a district court could, in every case, effectively enjoin agency action simply by recharacterizing its injunction as a necessary consequence of vacatur, that would circumvent the Supreme Court's instruction in *Monsanto* that 'a court must determine that an injunction *should* issue under the traditional four-factor test.'" (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139. 158 (2010))).

[9] Plaintiffs assert the Government's failure to perform certain duties is "contrary to" 20 U.S.C. § 9543 (failure to conduct longitudinal studies), 20 U.S.C. §§ 9573, 9574, 9575 (failure to make existing data usable by researchers), and 20 U.S.C. §§ 9534(b)(1), 9520 (failure to conduct peer-review process). *See* ECF 75-1 at 68–69.

relief that Plaintiffs request, and Plaintiffs have failed to meet their burden to demonstrate redressability.

Plaintiffs' citations to cases where other district courts have entered broad remedial orders to effectuate APA vacatur do not change this Court's conclusion. Plaintiffs first cite to *Child Trends, Inc. v. U.S. Dep't of Educ.*, 795 F. Supp. 3d 700 (D. Md. 2025). In *Child Trends*, the court vacated the Department of Education's decision to close all of its Regional Educational Laboratories (RELs) and all but two of its Comprehensive Centers and, to effectuate that vacatur, directed the plaintiffs and the Department of Education to "confer on the most workable option" for restoring the two programs. *See id.* at 730–32. But there, the plaintiffs had identified clear statutory minimums for the number of Comprehensive Centers and RELs that the Department of Education was required to operate, twenty and ten respectively. *See id.* at 708–709 (citing 20 U.S.C. §§ 9564(a), 9602(a)(1)). By contrast, Plaintiffs here have not identified statutory numerical thresholds for the volume or pace of peer review, disclosure review, research dissemination, or other services that IES must perform, and instead have left that threshold-setting task to this Court. As explained above, this Court is neither authorized nor competent to draw those lines.

Plaintiffs' comparison to *Widakuswara* also fails to move the needle. *See* ECF 75 at 70 (citing *Widakuswara, et al. v. Lake, et al.*, Case No. 25-cv-1015 (D.D.C. Mar. 17, 2026)). In that case, the district court ordered a government agency to file a "Reconstitution Plan" after it vacated the agency's unlawful decisions to place some employees on administrative leave and send other employees RIF notices. *See* Order at 8, *Widakuswara, et al. v. Lake, et al.*, Case No. 25-cv-1015 (D.D.C. Mar. 17, 2026), ECF 228. Plaintiffs suggest this Court can similarly order IES to file a reconstitution plan as part of vacatur, whereby IES would detail its plan to achieve the pre-Action status quo through some "combination of reassigning existing employees, hiring new ones, or

contracting out duties to new contractors." ECF 83 at 42 (emphasis added). However, asking the Government rather than the Court to devise a reconstitution plan does not resolve the central flaw in Plaintiffs' requested remedy—the lack of discrete statutory standards to measure the Government's compliance against. Again, without discrete statutory mandates to guide its analysis, this Court would lack the competency and authority to determine whether the Government's proposed reconstitution plan would do enough to restore IES's capacity to perform its varied statutory mandates.[10]

Certainly, the record in this case (or the notable lack thereof)[11] demonstrates that the Government's decisions to terminate 89 of IES's contracts and 90% of its staff has severely

---

[10] Plaintiffs' comparison to *Widakuswara* also omits that the plaintiffs in that case sought the admittedly broad but well-defined remedy that Plaintiffs disclaim in this case—an order that the agency "offer[] the opportunity to return to work" to "[a]ll employees" placed on administrative leave and rescind "all outstanding [RIF] notices." *See* Pls.' Proposed Order at 2–3, *Widakuswara, et al. v. Lake, et al.*, Case No. 25-cv-1015 (D.D.C. Mar. 17, 2026), ECF 166-5. Thus, as a practical matter, the *Widakuswara* court had much clearer benchmarks than provided here for judging the agency's compliance with its order.

[11] At the summary judgment hearing, the Government conceded at several points that the written record in this case was "sparse." That is an understatement. The Administrative Record produced by the Government comprised only 38 pages—ten documents in total. *See* ECF 76-6. Within that Record, only three documents pertained to the Government's RIF decisionmaking process: an Executive Order and a government-wide memo, neither of which addressed IES specifically; and a one-page organizational chart of IES with red highlighting to indicate which sections would be terminated. *See id.* at 29–39. That one-page organizational chart is the *only* contemporaneous document produced by the Government to explain its decision to terminate approximately 180 civil servants at IES. That is not just a "sparse" written record, that is quite literally a paper-thin one. Even following extra-record discovery, this Court is left struggling to understand exactly how the Government made its determinations that certain contracts and entire sections of IES should be terminated. As noted above, no minutes were recorded at the meetings where the decisionmakers from the Secretary's Office and DOGE actually decided the scope of the two Actions. And although the Government's deponents assert that the relevant decisionmakers made all of their decisions in reference to IES's statutory mandates, the lack of record evidence to support those assertions make them little more than *ipse dixit*.

hampered the agency's capacity to fulfill its various statutory duties. But because Plaintiffs fail to demonstrate that their requested form of relief could redress their injuries, Plaintiffs lack standing to assert their APA claims and summary judgment for the Government is appropriate. *See State of Maryland*, 151 F.4th at 211 (noting that redressability can pose an "independent bar" to standing "even where the defendant has directly injured the plaintiff." (internal quotations omitted)); *see also Morant v. Vaughn*, 2009 WL 6651941, at *4 (E.D. Va. Jan. 8, 2009) (granting summary judgment to defendant where plaintiff lacked standing), *aff'd*, 330 F. App'x 36 (4th Cir. 2009) (unpublished).

## III. CONCLUSION

For the reasons stated above, this Court will deny the Plaintiffs' motion for summary judgment, ECF 75, and grant the Government's cross-motion for summary judgment, ECF 79.

A separate Order follows.

Dated: November 18, 2026

/s/
Stephanie A. Gallagher
United States District Judge